UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ELEANOR SCALLI and ROBERT SCALLI,

Plaintiffs,

v.

CITIZENS FINANCIAL GROUP, INC.,

Defendant.

Civil Action No. 03-12413-DPW

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,
CITIZENS FINANCIAL GROUP, INC.
By its attorneys,

/s/ Anne M. Gaeta _____
Bradford J. Smith (BBO No. 550325)
Anne M. Gaeta (BBO No. 643299)
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

Dated: July 15, 2005

LIBB/1349132.4

## INTRODUCTION

Plaintiffs, who are married, were employed as loan officers for approximately two years by a subsidiary of Citizens Financial Group, Inc., Citizens Mortgage Corporation ("CMC" or the "Company"). Plaintiffs each signed loan officer commission incentive plans (the "Contracts") which describe their compensation, including commission payments they were eligible to receive for originating loans. There is no dispute that Plaintiffs received all payments they were owed under the terms of the Contracts. Plaintiffs allege that they were verbally promised certain payments by their supervisor which are not included in the Contracts. These Contracts provide that all changes to commissions must be in writing approved by the Center Manager and President of CMC and that the Contracts supersede all prior agreements. The Contracts were never changed in writing to reflect the alleged verbal promises.

Loan officers are not permitted to make credit decisions because they are paid on a commission basis (according to the volume of loans originated) and allowing them to make credit decisions would create a conflict of interest. The underwriting and processing departments determine whether a loan is approved or denied. In January 2003, CMC discovered that a loan had been declined by Ms. Scalli's office after it had already been approved by the Company's underwriting department. The Company determined that this loan may have been declined so that the borrower could buy a property that Ms. Scalli or her husband owned. This violated Citizens' Code of Ethics which prohibits even the appearance of a conflict of interest. Therefore, Ms. Scalli's employment was terminated. Mr. Scalli's employment was suspended and ultimately terminated.

Plaintiffs bring six separate claims against Defendant. The first four claims are virtually identical. Plaintiffs claim that they are owed certain compensation that they were promised during their employment with CMC. These claims fail because there is no dispute that Plaintiffs

were paid all monies due to them under their Contracts.  Plaintiffs' mere allegation that they were promised other wages is belied by the fully integrated unambiguous Contracts that they signed and all wage records produced in this matter.  Plaintiffs' other two claims (intentional interference with employment and defamation) are equally without merit.  There is absolutely no evidence that Defendant interfered with their post-CMC employment.  In fact, Plaintiffs both obtained jobs as loan officers shortly after leaving the Company.  Their defamation claim fails to prove that the individual who allegedly defamed them was acting as an agent of the Company. In short, Plaintiffs fail to present any evidence that enables their claims to survive Defendant's summary judgment motion.

<strong>FACTUAL BACKGROUND</strong>

**I.    Citizens Mortgage Corporation Hires the Scallis**

In December 2000, CMC recruited a married couple, Mr. Scalli and Ms. Scalli, to work as loan originators.  Loan originators take loan applications for customers seeking mortgages from CMC.  At the outset of his employment, Mr. Scalli alleges that Barden Conn, a CMC Senior Vice President, verbally promised him a $50,000 salary and a forgivable draw of $1,000 for each $1 million in loans closed after the first $50 million.  Ms. Scalli claims that Mr. Conn verbally promised her a $30,000 advance and .70 basis points[1] on all loans closed over $3 million per month.  She also alleges that he promised her a $1,000 bonus for each $1 million in loans closed per calendar year.  Neither Mr. Scalli nor Ms. Scalli produced any written documentation concerning these alleged promises.[2]  Defendant's Statement of Undisputed

---

[1]  A basis point is one-hundredth of a percentage point.  Therefore, for example, .70 basis points on a mortgage of $500,000 is equal to $3,500.

[2]  In asserting that he was promised a $50,000 salary, Mr. Scalli appears to rely on two human resources documents. First, he points to a new hire form that reflects a pay rate/salary of $65,000.  This new hire form is an internal human resources document that indicates that Mr. Scalli is a commissioned employee.  The salary rate on the new hire form (Continued on next page)

2

Material Facts ("SUMF") at ¶¶ 1-3, 6, 10.

Mr. Scalli and Ms. Scalli each signed loan officer commission incentive plans (the "Contracts").  There is no dispute that the Scallis were compensated for the full amount described in their Contracts.  However, Mr. Scalli's Contract does not include any reference to the compensation Mr. Conn allegedly verbally promised him:  a $50,000 salary and eligibility for a $1,000 bonus for each $1 million in loans closed over $50 million.  In March 2002, Mr. Scalli signed a renewal of his Contract.  His renewal Contract similarly makes no reference to a $50,000 salary or a $1,000 bonus for each $1 million in loans closed over $50 million.  Similarly, Ms. Scalli's Contract makes no reference to the compensation Mr. Conn allegedly verbally promised her:  a $30,000 forgivable draw, .70 basis points on all loans closed over $3 million per month and a $1,000 bonus for each $1 million in loans closed per calendar year.  SUMF at ¶¶ 7-9, 13, 16-17, 29.

The Contracts state (multiple times), that "[a]ny adjustment to commission will require the written approval of your Center Manager and the President of CMC."  The Contracts also state that "CMC reserves the right to change or discontinue the Plan upon 30 days written notice"

---

is $65,000 because this figure was necessary to generate the $15,000 "signing" bonus paid to Mr. Scalli.  This bonus was paid in six installments of $2,500 each over the first six pay periods.  In other words, he was paid at the annual rate of $65,000 over the first six pay periods.  Mr. Scalli's forgivable draw stopped as of May 28, 2001. Significantly, despite the fact that Ms. Scalli makes no claim that Mr. Conn promised her a $50,000 salary, her new hire form also contains a pay rate/salary of $65,000 – evidence that the pay/rate salary figure was merely used to prompt Citizens' payroll system to pay the $15,000 sign on bonus in the same manner to each of them.  Similarly, Mr. Scalli improperly relies on a worksheet used for Citizens' benefits.  This worksheet reflects an employee's "benefit base salary."  The benefit base salary is necessary for determining the amount of certain benefits offered to employees where the amount of the benefit is derived from the employee's salary level (*e.g.*, life insurance).  For commissioned employees who are not paid a salary (like loan officers), Citizens determines the benefit base salary as follows:  the greater of the assigned "market point" for the position or W-2 earnings by the employee for the calendar year prior to the annual benefit enrollment.  The assigned market point for a position is determined by Citizens' review of salaries in the market for the relevant position.  During the period of 2001 through 2003, the assigned market point for a loan officer was $50,000.  Therefore, the benefit base salary for any new loan officer, or loan officer with W-2 earnings below $50,000 for a calendar year, was $50,000.  This benefit base salary is only used for the purpose of determining the amount of certain benefits.  The benefit base salary does not reflect a promise by Citizens to pay a commissioned employee at the rate of the benefit base salary.  The benefit base salary on Robert Scalli's worksheet during his employment was $50,000.  Significantly, Mr. Scalli does not claim that any representative from the Company advised him that he would be paid the amount listed as his benefit base salary. Also, he signed two Contracts which made no reference to a $50,000 salary and during his two years of employment at CMC, he never complained to anyone except Mr. Conn about his alleged unpaid salary.  SUMF at ¶¶ 4-5, 29, 47.

and "[n]o deviations by you are permitted without the express written consent of the appropriate

President of CMC and the Center Manager."  Further, the Contracts "supersede[] all prior

agreements, either verbal or written, with respect to the subject matter."  The Contracts also

make clear that Mr. Scalli and Ms. Scalli were employed as at-will employees:  "You agree that

this Plan does not constitute an employment contract or a guarantee of employment for any

specific length of time and in no way limits CMC's authority to terminate employment at its sole

discretion, with or without cause."  Finally, the Contracts contain an acknowledgement clause:

"By signing below, you acknowledge and agree to be bound by the terms of this [Contract]."

SUMF at ¶¶ 12, 15.

## II.     Plaintiffs' Employment with CMC

When they first started working for CMC, the Scallis reported to Michael Diranian.  At

some point later, Ms. Scalli requested that she report directly to Mr. Conn.  After this change,

Mr. Diranian continued to receive commission payments based on the loans originated by the

Scallis.  Therefore, although Ms. Scalli reported directly to Mr. Conn, this did not impact

Mr. Diranian's compensation.  SUMF at ¶¶ 22, 24.

Mr. Conn requested that all loans originated by Mr. Scalli or Ms. Scalli be put under

Ms. Scalli's name for processing.  Therefore, Mr. Scalli put loans he originated under

Ms. Scalli's production number.  Mr. Scalli originated between ten and twenty percent of the

loans originated under Ms. Scalli's production number.  Ms. Scalli received commission

payments for all loans she originated, as well as, loans originated by Mr. Scalli.  Ms. Scalli was a

top loan officer for CMC.  In 2001, CMC paid Ms. Scalli approximately $242,000.  In 2002, Ms.

Scalli originated loans totaling $65 million and was paid approximately $428,000.  In 2002, Ms.

Scalli originated more loans than any other CMC loan officer.  If loans originated by Mr. Scalli

had not been included in Ms. Scalli's production for 2002, she would have been "neck and neck"

with the loan officer ranked below her for the number one loan officer ranking.  In 2003, for only

about one month of employment Ms. Scalli earned $83,300.  In addition to commission

payments paid to Ms. Scalli, Mr. Scalli was also directly paid $15,746.91 in 2001, $8,154.90 in

2002 and $2,966.10 in 2003 for his employment through March 5, 2003.[3]  SUMF at ¶¶ 21, 23,

25-27.

## III.     Plaintiffs' Termination from Employment

### A.     Code of Ethics and Policy and Procedure Manual

Both Mr. Scalli and Ms. Scalli acknowledged receiving a copy of the Citizens' Code of

Ethics.  At the commencement of their employment, the Scallis agreed to abide by the terms of

the Code of Ethics, which states that "[e]mployees … must avoid situations in which personal

interests conflict with, or appear to conflict with, the interests of Citizens.  A possible conflict of

interest exists whenever employees … or their relatives have an interest in an entity or matter

that may influence a decision or cloud the judgment that they may have to exercise in the

discharge of their responsibilities to Citizens."  Further, "[v]iolations of the Code are considered

serious and may lead to further disciplinary action, up to and including termination of

employment."  SUMF at  ¶¶ 18-19.

The CMC Policy and Procedure Manual states that "[l]oan officers are not authorized to

make credit decisions … If, at any time, you communicate to an applicant that they are either

qualified or not qualified for a loan, you have taken an application and made a credit decision."

---

[3]  During his employment, Mr. Scalli elected family medical and dental benefits through the Company.  Mr. Scalli
paid a portion of these benefits, which was withheld from his pay.  During 2002, because Mr. Scalli was originating
loans under Ms. Scalli's production number, he was not directly receiving commission payments to cover the
employee portion of these benefits.  As a result, beginning in June 2002, the Company paid Mr. Scalli a draw of
$1,000 per month that was deducted from Ms. Scalli's commissions (which included commissions for loans
Mr. Scalli had originated under Ms. Scalli's production number).  SUMF at ¶¶ 5, 25.

All loan originators are responsible for knowing CMC's policies and they have access to the CMC Policy and Procedure Manual on their laptops.  SUMF at ¶ 20.

### B.    Jean Barbosa's Loan Application

Jean Barbosa performed contracting work on properties owned by Mr. Scalli. Mr. Barbosa's loan for a property located at 311 Paris Street in East Boston was originated by the Scallis' office.  Pursuant to the purchase and sale agreement for the Paris Street property, the buyer's deposit of $14,750 would be retained by the seller if the buyer failed to perform his duties under the agreement.  If, however, the buyer's application for a mortgage was denied, any deposits made under the agreement would be refunded to the buyer (this is commonly referred to as a "mortgage contingency clause").  Therefore, if Mr. Barbosa (the buyer) withdrew his mortgage application he would lose his deposit.  On the other hand, if his mortgage application was denied, Mr. Barbosa's deposit would be refunded.  Mr. Barbosa's loan application was approved by CMC's underwriting department on January 9, 2003.  On January 16, 2003, despite the fact that Mr. Barbosa's loan application had already been approved, a letter denying Mr. Barbosa's loan was issued by Ms. Scalli's office.  SUMF at ¶¶ 30-34, 40.

A realtor, Tony Giacalone, complained to one of CMC's employees, Steven Roussel, that he had a copy of a decline on Mr. Barbosa's loan that he did not think was authentic. Mr. Giacalone told Mr. Roussel that Ms. Scalli had issued the decline on Mr. Barbosa's loan so that Mr. Barbosa could purchase another property.  Mr. Roussel passed the decline letter and Mr. Giacalone's concerns on to Mr. Diranian.  Mr. Diranian, in turn, forwarded the decline letter to his supervisor, Mr. Conn.  Shortly thereafter, Mr. Conn discovered that Mr. Barbosa's loan application had actually been approved by CMC.  Mr. Conn consulted with Joyce Hicks in Human Resources about this decline letter.  SUMF at ¶¶ 35-39.

6

### C.     Termination of Employment

Ms. Hicks consulted with her supervisor, Debra Cornish, concerning Mr. Scalli's and Ms. Scalli's continued employment and potential violations of CMC's policies and Citizens' Code of Ethics.  Ms. Hicks and Ms. Cornish agreed that if Ms. Scalli made a credit decision concerning Mr. Barbosa's loan, her employment should be terminated.  They also agreed that Mr. Scalli's employment should be terminated or suspended.  On February 4, 2003, Ms. Hicks met with Ms. Scalli.  During this meeting, Ms. Scalli admitted that her office had issued the denial letter and admitted that it looked like her signature on the denial letter.  Therefore, as Ms. Hicks and Ms. Cornish had agreed, Ms. Hicks advised Ms. Scalli that her employment was terminated.  SUMF at ¶¶ 42-43.

On February 4, 2003, Mr. Scalli's employment was suspended pending further investigation.  The day after his employment was suspended, Mr. Scalli called Ms. Hicks.  At that time he knew that Ms. Scalli was selling a property (located on Maverick Street in East Boston) to Mr. Barbosa.  Mr. Scalli, however, did not disclose this fact to Ms. Hicks because Ms. Hicks asked Mr. Scalli if *he* owned a property being sold to Mr. Barbosa, not if *Ms. Scalli* owned a property being sold to Mr. Barbosa.  SUMF at ¶¶ 41-42, 44.

While Mr. Scalli's employment was suspended, the Company found irregularities concerning a loan for customers, Paula Castillo, Andres Castillo and Raphael Guerrero.  For example, signatures on two documents did not match, social security numbers did not match and the tax return was fraudulent.  Additionally, the Company determined that a portion of the "gift money" the customers used to qualify for the loan came out of Mr. Scalli's and Ms. Scalli's bank account.  Loan officers are not permitted to give customers money to enable them to qualify for a loan that they do not qualify for on their own.  On March 5, 2003, Mr. Scalli's employment was

terminated because of suspected improper activity relative to mortgage origination and his failure to cooperate with the ongoing investigation. SUMF at ¶¶ 45-46.

At the time of their terminations, neither Mr. Scalli nor Ms. Scalli mentioned that they were owed any commission payments, bonuses or wages. In fact, during the entire two years that they worked at CMC, Mr. Scalli and Ms. Scalli never complained to anyone except Mr. Conn about unpaid compensation that had been allegedly promised. Accordingly, before making the decision to terminate the employment of Mr. Scalli and Ms. Scalli, Ms. Hicks and Ms. Cornish had no idea that Mr. Scalli and Ms. Scalli had raised any complaints about unpaid compensation. SUMF at ¶ 47.

## ARGUMENT

### I.    Plaintiffs' Fail to Allege Any Public Policy That Was Violated

Plaintiffs bring a claim for wrongful discharge in violation of public policy (Count I). Plaintiffs, however, fail to allege *any* public policy that was violated as a result of their termination from employment. As stated in their Contracts, Plaintiffs were at-will employees. SUMF at ¶¶ 12, 15. Therefore, they could be discharged for any reason or no reason at all. A claim for wrongful discharge in violation of public policy exists as a narrow exception to this at-will employment doctrine. *See Acher v. Fujitsu Network Commc'n, Inc.*, 354 F.Supp.2d 26, 29 (D. Mass. 2005) (employee was not within public policy exception). In order to succeed on a claim for wrongful discharge in violation of public policy, Plaintiffs must prove that they were terminated for "asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." *Wright v. Shriners' Hosp. for Crippled Children,* 412 Mass. 469, 472 (1992). Whether a public policy exists which is offended by the plaintiff's discharge is a matter of law for the trial court, not an issue of fact. *Id.*

Plaintiffs fail to allege *any* basis for their public policy claim. To the extent the public policy identified by Plaintiffs is their allegation that they are owed certain wages, such a claim must fail. The legislature has created a comprehensive legislative remedy for the wrongs alleged by Plaintiffs (the Wage Act, discussed *infra*). The reason for a public policy exception to the general rule of employment at-will is to provide a remedy where there is no other way to vindicate the public policy. *See Melley v. Gillette Corp.,* 19 Mass. App. Ct. 511, 512-513 (1985). Where a comprehensive remedial statute protects the public policy at issue, a terminated employee does not have a common law action for termination in violation of public policy. *See Mello v. Stop & Shop Cos.,* 402 Mass. 555, 557 n. 2 (1988) (no common law public policy exception is needed when the legislature has prescribed a statutory remedy and citing the Wage Act as an example of such a statutory remedy). For example, in *Scott v. Granada Computer Serv.,* 1996 WL 1186807, No. 9503429 (Mass. Super. May 2, 1996) (Houston, J.)[4], the plaintiff claimed his employment was terminated in retaliation for bringing a claim under the Wage Act. *See id.* at 5. The court rejected the plaintiff's claim that his termination violated a public policy because the Wage Act already prohibits retaliation against an employee for asserting his rights. *See id.* Accordingly, because Plaintiffs cannot point to any public policy that was violated as a result of their terminations and because the Wage Act provides a legislative remedy for their assertion that they are owed wages, their wrongful discharge claim must be dismissed.[5]

---

[4] All cases referring to a Westlaw cite are attached to Defendant's Appendix to the SUMF.

[5] Summary judgment "shall be rendered" when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To defeat summary judgment, the plaintiff must demonstrate that there is "sufficient evidence favoring the [plaintiff] for a jury to return a verdict for [the plaintiff]. If the evidence is merely colorable or is not sufficiently probative, summary judgment may be granted." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir. 1990) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986)). Therefore, the moving party need not prove that *no* factual dispute exists, only that there is no genuine dispute of material fact. *See Anderson,* 477 U.S. at 248-49.

**II.      There is No Evidence That Citizens Terminated Plaintiffs To Avoid Paying Them**

Plaintiffs assert that Citizens "breached the covenant of good faith and fair dealing by failing to pay benefits and commissions" and "Plaintiffs relied to their detriment on promises made by [Defendant]."  Compl. at ¶¶ 31-32 (Count II).  To the extent Plaintiffs' "breach of the covenant of good faith and fair dealing" claim is a claim for discharge in violation of public policy it is the same claim Plaintiffs raise in Count I and must be dismissed for the reasons stated above.

The only other basis for Plaintiffs' claim is an allegation that Defendant terminated their employment to avoid paying them compensation they had already earned or were "on the brink" of earning.  *Fortune v. Nat'l Cash Register Co.,* 373 Mass. 96, 105 (1977).  Subsequent cases interpreting *Fortune* have made clear that the purpose of the claim is to deny employers a "readily definable, financial windfall resulting from the denial to [the plaintiff] of compensation for past services."  *Gram v. Liberty Mut. Ins. Co.,* 391 Mass. 333, 334-35 (1984) (*Gram II*).  In short, the *Fortune* doctrine "is little more than a common law analogue to the Payment of Wages statute."  45 SCOTT C. MORIEARTY ET AL., MASS. PRACTICE § 3.2 (2003).

Critically, Plaintiffs cannot prove that their employment was terminated in order to avoid paying them compensation.  *See Coll v. PB Diagnostic Sys., Inc.,* 50 F.3d 1115, 1125 (1st Cir. 1995) (*Fortune* doctrine does not encompass situations in which employee was merely fired arbitrarily; plaintiff must demonstrate that he was discharged to deny him compensation due for past services) (citations omitted); *Michelson v. Digital Fin. Serv.* 167 F.3d 715, 726 (1st Cir. 1999) (even if plaintiff was discharged without good cause he failed to raise a genuine issue with regard to whether employer did so in order to deprive him of earned commissions).  Ms. Hicks and Ms. Cornish, who made the decision to terminate the employment of Mr. Scalli and

10

Ms. Scalli, were not aware of the Scallis' assertions that they were owed wages, bonuses or commission payments at the time of their respective terminations from employment. SUMF at ¶ 42, 47. Accordingly, their decision to terminate the employment of Plaintiffs necessarily could not have been motivated by the desire to deny them earned or "almost earned" compensation.

Plaintiffs also fail to prove that their termination from employment was either not for "good cause" or was in "bad faith," a necessary element of a *Fortune* claim. *Gram v. Liberty Mut. Ins.,* 384 Mass. 659, 668 (1981) (*Gram I*) ("termination in the absence of good cause … is only a factor in determining whether there was fair dealing"). Plaintiffs' terminations were not in bad faith. Ms. Scalli was terminated because she violated the Code of Ethics and CMC's policies. Mr. Scalli was terminated because of suspected improper activity relative to mortgage origination[6] and his failure to cooperate with the investigation. SUMF at ¶¶ 42-43, 45-46.

Even if Plaintiffs prove that Defendant terminated their employment in bad faith for the purpose of depriving them of earned compensation, they cannot prevail on their *Fortune* claim because there is no evidence that Defendant was unjustly enriched as a result of their terminations through the retention of any readily definable, financial windfall resulting from the denial of compensation for their past services. *See Gram II,* 391 Mass. at 334-35. Plaintiffs received all compensation due to them under the terms of their Contracts. Plaintiffs' Contracts provide that "[u]pon termination of employment, you will receive credit for commissions for all mortgage loans funded on the system up to, and including, your last day of employment." Ms. Scalli claims that she was not paid commissions on loans she originated in December 2002 (which funded prior to her date of termination). Ms. Scalli is unable to point to any documents

---

[6] In addition to Mr. Scalli's awareness of and potential involvement in the Barbosa transaction, the Company determined, during his suspension, that a portion of the gift money that a customer (Castillo) used to qualify for a loan came from the joint checking account of Mr. Scalli and Ms. Scalli. Loan officers are not permitted to give customers money to enable them to qualify for a loan for which they are not otherwise qualified. SUMF at ¶ 45.

supporting her assertion. Ms. Scalli was in fact paid on all loans she originated that were funded before her termination date (as required by her Contract). SUMF at ¶¶ 12, 48. Plaintiffs' claim must be dismissed because they cannot point to any financial benefits due and owing to them under their Contracts.[7] *See Sargent v. Tenaska, Inc.,* 914 F.Supp. 722, 729-730 (D. Mass. 1996) (plaintiff cannot escape the plain effect of the contract's language).

### III. Plaintiffs' Fully Integrated Contracts Make Their Alleged Reliance on Oral Representations Unreasonable

In order to establish a cause of action for intentional misrepresentation (Count III) Plaintiffs must prove that their reliance on alleged misrepresentations was reasonable. *See Armstrong v. Rohm and Haas Co.,* 349 F.Supp.2d 71, 81 (D. Mass. 2004) (granting motion to dismiss two former employees' fraud claim) (citations omitted). The statements that Plaintiffs allegedly relied on are the following:

- In February 2001, Ms. Scalli was promised a draw of one thousand dollars for every million dollars in sales that she generated in 2001 and 2002;

- In January 2003, Ms. Scalli was promised an all expense trip to Aruba for being a "top producer" in 2002;

- Ms. Scalli was repeatedly promised during her employment additional support staff to increase her production and sales thereby increasing her commissions, which she never received; and

- In July 2002 Ms. Scalli was promised by her supervisor, Mr. Conn, 10 bonus points on all her sales.[8]

Compl. at ¶¶ 18-21.

---

[7] Moreover, to the extent Plaintiffs assert that their claim is based on monies allegedly verbally promised to them by Mr. Conn, such compensation was not due and payable as is described in more detail *infra* in response to Plaintiffs' tortious misrepresentation and Wage Act claims.

[8] Defendant responds to the "averments of fraud or mistake" and the "circumstances constituting fraud or mistake" stated with particularity in Plaintiffs' consolidated complaint. *See* Rule 9(b).

Plaintiffs' claim fails because they cannot establish reasonable reliance. Ms. Scalli's Contract provides the terms of her compensation[9] with CMC and the scope of CMC's obligation to provide her with support staff.[10] Oral statements allegedly made by Mr. Conn that Ms. Scalli would receive additional compensation or support staff, outside of the terms of her Contract, conflict with the express language of the parties' agreement. As a result, it was unreasonable for Ms. Scalli to rely on these alleged oral representations. *See Sands v. Ridefilm Corp.,* 212 F.3d 657, 665 (1st Cir. 2000) (plaintiff's reliance on defendants' oral statements, which conflict with written representations, was not reasonable as a matter of law). As the First Circuit explained, "[c]onfronted by such a conflict a reasonable person investigates matters further; he receives assurances or clarification before relying." *Id.* (quotations and citations omitted). Indeed, despite allegedly receiving oral promises of additional compensation from Mr. Conn in February 2001 and July 2002, Ms. Scalli failed to inquire about the conflict between these oral promises and her Contract with anyone at the Company, aside from Mr. Conn, during the entire two year period that she worked for CMC. Accordingly, her reliance on Mr. Conn's alleged promises was plainly unreasonable.

The language of Ms. Scalli's Contract further undermines her assertion that she could have reasonably relied on Mr. Conn's promises. The Contract contains an integration clause which states: "This Plan supersedes all prior agreements, either verbal or written, with respect to the subject matter of the Plan." SUMF at ¶ 12. Moreover, Ms. Scalli's claim that Mr. Conn promised her additional points on all her sales (in other words, additional commissions on loans

---

[9] Ms. Scalli testified that she was verbally offered, by Mr. Conn, .70 basis points on loans closed over $3 million per month (instead of, as her Contract provides, .65 basis points on all loans closed over $1 million). SUMF at ¶ 10. Defendant assumes Ms. Scalli's claim that "in July 2002 [she] was promised by her supervisor 10 bonus points on all her sales" is consistent with her deposition testimony. Compl. at ¶ 21.

[10] Ms. Scalli's Contract provides that she will be assigned a full-time sales assistant. SUMF at ¶ 14.

13

she originated), is patently contrary to the Contract which states, multiple times, that commissions cannot be changed without the written approval of the Center Manager and President of CMC. SUMF at ¶ 12. Accordingly, Ms. Scalli's reliance on Mr. Conn's alleged promise to change her commissions was unreasonable.

Ms. Scalli's claim regarding the Aruba trip and additional support staff also fails because she cannot prove these representations were false. *See Zimmerman v. Kent,* 31 Mass. App. Ct. 72, 78 (1991) ("The first requirement to sustain a claim of misrepresentation is that the representation made must be false"). There is no dispute that Ms. Scalli was eligible to participate in a sales trip. The trip, as Ms. Scalli acknowledged, took place after the termination of her employment. Pursuant to CMC policy, an individual must be employed in good standing to participate in the trip. SUMF at ¶ 52. Ms. Scalli fails to present any evidence that she was promised the opportunity to participate in the Aruba trip even if she was no longer employed by the Company. Similarly, CMC made no false representations concerning support staff provided to Ms. Scalli. Assuming Ms. Scalli was promised additional support staff (contrary to the terms of her Contract), the Company fulfilled this promise. Ms. Scalli had multiple employees and temporary employees that were assigned to work with her as sales assistants. Although her Contract only provided for one sales assistant, she always had two to three sales assistants. SUMF at ¶ 14.

## IV.   Plaintiffs Were Paid All Wages Earned Under the Terms of Their Contracts

Plaintiffs allege violations of Massachusetts General Laws c. 149, § 148 (commonly referred to as the "Wage Act") (Count IV). Plaintiffs' claim fails because the allegations they raise (concerning compensation that they were allegedly verbally promised by Mr. Conn) cannot form the basis of an action for *earned* and *definitely determined* wages. Moreover, as highly paid executives, the Wage Act does not apply to Plaintiffs.

14

The Wage Act states in relevant part that "[e]very person having employees in his service shall pay ... each such employee the wages earned by him." *Id.* In order to fall within the rubric of the Wage Act, "wages," as defined under the Act, must be "earned" and any commissions must be "definitely determined." *Id.* There is no dispute that Plaintiffs were paid all amounts due under their Contracts.[11] Plaintiffs fail to point to any wages that were "earned," "definitely determined" and "due and payable" outside of the four corners of the Contracts they admit signing. *See Richards v. Datatec Sys., Inc.,* 2005 WL 1156162, No. 040509BLS2 (Mass.Super. March 31, 2005) (Burnes, J.) (dismissing plaintiff's claim under the Wage Act because plaintiff failed to prove that commissions were due and payable).

Plaintiffs' Wage Act claim is essentially a claim for a verbal breach of contract. Mr. Scalli claims Mr. Conn promised him a salary of $50,000 and certain bonus payments for loans he originated.[12] Ms. Scalli claims Mr. Conn promised her a higher basis point payment on loans originated and certain bonus payments for loans she originated.[13] Plaintiffs signed fully integrated Contracts that address the terms of their compensation: "This Plan supersedes all prior agreements, either verbal or written, with respect to the subject matter of the Plan." SUMF at ¶¶ 12, 15. Under the parol-evidence rule, where there is a binding integrated agreement,

---

[11] Mr. Scalli did not originate loans under his production number and therefore, he was not entitled to commission payments under the terms of his Contract. SUMF at ¶ 25.

[12] Notably, Mr. Scalli did not meet the contingency of the bonus payments he alleges that he is owed ($1,000 for each $1 million in loans closed after the first $50 million). There is no evidence that Mr. Scalli closed $50 million in loans. Such unearned contingent payments do not fall within the protections of the Wage Act. *See Cumpata v. Blue Cross Blue Shield of Mass., Inc.,* 113 F.Supp.2d 164, 167-168 (D. Mass. 2000) (compensation contingent on exceeding sales goals not within Wage Act); *Okerman v. VA Software Corp.,* 2003 WL 21960599, No. 0101825 at *9 (Mass. Super. July 9, 2003) (Cratsley, J.) (commissions contingent on the attainment of certain sales goals being reached were not definitely determined under the Wage Act).

[13] Plaintiffs' claims for non-payment of wages are limited to their allegations in the non-payment of wage complaints they filed with the Attorney General's Office. SUMF at ¶ 57. The administrative complaint for non-payment of wage complaint must describe the substance of the crime (non-payment of wages) that has been committed. *See Nahigian v. Leonard,* 233 F.Supp.2d 151, 164 (D. Mass. 2002) (explaining the purpose of the administrative requirement under Chapter 149, § 150).

evidence of prior or contemporaneous agreements or negotiations may not be considered to vary

a term of the written agreement.  *See Brennan v. Carvel*, 929 F.2d 801, 806, 808 (1st Cir. 1991);

*Coll,* 50 F. 3rd at 1122 (evidence of prior or contemporaneous oral agreement cannot be admitted

to vary or modify the terms of an unambiguous written contract) (quotations omitted).  Further,

while parol-evidence may be considered to elucidate the meaning of terms of a contract where

the terms of a contract are uncertain or equivocal in meaning, there is nothing uncertain or

unclear about the terms of compensation for Mr. Scalli and Ms. Scalli under their respective

Contracts.  *See Vakil v. Anesthesiology Assocs. of Taunton, Inc.*, 51 Mass.App.Ct. 114, 119-120

(2001) (unambiguous terms of employment contract were not modified by parol-evidence).

      To the extent Plaintiffs claim that these oral promises for wages were made after they

signed their Contracts, their claim is equally without merit.  The Contracts state, multiple times,

that the commission rates may not be adjusted without the written approval of the Center

Manager and the President of CMC.  Additionally, the Contracts provide that changes by CMC

are only permitted if in *writing* and with 30 days notice.[14]  Plaintiffs failed to produce any such

written modification of their Contracts.[15]  *See Cambridgeport Sav. Bank v. Boersner,* 413 Mass.

432, 439 n. 10 (1992) (evidence of subsequent oral modification must be of sufficient force to

overcome the presumption that the integrated and complete agreement expresses the intent of the

parties).

---

[14]  Indeed, by the very terms of the Contracts, Mr. Conn did not have actual or apparent authority to alter the terms of the Contracts.  *See, e.g., Hudson v. Mass. Prop. Ins. Underwriting Ass'n,* 386 Mass. 450, 457 (1982); *see also Rodowicz v. Mass. Mut. Life Ins. Co.,* 192 F.3d 162, 177-78 (1st Cir. 1999) (an employer only may be held liable for the acts of an employee if the acts were committed within the scope of employment).

[15]  Plaintiffs also fail to present any evidence of consideration that the Company received in exchange for the alleged modifications of their contracts.  In order to modify the unambiguous terms of a contract a subsequent oral agreement must be made on sufficient consideration.  *See Vakil,* 51 Mass. App. Ct. at 119-120 (oral conversations do not modify employment agreement where there is no evidence the employer received anything in exchange for the alleged modification)*; see Greater Boston Cable Corp. v. White Mountain Cable Constr. Corp.,* 414 Mass. 76 (1992) (past consideration does not support a contract).

Furthermore, Plaintiffs' uncorroborated testimony does not present a genuine issue of material fact. *See Ricci v. Alternative Energy, Inc.,* 211 F.3d 157, 161 (1st Cir. 2000) ("It is the role of the judge on summary judgment to determine whether a particular inference is reasonable … Evidence presented on summary judgment may be 'inherently incredible' and so disregarded") (citation omitted); *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir. 1997) (non-moving party may not rest merely on improbable inferences or unsupported speculation) (citations omitted). Plaintiffs claim they were verbally promised additional compensation by Mr. Conn (which is inconsistent with the integrated Contracts) but that they failed to document these promises in any way and failed to raise this issue with anyone else at the Company. Remarkably, Plaintiffs did not even raise this allegation at the time of their terminations from employment. Plaintiffs' implausible testimony is not sufficient to overcome their burden of proving sufficient facts showing that there is a genuine issue for trial. In Mr. Scalli's case, it is even more incredible that he did not raise a complaint to anyone, aside from Mr. Conn, about a $50,000 salary he was allegedly promised and never paid. Notably, Mr. Scalli signed another Contract in March 2002 which again did not include any reference to a $50,000 salary. Still, he did not raise this issue with anyone else at the Company. Since these amounts are not "earned," "definitely determined," or "due and payable," Plaintiffs' Wage Act claim fails.

Even if the amounts sought in Plaintiffs' Wage Act claim are deemed "earned," "definitely determined" and "due and payable," the Wage Act does not apply to highly paid employees like Plaintiffs. The Wage Act is construed narrowly. *See Prozinski v. Northeast Real Estate Serv., LLC,* 59 Mass. App. Ct. 599, 602-03 (2003) (employer did not violate Wage Act by failing to make severance payment). The intent of the Act is to protect "laborers and casual wage earners who might otherwise be vulnerable to employer intimidation." *Cumpata v. Blue Cross Blue Shield of Mass., Inc.,* 113 F.Supp.2d 164, 167-168 (D. Mass. 2000) (former

employee's commissions were not covered by the Wage Act) (citations omitted).  As the Court

in *Cumpata* explained "there is no evidence that the Legislature intended to provide treble

damages and attorneys fees and costs [recoverable under the Wage Act] to professionals

enforcing their asserted contract rights."  *Id.; see also Baptista v. Abbey Healthcare Group, Inc.,*

1996 WL 33340740, No. 95-10125-RGS (D. Mass. 1996) (Stearns, J.) (the Wage Act is intended

to protect laborers and casual wage earners who might otherwise be vulnerable to employer

intimidation).  In 2001, the Company paid Ms. Scalli over $242,000.  In 2002, the Company paid

Ms. Scalli over $428,000.  In 2003, for only approximately one month of employment,

Ms. Scalli was paid over $83,000.  Mr. Scalli originated approximately ten to twenty percent of

the loans under Ms. Scalli's name, for which she was paid commissions.[16]  In addition to the

commission payments made to Ms. Scalli, Mr. Scalli was also paid $15,746.91 in 2001 and

$8,154.90 in 2002.  In 2003, for his employment through March 5, 2003, Mr. Scalli earned

$2,966.10.  SUMF at ¶ 25-26.  Therefore, Plaintiffs were highly paid executives who do not fall

under the protection of the Wage Act.

## V.    Plaintiffs' Claim for Tortious Interference Fails Because They Cannot Establish Fundamental Elements of the Claim

To state a claim for intentional interference with contractual relations (Count V) Plaintiffs

must prove that (1) they had an advantageous business relationship with their employers; (2) that

Defendant knew of this relationship, (3) that Defendant intentionally and maliciously interfered

---

[16]  Mr. Scalli and Ms. Scalli are married and live together.  They both worked out of their home for CMC.  Their finances were pooled as is evidenced by the fact that they maintain joint bank accounts and Ms. Scalli "handles the money" for both herself and Mr. Scalli.  Accordingly, the economic realty of the situation leads to the conclusion that payments to Ms. Scalli for work done by Mr. Scalli were in fact payments to Ms. Scalli as Mr. Scalli's agent. The fact that during approximately June 2002, the Company started to pay Mr. Scalli a draw of $1,000 per month (to cover the employee portion of the family medical benefit he had elected), is further evidence of this agency. Moreover, Ms. Scalli never complained to anyone at the Company (aside from Mr. Conn) about this arrangement. SUMF at ¶¶ 2, 5, 25, 28, 47.

with the relationship, and (4) that Defendant's actions harmed them.[17]  *See Zimmerman v. Direct Fed. Credit Union,* 262 F.3d 70, 75 (1st Cir. 2001).  Here, Plaintiffs fail to demonstrate that Defendant's contact with a subsequent employer was malicious.  Even if Defendant did maliciously interfere with Plaintiffs' subsequent employment, Plaintiffs fail to present any evidence of harm.

Both Mr. Scalli and Ms. Scalli found employment as loan originators shortly after the termination of their employment from the Company.  Ms. Scalli obtained her position at GMAC during the same month that she was terminated.  Similarly, Mr. Scalli was hired by Hancock Realty after the termination of his employment.  The sole basis of their claim of tortious interference with their employment relationships with GMAC and Hancock Realty appears to be an allegation that a representative from the Company called GMAC to inquire about whether or not Mr. Scalli was employed by GMAC.  This inquiry took place during the time when Mr. Scalli was suspended but before his termination from employment (between February 4, 2003 and March 5, 2003).  SUMF at ¶¶ 53-55.

Plaintiffs fail to prove that Defendant acted with improper means or motive.  *See Shea v. Emmanuel Coll.,* 425 Mass. 761, 764 (1997) (to prevail on a claim for intentional interference, plaintiff must show that defendant's actions, in addition to being intentional, were improper in motive or means).  During Mr. Scalli's suspension, Ms. Hicks became aware that Ms. Scalli was working at GMAC.  Because Mr. Scalli and Ms. Scalli worked together at Citizens, she suspected that Mr. Scalli may also be applying for employment at GMAC.  Therefore, an inquiry

---

[17]  The Company is not a proper defendant in a claim for tortious interference with advantageous or contractual relations based on the termination of Plaintiffs' employment from CMC because the Company cannot interfere with its own contracts.  *See Appley v. Locke,* 396 Mass. 540, 543 (1986).  Accordingly, Defendant assumes this claim is based solely on Defendant's alleged interference with Plaintiffs' contracts with their new employers after the termination of their employment with CMC.

was made to GMAC to confirm whether or not Mr. Scalli was working for GMAC. Such a
verification of employment served the Company's legitimate business interests (to determine if
Mr. Scalli had accepted new employment) and was not done with improper means or motive. It
is unclear how an inquiry concerning whether or not *Mr. Scalli* was employed by GMAC could
have interfered with *Ms. Scalli's* employment with GMAC. Similarly, Mr. Scalli had no
contractual relationship with GMAC (since he was never employed by GMAC), therefore,
Defendant could not have interfered with his contract with Hancock Realty by inquiring if he
was employed by GMAC. Moreover, as Mr. Scalli and Ms. Scalli were hired as loan originators
by GMAC and Hancock Realty they suffered no harm as a result of Defendant's alleged
interference with their subsequent employment. SUMF at ¶¶ 53-56. Accordingly, Plaintiffs'
claim for tortious interference must be dismissed.

**VI.    Plaintiffs' Defamation Claim is Without Merit**

Plaintiff's defamation claim (Count VI) is solely based on an alleged statement by the
Company's former employee Victoria Noel. Plaintiffs' claim that "on or about February 6, 2003
through June 2003 Victoria Noel of Citizens Bank during communications with Javier Pico and
Danielle Felice stated that Eleanor and Robert Scalli had been 'indicted on bank fraud.'" *See*
Compl. at ¶ 23; SUMF at ¶ 49.

To prevail on a claim for defamation, Plaintiff must show Ms. Noel, who allegedly made
the defamatory statement, was acting within the scope of her employment. *See Kelly v.
Middlesex Corp.,* 35 Mass. App. Ct. 30, 31-32 (1993) ("In order to recover from [the
employer/defendant] on the basis of vicarious liability established through the idea of respondeat
superior, it was the plaintiff's burden" to show that the employee was acting within the scope of
his employment when he committed the tortious act); *see also Burroughs v. Commonwealth,* 423
Mass. 874, 877 (1996) (holding that an employee's conduct is within the scope of employment if

it (i) "is of the kind he is employed to perform," (ii) "occurs substantially within the authorized time and space limits," and (iii) "is motivated, at least in part, by a purpose to serve the employer") (citations omitted). Plaintiffs cannot produce any evidence to demonstrate that Ms. Noel made this alleged statement within the scope of her employment.

Ms. Noel worked as a loan officer. Ms. Noel's employment ended on April 1, 2003. As a loan officer, Ms. Noel was employed to originate loans. SUMF at ¶ 49. Even assuming she made a statement to Mr. Pico and Ms. Felice that the Scallis had been "indicted on bank fraud," such a statement would clearly not fall within the scope of Ms. Noel's employment. Plaintiffs cannot present any evidence that Ms. Noel made this statement at the direction or request of anyone from the Company. Moreover, this statement could not have been motivated to serve the Company, since it would clearly not be in the Company's interests to have its former number one loan originator (who originated millions of dollars worth of loans for the Company) indicted for bank fraud. *See, e.g., Alba v. Interactive Data Corp.,* 1995 WL 1146839, No. 9203570A (Mass. Super. Nov. 17, 1995) (Smith, J.) (granting summary judgment to defendant on defamation count in part because action of the employee were not done at the request of the employer); *Schlichte v. Granite Sav. Bank,* 40 Mass. App. Ct. 179, 182 (1996) (affirming summary judgment for employer where the employee's tortious behavior was "neither part of her job nor intended in any respect to benefit" her employer). Therefore, although Plaintiffs may have a claim against Ms. Noel, in her individual capacity, they have no basis for imputing liability for the alleged statement to Defendant.

Even if the Company could somehow be held vicariously liable for Ms. Noel's alleged statement, Plaintiffs must prove that the statement was published to a third party. Publication to a third party is an essential element of an action for defamation. *See Brauer v. Globe Newspaper Co.,* 351 Mass. 53, 56 (1966). Ms. Felice, a real estate broker, states in her affidavit that she has

21

never been provided with any negative information concerning Ms. Scalli or Mr. Scalli (including, for example, that they were "indicted on bank fraud") by any employee of the Company. Ms. Felice has never even met Ms. Noel and Ms. Noel certainly never told her that Ms. Scalli and Mr. Scalli had been "indicted on bank fraud." SUMF at ¶ 50. Accordingly, Plaintiffs cannot demonstrate that any statement by Ms. Noel was published to Ms. Felice. Mr. Pico is Mr. Scalli's attorney. Mr. Pico, both in 2003 and presently, performs real estate closings for Ms. Scalli. *See* SUMF at ¶ 51. The requirement of a publication of defamatory matters for the purposes of establishing liability is not satisfied by a communication to an agent of a defamed person. *See, e.g., Smith v. St. Regis Corp.,* 850 F.Supp. 1296, 1322-23 (S.D. Miss. 1994) (recognizing that communication to plaintiff's representative was insufficient to support a defamation claim); *Mims v. Metropolitan Life Ins. Co.,* 200 F.2d 800, 802 (5th Cir. 1952) (no publication to support slander action where language complained of is uttered only to plaintiff's agent). Accordingly, any alleged statement by Ms. Noel to Mr. Pico was not a publication since Mr. Pico is the Scallis' agent. Consequently, Plaintiffs' defamation claim must be dismissed.

## CONCLUSION

For all of the foregoing reasons, Defendant asks that the Court GRANT its Motion for Summary Judgment on all counts of Plaintiffs' Complaint and dismiss Plaintiffs' Complaint in its entirety.

LIBB/1349132.4