UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ELEANOR SCALLI and ROBERT SCALLI,

Plaintiffs,

v.

CITIZENS FINANCIAL GROUP, INC.,

Defendant.

Civil Action No. 03-12413-DPW

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Citizens Financial Group, Inc. ("Defendant") submits this Statement of

Undisputed Material Facts in Support of Its Motion for Summary Judgment. Defendant submits

that even if Plaintiff Eleanor Scalli's and Plaintiff Robert Scalli's versions of the facts in this

case are accepted, in their entirety, no reasonable jury could find in favor of Plaintiffs. Plaintiffs'

claims fail as a matter of law.

Many of the facts contained in this statement of undisputed material facts are disputed by

Defendant. Defendant has accepted these facts (including Plaintiffs' deposition testimony) as

true only for the purposes of its motion for summary judgment. In doing so, Defendant does not

waive its right to dispute any of these facts at trial.

Pursuant to Local Rule 56.1, the following documentation is submitted in the Appendix

to Defendant's Statement of Undisputed Material Facts in Support of Its Motion for Summary

Judgment ("Appendix"):

> (a)    Plaintiff Eleanor Scalli ("E. Scalli Dep.") and exhibits marked during the
>
> deposition of Eleanor Scalli attached thereto. (Appendix Ex. 1)
>
> (b)    Plaintiff Robert Scalli ("R. Scalli Dep.") and exhibits marked during the

deposition of Robert Scalli attached thereto. (Appendix Ex. 2)

        (c)      Joyce Hicks ("Hicks Dep.") and exhibits marked during the deposition of

Joyce Hicks attached thereto. (Appendix Ex. 3)

        (d)      Barden Conn ("Conn Dep."). (Appendix Ex. 4)

        (e)      Michael Diranian ("Diranian Dep."). (Appendix Ex. 5)

        (f)      Tara Tribelli-Gallone ("Gallone Dep.") and exhibits marked during the

deposition of Tara Tribelli-Gallone attached thereto.  (Appendix Ex. 6)

        (g)      Elizabeth Walsh ("Walsh Dep.") and exhibits marked during the

deposition of Elizabeth Walsh attached thereto. (Appendix Ex. 7)

        (h)      Steven Roussel ("Roussel Dep."). (Appendix Ex. 8)

        (i)      Affidavit of Joyce A. Hicks (Appendix Ex. 10)

        (j)      Affidavit of Debra A. Poirier Cornish (Appendix Ex. 11)

        (k)      Affidavit of Danielle Felice (Appendix Ex. 12)

## I.      CMC Hires Eleanor Scalli and Robert Scalli

1.      Citizens Mortgage Corporation ("CMC" or the "Company") is a subsidiary of Citizens

Financial Group, Inc.  Loan origination is the process by which CMC creates residential

mortgages.  It involves external relationships between borrowers, the real estate community and

loan officers and internal relationships between loan officers and processors and the underwriting

and loan closing departments.  The loan officer is responsible for taking a complete loan

application package from the applicant.  *See* Hicks Dep. at Ex. 6, CMC Policy and Procedure

Manual (C00286, C00349).[1]

2.      In approximately December 2000, Robert Scalli was approached by an employee of

CMC (Steven Roussel) about a position with the Company.  At that time, Mr. Scalli was working

---

[1]    For ease of reference, bates label numbers are identified where appropriate for certain exhibits to depositions.

as a loan officer for Hancock Mortgage and his wife, Eleanor Scalli, was working as a loan officer for North American Mortgage Company. At some point later, Mr. Scalli and Ms. Scalli met with Barden Conn, a Senior Vice President for the Company in charge of sales and operations for Massachusetts, New Hampshire and construction lending. *See* R. Scalli Dep. at 13-15, 17, 25; E. Scalli Dep. at 4-5, 14-15; Conn. Dep. at 24.

3.      Prior to Mr. Scalli receiving a written offer letter from CMC, Mr. Conn offered Mr. Scalli a "forgivable draw" of $50,000. Mr. Conn later stated that this forgivable draw would need to be split between Ms. Scalli and Mr. Scalli. Mr. Conn never gave Mr. Scalli a document including the offer of a $50,000 forgivable draw. Even if Mr. Scalli did receive a document indicating that he was going to receive a $50,000 forgivable draw or salary, he does not have that document now. *See* R. Scalli. Dep. at 38-39, 42-44, 52, 54-55.

4.      At the time their employment with CMC commenced, new hire information forms were created for both Mr. Scalli and Ms. Scalli. These new hire information forms are internal human resources documents that an employee does not receive. Both Mr. Scalli's and Ms. Scalli's new hire information forms reflect a pay rate/salary of $65,000. The salary rate on the new hire information form is $65,000 because this figure was necessary to generate the $15,000 "signing" bonus paid to both Mr. Scalli and Ms. Scalli. This bonus was paid in six payments of $2,500 each over the first six pay periods. In other words, they were paid at the annual rate of $65,000 over the first six pay periods. The comments/special instructions section of the new hire information form for both Mr. Scalli and Ms. Scalli states that they will receive a forgivable draw of $2,500 until 5/25/01. Employee data change forms for both Mr. Scalli and Ms. Scalli reflect that as of May 28, 2001, this forgivable draw had stopped and this pay rate was reduced to $0 annually. The new hire information forms for both Mr. Scalli and Ms. Scalli also state that the employee type is "commission." *See* Gallone Dep. at 46, 56-58, 60, Ex. 3; Hicks Dep. Ex. 3

(Eleanor Scalli's New Hire Information form (C00002), Eleanor Scalli's Employee Data Change form (C00003)), Ex. 4 (Robert Scalli's Employee Data Change form (C00033)).

5.      When an employee is hired by Citizens, he or she may generally participate in Citizens' benefit plans.  New employees receive a benefit enrollment package.  This package contains a worksheet summarizing certain information concerning the employee's benefits (the "Worksheet").  Thereafter, employees receive an updated Worksheet for use in the annual enrollment of their benefits.  The Worksheet reflects an employee's "benefit base salary."  The benefit base salary is necessary for determining the amount of certain benefits offered to employees where the amount of the benefit is derived from the employee's salary level (*e.g.,* life insurance, disability insurance).  For commissioned employees, who are not paid a salary (like loan officers), Citizens determines the benefit base salary as follows:  the greater of the assigned "market point" for the position or W-2 earnings by the employee for the calendar year prior to the annual benefit enrollment.  The assigned market point for a position is determined by Citizens' review of salaries in the market for the relevant position.  During the period of 2001 through 2003, the assigned market point for a loan officer was $50,000.  Therefore, the benefit base salary for any new loan officer, or loan officer with W-2 earnings below $50,000 for a calendar year, was $50,000.  This benefit base salary is only used for the purpose of determining the amount of certain benefits.  The benefit base salary does not reflect a promise by Citizens to pay a commissioned employee at the rate of the benefit base salary.  The benefit base salary on Robert Scalli's Worksheet during his employment was $50,000.  This was not the actual salary paid to Mr. Scalli, but rather, a number used for the purpose of calculating certain of Mr. Scalli's benefits.  *See* R. Scalli Dep. 61-62 (Day 2);[2] Ex. 11; Hicks Aff. at ¶¶ 3, 4 and 5.

---

[2]      Unless otherwise noted, deposition references are to the first day of the relevant deponent's deposition.

6.       Before Mr. Scalli accepted employment at CMC, Mr. Conn also told Mr. Scalli that he would receive a $1,000 forgivable draw for each $1 million in loans he closed after the first $50 million in loans.  Mr. Scalli never received a document indicating that he would receive this forgivable draw.  *See* R. Scalli. Dep. at 55, 61.

7.       Mr. Scalli signed and included his social security number on his written offer letter on February 23, 2001.  Mr. Scalli read the offer letter before he signed it and he does not recall having any discussions with Mr. Conn concerning the contents of the offer letter.  The offer letter does not include any statement concerning a $50,000 salary or eligibility for a $1,000 forgivable draw for each $1 million in loans originated in excess of $50 million.  *See* R. Scalli Dep. at 50, Ex. 2, Loan Officer Commission Incentive Plan; 58-60.

8.       Mr. Conn gave Ms. Scalli a verbal offer of employment.  At some point after giving her this verbal offer of employment he sent her a written offer letter.  *See* E. Scalli Dep. at 16-17.

9.       Ms. Scalli signed, dated and included her social security number on her written offer letter on February 22, 2001.  Ms. Scalli claims that the first few pages of the offer letter changed several times and that the offer letter she signed on February 22, 2001 was not consistent with the verbal offer of employment she received from Mr. Conn.  Ms. Scalli, however, was unable to produce the other versions of the offer letter that she alleges exist.  *See* E. Scalli Dep. at 24-25, 29.

10.      Ms. Scalli states that she was verbally offered a $30,000 advance not a $15,000 advance as is reflected in the offer letter.  After commencing employment with CMC, Ms. Scalli received a $15,000 advance, consistent with her offer letter.  Ms. Scalli claims that Mr. Conn verbally offered her .70 basis points on loans closed over $3 million per month, instead of .65 basis points on loans closed over $1 million as is reflected in the offer letter.  Mr. Conn verbally promised Ms. Scalli, while he was recruiting her (prior to her employment starting), a $1,000 bonus for

every $1 million of loans closed per calendar year.  Ms. Scalli acknowledged that she was only

eligible for this $1,000 bonus for every $1 million of loans closed for calendar year 2002.

Ms. Scalli never received this bonus.  Aside from the above issues, the written offer letter was

consistent with Ms. Scalli's verbal offer of employment that she received from Mr. Conn.  *See* E.

Scalli Dep. at 27-29, 34-39; 49 (Day 2); 78(Day 2).

11.      In approximately late February 2001 or early March 2001, after signing their respective

offer letters, Ms. Scalli and Mr. Scalli commenced employment with CMC.  Ms. Scalli was hired

as a Senior Loan Officer.  Mr. Scalli was hired as a Loan Officer.  *See* E. Scalli Dep. at Ex. 2,

Loan Officer Commission Incentive Plan; R. Scalli Dep. at Ex. 2, Loan Officer Commission

Incentive Plan.

## II.      Terms of the Contracts, Citizens' Code of Ethics and the CMC Policy and Procedure Manual

12.      Ms. Scalli's loan officer commission incentive plan, which is set forth in her written offer

letter (Ms. Scalli's "Contract"), which she acknowledges signing, states in relevant part the

following:

"Any adjustment to commission will require the written approval of your Center Manager and

the President of CMC."

…

"No adjustments to commission will occur without the written consensus of the Center Manager

and President of CMC."

…

"You agree that this Plan does not constitute an employment contract or a guarantee of

employment for any specific length of time and in no way limits CMC's authority to terminate

employment at its sole discretion, with or without cause.  Nothing contained herein should be

construed to alter your status as an 'at will' employee.  Upon termination of employment, you

will receive credit for commissions for all mortgage loans funded on the system up to, and including, your last day of employment."

…

"CMC reserves the right to change or discontinue this Plan upon 30 days written notice. No deviations by you are permitted without the express written consent of the appropriate President of CMC and the Center Manager."

…

"This Plan supersedes all prior agreements, either verbal or written, with respect to the subject matter of the Plan … It is expressly understood that both you and CMC are free to terminate your employment relationship at any time, for any reason, with or without notice. CMC expressly reserves the right at any time to take any action deemed to be in CMC's best interest regarding your employment relationship. No officer, supervisor or other employee of CMC, other than the President or Chairman, has the authority to alter, orally or in writing, the terminable-at-will status of your employment relationship. Unless otherwise stated in this Plan, nothing in this Plan is intended to confer any rights to any terms or conditions of your employment."

…

"By signing below, you acknowledge and agree to be bound by the terms of this Loan Officer Incentive Plan …"

Ms. Scalli's Contract also contains a statement that she has "read and understand[s] the Citizens Bank Ethics Statement."

*See* E. Scalli Dep. at 24-25; Ex. 2.

13.    Ms. Scalli's Contract describes the compensation that she would receive as a Senior Loan Officer. Ms. Scalli was eligible to receive a $15,000 advance paid biweekly at $2,500 for 6 pays, which <u>will not</u> be charged against future commissions. Ms. Scalli's Contract also provides for a

car allowance of $139 biweekly.  For origination commissions, Ms. Scalli's Contract states that she will be paid .56 Basis Points on all loans closed per month over $1,000,000, plus an additional 9 basis points on the closed loan volume (total of .65 basis points).  *See* E. Scalli Dep. at Ex. 2 (Section II).

14.     Ms. Scalli's Contract provides that she will be assigned a full-time sales assistant. Ms. Scalli had multiple employees and temporary employees that were assigned to work with her as sales assistants.  Although her Contract only provided for one sales assistant, she always had two to three sales assistants.  *See* E. Scalli Dep. 77-80, 83-87.

15.     Mr. Scalli's loan officer commission incentive plan, which is set forth in his written offer letter (Mr. Scalli's "Contract"), which he acknowledges signing, states in relevant part the following:

"Any adjustment to commission will require the written approval of your Center Manager and the President of CMC."

…

"No adjustment to commission will occur without the written consensus of the Center Manager and President of CMC."

…

"You agree that this Plan does not constitute an employment contract or a guarantee of employment for any specific length of time and in no way limits CMC's authority to terminate employment at its sole discretion, with or without cause.  Nothing contained herein should be construed to alter your status as an 'at will' employee.  Upon termination of employment, you will receive credit for commissions for all mortgage loans funded on the system up to, and including, your last day of employment."

…

"CMC reserves the right to change or discontinue this Plan upon 30 days written notice. No deviations by you are permitted without the express written consent of the appropriate President of CMC and the Center Manager."

…

"This Plan supersedes all prior agreements, either verbal or written, with respect to the subject matter of the Plan … It is expressly understood that both you and CMC are free to terminate your employment relationship at any time, for any reason, with or without notice. CMC expressly reserves the right at any time to take any action deemed to be in CMC's best interest regarding your employment relationship. No officer, supervisor or other employee of CMC, other than the President or Chairman, has the authority to alter, orally or in writing, the terminable-at-will status of your employment relationship. Unless otherwise stated in this Plan, nothing in this Plan is intended to confer any rights to any terms or conditions of your employment."

…

"By signing below, you acknowledge and agree to be bound by the terms of this Loan Officer Incentive Plan …"

Mr. Scalli's Contract also contains a statement that he has "read and understand[s] the Citizens Bank Ethics Statement." *See* R. Scalli Dep. at 50; Ex. 2.

16.     Mr. Scalli's Contract also describes the compensation that he would receive as a Loan Officer. Mr. Scalli was eligible to receive a $15,000 advance paid biweekly at $2,500 for 6 pays, which <u>will not</u> be charged against future commissions. For origination commissions, Mr. Scalli's Contract states that he will be paid .56 Basis Points on all loans closed per month over $1,000,000, plus an additional 9 basis points on the closed loan volume (total .65 basis points). *See* R. Scalli Dep. at Ex. 2 (Section II).

17.     There is no dispute that Mr. Scalli and Ms. Scalli were paid by CMC in a manner consistent with their Contracts.  *See* E. Scalli Dep. at 71-72, 77 (Day 2); Hicks Aff. at ¶ 6.

18.     Both Mr. Scalli and Ms. Scalli signed a Citizens' Code of Ethics Signature Page. Mr. Scalli and Ms. Scalli affirmed that they had "received a copy of the Citizens' Code of Ethics and agree[d] to abide by its provisions at all times."  Mr. Scalli and Ms. Scalli further agreed to "[c]ompliance with all policies and procedures set forth by CMC Management."  R. Scalli Dep. at Exs. 1, 4; E. Scalli Dep. at Exs. 3, 6.

19.     Citizens' Code of Ethics states in relevant part that:  "Employees … must avoid situations in which personal interests conflict with, or appear to conflict with, the interests of Citizens.  A possible conflict of interest exists whenever employees … or their relatives have an interest in an entity or matter that may influence a decision or cloud the judgment that they may have to exercise in the discharge of their responsibilities to Citizens …  Employees … should not enter investment transactions that would create, or give the appearance of creating a conflict of interest between them, Citizens and any customer … Employees may not accept, process or approve any transactions at Citizens in which they have personal interest … Employees … may not take for their own advantage an opportunity that rightfully belongs to Citizens.  Whenever, Citizens has been actively soliciting a business opportunity or the opportunity has been offered to it or its funds, facilities, property, or personnel have been used in pursuing the opportunity, that opportunity rightfully belongs to Citizens and may not be diverted for the personal benefit of the employee."

The Code of Ethics makes clear that "[v]iolations of the Code are considered serious and may lead to further disciplinary action, up to and including termination of employment."  Hicks Aff. at ¶ 7 and Tab 1.

20.     CMC Policy and Procedure Manual states that "[l]oan officers are not authorized to make credit decisions … If, at any time, you communicate to an applicant that they are either qualified or not qualified for a loan, you have taken an application and made a credit decision … you should always stop short of 'qualifying' the applicant.  Instead, you must encourage the applicant to complete a written application for processing and review by Citizens' Underwriting Department."  All loan originators are responsible for knowing the CMC policies and procedures and they have access to the CMC Policy and Procedure Manual on their laptops.  *See* Hicks Dep. 58-59, Ex. 6 (C00359), 79-80.

### III.    Mr. Scalli's and Ms. Scalli's Employment with CMC

21.     Ms. Scalli was a top producer while she worked for CMC.  Ms. Scalli had the "top numbers" in the entire Company up until the time she left.  Her total volume of loans closed for 2002 was approximately $65 million.  *See* Hicks Dep. at 201; E. Scalli. Dep. at 46-47 (Day 2); Conn. Dep. at 85.

22.     Initially, Michael Diranian, a Sales Manager for CMC, was the producing manager for both Mr. Scalli and Ms. Scalli.  At some point after starting her employment with CMC, Ms. Scalli requested that she report directly to Mr. Conn instead of Mr. Diranian.  *See* E. Scalli Dep. at 51-52; R. Scalli Dep. at 64; Diranian Dep. at 19.

23.     Mr. Conn requested that Mr. Scalli enter all loans he originated under Ms. Scalli's production number and Mr. Scalli agreed to Mr. Conn's request.[3]  According to Mr. Scalli, Mr. Conn explained that such an arrangement would result in an overage (bonus/commission) going to him instead of Mr. Diranian, since Mr. Conn was paid direct compensation from all the loans that were produced under Ms. Scalli's pipeline.  *See* R. Scalli Dep. at 63-65.

---

[3]     As stated above, many of the facts contained in this statement of undisputed facts are disputed by Defendant. For example, Defendant disputes that Mr. Conn requested Mr. Scalli enter all loans he originated under Ms. Scalli's production number.  Defendant has accepted this fact as true only for the purposes of its motion for summary judgment.

24.     In fact, Mr. Conn's compensation was capped and the volume of other loan officers (aside from the Scallis) was "more than significant" to cover his capped compensation rate. Mr. Diranian continued to earn basis points on loans originated by Ms. Scalli even though Ms. Scalli was reporting to Mr. Conn.  Mr. Diranian's compensation was not capped. Mr. Diranian was paid approximately $30,000 based on approximately $65 million in loans originated by the Scallis in 2002.  *See* Conn. Dep. at 86-87, 89-90, 179-80; Diranian Dep. at 25-27, 230-232.

25.     Mr. Scalli originated between 10% and 20% of the loans that were originated under Ms. Scalli's name.  Mr. Scalli did not originate loans under his production number and therefore, he did not directly receive commission payments under the terms of his Contract.  During his employment, Mr. Scalli elected family medical and dental benefits through the Company.  In approximately June 2002, Mr. Scalli received a draw of $1,000 per month that was deducted from Ms. Scalli's commissions (which included commission for loans Mr. Scalli originated under Ms. Scalli's production number).  This draw was deducted from Ms. Scalli's commissions in order to cover Mr. Scalli's benefit deductions.  *See* R. Scalli Dep. at 61-64, 67 (Day 2);  Hicks Dep. at 104-107, 113-114; Conn. Dep. at 184-185 (Day 2); E. Scalli Dep. at 62-64.

26.     In 2001, the Company paid Ms. Scalli approximately $242,000.  In 2002, the Company paid Ms. Scalli approximately $428,000.  In 2003, for her employment through February 4, 2003, Ms. Scalli earned approximately $83,300.  In 2001, the Company paid Mr. Scalli $15,746.91 directly.  In 2002, the Company paid Mr. Scalli $8,154.90 directly.  In 2003, for his employment through March 5, 2003, Mr. Scalli earned $2,966.10.  *See* R. Scalli Dep. at 67 (Day 2); E. Scalli Dep. at 86 (Day 2); Hicks Dep. at Ex. 11 (C01811, C01849, C01854, C01863-C01865).

27.    In 2002, Ms. Scalli was ranked as the top loan officer for the Company. If the loans originated by Mr. Scalli (10% to 20% of the loans) had not been included under Ms. Scalli's production, she would have been "neck and neck" with the loan officer ranked below her for the number one loan officer ranking. *See* E. Scalli Dep. at 87 (Day 2).

28.    Mr. Scalli and Ms. Scalli live together at 233 Main Street in Winthrop, Massachusetts. They worked for CMC out of their home. Mr. Scalli and Ms. Scalli maintain a joint checking account. They also have a joint savings account. Ms. Scalli "handles all the money" for both herself and Mr. Scalli. *See* R. Scalli Dep. at 7, 27-29 (Day 2), 32-33 (Day 2); E. Scalli Dep. at 4, 28 (Day 2), 39 (Day 2); Conn. Dep. at 234.

29.    In March 2002, Mr. Scalli received a renewal letter for his position as loan originator. Mr. Scalli signed and returned this renewal letter. The renewal letter does not include any statement concerning a $50,000 salary or eligibility for a $1,000 forgivable draw for each million dollars in loans originated in excess of $50 million. *See* R. Scalli Dep. 88; 99-105 (Day 2); Exs. 5, 12.

## IV.    Mr. Scalli's and Ms. Scalli's Termination from Employment

30.    Jean Barbosa is a plasterer contractor who did work in buildings owned by Mr. Scalli. Mr. Barbosa worked for Mr. Scalli during the Scallis' employment with CMC. *See* E. Scalli Dep. at 110-111; R. Scalli Dep. at 125.

31.    Mr. Barbosa was interested in obtaining a mortgage for a property at 331 Paris Street in East Boston. Mr. Barbosa's loan was originated out of the Scallis' office. *See* E. Scalli Dep. at 113, Ex. 9.

32.    The purchase and sale agreement for the Paris Street property was entered into on December 13, 2002. The purchase and sale agreement provides that $14,750 was paid as a deposit, that this deposit shall be retained by the seller as liquidated damages if the buyer fails to

perform his duties under the agreement.  If, however, despite the buyer's attempts, he is unable to obtain a mortgage for the property, any payments made under the agreement will be refunded to the buyer.  *See* Walsh Dep. at Ex. 3 (C03985-C03986).

33.     On January 9, 2003, Mr. Barbosa's loan applications for the property on Paris Street were approved by the Company.  *See* Walsh Dep. at 18, 62-63, Ex. 3 (C03933-C03936, C04040-4043).

34.     On January 16, 2003, after CMC had approved Mr. Barbosa's loan applications, a denial letter was issued by Ms. Scalli's office.  Ms. Scalli testified that she cannot be sure that it is her signature on the denial letter.  Ms. Scalli did not have authority to issue denials unless she had permission from Ms. Walsh or Mr. Conn.  Ms. Walsh gave Luis Riascos, who worked for Ms. Scalli, permission to issue this denial letter.  This denial was created from a form on Ms. Scalli's laptop computer.  *See* E. Scalli Dep. at 116, 119-120, 126-127, Ex. 10.

35.     At some point after this, Steven Roussel (a Sales Manager who had worked at CMC since August 1999 and helped recruit the Scallis) received a complaint from a realtor, Tony Giacalone, about a decline letter Mr. Giacalone received from Ms. Scalli.  Mr. Giacalone did not think the decline letter was authentic and he believed that the decline letter was being used so that the borrower (Jean Barbosa) could buy a different house.  Mr. Giacalone told Mr. Roussel that he understood Mr. Barbosa was under agreement to buy another house.  *See* Roussel Dep. at 11, 14-16, 32-33, 224-225, 265.

36.     Mr. Roussel told Mr. Giacalone that he did not think Ms. Scalli would "do something like that."  Mr. Roussel was attempting to exonerate Ms. Scalli.  Mr. Roussel did not know if the decline letter was authentic because it had an address on it that he was not used to seeing (instead of the Quincy address) and he was not used to a loan officer signing a decline letter.  Mr. Roussel has never declined a loan and he never requested authority from anyone to issue a decline letter.

Mr. Roussel understood that a loan officer cannot make credit decisions.  Mr. Roussel is aware that decline letters include a loan officer's name but not their signature.  Decline letters have loan officers' names on them because loan officers are the primary contact with the client.  Therefore, since Mr. Roussel did not know if the decline letter was authentic, he gave the decline letter to Mr. Diranian, who was Ms. Scalli's Sales Manager, so that Mr. Diranian could investigate the matter.  *See* Roussel Dep. at 13, 17-18, 28, 49, 53, 74-75, 123, 134, 137-138, 253, 255, 261-262; Walsh Dep. at 148-150 (Day 2); Diranian Dep. at 197-198.

37.    Mr. Diranian thought that the decline letter, signed by Ms. Scalli, "just wasn't right," "it looked like a mock up document," "someone…basically fudged a document" and it looked "unprofessional."  Mr. Diranian forwarded the decline letter to Mr. Conn.  Mr. Diranian was aware that a decline letter could only be issued by an underwriter or a designated underwriter.  Therefore, it was a violation of policy for a loan officer to issue a decline letter.  This rule (of not allowing loan officers to make credit decisions) is a policy at all mortgage companies.  *See* Diranian Dep. at 72-73, 75, 86, 164-165, 174, 177, 198.

38.    After receiving the decline letter from Mr. Diranian, Mr. Conn requested that Elizabeth Walsh (CMC Operations Manager for Massachusetts) review the loan file for Jean Barbosa.  The file revealed that the loan had not been declined but rather had been approved by CMC.  Neither Mr. Conn nor Ms. Walsh had the authority to authorize a loan officer to issue a decline letter.  *See* Walsh at 55; Conn at 56-58, 123-124, 157; Hicks Dep. at 40.

39.    Mr. Conn contacted Joyce Hicks, a Senior Human Resources Generalist Assistant Vice President, to state that there was concern regarding the fact that Ms. Scalli had issued a denial letter.  Ms. Hicks consulted with Sharon Costa, Vice President CMC Operations, about the decline issued by Ms. Scalli.  Ms. Costa explained to Ms. Hicks that underwriters and center operations managers are the only ones authorized to deny a loan.  A loan officer may not approve

or deny a loan. The reason a loan officer may not make credit decisions on loans is because loan officers are paid commissions and a conflict exists if a loan officer, for example, approves a loan because she is financially benefiting from the loan. This is a standard policy in the mortgage industry. *See* Hicks at 7, 15-17, 20, 32, 79.

40. According to terms of a purchase and sale agreement, if a loan is declined a buyer obtains his or her deposit back from the seller. If the buyer withdraws the loan, the seller keeps the deposit. It is to the buyer's advantage, if he or she wants to get out of the loan, to have the loan declined so the buyer can get his or her deposit money returned. *See* Hicks Dep. at 65; Walsh Dep. at Ex. 3 (C03985-C03986).

41. Ms. Scalli owned property at 208 Maverick Street. In February 2003, at the time of her termination from employment, Ms. Scalli was selling her property on Maverick Street to Mr. Barbosa. *See* E. Scalli Dep. 111-112; R. Scalli Dep. at 131-132.

42. Ms. Hicks consulted with her supervisor, Debra Cornish, concerning the Scallis' employment and potential violations of CMC's policies and Citizens' Code of Ethics. Ms. Hicks and Ms. Cornish agreed that if Ms. Scalli made a credit decision on a loan her employment would be terminated. They also agreed that Mr. Scalli's employment would be terminated or suspended pending further investigation concerning his involvement in his matter. After she discussed this matter with Ms. Cornish, Ms. Hicks, along with Mr. Conn and Alexander Buor (from security), met with Ms. Scalli and Mr. Scalli (separately) on February 4, 2003. Shortly after these meetings, Ms. Hicks wrote memoranda to the file describing the details of these meetings. Ms. Scalli's employment was terminated on February 4, 2003. Ms. Scalli's employment was terminated because she "breached the cardinal rule for loan officers." Loan officers are not permitted to make credit decisions on loans. Mr. Scalli's employment was

suspended on February 4, 2003, pending further investigation.  *See* Hicks Dep. at 34-35, 62, 76, 16 (Day 2); Exs. 9, 10 (C02312, C02313); Hicks Aff. at ¶¶ 9, 10.

43.     During the February 4, 2003 meeting, Ms. Scalli admitted that her office had issued the denial letter and admitted that it looked like her signature on the denial letter.  Mr. Scalli told Ms. Hicks that he would have to get back to her regarding whether or no he owned the house on Maverick Street.  *See* Hicks Dep. Exs. 9, 10; E. Scalli Dep. at 137-140; R. Scalli Dep. at 126-127.

44.     Mr. Scalli claims that the day after he was suspended he called Ms. Hicks.  At that time he knew that the property at 208 Maverick Street "wasn't [his] building and that [Ms. Scalli] was … selling Mr. Barbosa that building."  Mr. Scalli did not tell Ms. Hicks that Ms. Scalli was selling 208 Maverick Street to Mr. Barbosa because Ms. Hicks asked Mr. Scalli if *he* owned the property at 208 Maverick Street.  Ms. Hicks did not ask him if *Ms. Scalli* owned the Maverick Street property.  *See* R. Scalli at 130-132.

45.     While Mr. Scalli's employment was suspended, an issue came to light about a loan done for the customers, Paula Castillo, Andres Castillo and Raphael Guerrero.  CMC found irregularities concerning this loan.  For example, signatures on two documents did not match, social security numbers did not match and the tax return was fraudulent.  Additionally, there was "gift money" associated with the loan in which the customer only had a portion of the money and the remaining dollars came out of Mr. Scalli's and Ms. Scalli's bank account.  Citizens determined that the joint account of the Scallis issued money to the customer as a gift.  Loan officers are not permitted to give a customer money to enable them to get a loan that they did not qualify for on their own.  *See* Hicks Dep. at 30, 35, 39, 118-119, 206 (Day 2), Ex. 9 (C02331, C02333), Ex. 15 (C02334-C02338); E. Scalli Dep. at 28-30, 34, 36 (Day 2), Exs. 16-19.

46.    While he was suspended, Ms. Hicks attempted to reach Mr. Scalli but he did not return her calls. Since he did not return her calls, the Company sent Mr. Scalli a letter indicating that his employment was terminated. Mr. Scalli's employment was terminated on March 5, 2003, due to suspected improper activity relative to mortgage originations and his failure to cooperate with the ongoing investigation. *See* Hicks Dep. at 115, 117 (Day 2); Hicks Aff. at ¶ 13**.**

47.    Neither Mr. Scalli nor Ms. Scalli mentioned that they were owed any commissions or other wages at the time of their termination. If fact, during the entire two years that they were employed by CMC neither Mr. Scalli nor Ms. Scalli complained to anyone (aside from Mr. Conn) about the fact that they were allegedly owed certain payments based on Mr. Conn's promises. Before making the decision to terminate their employment and at the time of their termination, Ms. Hicks and Ms. Cornish were not aware of Mr. Scalli's claim that Mr. Conn promised him a $50,000 salary and other bonus payments, nor were they aware of Ms. Scalli's claim that Mr. Conn promised her higher basis points on loans and other bonus payments. *See* Hicks Aff. at ¶ 14; Cornish Aff. at ¶ 6; E. Scalli Dep. at 59-60; R. Scalli at 68-69, 79-80, 86.

48.    Ms. Scalli asserts that she was not paid commission on certain loans that she originated in December 2003 which were fully funded before her termination from employment. The Company's wage records, however, demonstrate that Ms. Scalli was paid commission for all loans that she originated which were funded on the system up to, and including, her last day of employment. *See* E. Scalli Dep. at 57 (Day 2); Hicks Aff. at ¶ 15.

**V.    Events After the Termination of The Scalli's Employment**

**A.    Alleged Defamation**

49.    In their complaint, Plaintiffs allege that Victoria Noel, a CMC employee, communicated with Danielle Felice and Javier Pico stating that Mr. Scalli and Ms. Scalli had been "indicted for bank fraud." Ms. Noel worked as a loan officer under Mr. Diranian. Ms. Noel's employment

with CMC ended on April 1, 2003. Compl. at ¶ 23; Roussel Dep. at 119-20, 165; Hicks Aff. at ¶ 16.

50.    Ms. Felice, a real estate broker, was never provided with any negative information concerning the Scallis from the Company. Ms. Felice has never met or spoken with Ms. Noel and Ms. Noel never told Ms. Felice that the Scallis had been indicted on bank fraud. Felice Aff. at ¶¶ 2-5.

51.    Mr. Pico is Mr. Scalli's attorney. Mr. Pico, both in 2003 and presently, performs real estate closings for Ms. Scalli. Mr. Pico is currently representing Mr. Scalli in a legal dispute. *See* R. Scalli Dep. at 8-9, 49-50 (Day 2); E. Scalli Dep. at 126 (Day 2).

## B.    Aruba Sales Trip

52.    Ms. Scalli alleges that in January 2003, she was promised an all expense trip to Aruba for being a "top producer" in 2002. Although she qualified for the trip, Ms. Scalli elected not to go on the sales trip in 2002. The sales trip in 2003 occurred after Ms. Scalli's employment with CMC ended. While there is no dispute that Ms. Scalli would have been eligible to attend this sales trip, "[a]ll Loan Officers that are eligible to receive the Sales trip Award must be classified as an employee in good standing with Citizens at the time the award is received and/or upon commencement of the trip." Ms. Scalli was no longer a CMC employee at the time of the 2003 sales trip. Therefore, she was not eligible for the trip. *See* Compl. at ¶ 19; E. Scalli Dep. at 70-72; Hicks Dep. at 201; Ex. 13 (C02258, C02266).

## C.    Communication with GMAC

53.    During Mr. Scalli's suspension from employment, Ms. Hicks became aware that Ms. Scalli may have accepted employment with GMAC. Because Mr. Scalli and Ms. Scalli worked together at Citizens, Ms. Hicks suspected that Mr. Scalli may also be applying for employment at GMAC. As a result, a Citizens representative called GMAC to confirm whether

or not Mr. Scalli had accepted employment at GMAC during his suspension from employment with Citizens. Mr. Scalli has never worked for GMAC. *See* Hicks Aff. at ¶ 12; R. Scalli at 114.

54.     During his interview with Hancock Realty (where he worked after his termination from employment with CMC) he was asked about "rumors." Shortly after this interview, he was offered a position and began employment with Hancock Realty. *See* R. Scalli at 44-46 (Day 2);

55.     Ms. Scalli asserts that someone from Citizens interfered with her employment at GMAC by calling to see if her husband was employed by GMAC. Ms. Scalli also claims that a representative from GMAC asked her if she committed any fraudulent acts at Citizens. The GMAC employee who inquired about whether or not Ms. Scalli committed fraudulent acts at Citizens asked her about this *before* she was hired by GMAC. Ms. Scalli has held the position of Sales Manager/Senior Loan Officer at GMAC since February 2003. *See* E. Scalli at 91-94 (Day 2), 5.

56.     In 2003, Ms. Scalli earned approximately $210,000 from GMAC and in 2004 she earned over $200,000 from GMAC. *See* E. Scalli Dep. at 88-89 (Day 2).

## D.     Non-Payment of Wage Complaints

57.     On December 9, 2003, both Mr. Scalli and Ms. Scalli filed complaints for non-payment of wages with the Massachusetts Office of the Attorney General. Mr. Scalli's non-payment of wage complaint, filed against Citizens Bank/Citizens Financial Group, Inc., alleges a total amount owed of $50,000. Ms. Scalli's non-payment of wage complaint, also filed against Citizens Bank/Citizens Financial Group, Inc., alleges a total amount owed of approximately $53,000. *See* Gaeta Aff. at Tab 1.

Respectfully submitted,
CITIZENS FINANCIAL GROUP, INC.
By its attorneys,

/s/ Anne M. Gaeta
Bradford J. Smith (BBO No. 550325)
Anne M. Gaeta (BBO No. 643299)
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

Dated:  July 15, 2005

LIBB/1349132.4