# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * *   *
ELEANOR SCALLI and ROBERT SCALLI,   *
    Plaintiffs                      *
                                    *
VS.                                 *   CIVIL ACTION
                                    *   NO. 03CV-12413DPW
CITIZENS FINANCIAL GROUP, INC.,     *
    Defendant                       *
* * * * * * * * * * * * * * * *     *
```

**DEPOSITION OF ELEANOR SCALLI**, called by the

Defendant, pursuant to the applicable provisions of the

Federal Rules of Civil Procedure, before Ruth E. Hulke,

Certified Shorthand Reporter No. 114893 and Notary Public

for the Commonwealth of Massachusetts, at Goodwin

Procter, Exchange Place, Boston, Massachusetts, on

Tuesday, February 15, 2005, commencing at 10:25 a.m.

# *Leavitt Reporting, Inc.*

*1207 Commercial Street, Rear*                          *Tel. 781-335-6791*
*Weymouth, MA 02189*                                    *Fax: 781-335-7911*
                                                        *leavittreporting@att.net*

*Hearings ◆ Conferences ◆ Legal Proceedings*

1   APPEARANCES:

2

3       BRADFORD J. SMITH and ANN M. GAETA, ESQ., of Goodwin
    Procter, Exchange Place, Boston, Massachusetts, 02109, on
    behalf of the Defendant.

4

5       MARK BURKE, ESQ., of Law Office of Mark Burke, 111
    South Bedford Street, Suite 208, Burlington,
    Massachusetts, 01803, on behalf of the Plaintiffs.

6

7       NICHOLAS J. DIMAURO, ESQ., of Law Office of Nicholas
    J. DiMauro, 111 South Bedford Street, Suite 208,
    Burlington, Massachusetts, 01803, on behalf of the

8   Plaintiffs.

9

10  ALSO PRESENT:    Robert Scalli
                    Jeffrey Siegel, Esq.

11

12

13

14

15

16

17

18

19

20

21

22

23

```
 1                      I N D E X

 2   WITNESS        DIRECT   CROSS    REDIRECT    RECROSS

 3   Eleanor Scalli    4

 4

 5

 6                    E X H I B I T S

 7   NUMBER                                      PAGE
```

```
 8     1    2-21-01 letter from Tribelli to Scalli  19

 9     2    Loan Officer Commission Incentive Plan  19

10     3    Code of Ethics signature page           19

11     4    Code of Ethics, eight pages             24

12     5    Loan Officer Minimum Standards          24

13     6    Loan Officer Minimum Standards          24

14     7    Complaint                               100

15     8    E-mail from Claudia Arrendondo          108

16     9    Citizens Mortgage Approval Letter       113

17    10    Statement of Credit Denial, Termination
            Or Change                               116
18
      11    E-mail                                  130
19
```

```
20

21

22

23
```

1                    P R O C E E D I N G S

2                      (Witness sworn)

3            MR. SMITH:  Can we reserve all objections,

4    except to the form of the question, until time of trial

5    as well as motions to strike?

6            MR. BURKE:  Motions to strike as well, yes.

7            MR. SMITH:  I would like the witness to review

8    and sign the deposition transcript.

9            MR. BURKE:  Waive the notorization?

10           MR. SMITH:  Okay.

11           ELEANOR SCALLI, having been duly sworn,

12   testified as follows in answer to direct interrogatories

13   by Mr. Smith:

14       Q.    Can you state your name?

15       A.    Eleanor Scalli.

16       Q.    Where do you live currently?

17       A.    I live at 233 Main Street in Winthrop,

18   Massachusetts, 02152.

19       Q.    How long have you lived there?

20       A.    Since 1998.

21       Q.    Are you married?

22       A.    Yes, I am.

23       Q.    Is your husband here today?

1       A.    Yes.

2       Q.    What is his name?

3       A.    Robert Scalli.

4       Q.    Do you have any children?

5       A.    I do.

6       Q.    How many?

7       A.    Two.

8       Q.    Their names, just for the record?

9       A.    Jake and Jacqueline.

10      Q.    How old are they?

11      A.    Nine and five.

12      Q.    Where do you presently work?

13      A.    General Motors, GMAC Mortgage Corporation.

14      Q.    What position do you hold?

15      A.    Sales manager/senior loan officer.

16      Q.    How long have you held that position?

17      A.    Since February of 2003.

18      Q.    So the same position throughout your entire

19  employment.  Is that correct?

20      A.    Yes.

21      Q.    You were hired into that position?

22      A.    Yes.

23      Q.    Who do you report to presently?

1          Q.    Okay.  Do you remember the income that your
2    husband earned during 2004?
3          A.    No.
4          Q.    Do you remember his income level for 2003?
5          A.    I don't remember that either.
6          Q.    All right.  Miss Scalli, do you remember when
7    your employment began with Citizens Bank?
8          A.    Yes.
9          Q.    When was that?
10         A.    Around March of 2001.
11         Q.    March of 2001.  How did you find out about
12   Citizens Bank or Citizens Mortgage and about employment
13   opportunities there?
14         A.    From Bard Conn.
15         Q.    Did Bard Conn contact you?
16         A.    Yes, he did.
17         Q.    When did he contact you about employment?
18         A.    I don't know the exact time.  It was months
19   before, though.
20         Q.    Months before your hire in approximately March?
21         A.    Yes.
22         Q.    How did you know Bard Conn?
23         A.    I didn't.

1      Q.    So when he contacted you, it was the first time
2    you had spoken to him?
3      A.    Yes.
4      Q.    Did he tell you how he got your name?
5      A.    I don't remember if we ever spoke about that.
6      Q.    Where were you working at the time when he
7    called you?
8      A.    North American Mortgage Company.
9      Q.    What was your position at North American?
10     A.    Loan officer.
11     Q.    How long had you worked at North American
12   Mortgage Company?
13     A.    Couple of years.
14     Q.    Had you been a loan officer for that period of
15   time?
16     A.    Yes.
17     Q.    So when you were first employed at North
18   American, was it as a loan officer?
19     A.    Yes.
20     Q.    And functioning as a mortgage originator?
21     A.    Yes.
22     Q.    When Bard Conn called you, was it on the phone
23   that he contacted you?

1   A. Yes.

2   Q. Do you remember anything about that phone call?

3   A. They were very friendly conversations.

4   Q. What did he say?

5   A. His main focus was how can I get you to come to

6 work for me.

7   Q. What did you say in response?

8   A. At first I told him I was happy where I was and

9 that it would have to be a good offer.

10   Q. What did he say?

11   A. That he would make me the best offer.

12   Q. Eventually did he make you an offer --

13   A. Yes.

14   Q. -- that you accepted?

15   A. Yes.

16   Q. What was that offer that he made?  Was it

17 verbally or was it in writing?

18   A. First verbally.

19   Q. What did he say when he made that verbal offer?

20 Do you remember?

21   A. I don't remember exactly what he said.

22   Q. Did you write it down?

23   A. I may have.

1          Q.    Do you have notes of that conversation?

2          A.    I would have to look.

3          Q.    If you could, that would be appreciated.  I

4    think it was among the documents we requested, but I

5    would like to see if you do have any notes of

6    conversations with Mr. Conn.  Did you speak with anyone

7    else at Citizens other than Mr. Conn prior to you

8    accepting employment?

9          A.    I can't remember.  All of my conversations

10   mostly took place with Bard Conn.

11         Q.    At some point did Mr. Conn send you an offer

12   letter, a written offer letter?

13         A.    He did.  It came, I believe, I can't remember

14   if it was before I accepted or after I accepted because

15   mostly everything was verbal.

16         Q.    Was your acceptance verbal?

17               MR. BURKE:  Objection.

18               MR. SMITH:  What's the objection?

19               MR. BURKE:  You do have some documents in front

20   of you, and specifically I believe there's an agreement.

21   So when you refer to the acceptance, are you referring to

22   the document or just a verbal?

23               MR. SMITH:  It's a follow-up, Mark, to her

1        A.    I can't remember.

2        Q.    Have you sued other employers other than

3   Citizens and Repligen?

4        A.    No.

5        Q.    Those are the only two?  Okay.  Other than the

6   claim against Repligen, have you ever brought a claim of

7   discrimination or harassment of any sort?

8        A.    I can't remember.

9        Q.    Is there anything that would help you remember?

10            MR. BURKE:   Objection.

11        A.    I can't remember.  I'm sorry.

12        Q.    Let me show you what has been marked as

13   Exhibits 1 and 2 in this case.  There are the marked

14   ones.  I would ask you to review those, if you would,

15   please, Ms. Scalli.

16            (A pause)

17            (Documents marked Exhibit Nos. 4, 5 and 6 for

18   Id.)

19        Q.    Have you had a chance to read the document?

20        A.    Yes.

21        Q.    Is that your signature at the end of the

22   document?

23        A.    Yes.

1       Q.    It's dated February 22nd, 2001.  Is that the

2   date on the document?

3       A.    Yes.   That's the date on this document.

4       Q.    So that's the date you signed it.  Is that

5   correct?

6       A.    The first couple of pages of this document

7   changed several times.

8       Q.    But this three-page document that has been

9   identified as Exhibit 2 was signed and dated by you on

10  February 22nd, 2001.  Is that correct?

11      A.    This one was, yes.

12      Q.    And that's your Social Security number --

13      A.    Yes.

14      Q.    -- on the bottom of Page 3?

15      A.    Yes.

16      Q.    So you're saying that this is the initial

17  document that you signed, but that the first two pages

18  were later changed during the course of your employment

19  at Citizens?

20      A.    Yes.

21      Q.    Tara Tribelli was a recruiter who signed the

22  document on the same day above your signature.  Do you

23  see that --

LEAVITT REPORTING, INC.

1      Q.   At the time you signed this document on
2  February 22nd, 2001, did you confirm that it was
3  consistent with the verbal terms of employment that Mr.
4  Conn had offered you?
5      A.   Yes.  This document changed several times
6  because the verbal was different than the actual
7  document.
8      Q.   But at the time you signed it on February 22,
9  2001, at that time was it consistent with the verbal
10 terms that Mr. Conn had offered you?
11     A.   No.
12     Q.   It was inconsistent?
13     A.   Correct.
14     Q.   Okay.  How was it inconsistent at the time you
15 signed it?
16     A.   Compensation at time of hire is incorrect.
17     Q.   Okay.  And that appears on which page?
18     A.   That appears on the first page.
19     Q.   Under Section 2-A?
20     A.   Correct.
21     Q.   All right.  What was the verbal term that Mr.
22 Conn had offered you?
23     A.   It was thirty thousand.

1          Q.    A $30,000 advance?

2          A.    Yes.

3          Q.    Did you receive an advance after your

4    employment with Citizens started?

5          A.    Yes.

6          Q.    How much did you receive in advance?

7          A.    Fifteen thousand.

8          Q.    You only received fifteen?

9          A.    Correct.

10         Q.    Now, when Mr. Conn gave you this letter that's

11   been marked as Exhibit 2, did you realize that section

12   2-A only stated a $15,000 advance?

13         A.    I don't remember.  I just know that it was

14   inconsistent with the verbal.

15         Q.    Do you remember telling Mr. Conn that that

16   section, Section 2-A, was inconsistent with what he had

17   verbally told you?

18         A.    Yes.

19         Q.    When did you tell him that?

20         A.    I don't remember when.

21         Q.    Do you remember telling him that prior to when

22   you signed the document?

23         A.    I remember this first couple of pages changing

1    several times, and he had the signature page and told me

2    not to worry about it, that he would fix it.  The first

3    two pages changed several times.

4        Q.    When you say they changed several times, did

5    the first two pages change during the course of your

6    employment at Citizens?

7        A.    During the course of accepting the, during the

8    course of the negotiation of what we spoke about for

9    compensation.

10       Q.    Do you have those other versions of Pages 1 and

11   2 of this letter?

12       A.    I don't know.

13       Q.    I need you to look and check in your files.

14   Those are documents that we have asked for, so it's

15   important, if you do have them, we would like to get

16   copies of them.

17       Now, you said after your employment with Citizens,

18   you only received the $15,000 advance.  Is that correct?

19       A.    Yes.

20       Q.    So you did not receive a $30,000 advance.  Is

21   that correct?

22       A.    No, I did not.

23       Q.    Did you complain about that?

LEAVITT REPORTING, INC.

1    Q.    What had you worked out with him?

2    A.    70 basis points.

3    Q.    For monthly dollars in excess of a million

4  dollars?

5    A.    70 basis points in excess of a million dollars.

6  I can't be sure about the million.  I don't know if there

7  was a cap on it.

8    Q.    But at some point in your loan origination you

9  were eligible for 70 basis points, according to what Mr.

10  Conn told you?

11    A.    I can't remember the exact amount because we

12  had it worked out for my assistant, too.  My bottom line

13  was 70.  I think if you add 9 to it, it was really 79.

14  Nine out of 79 he was going to pay to my assistant

15  directly.  I'm not sure about the 9.  It could be one

16  digit off.  I'm not sure exactly about the exact amount,

17  but it was somewhere in that range.

18    Q.    When you saw this letter or Mr. Conn gave it to

19  you, did you raise that issue with him?

20    A.    I did.

21    Q.    What did you say?

22    A.    I said it's not what we spoke about.

23    Q.    What did he say?

1       A.    I'll fix it.

2       Q.    Did he fix it?

3       A.    I don't remember if he fixed it, but I got the

4   amount that I was supposed to on some of the commission

5   reports that came out.  I don't know if this was actually

6   fixed.

7       Q.    So you don't know if he subsequently issued a

8   new offer letter with the proper commission rate on it?

9       A.    Exactly.

10      Q.    You can't remember?

11      A.    I can't remember.

12      Q.    But you do know that you got paid on the basis

13  of 79 basis points for some certain loans?

14      A.    I never said 79.

15      Q.    I'm sorry.  70 basis points.  Is that correct?

16      A.    Around that area, yes.

17      Q.    Were you eligible for that 70 basis points from

18  the beginning of your employment with Citizens, or was

19  that a condition that began to occur during your

20  employment?

21      A.    That was all arranged before my employment.

22      Q.    What else about this offer letter was

23  inconsistent with what Mr. Conn verbally told you prior

1   to your employment?  Is there anything else that is
2   inconsistent?
3        A.    Not that I can see or that I can think of right
4   now.
5        Q.    Is there anything else that would help you
6   identify any other inconsistencies that you can think of?
7        A.    I don't understand the question.
8        Q.    Sorry.  Are there any other documents, such as
9   notes that you might have, that would help you identify
10  any other inconsistencies in the letter?
11       A.    Not that I can think of.
12       Q.    Okay.  Now, during the course of your
13  employment, and you were employed at Citizens for
14  approximately two years, did Mr. Conn issue you new loan
15  officer commission incentive plans that he asked you to
16  review?
17       A.    He may have.  I know that this particular
18  document changed a couple of times, and I don't know if I
19  ever signed it again.  He always said he would take care
20  of it.  He would say, I'll take care of it.
21       Q.    When you say it changed a couple of times, did
22  it just change during the period prior to when you
23  started employment or did it actually change during the

1    period of your employment?

2        A.    I don't remember.

3        Q.    During the course of your employment, during

4    the approximately two years of your employment, did you

5    have discussions with Mr. Conn regarding your

6    compensation?

7        A.    Yes.

8        Q.    Can you tell me about those discussions?

9        A.    I don't know which discussions you're referring

10   to, you know, the time line when.

11       Q.    If we can, if it's easier for you, let's work

12   from the beginning of your employment.

13       A.    Okay.

14       Q.    In February or March of 2001, and work towards

15   February of 2003, and tell me about the discussions you

16   would have had with Mr. Conn relative to your

17   compensation.

18       A.    He had promised me $1,000 for every million

19   closed that was going to be given to me yearly as a

20   forgivable draw.

21       Q.    When did he promise you that?

22       A.    When he was recruiting me.

23       Q.    Prior to your employment starting?

1     A.     Yes.  And after as well we spoke about it.

2     Q.     Now, so I understand what you say Mr. Conn told

3  you, that he would pay you $1,000 for every million

4  dollars in loans that were closed.  Is that correct?

5     A.     Yes.

6     Q.     What was your understanding of when that

7  payment would be made to you?

8     A.     That would be paid, I don't remember the time

9  line, but it was supposed to be yearly.

10    Q.     Was it your understanding you would get paid at

11 the end of each year?

12    A.     Well, the end of the year in loans would be the

13 end of the year, so maybe at the beginning of the next

14 year.

15    Q.     Was that your understanding?

16    A.     Yes.

17    Q.     You said it was to be paid as a forgivable

18 draw.  Can you explain what your understanding of that

19 is?

20    A.     That you don't have to pay it back.

21    Q.     Do you remember approximately how many million

22 dollars in loans you closed during your first year of

23 employment at Citizens?

1      A.    I don't remember the exact amount.

2      Q.    Can you give me an approximate number?

3      A.    Thirty-five to forty million.

4      Q.    Did you receive this $1,000 bonus as a result

5  of achieving approximately thirty-five to forty million

6  dollars in total loans?

7      A.    No, I did not.

8      Q.    Did you receive any bonus for that?

9      A.    No.

10     Q.    Did you talk to Mr. Conn about the fact that

11  you hadn't received that?

12     A.    Yes, I did.

13     Q.    When did you talk to him about it,

14  approximately?

15     A.    I don't know exactly when.

16     Q.    Was it after your first year of employment

17  ended?

18     A.    I don't know exactly when it was.

19     Q.    Did you talk to anyone else at the bank other

20  than Mr. Conn about that?

21     A.    The only contact I had of a person to talk to

22  would have been Bard.  He was my direct boss.

23     Q.    Do you remember trying to talk to anyone in

LEAVITT REPORTING, INC.

1  more than, I would say, six months, you know, in the
2  first six months was the first complaint.
3      Q.   What did he say when you complained about that?
4      A.   He told me he would take care of it.  He also
5  told me that it was better for him to put it all under my
6  name because it all went under his numbers because I
7  reported directly to him.
8      Q.   Do you know who your husband reported to?
9      A.   Bard.
10      Q.   So he reported to him as well?
11      A.   He did.
12      Q.   So, is it your understanding since your husband
13  also reported to Mr. Conn that Mr. Conn would get credit
14  for any loans that were originated under your husband's
15  name?  Is that fair to say?
16      A.   I really never knew that because I think Mike
17  Diranian was somehow involved in that.  So meaning we
18  were two people, that Bob was supposed to go under Mike
19  Diranian's production and I was supposed to go under
20  Bard's production.
21      Q.   Why do you believe that?
22      A.   Because originally I was supposed to be under
23  Mike Diranian, under his production branch.

1      Q.    What's the basis for your belief that you were

2  originally supposed to be under Mike Diranian's

3  production branch?

4      A.    Because originally he was supposed to be my

5  boss, Mike Diranian was supposed to be my reporting

6  manager.

7      Q.    When did that change?

8      A.    Very quickly.  Right when I was hired, that

9  changed.

10     Q.    But it didn't change until after your

11 employment started?

12     A.    I don't understand the question.

13     Q.    Is it -- I'm trying to understand.  Is it your

14 belief that you reported to Mike Diranian until after you

15 actively started work at Citizens?

16     A.    My belief was at the time that I was recruited

17 by Bard that he was my boss.  Shortly thereafter my

18 understanding was it was supposed to be Michael Diranian,

19 and he had called me a couple of times, and I went back

20 to Bard and I said I'm not supposed to be reporting to

21 Mike Diranian, and he said okay.  He goes, that's when he

22 said that he was my direct boss.

23     Q.    Did Bard's statement to you that you just said

1       A.    No.

2       Q.    So when you say he switched the names by

3    substituting your name for someone else's name, on what

4    report did he make that substitution?

5       A.    For example, if a loan came out of my office

6    that Luis had put into his laptop, it would show up on my

7    commission report under my name.  I don't know anything

8    else that happened in between that process.  Bard did all

9    that.

10      Q.    Do you know, did Luis ever complain about the

11   fact that loans he originated he did not receive credit

12   for?

13      A.    Luis's pay compensation was a salary plus basis

14   points paid by Bard for total loans closed.

15      Q.    So as a result he would be receiving the same

16   amount of pay anyways?

17      A.    Exactly.

18      Q.    So he had nothing to complain about?

19      A.    He had nothing to complain about to that

20   respect.

21      Q.    Did you ever talk to anyone else other than Mr.

22   Conn at Citizens about the fact that Mr. Conn was

23   switching and substituting your name for other people's

1   names on these loan originations?

2        A.    I wouldn't have known anybody else to talk to.

3        Q.    Did you ever talk to Mike Diranian about it?

4        A.    No.

5        Q.    Did you ever talk to anyone in human resources

6   about it?

7        A.    No.  Just Bard.

8        Q.    Did you ever talk to anyone in underwriting

9   about it?

10       A.    No.

11       Q.    How about anyone else in the branch that you

12  occasionally worked out of?

13            MR. BURKE:  Objection.  You can answer if you

14  understand the question.

15       A.    I don't understand the question because I

16  wasn't in any, you know, around anybody else.

17       Q.    You knew Mike Diranian, didn't you?

18       A.    Yes.  I knew Mike Diranian, yes.

19       Q.    Can you tell me about other conversations that

20  you had with Mr. Conn concerning your compensation that

21  occurred during the course of your employment with

22  Citizens?  Just so you're clear, you told me about the

23  conversations about the $30,000 advance, you told me

1    paycheck and pay it to Bob.  I said to him, "How can you

2    do that?"  I never heard of something like that being

3    done, that I was going to check with my accountant

4    because we also wanted to contribute to 401(K)s

5    separately and we couldn't do that.

6         Q.    Why couldn't you do that?

7         A.    Because my husband wasn't getting any money to

8    pay or contribute to a 401(k) and I couldn't contribute

9    out of my paycheck for him.

10        Q.    Did you tell Mr. Conn that?

11        A.    Yes, I did.

12        Q.    What did he say?

13        A.    He said, "I know.  I'm in the process of trying

14   to take care of that.  Don't worry, I'll make it up to

15   you."

16        Q.    Did he ever make it up to you?

17        A.    I don't know what that meant, I'll make it up

18   to you.

19        Q.    Did you ask him what it meant?

20        A.    No.  I just know that after more than a couple

21   of conversations my husband started getting, like, $500 a

22   week, and then I saw it was coming out of my paycheck.

23   And I complained about that.

1       Q.    Did anything happen after you complained?

2       A.    No.

3       Q.    Did that continue?

4       A.    It continued for a while, yes.

5       Q.    For how long did that continue?

6       A.    Maybe six months.  I'm not sure on the precise

7   time, but around maybe six months.

8       Q.    Then what happened at the end of that

9   six months?

10      A.    The new year came around.

11      Q.    What happened then?

12      A.    I had asked him again for the forgivable draw.

13      Q.    And?

14      A.    He told me he was in the process of making up

15  the new agreements.

16      Q.    Did he ever send you a new agreement?

17      A.    No.  I was terminated shortly thereafter.

18      Q.    So when you say the new year, you meant 2003 --

19      A.    Yes.

20      Q.    -- came around?  Okay.  So is it fair to say

21  that you said that the $500 deduction from your check

22  continued for approximately six months?  Is that right?

23      A.    Six months prior to the 2003 year, to my

1    recollection.

2         Q.   So it started approximately in June or July of

3    '02?

4         A.   Around there, I think.  I can't be sure on

5    those dates.  I would have to go back and look at all of

6    the stubs which I did keep a lot of them.

7         Q.   Now, Bard told you he was in trouble with HR

8    because they hadn't been paying your husband, Robert

9    Scalli, correctly?

10        A.   Yes.

11        Q.   Did you ever talk to HR about that?

12        A.   No, I did not.  He told me there was no need

13   to, that he would take care of it.

14        Q.   But you said he didn't take care of it?

15        A.   He didn't.

16        Q.   And you didn't follow up with HR?

17        A.   It was a short period of time, like a six-month

18   period.  I did not follow up.  I didn't know who to

19   follow up with.

20        Q.   Did you ever talk to HR about your 401(k)

21   eligibility or your husband's 401(k) eligibility?

22        A.   I think I did, but I don't remember exactly

23   when I did.  That's how I knew that my husband couldn't

1  Scalli is conferring with her counsel.

2      Q.    Did you have something to say?  Did you want to

3  amend an answer that you gave previously?

4      A.    Yes.  Concerning compensation, I was put into

5  -- for the volume I was put into the President's Club

6  where I would receive additional compensation for closed

7  loans.

8      Q.    When were you put into the President's Club?

9      A.    I believe it was after the first year.

10     Q.    Do you know who put you in the President's

11 Club?

12     A.    Bard did.

13     Q.    What additional compensation were you eligible

14 for as a member of the President's Club?

15     A.    I don't remember the exact amount, but there

16 was vacations involved.  I had won a vacation in our

17 President's Club.  I don't remember the amount of basis

18 points, but it was additional basis points per volume of

19 closed loans.

20     Q.    Did you receive those additional basis points

21 under the President's Club practice?

22     A.    I believe I did.

23     Q.    Did you receive vacations as part of the

1   President's Club?

2       A.   I did not go on the vacations.  I didn't have

3   care for my children.

4       Q.   Okay.  Were those Aruba vacations?

5       A.   Yes.  It might not be Aruba.  I don't remember

6   where it was.  It could have been Mexico.

7       Q.   But you declined to participate in those?

8            MR. BURKE:  Objection.

9       Q.   Based on the fact that you didn't have child

10  care?

11      A.   Well, I don't remember if that was the exact

12  reason.

13      Q.   But to be clear, you decided that you did not

14  want to go for some reason?

15      A.   I don't remember what the reason was in 2002.

16  I don't remember what the exact reason was.

17      Q.   But I'm not asking you about the exact reason.

18  I want to confirm it was you who decided that you would

19  not go in 2002.

20      A.   Yes.

21      Q.   In 2003, is it fair to say that the vacation

22  trip occurred after your employment ended?

23      A.   Yes, and I was going to go.

1      Q.    You were going to go?

2      A.    Yes.

3      Q.    But the trip actually occurred after your

4    employment ended.  Is that correct?

5      A.    Yes.

6      Q.    Were there any other vacations other than that

7    2002 trip and the 2003 trip that you may have been

8    eligible for under the President's Club?

9      A.    Vacations, not that I can think of, but there

10   were other sales incentives like rallies and, you know,

11   dinners and meetings and things like that.

12     Q.    Rallies, dinners and meetings as sales

13   incentives?

14     A.    Yes.

15     Q.    Can you explain that?  When you say a rally,

16   what is a rally?

17     A.    I call it a rally.  It's when a bunch of

18   salespeople get together and cheer themselves on, you

19   know, that we're all celebrating our successes.

20     Q.    And you participated in those?

21     A.    No, I did not.

22     Q.    Why didn't you?

23     A.    Well, I was very busy, and Bard would tell me

LEAVITT REPORTING, INC.

1    into the mix, it changed because the first assistant I

2    had Bard fired him.

3        Q.    Who was that?

4        A.    That was Francisco Espaillat.

5        Q.    How long after your employment started did Bard

6    fire Francisco?

7        A.    I don't know the exact time when that occurred.

8    I don't know the exact date.

9        Q.    Is it possible that Francisco Espaillat worked

10   with you for the entire first year until March of '02?

11       A.    I don't remember it being that long.  Bard sent

12   him down to work with him for a couple of months.  To my

13   knowledge, it was January of '02, around that time.  I

14   can't be sure.

15       Q.    Had you had any interaction with Mr. Conn when

16   you worked at North American?

17           MR. BURKE:    Objection.

18       Q.    Did you work with Mr. Conn prior to your

19   employment with Citizens Bank?

20       A.    Did I work with him?

21       Q.    Yes.

22       A.    I don't know what you mean, work with him.

23       Q.    What do you understand work --

1      A.    Well, Bard was my boss, so I didn't work with

2  him.  So I don't know what -- When you say did I work

3  with him, he was my boss.  Did I work for him?

4      Q.    Yes.  No, no, I don't mean that.  Prior to your

5  employment at Citizens, had you ever been employed by the

6  same company as Mr. Conn was employed?

7      A.    To my knowledge, no.

8      Q.    Francisco Espaillat, did he work at North

9  American Mortgage?

10     A.    Yes.

11     Q.    Did he work with you?

12     A.    Yes.

13     Q.    Do you know why Mr. Conn terminated his

14  employment?

15     A.    There were a bunch of different reasons.

16     Q.    What were they?

17     A.    Well, Frank was consistently kind of messing

18  up.  He actually lost seven files of loans that he lost

19  when he was out on a weekend.  That was like the final

20  straw.

21     Q.    Did you agree with Mr. Conn's decision to

22  terminate him?

23     A.    No, I didn't.

1    Q.    Did you disagree with it?

2    A.    The last conversation I had with Bard about

3    that was that it would have been better if we taught him,

4    you know, how to be better at his job, and Bard had told

5    me it was going to be really painful at first, but in the

6    long run it would be better for me.

7    Q.    Now, I think you said when Frank Espaillat was

8    terminated that there was a change to your commission

9    rate.  Is that right?

10    A.    Well, I didn't say there was a change.  The

11    loan officer agreements were changed every time you added

12    an assistant on board, they were revised.

13    Q.    What revision occurred in connection with Mr.

14    Espaillat's termination?

15    A.    I don't know what occurred.

16    Q.    All right.  Then can you tell me about the

17    changes that occurred in your commission rates during the

18    course of your employment?

19    A.    Well, I had asked Bard, I said, "Since you're

20    taking so much out of me having an assistant, how are you

21    going to cover an assistant?"  He said, "I have the

22    perfect solution for that.  I'm going to get you temps so

23    we don't have to worry about the extra basis points."

1          Q.    Who was the first temp that you worked with?

2          A.    That's Luis Riascos.

3                MR. BURKE:  Can we take a break?

4                (Recess from 12:17 through 12:21 p.m.)

5                MR. SMITH:  On the record.

6          Q.    Miss Scalli, you said, I think you told me that

7    Bard Conn called you when you were at North American

8    Mortgage out of the blue to ask you about coming to work

9    for him at Citizens.  Is that correct?

10               MR. BURKE:  Objection.  You may answer.

11         A.    I didn't say he called me at North American

12   Mortgage.  I said he called me and I was employed at

13   North American Mortgage at the time.

14         Q.    Did he ever tell you how he got your phone

15   number?

16         A.    My phone number was kind of everywhere.

17   Everybody had my phone number.  I don't think I asked

18   him.  If I did, I wouldn't remember.

19         Q.    Prior to him calling you, did you know who Mr.

20   Conn was?

21         A.    Never heard of him --

22         Q.    You had never met him?

23         A.    -- that I could remember.  I mean, that's not a

LEAVITT REPORTING, INC.

1      A.    He told me it would be easier on myself and,

2  you know, he had the philosophy, the tried through time

3  philosophy the temps we could get rid of at any time and

4  we didn't have to go through the human resources stuff.

5      Q.    Who was the first temp you worked with?

6      A.    Luis Riascos.

7      Q.    Do you recall approximately what period of time

8  he worked with you?

9      A.    January of, let me see, 2002.

10     Q.    And what impact did the fact that there was a

11  temp assigned to you, what impact did that have on your

12  compensation or commission structure?

13     A.    There was no impact because, the way Bard

14  explained it was that he was going to be paying out of my

15  commission for the assistants, so he would delegate that

16  towards hiring a temp, so I wouldn't see, you know, there

17  wouldn't be any difference in my pay structure.

18     Q.    Did you determine whether it had any difference

19  in your pay structure?

20     A.    I would have noticed it, and I didn't notice

21  any decrease of any kind.

22     Q.    So is it fair to say that the existence of the

23  temp versus the assistant, there was no difference in

1   your pay structure?

2        A.   I didn't notice any difference.

3        Q.   Did you work with Luis Riascos from January of

4   2002 until your employment ended with Citizens?

5        A.   Yes.

6        Q.   Were there other temps in addition to Luis?

7        A.   Yes.

8        Q.   How many others?

9        A.   That I can think of, three.

10       Q.   Can you identify them?

11       A.   Actually four.  I can identify four.

12       Q.   Great.  Please do.

13       A.   Okay.  Luis Riascos, Flavia Oliveira.  I think

14   it's Oliveira.  I'm not sure about the last names.

15   Vanessa, I don't know the last name.

16       Q.   Pavesi?

17       A.   Yes.  Could be, but she got married.  There was

18   a different name before.  Matthew Furlong, and Edison

19   DeSousa.

20       Q.   Delarosa?

21       A.   Something like that.

22       Q.   Do you remember Ramon Carrasco?

23       A.   If I'm not mistaken, he came in for one day,

1  and he couldn't speak English, and Bard sent him home.

2  Somebody sent him home.

3       Q.   Do you remember Angela D'Avolio?

4       A.   Yes.  That was maybe a week.

5       Q.   Do you remember Reginal Gore?

6       A.   I don't believe he was a temp.

7       Q.   Do you remember him?

8       A.   Yes.

9       Q.   Was he an employee?

10       A.   He was an employee.

11       Q.   Do you remember Rodrigo Gazitua?

12       A.   No.

13       Q.   Do you remember anyone named Rodrigo?

14       A.   No.

15       Q.   Either as an employee or a temp?

16       A.   No.  Doesn't sound familiar.

17       Q.   How many temps typically did you have in the

18  office with you at one time?

19            MR. BURKE:  Objection.  From when to when are

20  you referring to?

21       A.   I don't know.  You would have to be, you know,

22  more specific.

23       Q.   Okay.  Then let's start from January of 2002,

1    when the temps started arriving.  During the period from
2    January to June of 2002, to be more specific, how many
3    temps did you have in your office?
4        A.    I don't remember from the time period and I
5    don't want to guess.  There were always two to three
6    people in my office.
7        Q.    What were they doing?
8        A.    Getting conditions, you know, anything that
9    needed to be done, you know, people helping with the
10   credit reports, helping getting the documents to get them
11   preapproved, running errands.  Anything that needed to be
12   done they would do.
13            MR. BURKE:  Did you want to start that break
14   now?
15            MR. DIMAURO:  12:30.  You still have a couple
16   of minutes.  Go ahead.
17       Q.    Do you know why Luis Riascos's employment
18   ended?
19       A.    I believe he resigned.
20       Q.    Do you know where he's working presently?
21       A.    Yes, I do.
22       Q.    Where?
23       A.    GMAC Mortgage.

LEAVITT REPORTING, INC.

1       Q.      Does he work with you?

2       A.      He does.

3       Q.      Did he work with you beginning in February of

4   2003?

5       A.      To my recollection, Luis came shortly

6   thereafter.  I don't know the exact dates.

7           MR. SMITH:  This is as good a time as any to

8   take a break.

9           (Whereupon, at 12:32 p.m., the deposition

10  recessed for lunch and reconvened at 1:06 p.m.)

11                  AFTERNOON SESSION

12          MR. SMITH:  Back on the record.

13      Q.      Miss Scalli, do you know what the criteria was

14  to be eligible for the President's Club?

15      A.      No, I don't.

16      Q.      Was it linked to how many mortgages an

17  originator originated or the total volume of those

18  mortgages?

19      A.      I thought it was just a top producers club,

20  like.  I don't know what it was linked to.

21      Q.      But it was linked, it was linked to the total

22  dollar value of mortgages that were originated in a

23  specific period?

LEAVITT REPORTING, INC.

1    training about the way the rules worked.

2        Q.    Did you ever try to explain to Frank how the

3    rules worked?

4        A.    No.  Because nobody really explained it to me.

5        Q.    Miss Scalli, one of the issues, were you aware

6    that FHA loans require a borrower to present a W-2 to

7    qualify for that type of loan?

8        A.    Yes.

9        Q.    You're aware of that?

10       A.    Yes.

11       Q.    Were you aware of it while you were employed at

12   Citizens?

13       A.    Yes.

14       Q.    What is a DU loan?

15       A.    DU means Desktop Underwriting.  It means that

16   you can put the loan through under Desktop Underwriting

17   to get a full approval before it goes to underwriting.

18   The full approval will then tell you what you need to get

19   the loan closed.

20       Q.    Can you tell me who Jean Barbosa is?

21       A.    He is a plasterer who did work in one of my

22   husband's buildings.

23       Q.    Do you know what period of time he was working

LEAVITT REPORTING, INC.

1    as a plasterer in your husband's building?

2         A.    Not exact.

3         Q.    Was it during your employment at Citizens?

4         A.    It was definitely during, but, you know, I

5    don't know if it was before as well.  So I don't know.

6         Q.    Do you know which building he worked in?

7         A.    No, I don't.

8         Q.    Do you know whether you or your husband have

9    ever sold a property to Mr. Barbosa?

10        A.    Yes.

11        Q.    You did?  Do you know which property that was?

12        A.    Yes.  208 Maverick Street.

13        Q.    Are you the owner of that property?

14        A.    Now?

15        Q.    I'm sorry.  Prior to its sale.

16        A.    Yes.

17        Q.    Was that jointly owned by you and your husband?

18        A.    No.

19        Q.    It was just you?

20        A.    Yes.

21        Q.    Do you know the date of sale to Mr. Barbosa?

22        A.    I don't know the exact date.  Somewhere around

23    June or July maybe of 2003.

1    Q.   Do you still have a file on that sale?  Do you
2  still have the P and S tucked aside?
3    A.   I don't know.
4         MR. SMITH:  Mark, I would like to request any
5  documents relative to the sale of that property to Mr.
6  Barbosa.
7         MR. BURKE:  Yes.  If you make a request --
8  Obviously, we'll search for them now.  But if you could
9  make a request, I would appreciate it.
10        MR. SMITH:  Sure.  You mean other than the
11  request I'm making now?
12        MR. BURKE:  As part of your calling for that we
13  will conduct a search, but we would appreciate a formal
14  request.
15        MR. SMITH:  Sure.
16    Q.   Miss Scalli, do you remember when Mr. Barbosa
17  first became interested in purchasing the 208 Maverick
18  Street property from you?
19    A.   No, I don't.  It was maybe a couple of months
20  before time.
21    Q.   Couple of months before the eventual, say, the
22  closing?
23    A.   Yes.

1    Q.   Now, Mr. Barbosa came to you at some point

2    regarding a loan on a property on Paris Street in East

3    Boston.  Do you remember that?

4    A.   He never came to me.

5    Q.   Do you know who he came to?

6    A.   Yes.  Someone in my office.  She spoke

7    Portuguese, and that was one of the temps, Flavia.  She

8    got all the information to qualify him for the loan.

9    Q.   To qualify him for the loan on this property on

10   Paris Street?

11   A.   Yes.

12   Q.   We're going to show you a document we're going

13   to mark as Exhibit 9.

14        (Document marked Exhibit No. 9 for Id.)

15   Q.   Have you had a chance to look at this?

16   A.   Yes.

17        MR. BURKE:  I want the record to reflect it is

18   a rather lengthy document, but it's four or five pages.

19        MR. SMITH:  I think it's a four-page document

20   to be accurate.

21   Q.   Have you had a chance to read it, to look at

22   it?

23   A.   Yes.

LEAVITT REPORTING, INC.

1    were not present at the last deposition, but it's been

2    referred to in other ways, if it's the document that I

3    believe you're anticipating.  I'm objecting as to the

4    form of the use of the word.

5            MR. SMITH:  All right.

6        Q.    Did you issue a statement of credit denial to

7    Mr. Barbosa?

8            MR. BURKE:  Objection.  You may answer if you

9    understand the question.

10       A.    Personally, you're asking me, if I issued it?

11   No, I did not.

12       Q.    Did you ever sign any statement of credit

13   denial for Mr. Barbosa?

14       A.    I don't remember signing any statement of

15   denial.

16       Q.    You don't?  Okay.  Let's get this marked.

17           (Document marked Exhibit No. 10 for Id.)

18           MR. BURKE:  The witness now has Exhibit 10 in

19   front of her.

20       Q.    I'm asking you to look at this Exhibit 10 which

21   is entitled Statement of Credit Denial, Termination or

22   Change.  Is that your signature at the bottom?

23       A.    I can't be sure.

1      A.    No.   Everything that was done was done through

2    Liz and Bard before time.   It was asked -- People in my

3    office, Liz, oversaw the pipeline.   And any time

4    something like this needed to be done, we got permission

5    from Liz first.   She would give the final word.   Liz or

6    Bard actually.

7      Q.    Liz or Bard's permission, would it be done on

8    an applicant by applicant, property by property basis?

9      A.    I don't understand the question.

10     Q.    I'm trying to make sure that -- I'm trying to

11    clarify what you said.   When you sought permission to

12    issue these denials, was it done each time the denial had

13    to be issued or were you given blanket authority to issue

14    denials whenever you needed to?

15          MR. BURKE:   Objection to the form.   You may

16    answer if you understand the question.

17     A.    I don't really understand the question.   You

18    know, blanket authority.   I don't know what blanket

19    authority means.

20     Q.    Blanket authority means that you have authority

21    to issue denials on an ongoing basis.

22     A.    No, I didn't have authority to issue denials

23    unless I had permission from Liz or Bard.

LEAVITT REPORTING, INC.

1       Q.    You had to get permission with respect to each

2   borrower?

3       A.    Yes.

4       Q.    Thank you.  Who gave you permission to, if you

5   remember, to issue this denial?

6       A.    This one here was Liz Walsh directly.

7       Q.    Did she give it to you?

8       A.    To Luis.

9       Q.    How do you know that?

10      A.    Because Luis told me.  I was not in the

11  meeting, like we did a pipeline meeting every Tuesday,

12  and this particular loan was discussed at the meeting,

13  and she gave it directly to Luis.  Luis wanted to

14  withdraw it, but Liz said it needed to be declined.

15      Q.    Was anyone else part of that pipeline meeting

16  on Tuesday when Liz gave that instruction?

17      A.    That particular meeting, I was not.  There

18  could have been other people in my office as far as the

19  temps that may have been there.  Flavia and maybe Vanessa

20  was there.  I don't know who else was there.  Luis was

21  definitely there.

22      Q.    Did he tell you what happened in that meeting?

23      A.    Yes, he did.  I don't know if it was the same

1              MR. BURKE:    -- on the record that I'm speaking

2    with my client?

3              MR. SMITH:    Because it's entirely appropriate

4    for me to do this.    Don't draw anything negative from

5    that.    Let's move on.

6              MR. BURKE:    So we are wasting time.    And so am

7    I now to take --

8              MR. SMITH:    I have a question for the witness.

9              MR. BURKE:    -- that every time I speak with my

10   client I should now say let the record reflect that

11   counsel is speaking with his associate?

12             MR. SMITH:    No.    Because counsel is not the

13   witness in the deposition, Mark.    An experienced

14   litigator would know that.

15             MR. BURKE:    The point of mine is well taken.

16        Q.    Let me ask a question.

17             MR. BURKE:    Let's move on.

18             MR. SMITH:    Great.

19        Q.    Miss Scalli, where did this form of Statement

20   of Credit Denial, Termination or Change come from?

21        A.    This came from one of the laptops.    All three

22   laptops have the same denial form built right into the

23   laptop.    You can just scroll right down to it.

1      Q.    Is this the denial form your office used in
2  every instance when a denial was issued?

3      A.    Depending on the time constraints, we issue
4  ones directly from the laptop as well as approvals, and
5  they also came from the loan center where Claudia was.
6  Claudia could also issue them.

7      Q.    But whenever your office issued a loan denial,
8  not from underwriting or not from Claudia, but your
9  office, was this the form that you issued it on?

10     A.    From the laptop, yes.

11     Q.    Whenever your office, again, not underwriting
12 and not Claudia, issued a loan denial, did you issue it
13 in any other way other than from the laptop?

14     A.    To my knowledge, there's no other way to issue
15 it.

16     Q.    That's what I want to know.  Okay.  Did this
17 form exist on all three, to your knowledge, of the
18 laptops in your office?

19     A.    Yes, sir.

20     Q.    Same form, to your understanding?

21     A.    Yes, sir.

22     Q.    Now, on those same laptops was there a
23 statement of credit approval form?

1      A.    That came after the fact.  It could have been
2  reversed.  I don't know which one came first, but it was
3  two subjects of conversation.
4      Q.    The two subjects were, one, the Barbosa loan
5  and, secondly, advertising?
6      A.    Yes.
7      Q.    With respect to the Barbosa loan, did she give
8  you documentation concerning the Barbosa loan?
9      A.    She didn't give me any documentation.  She
10  showed me briefly in front of my face real quick a letter
11  similar to this.
12      Q.    When you say "similar to this," similar to the
13  statement of credit denial?
14      A.    Yes.  But she didn't let me see it or hold it
15  or anything.  She just showed me and took it away.
16      Q.    Did she ask you if that was the signature?
17      A.    I remember her asking that, yes.
18      Q.    What did you say?
19      A.    I said it looks like it, but I can't be sure.
20      Q.    Did you tell Ms. Hicks and Mr. Conn that you
21  had issued that credit denial letter?
22          MR. BURKE:  Objection.  You may answer.
23      A.    No, I did not.

1          Q.    You didn't tell them?

2          A.    No.

3          Q.    Did they ask you?

4          A.    They asked me if I did.

5          Q.    What did you say?

6          A.    I said this particular letter was done out of

7    my office, that Luis did the letter at the approval of

8    Liz Walsh at the meeting, you know, the phone meeting

9    that takes place on Tuesday.

10         Q.    Did you discuss the reason for the issuance of

11   the denial letter?  In other words, that the owner was

12   not going to be moving into the property?

13         A.    Yes.  I mentioned to her at the time, I said to

14   my knowledge of this loan the owner was not moving into

15   the property and it couldn't be priced out as an

16   investment property, Liz and Luis could not make it work.

17         Q.    Did anyone at this meeting say that the fact

18   they were not moving into the property was not grounds

19   for denial of the loan under FDIC guidelines?

20         A.    I don't remember anything like that.  I

21   remember Bard speaking up at that point saying that he

22   was faxed the letter by a broker, an anonymous broker,

23   that he wouldn't say the name.

1      Q.   A real estate broker?

2      A.   He said a real estate broker.

3      Q.   Faxed him that?

4      A.   I don't know if it was this one.  All he said

5 was that he was faxed a copy of the denial letter from a

6 real estate broker.

7      Q.   Of a credit denial letter?

8      A.   Yes.

9      Q.   But you don't remember anyone saying that the

10 fact that Mr. Barbosa was not going to move into the

11 property was not a sufficient grounds to deny the loan

12 application?

13      MR. BURKE:  Objection.

14      A.   I don't remember that.

15      Q.   You don't remember that being said?

16      A.   I don't remember.

17      Q.   Did anyone ask you if you or your office had

18 issued these types of credit denials previously?

19      A.   Like who?

20      Q.   At this meeting.  At this meeting on

21 February 4th did anyone in the meeting ask you if your

22 office had previously issued these types of denials?

23      A.   I don't remember if I said to Joyce Hicks that

1    this was normal, that when Liz or Bard gave permission

2    that we could do that.  I don't remember if it was right

3    at that time or the next day.  Because when I went into

4    the meeting, Bard was sitting there, and I thought that

5    he was the one, I thought something was wrong with him.

6    I didn't know why I was there.  So I was caught very off

7    guard.  So I don't remember if I said it right at that

8    point or if I said it the next morning.

9         Q.    The next morning did you have a meeting or was

10   that a phone call?

11        A.    I phoned Joyce Hicks the next day.

12        Q.    All right.  Just so I'm clear, you're not sure

13   if you told Joyce at this termination meeting or the day

14   after at a phone call that your office issued these types

15   of letters frequently?

16        A.    I know I made a comment, but I didn't elaborate

17   on it.  When I was at the meeting, at the table they

18   showed me this briefly.  I said this was a normal thing

19   for Liz and Bard.

20        Q.    At some point you communicated that to Joyce

21   Hicks?

22        A.    Yes.

23        Q.    I understand you don't remember whether that