# CONTRACT

 **CITIZENS BANK**

One Citizens Plaza
Providence, RI 01903-1339

February 21, 2001

Eleanor Scalli
233 Main Street
Winthrop, MA 02152

Dear Eleanor:

Citizens Mortgage Corporation ("CMC"), a subsidiary of Qtizens Bank of RI is pleased to offer you the position of Senior Loan Officer for the Wobum Loan Production Office. Below are details regarding the position and a description of our Loan Officer "Commission" Incentive Plan ("Plan").

**EFFECTIVE DATE:** February 28, 2001

## SENIOR LOAN OFFICER "COMMISSION" INCENTIVE PLAN (utilizing a FT Jr. LO.)

I. **Participation**

   Participation in this Plan is limited to Loan Officers utilizing a full-time sales assistant who have executed this agreement

II. Plan **Description**

   A. <u>Compensation</u> at Time of Hire: You will be eligible to receive a **$15,000.00** advance paid biweekly at **$2,500.00** for 6 pays, which will not be charged against future commissions.

   B. Car <u>Allowance</u>: There will be a **$139.00** biweekly aup expense reimbursement to you under this Plan.

   C. <u>Origination Commission</u>: This Plan consists of a monthly incentive, which is based upon a percentage commission per mortgage loan funded on the system by CMC. Commissions will increase based upon the achievement of an increasingly larger number of mortgage loans closed during the month. Commissions will be determined by multiplying the applicable origination fees collected (to a maximum of 1% origination fee) and paid by the borrower tunes the applicable commission percentage as outlined below. Commissions will be paid the second payday of the month, and will be determined as follows:

### COMMISSION RATES

| Monthly Dollars Funded Goal (*) | Commission Basis Points All Mortgage Loans |
|---|---|
| $500,000 or less | .30 Basis Points |
| $500,001 to $600,000 | .35 Basis Points |
| ?600,001 to $999,999 | .45 Basis Points |
| $1,000,000 + | .56 Basis Points |



\* Retroactive to dollar one for the closing month
\*\* All CFG (all subsidiary) referred loans are capped at
   $1,000,000, Maximum base commission per loan is $5,800.

C02364

CITIZENS HUMAN RESOURCES → 916175393004                                   NO.814    P07

\*\*For the first year of employment you will receive an additional 9 basis paints on closed loan volume.

The fallowing conditions affect the Commission Rates listed in Table A:

1. Reduction of 5 percentage points (5%) may be assessed for loan riles that are incomplete due to documentation (based on CMC documentation requirements). Measurement and communication of deficiencies will be performed by the Operations Manager and Center Manager. Any adjustment to commission will require the written approval of your Center Manager and the President of CMC  Such written consensus shall not be unreasonably withheld.

2. No origination commission will be paid unless the mortgage loan application is in processing within 48 hours of the application being taken. No adjustment to commission will occur without the written consensus of the Center Manager and President of CMC  Such written consensus shall not be unreasonably withheld.

3. Reduction of $500.00 per loan may be assessed for loans not originated through point of sale automation. Any adjustment to commission will require the written approval of your Center Manager and the President of CMC.

4. You will have the opportunity to earn up to 50 percent in supplemental origination.

5. You are responsible for the collection of the credit report, appraisal, lock fees and disclosure of any other fees associated with the CMC fee schedule. To the extent that required fees are no: collected, the costs to CMC will be offset against your origination commissions.

III.    **Resignation,** Termination and **Offset**

A. Resignation: If you resign, you will receive commissions for all mortgage loans funded on the system up to, and including, your las: day of employment

B. Termination: You agree that this Plan does not constitute an employment contract or a guarantee of employment for any specific length of time and in no way limits CMC's authority to terminate employment at its sole discretion, with or without cause. Nothing contained herein should be construed to alter your scams as an "at will" employee. Upon termination of employment, you will receive credit for commissions for all mortgage loans funded on the system up to, and including, your last day of employment  No incentive or commissions will be paid on mortgage loans that are fraudulent or contain material irregularities. If you are paid for mortgage loans later found to contain material irregularities and misrepresentations, you are obligated to repay CMC commissions and any and all damages related to those mortgages.

C. Termination of Jr. Loan Originator: This agreement shall terminate automatically if the jr. loan originator is terminated from CMC's employment and, in such case, the termination of this agreement shall be effective and the standard Loan Officer Commission Incentive Plan (Attachment A) will be automatically reinstated as. follows:

If the last day for which the sales assistant receives compensation is on or before the 15* day of a given month, this agreement shall terminate and the standard Loan Officer Commission Incentive Plan shall be effective for all commissions earned that month; if the sales assistant last compensation if after the 15th of the month, this agreement shall remain in effect chat month and the standard Loan Officer Incentive Plan shall be reinstated the following month.

D. Leave of Absence of Jr. Loan Originator This agreement will be suspended and the standard Loan Officer Commission Incentive Plan (Attachment A) will be reinstated if the sales

assistant is on Short-Term Disability (STD) for more than 50% of the business days in a given month. This agreement will be reinstated in the first month in which the jr. loan originator returns from leave for more that 50 percent of the business days in that month.

E. **Right of Offset**: CMC reserves the right to offset any amounts due from you to CMC in calculating final compensation upon termination of employment.

**IV.    Other Conditions**

  • .. CMC reserves the right to change or discontinue this Plan upon 30 days written notice. No deviations by you are permitted without the express written consent of the appropriate President of CMC and the Center Manager. No waiver by CMC at any time of any breach by you. or compliance with, any condition or provisions of the plan shall be deemed a waiver of similar or dissimilar provisions or conditions at the same time or any prior or subsequent time. Any disputes shall be resolved in writing by the appropriate President of CMC and Human Resources in 4 manner which is considered to be fair, equitable and within the scope and intent of this Plan.

V.    Ethic* Statement

  I have read and understand the Citizens Bank Ethics Statement.

This Plan supersedes all prior agreements, either verbal or written, with respect to the subject matter of the Plan. This Plan shall be governed by the laws of the respective state of employment. It is expressly understood that both you and CMC are free to terminate your employment relationship any time, for any reason, with or without notice. CMC expressly reserves the right at any time to take any action deemed to be in CMC's best interest regarding your employment relationship. No officer, supervisor or other employee of CMC, other than the President or Chairman, has the authority to alter, orally or in writing, the terminable-at-will status of your employment relationship. Unless otherwise sated in this Plan, nothing in this Plan is intended to confer any rights to any terms or conditions of your employment. You further understand and agree to the repayment obligations and right of offset expressed in Section III C. Nothing in this plan shall preclude CMC from any legal remedies against you for any damages caused to CMC by you or for any sums not recovered through the repayment obligations set out in this Plan.

By signing below, you acknowledge and agree to be bound by the terms of this Loan Officer Incentive Plan during the term of your employment with CMC. Please return one copy of this letter to me in the enclosed postage-paid envelope.

_Tara Tribelli_ (signature)                    2/21/01

Tara Tribelli                    February 21, 2001
Recruiter
Human Resources
Citizens Bank of Rhode Island

---

I agree to be bound by the terms of the Producing Sales Manager Incentive Plan (with Sales Assistant) during my employment under Citizens Mortgage Corporation.

_Eleanor Scalli_ (signature)          025541337          2/23/01

Eleanor Scalli (Signature)          Social Security Number          Date

---

Barden Conn, Sr. Vice President                    Dace
Center Manager
Citizens Mortgage Corporation

C02366

## CITIZENS' CODE OF ETHICS

## SIGNATURE PAGE

I have received and read Citizens' Code of Ethics and agree to abide by its provisions at all times. Within it meanings, expressed and implied, I am not and have not been aware of any circumstances of a personal or family nature which would conflict with the Code except those which I have previously reported or as indicated below.

Please describe any unreported potential conflict of interest.

_____

_____

_____

_____

_____

_____

_____

_Eleanor Scall._

Print Name

_____

Social Security Number

_025 541 337_

Date   _2/22/01_

_Eleanor Scall_

Signature

_____

Department Name

_____

Department Number



HR028(6/99)

Center Manager
Citizens Mortgage Corporation

## LOAN OFFICER MINIMUM STANDARDS

1. Close a minimum of 6 loans and/or $500,000 per month or annualize at 72 units or $6,000,000.

2. Maintain a closing ratio of at least 80%.

3. ▬▬▬▬▬▬▬▬

4. Compliance with all policies and procedures as set forth by CMC Management.

Acknowledgment of Receipt:

_Eleanor Scalli_
Loan Officer

_2/22/01_
Date

- The above minimum standards are to be used as guidelines. Management will use these guidelines to assess Loan Officer performance.


EXHIBIT
E. SCALLI
6
len 2-15-05

2246122



## CITIZENS
### MORTGAGE CORPORATION

January    9    2003

Re:    331 PARIS STREET
       EAST BOSTON, MA   02128

**Dear Borrower(s) : JEAN BARBOSA**

We are **pleased** to **inform you** that your application for a mortgage has been **approved.**
Accordingly, CITIZENS MORTGAGE CORPORATION offers you the **mortgage** loan detailed
**below.**    Eleanor

**After** you accept this offer, it will be an agreement between this lender and you. Any **other**
agreement that may **exist** is **replaced** by this agreement. No change in the terms of conditions
of **this agreement** shall be effective, nor will it bind CITIZENS MORTGAGE CORPORATION
in any **way** unless the **change** is in writing and is signed by an officer of the Lender. The
terms and conditions are set forth below. If **you** do not comply with any one or **more** of **these**
**terms** or if any one or more of the conditions outlined on page 4 are not fulfilled then this
lender **will not be required** to **make** this mortgage loan to **you.**

| | | | |
|---|---|---|---|
| **Program** Type: | FIXED | | |
| **Loan** Amount: | $ 45,750.00 | | |
| Term: | 360 | | |
| Interest **Rate:** | 13.000 | | |
| Principal and **Interest:** | $ 506.08 | | |
| Real Estate **Taxes:** | Not Required | | |
| Hazard Insurance **Escrow:** | Not Required | | |
| Discount Fee: | $ 1,429.69 | ( 3.125 ) | To be collected from you at closing |
| Mortgage Insurance: | | | |
| Monthly Escrow: | $ | Monthly | |
| Initial MI Premium | $ | ( %) | To be collected from you at closing |
| **One-Time MIP** | $ | | |

Rate **Lock** Option
[ X ] The rate on **your** mortgage request will expire on   01/21/03        . In the event the
loan **fails** to close and disburse by this date, the interest rate in effect (7) seven calendar days
prior to closing or the originally committed rate whichever is higher, shall be assigned.

[    ] The rate of interest Of **your loan** has not yet been established. You have chosen to be
subject **to** rates established after the date of this commitment and prior to the closing as
described in the Rate/points Lock-In Option that you signed. By accepting this **commitment,**
you **agree** that the **rate** will be set prior to the closing.

Interest Rate **Adjustment**
[    ] The interest rate on your loan may be adjusted on
and every        months **thereafter.**

Your interest rate will be based **upon** the weekly average yield on United States Treasury
**Securities** adjusted to a constant maturity of        year(s) (for index), plus our margin. The
Index is **obtained** from the FRBSR (H15) S19. Information about the index is published
weekly in The Wall Street **Journal.**

The Adjustments in your interest rate are limited and cannot be adjusted more than
percentage points for each adjustment period, or more than            percentage points over
the life of the loan.

1    **CONFIDENTIAL**    C02368

CMCOM (REV 11.01)

Your initial rate is a low "discount" rate, and it will expire in _____ months. Your new interest rate will be based on the rate adjustment index indicated above plus a margin of _____ percentage points. When your initial interest rate expires the amount of your principal and interest payment may increase. Adjustments will be limited if so indicated above.

The minimum rate adjustment will be one-eigth of one percent (.125%). The new rate will be rounded to the nearest one-eigth percent. At each interest rate adjustment, you will be given at least 30, but no more than 45 days, notice of the new rate and when it will take effect. You will also he notified if no change in the rate is to take place. Your monthly payment will be adjusted so that the loan will be fully paid at maturity of the loan.

## Mortgage Insurance
[    ] Mortgage insurance must be approved and issued by a mortgage insurance company. You will pay the first year's premium at the time of closing and monthly escrow payments for annual renewal premiums, or the entire amount may be financed along with your loan.

## Construction or Renovation
[    ] If the property to be mortgaged is a new construction or substantial renovation, completion of work must be verified by this lendor before closing. The final appraisal of the property may not be less than $ _____ , and will be subject to review and approval by an underwriter of CITIZENS MORTGAGE CORPORATION

## Assumption of Your Mortgage
[ C ] If all or any part of the property or any interest in it is sold or transferred without Lender's prior written consent, Lender may at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of the Security Instrument.

If this is an adjustable rate mortgage loan the Lender also shall not exercise this option if : (a) Borrower caused to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the Lender's security will riot be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in the Security Instrument is acceptable to Lender; and (c) You have not exercised your option to convert this loan to a fixed rate loan. Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.

## Expiration or Extension
This commitment will expire on   03/12/03        . If for any reason the closing of your loan does not occur by that time, the obligation of CITIZENS MORTGAGE CORPORATION in this commitment will cease to have any legal force or effect. Any extension of this commitment will be within the sole discretion of CITIZENS MORTGAGE CORPORATION

If this commitment is extended,     CITIZENS MORTGAGE CORPORATION     will have the right to change any of the terms specified above, including the interest rate.

## Accuracy of your Application
This offer and agreement are made in reliance on the accuracy and completeness of all information submitted in your loan application. Verification of the completeness and accuracy of all such information is a precondition to any obligation on the part of CITIZENS MORTGAGE CORPORATION to close this loan.

## No Secondary Financing
You may not use secondary financing in addition to your loan from this Lender to complete the purchase of the property described above unless it is approved in writing by an officer of this Lender.

2

CONFIDENTIAL    C02369

2246122

### Title Examination

**Before the closing** of this **loan, the** attorney for this Lender **will examine** the **title** to the **property** referred to **above.** CITIZENS MORTGAGE **CORPORATION** will have no obligation to close **this loan unless, in** the opinion of **its** attorney, **you** will have at the time the mortgage is **recorded, good, clear, record, marketable title** to the **mortgaged property. This** means that your title **must, with the** exception of the **mortgage,** be free of all liens, encumbrances and defects **which, in** the sole discretion of this Lender and its attorney, would make the property an imprudent **investment.** In addition, the property must be in full compliance with all building, zoning and other applicable **governmental** regulations and **all** loan documents must be approved by this Lender's attorney before this Lender is obliged to close your loan.

### Hazard Insurance Coverage

**Unless CITIZENS MORTGAGE CORPORATION** gives you a written waiver of this **requirement,** you will be required to pay your first year's hazard insurance premium before the closing. After **that point this** Lender has the right to require you to make monthly escrow payments in order to **cover annual** renewal **premiums.** You are required to bring proof of hazard **insurance** in **the** form of a binder of policy with you **to** the closing of your loan. The policy must **include extended coverage,** and the amount of hazard insurance coverage should at least equal the lesser of **100%** of the **insurable** value of the improvements, or **the** unpaid principal balance **of** the mortgage as **long** as it equals the minimum amount required to compensate for damage or **loss** on a replacement cost basis. The policy must name **"DOVENMUEHLE MORTGAGE,** INC., its successors and assigns, as their interest may appear" PO BOX **57046 , IRVINE,** CA **92619-7046** as first mortgagee.

The insuring company must have at least a B general policy holder's rating and a financial size **category** of III in "Best's Key Rating Guide". We will accept as an alternate coverage written by a carrier that has an A general **policyholder's** rating. CITIZENS MORTGAGE CORPORATION will **also** accept coverage from Lloyd's of **London,** even though it has no Best's **rating** and under a FAIR plan if that is the only coverage that can be obtained at a reasonable cost. The hazard **insurance policy** or **binder** must state the Best's rating of the company.

### Flood Insurance Coverage

[   ] It has been determined that the property securing this transaction is located in a special flood **hazard.** You are required to purchase flood insurance and pay the first year's premium **before** the closing. You must provide a binder at the time of loan **closing.** The Lender **has** the right to require you to make monthly escrow payments in order to cover the annual renewal **premiums.**

### Your **Responsibility** for **Closing** Costs

If the **closing** of this loan transaction fails to occur, you agree to be responsible for all legal fees and **other** expenses of the **CITIZENS** MORTGAGE CORPORATION that are incurred as a result of processing this loan. For the estimated amount of these fees and costs, please refer to the Good Faith Estimate which has already been mailed to you. You will not be responsible for **these** fees and costs if the failure to close is due to the Lender's failure to **comply** with its **agreements** as set forth in this commitment.

### Special **Closing** Conditions

The approval of your **loan** application is **contingent upon additional** requirements which **must** be satisfied prior to **consumation** of the transaction. Please refer to page **four** (4) for those additional requirements.

Thank you very much for this opportunity to be of service. If you have any **questions** concerning your loan, please do not hesitate to call our office.

Sincerely,


**CLAUDIA ARRENDONDO**

3

CMCOM2 (REV, 10/96)

CONFIDENTIAL     C02370

This Commitment is subject to the conditions stated **below:**

**FOLLOWING CONDITIONS** ARE TO BE MET AT LEAST FIVE **DAYS** PRIOR TO CLOSING:

1. Review of most recent 12 month satisfactory rental **history.**
2. A satisfactory, felly executed Purchase and Sales Agreement with maximum sales price $305,000
3. **Original, satisfactory** 3 Unit appraisal **supporting** a value of at least **$305,000** that is satisfactory to CMC.
4. Life of loan flood determination.
5. No non-arms length transaction allowed.
6. Satisfactory desk review confirming value of $305,000

ALL **INFORMATION GIVEN ON** THE APPLICATION MUST BE **SUPPORTED** TO THE SATISFACTION OF **CITIZENS** MORTGAGE COMPANY, **BY** THE ABOVE REQUESTED **CONDITIONS.** APPROVAL IS **SUBJECT** TO CHANGE **IF** THE VERIFIED INFORMATION IS **DIFFERENT.**

**CLOSING:**

1. Your **credit** documents expire 3/12/03. Reverification will be required after this date.
2. HUD to Show no **gift** of equity **or** gift funds.
3. Subject to 2nd mortgage of $45,750.

PLEASE NOTE: **Should** there be any **change** due to the information provided to **Citizens** Mortgage **Corporation,** such as debt structure, employment status, assets to close, etc. please notify us immediately so that we can accommodate your financing needs. This approval letter is issued with the assumption **that** no **change will** occur.

Borrower(s) Acceptance of Mortgage Commitment

**I/We hereby accept** the terms and conditions as stipulated in this commitment letter.

_____          _____
Borrower                                                     Date


_____          _____
Borrower                                                     Date

CONFIDENTIAL

C02371

1/31/2003    10:39    7819946625 → 916177456578                              NO.244    D002

T BY: CITIZENS MORTGAGE;                    (8175399004              JAN-24-03 (7.18)

## STATEMENT OF CREDIT DENIAL, TERMINATION, OR CHANGE

Description of Account, Transaction or Requested Credit

:cant(s): [Type Full Name and Address)
IN BARROSA

Date:
1 BROOKS ST                                          01/16/2003
JT BOSTON, MA  02128
cription of Action Taken.

2T 1 Principal reason(s) for credit denial, termination or other action taken concerning credit, in compliance with Regulation
ortunity Act), you are advised that your recent application for credit has been declined/terminated/changed. Their decision to
r/terminate/change your application was based on the following reason(s):

**CREDIT**
- ☐ No Credit File
- ☐ Insufficient Number of Credit References Provided
- ☐ Insufficient Credit File
- ☐ Limited Credit Experience
- ☐ Unable to Verify Credit References
- ☐ Garnishment, Attachment, Foreclosure, Repossession, Collection Action or Judgment
- ☒ Excessive Obligations in Relation to Income
  - ☐ Unacceptable Payment Record on Previous Mortgage
  - ☐ Lack of Cash Reserves
- ☐ Delinquent Past or Present Credit Obligations with Others
- ☐ Bankruptcy Past or Present
- ☐ Unacceptable Type of Credit References Provided
- ☐ Poor Credit Performance With Us

**D. RESIDENCY**
- ☐ Temporary Residence
- ☐ Length of Residence
- ☐ Unable to Verify Residence

**E. INSURANCE GUARANTY or PURCHASE DENIED BY**
- ☐ Department of Housing and Urban Development
- ☐ Department of Veterans Affairs
- ☐ Federal National Mortgage Association
- ☐ Federal Home Loan Mortgage Corporation

**F. OTHER**
- ☒ Insufficient Funds to Close the Loan
- ☐ Credit Application Incomplete
- ☐ Value or Type of Collateral not Sufficient
  - ☐ Unacceptable Property
  - ☐ Insufficient Data - Property
  - ☐ Unacceptable Leasehold Estate
- ☐ We do not grant credit to any applicant on the terms and condition you have requested.
  - ☒ UNABLE TO GRANT SECOND MORTGAGE.

**EMPLOYMENT STATUS**
- ☐ Unable to Verify Employment
- ☐ Length of Employment
- ☐ Temporary or Irregular Employment

**INCOME**
- ☐ Insufficient Income for Amount of Credit Requested
- ☐ Unable to Verify Income
- ☐ Excessive Obligations in Relation to Income

or have the right to a copy of the appraisal report used in connection with your application for credit. If you wish a copy, please write to us at
be mailing address the bank provided. We must hear from you no later than 90 days after we notify you about the action taken on your credit
ication or the time when your application.

ART II Disclosure of use of information obtained from an outside source.
- ☐ Our credit decision was based in whole or in part, on information obtained in a report from the consumer reporting agency listed
  below. You have a right under the Fair Credit Reporting Act to know the information contained in your credit file. The consumer
  reporting agency. The reporting agency played no part in our decision and is unable to supply specific reasons why we denied
  credit to you. You also have a right to a free copy of your report from the reporting agency, if you request it no later than 60 days
  after you receive this notice. In addition, if you find that any information contained in the report you receive is inaccurate or
  incomplete, you have the right to dispute the matter with the reporting agency.

Name:
Address:                                                  or Toll Free Number:
- ☐ Our credit decision was based in whole or in part on information obtained from an affiliate or from an outside source other than a
  consumer reporting agency. Under the Fair Credit Reporting Act, you have the right to make a written request, no later than 60
  days after you receive this notice, for disclosure of the nature of this information.

If you have any questions regarding this notice, you should contact:
Creditor's Name: Citizens Mortgage Corporation
Creditor's Address: 335 Main Street
                    Woburn, MA  01801
Creditor's Telephone Number: tIIT-SaS-tj-eos

fc)u>i

The Federal        Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color,
religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into binding contracts); because all
or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any
right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is
the

Should you have any additional information which might assist us in evaluating your creditworthiness, please let us know.
Thank you for applying.
Citizens Mortgage Corporation                    (Lender)

By: _Eleanor Caalli_____
    Eleanor Caalli

Notice ☐ Mailed ☐ Delivered      Date: 1/16/03



CONFIDENTIAL

C02372

1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
                                 *
                                 *
ELEANOR  SCALLI,                *
ROBERT  SCALLI,                 *
          Plaintiffs        *   CIVIL ACTION
                      *   NO. 03-CV-12413DPW
          VS                *
                      *
                      *
CITIZENS  FINANCIAL  GROUP,     *
INC.,                           *
          Defendant         *
                      *
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VOLUME 2 OF THE DEPOSITION OF ELEANOR SCALLI,
taken on behalf of the defendant pursuant to the
Massachusetts Rules of Civil Procedure before Kathleen M.
Benoit, CSR # 1368F94, Shorthand Reporter and Notary Public
in and for the Commonwealth of Massachusetts at the offices
of Goodwin Procter, Exchange Place, Boston, Massachusetts, on
Tuesday, April 12, 2005, commencing at 10:53 a.m.

APPEARANCES:

NICHOLAS J. DiMAURO, ESQ., 111 South Bedford Street, Suite
208, Burlington, MA 01803, For the plaintiff, Robert Scalli

MARK E. BURKE, ESQ., 111 South Bedford Street, Suite 208,
Burlington, MA 01803, For the plaintiff, Eleanor Scalli

BRADFORD J. SMITH, ESQ., and ANNE GAETA, ESQ., Goodwin
Procter, Exchange Place, Boston, MA 02109-2881, -For the
defendant

ALSO PRESENT:

JEFFREY SIEGEL, ESQ.

# Leavitt *Reporting,* Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

Hearings * Conferences ◆ Legal Proceedings

2

1                          **INDEX**
    **WITNESS**                **DIRECT  CROSS  REDIRECT  RECROSS**

2
    **Eleanor Scalli**
3      by Mr. Smith        3

4                          EXHIBITS

    **No**. Description                           **Page**

5

6   12   Letter 1/6/03 **Paula Castillo** to
         **Eleanor Scalli**                          11

7   13    **E-mail** 12/30/02 **Eleanor Scalli**
         to **Elizabeth Walsh**                      13

8
    14   underwriting Recommendation for
9        Denial                                      19

10  15   Letter **1/16/03 Claudia** Arrendondo
         to **Paula Castillo** and Rafael
11       Guerrero                                    21

12  16    **Gift** Letter 1/14/03 To whom it
         May Concern                                 25

13
    17   copy of check No. **103,** 1/13/03
14       for $4,000                                  28

15  18   Copy of Check No. 055755431-8
         $4,000 to Andres **Castillo**               29
16
    19   **Teller** Transactions                     30
17
    20   Documents Produced in Response
18       to Subpoena                                 52

19  21   **Pipeline** Report                         58

20

21

22

23

28

1    A.  Yes.

2    Q.  And the **loan approval letter** is dated at the top of

3   the first page **January** 16th, **'03,** correct?

4    A.  Correct.

5           MR. **SMITH:**  Let me go off the record for a

6   second.

7           (Recess taken.)

8           MR. SMITH:  **I'm** going to show you a document:

9   and have it marked as Exhibit 17.

10          (Exhibit No. 17 marked.)

11   Q.  Have you had a chance to **look** at this document that

12  **I've** marked as Exhibit 17 --

13   A.  Yes.

14   Q.  – MS. **Scalli?**  okay, **that's** a copy of a check,

15  front and back, from your checking account, is that

16  correct?

17   A.  Yes.

18   Q.  And is that a joint checking account that you

19  maintain with your husband, Robert?

20   A.  Yes, it is.

21   Q.  Okay.  **Now, is** that checking Account No.

22  1134703179?

23   A.  Yes.

1    Q.   Now, the document that I've showed you is a check,

2    and I'm going to represent that the date on it, it's hard

3    on the photocopy, is January 13, 2003.  You can make out

4    the January and the '03, can't you?

5     A. Yes.

6     Q.  okay.  It's in the amount of $4,000, is that

7    correct?

8     A.   Correct.

9     Q.  Is that your signature on the check?

10    A. Yes, it is.

11    Q.  DO you remember, just curiously, do you remember

12    cashing a check for $4,000 on January 13th of '03?

13    A.  No, I do not.

14    Q.   DO you remember cashing a check for $4,000 in cash

15    during this time frame?

16    A.  No, I do not.

17          MR. SMITH:   I'm going to have this marked as

18   Exhibit 18 please.

19            (Exhibit No.  18 marked.)

20    Q.   Have you had a chance to look at the document I've

21   marked as Exhibit 18?

22    A. Yes.

23    Q.   Exhibit 18 is a copy of a Citizens Bank official

30

1    bank check, is that correct?

2        A.  It looks to be, yes.

3        Q.  And it is a check payable to Andres Castillo in the

4    amount of $4,000, correct?

5        A.  Yes.

6        Q.  Now, the date of the check is January 13th, 2003,

7    is that correct?

8        A.  I can barely see it, yes.

9        Q.  Okay.  And all right, now, this official bank

10   check, the number of it in the top right corner of the

11   front of the check is 0557554318, correct?

12       A.  I can barely make it out.

13       Q.  But is that correct that I identified that

14   correctly?

15       A.  It looks like it.

16       Q.  All right.

17                MR. SMITH:  I'm going to have this document

18   marked as Exhibit 19 please.

19                (Exhibit No. 19 marked.)

20       Q.  Have you had a chance to look at the document that

21   I've marked as Exhibit 19?

22       A.  Yes.

23                MR. BURKE:  And just for the record, I just

34

1     Q.   To be clear, Ms. **Scalli,** what **I'm** referring to,

2   I'm pointing you to the section of the document that begins

3   where it states "end of customer" and goes down to the next

4   end of customer, that a transaction occurred in your

5   account as recorded in the **teller computer** system **reflected**

6   by a **total** of five separate computer generated entries that

7   are **listed** between the end of customer designations.  Do

8   you see the section of this document that **I'm** pointing you

9   to (indicating)?

10     A.  Yes.

11     Q.   Okay, thank you.  Now, do you see the entry where

12   it indicates that this is your checking account number, is

13   that correct?

14     A.  Yes, it is.

15     Q.   okay.  Do you see that there was a $4,000

16   transaction indicated, do you see the entry for $4,000 in

17   **TXM** --

18            MR. BURKE:  objection.

19     Q.   -- do you see that entry?

20     A.   I see what **you're** pointing to, **yes.**

21     Q.   okay, now, do you see the entry **below** that states

22   that there was a $4,000 cash or CSH, do you see that entry?

23            MR. BURKE:  Objection.

35

1    A.  I don't know what those things mean.

2    Q.  Okay, but do you see the entry that states $4,000

3  CSH?

4    A.  This one are you talking about (indicating)?

5    Q.  Yes, that one (indicating), correct, $4,000 CSH.

6    A.  I see it, yes.

7    Q.  It's the one that there's a handwritten line that

8  says "purchase of OBC."  And I'm going to represent OBC

9  means official bank check.  Do you see that line?

10    A.  Yes.

11    Q.  Now, next to that entry, CSH, there is another

12  number with an asterisk next to it, it's below the number

13  of your bank account, do you see that number?

14    A.  I see it.

15    Q.  Now, that number is 0557554318, correct?

16        MR. BURKE:  Objection, where are you

17  referring to, on the document itself?

18        MR. SMITH:  That's correct, on the document

19  that's marked as Exhibit 19.

20        MR. BURKE:  Actually, oh, it has been marked,

21  I'm sorry.

22    Q.  Do you see that, Ms. Scalli?

23    A.  Yes.

36

1    Q.  okay, now, that number, I'm going to also put in

2  front of you what's been marked if I can at the same time

3  as Exhibit 18.  Now, that number is the same number as the

4  official bank check, citizens Bank check, that's payable to

5  Andres Castillo in the amount of $4,000, isn't it?

6       A.   The numbers are the same.

7       Q.   The numbers are the same, okay.

8            Let me ask you, Ms. Scalli, do you remember

9  requesting an official bank check in the amount of $4,000

10  payable to Andres Castillo?

11      A.   NO.

12      Q.   Do you know if anyone else requested that a $4,000

13  check be made payable to Mr. Castillo from your account?

14      A.   someone else could have, yes.

15      Q.   It's possible someone else did?

16    A.  Yes.

17      Q.   But you've indicated that Document No. 17, Exhibit

18  No. 17, the check made payable to cash in the amount of

19  $4,000 is your signature, correct?

20            MR. BURKE:  Objection.

21            MR. SMITH:  what's the objection?

22            MR. BURKE:  I don't believe she testified to

23  that.

1    Q.   But were there **additional people** authorized to draw

2   monies from those accounts other than you and your husband,

3   Robert?

4    A.   Yes.

5    Q.   who?

6    A.   Deposits and withdrawals.

7    Q.   No, **withdrawals,** write checks on the accounts, what

8   persons in addition to you and your husband, Robert, were

9   authorized to write checks on your accounts?

10   A.   I **don't** remember **right** now.

11   Q.   what **would help** you remember?

12   A.   Seeing a signatory other than **myself** on a check.

13   Q.   DO you remember having a joint account with a

14   **general** contractor?

15   A.   **Myself,** no.

16   Q.   Do you remember having a joint account in this time

17   frame **with** your mother?

18   A.   No.

19   Q.   Do you remember **having** a **joint** account with anyone

20   **else** other than your husband, Robert?

21   A.   No.

22   Q.   NOW, you said that you **don't** remember requesting a

23   Citizens Bank check for Andres **Castillo,** correct?

46

1  had promised $1,000 for every **million** closed, so it was

2  **double** the 30 which meant **65.** Maybe he had a **problem** with

3  **that.**

4     Q.   NOW, you said **earlier** that Bard conn had promised

5  you that you **would** receive a bonus of a thousand **dollars**

6  for every **million dollars** in **loans** that you originated, is

7  that correct?

8     A.   correct.

9     Q.   NOW, you just said that you were at over 60

10 **million. Is** that as of a **particular** date?

11    A.   up until the time I **left,** I had the top numbers in

12 the **whole** company which I **believe** were 65 **million.**

13    Q.   So as of February of '03, your **total volume** of

14 **loans closed** as of that date was 65 **million?**

15    A.   And I was due to get an award 2 days after, so

16 everybody **would** have known the **numbers.**

17    Q.   DO you know what the **beginning** time frame was of

18 that $65 **million** time frame?

19    A.   Yes, I do. **It** would have been from **January** of the

20 **previous,** of the same year.

21    Q.   of January of '03 or of '02?

22    A.   It **would** be of '02.

23    Q.   So was the 65 **million** the **total volume** in **loans** you

47

1  closed during 2002?

2      A.  Yes, I believe so.

3      Q.  Calendar year 2002?

4      A.  Yes.

5      Q.  So that would be loans closed during that calendar

6  year?

7      A.  January to December, correct, as much as I can

8  remember.

9      Q.  Ms. Scalli, in your Answers to Interrogatories, you

10  stated that you lost income and benefits including

11  commissions and bonuses in the approximate amount of

12  $300,000.  Can you help me break that $300,000 figure down

13  and identify the component sums that make it up?

14      A.  Can you show me the question that I answered that

15  would have said 300,000 so I could remember please?

16      Q.  Sure.  It's interrogatory answer No. 1.

17              (Document Perusal.)

18      Q.  Can you help me with breaking down the $300,000 in

19  different components please?

20      A.  I don't know if I can help break it down, but if

21  you ask me the individual question, I'll try to answer.

22      Q.  okay, well, you state that you've lost income and

23  benefits including commission and bonuses in the

49

1      Q.   But you would have earned it by virtue of the loans

2   you closed during 2002?

3      A.   The previous year, correct.

4      Q.   So were you eligible for that bonus during calendar

5   year 2001?

6      A.   Not really.   The reason being is I didn't start the

7   calendar year when everybody else did, so I was kind of

8   disqualified from that because my calendar year in essence

9   of transferring over all my loans started really around

10  March, April.

11     Q.   Okay.   In addition to that $65,000 amount, what

12  other portions of income, lost income and benefits account

13  for that $300,000?

14     A.   A person like myself who is mainly almost in a

15  sales type position, the confiscation of my laptop without

16  notice, all my clients, all my contacts, everything that

17  I've been doing for the last two years was just taken from

18  me without notice without myself being able to go in and,

19  you know, previous customers, future customers, customers

20  at the time, I had no, I had no access at all to and that

21  would be lost income.

22     Q.   okay, so that's income that you're, so I

23  understand, that you're claiming you lost following your

57

1    Q.   So why do you think that there is a month or two

2    missing?

3    A.   **Well,** because it went from **June** to, **June,** I don't

4    see **like** March of **'02** in here.

5    Q.   **Well, loans** that **closed** in March of '02 you **would**

6    have been paid for during 2002, correct?

7    A.   Yes, but you **didn't** ask me that.  You asked me what

8    commission reports are missing.

9    Q.   so you **would** have been paid for those.  So **loans**

10   that **closed** during which months were you not paid for?

11   A.   Loans that were originated in the month of 2002

12   December that **would** have funded in January or February of

13   2003 right up to the date of my termination.

14   Q.   okay.  I'm going to borrow this for a second.

15   A.   okay.

16   Q.   so **loans** that were originated during December of

17   2002, is that correct?

18   A.   Yes, and it **could** have even been November of 2002

19   if they **weren't** going to **close until** January of 2003.   I

20   don't have **specifics.**

21   Q.   DO you have any other documents, Ms. **Scalli,** that

22   **you're** aware of that **would** show loans that were **originated**

23   during December 2002 that you **weren't** paid on?

71

1    A.    Bard had it on his **list** of things to do, to

2    straighten out my 401K and my **husband's** 401K in 2002 and it

3    never happened.

4    Q.    **well,** you said you participated in November and

5    December --

6    A.    **I didn't finish.**

7    Q.    **Sorry.**

8    A.    **It** never happened the first six months of the year.

9    Then towards the **latter** part of the second quarter of the

10   year I was **able** to start contributing and it **only** amounted

11   to about $3,000, and I was again **overcompensated, highly**

12   compensated **employee,** and my husband did not get to

13   contribute at **all.**

14   Q.    MS. **Scalli,** the damages that **you're claiming,**

15   **you've** itemized **several** parts of them for me and they

16   **include** the $65,000 bonus for 2002, it **includes** the **lost**

17   business during the first six months of 2003, it **also**

18   includes your **inability** to contribute to the 401K that both

19   you and your husband experienced.  Any other parts of those

20   damages that you **haven't** told me about?

21   A.    what stands out in my head is the $30,000

22   **forgivable** draw that I was promised and somehow **only** became

23   15,000.

72

1     Q.   Now, was that just for your first year of
2   employment, 2001?

3     A.   Yes, correct.

4     Q.   And you received **half** of that 15,000 but not the
5   other **half,** is that correct?

6     A.   correct.

7     Q.   But **wasn't** that other $15,000 paid to your husband,
8   Robert?

9     A.   Yes, but I **didn't** have **knowledge** of that.  He
10   **didn't tell** me he was going to do that.  He had something
11   different worked out with my husband.  We were very, very
12   confused.

13    Q.   But is it your **understanding,** -- strike that.

14              **If** your husband received the **$15,000,**
15   **wouldn't** that account for the total of $30,000 in that
16   **forgivable** draw?

17    A.   **Absolutely** not.

18    Q.   Why?

19    A.   Because **we're** two separate **people,** and if **I'm** going
20   to be getting $30,000, **it's** my $30,000 **forgivable** draw to
21   be **able** to go under my name and for me.  To give **half** to my
22   husband was never mentioned to me.

23    Q.   Any other parts of your damages that you **haven't**

77

1    A.  **Exactly.**

2    Q.  were you paid at that rate?

3    A.  No, I was **not.**

4    Q.  Never?

5    A.  I **believe** it was 65 on **all** my commission reports or

6  **less.**

7    Q.  65.  And 65 is, **it's** your understanding that

8  56 basis points **plus** 9 basis points is a **total** of 65 basis

9  points, correct?

10    A.  Correct.

11    Q.  So you say you were paid at the rate of 65 basis

12  points, is that correct?

13    A.  **I'd** have to look back at the **commissions.**  I do

14  remember 55, 65, around there.

15    Q.  Okay, but you say you were supposed to be paid at

16  70, is that right?

17    A.  Exactly.

18    Q.  Do you have a document that you've seen or you have

19  in your possession that states that you were to **receive**

20  70 basis points?

21    A.  **I'd** have to look.

22    Q.  NOW, you said, I think you **told** me -- strike that.

23        The 70 basis points, is that **assuming** that

78

1  your funded **volume** was $3 minion or more a month?

2    A.  Yes, correct.

3    Q.  So it was **conditional** on a $3 **million** funded **volume**

4  per month, **is** that correct?

5    A.  **No,** there was no, no written condition of **that.**  **It**

6  was **verbal.**

7    Q.  Between who?

8    A.  Between Bard and I, **yes.**

9    Q.  so you understood that to be **eligible** for 70 basis

10  points you had to generate at **least** $3 **million** in funded

11  **loans** a month?

12    A.  I **can't** remember every conversation but it sounds,

13  it sounds pretty much accurate.

14    Q.  okay.  But you say you were **never** paid those extra

15  5 basis points up to 70; you were only paid at the rate of

16  65?

17        MR. BURKE:  objection.

18    A.  I **would** have to go back and **look** at every **single**

19  **loan closed** how much I was paid.

20    Q.  Did you ever **complain** to anyone about not **getting**

21  the 70 basis points?

22    A.  Of course I did, I **complained** to Bard.

23    Q.  Anyone **else?**

86

1      A.   I **would** have to dig **really deep.** **It** might have

2  **been.**   It **really** might have been and I was **wondering** that

3  **myself,** but when **you're dealing** with so many numbers and so

4  much **dollars, it's really** hard to find every **little** thing.

5  **Like** in some of those commission reports, I saw price share

6  things that, monies taken from me that went to Bard and

7  **they're** right in those reports and I **don't** know what that

8  was for **either.**   **It** was **like 3,** 4, 500 at a time that **says,**

9  you know, between me and Bard, so I **don't** know what those

10  monies were for either.

11      Q.   **Ms. Scalli,** you said that during 2002 that you

12  closed $65 **million** in **loans** or I **should** say you were

13  credited with **closing** $65 **million** in **loans,** correct?

14      A.   Correct.

15      Q.   what portion of that $65 **million** were originated by

16  your husband, Robert?

17      A.   Bob was the marketing person, so in terms of

18  origination, I **would** say **less** than 20 percent.

19      Q.   when you say he was the marketing person, did he do

20  the marketing for you too?

21      A.   Yes, Bard hired him to do the marketing with a

22  **salary** and to originate **loans.**   He did **all** the marketing

23  for my **whole** group.

87

1    Q.   But he **also** originated loans?

2    A.   Yes.

3    Q.   Now, during **2002**, how did you do in terms of the

4    ranking of, among **loan** originators in Citizens?

5    A.   I was the top one.

6    Q.   And if your husband had been credited with the

7    loans he originated, how **would** you have done?

8    A.   **If** I took maybe 10 to 20 percent off, **I probably**

9    would have been neck and neck with the next person in **line**.

10   Q.   **That's** your **recollection**?

11   A.   Yeah.   I **probably would** have been right there with

12   the next person underneath me.

13   Q.   Are there any other parts of your damages that you

14   **haven't told** me about?

15   A.   In **detail**, no.

16   Q.   So **you've** described in **detail all** of the damages

17   that **you're claiming**?

18             MR. BURKE:   **Just** so we are **clear**, other than

19   **what's** in the **complaint**, there may be some theories of

20   damages in terms of **labor laws** or --

21             MR. SMITH:   **I'm** asking her **including** the

22   **complaint**, Bard, to be **clear**.

23             MR. BURKE:   whatever she has an **understanding**

1    of obviously.

2              MR. SMITH:  Well, she's one of the plaintiffs

3    in this case.

4              MR. BURKE:  I understand that.  I'm just

5    saying —

6      A.  I don't think I made a good estimate in terms of

7    dollar amounts.  I think it should have been higher because

8    the 6 months of lost business was a huge, huge decline in

9    my income for the next following year.

10     Q.  How much income did you earn during 2003 from GMAC?

11     A.  About 210,000, maybe a little more.

12     Q.  How much did you earn during 2002 from Citizens?

13     A.  I want to say it was maybe 400,000.

14     Q.  During that year?

15     A.  Mm-hmm, it was give or take a few.  I don't know

16    the exact amount.

17             MR. SMITH:  Let's go off the record for a

18    second.

19             (Discussion held off the record.)

20     Q.  During 2004 at GMAC, do you know how much you

21    earned?

22     A.  It was over 200,000.

23     Q.  So approximately the same that you earned during

89

1  2003?

2     A.  No, my husband earned an additional 80 something

3  thousand, so it was a **little** bit more in **2003.**

4     Q.  NO, **I'm** talking about you **individually.**  During

5  **2003,** you **individually** from **GMAC,** do you know how much you

6  earned?

7     A.  About 200,000.

8     Q.  And during 2004, do you know how much you earned?

9     A.  About a **little** over **200,000.**

10    Q.  **Approximately** the same, is that correct?

11    A.  Yes.

12    Q.  NOW, but you say that during 2003 you **lost** a **lot** of

13  business —

14    A.  Oh, **yes.**

15    Q.  -- **at** GMAC?

16    A.  About 6 **months'** worth.

17    Q.  Did you work **less** during 2004?

18    A.  No, I just **told** you, my husband worked and made an

19  **additional** $100,000 of income doing mortgages, so it was

20  over $300,000 for both of us.  As compared to the previous

21  year with GMAC it was $200,000 compared to $400,000 before

22  that.

23    Q.  Just so **I'm clear,** in 2003 you earned **approximately**

1  at the next year, okay, **it's** 220,000 or whatever it is.

2      Q.  From **GMAC?**

3      A.  And whatever other income for both of us and then

4  for 2004, **yeah.**

5      Q.  Are you **saying** that **in** 2003 at GMAC you and your

6  husband worked together?

7      A.  NO, no.  My income for 2003 for GMAC was —

8      Q.  Was **approximately** $200,000?

9      A.  — was the head of the household **income,** was the

10  most income, you know, just from me.

11     Q.  And it was approximately the same amount as what

12  you earned in 2004?

13     A.  No, because my husband had an **additional almost**

14  hundred thousand of income, so it was 100,000 more.  Am I

15  saying it wrong?

16     Q.  During which year was it **$100,000** more?

17     A.  2004.

18         MR. BURKE:  Can we go off the record for a

19  moment?

20         MR. SMITH:  Sure.

21         (Discussion **held** off the record.)

22     Q.  MS. **Scalli,** how do you know that someone from

23  **Citizens interfered with** your **employment** at GMAC?

92

1      A.   There were phone **calls** made over to **GMAC shortly**

2    after I left **Citizens.**

3      Q.   Who from **Citizens** made those phone **calls?**

4      A.   I wrote down the number, the names, I'm sorry.

5    There was someone from, the guy Bert in security, he has **a**

6    woman that works with him.

7      Q.   She made a phone **call?**

8      A.   She made phone **calls, yes.**

9      Q.   Was it **Julie-Anne Aloise?**

10     A.   I **don't** know **if** that was the **name.**   I can **look**

11   back.   I think I gave the faxes and stuff with the names on

12   it.   Someone who worked in the security department with the

13   guy Bert was **calling** over to ˻**GMAC** to see if my husband

14   accepted **employment** there, was trying to do a verification

15   of employment, and I **believe** that they were trying to do

16   that before they **actually** terminated him so they **could** have

17   came back and said, oh, **you're** working somewhere **else** so

18   **you're** going to be **terminated,** but he never, never **applied**

19   for a position at GMAC **ever.**

20     Q.   Now, do you **allege** that that phone **call** was

21   improper?

22     A.   **Well,** if he was **still employed** at Citizens Bank,

23   okay, and someone from Citizens Bank was **calling** to see if

1  he was **employed** somewhere **else** and he was on suspension,

2  why **wouldn't** they ask him if they **could call** a future

3  employee?  You need **authorization.**  You **can't** just be

4  making phone **calls** to **people's** future **employees.**  I **would**

5  think you need some kind of **authorization** to try to get

6  **verifications** of **employment.**

7     Q.  **Is** it your **understanding** that you need an

8  authorization to get a verification of **employment?**

9     A.  **Well,** yes.

10     Q.  **Is** that why you believe that that call was wrong?

11     A.  **Well,** I think it was wrong because he **wasn't**

12  **employed** there, and I **believe** it to be wrong that they were

13  **calling** a **place** that *I* was **employed** at to see, probing to

14  see whether he **applied** for a position.

15     Q.  And is it your position that that interfered with

16  your **employment** at GMAC?

17     A.  Yes, because the reason being is there were so many

18  rumors **floating** around out there.  You know, I had vice

19  presidents, **regional** presidents **calling** me up, hearing **all**

20  these words on the street that I was fired, that I

21  committed fraud, that the FBI was investigating me.  There

22  were so many things at that time being said, and then phone

23  **calls** asking about Bob when he was not **employed** there, it

94

1  just added more **fuel** to **the,** you know, existing heat.

2      Q.  who was the **regional** president who **called** you up?

3      A.  Mike **Tavarozzi.**

4      Q.  How many times did **Mike call** you?

5      A.   Three or four times.

6      Q.  And what did **Mike** say **in** those phone **calls?**

7      A.   He said that he had to ask me before he entered

8  into my employment with me a very **direct** question, if I

9  committed any kind of **fraudulent** acts at Citizens Bank.

10     Q.   So this call was before you were offered **employment**

11  at GMAC?

12     A.   Right before, yes.

13     Q.   Did he ask you anything **else?**

14     A.   Nope, he **told** me word on the street was, that **all**

15  the rumors **floating** out there was that I was going to be

16  arrested.

17     Q.   Did he say anything **else?**

18     A.   **That's all** he said.  He asked me if it were true.

19     Q.   Did he **tell** you where he **learned** that?

20     A.   Yes.

21     Q.   what did he say?

22     A.   He **told** me that he, that there were **people** in

23  Connecticut that worked at Citizens Bank out of Rhode

126

1  to **Javier** Pico as **well.** How do you know that?

2     A.   Javier Pico **told** me.

3     Q.   Do you remember when he **told** you?

4     A.   I don't remember the exact time but it was **shortly**

5  after I **left Citizens.**

6     Q.   Now, **you** use Javier Pico as a **closing** attorney, is

7  that right?

8     A.   Sometimes, yes.

9     Q.   Do you **still** use him as a **closing** attorney?

10     A.   Sometimes, yes.

11     Q.   Where is **his** office located?

12     A.   He just changed it **recently.** I think **it's** near

13  Government Center somewhere.

14     Q.   **Is** he by **himself,** the Law offices of Javier Pico,

15  or is he with a **firm?**

16     A.   The Law Offices of Javier Pico.

17     Q.   what did Javier Pico **tell** you about this supposed

18  statement made by victoria **Noel?**

19     A.   He **told** me **specifically** that she **told,** that he

20  asked her what was the word at Citizens, like **what's** being

21  said, and she said that I was **fired** for bank fraud.

22     Q.   So he asked Victoria **Noel** what was being said about

23  you?

 CITIZENS MORTGAGE CORPORATION

GIFT LETTER
DEPOSITORY ACKNOWLEDGEMENT

GIFT LETTER

E. Scalli
Exhibit No. 16
4/12/05    KB

TO WHOM IT MAY CONCERN:

I/We _AN9 fc£g CASTILLO_ , do hereby certify that I/we have *made a*

gift of $ _6,000_ to my/our _BROTHER_ to be applied toward the purchase of
(chayow)                         RELATIONSHIP

the property located at: _9 CARLTON TERRACE LYNN MA 01905_

I/We further certify that there is no repayment expected or implied on this gift either in the form of cash or future

services from the recipient(s) and that these funds are not from any person or entity with an interest in the sale of the

property including the seller, real estate agent or broker, builder, loan officer, or any entity associated with them.

_PAULA CASTILLO_                    _PAUL A CASTILLO 1-14-03_
PRINT RECIPIENT NAME                RECIPIENT SIGNATURE          DATE

_ANDRES CASTILLO_                   _Andres Castillo 1-14-03_
PRINT DONOR NAME                    DONOR SIGNATURE              DATE

                                    _217 Trenton ST #1 E Boston MA 02128_
                                    DONOR ADDRESS

                                    _(617) 567 56 30_
                                    DONOR TELEPHONE NUMBER

Also required for Citizens Mortgage Corporation Is verification of the above funds in deposit account to give to the
applicant. Please have the depository complete the following:

DEPOSITORY ACKNOWLEDGEMENT

I/We _East Boston Savings Bank_ do hereby certify that

_Andres E. Castillo_ has had, as of this date, the above

stated funds in his/her _Checking acct 260015805_
                        TE OF ACCOUNT

_1-14-03_              ; _East Boston Savings Bank_
DATE                      INSTITUTION
                       _10 Meridian St E Boston MA 02128_
                        ADDRESS

By: _O Kayas_

C03357
CONFIDENTIAL



RES V4AR 00110-3455101382
ATTN: JULIE-ANNE ALOISE
ENCLOSED IS THE PHOTOCOPY YOU REQUESTED ON 2/24/00.
13
ROBERT SCALLI
ELEANOR SCALLI
253 MAIN ST MA
WINTHROP M  O  152

CONFIDENTIAL

E. Scalli
Exhibit No. 17
4/12/05    KB

Purchased at:
Putnam St. Br., Winthrop Br 681





CONFIDENTIAL



E Fralli
Exhibit No. 18
4/12/05

CONFIDENTIAL

```
Report: POTLOG  -----------------------  Page View (On Exit ~ Close Report)  -------------- |R. 3.0.2    Page:  26,319
COMMAND ==>
**********KEY: 681 *********************************************************************************************
                                                       90,000.00 TXN
681 M483351  O3 01/13/03 12:58      266  IOI 1136093408   90,000.00 TXN       2        TSB001
681 M483351  O3 01/13/03 12:59      266  IOI 1136093408   90,000.00 TXN       0 M483351
  END OF CUSTOMER
681 M483351  O3 01/13/03 12:59 13:O1 699               219,094.00 BIN1 Y YY 0
                                                       299,120.62 BIN2
631 M483351  O3 01/13/03 13:00 13:O1 257                 3,607.00 CSH     YY 0
                                                         3,607.00 TXN
681 M483351  O3 01/13/03 13:01 13:04 625                48,940.00 TXN     YY 0
  END OF CUSTOMER
681 M483351  O3 01/13/03 13:04 13:O4 S99                 3,607.00 BIN2 Y YY 0
681 M483351  O3 01/13/03 13:52 13:55 509                 2,266.60 TXH     YY 0
681 M483351  O3 01/13/03 13:53 13:55 610                 2,266.60 TXH     YY 0
  END OF CUSTOMER
681 M483351  O3 01/13/03 13:59      00 268 IOI 1134703179 18,500.00 TXH   Y   0
681 M483351  O3 01/13/03 13:59      250  IOI 1134703179  18,500.00 CSH
                                                        18.500.00 TXN
681 M483351  O3 01/13/03 14:01      266  IOI 1134703179   4,000.00 TXN       2        1X0102 TL0103
681 M483351  O3 01/13/03 14:01      266  IOI 1134703179   4,000.00 TXN       0 M483351
681 M483351  O3 01/13/03 14:03      506      0557554318   4,000.00 CSH       0
                                                         4,000.00 TXN
  END OF CUSTOMER
681 M483351  O3 01/13/03 14:O5      250  IOI 1107800401   1,290.00 CHK  Y    0
```

*cashed check*

*purchase of OBC*