EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*
\*
ELEANOR SCALLI,            \*
ROBERT SCALLI,              \*
         Plaintiffs     \*    CIVIL ACTION
                        \*    NO. 03-CV-12413DPW
         VS           \*
                        \*
CITIZENS FINANCIAL GROUP,    \*
INC.,                     \*
         Defendant     \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

           DEPOSITION OF ROBERT SCALLI, taken on behalf of the defendant pursuant to the Massachusetts Rules of Civil Procedure before Kathleen M. Benoit, CSR # 1368F94, Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts at the offices of Goodwin Procter, Exchange Place, Boston, Massachusetts, on Tuesday, March 1, 2005, commencing at 10:36 a.m.

APPEARANCES:

NICHOLAS J. DiMAURO, ESQ., 111 South Bedford Street, Suite 208, Burlington, MA 01803, For the plaintiff, Robert Scalli

MARK E. BURKE, ESQ., 111 South Bedford Street, Suite 208, Burlington, MA 01803, For the plaintiff, Eleanor Scalli

BRADFORD J. SMITH, ESQ., and ANNE GAETA, ESQ., Goodwin Procter, Exchange Place, Boston, MA 02109-2881, For the defendant

ALSO PRESENT:

JEFFREY SIEGEL, ESQ.

*Leavitt Reporting, Inc.*

1207 Commercial Street, Rear                          Tel. 781-335-6791
Weymouth, MA 02189                               Fax: 781-335-7911
                                             leamttreporting@att.net

*Hearings ◆ Conferences ◆ Legal Proceedings*

2

1

                            INDEX
  WITNESS                   DIRECT CROSS REDIRECT RECROSS

2

  Robert **Scalli**
    by Mr. Smith        3

3

4
                            EXHIBITS
  **No**. **Description**                            **Page**

5

6   1    Letter 2/21/01 Citizens to Robert
         **Scalli**                                    45

7   2    Letter 2/21/01 Tara **Tribelli** to
         Robert **Scalli**                             46

8
    3    Letter 2/21/01 Tara **Tribelli** to
9        Robert **Scalli**                             46

10  4    **Citizens'** Code of Ethics Signature
         Page                                          88

11
    5    Letter 3/5/02 Barden Conn to
12       Robert **Scalli**                             88

13  6    **Joint** Consolidated **Complaint** and
         Jury Demand                                   97

14

15

16

17

18

19

20

21

22

23

7

1    Q.   And that **includes** in a joint capacity with someone

2    else?

3    A.   I **don't** own any property.

4    Q.   You **don't** own any property.  Either as an

5    **individual** or as an owner of an entity that may perhaps own

6    the property?

7    A.   I **don't** own any property.

8    Q.   When was the **last** time you owned property?

9    A.   Maybe 6 months ago.

10         (Discussion held off the record.)

11    Q.   Let me, I just want to **clear** one thing up.  **Could**

12    you state your **full** name for the record?

13    A.   Robert **Scalli**.

14    Q.   And where do you **live**?

15    A.   233 Main Street in **Winthrop**, Mass.

16    Q.   **All** right.  And for the record, you are the

17    plaintiff, one of the **plaintiffs** in the case, Robert **Scalli**

18    and **Eleanor Scalli** versus Citizens **Financial** Group,

19    correct?

20    A.   Yes.

21    Q.   Other than in your capacity as a **landlord**, are you

22    **presently** a defendant in any action?

23    A.   A defendant?

8

1    Q.  Yes.

2    A.  With real estate?

3    Q.  In any capacity.

4    A. Yes.

5    Q.  Okay.  How many claims are you a defendant in?

6    A.  one.

7    Q.  which claim is that?

8    A.  It's a lease agreement, a lease dispute.

9    Q.  who is the plaintiff in the case?

10    A.  Kyle something.  I don't know who he is.

11    Q.  An individual?

12    A.  Yes.

13    Q.  And who are the defendants in that case?

14    A.  I am.

15    Q.  Just you?

16    A.  Mm-hmm.

17    Q.  And what is the nature of that dispute?

18    A.  It's over leasing one unit and I was said to have

19    leased two units by the prior landlord who died 3 days

20    before going to court, and that was it.

21    Q.  Do you know what court that claim is pending in?

22    A.  Lynn.

23    Q.  Lynn District Court?

9

1    A.    Correct.

2    Q.    other than that **claim** that is pending in District

3    Court brought by **Kyle**, and you don't remember his **last**

4    name, are there any other cases that you **currently** are a

5    defendant in?

6    A.    Not that I can **recall**.

7    Q.    **Is** there anything that **would help** you **recall** other

8    cases that **you're** a defendant in?

9    A.    If I spoke to my attorney, I **could**, my attorney,

10    **Javier Pico**.

11    Q.    And is Mr. Pico representing you in the **Kyle** case

12    **that's** pending in Lynn District Court?

13    A.  Yes.

14    Q.    Are there other cases that you have been a

15    defendant in in the past?

16    A.    There **could** be.

17    Q.    Can you **tell** me about the cases?

18    A.    As a defendant?

19    Q.  Yes.

20    A.   I really can't recall.

21    Q.    Well, have you ever been a defendant in a **claim**

22    **involving** defamation?

23    A.  Yes.

13

1    Q.  You don't recall.  were you a defendant in that

2  type of claim or were you a plaintiff?

3    A.  A plaintiff.

4    Q.  Did that claim settle or did it go to trial?

5    A.  I think it settled.

6    Q.  Any other cases that you've been a plaintiff or

7  defendant in?

8    A.  Not that I can remember.

9    Q.  Mr. Scalli, you were previously employed by

10  Citizens Financial Group and Citizens Mortgage company, is

11  that right?

12    A.  Correct.

13    Q.  You were employed as a loan originator, is that

14  right?

15    A.  Yes.

16    Q.  How did you become aware of the availability of a

17  position of a loan originator at Citizens?

18    A.  At a Christmas party.

19    Q.  what Christmas party?

20    A.  Dorado Real Estate in East Boston, excuse me,

21  Tony's Real Estate in East Boston.

22    Q.  Tony's Real Estate, okay.  And how did you become

23  aware of the position?

14

1      A.   I was approached by a **loan** officer from Citizens

2  Bank.

3      Q.   who was that **loan officer?**

4      A.   Steve -- **let** me think of his **last** name.   I **can't**

5  **recall** his **last** name.

6      Q.   Not Steve **Adamo?**

7      A.   NO, no.   I **don't** remember his name.

8      Q.   what did Stephen **tell** you?

9      A.   **well,** since we were originating **loans** in the same

10  **offices,** he said it **would** nice to get you over to Citizens.

11      Q.   Do you know what he meant when he said we were

12  originating **loans** in the same offices?

13      A.   we **would all,** when I say **all,** **loan** officers **would**

14  go into **real** estate offices to originate **loans,** and we

15  **would always** be crossing paths in different offices.

16      Q.   **All** right, so you knew him as a **result casually,** is

17  that right --

18      A.   Correct.

19      Q.   -- this **individual** Steve?

20      A.   He's a manager at citizens; **he's** a manager.

21      Q.   Did Steve describe the position to you at that

22  time?

23      A.   Yes.

15

1    Q.  what did he say?

2    A.  That Citizens was a great place to work for, they

3  had great benefits, great work **environment,** great **people**

4  and that they were **currently** recruiting some of the top

5  loan originators in the area.

6    Q.  Where were you working at the time?

7    A.  Hancock Mortgage.

8    Q.  How **long** had you been there?

9    A.  About a year.

10    Q.  Now, was this a Christmas party prior to Christmas

11  **'01** -- **I'm** sorry, Christmas 2000?

12    A.  It was Christmas of a few months before the **hire**

13  date.

14    Q.  Right, and you were hired in March of 2001, is that

15  right?

16    A.  Correct.

17    Q.  So it **would** have been Christmas 2000, sometime

18  around that season?

19    A.  Yes.

20    Q.  **All** right.  Did you **follow** up on that discussion

21  you had with Steve **relative** to that position at citizens?

22    A.  He **followed** up.

23    Q.  He **followed** up.  How **long** after the party?

17

1    A.  He **called** back again and asked if he **could** bring

2  the managers over to my house.

3    Q.  TO your house, **okay.**  **Is** that what happened?

4    A.  Yes.

5    Q.  okay, great.  Do you remember who visited your

6  house?

7    A.  Yes.

8    Q.  who was it?

9    A.  Steve, **Mike Dirani**an and Bard **Conn.**

10    Q.  Anyone **else?**

11    A.  NO.

12    Q.  3ust the three of them?

13    A.  Just the three of them.

14    **Q.**  was your wife **Eleanor** there for that meeting?

15    A.  Yes.

16    Q.  was anyone **else** from, on your **behalf** there at that

17  meeting?

18    A.  No.

19    Q.  So it was just the five of you?

20    A.  Yes.

21    Q.  And you met in -- do you and **Eleanor** have an office

22  in your house?

23    A.  Yes.

25

1    else **did** Mr. conn and Mike **Dirani**an or Steve --

2        A.   **Rousel.**

3        Q.   Steve **Rousel,** you knew it **would** come to **you,** and

4    that's R O U S E L?

5        A.   I have no idea how to **spell** it.

6        Q.   what **else** did they say to you, if you can **tell me,**

7    at that meeting?

8        A.   They asked how I was being invited to so many real

9    estate offices that Armando **couldn't** get into.

10       Q.   What did you say?

11       A.   I said that I have a lot of relationships with a

12   **lot** of **realtors** because **I'm** not Latin and I speak a **little**

13   Spanish.

14       Q.   what **else** did they say during this **meeting?**

15       A.   **Would** you **like** to come to work for **Citizens.**

16       Q.   what did you say?

17       A.   **Well,** what does Citizens have to offer.

18       Q.   And what did they say?

19       A.   And Bard said that **he'd like** to cut right to the

20   chase, he **doesn't** want to **lose** market share, he wants to

21   hire the very best **loan** originators and our name came up as

22   far as **last** name, **Scalli.**

23       Q.   Did he offer you **employment?**

38

1    if he hires the very best he'll have no competition and

2    he's not worried about people competing within inside the,

3    because they're all flying under the Citizens flag.

4        Q.    Did he talk about the offer or the terms of your

5    employment with citizens?

6        A.    Yes.

7        Q.    what did he say?

8        A.    He said that he knows that according to market

9    share that I'm in East Boston and other areas, Revere and

10   Lynn, and that he would make it worth my while to leave and

11   come work for citizens.

12       Q.    Did he say anything else about the terms of

13   employment at citizens?

14       A.    what do you mean by terms?

15       Q.    Well, there were, did he discuss the amount of pay

16   or commission structure —

17       A.    Yes.

18       Q.    -- that you would receive.    what did he say?

19       A.    He said that he could do whatever he wanted to do

20   as far as what loan officers get what basis points; that

21   his boss gave him all the leeway to do it.    He also told me

22   that, he offered me a forgivable draw.

23       Q.    How much?

39

1    A.    $50,000.  And he **told** me that every year according

2    to how many **millions** were brought in that you **could** make

3    more money.

4    Q.    Did he **explain** that?

5    A.    **Just** it was a **forgivable** draw, and he said that

6    **it's** common practice in the business when they recruit **loan**

7    officers to give them **forgivable** draws and Citizens does

8    **it.**

9    Q.    And **that's** that $50,000 **forgivable** draw, is that

10   correct?

11   A.    No, he said that every year you can renegotiate

12   your contract because **it's** year to year.

13   Q.    okay.  And he said depending on how many **millions**

14   in **loans** you originate?

15   A.    He said that he expected me to work hard, go out

16   there and get lots of mortgages, that he **could** grant the

17   **forgivable** draw on the anniversary date of every contract

18   **renewal.**

19   Q.    Did he indicate to you how much the **forgivable** draw

20   might be at a **renewal** time?

21   A.    He **always** said 50,000 because he asked me how

22   $50,000 sounds to me, and I said it sounds **like** $50,000.

23   Q.    what **else** happened during this meeting?

42

1    A.   Per year.

2    Q.   okay.

3    A.   Yes, and then on top of that, whatever **else** I

4  brought in on top of that I **would** be **commissioned** on.   So

5  **if** you did, I **don't** know, $70,000 as opposed to 50, **you'd**

6  get another $20,000 **forgivable** draw.

7    **Q.   Okay.**

8    A.   so it was a draw and a **salary.**

9    Q.   Did he give you a document that **included** those

10  terms in it?

11    A.   No, he said that **he'd** give the **salary** but he said

12  the draw was something that he **could** authorize, **only** he

13  **could** authorize it.

14    Q.   **I** understand.   Did he give you that authorization

15  in writing?

16    A.   I **didn't** — no, he didn't, just the **salary.**

17    Q.   Now, I think you said that Mr. Conn had **all** the

18  paperwork typed up and that you reviewed it at this

19  meeting, is that right?

20         MR. BURKE:   objection.

21    A.   Not **all** the paperwork just some paperwork about

22  Citizens.

23    Q.   which paperwork was that?

LEAVITT REPORTING, INC.

43

1      A.   I can't recall.

2      Q.   Was it an offer letter?

3      A.   I'm not sure if the offer letter was there or if I

4   got it in the mail.

5      Q.   Afterwards?

6      A.   Yes, after this meeting.

7      Q.   Did anything else happen at this meeting that you

8   haven't told me about?

9      A.   Not that I can recall.

10     Q.   Did, do you remember Eleanor saying anything during

11  this meeting?

12           MR. BURKE:   Objection.

13     A.   I don't want to speak for her but I was just

14  focused on what Bard was talking to me about.

15     Q.   But did he speak with Eleanor as well during this

16  meeting?

17     A.   Um, from what I can recall, I was just focusing on

18  Bard talking to me.

19     Q.   So you don't remember any discussion taking place

20  between Bard and Eleanor?

21     A.   No.

22     Q.   NO?

23     A.   Not that I can recall.

44

1      Q.   When was the next **communication** that you had with

2  Citizens, anyone from Citizens after this meeting in **Bard's**

3  office?

4      A.   Phone **calls,** faxes.

5      Q.   Who were the phone **calls** with?

6      A.   Bard.

7      Q.   what was said during those phone **calls?**

8      A.   That he wanted to, he had something he wanted to

9  run by as far as the, how he was **going** to justify that much

10  money.  When I say that much money, I mean the forgivable

11  draw that he **called** it, that how he wanted to split it

12  up - some to **Eleanor** and some to me.

13      Q.   what **else** did he say on that issue?

14      A.   That he wanted to, he said that it **would** create a

15  nightmare for him but he wanted to **split** it up; that it

16  was, I forget, 30, 40, 50,000, I **actually** forget the amount

17  but I remember that it had to be **split** up and **that's** what

18  he said it had to be **split** up.

19      Q.   Did you say anything to him when he **explained** that

20  it had to be **split** up?

21      A.   Like what?

22      Q.   **I'm** curious, you were on the phone **call** with him.

23  What did you say in response?

50

1    Q.  Okay, so is it **possible** you signed more than one

2 offer **letter?**

3    A.  I **can't** be sure.  **There's lots** of paperwork.

4    Q.  Okay, **fair** enough.

5        **Let's look** at Exhibit 2 then if you **would.**

6 Now, Exhibit 2 is a document that you produced to us that

7 **includes** a signature that **you've acknowledged is yours,** is

8 that correct?

9    A.  Yes.

10    Q.  **Is** that your **social** security number next to the

11 signature?

12    A.  Yes.

13    Q.  **All** right, if you would, on page 1 of this offer

14 **letter** that **I've** marked as Exhibit 2 and **that's** in front of

15 you, you see under Section 2, **Plan Description,** under **II-A**

16 that **you're** receiving a $15,000 advance paid **biweekly** at

17 $2500 for six pays which **will** not be charged **against** future

18 commissions.  Now, do you remember receiving an offer

19 **letter** that had just a $15,000 advance of this sort and not

20 any number greater than that?

21        (Document **Perusal.)**

22    A.  This is **only** one paper of a stack of other papers

23 that **I've** signed.

1    Q.  Were there other documents that you remember that

2  described your terms of compensation?

3    A.  Yes.

4    Q.  Can you describe those documents for me?

5    A.  Yes, that I was getting a $50,000 salary.

6    Q.  So there was a document that you signed that

7  included a term that you would receive a $50,000 salary?

8    A.  I would have to review all these papers.  There was

9  a huge packet.

10    Q.  Do you have that packet?

11    A.  Everything I have I've produced.  Can I take

12  5 minutes and just, I have to eat something.

13              MR. BURKE:  You're sick?

14              THE WITNESS:  If I don't eat, I get really

15  lightheaded.  I have to eat.  At 12 o'clock I have to eat.

16              MR. SMITH:  That's fine.  Let's go off the

17  record.

18              (Discussion held off the record.)

19              (Lunch recess taken at 12 p.m.)

20

21

22

23

54

1    A.  Yes.

2    Q.  In addition to that $50,000 salary, I believe that

3  you told me about discussions that you had concerning a

4  forgivable draw of $50,000?

5             MR. DiMAURO:  Objection.

6    Q.  Did you have discussions with Mr. conn about a 50,

7  about a forgivable draw?

8    A.  He said that I would get a $50,000 a year salary

9  and I could increase that if I produced more loans for him.

10    Q.  okay.  Did he tell you by how much it could be

11  increased?

12    A.  It was up to me.

13    Q.  Did he tell you at which point, at what point you'd

14  be eligible for an increase?

15    A.  Over 50 million.

16    Q.  So once you generated over $50 million in loans in

17  a year?

18    A.  NO, he said I'd have a salary and anything I

19  produced over that that he had the ability to give me what

20  I wanted, what he wanted to give me.

21    Q.  Did he say what he was willing to give you?

22    A.  A $50,000 salary.

23    Q.  Okay, I'm sorry, but was that in addition to your

55

1  other 50,000 **salary?**

2       A.   He said **he'd** give me a $50,000 **salary,** and if I

3  produced more than that, he **would** give me more money.

4       Q.   **Did** he say how much more money?

5       A.   **Just** more money.  Like the way it was **explained,** it

6  was a thousand for every **million** I produced over 50,000.

7       Q.   so he said —

8       A.   **I'm** sorry, 50 **million.**

9       Q.   50 **million.**  So he said that he **would** give you a

10  thousand **dollar** bonus?

11       A.   It wasn't a bonus.  He **didn't** say bonus.

12       Q.   What did he say?

13       A.   **Forgivable** draw.

14       Q.   Okay, a thousand **dollar forgivable** draw for each --

15       A.   After my, after my **salary.**

16       Q.   okay.  For each **million dollars** in **loans** you

17  originated over 50 **million?**

18       A.   He can make, yeah, everything I originate over 50

19  **million,** correct.

20       Q.   was it a thousand **dollars?**

21       A.   A thousand per **million.**

22       Q.   **Now,** was it your **understanding** that that $50

23  **million** number was determined on a **yearly** basis?

58

1    Q.   Right, but did you **talk** to him about this, about

2    the offer **letter** that you had received?

3    A.   He just **told** me to sign it and make sure they get

4    it back.

5    Q.   **That's** what he said?

6    A.   Correct.

7    Q.   And you signed it and made sure that they got it

8    back?

9    A.   Yes.

10   Q.   Did you have any discussion with him though about

11   it, about what it contained?

12   A.   Not that I can remember.

13   Q.   Now, did you read the document before you signed

14   it?

15   A.   Yes.

16   Q.   In **section,** on the **first** page of the document,

17   under Roman **numeral** II, **Plan** Description, Paragraph A, it

18   states that you **will** be **eligible** to receive a $15,000

19   advance paid **biweekly** at $2500 for six pays which **will** not

20   be charged against future commissions.  Did you **receive**

21   that $15,000 advance?

22   A.   Yes.

23   Q.   And was it paid to you over the **first** six pay

59

1    periods?

2        A.   Yes.

3        Q.   Now, does this offer letter include any statement

4    regarding a salary?

5                    (Document Perusal.)

6        A.   This letter doesn't.

7        Q.   It does not?

8        A.   It does not.

9        Q.   Now, did you ask Mr. Conn about that?

10       A.   Yes.

11       Q.   What did he say?

12       A.   He told me it would be in my packet.

13       Q.   He told you it would be in your packet.  Did you

14   have an understanding about what he was referring to when

15   he said "packet"?

16       A.   My employment packet.

17       Q.   Your employment packet.  Did you receive an

18   employment packet from him?

19       A.   Yes.

20       Q.   was there a document that addressed the $50,000

21   salary?

22       A.   Yes.

23       Q.   Can you describe that document for me?

60

1    A.  It just said $50,000 **salary.**

2    Q.  Did you have a space to sign that document?

3    A.  I **don't recall.**

4    Q.  Was it signed by anyone from citizens?

5    A.  I **don't recall.**

6    Q.  **When's** the **last** time **you've** seen that document?

7    A.  when I did **all** of my citizens paperwork.

8    Q.  At the beginning of your **employment?**

9    A.  Yes.

10   Q.  Do you remember returning that document to

11 Citizens?

12   A.  However they wanted it, it was done, it was given

13 back to them that way.

14   Q.  Did you keep a copy of it?

15   A.  whatever copies I had I gave to my attorney.

16   Q.  NOW, does Exhibit 2 contain any statement regarding

17 your **eligibility** for a thousand **dollar forgivable** draw for

18 each **million dollars** in **loans** you originated in excess of

19 $50 **million?**

20   A.  I **don't** see it.

21   Q.  Did you ask Mr. Conn about that?

22   A.  Numerous times.

23   Q.  Did you ask him at the beginning of your

61

1  employment?

2      A.  Yes.

3      Q.  what did he say?

4      A.  That he **would** take care of **it.**

5      Q.  Did he ever give you a document that **reflected** that

6  thousand **dollars** in a forgivable draw?

7      A.  No.

8      Q.  Before your **employment** began, you **told** me that Bard

9  **talked** to you about a $50,000 **salary,** correct?

10     A.  correct.

11     Q.  And this thousand **dollar forgivable** draw for each

12  million **dollars** in **loans** in excess of 50 **million,** correct?

13     A.  Correct.

14     Q.  were there any other parts of compensation that he

15  **talked** to you about?

16     A.  At that time?

17     Q.  Yes, at the beginning of your **employment.**

18           MR. DiMAURO:  **Objection.**  Can we go off the

19  record one moment.

20           (Discussion **held** off the record.)

21     Q.  Let me just ask you either prior to your employment

22  or at the beginning of your **employment** did you have

23  discussions with Mr. **Scalli** regarding other **elements** in

63

1    Q.   Yes.

2    A.   which time during the beginning?

3    Q.   Anytime during the first six months of your

4  employment.

5    A.   Yes.

6    Q.   Tell me about those discussions.

7    A.   A week or so after I was hired at citizens Mr. Conn

8  called me up and asked to see me.

9    Q.   Did you meet with him?

10   A.   Yes.

11   Q.   Where?

12   A.   At my house.

13   Q.   Was anyone else there?

14   A.   NO.

15   Q.   so Eleanor didn't attend this meeting?

16   A.   she was working.

17   Q.   what happened during the meeting?

18   A.   He told me that he wanted all of my production to

19  go under Eleanor's number because he was going to move

20  Eleanor under him and away from Mike Diranian.

21   Q.   what else did he say?

22   A.   That I would get my $50,000 salary if I sent all of

23  my loans under Eleanor which would then go directly to him.

64

1      Q.   I'm sorry, what was going to go directly to

2   Mr. Conn?

3      A.   The way Bard explained it to me was that right now

4   myself and Eleanor were under Mike Diranian, and that he

5   saw us as far as he wanted us working together, he wanted

6   me to put all of my production under her production number.

7      Q.   Understood.  Now, but I thought you said something

8   about that if he did that that that would allow Bard to get

9   certain credit?

10     A.   That's what Bard explained to me.

11     Q.   What did he say?

12     A.   That he wanted an overage to go to him and not to

13  Mike Diranian; that he would be paid direct compensation

14  from all the loans that is produced in Eleanor's pipeline

15  directly.

16     Q.   What else did he say in this meeting?

17     A.   Keep up the good work.

18     Q.   Anything else?

19     A.   Not that I can remember.

20     Q.   What did you say in response to that request?

21     A.   I did what he told me to do; he was my boss.

22     Q.   Did you tell him that you would agree to that?

23     A.   I told him that, why did he want me to put all of

65

1   my numbers under **Eleanor,** and he stressed the fact that he

2   **would** be paid **directly** for that and that's how he wanted it

3   done.

4       Q.  And you agreed to it?

5       A.  I had no choice.  I did whatever he **told** me to do.

6       Q.  **well,** did you **talk** to anyone **else** at the bank about

7   that?

8       A.  No, just Bard.

9       Q.  Did you **talk** to Mike **Dirani** an about it?

10      A.  Yes.

11      Q.  when did you **talk** to Mike **Diranian**?

12      A.  Around the same time.

13      Q.  Did you **call** him?

14      A.  I saw him at a Citizens **meeting.**

15      Q.  **Tell** me about that **conversation.**

16      A.  I said, "Why am I not under you any more, Mike?"

17  He said, "**It's Bard's** decision, not **mine.**"

18      Q.  Did you **tell** Mike about Bard's request to, for you

19  to **place all** of your production under **Eleanor's** name?

20      A.  No.

21      Q.  Why **didn't** you mention that to Mr. Diranian?

22      A.  Because I was now reporting to Bard.

23      Q.  Did you ever **tell** anyone **else** at the bank about

68

1    Q.  He said it was a salary?

2    A.  That's how he described it.

3    Q.  Did he say anything about when you would receive

4  it?

5    A.  I kept asking him when I'd receive it.

6    Q.  When did you ask him?

7    A.  The whole year, "Bard, when am I going to get my

8  money? when am I going to get my money?"  "I'll take care

9  of it; I'll take care of it."

10   Q.  When you asked him that, did you expect that you

11  were supposed to get a $50,000 check?

12   A.  Well, I expected because he could make a phone call

13  and produce $15,000 when he said he could do something, he

14  said he ran it, that he could make the compensations what

15  he wanted to make the compensations.  He could make the

16  basis points what he wanted to make the compensations, and

17  I kept asking him, "Hey, when am I going to get my money?"

18  And he said "I'll take care of it; I'll take care of it."

19   Q.  Did you talk to anybody else in the bank besides

20  Bard?

21   A.  Just Bard.  He ran the whole department.  All the

22  managers reported to Bard.  No one was beyond Bard.

23   Q.  What about Human Resources, did you ever talk to

69

1  anyone at Human Resources?

2      A.   No.

3      Q.   Ever **talk** to anyone in **benefits?**

4      A.   **No.**

5      Q.   why not?

6      A.   I **talked** to Bard.  **I've** never worked for a large

7  company **like** citizens ever.

8      Q.   **Weren't** you in the Army?

9      A.   Yes.  A **whole** different structure.  You **don't** break

10  the chain of command.

11      Q.   Other than your **employment** at **Hancock,** who **else**

12  have you worked for?

13      A.   **Myself.**

14      Q.   As a **real** estate **developer?**

15      A.   **No,** I worked --

16          MR. BURKE:  Objection.

17          MR. **DiMAURO:**  You can answer **if** you

18  understand the question.

19          MR. SMITH:  Just a second.  Are we getting

20  objections from both attorneys?

21          MR. BURKE:  **I'm** objecting on **behalf** of my

22  **client** here.

23          MR. SMITH:  You **can't** object on **behalf** of

79

1    Q.   Did Mr. conn ever identify that that advance **would**

2  be any other sum other than $15,000?

3    A.  At what time?

4    Q.  At any time.

5    A.  He said after I was **hired** and he said **you'll** be

6  putting **all** of your **loans** under **Eleanor's** number, that I

7  **would** get a **$50,000** a year **salary.**

8    Q.  And he didn't say that **until** after you were **hired**?

9    A.  He **didn't** come to me with that **until** about a week

10  after I was hired.

11    Q.  Okay.  So just to be **clear,** prior to you starting

12  **employment** with Citizens, Mr. Conn never had any discussion

13  with you about a $50,000 **salary** --

14    A.  Correct.

15    Q.  -- or **salary** in any other amount?

16    A.  Correct.  But he did say that I **would** have a

17  $50,000 a year salary.

18    Q.  But you never received that, did you?

19    A.  I kept asking him for it.

20    Q.  Did you ever ask him in writing?

21    A.  No.

22    Q.  Did you ever **E-mail** him?

23    A.  No.

1      Q.   And you never talked to anyone else at citizens

2   about that?

3      A.   Why would I?

4      Q.   Well, were you aware that there was a Human

5   Resource Department?

6      A.   NO.

7      Q.   Tara Tribelli is a recruiter from Human Resources

8   who signed your offer letter.   Do you know who she is?

9      A.   I've never met Tara Tribelli.

10     Q.   Have you ever spoken to her?

11     A.   I may have.

12     Q.   DO you have an understanding of what the Human

13   Resource Department does at a company?

14     A.   My understanding is that you don't violate the

15   chain of command.   When you work for someone when they're

16   your boss, that's your boss.   There's a chain of command.

17   That you don't jump the heads of the chain of command.

18     Q.   Is it fair to say though that Bard Conn did not

19   fulfill his promise to pay you the $50,000 salary?

20     A.   It is fair.

21     Q.   Now, in that circumstance, isn't it your opinion

22   that you should jump the chain of command and talk to

23   someone else about that?

86

1       A.   we never went to functions.   Bard **told** us not to
2   **go**.
3       Q.   But to be **clear,** you had **told** Mr. Conn that you
4   were **going** to speak with Steve Adamo at that function at
5   the casino, is that correct?
6       A.   I believe it was the casino.   **I'm** not sure but I
7   **believe** it was.
8       Q.   But you decided not to attend the casino function?
9       A.   I was suspended at that time.
10      Q.   You were suspended?
11      A.   Yes.   When that happened I was suspended.
12      Q.   Did you, at the meeting when you were suspended,
13  did you **tell** anyone about **Bard's** promise of the $50,000
14  **salary?**
15      A.   They were asking me questions.
16      Q.   No, but, and **I'm** asking you, did you **tell** anyone
17  about the $50,000 **salary?**
18      A.   I **didn't** know who to **talk** to.
19      Q.   **Well,** did you **tell** anyone about that issue at the
20  suspension meeting?
21      A.   **No.**
22      Q.   Okay, thank you.
23           Did you, do you know whether **Eleanor** was

1            (Exhibit NO. 4 and 5 marked.)

2      Q.   Have you had a chance to read that document that's

3  in front of you marked as Exhibit 4?

4      A.   Yes.

5      Q.   Is that your signature?

6      A.   Yes.

7      Q.   Do you remember signing that document?

8      A.   I don't remember signing this document but I

9  remember signing documents.

10     Q.   DO you remember receiving a copy of citizens' Code

11  of Ethics?

12     A.   I remember receiving a bunch of paperwork from

13  Citizens.

14     Q.   Let me show you what's been marked as Exhibit 5.

15           (Document Perusal.)

16     Q.   can you identify that document for me?

17     A.   It's a renewal of your position of loan originator

18  from the loan production office.

19     Q.   And it's dated March 5th of 2002, correct?

20     A.   Yes.

21     Q.   Now, this is a document, I'll represent, that was

22  produced to you by us.  On page 5 of the document which is

23  actually, it's marked page 5 of the document but it's the

1   A.  Yes.

2   Q.  Did you have a territory as a **loan** originator?

3   A.  At Renaissance.

4   Q.  YOU **could sell** wherever you wanted to?

5   A.  At Renaissance, **yes.**

6   Q.  Did you work in conjunction with any other **loan**

7 originators or were you on your own?

8   A.  On my own.

9   Q.  Are you aware did anyone from Citizens interfere in

10 any way with your **employment** at Renaissance?

11   A.  what do you mean by that?

12   Q.  **well,** are you aware of whether anyone from Citizens

13 contacted anyone at Renaissance **while** you were there?

14   A.  The **only** thing that happened was somebody from

15 Citizens Bank **called,** I **believe** it was **GMAC** to ask them if

16 I worked at GMAC.  **That's** the **only** time somebody tried to

17 interfere into my **employment.**

18   Q.  **Did** you ever work at GMAC?

19   **A.**  **No.**

20   Q.  why do you say that that was an attempt to

21 interfere with your **employment?**

22   A.  They were asking questions about me to GMAC **when** I

23 **didn't** work there.

1    A.  They just sat there.

2    Q.  They just sat there, **all** right.  You **don't** remember

3  what department they were from or anything?

4    A.  No.

5    Q.  **Tell** me what happened during the meeting.

6    A.  I sat down.  I asked Bard, I said, "Bard, **what's**

7  going on?"  He asked me a few questions about **real estate,**

8  and I said "what does this have to do with?"  He caught me

9  off guard.  I was pretty nervous.  I said "What are we

10  **talking** about, **what's** going on?"  And he **told** me there were

11  some **improprieties,** and then he **told** me, then Joyce Hicks

12  jumped in and asked me if I owned a building.

13    Q.  Anything **else?**

14    A.  Not that I can remember right now.

15    Q.  **All** right.  In addition to her asking you about

16  whether you owned a building, did she ask you about a

17  **gentleman** named Barbosa?

18    A.  Yes.

19    Q.  who is Mr. Barbosa?

20    A.  He's a **plastering** contractor.

21    Q.  Does he do work for you?

22    A.  He has.

23    Q.  what did she ask you?

126

1    A.  I can't recall.  Something about do I know him, did

2  I sell him a building.

3    Q.  Did you say that you knew him?

4    A.  I don't recall what I said.

5    Q.  Did you say that you were selling him a building?

6    A.  I said that, she asked me if I owned a building,

7  and I said "I don't know.  I have to get back to you on

8  that."

9    Q.  Did you answer a question as to whether you were

10  selling him a building?

11    A.  I don't recall.

12    Q.  DO you recall if you answered it?

13    A.  I don't recall.

14    Q.  Well, regardless of what you said in the meeting,

15  at the time of this meeting were you selling Mr. Barbosa a

16  building?

17    A.  No.

18    Q.  You weren't.  Have you ever sold Mr. Barbosa a

19  building?

20    A.  No.

21    Q.  DO you know has your wife Eleanor ever sold

22  Mr. Barbosa a building?

23    A.  she has.

127

1    Q.   She has, **okay.**   which **building** did she **sell** to him?

2    A.   One of the houses in East Boston.

3    Q.   On Maverick Street?

4    A.   It **could** be.

5    Q.   208 Maverick street?

6    A.   It **could** be.

7    Q.   Could be.   Have you ever owned or had any ownership

8   interest in 208 Maverick Street?

9    A.   Not that *I* **recall.**

10    Q.   Did they ask you about the fact that **Eleanor** had

11   issued a **loan denial letter** to Mr. Barbosa?

12    A.   I **don't recall.**

13    Q.   Do you **recall** there being discussion about the

14   issuance of a **denial letter?**

15    A.   I remember hearing that and I asked Bard what was

16   going **on,** and he **really didn't,** he just **looked** straight

17   ahead.   He **didn't** say anything.

18    Q.   But what do you **recall** being discussed about that

19   **denial letter?**

20    A.   I said "I have no idea what **you're talking about."**

21    Q.   **Well,** how **involved** did you get in the **loans** during

22   the processing, the **loan** processing stage?

23    A.   I was in the branch every day.

130

1    A.   1003.

2    Q.   1003?

3    A.   Yes.

4    Q.   Thank you.  Did you later become aware that

5 Mr. Barbosa was purchasing a Maverick street property from

6 **Eleanor?**

7          MR. **DiMAURO:**  objection.

8    A.   What does the word **"later" mean,** like when did I

9 become aware of this?

10    Q.   Sure, when did you become aware?

11    A.   After the suspension, after, during my suspension.

12    Q.   During the two-week suspension period?

13    A.   Yes.  I **called** her up and, when I **called Joyce**

14 Hicks up on the phone and I **told** her I **didn't** own that

15 **building.**

16    Q.   **Okay.** what did you say to her?

17    A.   **Joyce, hi, it's** Bob, **it's** not my **building.**  Bard,

18 hi, it's Bob, it's not my building.  Bard said **it's** out of

19 his hands.  **Joyce** Hicks said **she'd look** into it.

20    Q.   Did you **tell** Joyce that Eleanor was **selling** the

21 **building** to Mr. Barbosa?

22          MR. DiMAURO:  Objection.

23    A.   No, I just answered her question.

131

1          MR. DiMAURO:  Objection.

2     A.   Because she asked if it was my **building**.

3     Q.   **Just** so the **record's clear**, **I'm** not sure, did you

4 **tell** Joyce Hicks whether or not Mr. Barbosa was purchasing

5 the building from **Eleanor?**

6     A.   I **don't** understand what you mean by that.

7     Q.   YOU said you **called** Joyce Hicks during your

8 suspension period?

9     A.   I **called** Joyce Hicks.

10     Q.   You **also told** me that during the suspension

11 period —

12     A.   The day after the suspension.  I was suspended and

13 I **called** her back the very next morning.

14     Q.   At the time you **called** her back, did you know that

15 **Eleanor** was **selling** Mr. Barbosa the Maverick Street

16 property?

17     A.   I knew that it **wasn't** my **building** and that **Eleanor**

18 was **selling** her, **selling** Mr. Barbosa that **building**.

19     Q.   And you knew that.  Did you **tell** Joyce Hicks that?

20     A.   She didn't ask that.

21     Q.   I **didn't** ask you that.

22     A.   No, I **didn't**.

23     Q.   Did you **tell** her that?

132

1    A.   NO.

2    Q.   Why not?

3    A.   I **don't** want to say no **definitely.** we had a

4 conversation which was **like** a minute or two, and she was

5 kind of in a hurry to get me off the phone. **Basically** she

6 just **told** me that, I just gave her the information that I

7 gave her and I **told** her that **Joyce** this is what it is, **I'm**

8 going to **call** Bard after I hang up with you, and **that's**

9 what happened.

10    Q.   so you **don't** remember **telling** her --

11    A.   I **don't.**

12    Q.   -- that **Eleanor** was **selling** Mr. Barbosa the

13 Maverick street property?

14    A.   At that time I **don't** remember.

15    Q.   Had you ever issued a **loan denial** in your capacity

16 as a **loan** originator?

17    A.   I never have.

18    Q.   You never have. During your **employment** at

19 Citizens, were you authorized to issue **loan approvals** or

20 **loan denials?**

21    A.   Everything went through, went on to **Eleanor's**

22 **pipeline,** so she was **really** in **control** of the **pipeline**

23 because it was under her --

**CITIZENS BANK**

One Citizens Plaza
Providence, RI 02903-1339

February 21, 2001

Robert Scali
233 Main Street
Winthrop, MA 02152

Dear Robert

Citizens Mortgage Corporation ("CMC"), a subsidiary of Citizens Bank of RI is pleased to offer you the position of Loan Officer for the Woburn Loan Production Office. Below are details regarding the position and a description of our Loan Officer "Commission" Incentive Plan ("Plan").

## EFFECTIVE DATE: February 28, 2001  3/5/01

## LOAN OFFICER "COMMISSION" INCENTIVE PLAN (utilizing a FT Jr. L.O.)

I.  **Participation**

Participation in this Plan is limited to Loan Officers utilizing a full-time sales assistant who have executed this agr

II.  **Plan Description**

A. Compensation at Time of Hire: You will tie. eligible to receive a $15,000.00 advance paid biweekly at $2,500.00 for 6 pays, which will not be charged against future commissions.

B. Car Allowance: There will be a $139.00 biweekly auto expense reimbursement to you Under this Plan.

C. Origination Commission: This Plan consists of 3 monthly incentive, which is based upon 1 percentage commission per mortgage loan funded on the system by CMC Commissions will increase based upon the achievement of in increasingly larger number of mortgage loans closed during the month. Commissions will be determined by multiplying the applicable origination fees collected (to a maximum of 1% origination fee) and paid by the borrower times the applicable commission percentage as outlined below. Commissions will be paid the second payday of the month, and will be determined as follows:

### COMMISSION RATES

| Monthly Dollars Funded Goal (*) | Commission Basis Points All Mortgage Loans |
|---|---|
| $500,000 or less | .30 Basis Points |
| $500,001 to $600,000 | .35 Basis Points |
| $600,001 to $999,999 | .45 Basis Points |
| $1,000,000 + | .56 Basis Points |

\* Retroactive to dollar one for the closing month
\*\* All CMC (all subsidiary) referred loans are capped H

C 00027

FEB 23.01 18:14    PAGE
NO.614    003

$1,000,000  Maximum base commission per loan is $5,800.
**For the first year of employment you will receive an additional 9 basis points on closed loan volume.

The following conditions affect the Commission Rates listed in Table A:

1. Reduction of 5 percentage points (5%) may be assessed for loan files that are incomplete due to documentation (based on CMC documentation requirements). Measurement and communication of deficiencies will be performed by the Operations Manager and Center Manager. Any adjustment to commission will require the written approval of your Center Manager and the President of CMC. Such written consensus shall not be unreasonably withheld

2. No origination commission will be paid unless the mortgage loan application is in processing within 48 hours of the application being taken. No adjustment to commission will occur without the written consensus of the Center Manager and President of CMC. Such written consensus shall not be unreasonably withheld.

3. Reduction of $500.00 per loan may be assessed for loans not originated through point of sale automation. Any adjustment to commission will require the written approval of your Center Manager and the President of CMC.

4. You will have the opportunity to earn up to 50 percent in supplemental origination.

5. You are responsible for the collection of the credit report, appraisal, lock fees and disclosure of any other fees associated with the CMC fee schedule. To the extent that required fees are not collected, the costs to CMC will be offset against your origination commissions.

III. Resignation, Termination and Offset

A. Resignation  If you resign, you will receive commissions for all mortgage loans funded on the system up to, and including, your last day of employment.

D. Termination  You agree that this Plan does not constitute an employment contract or a guarantee of employment for any specific length of time and in no way limits CMC's authority to terminate employment at its sole discretion, with or without cause. Nothing contained herein should be construed to alter your status as an "at will" employee. Upon termination of employment, you will receive credit for commissions for all mortgage loans funded on the system up to, and including, your last day of employment. No incentive or commissions will be paid on mortgage loans that are fraudulent or contain material irregularities. If you are paid for mortgage loans later found to contain material irregularities and misrepresentations, you are obligated to repay CMC commissions and any and all damages related to those mortgages.

C Termination of Jr. Loan Originator: This agreement shall terminate automatically if the jr loan originator is terminated from CMC's employment and, in such case, the termination o." this agreement shall be effective and the standard Loan Officer Commission Incentive Plan (Attachment A) will be automatically reinstated as follows.

if the last day for which the sales assistant receives compensation is on or before the 15th day of a given month, this agreement shall terminate And the standard Loan Officer Commission Incentive Plan shall be effective for all commissions earned that month; if the sales assistant last compensation is after the 15th of the month, this agreement shall remain in effect that month and the standard Loan Officer Incentive Plan shall be reinstated the following month

C 00028

FEB-23-01 13:14    PAGE 8
NO.914

D. **Leave of Absence of Jr Loan Originator:** This agreement will be suspended and the standard Loan Officer Commission Incentive Plan (Attachment A) will be reinstated if the sales associate is on Short-Term Disability (STD) for more than 50% of the business days in a given month. This agreement will be reinstated in the first month in which the jr. loan originator returns from leave for more that 50 percent of the business days in that month.

E. **Right of Offset:** CMC reserves the right to offset an amounts due from you to CMC in calculating final compensation upon termination of employment.

IV.    **Other Conditions**

CMC reserves the right to change or discontinue this Plan upon 30 days written notice. No deviations by you are permitted without the express written consent of the appropriate President of CMC and the Center Manager. No waiver by CMC at any time of any breach by you, or compliance with, any condition or provisions of the plan shall be deemed a waiver of similar or dissimilar provisions or conditions at the same time or any prior or subsequent time. Any disputes shall be resolved in writing by the appropriate President of CMC and Human Resources in a manner which is considered to be fair, equitable and within the scope and intent of this Plan.

V    **Ethics Statement**

I have read and understand the Citizens Bank Ethics Statement.

This Plan supersedes all prior agreements, either verbal or written, with respect to the subject matter of the Plan. This Plan shall be governed by the laws of the respective state of employment. It is expressly understood that both you and CMC are free to terminate your employment relationship my time, for any reason, with or without cause. CMC expressly reserves the right at any time to take any action deemed to be in CMC's best interest regarding your employment relationship. No officer, supervisor or other employee of CMC, other than the President or Chairman, has the authority to alter, orally or in writing, the terminable-at-will status of your employment relationship. Unless otherwise stated in this Plan, nothing in this Plan is intended to confer any rights of the terms or conditions of your employment. You further understand and agree to the repayment obligations if any of offset expressed in Section III C. Nothing in this plan shall preclude CMC from any legal remedies it may have for any damages caused -0 CMC by you or for Any sums not recovered through the repayment provisions set out in this Plan.

By signing below, you acknowledge and agree to be bound by the terms of this Loan Officer Incentive Plan during the term of your employment with CMC. Please return one copy of this letter to me in the enclosed postage-paid envelope.

_____    _____2/21/01_____
[signature]                          February 21, 2001
Recruiter
Human Resources
Citizens Bank of Rhode Island

---

I agree to be bound by the terms of the Producing Sales Manager Incentive Plan (with Sales Assistant) during my employment under Citizens Mortgage Corporation.

_____    __011 58 1599__    __2/22/01__
[signature] (Signature)              Social Security Number    Date

_____    _____
Citizens Corp. Sr. Vice President    Date

C 00029

# LOAN OFFICER MINIMUM STANDARDS

⋅ ⋅ a minimum of 6 loans and/or $500,000 per month or annualize at 72 units or $6,000 000.

⋅ ⋅ maintain a closing ratio of at least 50%.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

⋅ ⋅ compliance with all policies and procedures as set forth by CMC Management.

⋅ ⋅ Acknowledgment of Receipt:

_____          $\underline{23\ Feb\ 2001}$
Loan Officer:                              Date

⋅ ⋅ These minimum standards are to be used as guidelines. Management
⋅ ⋅ use these guidelines to assess Loan Officer performance.