# CONTRACT

 CITIZENS **BANK**

One Citizens Plaza
Providence, RI 02903-1339

February 21, 2001

Robert Scalli
233 Main Street
Winthrop, MA 02152

Dear Robert:

Citizens Mortgage Corporation ("CMC"), a subsidiary of Citizens Bank of RI is pleased to offer you the position of Loan Officer for the Woburn Loan Production Office. Below are details regarding the position and a description of our Loan Officer "Commission" Incentive Plan ("Plan").

**EFFECTIVE DATE:**

## LOAN OFFICER **"COMMISSION"** INCENTIVE PLAN (utilizing a FT Tr. LO.)

I.    Participation

Participation in this Plan is limited to Loan Officers utilizing a full-time sales assistant who have executed this agreement.

II.    Plan Description

A. <u>Compensation</u> at Time of Hire: You will be eligible to receive a $15,000.00 advance paid biweekly at $2,500.00 for 6 pays, which will not be charged against future commissions.

B. Origination Commission: This Plan consists of a monthly incentive, which is based upon a percentage commission per mortgage loan funded on the system by CMC. Commissions will increase based upon the achievement of an increasingly larger number of mortgage loans closed during the month. Commissions will be determined by multiplying the applicable origination fees coEected (to a maximum of 1% origination fee) and paid by the borrower times the applicable commission percentage as outlined below. Commissions will be paid the second payday of the month, and will be determined as follows:

COMMISSION RATES

| Monthly Dollars Funded Goal (*) | Commission Basis Points All <u>Mortgage</u> Loans |
|---|---|
| $500,000 or less | .30 Basis Points |
| $500,001 to $600,000 | .35 Basis Points |
| $600,001 to $999,999 | .45 Basis Points |
| $1,000,000 + | .56 Basis Points |

\* Retroactive to dollar one for the closing month

\*\* All CFG (all subsidiary) referred loans are capped at $1,000,000. Maximum base commission per loan is $5,800.

\*\*For the first year of employment you will receive an additional 9 basis points on closed loan volume.

The following conditions affect the Commission Rates listed in Table A:

1. Reduction of 5 percentage points (5%) may be assessed for loan files that are incomplete due to documentation (based on CMC documentation requirements). Measurement and communication of deficiencies will be performed by the Operations Manager and Center Manager. Any adjustment to commission will require the Written approval of your Center Manager and the President of CMC. Such written consensus shall not be unreasonably withheld.

2. No origination commission will be paid unless the mortgage loan application is in processing within 48 hours of the application being taken. No adjustment to commission will occur without the written consensus of the Center Manager and President of CMC. Such written consensus shall not be unreasonably withheld.

3. Reduction of $500.00 per loan may be assessed for loans not originated through point-of-sale automation. Any adjustment to commission will require the written approval of your Center Manager and the President of CMC.

4. You will have the opportunity to earn up to 50 percent in supplemental origination.

5. You are responsible for the collection of the credit report, appraisal, lock fees and disclosure of any other fees associated with the CMC fee schedule. To the extent that required fees are not collected, the costs to CMC will be offset against your origination commissions.

III.   Resignation, Termination and Offset

A. Resignation: If you resign, you will receive commissions for all mortgage loans funded on the system up to, and including, your last day of employment.

B. Termination: You agree that this Plan does not constitute an employment contract or a guarantee of employment for any specific length of time and in no way limits CMC's authority to terminate employment at its sole discretion, with or without cause. Nothing contained herein should be construed to alter your status as an "at will" employee. Upon termination of employment, you will receive credit for commissions for all mortgage loans funded on the system up to, and including, your last day of employment. No incentive or commissions will be paid on mortgage loans that are fraudulent or contain material irregularities. If you are paid for mortgage loans later found to contain material irregularities and misrepresentations, you are obligated to repay CMC commissions and any and all damages related to those mortgages.

C. Termination of Jr. Loan Originator: This agreement shall terminate automatically if the jr. loan originator is terminated from CMC's employment and, in such case, the termination of this agreement shall be effective and the standard Loan Officer Commission Incentive Plan (Attachment A) will be automatically reinstated as follows:

If the last day for which the sales assistant receives compensation is on or before the 15th day of a given month, this agreement shall terminate and the standard Loan Officer Commission Incentive Plan shall be effective for all commissions earned that month; if the sales assistant last compensation if after the 15th of the month, this agreement shall remain in effect that month and the standard Loan Officer Incentive Plan shall be reinstated the following month.

D. Leave of Absence of Jr. Loan Originator: This agreement will be suspended and the standard Loan Officer Commission Incentive Plan (Attachment A) will be reinstated if the sales assistant is on Short-Term Disability (STD) for more than 50% of the business days in a

given month. This agreement will be reinstated in the first month in which the jr. loan originator returns from leave for more that 50 percent of the business days in that month.

E.   Right of Offset  CMC reserves the right to offset any amounts due from you to CMC in calculating final compensation upon termination of employment.

## IV.   Other Conditions

CMC reserves the right to change or discontinue this Plan upon 30 days written notice. No deviations by you are permitted without the express written consent of die appropriate President of CMC and the Center Manager. No waiver by CMC at any time of any breach by you, or compliance with, any condition or provisions of the plan shall be deemed a waiver of similar or dissimilar provisions or conditions at me same time or any prior or subsequent rime. Any disputes shall be resolved in writing by the appropriate President of CMC and Human Resources in a manner which is considered to be fair, equitable and within the scope and intent of this Plan.

## V.   Ethics Statement

I have read and understand the Citizens Bank Ethics Statement.

This Plan supersedes all prior agreements, either verbal or written, with respect to the subject matter of the Plan. This Plan shall be governed by the laws of the respective state of employment. It is expressly understood that both you and CMC are free to terminate your employment relationship any time, for any reason, with or widiout notice. CMC expressly reserves the right at any time to take any action deemed to be in CMC's best interest regarding your employment relationship. No officer, supervisor or other employee of CMC, odier than the President or Chairman, has the authority to alter, orally or in writing, the terminable-at-will status of your employment relationship. Unless otherwise stated in this Plan, nothing in this Plan is intended to confer any rights to any terms or conditions of your employment. You further understand and agree to the repayment obligations and right of offset expressed in Section III C. Nothing in this plan shall preclude CMC from any legal remedies against you for any damages caused to CMC by you or for any sums not recovered through the repayment obligations set out in this Plan.

By signing below, you acknowledge and agree to be bound by the terms of this Loan Officer Incentive Plan during the term of your employment with CMC. Please return one copy of this letter to me in the enclosed postage-paid envelope.

_Tara Tribelli_ _____               _2/21/01_ _____
Tara Tribelli                                February 21, 2001
Recruiter
Human Resources
Citizens Bank of Rhode Island

I agree to be bound by the terms of the Producing Sales Manager Incentive Plan (with Sales Assistant) during my employment under Citizens Mortgage Corporation.

_____          _____          _____
Robert Scalfi (Signature)              Social Security Number            Date

_____          _____
Barden Conn, Sr. Vice President          Date
Center Manager
Citizens Mortgage Corporation



# CITIZENS' CODE OF ETHICS

## SIGNATURE PAGE

I have received and read Citizens' Code of Ethics and agree to abide by its provisions at all times. Within it meanings, expressed and implied, I am not and have not been aware of any circumstances of a personal or family nature which would conflict with the Code except those which I have previously reported or as indicated below.

Please describe any unreported potential conflict of interest.

_____

_____

_____

_____

_____

_____

_____


RobeeT S Scalli

**Print Name**

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

**Social Security Number**

23 Feb 2001

**Date**

Signature

**Signature**

**Department Name**

**Department Number**

HR028(6/99)

# CONTRACT



March 5, 2002

Robert Scalli
233 Main Street
Winthrop, MA 02152

Dear Bob:

Citizens Mortgage Corporation ("CMC"), a subsidiary of Citizens Bank of RI is pleased to renew your position of Loan Originator for the Woburn Loan Production Office. Below are details regarding the position and a description of our Loan Officer "Commission" Incentive Plan ("Plan") utilizing a shared Sales Assistant.

## EFFECTIVE DATE:

LOAN OFFICER "COMMISSION" INCENTIVE PLAN farili-»ngr a shared Sales Asst.)

I.   **Participation**

   Participation in this Plan is limited to Loan Officers utilizing a shared sales assistant who have executed this agreement.

II.   **Plan Description**

   A.   Car Allowance:  There will be a $139.00 biweekly auto expense reimbursement to you under this Plan.

   B.   Origination Commission: This Plan consists of a monthly incentive, which is based upon a percentage commission per mortgage loan funded on the system by CMC Commissions will increase based upon the achievement of an increasingly larger number of mortgage loans closed during me month. Commissions will be determined by multiplying the applicable origination fees collected (to a maximum of 1% origination fee) and paid by the borrower times the applicable commission percentage as outlined below.   Commissions will be paid the second payday of me month, and will be determined as follows:

### COMMISSION RATES

| Monthly Dollars Funded Goal (**) | Commission Basis Points AH Mortgage Loans |
|---|---|
| $500,000 or less | .32 Basis Points |
| 5500,001 to $600,000 | .37 Basis Points |
| 5600,001 ro 5999,999 | .47 Basis Points |
| $1,000,000 to $2,499,999 | .58 Basis Points |
| $2,500,000 or more | .60 Basis Points** |

   \*  Retroactive to dollar one for the closing month
   ** All CFG (all subsidiary) referred loans are capped at
      51,000,000.  Maximum base commission per loan is $6,000.

The following conditions affect the Commission Rates listed in Table A:

1. Reduction of 5 percentage points (5%) may be assessed for loan files that are incomplete due to documentation (based on CMC documentation requirements). Measurement and communication of deficiencies will be performed by the Operations Manager and Center Manager. Any adjustment to commission will require the written approval of your Center Manager and the President of CMC. Such written consensus shall not be unreasonably withheld.

2. No origination commission will be paid unless the mortgage loan application is in processing within 48 hours of the application being taken. No adjustment to commission will occur without the written consensus of the Center Manager and President of CMC. Such written consensus shall not be unreasonably withheld.

3. Reduction of $500.00 per loan may be assessed for loans not originated through point of sale automation. Any adjustment to commission will require the written approval of your Center Manager and the President of CMC.

4. You will have the opportunity to earn up to 50 percent in supplemental origination.

5. President's Club Commissions:

   a. For each consecutive year of President's Club qualification, you will receive one (1) additional bonus percentage point credit (1%) to your monthly commissions ("bonus point") up to a maximum of 5 additional percentage points (5%). If you do not qualify for President's Club in subsequent year(s), you will lose 1 bonus percentage point (1%) credit each year you fail to qualify. All President's Club bonus points will be lost if you fid to qualify for 2 consecutive years. You can have a maximum of 5 bonus percentage points (5%) at any given time.

6. You are responsible for the collection of the credit report, appraisal, lock fees and disclosure of any other fees associated with the CMC fee schedule. To the extent that required fees are not collected, the costs to CMC will be offset against your origination commissions.

## III.    Resignation, Termination and Offset

A.  **Resignation:**  If you resign, you will receive commissions for all mortgage loans funded on the system up to, and including, your last day of employment

B.  **Termination:**  You agree that this Plan does not constitute an employment contract or a guarantee of employment for any specific length of time and in no way limits CMC's authority to terminate employment at its sole discretion, with or without cause. Nothing contained herein should be construed to alter your status as an "at will" employee. Upon termination of employment, you win receive credit for commissions foe all mortgage loans funded on the system up to, and including, your last day of employment. No incentive or commissions will be paid on mortgage loans that are fraudulent or contain material irregularities. If you are paid for mortgage loans later found to contain material irregularities and misrepresentations, you are obligated to repay CMC commissions and any and all • damages related to those mortgages.

C. Termination of Sales Asst.: This agreement shall terminate automatically if the jr. loan originator is terminated from CMC's employment and, in such case, Ac termination of this agreement shall be effective and the standard Loan Officer Commission Incentive Plan (Attachment A) will be automatically reinstated as follows:

If the fast day fiwwhjcfa the sales assistant receives compensation is on or before me 15* day of a given month, this agreement shall terminate and the standard Loan Officer Commission Incentive Plan shall be effective *fat* all commissions earned that month; if the sales assistant last compensation if after the 15* of the month, rfm agreement shall remain in effect that month and the standard Loan Officer Incentive Plan shall be reinstated the following month.

ID. Leave of Absence of SalesAsst · This agreement will be suspended and the standard Loan OfficerCommission Incentive Plan (Attachment A) will be reinstated if dte sales assistant *is*. on Short-Term Disability (STD) ftw more than 50% of the business days in a given month. This agreement will be reinstated in the first month in which the sales assistant returns from leave for more that 50 percent of the business days in that month.

E. Right of Offset: CMC reserves the right to offset any amounts due from you to CMC in calculating final compensation upon termination of employment.

## IV. Other Conditions

CMC reserves the right to change or discontinue this Plan upon 30 days written notice. No deviations by you are permitted without the express written consent of the appropriate President of CMC 2nd the Center Manager. No waiver by CMC at any time of any breach by you, or compliance with, any condition or provisions of the plan shall be deemed a waiver of similar or dissimilar provisions or conditions at the same time or any prior or subsequent time. Any disputes shall be resolved in writing by the appropriate President of CMC and Human Resources in a manner which is considered to be fair, equitable and within me scope and intent of this Plan.

## V. Ethics Statement

I have read and understand me Citizens Bank Ethics Statement

This Plan supersedes all prior agreements, either verbal or written, with respect to me subject matter of the Plan. This Plan shall be governed by the laws of the respective state of employment. It is expressly understood mat both yon and CMC are free to terminate your employment relationship any time, for any reason, with or without notice. CMC expressly reserves the right at any time to take any action deemed to be in CMC's best interest regarding your employment relationship. No officer, supervisor or other employee of CMC, other than the President or Chairman, has the authority to alter, orally or in writing, the terminable-at-will status of your employment relationship. Unless otherwise stated in this Plan, nothing in this Plan is intended to confer any rights to any terms ox conditions of your employment. You further understand and agree to the repayment obligations and right of offset expressed in Section M C. Nothing in this plan shall preclude CMC from any legal remedies against you for any damages caused to CMC by you or for any sums not recovered through the repayment obligations set out in this Plan.

By signing **below,** you **acknowledge** and agree to be bound **by the** ttnns of this Loan **Officer Incentive** Plan during the renn of **your** employment **with** CMC. **Please** renun one copy of this ktxer to me in the enclosed **postage-paid envelope.**

_Joyce A. Hicks_                                    _3/2/02_
Joyce A. **Hicks**                                    Date
Assistant **Vice President**
Human **Resources**
Gtizens Bank of **Rhode** Island

**Page 5**



_Barden Conn_                                    _3/11/02_
Barden Conn, Sr. **Vice President**              Date
Center **Manager**
**Citizens** Mortgage **Corporation**

Loan Officer
## ORIGINATION COMMISSION RATES  (Table A)

| Monthly Dollars Funded Goal (*) | Commission Basis Points All Mortgage Loans |
|---|---|
| **$500,000 or less** | .45 Basis Points |
| **$500,001** to **$600,000** | .50 Basis Points |
| $600,001 to **$1,000,000** | .60 Basis Points |
| **$1,000,001** or more | .65 Basis Points** |

\* Retroactive TO dollar one for the closing month
** All CFG (all subsidiary) referred loans are capped at
$1,000,000. Maximum base commission per loan is $6,500.

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *
                                  *
ELEANOR SCALLI,                   *
ROBERT SCALLI,                    *
               Plaintiffs         *    CIVIL ACTION
                                  *    NO. 03-CV-12413DPW
               VS                 *
                                  *
CITIZENS FINANCIAL GROUP,         *
INC.,                             *
               Defendant          *
                                  *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * *


            DEPOSITION OF ROBERT SCALLI, taken on behalf
of the defendant pursuant to the Massachusetts Rules of Civil
Procedure before Kathleen M. Benoit, CSR # 1368F94, Shorthand
Reporter and Notary Public in and for the Commonwealth of
Massachusetts at the offices of Goodwin Procter, Exchange
Place, Boston, Massachusetts, on Wednesday, April 13, 2005,
commencing at 10:36 a.m.


APPEARANCES:

NICHOLAS J. DiMAURO, ESQ., 111 South Bedford Street, Suite
208, Burlington, MA 01803, For the plaintiff, Robert Scalli

MARK E. BURKE, ESQ., 111 South Bedford Street, Suite 208,
Burlington, MA 01803, For the plaintiff, Eleanor Scalli

BRADFORD J. SMITH, ESQ., and ANNE GAETA, ESQ., Goodwin
Procter, Exchange Place, Boston, MA 02109-2881, For the
defendant

ALSO PRESENT:

Jeffrey Siegel, Esq.
Eleanor Scalli

## Leavitt Reporting, Inc.

1207 Commercial Street, Rear                    Tel. 781-335-6791
Weymouth, MA 02189                              Fax: 781-335-7911
                                         leavittreporting@att.net

Hearings ◆ Conferences ◆ Legal Proceedings

2

INDEX

WITNESS                    DIRECT CROSS REDIRECT RECROSS

Robert Scalli
  by Mr. smith            3

EXHIBITS

No. Description                                    Page

7   Plaintiff Robert Scalli's Supplemental
    Answer to Interrogatory No. 5                  5

8   Gift Letter                                    26

9   Copy of Check No. 103 for $4,000               27

10  Copy of Check for $4,000                       33

11  2003 Personalized Enrollment
    Worksheet                                      60

12  Note, Bard to Eleanor/Bob with
    others                                         99

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

27

1  didn't.  That's what I remember.

2      Q.  Do you recall if they did get a gift to qualify for

3  certain programs that they would establish the legitimacy

4  of the gift through the gift letter?

5      A.  I don't recall how Citizens did it, but I remember

6  hearing something that gifts were involved in certain

7  programs and that's all that I recall.

8      Q.  All right.

9              MR. SMITH:   Let me show you another document.

10  I'd like to have that marked as 9 please.

11              (Exhibit No. 9 marked.)

12      Q.  I've showed you a document that's been marked as

13  Exhibit 9, and it is a photocopy, front and back, of a

14  check that appears to be from your and Eleanor's checking

15  account at citizens, is that correct?

16      A.  Exhibit 9, yes.

17      Q.  Is that a checking account you still maintain at

18  Citizens?

19      A.  I'd have to look.

20      Q.  Well, do you maintain a joint checking account with

21  Eleanor?

22      A.  It depends.  Some accounts are for savings, some

23  are for checking, some accounts we put money in there to

28

1  pay contractors with.  This account right here was one of

2  the accounts that we use to pay people.

3      Q.  Okay.  Is this a joint account?

4      A.  Well, both our names are on it.

5      Q.  Is it a joint account?

6      A.  I would assume so.

7      Q.  Well, you know.  I certainly don't know.  I'm

8  asking you do you know is this a joint account?

9      A.  I would assume this is a joint account.

10     Q.  Is this an account that is still open?

11     A.  I'd have to look.

12     Q.  what would you look at?

13     A.  I'd look at, you know, if this is the account that

14  I would put money into to pay the contractors that were

15  redoing my properties, and then some accounts I would

16  close.  I would have like other open accounts just for the

17  properties, and I didn't want to keep too much money in the

18  accounts because I didn't want to have the, I was always

19  afraid of the contractors when I give them a check playing

20  with the checks so I'd open up lots of accounts.

21     Q.  How many accounts do you have open?

22     A.  A lot.

23     Q.  How many is a lot?

29

1    A.   More than five.

2    Q.   Well, how much more than five?

3    A.   I'm not sure.  I'd have to look.

4    Q.   50?

5    A.   I don't think so, no, it wouldn't be 50.

6    Q.   Well, can you give me --

7    A.   5, around there, in the vicinity of.

8    Q.   And is that the total of, are they all checking

9    accounts?

10    A.   They'd be used for different things, correct.

11    Q.   Are they all at Citizens?

12    A.   All of our accounts are at Citizens.

13    Q.   All of your accounts are at Citizens?

14    A.   Well, I shouldn't say that.  We have a savings

15    account somewhere else but my wife handles all that.

16    Q.   Your wife handles what, the savings account?

17    A.   She handles all the money as far as where we put

18    out investments.  I'm not sure if you're asking if it's an

19    investment account.  There's different types of accounts.

20    This one is at Citizens.

21    Q.   Okay, this is a checking account?

22    A.   This is a checking account.

23    Q.   And obviously, this is a Citizens Bank check; it

32

1    Q.  Okay.  NOW, do you have an ATM card **that's** linked

2  to one of these accounts?

3    A.  I **don't** know.

4    Q.  **Well,** do you have an ATM card?

5    A.  On me right now?

6    Q.  That you use?

7    A.  I have an ATM card.

8    Q.  Do you use it to access cash from your accounts?

9    A.  Yeah, every once in a **while.**

10    Q.  which account do you use to access cash from?

11    A.  I think my **direct** account.

12    Q.  what is your **direct** account?

13    A.  I have no idea.  **It's** just a **direct** account.

14    Q.  **Well,** I'm sorry, I **don't** understand what a **direct**

15  account is.  Can you explain that?

16    A.  **It's** a savings account.

17    Q.  It's a savings account.  At Citizens Bank?

18    A.  I'm not sure where it is.

19    Q.  **Well,** it's your ATM card.  You don't know what bank

20  the ATM card is linked to?

21    A.  No.

22    Q.  **Well,** do you handle the finances?

23    A.  No.

33

1    Q.  who does?

2    A.  My wife does.

3    Q.  so you don't look at the bank statements?

4    A.  No.

5    Q.  Do you pay any, do you write any checks to

6  contractors?

7    A.  We've both written checks to contractors.  I have,

8  yes.

9    Q.  Do you regularly do that if checks are due to

10  contractors or does your wife pay those bills?

11    A.  we both pay the bills.

12    Q.  so you both handle that aspect of your finances?

13    A.  Yes.

14    Q.  DO you file your taxes jointly?

15    A.  You'd have to ask my accountant that.

16    Q.  well, do you file one tax return, you and your wife

17  together, or do you file individual tax returns?

18    A.  You'd have to ask Jeff, my accountant, that.

19    Q.  YOU don't know the answer to that question?

20    A.  I don't.

21        MR. SMITH:  I'm going to show you another

22  document and have this marked please as Exhibit 10.

23        (Exhibit No. 10 marked.)

44

1     A.   Yeah, I mean the way, the way that they interfered

2  was, you know, my relationship is with all my realtors.

3  You know, when things start going around and people start

4  saying things about indictment and I'm being fired for bank

5  fraud and this and that, that does interfere because my

6  name is what people come, when they're looking for a loan,

7  they come to me and my name is everything in the business.

8     Q.   Do you know did Citizens -- strike that.

9              Did anyone from Hancock Mortgage talk to you

10 about statements that Citizens was making?

11    A.   I don't recall.

12    Q.   So you don't, to be clear, you don't recall anyone

13 from Hancock Mortgage coming to you and asking you about

14 whether you were indicted for bank fraud or questions of

15 that sort?

16    A.   That question was asked at my interview.

17    Q.   who asked you that?

18    A.   Larry Farrelly.

19    Q.   Larry Farley?

20    A.   Farrelly.

21    Q.   can you spell his last name?

22    A.   F A R R E L L Y.

23    Q.   Who is Larry Farrelly?

45

1    A.   He owns Hancock.

2    Q.   And he asked you what question at your interview?

3    A.   I can't recall but something, again, rumors, and he

4    said are there any rumors and I said no.

5    Q.   To the best of your recollection, that's what he

6    said --

7    A.   Yeah.

8    Q.   -- are there any rumors?

9    A.   Yes, I heard some rumors.  He said, "Are any of the

10   rumors true?"  And I said no.

11   Q.   Did he indicate what those rumors were?

12   A.   No, he didn't.

13   Q.   Did he ever ask you subsequent to that --

14   A.   I don't recall.

15   Q.   -- about those rumors?

16   A.   I don't recall.

17   Q.   NOW, you said, Mr. Scalli, that, a minute ago that

18   your relationship with realtors was affected by people

19   saying that you had been indicted or fired for bank fraud,

20   is that correct?

21   A.   Mm-hmm, yes.

22   Q.   Yes, okay.  Was it Mr. Farrelly who offered you a

23   job at Hancock?

46

1    A.  I can't recall.

2    Q.  Did you get a job offer shortly after the interview

3  with Mr. Farrelly?

4    A.  I went to work for them, yes.

5    Q.  Do you believe that someone at Citizens said that

6  you were, you had been indicted or fired for bank fraud?

7    A.  Yes.

8    Q.  why do you believe that?

9    A.  Because Ed Martinez, who was the boyfriend of one

10 of the realtors, came and told me.

11   Q.  Any other reasons why you believe that?

12   A.  well, he told me that all the realtors — he asked

13 me if it was true, and I said is what true, and he said

14 Peggy said, Peggy being Peggy Pratt, that me and my wife

15 were being indicted on bank fraud, and I asked him where he

16 heard that, and he told me that her best girlfriend worked

17 at Citizens Bank and told her.

18   Q.  Do you know who Peggy Pratt's best girlfriend is?

19   A.  Her name is Diana.

20   Q.  Do you know her last name?

21   A.  Franc, Franco, Diana Franco.

22   Q.  Diana Franco?

23   A.  Yes.

49

1    A.   Francisco Espelliate.

2    Q.   Now, Francisco used to be --

3    A.   -- Eleanor's assistant.

4    Q.   what did you hear from him?

5    A.   I saw him up at the restaurant up on Route 1,

6  Bertucci's, and he said "I heard you and Eleanor are

7  getting in trouble."

8    Q.   Did he say how he had heard?

9    A.   No.   He laughed.

10    Q.   Did he indicate what he meant by getting in

11  trouble?

12    A.   with citizens Bank is what he said.

13    Q.   Did he indicate what type of trouble?

14    A.   No.

15    Q.   Any other reasons why you believe that Citizens

16  made statements concerning being indicted, you being

17  indicted for bank fraud or being fired for bank fraud?

18    A.   well, all the, Ed Martinez -- there was a big

19  connection of realtors inside of East Boston, and they all

20  kind of use the same people.  When I say same people, you

21  know, the same lawyers, the same everybody, and I asked my

22  lawyer, I said how come, how come like Peggy's not calling

23  me or Marisol Aldana is not calling, how come Louis

50

1   Gonsales isn't calling, how come Rodrigues and Gould is not

2   calling, how come the phone, people just stopped calling,

3   and my attorney, Javier Pico, told me that they have all

4   been saying to him that they don't want to do business with

5   us because they heard that Citizens Bank, someone from

6   Citizens Bank said we were being indicted on bank fraud

7   charges.

8       Q.  Did Mr. Pico tell you who from Citizens had told

9   these other realtors that you were being indicted?

10      A.  I can't recall.

11      Q.  You don't recall if Mr. Pico told you that?

12      A.  If he said — ask the question again.

13      Q.  Do you recall if Mr. Pico told you who at Citizens

14  had told the realtors that you were being indicted?

15      A.  Yes.

16      Q.  who?

17      A.  Vicky, someone named Vicky.  She works at a bank in

18  East Boston.

19      Q.  Vicky Noel?

20      A.  That's the name.

21      Q.  Did Mr. Pico say, identify anyone else?

22      A.  That said -- from Citizens or from the realtors,

23  which is the question?

61

1   states that it's your 2003 Personalized Enrollment work

2   Sheet.   Do you see this document?

3        A.   Yes.

4        Q.   I'm going to represent that this is a document that

5   your counsel produced to us pursuant to a request for

6   documents that we made, that Citizens made.   In addition,

7   for the record I'm going to indicate that it appears on the

8   first page that there's some handwriting but that that was

9   done by you or your counsel because it was not done by us.

10  It was marked up at the time when we received it for the

11  record.

12               Have you had a chance to look at Exhibit 11?

13       A.   Yes.

14       Q.   Let me ask you, do you remember logging into

15  Citizens benefits web site and registering for employment

16  benefits?

17       A.   I don't remember.

18       Q.   Did you, do you remember did you have any

19  responsibility or take responsibility for the benefits part

20  of the employment for both you and Eleanor?

21       A.   I did.

22       Q.   You did, okay.   Is it fair to say that it was

23  through your employment that the two of you received, for

62

1    example, family medical coverage?

2        A.  Yes.

3        Q.  It was through your employment?

4        A.  Yes.

5        Q.  In your name?

6        A.  Mm-hmm, yes.

7        Q.  And that family medical coverage obviously covered

8    your two children as well?

9        A.  Yes, it was going under me because I was getting

10   the base salary.

11       Q.  How did you know that?

12       A.  Bard told me.

13       Q.  Is it, but why would it, why would the fact that

14   you were getting a base salary determine whether the

15   benefits would go under you?

16       A.  Because we have to pay for our benefits, our health

17   benefits, and we have to contribute.

18       Q.  I understand but isn't it your understanding that

19   your wife, as a commission employee, would be eligible for

20   benefits at citizens?

21       A.  They went under me.

22       Q.  That's not my question.  Is it your understanding

23   though that your wife, as a full-time commissioned

63

1  employee, she would be eligible for benefits through

2  Citizens?

3      A.   Correct.

4      Q.   So I don't understand.  You said you understood

5  that the benefits were going through you because of your

6  salary.  Can you explain that?

7      A.   I was getting a base salary and we would have to

8  contribute so much dollars per month, and I'm not quite

9  sure what they were, for health benefits and dental

10 benefits and everything else.

11     Q.   But the contribution, your understanding, could

12 come from, could be deducted from a commission payment or

13 any other type of wage payment, correct?

14     A.   I'm sure it could.

15     Q.   So I'm trying to understand, is there any other

16 reason why you say they went through you because of your

17 base salary?

18     A.   No, just that.

19     Q.   Do you remember having to log in to generate your

20 benefit programs?

21     A.   I don't remember.

22     Q.   You don't remember, okay.  Do you remember seeing

23 this document that I've given you prior to today?

64

1      A.   Yes, it was one of the many documents that we got

2   from citizens.

3      Q.   Well, you say you got it from Citizens.  Is it

4   possible you printed it out after logging into the web

5   site?

6      A.   I may have.

7      Q.   YOU may have, okay.  You don't remember?

8      A.   I don't remember.

9      Q.   All right.  On that first page over to the right it

10  indicates a pin number of 1118.  Do you remember that that

11  was your pin number to access your Citizens benefits web

12  site?

13     A.   I don't recall.

14     Q.   Is that pin number 1118 used for anything else that

15  you recall?

16     A.   Not that I recall.

17     Q.   That's not a familiar pin number to you?

18     A.   No.

19     Q.   I say that because --

20     A.   we have hundreds of pin, I mean everything's a pin

21  number.

22     Q.   I tend to use the same pin number for everything,

23  from opening my garage, to turn on my alarm, so it would be

1      Q.  I'm going to suggest to you that your wife,

2  Eleanor,  indicated yesterday that she thought the number

3  was $65 million during calendar year 2002.  So is it

4  possible that that is the number you're --

5      A.  It's possible.

6      Q.  All right.  what portion of that volume alone

7  during 2002 did you originate?

8      A.  I was doing all the marketing, so I would say my

9  origination at the banks would be more than 10 percent,

10  less than 20 percent.

11      Q.  Now, to originate those loans, you would be in

12  contact with the borrowers, the individuals?

13      A.  I'd be in the bank.

14      Q.  You'd be in the bank.  What bank?

15      A.  Charlestown, the Charlestown branch and the

16  Winthrop branch.  I was assigned to the Charlestown branch.

17      Q.  Did you have an office there?

18      A.  I had a desk.

19      Q.  YOU had a desk.  Now, did you also meet with

20  potential borrowers outside the bank?

21      A.  If they couldn't make it to the bank, I would

22  arrange to meet with them.

23      Q.  Did you ever meet them at their homes?

99

1    Q.   Did you have a shredder at home?

2    A.   Yes, in the office.

3              MR. SMITH:  Let's have this marked please.

4              (Exhibit No. 12 marked.)

5    Q.   Do you have that document in front of you that I

6    marked as Exhibit 12?

7    A.   Yes.

8    Q.   There's a note on the front of it but then attached

9    to that note is a letter to you dated March 5, 2002, do you

10   see that?

11   A.   It's dated to Eleanor and I.  You said the note on

12   the front of this.

13   Q.   I'm sorry, I mean attached to the note is a letter?

14   A.   Yes.

15   Q.   Dated March 5, 2002, which is a letter addressed to

16   you, do you see that?

17   A.   Yes.

18   Q.   okay, now, do you see that the letter in the second

19   to last page is signed and dated?

20             (Document Perusal.)

21   A.   Yes.

22   Q.   okay.  Can you identify this letter I'm showing you

23   for the record please, tell me what it is.

100

1    A.   A renew **position** of loan originator in the Woburn

2   loan production **office**.

3    Q.   **In** the opening paragraph in the second sentence it

4   says "**Below** are details regarding the position and a

5   description of our Loan Officer Commission Incentive Plan

6   utilizing a shared assistant."  Have you seen this document

7   before?

8    A.   **I've** seen lots of Citizens documents.  **I'm** not sure

9   if **I've** seen this one.

10    Q.   You **don't** remember?

11    A.   No.

12    Q.   At any rate, on the second to **last** page of what

13   **I've** given **you,** is that your, is that your signature in the

14   grayed in box there?

15    A.   Yes.

16    Q.   And is that your **social** security number and date?

17    A.   Yes.

18    Q.   Do you remember signing this Loan Officer incentive

19   Plan?

20    A.   I **don't** remember.

21    Q.   NOW, **it's** attached to a note.  The note at the

22   front, Mr. **Scalli,** is a note from Bard conn.  Do you see

23   that note?

101

1    A.   Yes.

2    Q.   Do you remember receiving this note?

3    A.   I **don't** remember receiving the note, no.

4    Q.   **I'm** going to represent that this note and the

5    letter was produced by your **counsel** to us so that we got it

6    from you recently.

7    A.   **Mm-hmm.**

8    Q.   But you **don't** remember reading that note?

9    A.   **well,** the note is put to my wife and **myself.**

10   Q.   I understand.  Do you remember --

11   A.   Yes.

12   Q.   But you **don't** remember getting this note from Bard?

13   A.   I don't remember when I got it, no.

14   Q.   You don't remember when you got it?

15   A.   Correct.

16   Q.   But you do remember getting a note of that sort

17   from Bard?

18   A.   Yes.

19   Q.   You do, **all** right.  What did you do when you got

20   this note, do you remember?

21   A.   I did what he **told** me to do.

22   Q.   What did you do?

23   A.   Signed it and sent it back.

102

1    Q.   And you kept a copy?

2    A.   I **can't** remember.

3    Q.   **All** right.  Did you **call** Mr. Conn with any

4    questions regarding this?

5    A.   Regarding what he told me to do?

6              MR. DiMAURO:   Regarding what?  Objection.

7    Q.   I'm sorry, the note, the cover note at the end says

8    "Call with any questions," and then **it's** signed **Bard's**

9    name, do you see that?

10   A.   Yes.

11   Q.   Did you **call** Mr. Conn with any questions you had

12   after you got this note and the attached letter?

13   A.   Yes.

14   Q.   YOU did?

15   A.   Yes.

16   Q.   okay, when did you call him?

17   A.   Right when I got **it**.

18   Q.   what was the question you asked?

19   A.   what do you want me to do with **this**.

20   Q.   what did he say?

21   A.   sign it and send it back.

22   Q.   He told you to sign it and send it back?

23   A.   Yup.

103

1    Q.  Do you **recall keeping** a copy after you sent it

2  back?

3    A.  I **don't recall.**

4    Q.  Did you ask him any other questions?

5    A.  Yes.

6    Q.  What did you ask?

7    A.  **Where's** my money, **where's** my **$50,000 salary.**

8    Q.  So you asked him that, now **you're telling** me you

9  asked him that in March of 2002?

10    A.  I asked him **all** year from when we started to when I

11  finished when am I getting my salary.

12    Q.  what did he say?

13    A.  **I'll** take care of it, don't worry about it.

14    Q.  Did you ask him anything else?

15    A.  He hung up.

16    Q.  Did you ask him anything else?

17    A.  He hung up.  I **couldn't** ask him anything else at

18  that time.

19    Q.  Did you **call** him back?

20    A.  Yes.

21    Q.  so you asked him another question?

22    A.  He said, "Bard, I can't talk right now.  I'll call

23  you back."

104

1    Q.   Did you ask him any other questions about this

2   document that you signed?

3    A.   No.

4    Q.   Just to be clear, you called Mr. Conn as soon as

5   you got this letter, is that right?

6    A.   I called him with a question.

7    Q.   After he told you that he would -- I'm sorry, did

8   he tell you that he would get you your $50,000?

9    A.   He said he would call me back.

10    Q.   He said he would call you back?

11    A.   Correct.

12    Q.   Did he call you back?

13    A.   No.

14    Q.   And you didn't ask him any other questions?

15    A.   No.

16    Q.   But you signed the letter and sent it back to him?

17    A.   He told me to sign the letter.

18    Q.   So you signed it?

19    A.   Yes.

20    Q.   And you returned it to him?

21    A.   Correct.

22         MR. DiMAURO:   Can we go off the record one

23   moment.

105

1              (Discussion held off the record.)

2     Q.  Have you told me everything that Bard Conn told you

3  in the conversations you had where you addressed questions

4  concerning this letter that's in front of you as

5  Exhibit 12?

6     A.  He told me to sign it and make sure I sent it back

7  to Citizens.

8     Q.  Did he tell you anything else?

9     A.  I don't remember.  I just remember signing it and

10  giving it to one of the assistants.

11     Q.  To be sent back to Citizens?

12     A.  I'm not sure what they did with it.  I just said

13  make sure Bard gets this back.

14     Q.  But you gave one of your assistants the

15  instructions to make sure that Bard got it back?

16     A.  Yup.

17     Q.  Is that correct?

18     A.  Yes.

19              MR. SMITH:  Let's go off the record for a few

20  minutes.

21              MR. DiMAURO:  Sure.

22              (Recess taken.)

23              MR. SMITH:  I'm done.

*Your 2003 Personalized Enrollment Worksheet*

R Scalli
Exhibit No. I (
4/13 65   KB

This worksheet lists your 2003 benefit options and per pay period costs. Follow these steps to enroll:

1. Review your **enrollment** materials and use this worksheet to determine your elections.
2. Complete and/or update your dependent coverage information on this worksheet. ·
3. **ENROLL** IN **YOUR** BENEFITS by ONE of the following:
   - ENROLL ONLINE: www.citizensbenefits.com
   - Intranet: Employee Resources - Employee Benefits Online!- Enroll
   - Enrollment Line at **1-800-756-3539**
4. KEEP THIS WORKSHEET FOR YOUR RECORDS. Do not send your completed worksheet to Human Resources.

Robert S Scalli
233 Main Street
Winthrop, MA 02152

K E MWB220       MA   2603540   1
07960   AE-Annual Enrollment           C

| | |
|---|---|
| PIN: | 1118 |
| Employee ID: | E521250 |
| Date of Birth: | 05/10/1962 |
| Date of Hire: | 03/05/2001 |
| Benefit Base Salary | $50,000.00 |
| Scheduled Hours: | 40.00 |
| Benefits Effective Date: | 01/01/2003 |

*You MUST ENROLL BY 11/12/2002. If you DO NOT enroll by the deadline, you will default into the "default coverage" opti for each benefit.*

BI-WEEKLY COST

## 01 MEDICAL

Default: You will receive Citizens HealthPlan with Employee + Family coverage for 2003.

| Election | Phone Code | Option | Employee Only | Employee + Spouse or Domestic Partner | Employee + Child or Children | Employee Family |
|---|---|---|---|---|---|---|
| O | 1 | Citizens HealthPlan | $36.92 | $73.84 | $68.30 | J10S.24 |
| O | 0 | No Coverage | $0.00 | $0.00 | $0.00 | $0.00 |

**Your** coverage level **for 2003 will automatically be determined based on the dependents you choose to cover.**

## 02 DENTAL

You are **currently** enrolled **in** Dental **High** Option with Employee + Family coverage for 2002.
**Default:** You will receive Dental High Option **with** Employee + **Family** coverage for 2003.

| Election | Phone Code | Option | Employee Only | Employee + Spouse or Domestic Partner | Employee + Child or Children | Employee Family |
|---|---|---|---|---|---|---|
| O | 1 | Dental Standard Option | $5.36 | $10.72 | $12.98 | $17.16 |
| O | 2 | Dental High Option | 59.68 | $19.32 | $23.44 | $31.00 |
| O | 0 | No Coverage | $0.00 | $0.00 | $0.00 | $0.00 |

**Important Note:** If you enroll in the Dental High Option, you must remain in the plan for two years. You will not have the option to waive coverage or elect the Standard Option, even if you experience a qualified status change.

**Your** coverage level for 2003 will automatically be determined based on the dependents you choose to **cover.**

BI-WEEKLY COST

## 06 SPOUSE OR DOMESTIC PARTNER LIFE INSURANCE

You are currently enrolled in $20,000 of coverage for 2002.
Default: You will receive $20,000 of coverage for 2003.

| Election | Phone Code | Option | Cost |
|----------|-----------|--------|------|
| O | 1 | $10.000 | $0.16 |
| O | 2 | $20.000 | $0.32 |
| O | 3 | $30.000* | $0.48 |
| O | 4 | $40.000* | $0.64 |
| O | 5 | $50.000* | $0.80 |
| O | 0 | No Coverage | $0.00 |

*Evidence of Insurability is required if you elect this option. You will be sent a form with your confirmation statement if your spouse's or domestic partner's coverage requires approval.

## 07 DEPENDENT CHILD LIFE INSURANCE

You currently have No Coverage for 2002.
Default: You will receive No Coverage for 2003.

| Election | Phone Code | Option | Cost |
|----------|-----------|--------|------|
| O | 1 | $4.000 | $0.03 |
| O | 2 | $8.000 | $0.06 |
| O | 0 | No Coverage | $0.00 |

Deductions for Dependent Child Life Insurance are made on a monthly basis - $ .07 for Option 1 and $ .14 for Option 1.

## 08 LONG-TERM DISABILITY INSURANCE

You are currently enrolled in additional 10% of benefit base pay for 2002.
Default: You will receive additional 10% of benefit base pay for 2003.

| Election | Phone Code | Option | Cost |
|----------|-----------|--------|------|
| O | 1 | 5096 of benefit base pay (Standard Option) | $0.00 |
| O | 2 | Additional 10% of benefit base pay | $3.27 |

## 09 VACATION BUY/SELL

You are currently not eligible for this benefit.

## ▼ Your 2003 Personalized Enrollment Worksheet

BI-WEEKLY COST

### 03 VISION

You are currently enrolled in Vision Service Plan with Employee + Family coverage for 2002.
Default: You will receive Vision Service Plan with Employee + Family coverage for 2003.

| Election | Phone Code | Option | Employee Only | Employee + Spouse or Domestic Partner | Employee + Child or Children | Employee + Family |
|----------|-----------|--------|---------------|---------------------------------------|------------------------------|-------------------|
| O | 1 | Vision Service Plan | $2.94 | $4.70 | $4.80 | $7.74 |
| ⊙ | 0 | No Coverage | $0.00 | J0.00 | $0.00 | $0.00 |

Your coverage level for 2003 will automatically be determined based on the dependents you choose to cover.

### 04 BASIC AND SUPPLEMENTAL LIFE INSURANCE

Citizens provides Basic Life Insurance of $100,000.00 (2 times your benefit base salary) at no cost to you.
Supplemental Life Insurance: You are currently enrolled in coverage of 1x your benefit base salary for 2002.
Supplemental Life Insurance Default: You will receive coverage of 1x your benefit base salary for 2003.

| Election | Phone Code | Option | Coverage Amount | Cost |
|----------|-----------|--------|-----------------|------|
| O | 1 | Additional 1x benefit base salary | $50,000.00 | $1.60 |
| O | 2 | Additional 2x benefit base salary | $100,000.00 | $3.20 |
| O | 0 | No Coverage | $0.00 | $0.00 |

### 05 VOLUNTARY AD&D INSURANCE

You are currently enrolled in coverage of 5* your benefit base salary for Employee + Family for 2002.
Default: You will receive coverage of 5x your benefit base salary for Employee + Family for 2003.

| Election | Phone Cod* | Option | Coverage Amount | Employee Only | Employee + Family | |
|----------|-----------|--------|-----------------|---------------|-------------------|---|
| O | 1 | 1x benefit base salary | $50,000.00 | $0.46 | $0.74 | Coverage Category [ ] |
| O | 2 | 2x benefit base salary | $100,000.00 | $0.92 | $1.47 | 1 - Employee Only |
| O | 3 | 3x benefit base salary | $150,000.00 | $1.38 | $2.21 | 3 - Employee + Family |
| O | 4 | 4x benefit base salary | $200,000.00 | $1.85 | $2.96 | |
| O | $ | 5x benefit base salary | $250,000.00 | $2.31 | $3.69 | |
| O | 0 | No Coverage | $0.00 | $0.00 | $0.00 | |

Robert S Scalli

E521250

*Your 2003 Personalized Enrollment Worksheet*

BI-WEEKLY COST

## 10 HEALTH CARE REIMBURSEMENT ACCOUNT

For 2003. you may contribute between $100 and $5,000 annually In whole dollar amounts to your Health Care Reimbursement Account.

Annual Contribution $_____    Divided by 26 equals $_____ per pay period

## 11 DEPENDENT CARE REIMBURSEMENT ACCOUNT

For 2003. you may contribute between $100 and $5,000 annually in whole dollar amounts to your Dependent Care Reimbursement Account.

Annual Contribution $_____    Divided by 26 equals 5_____ per pay period

## TOTAL

Add your bi-weekly amounts to determine the cost per pay period $_____

## DEPENDENT COVERAGE INFORMATION

Please review the information listed below for accuracy. If you need to change any of the information shown below or need to add or delete medical, dental and/or vision coverage for a dependent. you must do so when enrolling online or by phone. Your coverage levels for 2003 will automatically be determined based on the dependent(s) listed below unless you make changes either online or on the Citizens Benefits Enrollment Line at 800-756-3539. If you do not enter correct dependent information, your dependents will not be covered.

| Dep ID# | Name (First MI Last) | Social Security # | Date of Birth | Relationship (See below) | Gender | Medical | Dental | Vision |
|---|---|---|---|---|---|---|---|---|
| 01 | Jacquelyn Scalli | | 10/10/1999 | 2 | F | Y | Y | Y |
| 02 | Jake Scam | | 08/13/1995 | 2 | M | Y | Y | Y |
| 03 | Eleanor Scalli | ███████ ███████ | | 1 | F | Y | Y | Y |

Relationship Codes:
1=Spouse
2=Child /Step-Child (under age 19)
3=Full Time Student (age 19 through 22)
4=Domestic Partner

5=Handicapped Child (age 19 or older)
6=Child of Domestic Partner (under age    19)
7=Full-Time Student Child of Domestic Partner (age 19 through 22)
8=Handicapped Child of Domestic Partner (age 19 or older)



Rosalba
Exhibit No. 12

4/13/05    KB


**CITIZENS BANK**

Barden K. Conn                617-745-6177

Eleanor / Bob.

Here's Bob's new contract that
has him sharing an assistant
with you, the same way we're
going to set up Reggie. To be
shurt. & b, both of you. Bob needs to
sign and send back to me. Call
with any question.

Barden

 CITIZENS BANK

10 Tripps Lane
Riverside, RI 02915

March 5, 2002

**Robert Scalli**
233 Main Street
**Winthrop, MA** 02152

**Dear** Bob:

Citizens Mortgage Corporation **("CMC"),** a subsidiary **of Citizens** Bank of RI is pleased to renew your
position of Loan Originator for **the Woburn** Loan Production Office.  Below are details regarding **the**
position and a description of our Loan **Officer** "Commission" Incentive Plan **("Plan")** utilizing a shared
Sales Assistant

<u>EFFECTIVE DATE</u>:

LOAN OFFICER **"COMMISSION"** INCENTIVE PLAN **(<u>utilizing</u>** a shared Sales **<u>Asst.</u>)**

**I.    Participation**

Participation in this Plan is limited to Loan Officers utilizing a shared sales assistant who have
executed this agreement.

**II.    Plan Description**

A.    Car Allowance: There **will** be a $139.00 biweekly auto expense reimbursement to you under
mis Plan.

B.    Origination Commission: This Plan consists of a monthly incentive, which is based
upon a **percentage** commission per mortgage loan funded on the system by CMC.
Commissions wfll increase based upon **the** achievement of an increasingly larger number of
mortgage loans closed during **the** month.  Commissions will be determined by multiplying the
applicable origination fees collected (to a maximum of 1% origination fee) and paid by the
borrower times **the** applicable commission percentage as outlined below.  Commissions will
be paid **the** second payday of me **montn,** and wfll be determined as **follows:**

COMMISSION RATES

| Monthly Dollars Funded Goal (*) | Commission Basis Points All Mortgage Loans |
|---|---|
| $500,000 or less | .32 Basis Points |
| **$500,001** to $600,000 | .37 Basis Points |
| **$600,001** to $999,999 | .47 Basis Points |
| $1,000,000 to $2,499,999 | .58 Basis Points |
| **$2,500,000** or more | .60 Basis Points** |

\*   Retroactive to dollar one for **the** closing **month**
\*\* All CFG (all subsidiary) referred loans are capped at
$1,000,000.  Maximum base commission per loan is $6,000.

The following conditions affect the Commission Rates listed in Table A:

1.  Reduction of 5 percentage points (5%) may be assessed for loan files that are incomplete due to documentation (based on CMC documentation requirements). Measurement and communication of deficiencies will be performed by the Operations Manager and Center Manager. Any adjustment to commission will require the written approval of your Center Manager and the President of CMC. Such written consensus shall not be unreasonably withheld.

2.  No origination commission will be paid unless the mortgage loan application is in processing within 48 hours of the application being taken. No adjustment to commission will occur without the written consensus of the Center Manager and President of CMC. Such written consensus shall not be unreasonably withheld.

3.  Reduction of $500.00 per loan may be assessed for loans not originated through point of sale automation. Any adjustment to commission will require the written approval of your Center Manager and the President of CMC.

4.  You will have the opportunity to earn up to 50 percent in supplemental origination.

5.  President's Club Commissions:

    a.  For each consecutive year of President's Club qualification, you will receive one (1) additional bonus percentage point credit (1%) to your monthly commissions ("bonus point") up to a maximum of 5 additional percentage points (5%). If you do not qualify for President's Qub in subsequent year(s), you will lose 1 bonus percentage point (1%) credit each year you fail to qualify. All President's Qub bonus points will be lost if you fail to qualify for 2 consecutive years. You can have a maximum of 5 bonus percentage points (5%) at any given time.

6.  You are responsible for the collection of the credit report, appraisal, lock fees and disclosure of any other fees associated with me CMC fee schedule. To the extent that required fees are not collected, the costs to CMC will be offset against your origination commissions.

## III.  Resignation, Termination and Offset

A.  Resignation: If you resign, you will receive commissions for all mortgage loans funded on the system up to, and including, your last day of employment.

B.  Termination: You agree that this Plan does not constitute an employment contract or a guarantee of employment for any specific length of time and in no way limits CMC's authority to terminate employment at its sole discretion, with or without cause. Nothing contained herein should be construed to alter your status as an "at will" employee. Upon termination of employment, you will receive credit for commissions for all mortgage loans funded on the system up to, and including, your last day of employment. No incentive or commissions will be paid on mortgage loans that are fraudulent or contain material irregularities. If you are paid for mortgage loans later found to contain material irregularities and misrepresentations, you are obligated to repay CMC commissions and any and all damages related to those mortgages.

C. Termination of Sales Asst: This agreement shall terminate **automatically** if the jr. loan originator is terminated from CMCs employment **and,** in such **case,** the termination of **this** agreement shall be **effective** and the standard Loan Officer **Commission** Incentive Plan (Attachment A) **will** be automatically reinstated as follows:

If the last day for which the sales assistant receives compensation is on **or** before the 15* day of a given month, this agreement shall terminate and the standard Loan Officer Commission Incentive Plan shall be effective for all commissions earned that month; **if** the sales assistant **last** compensation if after the 15* of the **month,** this agreement shall remain in effect that month and the standard* Loan **Officer** Incentive Plan **shall** be reinstated the following month.

D. Leave of **Absence** of Sales **Asst.:** This agreement **will** be suspended and the standard Loan **Officer** Commission **Incentive** Plan (Attachment A) **will** be reinstated if the sales assistant is on **Short-Term Disability (STD)** for more than 50% of the business days in a given month. This agreement will be reinstated in the first month in which the sales **assistant** returns from leave for more that 50 percent of the business days in that month.

E. **Right** of Offset  CMC reserves **the** right to offset any amounts due from you to CMC in calculating final compensation upon termination of **employment.**

## IV.    Other Conditions

CMC reserves the right to change or discontinue **this** Plan upon 30 days written notice.  No deviations by you are permitted without the express written consent of the appropriate President of CMC and the Center Manager.  No waiver by CMC at any time of any breach by **you,** or compliance **with,** any condition or provisions of me **plan** shall be deemed a waiver of similar or dissimilar provisions or conditions at the same time or any prior or subsequent time.  Any disputes **shall** be resolved **in** writing by the appropriate President of CMC and Human Resources in a manner which is considered to be **fair,** equitable and within the scope and intent of this Plan.

## V.    Ethics **Statement**

I have read and understand the Citizens Bank Ethics Statement

This Plan supersedes **all** prior agreements, either verbal or **written, with** respect to the subject matter of me Plan. This Plan shall be governed by the laws of the respective state of employment.  It is expressly understood that both you and CMC are free to terminate your employment relationship any time, for any **reason,** with or without notice.  CMC expressly reserves the right at any time to take any **action** deemed to be in CMCs best interest regarding your employment **relationship.**  No **officer,** supervisor or other employee of CMC, other than the President or **Chairman,** has the authority to **alter,** orally or in **writing,** the **terminable-at-will** status of your employment relationship.  Unless otherwise stated in this **Plan,** nothing in this Plan is intended to confer any rights to any terms or conditions of your employment.  You further understand and agree to the repayment obligations and right of offset expressed in Section **III** C. Nothing in this plan shall preclude CMC from any legal remedies against you for any damages caused to CMC by you or for any sums not recovered through the repayment obligations set out in this Plan.

By signing below, you **acknowledge** and agree to be bound by the terms of this Loan Officer Incentive **Plan** during **the** term of your employment **with** CMC  **Please return one copy of this letter to me in the enclosed postage-paid envelope.**

_Joyce Achiles_                    _3/2/02_

Joyce A. Hicks                        Date
**Assistant** Vice President
Human Resources
**Citizens** Bank of Rhode Island

Page 5



_Barden Conn_                    _3/11/02_

**Barden** Conn, Sr. Vice President          Date
Center Manager
Citizens Mortgage Corporation

# ATTACHMENT A

Loan Officer
## ORIGINATION COMMISSION RATES  (Table A)

| Monthly Dollars Funded Goal (*) | Commission Basis Points All Mortgage Loans |
|---|---|
| $500,000 or less | .45 Basis Points |
| $500,001 to $600,000 | .50 Basis Points |
| $600,001 to $1,000,000 | .60 Basis Points |
| $1,000,001 or more | .65 Basis Points** |

\* Retroactive to dollar one for the closing month
\*\* All CFG (all subsidiary) referred loans are capped at
   $1,000,000.  Maximum base commission per loan *is* **$6,500**.