# EXHIBIT 3

PAGES:    1 - 122
VOLUME:    I
EXHIBITS: 1 - 23

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

CIVIL ACTION
NO.:  03-CV-12413DPW

- - - - - - - - - - - - - - - - - - x

**ELEANOR SCALLI and**
**ROBERT SCALLI,**

Plaintiffs

vs.

CITIZENS FINANCIAL GROUP, INC.,

Defendant

- - - - - - - - - - - - - - - - - - x

Deposition of JOYCE ANN HICKS, a witness called on behalf of the Plaintiffs, taken pursuant to notice before Jeanne M. Bramanti, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law office of Mark E. Burke, 111 South Bedford Street, Burlington, Massachusetts, on Tuesday, December 7, 2004, commencing at 11:20 a.m.

* * * * *

BRAMANTI & LYONS COURT REPORTING, INC.
REGISTERED PROFESSIONAL REPORTERS
92 STATE STREET, 8TH FLOOR, BOSTON, MA 02109
TEL:  617.723.7321 / FAX:  617.723.7322
www.bramanti-lyons.com

1        APPEARANCES:

2        Mark *E*. Burke, Esq. and
         **Nicholas** DiMauro, Esq.
3        Law office of Mark E. Burke
         111 South Bedford Street
4        **Burlington**, Massachusetts 01803
         Attorney for the **Plaintiffs**

5
         Bradford *3*. smith, Esq.
6        **Goodwin** Procter LLP
         Exchange **Place**
7        Boston, Massachusetts 02109
         Attorney for the Defendant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                          I N D E X

2

3       Deposition of:                              Page

4       Joyce Ann Hicks

5          Examination by Mr. Burke                   5
           Examination by Mr. DiMauro                80
6

7                        - - - - - -

8                        E X H I B I T S

9       NO.                                          Page

10

11         1    Notice of Taking Deposition, 4 pages    5

12         2    Defendant's Answers to Interrogatories,
                10 pages                                 5

13         3    Hire Information
                Bates Nos. C00001 - C00026              5
14
           4    Hire Information
15              Bates Nos. C00027 - C00054              5

16         5    E. Scalli Performance Evaluation
                Bates Nos. C00055 - C00207              5
17
           6    Employee Handbook & Procedure Manual
18              Bates Nos. C00208 - C01770              5

19         7    Organizational Charts
                Bates Nos. C01771 - C01778              5
20
           8    Loan Originator Job Description
21              Bates Nos. C01779 - C01780              5

22         9    E. Scalli's Discharge Documents
                Bates Nos. C02328 - C02333              5
23
           10   R. Scalli's Discharge Documents
24              Bates Nos. C02362, C02312, 13, 10,
                11 and C02314 - C02327                  5

DEPOSITION OF JOYCE ANN HICKS

Exhibits Continued:                                                        Page

11   E. **Scalli's** Compensation Documents
     Bates Nos. C01781 – C02203                                              5

12   R. **Scalli's** Compensation Documents
     Bates Nos. C02204 – C02256                                             5

13   E. & R. **Scalli's** incentive Programs
     Bates Nos. C02257 – C02275                                             5

14   E. & R. **Scalli's Electronic** Data
     Bates Nos. C02276 – C02309                                             5

15   **Castillo** Transaction
     Bates Nos. C02334 – C02361                                             5

16   Commission Reports                                                     5

17   Documents Re. Barbosa Transaction
     Bates Nos. C02368 – C02372                                             5

18   Documents Re. Advertising
     Bates Nos. C02373 – C02380                                             5

19   R. **Scalli's** Compensation
     Bates Nos. C02381 – C02386                                             5

20   Memo from E. **Walsh** dated
     2/4/03                                                                43

21   Memo from E. **Walsh** dated
     2/3/03                                                                43

22   Memo from Louise Riascos dated
     1/17/03                                                               43

23   **Policy** 5.0 Bates No. C00359                                       58

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1       question.

2   A.  Okay.

3   Q.  Okay.  with that, ma'am, would you kindly tell me your

4       full name?

5   A.  It's Joyce Ann Hicks.

6   Q.  Is that Ann with an E?

7   A.  No, no E.

8   Q.  without an E.  All right.

9               And what is your position with the Citizens

10      Bank, ma'am?

11  A.  I'm a senior human resource generalist assistant vice

12      president.

13  Q.  And what are your responsibilities as an assistant vice

14      president for human resources?

15  A.  I work with employees of the citizens mortgage

16      corporation in New England and the mid-Atlantic

17      supporting them in employee relations issues, general

18      questions that they might have with regard to payroll

19      benefits, etcetera, any counseling problems that they

20      might have as well as work closely with the recruiting

21      department.

22  Q.  Ma'am, I'm going to show you what's been marked as

23      Exhibit No. 1.  If you would kindly review that, and I

24      shall ask you a question.

1    A.    who initiated --

2    Q.    who initiated the investigation?

3    A.    The -- well, the manager contacted, Bard Conn contacted

4          me to state that there was a concern because of the

5          denial being issued by Eleanor which is against policy.

6    Q.    And do you have any notes memorializing the initial

7          conversation that you had with Mr. Conn?

8    A.    It was an e-mail.

9    Q.    It was an e-mail?

10   A.    Yes.

11   Q.    Do you know if that has been produced?

12              MR. SMITH:    If you know.

13   A.    I don't know.

14   Q.    What was the substance of the e-mail?

15   A.    Just explaining that the denial had been issued by her

16         directly and that, you know, it was a policy violation

17         and we needed to get copies of everything and to look

18         into it at that point.

19   Q.    When you say that we needed to look into it, who are

20         you referring to?

21   A.    He was bringing it to my attention which at that point

22         I get involved with both the manager as well as the

23         operations manager.

24   Q.    The manager being who?

1    A.    Bard Conn was the manager of the Massachusetts office.

2    Q.    And who else?

3    A.    And Sharon Costa.  She's the overall operations manager

4          for CMC.

5    Q.    And was that the extent of any written or electronic or

6          other communication that Bard conn had with you --

7    A.    Yes.

8    Q.    -- relative to the initiation of any investigation?

9    A.    Yes.

10   Q.    And that was the only e-mail, and that started the ball

11         rolling so to speak in regards to an investigation?

12   A.    Yes.

13   Q.    And what did Sharon Costa do in terms of that

14         investigation?

15   A.    she reviewed the mortgage policy with regard to the

16         process for approving and denying loans.

17   Q.    with whom?

18   A.    with me, and provided me with documents on the

19         policies, loan origination policy.

20   Q.    were you familiar with this policy before?

21   A.    Yes, I was, but I went to her because she's the expert

22         so to speak, and she's outside of the Massachusetts

23         office.  she supports all of the mortgage companies, so

24         for consistency purposes she's the person that you

1          would go to for something like this.

2                MR. SMITH:   Make sure that you let him finish

3          his question.

4     A.   I'm sorry.

5     Q.   And what is Sharon Costa's position?

6     A.   She's senior vice president, CMC operations.

7     Q.   And where is she located?

8     A.   She's in Rhode Island at the Tripps Lane office.

9     Q.   At the what?

10    A.   Tripps, T-r-i-p-p-s, Lane office.

11    Q.   And you described her as the expert of what?

12    A.   Well, she oversees all of operations for the mortgage

13         company, all locations.  She would be the one that

14         would initiate any policy development and things like

15         that.

16    Q.   Policy development in what regard?

17    A.   Any mortgage operation policies, compliance, etcetera,

18         that all falls under her.

19    Q.   Is she a lawyer?

20    A.   NO.

21    Q.   And did you actually meet with her, or did you have a

22         conference with her over the telephone?  What was --

23    A.   I believe I did both.  I'm not a hundred percent

24         positive on that.

1    A.    **Approximately.**  I'm not positive about that date.

2    Q.    But the **e-mail** from Mr. Conn **would** --

3    A.    It **would** be from that point forward.  I just **don't** know

4          the date on that **e-mail** off the top of my head.

5    Q.    And as it **relates** to the **telephone** conversation with

6          Sharon Costa, did that occur before the in-person

7          meeting or after, if you know?

8    A.    I honestly don't remember at this point.

9    Q.    What was the substance of that **call,** that **telephone**

10þ4X      Q?CC'PDES'$S?VL@'8LGE?i

11   A.    I asked her to, you know, review the procedure for

12         denying **loans,** what the process **would** be in **all** of our

13         mortgage centers and where that information was written

14         as **well** as how **loan** offices are aware of that.

15   Q.    And what did she say?

16   A.    **Well,** she went over the process which is that the

17         underwriters are the only ones authorized as **well** as

18         the center operations manager to deny a **loan.**  under no

19         **circumstances** are **loan** officers to approve or deny a

20         loan, and that the form that goes to the customer **would**

21         be generated from the operations center in **Quincy.**  And

22         then she did give me a copy of the actual policy that

23         states that as **well.**

24   Q.    And are you **familiar** with any of the documents that

1    Q.    Is he in the same **physical** space as you were?

2    A.    He was then; he is not any **longer**.

3    Q.    And then you spoke to **him** after you had reviewed

4          information with Sharon Costa, correct?

5    A.    Yes.

6    Q.    And what did he do or say in response to that?

7    A.    My **recollection** is that he **obviously felt** that if she

8          had, you know, had done -- based on the documents that

9          we were **looking** at and after we spoke with her what she

10          had done, the **denial**, that that **obviously** was very

11          serious and it was a **conflict** with her position here,

12          and that she **should** be terminated.

13    Q.    when you say that it was a **conflict** with her position,

14          what do you mean?

15    A.    The reason that **loan officers** are not **allowed** to

16          approve or deny **loans** is because they are paid

17          commission on those loans, and we keep that **totally**

18          **separate** from **their** function so that there **isn't** a

19          **conflict** in that someone might be approving a **loan**

20          because **they're financially** going to benefit from it.

21    Q.    What evidence did you have when you performed this

22          **investigation** that **Eleanor Scalli** had approved or

23          denied a **loan**?

24    A.    There was a **denial** document in the **customer's** file that

1          with Citizens was to get their deposit back to purchase

2          Robert's property.

3    Q.    Let me see if I can sort of unwind this because

4          obviously it's somewhat involved.

5                 Wouldn't a starting point be to determine

6          whether Robert Scalli actually owned this property?

7    A.    He admitted that he owned it at the meeting.

8    Q.    Okay.  What property are you referring to?

9    A.    The Maverick street property.

10   Q.    Did you conduct any investigation into whether Robert

11         Scalli had owned this particular property?  Yes or no.

12   A.    NO.

13                MR. SMITH:  Objection to whether or not the

14         question can be answered with a yes or no.  I'm just

15         objecting to the form.

16   Q.    (By Mr. Burke)  All I'm asking, ma'am, is whether you

17         independently corroborated that Robert Scalli had owned

18         this piece of property.

19   A.    He admitted he owned it.  I didn't need to corroborate

20         it.

21   Q.    when did he do this, ma'am?

22   A.    At the meeting that we had with both him and Eleanor.

23   Q.    And when did that occur, ma'am?

24   A.    February 4.

1    Q.    2003?

2    A.    Yes.

3    Q.    when you say we, who was present at that **meeting?**

4    A.    Bard Conn and **Alexander** Buor.   He was from security.

5    Q.    Buor?

6    A.    **B-u-o-r,**  I **believe.**

7    Q.    was it your **decision** to have someone from security in

8          the room at the time, or whose decision was that?

9    A.    It was a joint decision.

10   Q.    Between who?

11   A.    Security, Bard conn, and **myself.**

12   Q.    And what was that joint decision based upon?

13   A.    **It's** done often for terminations in the event that the

14         employee becomes somewhat **hostile,** and depending upon

15         the **location** and where **you're** situated to conduct the

16         meeting whether or not it's a situation where it needs

17         somebody there.

18   Q.    who **called** this meeting?

19   A.    **Well,** it was -- I **don't** know.   I don't know what you

20         mean by the question.

21              MR. SMITH:   can I have just a moment?   Can we

22         go off the record for a second?

23              MR. BURKE:   **Absolutely.**

24              (Discussion off the record.)

1    Q.    Have you ever spoken to Claudia Arredondo?

2    A.    No, I haven't.

3    Q.    Is there any particular reason why you wouldn't have

4          spoken to her?

5    A.    she wasn't involved in the denial process.

6    Q.    Again, if you could just let me finish my question.  I

7          know that you want to answer, but -- so the reason that

8          you did not speak with her at any time is that she was

9          not involved in the denial process, correct?

10   A.    correct.

11   Q.    But she was involved in the approval process, correct?

12   A.    correct.

13   Q.    And it's your testimony that citizens Mortgage

14         Corporation approved this loan, correct?

15   A.    Correct.

16   Q.    And you never discussed the approval process with

17         claudia Arredondo?

18   A.    NO.

19   Q.    NOW, do you know as part of -- from whatever source of

20         information that is available to you, what the policy

21         is for owner occupied versus investment-type loans?

22   A.    when you say policy, it's not so much a policy.  There

23         are different products for different types of loans

24         depending upon --

1          MR. SMITH:  Can you identify the document for

2      the record?

3          MR. BURKE:  Yes, I **am**.  Again, this is Exhibit

4      NO. 6, and as parts of Exhibit No. 6 there is the

5      citizens Mortgage Corporation **policy** and procedure

6      **manual,** and **specifically** Miss Hicks has referred us to

7      that section of the **manual** regarding **loan** origination,

8      and **specifically** Section 5.0 referred to as making a

9      credit decision.

10          MR. SMITH:  Can I **look** at that?

11          MR. BURKE:  Yes, **absolutely**.  **In** fact I want

12      to mark that and copy it **separately**.  Go off the

13      record.

14              (Discussion off the record.)

15              (Exhibit No. 23 marked.)

16  Q.  (By Mr. Burke)  Ma'am, I'm going to show you **what's**

17      been marked as Exhibit No. 23, and for the record, this

18      is the document that you pulled from the **policy** and

19      procedure **manual relative** to the **investigation** that you

20      conducted as it **relates** to **Eleanor Scalli?**

21  A.  Yes.

22  Q.  And, **specifically**, I'm going to **direct** your attention

23      to 5.0, and could you, if you **wouldn't** mind, **direct** me

24      to exactly where in **this** paragraph there was an **alleged**

1          violation of policy?

2    A.    The first sentence where it says, "Loan officers are

3          not authorized to make credit decisions."

4    Q.    And do you have in your 24 years as a human resources

5          vice president, director, or whatever other capacity

6          you've worked in that area ever terminated someone for

7          making credit decisions that they were not authorized

8          to make?

9    A.    Not an exactly similar situation but similar.

10   Q.    I'm sorry, ma'am?

11   A.    I've terminated someone for a policy violation that

12         involved some credit issues.  It wasn't an exact

13         similar situation as this.

14   Q.    NOW, was Bard conn authorized to make a credit

15         decision?

16   A.    I don't know if he could have.  I'm not sure about

17         that.  That does not happen.  It goes through the

18         underwriters who are the experts in that area.

19   Q.    And --

20   A.    Even though they report in to him ultimately.

21   Q.    And who was the underwriter in this case?

22   A.    I'm not sure which underwriter actually underwrote this

23         loan.  There are three in that center.

24   Q.    And who are they?

1    Q.   On February 3, 2003, correct?

2    A.   Correct.

3    Q.   Actually, it was sent on — at three thirty-one on

4         February 3, correct?

5    A.   Yes.

6    Q.   And Eleanor Scalli was terminated on February 4, 2003,

7         correct?

8    A.   correct.

9    Q.   At what time?

10   A.   I honestly don't remember. I think it was in the

11        morning, late morning.

12   Q.   NOW, in this e-mail from Elizabeth Walsh she states,

13        "on January 17 Louise e-mailed Galina Claudia to

14        withdraw the files, correct?

15   A.   Correct.

16   Q.   So in this e-mail is making reference to not a

17        declination but a withdrawal?

18   A.   If you read down a little further it says decline.

19   Q.   Okay. But let's take it step by step. I mean, the

20        e-mail that Liz Walsh is referring to, it doesn't say

21        anything regarding, regarding declination. It's

22        referring to withdrawal, correct?

23   A.   Correct.

24   Q.   And withdrawal by your testimony is different than

DEPOSITION OF JOYCE ANN HICKS

1    **A.**   No.  The customer **doesn't** request a **decline.**  The bank

2    **declines** for credit reasons, for not meeting **loan**

3    parameters, not providing documentation, etcetera.  The

4    customer **can't** request a **decline.**

5    **Q.**   But your testimony was that the customer had been

6    requesting that it be **declined?**

7    **A.**   Yes, of **Eleanor** because they wanted -- if it's

8    **declined,** the customer gets their deposit back from the

9    **realtor.**  If they withdraw, the **realtor** keeps the

10    deposit.  So it's to the customer's advantage if they

11    want to get out of the **loan** to have it be **declined** so

12    that they can get their money back and use it to

13    purchase another piece of property.

14    **Q.**   And **that's** what you represented to Miss **Scalli** occurred

15    in this case?

16    **A.**   What we **talked** to her about was **specifically** this form,

17    that the **loan** had been approved, she issued a **decline,**

18    and that it was out of the scope of her authority as a

19    loan originator for Citizens Mortgage.

20    **Q.**   Did she indicate that the credit decision had been

21    approved by Liz **Walsh?**

22    A,   I don't **believe** she mentioned that at the time, no.

23    **Q.**   That **would** be rather important, **don't** you think?

24    A,   No.

1    Q.   But who makes the **ultimate** decision as to termination?

2    A.   **Well,** it depends on the situation.

3    Q.   **Well,** in this situation?

4    A.   In this situation it was a combination between the

5         group manager and **legal counsel.**

6    Q,   And the group manager?

7    A.   Deborah Cornish.

8    Q.   But so **let** me see if I understand your answer or your

9         testimony.  After **consultation** with **counsel** you and

10        Miss Cornish made a decision to terminate?

11   A.   It wasn't -- yeah.  I mean, **counsel** didn't decide to

12        **terminate.**  we made the recommendation but because of

13        the seriousness of this and the fact that she **hadn't**

14        had any prior warnings we **normally wouldn't** review any

15        situation **like** this with **counsel** before pursuing it.

16   Q.   Did you speak **directly** to **counsel?**

17   A.   On **several** occasions, yeah,

18   Q.   Prior to the termination?

19   A.   Yes.

20   Q.   On **several** occasions?

21   A.   **Probably** two.

22   Q.   what happened after that?

23   A.   I spoke with her, and then there **probably** was another

24        phone **call.**

1    everything else.  So it's there for a lot of reasons,

2    and that's the policy in place that they have to adhere

3    to, and it's not unique to Citizens.  It's standard in

4    the mortgage industry.  So this is something that she

5    would have been exposed to any other player in the

6    mortgage industry.

1   Q.   Were you aware that she worked with other lenders, is

8        that what you're implying?

9   A.   NO.  I'm not implying anything.  I'm just -- obviously

10       she worked for other lenders.  You know, we knew that

11       when we hired her.  That's why she was good at what she

12       did in terms of her sales.  But what I'm saying is that

13       loan officers not making credit decisions is standard

14       in the industry.  It's not a unique Citizens' policy,

15       that's all I'm saying.

16  Q.   But you're not testifying about what her knowledge was,

17       right?  You don't know what her knowledge was of this

18       particular provision, correct?

19  A.   I don't know what her knowledge is.  All I know is that

20       she should have been aware of this.  It was on her

21       laptop.  she was responsible for knowing the policy.

22  Q.   It was on her laptop.  How do you know that?  Did you

23       review her laptop?

24  A.   All originators have the policy manual.  It's sent to

1         them as **it's** updated, and it's an **Icon** right on **their**

2         **laptop** so that that way they can refer to it at any

3         given time.

4   Q.    So **you're referring to this** document here which is

5         some 200 pages?

6   A.    Yes, but it was **already** reviewed in training with her.

7                     (Discussion off the record.)

8                     (Lunch recess taken.)

9

10

11                        AFTERNOON SESSION

12                     (Mr. Burke is no **longer** present.)

13

14         Examination by Mr. **DiMauro:**

15   Q.    Good afternoon.  As you know, my name is Nick DiMauro.

16         I represent Robert **Scalli** in this matter.  If at any

17         time you want to stop or you have a question for your

18         **counsel,** please **let** me know.  If you **don't** understand

19         the question, **please tell** me and **I'll** try to rephrase

20         it if I can.  **We're** continuing at this point **until** four

21         **o'clock** by agreement, and then **we'll schedule** a date, I

22         **will** speak to my brother and we **will schedule** a date

23         upon which we **will** resume, and we **will** notify each

24         other of that date.

1        **twelve** months of his **employment?** were you ever made

2        aware of that?

3    **A.**    I was **later** on in the process.  It was at the **Scallis'**

4        request to **funnel** the **loans** under the one name because

5        the way the commission structure works is the basis

6        points go up with **volume,** so if **all loans fell** under

7        one person they **would** receive higher commissions by

8        doing that.  **Plus** there were **also** certain tax reasons,

9        some reasons why they wanted it set up that way.

10   **Q.**    So there is some document wherein the **Scallis** had

11       requested that?

12   **A.**    There is not a document, no.  They requested it of

13       their manager, but had they not wanted that it was

14       never, no one ever **called** me and said why am I not

15       getting any money after **all** this time which I think

16       they **would** have done.

17   **Q.**    **That's exactly** my point.  You **weren't** involved in that

18       situation wherein they communicated with you --

19   A,    **No.**

20   Q,    -- regarding **their willingness** to put it under one

21       **person's** name or --

22   A,    No.

23   Q.    When did you -- when did you first come to **learn** that?

24   A.    I think it was at the end of the year because it became

1          an issue with his benefits, and he went in the

2          negative, so they rejected from **payroll** because there

3          **wasn't** enough money to cover his benefit deductions at

4          that point which is when we had to set up a **small** draw

5          for him.

6     Q.   And do you remember **approximately** when that was

7          datewise?

8     A.   I **would** say it was **probably** in January because it **would**

9          have been with the new year when the benefits increased

10         this **dollar** amount, so **probably** towards the end of

11         **January** I **would** think.

12    Q.   And **would** it be common under those **circumstances**

13         wherein there was such a dramatic change, I **feel** as

14         **it's** dramatic because **certainly** I may be

15         **characterizing,** but based on the **original** agreement of

16         his employment wouldn't human resources be made aware

17         of this change with respect to what does the change

18         **involve?**  Citizens Bank **certainly** has a criteria for

19         loan officers, **it's** stated very **plainly,** and now there

20         is some side agreement **that's** under **Eleanor's** name or

21         whatever it may **be,** is that something that **would** be

22         brought to the attention of human resources so that it

23         **could** be documented **properly?**

24    A.   It **should** have been, yes.  But what, in terms of the

DEPOSITION OF JOYCE ANN HICKS

1      way that the **payroll** works, what we see **would** be the

2      draw amount, and **it's** not uncommon for a **loan** officer

3      to not want a draw.  Some of them just **don't** want to

4      manage **it,** so if **they're** top producers, they just say I

5      **don't** want to draw.  So it's not uncommon for a person

6      to get a zero pay.  The commissions are accounted

7      **directly** through **payroll.**  They **don't** bypass my office.

8      so the two, **unfortunately,** are somewhat separated, so I

9      **wouldn't** see what commissions are being paid to

10     somebody.  I **would** have to **look** at a W-2 to see what --

11  Q.  **okay.  would** you agree that it **would** be somewhat

12     **unusual** for a manager to recreate a position without

13     the -- you know, without **consulting** with human

14     resources on a position that was **established** in writing

15     at the time that he was **hired** and now without human

16     **resources' knowledge** and/or **approval** the position is

17     now **completely** changed wherein Robert **scalli** is not

18     receiving his own commission, he is not working within

19     the **guidelines** of what he **originally** agreed to when

20     **hired** pursuant to the Citizens Bank **guidelines?  would**

21     you agree that that **would** be **unusual?**

22  A.  **well,** if you **look** at the way that he was paid, I mean,

23     **it technically** was in accordance with the agreement

24     because, no, he didn't receive any commissions, but

1   that's because he chose not to book the **loans** under his

2   name and book them under **Eleanor's** name.

3  Q.  And you're **saying** that that agreement that you referred

4      to **earlier** states that that's part of something that he

5      can do under the **policies** of citizens Bank?

6  A.  NO.  what **I'm** saying is that had Bob not wanted it to

7      **funnel** under **Eleanor** he **would** have written the **loans**

8      under his name and been paid according to his agreement

9      that he was **hired** to.  He **consciously** chose not to put

10     the **loans** under his name.

11 Q.  And how do you know that?

12 A.  Because when he originates a **loan** he has to put in the

13     **loan** number whether it was his loan number or

14     **Eleanor's.  That's** done on the **laptop** when they take a

15     **loan** application.

16 Q.  Yes.  *I* meant how do you know that that is the way that

17     his manager or he set up that system?

18 A.  **well,** if they hadn't done that, then Bob **would** have

19     **loans,** and we **would** have been paying commission or he

20     would no **longer** be here because he **wouldn't** be meeting

21     **sales** goals.

22 Q.  But I guess my point is that other than the fact that

23     **you're** being **told** that Robert **Scalli** is now, I guess,

24     getting credit for things that **Eleanor** Scalli is doing

1    A.    (No response.)

2    Q.    And more **importantly**, how **would** he be paid?  If he was

3          not generating **loans** that were put under **Eleanor's** name

4          as you suggested there was some type of an agreement

5          that was done at the behest of Bob and **Eleanor** wherein

6          **loans**, *I* guess, he generated were put under her name?

7    A.    **Uh-hum.**

8    Q.    **Let's** assume that he generated zero **loans,** nothing.

9          what **would** he be paid for as a Citizens' **employee** and

10         how **would** he be paid?

11   A.    **Well, he's classified** as a **loan** originator and is paid

12         on a commission, and if he doesn't generate **loans,** he

13         **doesn't** get paid.

14   Q.    so, **basically** --

15   A.    That is the job that he was --

16   Q.    Yes, I appreciate the answer.  **Basically** he **would** be

17         working for nothing?

18   A.    correct.

19   Q.    Are there any people that you know of right now at

20         Citizens Bank that are working for nothing in any

21         position?

22   A.    We have some poor **salespeople** right now that are

23         working for nothing.  You know, if you're not

24         generating any **loans, typically** if you're in a negative

1    draw, **you're** not getting paychecks **until** you bring up

2    your **sales volume.**

3  Q.  And how **long** does that, how **long** does Citizens **allow**

4    that to go on?

5  A.  **It** depends on a **lot** of **variables.**  You know, they **look**

6    at what the production in the **pipeline** is, and, you

7    **know,** the **closing** ratios are and **all** of that.  If it

8    **looks like it's** starting to get better and **they're** just

9    in a **little slump,** they just stop the draws, future

10    draws and see if they come out of it, and then they

11    **would** go through a progressive **disciplinary** situation.

12    so it **could** take six months or so or **longer.**

13  Q.  And what, for the average **loan** officer, what **would** that

14    draw be, 15,000? ·

15  A.  **It's** 924 biweekly.  **It's,** like, 24,000 a year.

16  Q.  And that **would** assume, of **course,** that they were

17    **actively** attempting as part of **their** job to originate

18    **loans?**

19  A.  correct.

20  Q.  But this is a **little** bit different wherein this person

21    is **actively** not attempting to originate any **loans,** so

22    now what **would** he be paid for?

23  A.  **Well,** we **don't** know that he **wasn't** originating **loans.**

24    He **could** have just been putting them under **Eleanor's**

DEPOSITION OF JOYCE ANN HICKS

## Fair Lending Policy Statement

It is the policy of Citizens **Financial** Group, Inc., its subsidiary banks and Citizens Mortgage Corporation to comply fully with all provisions of the Community Reinvestment **Act,** the Equal Credit Opportunity Act, the Fair Housing Act and the Home Mortgage Disclosure Act. Unlawful discrimination is morally repugnant and destructive; it will not be tolerated in any form, especially in the lending process.

Applications will be encouraged from all persons within Citizens' service **area,** especially from all persons requesting or inquiring about a **loan.** No applicant will be denied the credit services provided by Citizens Mortgage **Corporation, CBRI,** CBCT, CBNH, and CBMA because of that **applicant's** race, color, religion, national origin, sex, marital status, familial status, sexual preference, handicap, age (providing that the applicant has the legal capacity to enter into a binding contract), receipt of public assistance funds, or the fact that the applicant has, in good faith, exercised any right under the Consumer Credit Protection Act or any similar state law. Employees must treat all persons fairly and shall not discourage, in any manner, any prospective applicant from submitting an application for residential mortgage credit. The subsidiary banks and Citizens Mortgage Corporation will encourage, accept and consider applications from any person and for property located in any neighborhood, including low- and moderate- income census tracts, within their service areas.

Any action by an employee of Citizens Mortgage Corporation that violates the fair lending laws or the fair lending standards of the corporation will be grounds for immediate dismissal.

This Fair Lending Policy applies to all employees of Citizens Financial Group, Inc. Employee compliance with this policy is essential to fulfilling the overall corporate mission of Citizens Financial Group, Inc., and its affiliated companies, to be the absolute leader in our commitment to the communities we serve, to maintaining the highest ethical standards, and to be in full compliance with state and federal law.

I have read, fully understand and accept the Company policy statement as set out above. I understand that this policy is part of the Policy & Procedures Manual, and can be referenced at any time.

| | | |
|---|---|---|
| Please Print Name | Signature | Date |

C 00286

## 1.0    Policy Statement

Loan origination is the process by which CMC creates residential mortgages. It involves external relationships between borrowers, the real estate community and loan officers and internal relationships between loan officers and processors and the underwriting and loan closing departments. These relationships must be conducted with the highest ethical standards.

This activity is conducted by the Loan Officers who solicit applicants, **pre-qualify** applicants, take applications and monitor the process through closing.

### 1.1    Authority

The specific authority structures for each origination area are detailed in the supplemental sections of this manual covering each specific division:

- Retail Lending
- Direct Mortgage Lending
- Bank Branch Originations
- Single Family Construction

### 1.2    Compliance

Citizens Mortgage Corporation requires its employees to perform all aspects of their jobs in accordance with standards established through corporate, investor and governmental requirements as specified in Citizens Mortgage Corporation Fair Lending Policy Statement.

#### 1.2.1    Disclosure

Appropriate regulatory disclosure is mandatory during the application process. Federal laws and statutes have been implemented to protect and inform the applicant. See the **Compliance/Fair** Lending section of this manual.

## 2.0    Marketing

### 2.1    Advertising Materials

All advertising materials whether produced in-house or by an outside firm, must be approved by the Compliance Officer. This is not optional, many regulatory agencies have requirements for advertising and failure to comply with these regulations could involve CMC in liability for fines and damages. This includes flyers, handouts, or other promotional material, which may be developed by the loan officers or any other person. This also includes material, which describes programs offered by other mortgage companies, which CMC may offer to our customers with the intention of brokering **loans** to the other company. Any Loan Officer found to be by-passing this compliance review process for advertising will be **reported** to their Center Manager for disciplinary action.

## 3.0    Loan Officers

### 3.1    Taking the Application

The Loan Officer is responsible for taking a complete application **package** from the applicant. In the course of taking the application the loan officer is expected to perform the tasks that are detailed in the CMC Roles & Responsibilities section of this manual.

**C  00349**

a)    Loan Officer will:
   i)     Verify customer eligibility for product.
   ii)    Collect appropriate Appraisal Fee
   iii)   Review with **applicant(s)** their expectations and any outstanding conditions needed for final approval.
   iv)    Fax new Registration Form (with new product code) to the **NLSU/Processing** area if the loan is a Purchase **transaction,** or to the Construction Loan Department if the loan is a New **Construction/Perm** request. This form must be **completed** with Pre-**House** number and write "**Pre-House** Live" on the top of the form. (Note:  It is very important that this form is completed **in** its entirety).
   v)     Fax completed Loan Cost Estimate Worksheet
   vi)    Fax signed Purchase & Sales agreement with all appropriate addendum.
   vii)   Forward all new and updated loan documentation to the Processor area within 24 hours. Processing will then follow their Pre-House instructions that are detailed in the Processing Section of this manual.

## 5.0    Making a Credit Decision

Loan Officers are not authorized to make credit decisions. It is the policy of Citizens Mortgage Corporation to recognize the Reg B definition of an application. If, at any time, you communicate to an applicant that they are either qualified or not qualified for a **loan,** you have taken **an** application and have made a credit decision. When working with applicants for **pre-qualification** purposes, you should always avoid "giving the applicants an approval". You may state Citizens' underwriting guidelines including: income, ratio, or down payment requirements for specific transactions, but you should always stop short of "qualifying" the applicant. **Instead,** you must encourage the applicant to complete a written application for processing and review by Citizens' Underwriting Department. Any written commitment to the Realtor or builder used by your applicant must be done after the completed credit application has been processed and reviewed by an underwriter.

### 5.1    Loan Officer Credit Report Procedures

Credit reports are to be used strictly for informational purposes and at no time will the customer be discouraged to apply for a mortgage.

At (he **pre-qualification** stage you can discuss what our standard **guidelines** are and how the customer compares to the standards. Even if a customer **is outside** our standard **guidelines** we will **always** encourage them to apply for a mortgage. This will be carefully monitored and is an extremely **sensitive** subject with **Regulation** B. Any violation of Regulation B will **result** in serious ramifications for the company and jeopardize the ability to generate credit reports prior to **application.**

C 00359

02/12/2003    18:46    CITIZENS → 2824008

# ◆ CITIZENS BANK          NEW HIRE INFORMATION

Company **C890-CMC**    State *in* Which **Employee is Working:** MA

## PERSONAL INFORMATION:
Has this person ever been employed by Citizens **before?** No    If yes, provide previous dates of **employment in** sections marked *

**Date of Hire: 3/5/01**          Social Security **Number:** 025S41337

**Name - First: Eleanor**        Middle:              Last: **Scalli**              Suffix: (none)

Home Address:                Street 1: **233 Main Street**        Street 2:
                            City: **Winthrop**              State: MA    Zip: 02IS2

                            Home Telephone: **617-S39-1668**

**Date of Birth: 1/4/63**        Gender: **Female**          Marital Status: **Married**
**Ethnicity: White**            VETS-100: Not ft **Veteran**    Disabled ☐
• Original Hire **Date: 00/00/2000**    * Seniority Calc **Date: 00/00/2000**

## EMPLOYMENT INFORMATION:
**Category: Full    time**        Status: Active          Employee Type: **Commission**
E-**Number/Access ID: E521249**    Acquisition Code: (none)    Acquisition Date: **00/00/2000**

## JOB INFORMATION:
Job Code: 2549  V              Job Title: Sr. Loan **Originator**    Job Title Date: **03/05/01**
**Grade: 0**                  Bank Title: **(none)**          Bank Title Date:
Department Number **2603540**    Department **Name: CMC-Woburn**    Department Date:
Mail **Code: MWB228**            Work Phone:

## COMPENSATION INFORMATION:
**Shift: 1st Shift**    I        Shift **Differential Percent:**
Pay Cycle: **Biweekly**          Pay Type: Salary
**Pay Rate/Salary: 65,000**    I    Next Salary Date: **04/01/02**
**Weekly Scheduled Hours: 40**    **Hours Per Pay Period: 80**

## PAYROLL INFORMATION: —0—
Max Vacation  Allowance: **15 day**    Max Sick Allowance: **0**      Next Perf **Review Date: 04/01/02**

## EMERGENCY CONTACT INFORMATION:
Contact Name: Angela **Davolio**    Relationship: **Mother**
Home Phone: **978-762-4613**        Work Phone:

## COMMENTS/SPECIAL INSTRUCTIONS:

Mgn Mike **Diraninan.** Car **allowance: $139.00 bi-weekly. Forgivable draw of $2,500 until 5/25/01 . Unforgivable**
**draw starts on 5/28/01. Charged** to **paycode 1S.**

Prepared by: Tap **Tribelli**        Approved by: Joyce **Hicks**              Date: **03/01/01**

Signature _____ 3-6-01 ____    Signature __3-6-01__

*For Internal Use:*

02/12/2003   18:46   CITIZENS - 2824008

# CITIZENS BANK

EMPLOYEE DATA CHANGE

| SOC. SEC. NO. 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 | ☑ SALARY CHANGE | ☐ RECORD CHANGE | ☐ REHIRE | ☐ NEW HIRE | ☐ TERMINATION |
|---|---|---|---|---|---|
| STATE | BANK CMC | ☐ PROMOTION | ☐ TRANSFER | ☐ ADDITION | ☐ REPLACEMENT | ☐ INTER-COMPANY TRANSFER |

**PERSONAL**

| EFFECTIVE DATE | EMPLOYEE NAME | | CURRENT DOH | ORIGINAL DOH |
|---|---|---|---|---|
| 5/28/01 | Scalli, Eleanor | | | |

| STREET AND NUMBER | APT./P.O. BOX ETC. | CITY/STATE | ZIP |
|---|---|---|---|
| | | | |

| HOME TELEPHONE | BIRTH DATE | SEX | MARITAL STATUS | MINORITY CODE | CHECKING ACCT # (DDA) |
|---|---|---|---|---|---|
| | | M | | | |

| EMERGENCY CONTACT | TELEPHONE | RELATIONSHIP |
|---|---|---|
| | | |

| SPOUSE NAME | SPOUSE DOB | NEW DEPENDENT | DEPENDENT DOB |
|---|---|---|---|
| | | | |

| COLLEGE NAME | DEGREE | YEAR GRADUATED | MAJOR |
|---|---|---|---|
| | | | |

**POSITION**

| EFFECTIVE DATE | RC# | RC NAME | FLSA | OFFICER STATUS |
|---|---|---|---|---|
| | | | NONEXEMPT EXEMPT | NON-OFFICER OFFICER |

| JOB CODE | JOB TITLE | PT/FT | GRADE | FTE |
|---|---|---|---|---|
| | | FT | | |

| TERM DATE | TERM REASON | LOA START DATE | LOA REASON | LOA RETURN DATE |
|---|---|---|---|---|
| | | | | |

**HISTORY**

SALARY HISTORY DATA:

| EFFECTIVE DATE | PRIOR SALARY | INCREASE$ | PERCENT | REASON | PERFORMANCE RATING |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| EFFECTIVE DATE | RANGE MINIMUM | RANGE MIDPOINT | RANGE MAXIMUM | COMPA RATIO |
|---|---|---|---|---|
| | | | | |

**PAYROLL**

| HOURLY RATE | BIWEEKLY RATE | ANNUAL SALARY | HOURS | SHIFT | FREQUENCY | PAY TYPE |
|---|---|---|---|---|---|---|
| | 2500.00 | 65,000 | | | WEEKLY BIWEEKLY | HOURLY SALARY |
| | 937.00 -0- | 24,370.00 -0- | | | | |

| REMARKS: | INCREASE % | INC. AMOUNT | REASON # | PERFORMANCE RATING | NEXT REVIEW DATE |
|---|---|---|---|---|---|
| Stop forgivable draw | | | Change Pay Code to + XV | | |

Stop forgivable draw on 5/28/01 begin unforgivable draw on 5/28/01 no draw

| APPROVAL | DATE |
|---|---|
| Joyce A Stokes | 3/2/01 |
| APPROVAL | DATE |
| | |
| HUMAN RESOURCES | DATE |
| KEYED BY | DATE |

HUMAN RESOURCES COPY

REASON #: 01 = Merit    02 = Promotion    1/03 = Adjustment    /03 = TOP3    05 = Comp. Strm.    06 = Off. POW    07 = Other

C 00003

Scalli Robert J
March 2001

**◆ CITIZENS BANK**

**EMPLOYEE DATA CHANGE**

| SOC. SEC. NO. | 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 |
|---|---|
| STATE | BANK  CMC |

- ☑ SALARY CHANGE
- ☐ RECORD CHANGE
- ☐ REHIRE
- ☐ NEW HIRE
- a TERMINATIO

- ☐ PROMOTION
- ☐ TRANSFER
- ☐ ADDITION
- D REPLACEMENT
- ☐ INTER-COMP TRANSFER

### PERSONAL

| EFFECTIVE DATE | EMPLOYEE NAME | | CURRENT DOH | ORIGINAL DOH |
|---|---|---|---|---|
| | Robert Scalli Robert J | | | |

| STREET AND NUMBER | APT/P.O. BOX ETC | CITY/STATE | ZIP |
|---|---|---|---|
| | | | |

| HOME TELEPHONE | BIRTH DATE | SEX | MARITAL STATUS | MINORITY CODE | CHECKING ACCT # (DDA) |
|---|---|---|---|---|---|
| | | | M | | |

| EMERGENCY CONTACT | TELEPHONE | RELATIONSHIP |
|---|---|---|
| | | |

| SPOUSE NAME | SPOUSE DOB | NEW DEPENDENT | DEPENDENT DOB |
|---|---|---|---|
| | | | |

| COLLEGE NAME | DEGREE | YEAR GRADUATED | MAJOR |
|---|---|---|---|
| | | | |

### POSITION

| EFFECTIVE DATE | RC# | RC NAME | FLSA | OFFICER STATUS |
|---|---|---|---|---|
| | 1 | | NONEXEMPT / EXEMPT | NON OFFICER / OFFICER |

| JOB CODE | JOB TITLE | PT/FT | GRADE | FTE |
|---|---|---|---|---|
| | | PT / FT | | |

| TERM DATE | TERM REASON | LOA START DATE | LOA REASON | LOA RETURN DATE |
|---|---|---|---|---|
| | | | | |

### HISTORY

| EFFECTIVE DATE | PRIOR SALARY | INCREASE | PERCENT | REASON | PERFORMANCE RATING |
|---|---|---|---|---|---|
| | | | | MAY 23 2001 | |

### PAYROLL

| EFFECTIVE DATE | RANGE MINIMUM | RANGE MIDPOINT | RANGE MAXIMUM | COMPA RATIO |
|---|---|---|---|---|
| | | | | |

| HOURLY RATE | BIWEEKLY RATE | ANNUAL SALARY | HOURS | SHIFT | FREQUENCY | PAY TYPE |
|---|---|---|---|---|---|---|
| | 3500.92 | 95,000.00 | | | WEEKLY / BIWEEKLY | HOURLY / SALARY |

| REMARKS: | % INCREASE | INC. AMOUNT | REASON # | PERFORMANCE RATING | NEXT REVIEW DATE |
|---|---|---|---|---|---|
| Change draw ✓  to Ø  Code 1X ✓ | | | | | |

### APPROVAL

| | APPROVAL | DATE |
|---|---|---|
| APPROVAL | Joyce R Hulce | 3/2/10 |
| | APPROVAL | DATE |
| | HUMAN RESOURCES | DATE |
| KEYED BY | | 5-29-0?  DATE |

HUMAN **RESOURCES** COPY

REASON #.  01 = Merit  03 = Adjustment  OS = Comp Sum  07 = Other
02 = Promotion  04 = TOPS  08 = OtFDW

| | | |
|---|---|---|
| | | CHECK NO.    A22763 |
| | | CHECK DATE:    12/21/2001 |
| | | PERIOD ENDING:    12/23/2001 |
| | | PERIOD:    BI-WEEKLY |

| ELEANOR SCALLI | SSN: | 25-54-1337 | NUMBER: | 0025541337 | FED STATUS: | MARRIED | ST1 STATUS: |
| 233 MAIN STREET | EXEMPTIONS: | FED: 4  STATE: 0 | STATE CODE: | PRI: MA  SEC: # | | | ST2 STATUS: |
| WINTHROP, MA 02152 | TAX ADJ: | FED: 0  STATE: | SDI/UC ALT: | | LOCAL CODE: | LOC1: | LOC2:  LOC3: |
| | | | BASE RATE: | 0.00 | LOCAL ALT: | | LOC4:  LOCS: |

## IMPORTANT MESSAGE

## HOURS AND EARNINGS

| DESCRIPTION | HOURS/UNITS | CURRENT EARNINGS | HOURS/UNITS | Y-T-D EARNINGS |
|---|---|---|---|---|
| COMMISSIONS | .00 | 33,396.49 | .00 | 0.00 |
| | | | | |
| TOTAL WE | .00 | 33396.49 | .00 | .00 |

### PRE-TAX ITEMS

| TOTAL | | 33396.49 | | 242,379.79 |
|---|---|---|---|---|

## TAXES AND DEDUCTIONS

| DESCRIPTION | CURRENT AMOUNT | Y-T-D AMOUNT |
|---|---|---|
| SO SEC TAX | 0.00 | 4,984.80 |
| MEDICARE TAX | 484.25 | 3,515.28 |
| FED INC TAX | 10,273.90 | 68,793.04 |
| PRI-STATE TAX | 1,870.20 | 13,464.24 |
| TOTAL TAXES | 12628.35 | 90757.36 |

### AFTER-TAX DEDUCTIONS

## SPECIAL INFORMATION

### CURRENT NET PAY DISTRIBUTION

| C | 016131633 | 20,668.14 |
|---|---|---|
| S | 016131633 | 100.00 |

| | EARNINGS | PRETAX | HI TAXABLE | LESS TAXES | LESS DEDS | EQ NET PAY |
|---|---|---|---|---|---|---|
| CURRENT | 33,396.49 | 0.00 | 33,396.49 | 12,628.35 | 0.00 | 20.768.14 |
| Y-T-D | 242,379.79 | 0.08 | 242,379.79 | 90,757.36 | 0.00 | 151,622.43 |

**TOTAL CURRENT NET PAY**    20768.14

C01811

CHECK NO.      A29833
CHECK DATE:     12/20/2002
PERIOD ENDING:  12/22/2002
**PERIOD:**       BI-WEEKLY

ELEANOR SCALLI          SSN:        25-54-1337      STATE: 0
233 MAIN STREET         EXEMPTIONS: FED:  4    STATE: 0
WINTHROP, MA 02152      TAX ADJ:    FED:  0    STATE:

NUMBER:       0025541337      FED STATUS:   MARRIED   ST1 STATUS:
STATE CODE:   PRI: MA  SEC: *                        ST2 STATUS:
SDI/UC ALT:                   LOCAL CODE:   LOC1:     LOC2:    LOC3:
BASE RATE:    0.00            LOCAL ALT:    LOC4:     LOC5:

## IMPORTANT MESSAGE

- YEAR END IS FAST APPROACHING. TO ENSURE AN ACCURATE W-2. PLEASE REVIEW YOUR NAME.

ADDRESS AND SSN. CALL THE HR SERVICE CENTER AT **1-866-472-8234** WITH ANY CHANGES. -

| HOURS AND EARNINGS | | | | | TAXES AND DEDUCTIONS | | | SPECIAL INFORMATION |
|---|---|---|---|---|---|---|---|---|
| DESCRIPTION | CURRENT HOURS/UNITS | EARNINGS | Y-T-D HOURS/UNITS | EARNINGS | DESCRIPTION | CURRENT AMOUNT | Y-T-O AMOUNT | |
| COMMISSIONS | .00 | 33.785.37 | .00 | 0.00 | SO SEC TAX | 0.00 | 5.263.80 | |
| | | | | | MEDICARE TAX | 489.89 | 6.210.00 | |
| | | | | | FED INC TAX | 10.291.54 | 130.099.33 | |
| | | | | | PRI-STATE TAX | 1.790.62 | 22.593.06 | |
| | | | | | TOTAL TAXES | 12572.05 | 16+166.19 | |

AFTER-TAX DEDUCTIONS

| TOTAL H/E | .00 | 33785.37 | .00 | .00 |
|---|---|---|---|---|

PRE-TAX ITEMS

CURRENT NET HAY DISTRIBUTION

C  016131633          21.113.32
S  016131633          100.00

| TOTAL | | 33.785.37 | | 428,171.80 |
|---|---|---|---|---|

| | EARNINGS | PRETAX | HI TAXABLE | LESS TAXES | LESS DEDS | EQ NET PAY |
|---|---|---|---|---|---|---|
| **CURRENT** | 33,785.37 | 0.00 | 33,785.37 | 12,572.05 | 0.00 | 21,213.32 |
| **Y-T-D** | 428,171.80 | 0.00 | 428,171.80 | 164.166.19 | 717.00 | 263,288.61 |

TOTAL CURRENT NET PAY   21213.32

C  01849

| | | CHECK NO. | 020210 |
|---|---|---|---|
| | | CHECK DATE: | 02/13/2003 |
| | | PERIOD ENDING: | 03/02/2003 |
| | | PERIOD: | BI-WEEKLY |

ELEANOR SCALLI      SSN:         25-54-1337
233 MAIN STREET     EXEMPTIONS:  FED: 4   STATE: 0
WINTHROP, MA 02152  TAX ADJ:     FED: 0   STATE:

NUMBER:     0025541337       FED STATUS:   MARRIED   ST1 STATUS:
STATE CODE:    PRI: MA  SEC: *                        ST2 STATUS:
SDI/UC ALT:                   LOCAL CODE:   LOC1:     LOC2:    LOC3:
BASE RATE:  0.00              LOCAL ALT:              LOC4:    LOC5:

## IMPORTANT MESSAGE

### HOURS AND EARNINGS

| DESCRIPTION | HOURS/UNITS | CURRENT EARNINGS | HOURS/UNITS | Y-T-D EARNINGS |
|---|---|---|---|---|
| COMMISSIONS | .00 | 47,957.96 | .00 | 0.00 |
| TOTAL H/E | .00 | **47,957.96** | .00 | .00 |

### PRE-TAX ITEMS

| | | | | |
|---|---|---|---|---|
| TOTAL | | 47,957.96 | | **83,334.97** |

### TAXES AND DEDUCTIONS

| DESCRIPTION | CURRENT AMOUNT | Y-T-D AMOUNT |
|---|---|---|
| SO SEC TAX | 2,973.39 | 5,358.98 |
| MEDICARE TAX | 695.39 | 1,253.31 |
| FED INC TAX | 15,719.52 | 26,421.82 |
| PR1-STATE TAX | 2,541.77 | 4,313.94 |
| TOTAL TAXES | 21930.07 | 37348.05 |

### AFTER-TAX DEDUCTIONS

### SPECIAL INFORMATION

### CURRENT NET PAY DISTRIBUTION

| CHECK AMOUNT | 26,027.89 |
|---|---|

| | EARNINGS | PRETAX | FIT TAXABLE | LESS TAXES | LESS DEDS | EQ NET PAY |
|---|---|---|---|---|---|---|
| CURRENT | 47,957.96 | 0.00 | 47,957.96 | 21,930.07 | 0.00 | 26,027.89 |
| Y-T-D | **83,334.97** | 0.00 | **83,334.97** | 37,348.05 | 0.00 | **45,986.92** |

TOTAL CURRENT NET PAY     26027.89

C 01854

| a Control number | | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|---|
| 0011581594 | | 15746.91 | 3442.24 |
| | OMB No. 1545-0008 | | |
| b Employer identification number | d Employee's social security number | 3 Social security wages | 4 Social security tax withheld |
| 05-0412693 | ▉▉▉▉ | 15746.91 | 976.31 |
| c Employer's name, address, and ZIP code | | 5 Medicare wages and tips | 6 Medicare tax withheld |
| | | 15746.91 | 228.33 |
| CITIZENS FINANCIAL GROUP INC | | 7 Social security tips | 8 Allocated tips |
| ONE CITIZENS PLAZA | | | |
| | | 9 Advance EIC payment | 10 Dependent care benefits |
| PROVIDENCE     RI 02903 | | | |
| e Employee's first name and Initial     Last name     C89-0     204 | | 11 Nonqualified plans | 12 - a-d     C     102.34 |
| | | 14 Other | |
| ROBERT S          SCALLI | | | |
| 233 MAIN STREET | | | |
| WINTHROP, MA 02152 | | | 13 Statutory employee     Retirement plan |
| f Employee's address and ZIP code | | | |

| 45 State | Employer's state ID number | 16 State wages, tips, etc | 17 State income tax | 18 Local wages, tips, etc | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| MA | 580-834-754°09° | 15746.91 | 814.36 | | | |

Form **W-2**  Wage and Tax Statement   **2001**     REPLACEMENT COPY

C 01863

| a Control number 0011581594 | | | OMB No. 1545-0008 | 1 Wages, tips, other compensation 8154.90 | 2 Federal income tax withheld 763.70 |
|---|---|---|---|---|---|
| b Employer identification number 05-0412693 | | d Employee 's social security number | | 3 Social security wages 8154.90 | 4 Social security tax withheld 505.60 |
| c Employer's name, address, and ZIP code  CITIZENS FINANCIAL GROUP INC ONE CITIZENS PLAZA  PROVIDENCE      RI 02903 | | | | 5 Medicare wages and tips 8154.90 | 6 Medicare tax withheld 118.25 |
| | | | | 7 Social security tips | 8 Allocated tips |
| e Employee 's first name and initial      Last name      C89-0      299 | | | | 9 Advance EIC payment | 10 Dependent care benefits |
| ROBERT S        -SCALLI 233 MAIN STREET WINTHROP, MA 02152 | | | | 11 Nonqualified plans | 12 a-d      C      120.12 |
| | | | | 14 Other | |
| f Employee's address and ZIP code | | | | | 13 Statutory employee ☐  teawnent plan ☐  Third-Party ☒ Sick Pay |
| 15 State  Employer's state ID number MA | 580-834-754*09* | 16 State wages, tips, etc 8154.90 | 17 State income tax 398.38 | 18 Local wages, tips, etc | 19 Local income tax | 20 Locality name |

Form **W-2** Wage and Tax Statement   **2002**        REPLACEMENT COPY

C 01864

| a Control number | | | | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|---|---|---|
| 0011581594 | | OMB No. 1545-0008 | | 2966.10 | 280.98 |
| b Employer identification number | d Employee's social security number | | | 3 Social security wages | 4 Social security tax withheld |
| 05-0412693 | | | | 2966.10 | 183.90 |
| c Employer's name, address, and ZIP code | | | | 5 Medicare wages and tips | 6 Medicare tax withheld |
| | | | | 2966.10 | 43.01 |
| CITIZENS  FINANCIAL  GROUP  INC | | | | 7 Social security tips | 8 Allocated tips |
| ONE CITIZENS PLAZA | | | | | |
| PROVIDENCE      RI 02903 | | | | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's first name and Initial      Last name | | C89-0      405 | | 11 Nonqualified plans | 12 a-d      C      27.72 |
| ROBERT S            SCALLI | | | | 14 Other | |
| 233 MAIN STREET | | | | | |
| WINTHROP, MA 02152 | | | | | |
| | | | | | 13 Statutory employee / Retirement plan / Third-Party Sick Pay |
| f Employee's address and ZIP code | | | | | |

| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 total wages, tips, etc. | 19 Local Income tax | 20 Locality name |
|---|---|---|---|---|---|
| MA] 580-834-754*09* | 2966.10 | 145.20 | | | |

Form **W-2** Wage and Tax Statement **2003**      REPLACEMENT COPY

C 01865