# EXHIBIT 3
Part 2

2/3/03

Meeting with Eleanor **Scalli**

Present:        Barden **Conn**-MA/NH Center Manager, Joyce Hicks-Sr. **HR** Generalist,
                Alexander **Buor-Corporate** Security


Eleanor was presented with the following documentation concerning the **Barboza** loan:
the commitment letter approving the loan and the statement of denial. Eleanor admitted
issuing the denial notice and that it was her signature. She stated that 2 weeks after
taking the **loan,** the customer indicated they were not moving in and the loan was taken as
owner-occupied so the loan needed to be declined. Bard explained to her that **FDIC**
guidelines require that this was not grounds for denial and that FDIC regs require the
customer to reapply. The customer would have to negotiate with the realtor to get back
the down payment.

Eleanor indicated that she had not issued a denial before and that credit decisions came
through CMC operations. She stated on several occasions that **the** customer asked for the
letter and she **stated,** "**What** was I supposed to do?" Eleanor denied that the loan **was**
**declined** to enable the customer to buy property from Bob Scalli.

When asked why the processor received an e-mail to withdraw the loan and Liz **Walsh,**
Operations Mgr, was called to decline it after Eleanor had already issued the denial, she
stated she did not recall speaking with Liz. Dates on the documents and e-mail indicate
the loan was declined after the approval was issued but before the contingency date.

We also reviewed the TV commercial that was not approved by Marketing. Eleanor
indicated that they thought that it was okay if they did not use the Citizens logo. Bard
reminded her that on numerous occasions, she had been told that all advertising must go
through Marketing. In addition, since she was not licensed and was soliciting business,
this was **a** legal violation in MA.

Eleanor was terminated due to the policy violation concerning exercising a credit
decision outside her authority and conducting unauthorized **advertising.**


*[signature]*

2/34/03

Meeting with Robert Scalli

Present:        Barden Conn-MA/NH Center Manager, Joyce Hicks-Sr. HR Generalist,
                Alexander Buor-Corporate Security

Bob Scalli was asked to explain any information concerning the Barbosa loan. Bob
indicated that he does not get involved in the loans. He did state that Barbosa was a
plasterer and did subcontracting work for him on some of his investment properties. He
stated he knew nothing of the denial letter; however, did state the Barbosa was buying a
property from him at 208 Maverick Street. Bob stated he did not know if there was a
purchase and sale agreement and he would have to go back and check since he owned
many properties. We addressed with Bob that there were 2 concerns: that the loan was
denied for his personal gain and that selling property to a bank customer was a conflict of
interest.

We discussed the unapproved advertising. Bob stated that he looked in the Code of
Ethics and thought it was all right if they did not use the bank name. Bard discussed that
since they were not licensed to personally do business and the ad was soliciting business,
this was a legal violation in MA.

We indicated to Bob that we were suspending him with pay at this time pending further
investigation and that HR and security would be in touch as soon a possible. All benefits
would remain in effect while on suspension.

2002 (2)

- **All** Loan Officers that are eligible to receive the Sales Trip Award must **be** classified as an employee in good standing with Citizens at the time the award is received and **/or** upon **commencement** of the trip.

- **If** a Loan Officer is unable **to** attend. the trip **can not** be transferred and the **Loan Officer will** not receive a cash equivalent award.

C 02258

# MEMORANDUM

To:    AH Loan Officers, **Sales Managers** and Center Managers

From:  Steve **Adamo**

Date:  **12/16/03**

Re:    Annual Sales Trip

---

**This** memo will further clarify some of the **questions** regarding the sales trip:

• We will be sending **18** total Loan Officers on the annual sales trip this year. The top **16** Sales people **from** the normal Loan Officer Ranking, the top Direct Mortgage Sales person, and the top **CRA** Loan Officer.

• There is not a multiple qualifier for the top CRA Loan **Officer** or Direct Mortgage Loan **Officer**. In the event that the top CRA or Direct Mortgage Loan Officer falls into the top **16,** we will add an additional Loan Officer from the Ranking report, so that we will have a total of 18 Loan Officers on the annual sales trip.

• **In** the event of a tie between Loan Officers that are ranked number **16** or the number 1 Direct Mortgage Loan Officer or the top CRA Loan Officer, the tie will be broken as follows. The Loan Officer with the most units of Purchase Money Transactions will be the tie-breaker. In the unlikely case where there is a tie at the most Purchase units the second tier tie-breaker **will** be broken by the Loan **Officer** with the most Purchase **dollars.**

• AlJ Loan Officers that are eligible to receive the sales trip must be classified as an employee in good standing with Citizens at the time the award is received **and/or** upon commencement of the trip.

• If a Loan Officer is unable to attend the trip, the trip cannot be transferred and the Loan Officer will not receive a cash equivalent award.

C 02266

P.05/08

CONFIDENTIAL

C02331

CONFIDENTIAL

te: 3/3/03 Time: 4:37:02 PM

IM12    03/03/03    QC=&msm  N  =:  untitled                    ACCOUNT HISTORY                16.36.58 PAGE 002
KEY 103-000-0000-113470317 9
Page 1                CNTLA 101   CNTLA 000   CNTLA 0000   AS OF 113470317 9

| SERIAL NUMBER | POST DATE | PASS/SPRAY TRAN NUMBER | CODE | AMOUNT | DESCRIPTION/SOURCE | RET DAYS |
|---|---|---|---|---|---|---|
| *103 | 01/16 | 12543354 | 0120 | 4000.00 | CHECK | 39 |
| *103 | 01/21 | 767605660 | 0169 | 4000.00 | FROM LOAN   1017736674 | 39 |
| *** (01103/) | | /TTPR | | | SOURCE: TTT  -AA4   01/21/03   11.26 ) *** | |
| 331 | 01/24 | 21767137 | 0122 | 21.00 | CHECK | 9 |
| | 01/27 | 24686569 | 0155 | 10000.00 | DEPOSIT | 9 |
| | | | | | SOURCE: TTT  -AA4 ) *** | |
| *** | 01/28 | 767601652 | 0129 | 5000.00 | TO CHECKING   113573660 | 9 |
| *** (01803/) | | /TTPR | | | SOURCE: TTT  -AA4   01/28/03   12.42 ) *** | |
| *** | 01/28 | 767601656 | 0207 | 4000.00 | TO LOAN   1017736674 | 9 |
| *** (01203/) | | /PYMT | | | SOURCE: TTT  -AA4   01/28/03   12.42 ) *** | |
| | 01/29 | 808871383 | 0135 | 52.60 | POS PURCHASE | 9 |
| *** (02903/00316451 | | /CMS MAXI DRUG | | | BOSTON   MA ) *** | |
| *** | 01/31 | 808873280 | 0108 | 200.00 | ATM WITHDRAWAL | 9 |
| *** (013003/S18409 | | /35 REVERE STREET | | | WINTHROP   MA ) *** | |

PF1 - PAGE PMD    PF2 - PAGE BKWD

CONFIDENTIAL

**East Boston Savings Bank**

## DEPOSIT TICKET

DATE _1-14-03_

NAME _Andres Castillo_

ADDRESS _217 Trenton St #1_

CITY/TOWN _E. Boston ma. 02128_

(PLEASE REPORT A CHANGE OF ADDRESS)

ACCT. NO. _260 158051_

| | DOLLARS | CENTS |
|---|---|---|
| CASH | 2000 | 00 |
| CHECKS (LIST SEPARATELY) | | |
| 1. | 4.000 | 00 |
| 2. | 4 | |
| 3. | | |
| CHECKS OR TOTAL FROM OTHER SIDE | | |
| TOTAL | 6000 | 00 |
| RETURNED | | |
| DEPOSIT | 6000 | 00 |

1602 U184356 356  01/14/03 14:45
260158051 CHKDEP      $6,000.00

DEPOSITS MAY NOT BE AVAILABLE FOR IMMEDIATE WITHDRAWAL.
PLEASE REFER TO OUR CHECK CLEARING POLICY BROCHURE FOR
FURTHER EXPLANATIONS.

EBSB-131 (03/91)

MEMBER FDIC / MEMBER DIF

CONFIDENTIAL

C02333



MASSACHUSETTS ASSOCIATION of REALTORS®

## CONTRACT TO PURCHASE REAL ESTATE #501
### (Binding Contract. If Legal Advice Is Desired, Consult An Attorney.)

From: BUYER(S):

Name(s): _Paula Castillo_    To: OWNER OF RECORD ("SELLER"):

Address: _217 Trenton St_    Name(s): _____

_East Boston MA 02128_    Address: _____

The BUYER Offers to purchase the real property described as _illegal three family house_
_located at 7 Marlton Terrace Lynn_ _MA_
together with all buildings and improvements thereon fine "Premises") to which I have been introduced by _CMA_
_Real Estate Specialist_ upon the following terms and conditions:

**1. Purchase Price:** The BUYER agrees to pay the sum of S- _23,500_ to the SELLER for the purchase of the Premises, due as follows:

  i.  S _500_ as 4 deposit to bind this Offer.

  ii.  S _-0-_ as an additional deposit upon executing the Purchase And Sale Agreement;

  iii.  Balance by bank's, cashier's, treasurer's or certified check or wire transfer at time for closing.

**2. Duration Of Offer.** This Offer is valid until _7:00_ a.m. ☒ p.m. on _10/15/02_ by which time a copy of this Offer shall be signed by the SELLER, accepting this Offer and returned to the BUYER, otherwise this Offer shall be deemed rejected and the money tendered herewith shall be returned to the BUYER. Upon written notice to the BUYER or BUYER'S agent of the SELLER'S acceptance, the accepted Offer shall form a binding agreement. Time is of the essence as to each provision.

**X Purchase And Sale Agreement.** The SELLER and the BUYER shall, on or before _12:00_ ☐ a.m ☒ p.m. on _10/22/02_ execute the Standard Purchase and Sale Agreement of the MASSACHUSETTS ASSOCIATION OF REALTORS® or substantial equivalent which, when executed, shall become the entire agreement between the parties and this Offer shall have no further force and effect.

**4. Closing.** The SELLER agrees to deliver a good and sufficient deed conveying good and clear record and marketable title at _____ ☐ a.m. ☐ p.m. on _11/14/02_ at the _7_ County Registry of Deeds or such other time or place as may be reauiraltettgreed upon by the parties.

**5. Escrow.** The deposit shall be held by _CMA Realty_ as escrow agent, subject to the reroti hereof. Endorsement or negotiation of this deposit by the real estate broker shall not be deemed acceptance of the terms of the Offer. In the event of any disagreement between the parties concerning to whom escrowed funds should be paid, the escrow agent may retain said deposit pending written instructions mutually given by the BUYER and SELLER. The escrow agent shall abide by any Court decision concerning to whom the funds shall be paid and shall not be made a party to a pending lawsuit solely as a result of holding escrowed funds. Should the escrow agent be made a party in violation of this paragraph, the escrow agent shall be dismissed and the party asserting a claim against the escrow agent shall pay the agent's reasonable attorneys' fees and costs.

**6. Contingencies.** It is agreed that the BUYER'S obligations under this Offer and any Purchase and Sale Agreement signed pursuant to this Offer are expressly conditioned upon the following terms and conditions:

  a. **Mortgage.** *(Deleteif Waived)* The BUYER'S obligation to purchase is conditioned upon obtaining a written commitment for financing in the amount of S _371,510_ at prevailing rates, terms and conditions by _11/27/02_. The BUYER shall have an obligation to actreasonably diligently to satisfy any condition within the BUYER'S control. If, despite reasonable efforts, the BUYER has been unable to obtain such written commitment the BUYER may terminate this agreement by giving written notice that is received by 5:00 p.m. on the calendar day after the date set forth above. In the event that notice has not been received, this condition is deemed waived. In the event that due notice has been received, the obligations of the parties shall cease and this agreement shall be void; and all monies deposited by the BUYER shall be returned. In no event shall the BUYER be deemed to have used reasonable efforts to obtain financing unless the BUYER has submitted one application by _10/19/02_, and acted reasonably promptly in providing additional information requested by the mortgage lender.

501.8.18.00/160356

**MASSFORMS™**    ©1999, 2000 MASSACHUSETTS ASSOCIATION OF REALTORS®



Massachusetts Association of REALTORS® 256 Second Avenue, Waltham MA 02451
Phone: 781 890 3700    Fax. 781 890 4919    Diana O'Donoghue, ESQ.

1

**CONFIDENTIAL**

C02334

CO2335

CONFIDENTIAL

YP1M2040  W184366                                                      020952

**East Boston Savings Bank**
TEN MERIDIAN ST.
**Six Thousand Dollars and Zero Cents**

**PAULA CASTILLO**

January 14, 2003 CS

****6,000.00

Remitter:  **ANDRES E CASTILLO**

CUSTOMER COPY

⑈020952⑈ ⑆211070120⑆  24 5012976⑈

---

YP1M2040  WHEN HELD TO LIGHT. IF CIRCULAR WATERMARKS ARE NOT PRESENT, DO NOT CASH. SEE BACK FOR ADDITIONAL SECURITY FEATURES.  020852
W184366                                                                5-7012
                                                                       2110

**East Boston Savings Bank**
TEN MERIDIAN ST.
**Six Thousand Dollars and Zero Cents**

PAY TO THE
ORDER OF    **PAULA CASTILLO**

January 14, 2003 CS

****6,000.00
$

COUNTERSIGNATURE REQUIRED OVER FIVE THOUSAND DOLLARS

Remitter: MEMBER FDIC **ANDRES E CASTILLO**

AUTHORIZED SIGNATURE

⑈020952⑈ ⑆211070120⑆  24 5012976⑈



**ANDRES E. CASTILLO**
217 TRENTON ST., APT. 1
EAST BOSTON, MA 02128-1719

1330

Date _1-14-03_

5-7812/2110
02

Pay to the
Order of _Paula Castillo_                    $ _6000.00_

_Six Thousand_ ─────────────── Dollars

**East Boston Savings Bank**
EAST BOSTON, MASS. 02128

For _____

⑆ 211070120⑆   26 0158051⑈ 1330

_Andres Castillo_

GUARDIAN SAFETY BLUE WBL

CONFIDENTIAL

C02346

## PROPERTY TRANSFER NOTIFICATION **CERTIFICATION**

This form is to be signed by the prospective purchaser before signing a purchase and sale agreement or a jnemorandum of agreement, or by the lessee-prospective purchaser before signing a lease with an option to purchase for residential property built before 1978, for compliance with federal and Massachusetts lead-based paint disclosure requirements.

**Required Federal Lead Warning Statement:**
Every purchaser of any interest in residential property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead            fioiafcadrbasedpamtdiatina^                    Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real «ropt rsv » required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards if recommended prior to purchase.

**Seller's Disclosure**
(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):
  (i)_____ Known lead-based punt and/or lead-based paint hazards are present in the housing (explain).

  _____
  fii) __√__ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.
(b) Records and reports available to the seller (check CO or (ii) below):
  (i)_____ ScBer has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (circle documents below).
  Lead Inspection Report; Risk Assessment Report; Letter of Interim Control; Letter of Compliance
  (ii) __√__ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's or Lessee** Purchaser's **Acknowledgment** (initial)
(c)_____ Purchaser or lessee purchaser has received copies of all documents circled above.
(d)_____ Purchaser or lessee purchaser has received no documents.
(e) _PC_ Purchaser or lessee purchaser has received the Property Transfer Lead Faint Notification    _PC_
(f)_PC_ Purchaser or lessee purchaser has (check (i) or (ii) below):   _PC_
  (i)_PC_ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or _____
  (ii)_____ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)
(g)_____ Agent has informed the seller of the seller's obligations under federal and state law for lead-based paint disclosure and notification, and is aware of his/her responsibility to ensure compliance.
(h)_____ Agent has verbally informed purchaser or lessee-purchaser of the possible presence of dangerous levels of lead in paint, plaster, puny or other structural materials and his or her obligation to bring a property into compliance with the Massachusetts Lead Law — either through full deleading or interim control — if it was built before 1978 and a child under six years old resides or will reside in the property.

**Certification of Accuracy**
The foBcwing parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

_Milagro Garcia_____    Date____    Seller _Andres Castillo_____    Date____
Seller
_PAUL A CASTILLO_____    Date____    Purchaser _____    Date____
Purchaser
_____    Date____    Agent _____    Date____
Agent
**Address of Property / Unit** _9 Carlton Terrace Lynn MA_____

[R] **MASSACHUSETTS ASSOCIATION OF REALTORS®**
REALTOR
CLPPP Form 54-3, 4/30/94, Rev. 31/99

[equal housing logo]

11

**MASSFORMS**

CONFIDENTIAL

C02337



**INSPECTION CONTINGENCY**
**(SUBJECT TO BUYER'S SATISFACTION)**
*For use with CONTRACT TO PURCHASE REAL ESTATE #501 B*

**ADDENDUM A**

The BUYER has the right to obtain inspection(s) of the Premises or any aspect thereof, including, but not limited to. home, pest, radon, lead paint, septic/sewer, water quality, and water drainage by consultant(s) regularly in the business of conducting said inspections, of BUYER'S own choosing, and at BUYER'S sole cost within ___10___ days after SELLER'S acceptance of this agreement. If the results arc not satisfactory to BUYER, in BUYER'S sole discretion, BUYER shall have the right to give written notice received by the SELLER or SELLER'S agent by 5:00 p.m. on the calendar day after the date set forth above, terminating this agreement. Upon receipt of such notice this agreement shall be void and all monies deposited by the BUYER shall be returned. Failure to provide timely notice of termination shall constitute a waiver. In the event that the BUYER does not exercise the right to have such inspection(s) or to so terminate, the Seller and the listing broker are each released from claims relating to the condition of the Premises that the BUYER or the BUYER'S consultants could reasonably have discovered.

Dated: ___10|14|52___

___PAULA CASTILLO___   ___Milagos Garcia___
**BUYER**          **SELLER**

___Andres Castillo___        _____
**BUYER**          **SELLER**, *or spouse*

7.05.00/160358

**MASSFORMS™**  ©2000 **MASSACHUSETTS** ASSOCIATION OF **REALTORS®**
State of the Standard Real Estate Forms



Massachusetts Association of REALTORS® 256 Second Avenue. Waltham MA 02451
Phone: 781 890 3700  fioc  781 890 4919  Diana O'Donoghue, ESQ.

T7307456ZFX

1

CONFIDENTIAL
C02338

VOLUME:   II
PAGES:    1  -  214
EXHIBITS:   24 - 38

UNITED  STATES  DISTRICT  COURT
DISTRICT  OF  MASSACHUSETTS

NO.  03-CV-1241DPW

- - - - - - - - - - - - - - - - - x

ELEANOR SCALLI and ROBERT SCALLI,

        Plaintiffs

 vs.

CITIZENS FINANCIAL GROUP,  INC.,

        Defendant
- - - - - - - - - - - - - - - - - x

        CONTINUED DEPOSITION of JOYCE ANN HICKS,
a witness called on behalf of the Plaintiff,
Eleanor Scalli,  taken pursuant to notice before
Robert M. Bramanti, Certified Shorthand
Reporter,  Registered Merit Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the offices of Mark Burke,
Esq.  111 South Bedford Street,  Burlington,
Massachusetts,  on Thursday,  February 10,  2005,
commencing at 11 a.m.

---

BRAMANTI & LYONS COURT REPORTING,  INC.
REGISTERED PROFESSIONAL REPORTERS
240 COMMERCIAL ST., BOSTON, MA. 02109
TEL:   617.723.7321  /  FAX:   617.523.5153
www.bramanti-lyons.com

1    APPEARANCES:

2    Mark Burke, Esq.
     Law Offices of Mark Burke
3    South Bedford Street
     Burlington, Massachusetts 01803
4    Attorney for the Plaintiff,
     Eleanor Scalli
5
     Nicholas J. Di Mauro, Esq.
6    Law Offices of Nicholas J. Di Mauro
     South Bedford Street
7    Burlington, Massachusetts 01803
     Attorney for Robert Scalli
8
     Anne M. Gaeta, Esq.
9    Goodwin Procter, LLP
     Exchange Place
10   Boston, Massachusetts 02109
     Attorney for the Defendant
11

12

13

14

15

16

17

18

19

20

21

22

23

24

DEPOSITION OF JOYCE ANN HICKS

1                            I N D E X

2        Deposition of:                              Page

3        JOYCE ANN HICKS

4          Continued Examination by Mr.  Burke         5

5          Continued Examination by Mr.  Di Mauro    100

6          Further Examination by Mr. Burke          169

7

8

9

10                         ------

11

12

13

14                    E X H I B I T S

15        No.                                        Page

16        24              Policy Document              5

17        25              Underwriting Guidelines      5

18        26              Month End Commission Report  5

19        27              Mortgage Commitment Letter   5

20        28              Notes from Security          5

21        29              Human Resources Policy Manual 5

22        30              Denial Letter                74

23        31              Policy No. 4.04,

24                        Employee Relations           77

1       <u>EXHIBITS</u> (Continued)

2       <u>No.</u>                                          <u>Page</u>

3        32            Policy                               80

4        33            Videotape                            98

5        34            Denial Letter                       118

6        35            Approval Letter                     140

7        36            Guidelines and Policies             153

8        37            Job Description/Salary

9                      Guideline For Performance

10                     Increases Annually                  154

11       38            ECOA Training                       197

12

13

14

15

16

17

18

19

20

21

22

23

24

DEPOSITION OF JOYCE ANN HICKS

1    that they are not **allowed,** within the scope of

2    their authority, to make credit decisions,

3    approval or denial, per bank policy and federal

4    regulations.  And they are violating that by

5    doing **that.**  It's not their call to determine

6    whether or not they are benefiting from it and

7    whether they have to follow the policy.

8  Q.  You would agree with me, would you not, that

9    certainly you would want to determine whether

10   the spirit of this policy was violated if you

11   were going to terminate someone based upon that

12   policy, correct?

13 A.  No.

14 Q.  No?

15 A.  No.  Because the point is that they breached the

16   cardinal rule for loan officers.  You do not

17   make a credit decision, period.  The form that

18   was issued to the customer was not our form.  It

19   was a fraudulent form.  So there were two issues

20   involved here.

21      MR. BURKE:  I move to strike that because

22   that has not been determined.

23 Q.  That's your opinion, correct?  That's your view?

24 A.  It's based on the form that's used in the

1      indirect, that would not change your decision to

2       terminate?

3    A.   No, because while he was suspended, there were

4         other issues while we were waiting to get in

5         touch with him regarding the Barbosa situation

6         with the Castillo loan that surfaced.  So there

7         were other situations that were involved at that

8         point.

9    Q.   So you were investigating other issues?  When?

10   A.   Began the day of their termination.

11   Q.   You say "their termination."  Who are you

12        referring to?

13   A.    Eleanor and Robert Scalli.

14   Q.   What date are you referring to?

15   A.   Let me correct that.  The date of Eleanor's

16        termination.  At that point when we became aware

17        of that situation with the Barbosa loan, the

18        audit and security people obviously needed to

19        take a look at all of their loans to see if

20        there were any other irregularities.

21   Q.   Who prompted that?  Security prompted that

22        further inquiry?

23   A.   The bank as a whole.  Wherever there is a

24        situation like that, they have to investigate.

1    Q.    Do you understand the question?

2    A.    I understand the question, but that's not what I

3          said.

4    Q.    Let's break it down.  Let's break it down.

5          Let's be very clear.  Because out of the large

6          sampling that was conducted by a team of

7          auditors, how many irregularities were found?

8    A.    I don't know.  I don't know the answer to that.

9          The Castillo loan that was referred to, the

10         issues with that were found by the auditors when

11         they reviewed the loan file.

12   Q.    You just told me, ma'am, that a realtor brought

13         that to your attention.

14   A.    There was an issue that came up that made that

15         customer name come to the surface.  The file is

16         what determined that there were irregularities.

17         There were irregularities with the tax returns;

18         there were irregularities with the signatures.

19         There were a lot of irregularities on that loan

20         that made it unsalable.  That is not something

21         we would get from an outside party.  That's

22         something other people looking at the documents

23         found.

24   Q.    But that was precipitated, that further inquiry

1    A.    Signatures on two of the documents did not

2          match.  Social security numbers did not match.

3          The tax return was determined to be fraudulent.

4          In addition, there was a gift money in which the

5          customer only had a portion of the money and the

6          remaining dollars came out of Eleanor and Bob's

7          account, which originators are not allowed to

8          do.

9    Q.    None of this information — I'm going to show

10         you what's been marked as Exhibit No. 9,

11         specifically.  For the record, what are those

12         documents?

13   A.    They are copies of the checks for the gift for

14         that loan and teller tapes of the transaction

15         that took place at the branch.

16   Q.    Are these the only documents that you have in

17         your possession relative to the alleged

18         violations?

19   A.    Yes.

20   Q.    But none of these documents were presented to

21         Mrs. Scalli on February 4th, 2003, correct?

22   A.    We didn't have it at that time.

23   Q.    But the answer is —

24   A.    No.

1          Boston, correct?

2     A.    Correct.

3     Q.    Did you contact him one other time?

4     A.    I contacted him because we needed to have him

5          come in to talk to him.  It was more than one

6          time.  It was at least three or four times that

7          I left messages and I did not hear back from

8          him, which is why we sent him a letter.

9     Q.    What was the purpose for that contact?

10    A.    It was —

11    Q.    The contact, your testimony was he did not

12         return the call?

13    A.    Well, we had questions that security wanted to

14         speak with him about and also, you know, he had

15         been on suspension for several weeks and we

16         needed to discuss, you know, his employment

17         status at that point, as well.

18    Q.    So your testimony is he never returned those

19         calls?

20    A.    No, he did not.

21    Q.    Were you aware of Robert Scalli's position in

22         the military?

23    A.    Yes.

24    Q.    Your testimony is that he never called you and

DEPOSITION OF JOYCE ANN HICKS

1    spoke to you regarding a situation wherein as *a*

2    member of the 18 Delta Special **Forces,** he was

3    called up and was unable to attend the meeting

4    that you had informed was going to take place?

5    A.    No.  He had told me he thought he might get

6    called up and would, but he had still been

7    talking to me at that time.  It **wasn't** something

8    that was going to be happening within the next

9    day or so.

10   Q.    A moment ago, ma'am, you didn't mention a word

11   talking about military service.

12   A.    It wasn't in that conversation that you asked

13   me.

14   Q.    There were two conversations?

15   A.    Uh-huh.

16   Q.    One that you had spoken to him about with

17   reference, according to you, only to Blue

18   Cross/Blue Shield?

19   A.    Correct.

20   Q.    And the other was not a conversation, it was

21   simply a voice mail?

22   A.    Uh-huh.

23   Q.    So what other conversation are you referring to?

24   A.    I think it was — I don't remember exactly when

1          it might have been.   It might have been at the

2          termination meeting or whatever.   It was

3          well-known Bob was in the military.   It's come

4          up many times in the past.

5    Q.    Is it possible that you may or may not recall

6          that he called you and did have a conversation,

7          but it didn't occur at the termination meeting,

8          because it's not even reflected in your notes, I

9          think you admit that it occurred when he called

10         you and explained and gave you his superior

11         officer's name that the reason why he could not

12         attend that meeting was because he had to report

13         for duty as a member of 18 Delta Special Forces?

14   A.    No, absolutely not.

15   Q.    So if there are records to that effect that he

16         did call, your testimony is that he did not?

17   A.    No.  No.  I would remember that.

18   Q.    So as a result of, according to your testimony,

19         not getting a return call, what occurred next?

20.  A.    We sent him a letter indicating that his

21         employment was being terminated.

22   Q.    So if there was a call and an explanation was

23         given that military services was the reason he

24         could not have attended that particular day,

1              would that be —

2    A.    He ultimately would have been terminated anyway

3          because of the circumstances involved in the

4          case.

5    3.    Tell me about that.  What circumstances are you

6          referring to?

7    A.    The Castillo loan.

8    Q.    What about the Castillo loan?

9    A.    The fact the joint account of the Scallis issued

10          money to the customer as a gift.

11    Q.    Just explain to me why is that a violation?

12    A.    Because a salesperson can't give a customer

13          money to enable them to get a loan that they

14          didn't qualify on their own for.

15    Q.    How do you define salesperson in connection to

16          the Castillo loan?

17    A.    A loan originator.

18    Q.    I want to show you what I want to mark as

19          Exhibit 34.

20                   (Exhibit No.  34 ID marked.)

21    Q.    First of all, with respect to the Castillo loan,

22          we are talking about, for the record, Paula

23          Castillo and Raphael Guerrero, correct?

24    A.    Correct.

1   Q.   Who was the originator?

2   A.   **Eleanor,** I believe.  I would have to look at the

3        loan file.

4   Q.   Okay.  A moment ago you testified a salesperson,

5        i.e., the originator could, in fact, violate

6        policy in reference to some check that was

7        written if he were the salesperson in reference

8        to this loan; is that correct?

9   A.   Correct.  I mean, **it's** a conflict of interest.

10       **It's** a joint account under Bob and **Eleanor's**

11       name.  So it really wouldn't matter who actually

12       issued the loan, whether it was Bob or Eleanor.

13  Q.   So if Robert Scalli was not the originator of

14       the loan and had nothing to do with it and did

15       not sign a check that you allege was given to

16       some third party, not by the way — strike that.

17       Let me back up.

18           Who are you alleging the check was given

19       to?

20           MS. GAETA:  Do we have a copy of the

21       check?  If we are talking about a specific

22       document, it's helpful for her to have it.

23  A.   The $4,000 from the Scalli account was given to

24       Andres Castillo and then a bank check was issued

1        contract how that's determined, and but for the

2        president, no, you don't get any basis points.

3        It's the trip, the top 10 percent are eligible.

4    Q.   Eleanor was in the top 10 percent for both years

5        that she was employed?

6    A.   Correct.

7    Q.   In fact, was she in line for another sales trip

8        in 2003 at the time —

9    A.   Based on the 2002 earnings.  It's for the prior

10       year.

11   Q.   She was scheduled to go on the sales trip that

12       was outlined in Mr. Adamo's memorandum of

13       December 3, 2002?

14   A.   Correct.

15            MS. GAETA:  Objection.  What do you mean

16       by "scheduled to go on"?

17   Q.   She was in the top ten percent of the loan

18       officers that were eligible for the trip,

19       according to his memo, so she was slated to go

20       on the sales trip to wherever it was, the

21       Caribbean?

22   A.   Atlantis.

23   Q.   Where is Atlantis?

24   A.   Somewhere in the Caribbean.

1    "It's already on Eleanor's January report.    It

2    was transferred from Louis by secondary before

3    month end.    It was already on there."

4        Then there is another one on the same

5    e-mail, Hennock loan, they confirmed with loan

6    closing that it closed and she should be paid.

7    Leah just responding she is going to enter it

8    into the January commission report.

9        Do you want me to go through all of

10    these?

11  Q.  No.

12  A.  It's all basically the same thing.    It's just

13    corrections.    It's common with loan officers

14    that these go back and forth.

15  Q.  I'm going to show you what's been marked as

16    Exhibit No. 15.    If you could kindly review that

17    and I will ask you a question.

18        Did you want to say something, ma'am?

19  A.  Andres Castillo is listed as buyer on this in

20    both of these documents with Paula.    Again, on

21    this one, as well.

22        MS. GAETA:    Just in terms of the record,

23    can you identify the Bates stamp number.

24        MR. BURKE:    Wait a minute.    Wait a

DEPOSITION OF JOYCE ANN HICKS

ERRATA SHEET

| PAGE | LINE | REASON FOR CORRECTION |
|------|------|------------------------|
| 16 | 23 | company |
| 19 | 7 | bank and outside agencies |
| 23 | 12 | Human Resources Managers Manual |
| 23 | 12 | Intranet |
| 23 | 13 | Intranet |
| 24 | 1 | Intranet |
| 24 | 2 | Intranet |
| 29 | 24 | delete very and add many |
| 32 | 8-10 | had issued the denial as the documents indicated that this was obviously very serious |
| 40 | 23-24 | different loan products and the guidelines differ depending upon the loan product |
| 42 | 15 | Gueorguiva were |
| 60 | 1 | Kathy Holt and Jennifer Fierri |
| 60 | 6 | Holt |
| 76 | 14 | would review |
| 77 | 2 | Sandy |
| 77 | 23 | a short time before the termination |
| 80 | 1 | It could be downloaded as an icon |
| 82 | 4 | request.  It |
| 83 | 15 | Julie-Anne |
| 83 | 17 | Julie-Anne |

DATE: 3/29/05    SIGNATURE: _Joyce Atticks_

## ERRATA SHEET

| PAGE | LINE | REASON FOR CORRECTION |
|------|------|------------------------|
| 83 | 22 | specific to this |
| 85 | 6 | delete usually |
| 86 | 21 | delete the only |
| 88 | 20 | or the day after |
| 92 | 24 | that it could be the case |
| 105 | 9 &10 | benefit rates increased, so probably… |

DATE: 3/29/05      SIGNATURE: _Joyu aHicks_

## ERRATA SHEET-Day 2

| PAGE | LINE | REASON FOR CORRECTION |
|------|------|------------------------|
| 22 | 15 | replace approval with improvement |
| 63 | 4 | replace construction with krux |
| 63 | 18 | a manager that the Scallis' reported to |
| 71 | 1 | Relations |
| 81 | 19 | Buor |
| 86 | 9 | and procedure |
| 98 | 12 | to | ask him |
| 99 | 4 | this at the meeting. |
| 99 | 8 | opened up |
| 101 | 2 | replace she with I |
| 102 | 4 | things were brought up |
| 123 | 4 | ended with the Castillos as part of the gift. |
| 128 | 22 | base pay, an hourly rate. |
| 132 | 6 | But he |
| 132 | 7 | to support the Scallis. |
| 136 | 8 | as a bank |
| 155 | 20 | not salary |
| 157 | 5 | they were pooling |
| 157 | 6 | their work ____ delete Robert |

DATE: _____    SIGNATURE: _____

### ERRATA SHEET-Day 2

| PAGE | LINE | REASON FOR CORRECTION |
|------|------|------------------------|
| 157 | 14 | points. |
| 160 | 12 | would go |
| 182 | 2 | be under class.  This |
| 185 | 12 | She had no control over the closing date desired by the customer. |
| 185 | 13 | Obviously, |
| 185 | 13 | replace "and" with "but" |
| 185 | 14 | there are |
| 185 | 14 | loan, it might be delayed.  She |
| 191 | 13 | replace "is" with "are" |
| 192 | 2 | replace "is" with "are" |
| 197 | 23 | delete "fee |
| 198 | 17 | ones were. |
| 199 | 9 | Dewey |
| 200 | 23 | That's separate from the trip |
| 201 | 2 | trip ranking, no. you... |
| 211 | 10 | Fierri |

DATE: _3/29' ˉ fit)_     SIGNATURE: _Joyce Atticles_

1                          CERTIFICATE

2

3

4               I, JOYCE ANN HICKS, do hereby
      certify that I have read the foregoing
5     transcript of my testimony, and I further
      certify that said transcript is a true and
6      accurate record of said testimony.

7

8               Signed under the penalties of perjury
      this  _29ᵗʰ_ day of _March_ , 2005.

9

10

11

12                              _Joyce Ann Hicks_
                                JOYCE ANN HICKS

13

14

15

16

17

18

19

20

21

22

23

24

                DEPOSITION OF JOYCE ANN HICKS