EXHIBIT 4

```
PAGES:      1 - 114
VOLUME:        I
EXHIBITS:  1 - 2
```

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**CIVIL ACTION**
**NO.:**  03-CV-12413DPW

- - - - - - - - - - - - - - - - - - x

ELEANOR **SCALLI** and
ROBERT  SCALLI,

        **Plaintiffs**

vs.

CITIZENS FINANCIAL GROUP,  INC.,

        Defendant

- - - - - - - - - - - - - - - - - - x


        Deposition of BARDEN KENNET CONN, a witness
**called** on **behalf** of the **Plaintiffs,** taken pursuant to
notice before **Jeanne** M. **Bramanti,** Registered
**Professional** Reporter and Notary **Public** in and for the
**Commonwealth** of **Massachusetts,** at the Law office of
Mark E. Burke, 111 South Bedford Street, **Burlington,**
**Massachusetts,** on Wednesday, March 2, 2005,
commencing at  11:20 a.m.


        ***** 

BRAMANTI & LYONS COURT REPORTING,  INC.
REGISTERED PROFESSIONAL REPORTERS
92 STATE STREET, 8TH FLOOR, **BOSTON,** MA 02109
TEL:   617.723.7321 / **FAX:**  617.723.7322
**www.bramanti-lyons.com**

1       **APPEARANCES:**

2       Mark E. Burke, Esq. and
        **Nicholas DiMauro,** Esq.
3       Law office of Mark E. Burke
        111 South Bedford Street
4       **Burlington,** Massachusetts 01803
        Attorney for the Plaintiffs
5
        Anne M. Gaeta, Esq.
6       Goodwin Procter LLP
        Exchange **Place**
7       Boston, Massachusetts 02109
        Attorney for the Defendant
8
        **Present: Eleanor Scalli**
9                 Robert **Scalli**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                           **I N D E X**

2

3    Deposition of:                                    Page

4    Barden Kennet Conn

5        Examination by Mr. Burke                         4
         Examination by Mr. **DiMauro**                  97

6

7                        - - - - - -

8

9

10                          **E X H I B I T S**

11   **No.**                                            Page

12   **1**    Memo to **Mike  Dirani**an from **Elizabeth**    42
            **Walsh** dated 2/4/03 (1 page)

13   **2**    Position Description (9 pages)             102

14

15

16

17

18

19

20

21

22

23

24

1       processing **loans** faster, right?

2   A.  NO.

3   Q.  And did **loan** originators, were they -- **would** they

4       provide any incentives or other enumerations for

5       processing loans more **quickly** or no?

6   A.  No.

7   Q.  **You're** not aware of anything?

8   A.  NO, **I'm** not.

9   Q.  Did you request any **additional** compensation for

10      Miss **walsh** from any **loan** originators to process **their**

11      **loans** quicker?

12  A.  No.

13  Q.  NOW, how **long** were you with citizens, **sir?**

14  A.  **If** you count the time that I was with **First** NH,

15      approximately nine years.  The acquisition was in '96.

16  Q.  And what was your **last title** with citizens Bank?

17  A.  Senior vice president.

18  Q.  And what were your **responsibilities?**

19  A.  I was in charge of sales and operations for

20      **Massachusetts,** New Hampshire, and construction **lending.**

21  Q.  And what **specifically** did you do on a day-to-day basis?

22  A.  I spent a **lot** of time **talking** to upset customers,

23      recruiting, managing work **flows.**

24  Q.  when you say speaking with upset customers, what are

1    A.    I **don't** remember.

2    Q.    so after you received the **decline letter** from

3          Mr. **Diranian** sometime before **January** 31 of 2003, right,

4          did you, did that prompt you to review the **loan file?**

5    A.    I **don't** remember.

6    Q.    Did you think that it was important to review the **loan**

7          **file** if you had received a **decline letter** from Mike

8          Diranian **relative** to **allegations revolving** around

9          termination of one of your **employees?**

10   A.    I might have.

11              MS. GAETA:   objection.

12   Q.    (By Mr. Burke)  You can answer, sir.

13   A.    I understand the question.  I **probably would** have had

14         Liz **walsh** review it and **tell** me what is the situation

15         with the **file.**

16   Q.    **I'm** not asking you whether you **would** have on some

17         **conditional** tense of what may have transpired.  **I'm**

18         asking you whether you thought it was important to

19         review the **loan file yourself** once you received the

20         communication from Mr. Diranian saying here is a

21         **decline letter** that may or may not be in **violation.**

22   A.    Yes.

23   Q.    Did you do that?

24   A.    I had someone **else** do it.

1    Q.    when you say someone **else, you're** referring to

2          Miss **Walsh,** correct?

3    A.    Yes, I am.

4    Q.    And did you have a discussion with Miss **Walsh** about the

5          **loan file?**

6    A.    Yes, I did.

7    Q.    And what was the substance of the conversation that you

8          had with her?

9    A.    I **don't** remember.

10   Q.    Did you go through together the documents that were in

11         the **loan file?**

12   A.    I **don't** remember.

13   Q.    DO you know what was in the **loan file?**

14   A.    Yes.

15   Q.    what, to your **knowledge,** was in the **loan file?**

16   A.    An **application,** contract, **verifications,** credit report,

17         standard **loan** package.

18   Q.    And did you have any conversations with Miss **Walsh**

19         about the, about her conversations with either Louise

20         **Riascos** or any other individual from Miss **Scalli's**

21         office?

22              MS. GAETA:   Objection.   Conversations about

23         what?

24   Q.    (By Mr. Burke)   Do you understand the question, **sir?**

1    A.   NO.

2    Q.   Did you have any conversations with Liz Walsh regarding

3          authority to decline the, to issue the decline letter?

4    A.   whose authority?

5    Q.   Liz Walsh's authority.

6    A.   The loan hadn't been declined.

7    Q.   Let's step back a moment.

8          Did Liz Walsh have authority to authorize a

9          loan officer to issue a declination?

10   A.   NO.

11   Q.   Did you confiscate or take a laptop from Mr. Scalli at

12         the termination and/or suspension meeting on February

13         4, 2003?

14   A.   I don't remember.

15   Q.   DO you know if any laptops were taken at the time of

16         the termination meeting?

17   A.   I think so but I'm not sure.

18   Q.   whose laptop was taken?

19         MS. GAETA:  Objection.

20   Q.   (By Mr. Burke)  If you know.

21   A.   I don't.

22   Q.   was more than one laptop taken?

23   A.   I don't remember.

24   Q.   DO you know that the loan officers are generally issued

1        loan declined so that the borrower could buy a property

2        that Scalli was selling, Bob Scalli was selling?

3    A.  No.  what Michael said was that the realtor had

4        indicated that Eleanor had declined the loan so that

5        the borrower could get back their down payment money

6        and by a piece of property that Bob Scalli was selling.

7    Q.  Did you independently verify that information?

8    A.  No, I did not.

9    Q.  You simply accepted that from Mr. Diranian, correct?

10   A.  Yes, I did.

11   Q.  And you passed it along in an e-mail --

12   A.  Yes, I did.

13   Q.  -- to Joyce Hicks, correct?

14   A.  Yes, I did.

15   Q.  Now, Mrs. Scalli was a top producer, correct?

16   A.  Yes, she was.

17   Q.  And she had been ranked amongst the top producers in

18       your company, correct?

19   A.  The top producer.

20   Q.  For how long?

21   A.  Two years in a row, I believe.

22   Q.  By the way, how much would you make off of the loans

23       that were generated by Eleanor Scalli or Robert Scalli?

24   A.  It's irrelevant.

1    Q.   Sir, how much in terms of the **guidelines** were you –

2    A.   Nothing.

3    Q.   -- earning?

4    A.   Nothing.

5    Q.   HOW do you come to that?

6    A.   Because **their volume** was **inconsequential** to my income

7         because I had a cap.  whether they did 60 **million** or a

8         **million dollars** I **didn't** make a dime more.

9    Q.   But **certainly** it was cumulative?

10   A.   No, it was not.

11   Q.   So are you saying that you had a **salary** that was

12        $350,000, or are you saying that you were -- you did

13        make commissions, correct?

14   A.   **That's** correct.

15   Q.   And how **would** you earn those commissions?

16   A.   Based on **volume.**

17   Q.   Based upon the **volume** of your top producer, correct?

18   A.   NO.  Based on **all** of my producers.

19   Q.   And so were **all** of -- did you have any other

20        incentives?

21   A.   I had a salary.

22   Q.   YOU had a **salary** of what?

23   A.   Eighty thousand, seventy-five thousand?  I **don't** know.

24   Q.   so you had a **salary,** and then you made $350,000 in cap

1     off of **all** of your **loan officers' commissions?** How

2     would it work?  Describe it to me.

3  **A.**  The best way to **explain** it is **this.** **If** I did not have

4     a cap I would have made about $800,000 instead of 350.

5     So whether they did 60 or 80, a hundred, it **didn't**

6     matter how much more **volume** they gave to me because I

7     was **already** there with any of the other **loan** officers

8     under my work.

9          If you want to say a portion of their portion

10    accounted to a portion of my income you **could** say that,

11    but it **didn't** change depending on how much more **volume**

12    they did.

13  **Q.**  **Well,** it depends upon the **volume** of the other **loan**

14    officers, correct?

15  A.  It was more than significant to cover the 350.

16  Q.  So what was the **deal** that you were making off of, or

17    what was the commission that you **would** make off the

18    **Scallis?**

19  A.  I **would** have to see my contract.

20  **Q.**  What contract are you referring to, **sir?**

21  A.  My **employment** contract.

22  **Q.**  So as you sit here today, you cannot **recall** what your

23    **employment** contract was with citizens on or about the

24    time that the **Scallis'** were terminated?

1    A.    NO.

2    Q.    In other words, once you hit your cap, $350,000, all

3          right, could some money then now go to other managers

4          like Mr. Diranian or Mr. Adamo or how did that work?

5    A.    They all had their own separate comp plans.  I don't

6          know how Steve Adamo got paid.  I believe Mike Diranian

7          got five basis points on volume that his group did.

8    Q.    what about Mr. Adamo, would he make any basis points?

9    A.    I believe Steve Adamo has a cap on his income, also.

10   Q.    what was his cap, if you know?

11   A.    I don't know.

12   Q.    But the commissions whether it be on basis points or

13         profit could go to other managers, correct?

14   A.    NO.

15   Q.    or it would all stay within your --

16   A.    It would all go to the corporation.

17   Q.    Anything over and above your $350,000 cap?

18   A.    Correct.

19   Q.    So how would it work with Mr. Diranian if he was

20         getting five basis points on the volume that he was

21         generating?

22   A.    Michael Diranian did not have a cap.

23   Q.    so do you know what he was earning --

24   A.    NO, I don't.

1    Q.    -- at or about this time?

2    A.    I don't.

3    Q.    so was Mr. Diranian earning basis points on any of

4          either Mr. scalli's or Mrs. Scalli's loans?

5    A.    Yes.

6    Q.    HOW would that occur?

7    A.    He received five basis points on their fundings.

8    Q.    so even if you were capped out Mr. Diranian was still

9          making money off of the Scallis' loans, correct?

10   A.    Correct.

11   Q.    And do you know how much money he earned from the

12         Scallis' loans over a period of their employment?

13   A.    I don't.

14   Q.    DO you have any idea at all?

15   A.    I can tell you that based on funding of approximately

16         $60 million in 2003 five basis points on $60 million

17         would be $30,000, so my guess would be that in 2003

18         Mike Diranian made approximately $30,000 from their

19         volume.

20   Q.    And did anyone else have the kind of employment

21         agreement with Citizens that would allow them to

22         benefit from the Scalli loans other than Mr. Diranian

23         and yourself?

24   A.    And Mr. Adamo.

VOLUME: II
PAGES: 115-332
EXHIBITS: See index

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 03CV-12413DPW

- - - - - - - - - - - - - - - - - - -x
ELEANOR SCALLI and ROBERT SCALLI,

      Plaintiffs,

vs.

CITIZENS FINANCIAL GROUP, INC.,

      Defendant.
- - - - - - - - - - - - - - - - - - --x


      Continued deposition of BARDEN K. CONN, a
witness called on behalf of the Plaintiffs, taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure before Susan L.
Prokopik (CSR #124893), a Registered Merit
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Law Offices
of Mark E. Burke, 111 South Bedford Street, suite
208, Burlington, Massachusetts on Thursday, March
31, 2005, commencing at 9:23 a.m.

—————

BRAMANTI & LYONS COURT REPORTING, INC.
REGISTERED PROFESSIONAL REPORTERS
92 STATE STREET, BOSTON, MA  02109
TEL: 617.723.7321 / FAX: 617.723.7322
www.bramanti-lyons.com

1

2

<u>APPEARANCES</u>:

3      Mark E. Burke, Esq.
       Law Offices of Mark E. Burke
4      111 South Bedford Street, suite 20B
       Burlington, Massachusetts 01803
5                 - and -
       Nicholas J. DiMauro, Esq.
6      Law Offices of Nicholas J. DiMauro
       111 South Bedford Street, suite 208
7      Burlington, Massachusetts 01803
       Attorneys for the Plaintiffs

8

9      Anne M. Gaeta, Esq.
10     Goodwin Procter LLP
       53 State Street
11     Exchange Place
       Boston, Massachusetts 02109
12     Attorney for the Defendant

13

<u>ALSO PRESENT</u>:
14

       Eleanor Scalli
15     Robert Scalli

16

17

18

19

20

21

22

23

24

DEPOSITION OF BARDEN K. CONN

117

# I N D E X

**Deposition of**:                                    Page

BARDEN K. CONN

  Examination by Mr. Burke              119, 304

  Examination by Mr. DiMauro                    186

# E X H I B I T S

| No. | | Page |
|-----|---|------|
| 3 | Documents | 119 |
| 3A | 1/17/03 E-mail | 130 |
| 3B | Decline/Withdrawn Checklist | 137 |
| 3C | Uniform Residential Loan Application | 141 |
| 3D | Fax cover sheet | 144 |
| 3E | Purchase and Sale Agreement | 144 |
| 3F | 2/5/03 letter | 167 |
| 4 | Documents | 119 |
| 4A | Decline/Withdrawn Checklist | 161 |
| 4B | 1/17/03 E-mail | 165 |
| 4C | 2/5/03 letter | 170 |
| 5 | New Hire Information | 181 |

118

# E X H I B I T S

No.                                                            Page

6    10/1/02 E-mail                                      183

7    2/21/01 letter                                      186

8    Employee Profile Change                             205

9    Handwritten memo and attachments                    212

10   Statement of Credit Denial,
     Termination or Change                               250

11   Loan Officer Ranking                                262

12   Handwritten notes                                   321

DEPOSITION OF BARDEN K. CONN

1   represented the loan was withdrawn rather than

2   declined?

3   A.  No idea.

4   Q.  And were you aware that the financing relative to

5   331 Paris Street in East Boston had financing for

6   a first mortgage and a second mortgage when

7   Eleanor Scalli was terminated?

8   A.  Yes, I was.

9   Q.  And did you review the file relative to the

10  secondary mortgage --

11  A.  Not that I recall.

12  Q.  -- prior to her termination?

13  A.  Not that I recall.

14  Q.  Do you know if anyone reviewed the loan file

15  relative to the first or secondary financing as

16  it relates to the Barbosa loan?

17          MS. GAETA:  Objection.

18  Q.  Do you understand the question, sir?

19  A.  Could you state it again, please?

20  Q.  Do you as you sit here today have knowledge of

21  anyone from Citizens Bank having reviewed the

22  first and secondary mortgage financing loan files

23  as it relates to the Barbosa loan?

24  A.  I believe it was reviewed by Liz Walsh.

124

1   Q.   And what is the basis for that belief?

2   A.   Because I believe I asked Liz to do that.

3   Q.   When did you ask her to do that?

4   A.   After I received the information from Michael

5        Diranian.

6   Q.   When you say "the information from Michael

7        Diranian," you're referring to the copy of the

8        declination or credit denial?

9   A.   Yes.

10  Q.   Yes or no.

11  A.   Yes.

12  Q.   And did you instruct Liz Walsh to review both the

13       first and secondary mortgage financing loan files

14       for the Barbosa loan?

15  A.   I don't remember.

16  Q.   What did you instruct her to do as a result of

17       the receipt of the declination and/or credit

18       denial letter from Mr. Diranian?

19  A.   I don't remember.

20  Q.   I'm going to show you another document, which is

21       part of Exhibit No. 3.  Titled "Notes to the

22       file" and Bates stamped C 03954.  If you could

23       kindly review that and I'll ask you a question.

24  A.   Okay.  I've reviewed it.

1    Q.    And you didn't think that was important to verify

2          that information prior to a termination meeting

3          with Mrs. Scalli?

4                MS. GAETA:    Objection.

5    Q.    You may answer, sir.

6    A.    At that point Eleanor Scalli had already declined

7          the loan.   She already violated policy.

8    Q.    Did either you or Liz Walsh have the authority to

9          give permission to Mrs. Scalli to issue a credit

10         denial letter?

11   A.    No.

12   Q.    And you never did that at any point prior to the

13         issuance of this credit denial letter, correct?

14   A.    No.

15   Q.    Are there credit denial form letters on the

16         laptops that were issued to each -- Mr. and Mrs.

17         Scalli?

18   A.    I don't believe so.

19   Q.    So you have never viewed a credit denial letter

20         on any of the laptops that were issued by

21         Citizens Bank?

22                MS. GAETA:    Objection.   What laptops?

23                MR. BURKE:    The laptops that were

24         issued to Mr. or Mrs. Scalli or any other

1  A.  That's correct.

2  Q.  Wouldn't that upset him if you were now changing

3      the manager?

4  A.  I don't think that would have upset Mike.

5  Q.  So he didn't question you when you said, We're

6      going to change Mrs. Scalli reporting to me, you,

7      as opposed to him?

8  A.  No.

9  Q.  Do you know how much money he lost as a result of

10     this decision?

11 A.  He didn't lose any money.

12 Q.  How come?

13 A.  Continued to pay him on Eleanor's volume.

14 Q.  Who did?

15 A.  The company did.

16 Q.  Okay.  So even though he was now reporting to

17     you, he was still getting his five basis points

18     on every million?

19 A.  Even though Eleanor was still reporting to me.

20 Q.  Right.

21 A.  Mike was still receiving the override on her

22     volume.

23 Q.  And how much was that, if you know, on an annual

24     basis?

1  A.  Based on approximately $60 million in fundings,

2      in 2002, that would have been $30,000.

3  Q.  And as you sit here today, your testimony is that

4      he received his $30,000?

5  A.  That's correct.

6  Q.  I think you indicated that Mr. Adamo could also

7      benefit from the loans that were generated by

8      Mrs. Scalli, correct?

9  A.  I don't know Steve Adamo's comp plan.  I believe

10     he would benefit from volume.  But he may have a

11     cap also I believe is what I said.

12 Q.  But that it was a very high cap?

13            MS. GAETA:  Objection.

14 A.  They don't use high caps at Citizens.

15 Q.  Now, was Mrs. Scalli paid a salary?

16 A.  No.

17 Q.  Would it surprise you that her compensation

18     information shows that she was earning $65,000 a

19     year in salary?

20 A.  That would surprise me.  Since she wasn't paid a

21     salary.  But the computers at Citizens often

22     didn't handle commission structures.

23            MR. BURKE:  If I could have that marked

24     as Exhibit 5.

1     contributions?

2  A.  Not that I recall.

3  Q.  Did you have any conversations with Mr. Scalli

4     relative to his 401(k) contributions?

5  A.  Not that I recall.

6  Q.  Now, this E-mail indicates that Mrs. Scalli is

7     over the compensation limit.  She elected to have

8     401 contributions.  401(k) contributions.  Are

9     you familiar with that?

10  A.  No.  I'm not.

11  Q.  Were Mr. and Mrs. Scalli paid by ADP or were they

12     administering the payment of their salaries --

13  A.  I don't recall.

14  Q.  -- or commissions?

15  A.  I don't recall.

16  Q.  Did you at any time authorize payroll and/or ADP

17     to deduct compensation from Mrs. Scalli and

18     allocate it to Mr. Scalli?

19  A.  I remember that we gave Bob a draw that was then

20     deducted from Eleanor's commissions.

21  Q.  So Bob's forgivable draw of how much was deducted

22     from Eleanor's commissions?

23  A.  I think it was $1,000 a month.

24  Q.  Are you saying that Bob's compensation was just a

185

1        forgivable draw?

2   A.   What I'm saying is that Bob received $1,000 a

3        month.  That same $1,000 was deducted from

4        Eleanor Scalli's compensation.

5   Q.   From when to when did this occur?

6   A.   I don't recall.

7   Q.   Was that the agreement that you had with Mr.

8        Scalli at the beginning of his hire with Citizens

9        Bank?

10  A.   I don't recall.

11  Q.   Do you recall anything about the compensation

12       that Mr. Scalli was paid at the beginning of his

13       employment with Citizens Bank?

14            (Mr. DiMauro entered the room.)

15  A.   I believe he received $15,000 as a pipeline

16       buyout or forgivable draw.

17  Q.   And other than that, what were the terms of his

18       compensation or incentive plan?

19  A.   I believe it was a loan officer compensation plan

20       with an assistant attached to it.

21  Q.   Can we go off the record for one moment?

22            (Off the record.)

23            (Lunch recess.)

24

DEPOSITION OF BARDEN K. CONN

234

1       office, give me a little background on how

2       Eleanor and Robert Scalli were assigned there.

3       First of all, were they assigned to that office?

4   A.  Yes.

5   Q.  By whom?

6   A.  Me.

7   Q.  Okay.  And --

8               MS. GAETA:  Excuse me.  Can you put the

9       air conditioning?

10              MR. DiMAURO:  Sure.  Want it up again?

11              (Off the record.)

12  Q.  And can you tell me a little bit about what the

13      structure was at the Woburn office as it relates

14      to Robert and Eleanor Scalli?

15  A.  Can you be more specific?

16  Q.  How did they interact at that office?  What did

17      they do on a weekly basis?

18  A.  I wasn't located in that office so I don't know

19      how much time they did or didn't spend there.  I

20      know that they had an office in their house that

21      they worked out of that we licensed.

22  Q.  Okay.  And when you say that you licensed,

23      explain what you mean by that.

24  A.  In other words, because they're meeting customers