# EXHIBIT 5

1

<u>VOLUME:</u>  I
<u>PAGES:  1-250</u>
<u>EXHIBITS:  1-7</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 03CV-12413DPW

- - - - - - - - - - - - - - - - - - - x
ELEANOR SCALLI and ROBERT SCALLI,
        Plaintiffs
vs.
CITIZENS FINANCIAL GROUP, INC.,
        Defendant
- - - - - - - - - - - - - - - - - - - x

        DEPOSITION of MICHAEL C. DIRANIAN, a witness
called on behalf of the Plaintiff, Eleanor Scalli,
taken pursuant to notice before Michele Eisen,
Registered Professional Reporter, Certified
Shorthand Reporter No. 129593 and Notary Public in
and for the Commonwealth of Massachusetts, at the
Law Offices of Mark E. Burke, 211 South Bedford
Street, Burlington, Massachusetts, on Thursday,
April 28, 2005, commencing at 10:15 a.m.

———————————

BRAMANTI & LYONS COURT REPORTING, INC.
REGISTERED PROFESSIONAL REPORTERS
92 STATE ST., 8TH FLOOR, BOSTON, MA 02109
TEL: 617.723.7321 / FAX: 617.723.7322
www.bramanti-lyons.com

2

1          APPEARANCES:

2          Mark E. Burke,  Esq.
            Law Offices of Mark E. Burke
3           211  South Bedford  Street
            Burlington,  Massachusetts 01803
4           Attorney  for Eleanor  Scalli

5          Nicholas DiMauro,  Esq.
            Law Offices of Nicholas DiMauro
6           211  South Bedford  Street
            Burlington,  Massachusetts  01803
7           Attorney  for Robert  Scalli

8          Anne M.  Gaeta,  Esq.
            Goodwin  Procter  LLP
9           Exchange  Place
            Boston,  Massachusetts 02109
10          Attorney  for the Defendant

11

12
            ALSO  PRESENT:    Eleanor  Scalli
13                            Robert  Scalli

14

15

16

17

18

19

20

21

22

23

24

DEPOSITION OF MICHAEL C.  DIRANIAN

3

1                          I N D E X

2          Deposition of:                          Page

3          MICHAEL C. DIRANIAN

4          Examination by Mr. Burke              4,  188

5          Examination by Mr. DiMauro          96,  246

6

7                       - - - - - - - - - -

8

9                       E X H I B I T S

10         No.                                    Page

11         1              E-Mail                   65

12         2              E-Mail                   96

13         3              Points and Fees Test     96

14         4              Price Adjustment

15                        Worksheet                96

16         5              Five-Page Document      136

17         6              Statement of Credit

18                        Denial Termination or

19                        Change                  188

20         7              Letter                  204

21

22

23

24

19

1    Q.   And did Tom Finney recruit Bard Conn and Liz Walsh,

2         as well?

3    A.   I don't know.

4    Q.   Okay.  You currently work with Bard Conn and Liz

5         Walsh, correct?

6    A.   Correct.  I work for Bard, and Liz works for me.

7    Q.   And how long has that relationship continued at

8         Countrywide?

9    A.   I don't exactly remember.  Starting a year and a

10        half ago, approximately.

11   Q.   And did your position change in any way while you

12       were employed at Citizens Mortgage Corporation?

13   A.   Yes.  I went from a loan officer to a sales

14       manager.

15   Q.   Were your duties the same as a loan officer at

16       Citizens Mortgage Corporation as they were with

17       Fleet, as well as First Eastern Bank?

18   A.   As a loan officer?

19   Q.   Yes.

20   A.   Yes.

21   Q.   Okay.  And when did your position change to a sales

22       manager while you were working at Citizens Mortgage

23       Corporation?

24   A.   I can't recall the exact time frame, but

25

1      twelve million or more in production out of your

2      branch would give you an extra five basis points?

3   A.  Correct.  Not on my production, no.

4   Q.  On their production?

5   A.  Correct.

6   Q.  And that would be for every other loan officer that

7      you were supervising?

8   A.  Stationed out of Branch 35.  I think it was 35.  I

9      forget the exact number, but Woburn, out of the

10     Woburn branch.

11  Q.  So how would you -- strike that.

12              That would mean that you would have to

13     go over the commission statements of every single

14     loan officer in your branch in order to determine

15     what your compensation structure would be on an

16     annual basis or on a monthly basis?

17  A.  I didn't go -- yes, monthly it came out.

18  Q.  Okay.

19  A.  It was monthly.  And I wouldn't go over all the

20     commissions.  On my report it would say I closed

21     "X" amount, I would have a general idea, and if it

22     seemed like it was off, then I would probably look

23     through the commissions to try to add it up, or the

24     closing reports, so --

26

1   Q.   But how would you receive your basis points on the

2         loans -- on production of other loan officers out

3         of your branch?

4   A.   How would I receive it?

5   Q.   Yes.

6   A.   It would show up in the bottom of the commissions.

7         I would have all my loans that closed, and then it

8         would have a total of the branch loan closings, say

9         fifteen million times five basis points would be

10        $7500, so it would on the commission points.

11  Q.   So it was on total loans out of your branch; is

12        that what you are referring to?

13  A.   Correct, minus my production.

14  Q.   And can you describe to me what an "override" is in

15        terms of basis points or --

16  A.   That's what you're saying, that's what we're

17        discussing now.  It would be an override on the

18        branch commissions.  There's different terms with

19        different companies.

20  Q.   I see.

21            So the override would be your basis

22        points earned on the production of other loan

23        officers on a monthly basis?

24  A.   Could you say that one more time?

27

1    Q.    The override would be the compensation that you

2          would receive in terms of loans closed or

3          production of other loan officers in your branch?

4    A.    Yes.

5    Q.    Now, were Mr. and Mrs. Scalli in your branch?

6    A.    Listed under my branch?

7    Q.    Did they fall within your branch?

8    A.    Yes.

9    Q.    From when to when did they fall within your branch?

10   A.    I can't recall their exact start date, but --

11   Q.    If I told you that their start date was in February

12         of 2001, does that refresh your recollection?

13   A.    It sounds about right.

14   Q.    Okay.  And were they under your branch from the

15         beginning of your employment --

16   A.    Yes.

17   Q.    -- from the beginning of their employment?  I'm

18         sorry.

19   A.    Yes.

20   Q.    And they remained within your branch until the end

21         of their employment?

22   A.    Yes.

23   Q.    And I'm going to digress here for a moment, sir.

24               What if anything did you do to prepare

72

1    Q.   Who was the realtor?

2    A.   I don't know.  It was one of his relationships that

3         had an approval, and it was rescinded with a

4         decline they received from Eleanor.

5    Q.   They had an approval; is that what he said to

6         you - -

7    A.   A loan that was approved.

8    Q.   Did he say that they had a loan that was approved?

9    A.   I can't recall the exact terminology of the

10        conversation.

11   Q.   And he indicated to you that he had a decline that

12        was signed or generated by whom?

13   A.   By Eleanor.  He forwarded the document to me.  I

14        forwarded it to Bard.  I don't know if I faxed it

15        or interofficed it.  I don't know how I got it to

16        Bard, but this letter is referring to that decline

17        that Eleanor signed.  I don't know if it was her.

18        It was the signature of Eleanor.  If I remember, it

19        just wasn't right.  It wasn't one of ours.  It

20        looked like a mock-up document.  It wasn't -- it

21         seemed like someone pasted something together,

22        basically fudged a document.  It didn't look right,

23        whatever it was.  I just forwarded it over to Bard,

24        you know, here it is, to check in, that type of

DEPOSITION OF MICHAEL C. DIRANIAN

1       deal.  That's -- I don't remember exactly, it was

2       two years ago, but that's the general gist of it.

3   Q.  So Mr. Roussel called you up.  Do you have a memory

4       of when that conversation occurred?

5   A.  I don't, but I would have to guess it was prior to

6       January 31st.

7   Q.  Was it the day before, was it the same day; if you

8       know?

9   A.  I don't.  I don't know.

10  Q.  Do you have any documents that would memorialize

11      when you received the facsimile from Mr. Roussel?

12  A.  No, I don't.

13  Q.  Do you know what happened to those documents?

14              MS. GAETA:  Objection.  What documents?

15  Q.  Did you just testify about a facsimile that you

16      received from Mr. Roussel --

17  A.  I received --

18  Q.  -- yes or no?

19  A.  I received a decline letter from him.

20  Q.  Did you receive it in the nature of one document or

21      two or three; if you know?

22  A.  I can't recall that.  I'm assuming it was a fax or

23      an interoffice.  I don't remember what was with it

24      or -- I am assuming it was one page if it was a

1            just remember the decline letter.

2    Q.    And you received this document, and what did you do

3          with it after that?

4    A.    I forwarded it to Bard.

5    Q.    Well, did you have a conversation with Mr. Conn in

6          advance of that?

7    A.    I don't recall if I called him, or if I faxed it,

8          or if I put a letter in the interoffice.  I don't

9          know what I did at the time.  I just know I

10          forwarded it to him.

11    Q.    And what prompted you to forward it to Mr. Conn?

12    A.    It didn't look like one of ours.  It must have been

13          something that was produced, you know, outside of

14          Countrywide -- I mean, Citizens at the time.

15    Q.    And how do you know that?

16    A.    How?

17    Q.    Yes.  How do you know that?

18    A.    It wouldn't have -- it looked like something we

19          wouldn't have produced.  It was unprofessional.  It

20          wasn't something that we would -- it didn't look

21          like it was up to par with what they would issue to

22          a customer and whatnot.

23    Q.    When you were hired by Citizens Mortgage

24          Corporation as a loan officer, were you issued a

86

1    Q.    So is it your testimony that -- you indicated there

2          were two problems with the decline letter.  Did you

3          indicate that to Mr. Conn, or are those his

4          thoughts?  I'm referring to the sentence, There are

5          two -- There are two problems with this, Mr. Conn

6          states.  Did you relate that to Mr. Conn or --

7    A.    No.  That looks like it would be his own wording.

8          I mean, I understand it, but --

9    Q.    Did you relate those sentiments to Mr. Conn when

10         you spoke to him?

11   A.    Not that I recall.

12   Q.    Were you familiar with the policy relative to the

13         issuance of a decline at the time that you received

14         the letter from Mr. Roussel?

15   A.    That's Citizen's policy of a decline?

16   Q.    Yes.

17   A.    Yes.

18   Q.    What was that policy?

19   A.    As far as who can decline loans?

20   Q.    To your understanding, what was the policy relative

21         to the issuance of a decline?

22   A.    A decline can only been issued by an underwriter, a

23         designated underwriter.

24   Q.    And where did you learn that?

164

1    his possession when he called you -- did he call

2    you first before he faxed it?

3  A.  I don't recall the time frame as to how it worked

4    out.  I don't remember him saying how long he had

5    it in his possession.  I don't recall whether it

6    was before, during, or after, but it was in the

7    same period.

8  Q.  Okay.  Your testimony was that as you reviewed that

9    document when you did get it into your possession,

10   that you knew it to be a violation of some policy;

11   was that your testimony?

12 A.  I don't recall my exact testimony.  It didn't look

13   like a denial letter that we would produce.  It was

14   just -- I can't recall the exact layout of it or

15   the format.  It just wasn't right, whatever it was.

16   It wasn't something that we would professionally

17   provide to a customer.

18 Q.  And you would produce that to a customer, correct?

19   You would produce that to a customer?

20        MS. GAETA:  Objection.

21 A.  No, we --

22 Q.  Not you.  I'm saying you are saying that that

23   denial letter wasn't what you would normally see

24   produced to a customer/borrower?

165

1    A.    That Citizens would produce for --

2    Q.    Yes.

3    A.    -- a client or a general customer.

4    Q.    Okay.  And so if that was true, then, was there a

5          violation, in your mind, at that time?

6                    MS. GAETA:   Objection.

7    A.    Rephrase that?

8    Q.    If that document was not produced by Citizens Bank,

9          and it was produced exclusively by Eleanor Scalli,

10         because you had -- the document had her -- you had

11         it and it had her name on it?

12   A.    Yes.

13   Q.    Was that a violation of any policy, in your mind?

14   A.    Yes.  Loan officers, which Eleanor was at the time,

15         and even though I'm a sales manager, we're still

16         considered a loan officer, and we can't approve or

17         deny a borrower.

18   Q.    And they can't approve or deny to whom?

19   A.    To anyone.

20   Q.    And so do you know -- in this particular case, do

21         you recall who that denial was sent to?

22   A.    Sent to -- you mean the realtor's name?

23   Q.    No.  The denial letter.

24   A.    Who I sent it to?

174

```
 1   Q.   Issuance means to issue, according to your
 2        testimony, because your testimony was very
 3        accurate.  We all agreed that the issuance of a
 4        denial letter goes to the borrower.
 5   A.   From Operations.  I would think procedure-wise it
 6        would have to go from there.  That's the issuance.
 7        No one should be issuing anything to the borrower
 8        except for Operations.
 9   Q.   So if the borrower never receives it, and was never
10        issued anything, is there any violation of policy?
11             MS. GAETA:   Objection.
12   A.   We're missing a step.  I am missing it.
13   Q.   Tell me what you're missing.
14   A.   My opinion of violation of policy is I have a
15        decline letter that is declined by someone not
16        authorized to decline, that's my opinion of the
17        violation of policy.  I think it's two separate
18        issues.
19   Q.   If that decline letter -- if that decline letter is
20        sent to a borrower, there's a violation, it's only
21        going to the borrower.  On the decline letter
22        itself, it does not say J&R Realty, it does not say
23        that, sir, it says Jean Barbosa at an address,
24        okay?  You are assuming, for the sake of your
```

1        from one of your loan officers -- if you found the

2        letter, somebody gave you a letter --

3  A.   That they produced, the loan officer produced?

4  Q.   Right.  Someone brang you a denial letter --

5        brought you a denial letter, and that denial letter

6        was never sent to the person whose name appears

7        therein, and how do you know that, because you

8        called the borrower, we have phones, you call

9        people, and the borrower says, I never received any

10       such denial letter.  I don't know what you are

11       talking about.  And, therefore, you as the sales

12       manager determined this letter was never issued to

13       the borrower, it was never issued, you have some

14       letter that might have been in someone's office,

15       but it was never issued anywhere, what would be the

16       violation if it's not issued to the borrower?

17             MS. GAETA:  Objection.

18  A.   This is purely my opinion, that the company would

19       have to make the formal decision.  Someone

20       shouldn't produce approval or decline letters.  Why

21       would they produce it at all?  It's still something

22       they're not -- it's taboo.  We don't approve or

23       deny people.  We take applications, and we let

24       someone who's authorized to do it do it.

197

1    A.    I don't know where it was situated, but I know the

2          loan officer goes on the decline letter, because --

3          it's issued by Operations, but they put the loan

4          officer's name on because that's -- we had a

5          practice of whenever it got to the point of denial,

6          we'd want our name on there so the contact could

7          deal with us if they have any questions.  We'd

8          provide it to them, I guess, and work it through.

9    Q.    So there's a by line, you referred to it as a

10         signature line, with the loan officer's name on the

11         decline letter, correct?

12   A.    Name, but not signature.

13   Q.    But it has their name, and it has a place for their

14         signature, and I'm referring to the loan officers,

15         correct?

16   A.    It has a place for a signature.

17   Q.    And so you have seen decline letters out of the

18         Operations Center with a by line or signature line

19         with the loan officer's name underneath it,

20         correct?

21   A.    Correct.  I don't know if it was underneath, I

22         forget exactly, but you put the loan officer's name

23         on the decline.  I don't know if it was -- I don't

24         know exactly where it was on the decline letter,

198

1          but --

2    Q.    Had you ever seen your name on a decline letter?

3    A.    I have had a couple in the past.  I can't recall

4          exactly what loans they were, but I have had

5          borrowers send them to me and let me know.

6    Q.    And how many times have you seen your signature

7          line or by line on a decline letter?

8    A.    I forget if there was a by line.  I have seen a

9          couple of them.  I can't recall exactly how many.

10   Q.    At least two you have seen in your tenure as an

11         employee of Citizens Mortgage Corporation, correct?

12   A.    Yes.

13   Q.    And you were aware, at that time, of the Citizens

14         Mortgage Corporation policy that a loan officer

15         should not be making credit decisions, correct?

16   A.    Yes.  It's a policy I think all mortgage companies

17         have.

18   Q.    You are aware of that, correct?

19   A.    Yes.

20   Q.    When you observed your by line or signature line on

21         a decline letter, did that trouble you?

22   A.    No.

23   Q.    It didn't trouble you at all?

24   A.    No.  I would want -- I want the customer to contact

230

1        involve Bard, it was just us, the people in the

2        branch that chose to go.

3    Q.   Now, Bard Conn's salary was capped, are you aware

4        of that?

5    A.   I had an idea.  I didn't know for sure.  I have

6        heard that the managers can be capped, the upper

7        management.

8    Q.   Do you know what he was capped out at?

9    A.   No.  I'm not familiar with that compensation.

10   Q.   You weren't capped out, correct?

11   A.   Correct.

12   Q.   Do you know how much you were earning in 2002?

13   A.   Commissions?  I would be guessing, but probably

14       about 350, 400,000.

15   Q.   And so were you earning more than your boss?

16              MS. GAETA:  Objection.  He testified --

17   A.   I don't know what he was making.

18   Q.   He was making 350.

19   A.   I guess.

20   Q.   So you are saying you guess that you were earning

21       more than he was?

22   A.   I can't recall exactly what I made, but if he was

23       making 350, and that's a fact, then you're correct.

24   Q.   And in other years, 2002 through 2003, what were

231

1          you earning?

2                    THE WITNESS:  Do *I* have to answer?

3                    MR. **BURKE**:  I already have the

4     information, sir.

5                    **MS**. GAETA:  Just answer about your

6     employment at Citizens.

7     Q.   **Your** employment at Citizens.

8     A.    I thought you were asking now.

9     Q.   Not at Countrywide, at Citizens.

10                   You were employed at Citizens, and you

11    left in 2003, correct?

12    A.   Like, 500.

13    Q.    In 2003 you earned $500,000?

14    A.   No, 2002.  **I'm** sorry, you asked 2003?  450, 500.

15    Q.   450,000 to 500,000?

16    A.   450,000 to $500,000, somewhere around there.

17    Q.   And did you have any agreement with **Mr.** Conn

18         relative to your override in terms of sharing any

19         of your override?

20    A.   **No.**  It's a flat agreement where my branch does

21         "X," I get **five** basis points on the branch, or four

22         or three, depending on the tier.  Most of the time

23         we were at the top tier.

24    Q.    Did you have any agreement with **Mr.** Conn to share

232

1            any of your overrides?

2    A.    No, not at all.  It was my compensation totally.

3    Q.    Are you aware of any gifts or other types of

4          compensation that Liz Walsh received for her

5          expediting loans on behalf of any loan officers?

6    A.    No, not at all.

7    Q.    Have you ever heard of anything like that?

8    A.    No.  She would never do anything like that.

9    Q.    How do you know that, sir?

10   A.    Because she's a straightforward person.  You met

11         her.  She's does her job.

12   Q.    So as you sit here today, you're absolutely certain

13         that Miss Walsh would not accept any other

14         compensation and/or gifts for her assistance in

15         expediting loans?

16   A.    I'm not certain of anything in life, but acceptance

17         is --

18   Q.    So you are not certain?

19   A.    In my experience, no.

20   Q.    But you're not certain about that, correct?

21               MS. GAETA:   Objection.

22   A.    No.

23               MR. BURKE:   Just give me one moment.

24               (Brief recess.)