# EXHIBIT 8

VOLUME: I
PAGES: 1-278
EXHIBITS: 1-3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 03CV-12413DPW

- - - - - - - - - - - - - - - - - - -x
ELEANOR SCALLI and ROBERT SCALLI,

     Plaintiffs,

vs.

CITIZENS FINANCIAL GROUP, INC.,

     Defendant.
- - - - - - - - - - - - - - - - - - -x

     Deposition of STEVEN ROUSSEL, a witness called on behalf of the Plaintiffs, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure before Susan L. Prokopik (CSR #124893), a Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Mark E. Burke, 111 South Bedford Street, suite 208, Burlington, Massachusetts on Tuesday, May 17, 2005, commencing at 10:23 a.m.

_____

BRAMANTI & LYONS COURT REPORTING, INC.
REGISTERED PROFESSIONAL REPORTERS
92 STATE STREET, BOSTON, MA  02109
TEL: 617.723.7321 / FAX: 617.723.7322
www.bramanti-lyons.com

1      <u>APPEARANCES</u>:

2

3          Mark E. Burke, Esq.
           Law Offices of Mark E. Burke
           111 South Bedford Street, suite 208
4          Burlington, Massachusetts 01803
                  - and -
5          Nicholas J. DiMauro, Esq.
           Law Offices of Nicholas J. DiMauro
6          111 South Bedford Street, suite 208
           Burlington, Massachusetts 01803
7          Attorneys for the Plaintiffs

8

9          Anne M. Gaeta, Esq.
           Goodwin Procter LLP
10         53 State Street
           Exchange Place
11         Boston, Massachusetts 02109
           Attorney for the Defendant

12

13     <u>ALSO PRESENT</u>:

14         Eleanor Scalli

15

16

17

18

19

20

21

22

23

24

DEPOSITION OF STEVEN ROUSSEL

1                        I N D E X

2
         Deposition of;                          Page
3
         STEVEN ROUSSEL
4
            Examination by Mr. Burke          5, 222
5

6           Examination by Mr. DiMauro             29

7

8

9

1 0                   E X H I B I T S

11       No.                                      Page

12       1    1/17/03 E-mail                      162

13       2    2/5/03 document                     270

14       3    2/5/03 document                     270

15

16

17

18

19

20

21

22

23

24

1   A.   I -- I don't know.  Whenever I send something, I

2        send it to Tony.

3   Q.   I'm sorry?

4   A.   Whenever I send something to him, I say his name

5        is Tony.  I just put Tony G but it's Giacalone.

6        If I were to guess, it's G A C L I O N E?

7   Q.   Okay.

8   A.   So he told me that he had an issue with Citizens.

9   Q.   He had an issue with Citizens; is that --

10  A.   Yes.

11  Q.   You remember him stating that specifically; is

12       that -- he had an issue --

13  A.   Something like that.  There was something on his

14       mind.  And I had asked him if it had anything to

15       do with me.  And he said, No, not with you but

16       with another loan officer.

17  Q.   Okay.  And why don't you expand upon that?

18  A.   Well, he had said that he got a decline letter

19       from Eleanor Scalli, who was a loan officer that

20       works out of the Woburn office.  I work out of --

21       at that time I was working out of the Dorchester

22       office and Eleanor does not report in to me.

23  Q.   Let me just interrupt you for one moment.  What

24       do you mean by that?  She does not report in to

1       Gonzalo Puibo reported in to Mike.  Eleanor

2       Scalli reported to Mike.  She reported in to

3       Michael Diranian.

4              Victoria Noel reported in to Michael

5       Diranian because she worked out of Woburn and

6       then Mike was doing loans in East Boston also.

7       So there were four people, sir, that were working

8        out of the Woburn office that reported in to

9       Michael that were in that area.  I'm the only

10      person that's in that area that's not from

11      Woburn.  I'm a sales manager and I have my own

12       team but I'm the only person on my team that's

13      originating loans in East Boston and my name is

14      Steven J. Roussel so there's five people that

15      could be originating loans out of that office.

16  Q.  Okay.

17  A.  So when Tony said that he had an issue with

18      Citizens, there could have been any one of the

19      five of us.

20  Q.  And that was Miss Scalli, Victoria Noel, yourself

21      and --

22  A.  Gonzalo Puibo.  P U I B O.  And then Michael

23      Diranian himself.  So I had no idea what the

24      issue was.  I was there on the premise that I'm

1    looking for business.  I'm looking to preapprove

2    customers.  But then as I'm asking for that, he

3    said that he had an issue.  And I had asked, Is

4    that issue with me?

5          And he said no.  And I said, you know,

6    What's the issue all about because whatever that

7    issue is, if it falls -- if it doesn't fall into

8    my jurisdiction, if it falls into Mike's

9    jurisdiction, I would have to get Mike involved.

10 Q.  Okay.  What else?

11 A.  So then he had said that he had this decline

12    letter and he didn't think it was authentic.  So

13    I said to him -- I said, Well, if you would like,

14    I could get that decline letter and forward it

15    off to Mike and have him research it.

16          And at that point, he had said

17    something like, I don't know if I want to do

18    that.  So I said to -- I said to Tony Giacalone,

19    the owner of Tony's Realty, I said to him, Gee,

20    Tony, if you really want to know that it's

21    authentic, you have two choices.  If you want to

22    know that it's authentic, then we can proceed.

23    If you just don't want to proceed, then that's

24    fine also.  But I'm here for a sales call for

1    myself.  How would you like to proceed?

2         It became a little awkward at that

3    point because I've known Tony for a long time.

4    And he said, Let me think about it.

5         And then of course I tried to -- tried

6    to get business out of him, of course.  That's

7    why I was there in the first place.  The next day

8    ──────

9  Q.  Which day was this, by the way?

10 A.  Oh, boy.  *I* don't recall the exact day, sir.

11 Q.  Okay.  When did you notify anyone at Citizens

12    Mortgage relative to the issue here?

13 A.  I didn't notify anybody at that point because I

14    didn't have the letter, number one.  And I didn't

15    know if Tony wanted to move forward.  At that

16    point, I had already moved forward to make

17    another call with another office and I really

18    didn't think anything of it because Realtors

19    perceive a lot of stuff that sometimes is not

20    necessarily true.

21         And I didn't think anything of it.  I

22    didn't say anything.  And then the next day I got

23    a call from Tony and Tony was upset.  And I had

24    talked to Tony and he had then made an allegation

1    to say that he thought that the decline letter

2    was being used to decline the borrower but he had

3    said that **there's** a rumor that that same borrower

4    that was declined was trying to buy another

5    house.

6              And he was upset.  **At** that **point,** I

7    said to **Tony,** I said, Tony, **we're** right back to

8    the two options that you **have.**  I said, What

9    would you like to do?

10              Didn't even know who we were talking

11    about.  So I said --

12  Q.  What do you mean, didn't even know who you were

13      talking about?

14  A.  Didn't even know who we were talking about.

15      Because remember, there's five of us.  I know

16      it's not me.  It could be one of the four members

17      of Michael's team.  So then I said to him — so

18      then he said to me, he said, Steve, it's Eleanor

19      Scalli.  And this is what I said:  I said, Tony,

20      I said, I know Eleanor Scalli.  And I really

21      don't think that Eleanor would do -- would do

22      something that's not right.  I said, I think you

23      might be overreacting.

24              *I* said, You got two choices.  The first

1       choice is you let it go and you move on.  The

2       second one is, you give me the letter.  I give it

3       to Mike and Mike looks into it for you.  **Because,**

4       you know, loan officers just **don't** do that.

5               So he was so upset that he ended up

6       giving me the letter.  I took a look at the

7       letter.  And from the visualization, **sir,** I

8       **didn't** know if it was authentic.  It wasn't my

9       call.  I went to his office.  I picked up the

10      letter.  Probably about two or three days after

11      we had the **conversation.**  At that point, I knew

12      that this thing was a little more than a, you

13      know, run of the mill complaint.

14              So I told Tony that I would get the

15      letter, give it to the manager who's that

16      jurisdiction and he would run from it from that

17      point on.  And what I did was I had the letter.

18      At that point I called Mike.  Because now I knew

19      I had a problem.  One thing, sir, I'm not going

20      to do is create issues.  I'm not looking for

21      issues because time is a luxury that we all don't

22      have.

23              At that point I knew we had an issue

24      and I thought about what to do, and the right

1        thing for me to do at that time was to give that

2        letter to Mike Diranian.

3    Q.  Okay.  Where is the letter now?

4    A.  I gave it to Mike.

5    Q.  And was it an original letter?

6              Do you understand that?  Do you

7        understand the question, sir?

8    A.  I understand that question but I need the

9        definition of an original.

10   Q.  Did it have original signatures on it?

11   A.  No, but it was a fax copy and a fax to me is a

12       duplicate original.

13   Q.  So it was not an original with original

14       signatures, correct?  It was a faxed —

15   A.  Can I --

16   Q.  -- version of a copy or a faxed version of

17       potentially an original, correct?        .

18   A.   It's always been my understanding that when you

19       fax something over, it's a duplicate original.

20       So to me, sir, it was an original.

21   Q.  Okay.

22   A.  So there's a definition issue.

23   Q.  I'm not asking what your sense is in whatever

24       industry that you're in that something is an

DEPOSITION OF STEVEN ROUSSEL

1    Q.   And you are not the least bit curious as to the

2         results of Mr. **Diranian's** inquiry or Citizens

3         Mortgage **Corporation's** inquiry into this matter?

4    A.   Mike said he was going to take care of it.  That

5         he was going to take care of it and I, you **know,**

6         I was on to something **else,**  sir.  One thing that

7         I would like to say is that we work in a fast

8         pace environment.  And once someone says that

9         they're going to do something, it's like a

10        military guy in a fox hole.

11             If he says **he's** going to do something,

12        it's going to get done.  **We're professionals.**  We

13        don't say we're going to do something if we're

14        not going to do it.  Mike, **I've** known Mike for 15

15        years, okay?  If Mike says he's going to do

16        something, he's going to do it.

17   Q.   What did he say he was going to do in this case?

18   A.   He said he was going to get that decline letter

19        and he was going to look into the authenticity of

20        that decline letter.

21   Q.   Okay.  And my question is, you were not curious

22        about your procurement, your turning over this

23        document to your sales manager and ultimately to

24        human resources at Citizens Mortgage?

1          expertise to determine whether something from

2          your mortgage company would be authentic or not?

3                  MS. GAETA:  Objection.

4     A.   No.  No.

5     Q.   Why would he be questioning the authenticity of

6          such a letter if he had no background in the

7          operations department, sir?

8     A.   I don't know.

9     Q.   Okay.  He didn't mention the reason why he was

10         questioning it?

11    A.   Not at that first time, no.

12    Q.   How about the second time?

13    A.   The second time, the answer is yes.

14    Q.   What did he say?

15    A.   He had told me that there was a rumor that a

16         particular borrower was getting declined and that

17         that person was under agreement to buy another

18         house.

19    Q.   Okay.

20    A.   And that's when he gave me the letter.

21    Q.   So your testimony, sir, if I understand you

22         correctly is that Mr. Giacalone's making

23         accusations against the borrower, correct?

24                  MS. GAETA:  Objection.

1    A.   I don't understand.

2    Q.   Well, you just testified that Mr. Giacalone made

3         accusations that -- by the way, do you know the

4         borrower's name in this case, sir?

5    A.   Well, I saw the decline letter that was presented

6         to me.   I remember the decline letter that I saw

7         with my counsel.   I remember that name.

8    Q.   What is that name, sir?

9    A.   Barbosa?

10              MS. GAETA:   Just answer his question.

11   Q.   That's fine.   Jean Barbosa.   Does that sound

12        familiar?

13   A.   I just know Barbosa.   I just remember Barbosa.

14   Q.   All right.   And your testimony was that Mr.

15        Giacalone of Tony's Realty made an assertion to

16        you that a borrower, in this case the borrower is

17        Jean Barbosa, was engaging in activities wherein

18        he was looking to purchase a home or under

19        agreement, I believe you said, to purchase a home

20        from another party.   Is that what Mr. Giacalone

21        told you?

22   A.   Well, no.   He first said, I have an issue.

23              And then he asked me to take a look at

24        the decline letter.   And I didn't know if it was

1          in the purchase of another property and said that

2          it was -- he believed was under agreement, **that's**

3          not gossip, sir?

4                    MS. GAETA:    Objection.

5     A.   Well, **let's** reel the tape back.   I had told Tony

6          at that time that *I* didn't think Eleanor Scalli

7          would do something like that.

8     Q.   Okay.

9     A.   So are you ready?   First of all, I stuck up for

10         an employee that at that point we had no

11         knowledge of was it true or not true so let's

12         kind of remember that fact.

13    Q.   So did you stick up for her, sir, by passing on

14          this negative gossip to Mike Diranian?

15                    MS. GAETA:    Objection to that

16         characterization.

17    Q.   Is that how you stuck up for her, sir?

18    A.   No, sir.

19    Q.   How did you stick up for her, sir?

20    A.   Let's go back and let's say and let's look at the

21         transcripts.   Because I know Eleanor is here.

22        Let her read the whole transcript.   I went in

23         there and I told Tony that I didn't think Eleanor

24         Scalli would do something like this.   He had two

DEPOSITION OF STEVEN ROUSSEL

```
 1  A.   That is true.  I did not ask Tony where he got
 2       that information.
 3  Q.   Okay.  And if you will -- first of all, how long
 4       did you know Eleanor Scalli prior to speaking to
 5       Tony about this issue?
 6  A.   I've known Eleanor since childhood.
 7  Q.   Okay.  As you say, you were going to speak -- you
 8       were trying to speak on her behalf saying she --
 9       I think your testimony was, she wouldn't do
10       something like that.  Is that --
11  A.   I was trying to exonerate her on the premise that
12       nobody would ever do something like that.
13  Q.   And when you were trying to exonerate her, sir,
14       you -- did you ever call her up?
15  A.   No, sir.  I did not.
16  Q.   Did you ever ask her, a person you've known since
17       childhood, before calling Mike Diranian, I've
18       heard a lot of gossip.  I didn't verify any of it
19       but I heard a lot of gossip.  Can you tell me
20       about it?
21            Did you ever call her up and ask her
22       that question?
23            MS. GAETA:  Objection.
24  A.   No, sir.  I did not.
```

DEPOSITION OF STEVEN ROUSSEL

1          discipline was finding out if that letter was

2          authentic.

3     Q.   Okay.

4     A.   Okay?  And I truly believed, **okay,** that the

5          letter that I had, it was a logical explanation.

6          There had to be some sort of logic of why he had

7          that letter.  Okay?

8     Q.   All right.

9     A.   It was not my place to say if it was authentic.

10         Sir, I didn't even know if it was authentic.

11         Because when I looked at the letter, there was a

12         different address on the left-hand side that I

13         wasn't used to seeing.

14    Q.   And at that time when you say you **didn't** even

15         know if it was authentic, at that time how long

16         had you been in the business?  You had been in

17         the business quite a number of years?

18    A.   Fifteen years.

19    Q.   All right.  And even with your own expertise, you

20         didn't even know if it was authentic or not?

21    A.   That's why I had to ask Michael his opinion.

22    Q.   Right.  So --

23    A.   Maybe it was a new form I **didn't** know.  I was not

24         used to that template.

1   Q.   Okay.

2   A.   I wasn't used to that format.

3   Q.   Okay.

4   A.   And I wasn't used to having an address that

5        wasn't from 1200 Hancock Street.  I certainly

6        wasn't used to a loan officer signing a decline

7        letter.  I didn't know what to make of it.

8   Q.   Okay.

9   A.   But I'm thinking in my head there has to be some

10       sort of logical explanation.  I couldn't get that

11       explanation because unfortunately, Eleanor did

12       not report in to me.

13  Q.   Right.

14  A.   That was Michael's jurisdiction.

15  Q.   Did you have a laptop during your employment?

16  A.   Oh, yeah.

17  Q.   At this time?

18  A.   Yes, sir.

19  Q.   Okay.  And on that laptop, did you have a form

20       that was similar to the form that you were

21       viewing that declination form burnt onto your

22       laptop, if you know what that means?

23  A.   No, no.  I understand that question.  There were

24       a lot of forms on the laptop that I did not

1        to answer your question directly, if Eleanor had

2        a deal with Bard or Mike, I **don't** know about that

3        deal because it **wasn't** my territory.  With Kathy,

4        I don't recollect her ever making a big deal out

5        of not getting TV or radio.

6                  I think that she wouldn't present well

7        to be candid with you.  I **don't** think we would

8        ever make that decision for her at that time in

9        her career.

10   Q.   Do you know a person named Victoria Noel?

11   A.   Yes, I do.

12   Q.   And how do you know her, sir?

13   A.   She was a colleague of mine that I have a lot of

14        respect for.

15   Q.   And did she work under your direction?

16   A.   No, sir.  She did not.

17   Q.   Who did she work for?

18   A.   She worked for Mike.  Out of Woburn.  She was one

19        of the five people that could have got that

20        letter from Tony.  There's four people, including

21        Mike, that work out of Woburn.  She was one of

22        those four.

23   Q.   Okay.  And did you ever discuss with Miss Noel

24        Eleanor Scalli's situation or Robert Scalli's

1      situation with respect to them leaving the bank?

2   A.  **No,** sir.  I didn't have that sort of relationship

3      with them.

4   Q.  Did you ever hear Miss Noel indicate that the

5      reason why Eleanor and Robert left the bank is

6      because they were going to be indicted for bank

7      fraud?

8   A.  **No,** sir.  I have not ever heard that.

9   Q.  Okay.  Do you know whether or not Miss Noel made

10      any representations like that to anyone on your

11      team, any of the loan officers under your

12      direction?

13  A.  Not to the best of my knowledge.  Vicki just

14      **didn't** come around our office.  And as a matter

15      of fact, my loan officers just **didn't cross** into

16      East Boston.  Um, there **wasn't** that sort of

17      contact with my office and Woburn's office.  We

18      were competing offices.

19              You know, it's like the Yankees and the

20      Red Sox, you know.  You know, **you're** friends but

21      you **don't** talk about stuff like that.

22  Q.  But you're in competition?

23  A.  That's true.  But it's good, healthy competition.

24      All right?  You know, it's -- if something is

DEPOSITION OF STEVEN ROUSSEL

1              I said -- I **didn't** know what to think

2       about that letter.  I said, Tony, I said, I **don't**

3        know what to tell you about this letter.

4              I looked at the letter.  The format was

5       different.  The address in the bottom like

6        left-hand corner was not Quincy.  It was not 1200

7       Hancock Street.  And then the loan officer had

8       signed it.  And I said to him, I **said,** I don't

9       know whether to make heads or tails out of this.

10             At that **point,** I believe he took the

11      letter back and he **didn't** know whether or not

12      that he was going to go forward.  And it **wasn't**

13      until the next day or so, *I* believe, where he had

14      called me up and he said he wanted to see if it

15      was authentic.

16             And before he said that, he said that

17      he had heard that this person was being declined

18      and that the rumor was that they were going to

19      buy another house.  And he just wanted to know if

20      it was authentic so I told him the course of

21      action that I would take.

22             I told him -- and everybody always knew

23      this about Steve Roussel.  I'm not going to get

24      involved in Woburn issues.  Okay?  I told him and

1          have the original.  You **don't** know whether or not

2          he does or he **doesn't**?

3   A.   I **don't** know that answer.

4   Q.   And but he gave you one **copy,** correct?

5   A.   To the best of my recollection, it was one copy.

6   Q.   Okay.  And how long after that did you send that

7          over to Mike Diranian?

8   A.   **Um,** immediately after I left his office, I

9          believe it was later on in the afternoon.  The

10         next day, I called Mike up and I told him what

11         had occurred for the first time.

12  Q.   Okay.  But Mike never indicated to you what he

13         intended to do about it?

14  A.   No, sir.  All he said was that he would look into

15         it.

16  Q.   And Bard never spoke to you about it?

17  A.   Never did.

18  Q.   Okay.  And let me ask you a question.  Have you

19         ever declined a loan yourself, sir?

20  A.   Have I?  I don't have the capacity, sir.  I never

21         have.

22  Q.   That wasn't my question.  You've never declined a

23         loan?

24  A.   Never.

1          deviate from that by not asking Tony Galina (sic)

2          where he got that document?

3                    MS. GAETA:   Objection.

4    Q.   Very important document you said.   Where did you

5          get it?

6    A.   I identified it as an important document but I

7          also identified that as possibly there has to be

8          a logical explanation.   A loan officer of any

9          experience should never -- and it **wasn't** my

10         judgment call to make that but a loan officer

11         just doesn't make credit decisions.

12                   I don't know if it was a lapse of

13         judgment by who did it.   But I was really hoping

14         that that letter once it went to Mike, there was

15         a logical explanation why that letter was like

16         that because I had never seen that format and I

17         was hoping that it was just going to go away.

18                   I was hoping that Mike would just call

19         Tony and say, Hey, listen, the loan is declined.

20         This is the letter and it's in the file.

21                   There was no way for me to ever know --

22         now, today, let's go three -- you know, three

23         years forward.   If I had my laptop, I can drill

24         down and see commitment letters and pend letters

1        and -- but only people underneath my

2        jurisdiction.  You know, so even still today, we

3        have, you know, updated the system.  I still

4        don't have capabilities of ever reviewing someone

5        that's not reporting in to me.

6   Q.   Okay.

7   A.   And I think that's fair.

8   Q.   Have you ever seen a decline letter issued with

9        your name on it?

10  A.   Yes.  It will have my name on it but not my

11       signature.

12  Q.   Okay.  So you have seen them with your name on

13       it?

14  A.   On the bottom to say that I was a loan officer on

15       the deal.  I believe that's how our decline

16       letters at that time were being sent out.

17  Q.   Okay.  How are they sent out now, sir?

18  A.   You know?  I don't handle that aspect of the loan

19       anymore.  My assistant does.  She handles that.

20                  (Recess.)

21  Q.   Mr. Roussel, you indicated earlier you have a

22       recollection of possibly sending Liz Walsh a

23       birthday card to her home.

24  A.   (Witness nods.)

1    Q.    Okay.  Was there a caption or a -- any kind of

2          indication that there was a form for statement of

3          credit **denial,** termination or change on there?

4    A.    I **don't** remember that form on there.  But I do

5          remember verification of employment, verification

6          of **deposit,** verification of mortgage.

7    Q.    Okay.

8    A.    Okay?  And the policy for me that I abided by was

9          that I could not have direct **contact** in sending

10         that stuff out.

11   Q.    What -- did you ever seek authority from whatever

12         **source,** whether it be Liz Walsh, Bard Conn or

13         anyone in operations?  Did you seek authority

14         from anyone in operations to have a decline

15         letter issued?

16   A.    No.  I never -- I never -- I never had tried to

17         send a decline letter out.  It was always, I'm

18         trying to get the deal through.

19               I would never call somebody -- except

20         for in one case -- I would not call someone for a

21         decline letter.  I would try to get a pend

22         letter.  Try to get an approval letter but --

23   Q.    What is a pend letter?

24   A.    A pend letter meaning they need more information

1  Q.  Have you ever been in a situation where you were

2      up against a deadline and your customer had come

3      to you and **said,** I need a decline because I need

4      to get my deposit back?

5  A.  Yes.  That has happened to me and then what I

6      would do is see if there was a reason to decline

7      the loan.  And if there was, then just tell my

8      processor, Hey, listen, give me a decline letter.

9  Q.  You would tell your processor to issue or give

10     you authority to issue the decline letter?

11 A.  **No.**  No, **no.**  I never had authority to do a

12     decline.  She would have to go through the proper

13     channels.  The only people that I know of that

14     have the capabilities of declining a loan is not

15     my processor.  It's the underwriting team.

16         My processor would have to bring the

17     file to an underwriter as an emergency.  Go out

18     of -- they have this whole line of things that

19     you got to put it in a certain order but if, you

20     know -- in priority.  I would have her go to the

21     underwriter and see if there was a reason for

22     decline.  If there is not a reason for decline,

23     sir, it can't be declined.

24 Q.  Did you ever check yourself to see that --

```
 1   A.   What's the date that we're talking about?

 2   Q.   The date that is the relevant period here is in

 3        or about -- I think you even mentioned late 2002

 4        and early 2003.

 5   A.   I would say three to four years.

 6   Q.   Okay.  And you had kept copies of files yourself,

 7        loan files, correct?

 8   A.   Yes.

 9   Q.   That you indicated that you would destroy after

10        you were paid?

11   A.   I do that with my active applications, sir, yes.

12        That's what I do.

13   Q.   After you were paid, you destroyed all of your

14        files?

15   A.   That's correct.

16   Q.   Okay.

17   A.   I never left anything in the office.

18   Q.   And so you had in your experience observed

19        decline letters, correct?

20   A.   Not many but I have.

21   Q.   Okay.  And how were those decline letters

22        different than the one that you had procured from

23        Mr. Giacalone?

24   A.   I don't recollect the specifics but that
```

1      particular document that I got from **Tony,** just

2      the format was very -- like the print was

3      smaller.  It just **didn't** look like one that I was

4      familiar with.  Other than -- other than it was

5      small, hard to **read,** small printing, with a

6      different address, with a loan officer signing

7      it, I said to myself, I **can't** make this call.  I

8      need help.

9              And that's what I did.  I called for

10     help.

11  Q.  Well, let me ask you this:  Did you know at that

12     point in time when you reviewed this letter with

13     Mr. Giacalone, did you know it was a violation of

14     Citizens Mortgage Corporation's policy to issue

15     such a decline?

16          MS. GAETA:  Objection.

17  A.  I cannot make that determination with the

18     information that I had whether Eleanor had sent

19     that to Tony.  Um, I just know that Tony was very

20     upset.  I fielded a complaint.  And I really

21     didn't know if that was a good rejection letter

22     or a bad one.

23              And even if I did know if it was good

24     or bad, I would never say that to Tony.  I would

1          sending me to different sort of classes.  Like

2          I've been to negotiation classes at Citizens.

3                  You know, they support you and try to

4          strengthen you because I negotiate rates and

5          things like that.  Do I have certificates in

6          this?  No.  But there have been seminars.  You

7          know.  I've been to respect training.  Diversity

8          training.  Public -- I read a lot of public

9          speaking books but never really went to Dale

10         Carnegie.  Read the book.  Dale Carnegie book.  I

11         constantly go to motivational speakers and things

12         like that.

13    Q.   Can you give me a brief thumbnail sketch of your

14         employment background?

15    A.   Yes, sir.  Let's go backwards.  Is that okay?

16    Q.   However you feel comfortable.

17    A.   August, 1999 I became sales manager, Dorchester.

18         Before that -- it gets sketchy.  At Bank of

19         Boston -- I --

20    Q.   Let me just stop you for a moment.  Sales manager

21         of the Dorchester branch of Citizens Bank.  Is

22         that --

23    A.   Yes.  That's always been my -- no.  I'm sorry.

24         When I first got hired, the office was in Jamaica

1      **Plain,** sir.  And then two years later, they built

2      the new office in Dorchester.

3   Q.  Okay.

4   A.  But **it's** all like -- Jamaica Plain and Dorchester

5      is all in the same breath.

6   Q,  It's in the same geographical location?

7   A.  Right.  But some people still call us the JP

8      office even though we're not.

9   Q.  So you have a physical office in Dorchester at

10      the branch bank; is that —

11   A.  Yes.  **That's** where my office is, sir, **yes.**

12   Q.  From when to when have you been physically

13      located at the Dorchester branch?

14   A.  I would say -- I would say -- let me do it this

15      way.  JP from August, 1999 to August, 2001.  And

16      then I would say from August, 2001 to present in

17      Dorchester at 572 Columbia Road.  That's where my

18      physical office is but wherever I lay down my

19      laptop is where I work.

20   Q.  Now, so you have been working for Citizens

21      Mortgage Corporation since August of 1999?

22   A.  Yes, sir.  To the best of my knowledge.

23   Q.  Okay.  And you testified previously that Steve

24      Adamo recruited you; is that correct?

1   A.   Yes, sir.

2   Q.   Okay.  Where did he recruit you from?

3   A.   Bank of Boston.

4   Q.   Okay.  From when to when did you work at Bank of

5        Boston?

6   A.   I left there **August,** 1999 with no, you know --

7        quit one day.  Started the next day.  And I

8        started working, I would say -- I would say maybe

9        August of 1992 at Bank of **Boston/BBMC.**

10  Q.   What does that mean?

11  A.   We changed our name from Bank of Boston to BBMC

12       to BankBoston because of the mergers and stuff

13       that happened.

14  Q.   Okay.

15  A.   So Bank of Boston, then it was BBMC, then it was

16        B A N K Boston, one word, when we took over

17       BayBank.

18  Q.   And when you started in August of 1992 with Bank

19       of Boston, what was your position?

20  A.   Telemarketing sales.  I think it was 1993.  I'm

21       sorry to drive you crazy.

22  Q.   Not at all.  So describe to me your

23       responsibility in telemarketing sales.

24  A.   I would field all sales questions to people that

DEPOSITION OF STEVEN ROUSSEL

1    said to Eleanor, I don't know if this is an

2    appropriate time but, you know, if you would want

3    to take a look at us, we would like to tell you

4    our story.

5             And I just kind of figured they would

6    give us a call afterwards but right then and

7    there we started talking about it because where

8    Bob can be so energetic, so exciting, he wanted

9    to know more right then and there. I had told

10   him how I thought, you know, what the pros and

11   cons were and they had thought that Freddie

12   Girolamo at North American was holding Eleanor

13   down because Eleanor and him shared a processor

14   which was a relative of Freddie and Freddie, she

15   said, always wanted to be big man on campus and

16   was holding her back.

17 Q.  Did Bard Conn get involved at some point in this

18      process?

19 A.  Eventually he did.

20 Q.  And did you inform Bard that there was a

21      willingness to come on board?

22 A.  You know, not at that time.  Only because I don't

23      know how serious they were.  But then the

24      conversation really picked up and then at that

DEPOSITION OF STEVEN ROUSSEL