EXHIBIT 13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ELEANOR SCALLI and ROBERT SCALLI,

Plaintiffs,

v.

CITIZENS FINANCIAL GROUP, INC.,

Defendant.

Civil Action No. 03-12413-DPW

**UNPUBLISHED CASES CITED IN DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

1. *Alba v. Interactive Data Corporation,* **1995 WL 1146839 (Mass. Superior,** Nov. 17,
**1995)**

2. *Baptista v. Abbey Healthcare Group, Inc.,* **1996 WL 33340740** (Mass. **Superior,
April 10, 1996)**

3. *Okerman v. VA Software Corporation,* **2003 WL 21960599 (Mass. Superior, July
9, 2003)**

4. *Richards v. Datatech Systems, Inc.,* **2005 WL 1156162 (Mass. Superior, March 31,
2005)**

5. *Scott v. Granada Computer Services, Inc.,* **1996 WL 1186807 (Mass. Superior,
May 2, 1996)**

Not Reported in N.E.2d                                          **Page** 2
1995 WL 1146839 (Mass.Super.)
(Cite as: 1995 WL 1146839 **(Mass.Super.)**)

Only the Westlaw citation is currently available.

Superior Court of Massachusetts.
Wayne J. ALBA
v.
INTERACTIVE DATA CORPORATION et al.
[FN1]

FN1. Christine Sampson.

No. 9203570A.

Nov. 17, 1995.

MEMORANDUM OF DECISION AND ORDER
FOR SUMMARY JUDGMENT

SMITH.

**\*1** This matter comes before the court on the motion for summary judgment of defendants Interactive Data Corporation (IDC) and Christine Sampson, pursuant to Mass.R.Civ.P. 56. Plaintiff Wayne Alba alleges that defendant Sampson: (1) intentionally interfered with plaintiffs employment; and (2) defamed the plaintiff. Plaintiff alleges that defendant Sampson purported to act on behalf of defendant IDC at the times she allegedly defamed plaintiff; and that defendant IDC should therefore be vicariously liable for defamation.

Defendants move for summary judgment on the arguments that: (1) plaintiffs defamation claim is based on nonactionable expressions of opinion that are further protected by a qualified privilege, and that he cannot establish that he suffered any defamation damages; and (2) plaintiffs claim that Sampson tortiously interfered with his employment contract is unsupported by the factual record. For the following reasons, defendants' motion for summary judgment is ALLOWED.

### BACKGROUND

Defendant IDC is a financial information services company. The President of IDC at the time in question was John Rutherford, and the Chief Financial Officer (CFO) was Kurt Hausafus. Among Hausafus's responsibilities were overseeing the Human Resources Department and the Finance Department. Thomas Samalis was the Corporate Controller, and reported to Hausafus. Christine Sampson was the Manager of Finance, and also reported to Hausafus. William Molloy was the Manager of Taxes, Treasury and Payroll, and reported to Samalis.

Plaintiff Wayne Alba began working for IDC in 1987 as a tax accountant. He had an associates degree in business management. Alba reported directly to Molloy. In July, 1991 Samalis and Molloy promoted Alba to the position of Senior Accountant. Alba's principal duties as a Senior Accountant were to prepare and file state and local tax returns.

Alba did not report to, or work directly with Sampson on a day-to-day basis; but they occasionally worked together on audits, and he occasionally worked with some of Sampson's subordinates. Over a period of years, Sampson and a group of her subordinates regularly ate lunch with Samalis and a group of his subordinates, including Alba. At some point in late 1990 or early 1991, they stopped eating lunch together, due to a conflict between the two groups. After the conflict, there was tension between the groups, and between Alba and Sampson in particular, as evidenced by the fact that Sampson and Alba each made derogatory remarks about each other to third persons.

A. Background of the Defamation Claim

Alba bases his defamation claim upon two incidents. The first involved a confrontation between Alba and Sampson over a derogatory bumper sticker. The second concerned a negative report which Sampson gave regarding Alba.

1. The Bumper Sticker Incident

In late 1990 or early 1991, approximately one year prior to Alba's layoff, someone placed bumper stickers which said "Christine Sampson is a fat loser" on the walls of the IDC employee parking garage. Upon seeing these stickers when she arrived at IDC in the morning, Sampson went into the building, and confronted Alba in the presence of other employees. She implied that he had put the stickers on the wall and referred to him in crude language. [FN2] Later that morning, Sampson reviewed a security videotape of the garage, and discovered that the perpetrator was not Alba, but rather was a former employee of IDC. That afternoon, Sampson apologized to Alba for confronting him.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(Cite as: 1995 WL 1146839, \*1 (Mass.Super.))**

FN2. The plaintiff claims that Sampson called him a "fucking asshole," or something to that effect. The Court notes that the plaintiff was no less colorful in his crude description of Sampson in his conversations with Hausafus and others in his department. (Alba Dep. P. 165-66, 169: Hausafus Dep. P. 109; Samalis Dep. P. 34; and Molloy Dep. P. 54.)

\*2 No disciplinary action was proposed or taken against Alba as a result of this incident. His supervisors, Molloy and Samalis, in fact, did not believe that Alba would be involved in such a thing.

2. The report to Human Resources

At some point between August, 1990 and early 1991, Cindy Lanciani, the Manager of the Human Resources Department, informed Alba that Sampson had made a negative report to her regarding him. Though he could not recall specifically what Lanciani told him, Alba believed that the general report was that he was not performing his job professionally and that he was not getting his job done. No adverse actions whatsoever were proposed or taken against Alba as a result of this report.

B. Background of the Interference With Employment Claim

In 1990, CFO Hausafus and other members of senior management began to plan a three year restructuring of IDC, in order to reduce costs and increase profits. Hausafus was responsible for formulating a plan to reduce costs in the Finance Department. In accordance with his plan, Hausafus laid off Samalis. Upon consulting with other senior managers, Hausafus came to the conclusion that corporate tax could be done by one person rather than two. He therefore decided to combine the duties of Molloy and Alba. He also decided to put Sampson in charge of corporate tax, and to give her the duty of supervising the person who worked in the combined Molloy/Alba position.

Hausafus informed Sampson of his plans in January, 1992. He consulted with her about who could best take over the restructured tax position. Sampson and Hausafus were concerned about the ability of Alba to fulfill the duties of the position, due primarily to his lack of supervisory experience, his limited accounting experience, and the fact that he did not have a bachelor's degree. Hausafus decided that Alba's accounting skills were "significantly less than ...

middle level" and that he was only "marginally acceptable" for the position. He decided to lay off Molloy, Alba and a number of others, and to hire Ronald Pelletier to fill the reorganized position.

Pelletier was a former IDC employee, and was working for The Boston Company when he was hired for the reorganized position. Among his qualifications were that he had a four year college degree with a minor in accounting, supervisory experience, and tax accounting experience. Pelletier had worked for Sampson from 1982 to 1988 at IDC.

Subsequent to the layoffs, Sampson had a discussion with Molloy regarding the layoffs. She made a statement to him to the effect that she and Alba could not work together, or that she could not have Alba work for her.

DISCUSSION

This court grants summary judgment where there are no genuine issues of material facts and where the summary judgment record entitles the moving party to judgment as a matter of law. *Cassesso v. Commissioner of Correction,* 390 Mass. 419, 422, 456 N.E.2d 1123 (1983); *Community National Bank v. Dawes,* 369 Mass. 550, 553, 340 N.E.2d 877 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. *Pederson* v. *Time, Inc.,* 404 Mass. 14, 16-17, 532 N.E.2d 1211 (1989). The nonmoving party's failure to prove an essential element of its case "renders all other facts immaterial" and mandates summary judgment in favor of the moving party. *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 711, 575 N.E.2d 734 (1991), citing *Celotex v. Catrett.* 477 U.S. 317, 322 (1986).

A. Count I: Tortious Interference With Employment Contract

\*3 To establish the tort of interference with contract, "the plaintiff must prove that: (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Wright v. Shriner's Hospital for Crippled Children,* 412 Mass. 469, 476, 589 N.E.2d 1241 (1992), (citations omitted). A defendant is not liable if the interference is privileged as part of his employment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                    Page 4
(Cite as: 1995 WL 1146839, *3 (Mass.Super.))

responsibilities. *Steranko* v. *Inforex, Inc.* 5 Mass.App.Ct. 253, 273, 362 N.E.2d 222 (1977).

Defendant Sampson was a supervisory employee at the time she discussed plaintiffs abilities with Hausafus. As such, she had a conditional privilege to "disclose information which may turn out not to be true concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job." *Dexter's Hearthside Restaurant, Inc. v. Whitehall Co.,* 24 Mass.App.Ct. 217, 222, 508 N.E.2d 113 (1987). However, this privilege may be lost if the defendant acted out of actual malevolence or malice. *Steranko v. Inforex, Inc., supra* at 273, 362 N.E.2d 222.

In this context, "malevolence is 'for a spiteful, malignant purpose, unrelated to the legitimate corporate interest.' " *Boothby v. Texon, Inc.,* 414 Mass. 468, 487, 608 N.E.2d 1028 (1993). It may be established "by proof of facts from which a reasonable inference of malice may be drawn." *Gram v. Liberty Mutual Ins. Co.,* 384 Mass. 659, 664, 429 N.E.2d 21 (1981). "Any reasonable inference of malice must, however, be 'based on probabilities rather than possibilities.' " *Id,* quoting *Alholm v. Wareham,* 371 Mass. 621, 627, 358 N.E.2d 788 (1976).

Plaintiff does not provide sufficient facts in the record to support a finding of malevolence or malice on the part of defendant Sampson during her discussions with Mr. Hausafus. The defendant's discussions with Hausafus were limited to assessments of plaintiffs work-related skills, and predictions as to whether those skills would correlate with the future needs of the accounting department. Clearly, such discussions are well within the legitimate corporate interest.

As evidence of malice, plaintiff relies upon defendant Sampson's statement to Molloy to the effect that she and the plaintiff could not work together, and upon the conclusory assertion that defendant hired a less qualified accountant to do the job. With regard to the former, the ability of coworkers to communicate, cooperate and rely upon one another is certainly a legitimate corporate consideration which may be taken into account in making staffing decisions. The latter assertion is unsupported by the facts, as the new hire (Pelletier) had extensive experience and education in the field of accounting. A comparative evaluation of the skills,

experience, education and disposition of competing job candidates is best left to the employer, and is especially unsuited for judicial determination.

*4 It is noteworthy that in a case in which there was a similar history of tension between the plaintiff and defendant, the Supreme Judicial Court upheld a directed verdict for the defendant, even though the defendant was the individual who fired the plaintiff. *Boothby, supra,* at 487, 488, 608 N.E.2d 1028. Unlike in *Boothby,* in the present case the defendant is not the individual who terminated plaintiffs employment. It is undisputed that Mr. Hausafus made the decision to lay off plaintiff and a number of other employees. Plaintiff, in fact, admits that, not only was Hausafus the one who made the decision, but that he (plaintiff) was "laid off ... as a result of a *planned reduction in force."* (Plaintiffs Memorandum in Opposition to Defendants' Motion for Summary Judgment, p. 7; emphasis added). Plaintiffs contention that defendant acted upon an ulterior motive to convince Hausafus to lay off the plaintiff simply does not establish a reasonable inference of malice.

For the foregoing reasons, the defendants' motion for summary judgment on the tortious interference with an employment contract claim is granted.

### B. Count II: Defamation/Slander

To establish a claim of slander, the plaintiff must establish three elements. First, he must show that the statement held him up to scorn, hatred, ridicule or contempt in the minds of a considerable and respectable segment of the community. *Tartaglia v. Townsend,* 19 Mass.App.Ct. 693, 696, 477 N.E.2d 178 (1985). Second, plaintiff must prove the statement was published by the defendant to someone other than her. *Brauer v. Globe Newspaper Co.,* 351 Mass. 53, 56, 217 N.E.2d 736 (1966). Third, plaintiff must aver that he suffered special damages, and must set forth these damages specifically. *Lynch v. Lyons,* 303 Mass. 116, 119, 20 N.E.2d 953 (1937). Furthermore, where a conditional privilege exists, plaintiff must show that the statement either was false, or was published maliciously without lawful reason in a conscious effort to ruin his reputation. *McAvoy v. Shufrin,* 401 Mass. 593, 597, 518 N.E.2d 513 (1988).

Plaintiff seeks to recover damages for two alleged defamatory incidents. He seeks recovery for each of these from defendant IDC as well as defendant Sampson, on the basis of vicarious liability. The first

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
(Cite as: 1995 WL 1146839, *4 (Mass.Super.))

claim is based upon the incident when defendant Sampson confronted plaintiff after discovering the insulting bumper stickers. The second claim is based upon defendant Sampson's statement to Cindy Lanciani, of the Human Resources/Personnel department.

### 1. Vicarious Liability of IDC

At the outset, summary judgment must be granted for defendant IDC on both defamation counts. In order for a plaintiff to recover from an employer on a theory of vicarious liability for a tortious act of an employee, he must establish that the tort was committed by the employee within the scope of the employment relation. *Kelly v. Middlesex Corp.,* 35 Mass.App.Ct. 30, 32, 616 N.E.2d 473 (1993); *review denied* 416 Mass. 1104 (1993). Clearly, defendant Sampson's accusation regarding the bumper stickers was made in a personal capacity and was not within the scope of her employment duties. The bumper sticker maligned defendant Sampson and not IDC. Defendant Sampson's confrontation of the plaintiff involved no interest of IDC nor was the confrontation done at the request of IDC. Summary judgment shall be granted for defendant IDC on this count.

### *5 2. Qualified Privilege

The plaintiff admits that defendant Sampson had a qualified privilege to report to the personnel department regarding plaintiffs job performance (Plaintiffs Memorandum in Opposition to Defendants' Motion for Summary Judgment, pp. 15, 16). To overcome this privilege, plaintiff must show that Sampson acted with malevolence. He must establish that the comment was made with knowledge that it is false, with improper motive, or with reckless disregard for its truth, *Ezekiel v. Jones Motor Co.,* 374 Mass. 382, 390-91, 372 N.E.2d 1281 (1978); that the comment was published excessively, *Bratt v. International Business Machines Corp.,* 392 Mass. 508, 515, 467 N.E.2d 126 (1984); or that the comment was made with malice. Malice in this context is defined as "the wilful doing of an injurious act without lawful excuse." *Id* at 513, 467 N.E.2d 126, quoting *Doan v. Grew,* 220 Mass. 171, 176, 107 N.E. 620(1915).

As with his tortious interference with contract claim, plaintiff does not produce sufficient facts in the record to establish malice. First, Sampson's comment was not made with knowledge of falsity or with reckless disregard for its truth. The record establishes

that although Sampson was not entirely familiar with the specifics of plaintiff's job performance, she had occasionally interacted with him on a professional basis in conducting audits, and interacted with him in a personal capacity nearly every afternoon at lunchtime for a number of years. As such, she was able to gain a general knowledge of the quality and nature of his work. Secondly, the comment was not excessively published by Sampson since Lanciani was the only person to whom she spoke. Lastly, Sampson's statement cannot be regarded as a wilful injurious act, since she had a legitimate business reason for communicating to Human Resources any concerns she had with the plaintiffs job performance. The plaintiff therefore cannot overcome Sampson's qualified privilege to comment upon his work to the personnel department. Summary judgment shall be granted for defendant IDC and Sampson on this count.

### 2. Damages

Summary judgment shall be granted on the defamation claims for both defendants (IDC and Sampson) because the plaintiff cannot prove an essential element of his claim. *Brunner v. Stone & Webster Engineering Corp.,* 413 Mass. 698, 705, 603 N.E.2d 206. In order to recover for slander, a plaintiff must aver special or peculiar damages caused by the remarks and must do so specifically. *Lynch v. Lyons, supra* at 119, 20 N.E.2d 953. Humiliation and injury to one's reputation are general, not special damages. *Morill v. Crawford,* 278 Mass. 250, 256, 179 N.E. 609 (1932). Here, plaintiff admits that his reputation was not harmed at all by defendant Sampson's statement to Lanciani. His reputation was only temporarily injured, if at all, by the accusation regarding the bumper stickers. It is clear that the real culprit was quickly discovered, and that defendant Sampson apologized to plaintiff within hours of accusing him. Moreover, the only support in the record for plaintiff's claim of emotional stress refers to the stress of filing and going forward with this lawsuit, rather than any stress related to the alleged defamatory remarks. Most importantly, the defendant draws no connection between the two remarks and his discharge. In fact, he testified in his deposition that no unfavorable employment action whatsoever was taken against him as a result of either incident. (Alba deposition, pp. 111, 124.) Due to plaintiffs failure to produce any facts in support of special damages, an essential element of his claim, summary judgment is granted for the defendant. Having made such a determination, the court need not address whether

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                        Page 6
(Cite as: 1995 WL 1146839, *5 **(Mass.Super.))**

defendant Sampson's statements were pure opinion or mixed statements which implied facts; for, even if they were mixed statements, his inability to prove an essential element would bar the claim.

ORDER

*6 For the foregoing reasons, it is hereby ORDERED

that summary judgment enter for defendants IDC and Sampson on all counts.

1995 WL 1146839 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 33340740 (D.Mass.)
**(Cite as: 1996 WL 33340740 (D.Mass.))**
**c**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.
Richard J. BAPTISTA and Francis P. Mitrano
v.
ABBEY HEALTHCARE GROUP, INC., Total
Pharmaceutical Care Inc., Timothy Aitken,
and the Plan Administrator of the Abbey Medical,
Inc. Employee Retirement Plan
No. 95-10125-RGS.

April 10, 1996.

*MEMORANDUM OF DECISION AND ORDER ON
DEFENDANTS' MOTION TO DISMISS THE
SECOND
AMENDED COMPLAINT*

STEARNS, J.

*1 Plaintiffs Richard Baptista and Francis Mitrano
are two former executives of the defendant Abbey
Healthcare Group, Inc. (Abbey). The plaintiffs claim
that defendant Timothy Aitken, the Chairman of the
Board of Abbey (and the President of defendant Total
Pharmaceutical Care, Inc. [TPC], a subsidiary of
Abbey), promised that they would be entitled to
exercise certain stock options if they were terminated
by Abbey, and that when they were, Abbey refused to
honor Aitken's promise. Plaintiffs also allege that the
administrator of the Abbey Medical Employee
Retirement Plan violated ERISA by failing to provide
them with timely pension plan information. Before
the court is defendants' motion to dismiss the Second
Amended Complaint. Defendants claim improper
venue, lack of personal jurisdiction over Aitken, and
a complete defense to Counts I-V of the Second
Amended Complaint under the Statute of Frauds.

*PROCEDURAL BACKGROUND*
On August 14, 1995, the court allowed in part
Abbey's motion to compel arbitration of the plaintiffs'
original claims, and ordered that seven of the ten
counts of the First Amended Complaint be dismissed
and referred to arbitration. Two of the three
remaining counts involved stock options allegedly
owed to the plaintiffs, and the third an alleged ERISA
violation. On October 16, 1995, the plaintiffs filed a
six count Second Amended Complaint alleging a
violation of M.G.L. c. 149, §§ 148, 150, on the part

of Abbey, TPC, and Aitken for failure to pay "wages
and benefits" (stock options) upon termination;
breach of contract and conversion by Abbey and
TPC; fraud and misrepresentation by Aitken (and,
through Aitken, Abbey) regarding the stock options;
and a violation of ERISA by Abbey's plan
administrator. [FN1]

> FN1. The ERISA claim will be addressed
> separately. In a November 26, 1995
> Memorandum of Decision, the court ruled
> that the issue of whether the plaintiffs may
> recover statutory penalties based on the
> ERISA allegation (29 U.S.C. §
> 1132(c)(1)(B)) is not subject to arbitration.

*FACTS*
When considering a motion to dismiss, "[w]e must
accept the allegations of the complaint as true, and if,
under any theory, the allegations are sufficient to state
a cause of action in accordance with the law, we must
deny the motion to dismiss." *Vartarian v. Monsanto
Company,* 14 F.3d 697, 700 (1st Cir.1994); *Knight v.
Mills,* 836 F.2d 659, 664 (1st Cir.1987). The facts
alleged in the Amended Complaint, which for present
purposes are deemed true, are these. The plaintiffs are
registered Massachusetts pharmacists who have
extensive managerial experience in the home health
care industry. In 1984, Baptista was named General
Manager of the Deaconess Home Health Care
Corporation (HHCC). At that time, HHCC was a
newly established not-for-profit subsidiary of the
Deaconess Hospital. HHCC specialized in the
delivery of in-home intravenous drug therapies.
Mitrano joined HHCC as Director of Operations in
1986. In 1989, Baptista was named President of
HHCC and Mitrano was elevated to Vice President.

In the early 1990's, certain assets of the Deaconess
were purchased by TPC. Baptista became the
President of the home health care division of TPC
and a Senior Vice President, while Mitrano became
the Vice President of Operations. Under the terms of
their employment, Baptista and Mitrano received the
right to purchase 40,000 and 30,000 shares of TPC
stock respectively. The right to purchase these shares
(options) vested in equal installments over a four year
period from February, 1993, to February, 1996. The
options were to vest so long as plaintiffs remained
employed by TPC. If their employment was
terminated, plaintiffs had the right to exercise any
vested options. In October of 1992, after a steep
decline in the price of TPC stock, the option package

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was re-configured. The exercise price was lowered and the vesting schedule was extended from four to five years. In May of 1993, TPC gave Baptista and **Mitrano** options to buy an additional 12,500 and 10,000 shares of TPC stock, respectively, options which were to vest in equal annual installments over a four year period beginning in May of 1994.

*2 In November of 1993, TPC become an Abbey subsidiary. Abbey offered to exchange cash and Abbey stock for plaintiffs' vested (or soon to vest) TPC options. As for unvested TPC options, Abbey offered plaintiffs the opportunity to purchase Abbey stock under the same vesting schedule at an equivalent price.

Baptista and Mitrano accepted the offer, but because of SEC restrictions were not permitted to exchange the TPC options that were to vest in September of 1994. With respect to these options, Abbey offered the plaintiffs a "Substitute Option" to purchase an equivalent amount of Abbey stock, 25% of which vested on the date of the TPC--Abbey merger (but which could only be exercised six months after the merger date), and the remainder according to the schedule of the superseded TPC options. The plaintiffs accepted this offer.

To sum up, as of December 1, 1993, Baptista and Mitrano had been awarded options as follows.

Baptista: Options to purchase 23,115 shares of Abbey at $13.367/per share in substitution for the 1992 TPC options, scheduled to vest in 7,705 share increments in February of 1995, 1996, and 1997; and options to purchase 9,030 of Abbey at $13.497/share in substitution for the 1993 TPC options, scheduled to vest in 3,010 share increments in May of 1995, 1996, and 1997.

Mitrano: Options to purchase 17,337 shares of Abbey at $13.367/per share in substitution for the 1992 TPC options, scheduled to vest in 5,779 share increments in February of 1995, 1996, and 1997; and options to purchase 7,224 of Abbey at $13.497/share in substitution for the 1993 TPC options, scheduled to vest in 2,408 share increments in May of 1995, 1996, and 1997.

In February of 1994, Abbey fired Victor Chaltiel, the Chairman of TPC. The remaining officers of TPC, fearing further terminations, informally appointed three representatives, Baptista among them, to discuss a modification of the vesting schedules with Aitken. The plaintiffs allege that they (and the other officers) considered leaving Abbey in response to Chaltiel's firing, but entered into discussions with Aitken because "moving the dates of vesting forward toward the present--would work a real incentive to the TPC officers to stay put...." Second Amended Complaint, at 6.

Following discussions (primarily in California where Abbey's headquarters are located), Aitken promised to immediately vest the TPC options that were to come due in September of 1994 and 1995, and to accelerate the vesting of the 1996 and 1997 options to February, 1995. He also agreed to pro-rate the vesting schedule so that any officer terminated between vesting dates would receive a proportional share of any unvested options that would otherwise have been earned. The Second Amended Complaint alleges that during February, March and April of 1994, Aitken represented to several TPC officers that he had sought and obtained approval for the modifications to the options plans from Abbey's board of directors, that the modifications were "done," and that the TPC officers should rely on him as a "man of his word."

*3 The Second Amended Complaint alleges that Aitken not only made oral representations about the promised options, but that he "directed that certain paperwork be prepared to reflect the modified vesting schedules." In fact, an "Employee Stock Options Summary" was mailed by Abbey to the plaintiffs on April 7, 1994. Second Amended Complaint, at 6. These documents summarized the accelerated vesting schedule promised by Aitken (with the exception of the pro-rated schedule). The Second Amended Complaint also alleges "[o]n information and belief, other paperwork reflecting Aitken's promise-- including actual modified substitute stock option agreements reflecting the disputed modifications--was prepared and executed by Abbey personnel." Second Amended Complaint, at 6.

Baptista and Mitrano were terminated by Abbey on April 28, 1994. They immediately demanded that Abbey permit them to exercise their vested options, but Abbey, without specifically denying the existence of their right to do so, refused.

## DISCUSSION

1. *Venue*

Abbey argues that the entire Second Amended Complaint should be dismissed because venue does not lie in the District of Massachusetts. Under 28 U.S.C. § 1391(b), when, as here, jurisdiction over an action is not founded solely on the parties' diversity of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

citizenship (plaintiffs claim federal question jurisdiction as well as diversity), venue is appropriate "where any defendant resides, if all defendants reside in the same State," or "[in a] district in which a substantial part of the events or omissions giving rise to the claim occurred." Abbey correctly argues that although the corporate defendants "reside" in Massachusetts, because Aitken is a California resident, venue does not lie under the first clause of the statute. Although plaintiffs concede that the alleged fraud and misrepresentation "occurred primarily in California," this does not preclude a finding that "a substantial part of the events or omissions giving rise to the claim occurred [in Massachusetts]." The plaintiffs lived and worked in Massachusetts, acquired the original vesting rights in Massachusetts, were terminated in Massachusetts, and became aware of Aitken's alleged fraud in Massachusetts. [FN2] Under these facts, the "substantial occurrence" requirement of the venue statute is met, and venue is proper in this district. The motion to dismiss the Second Amended Complaint for improper venue will be *DENIED*.

> FN2. At oral argument, Abbey acknowledged that "Boston is the main branch of Abbey outside of California."

## 2. *Lack of Personal Jurisdiction over Aitken*

Abbey also argues that the plaintiffs' claim of fraudulent misrepresentation against Aitken (Count IV) should be dismissed because the court lacks personal jurisdiction over Aitken, "a California resident ... not alleged to have engaged in tortious conduct in Massachusetts." Defendants' Memorandum in Support, at 14. While it is true that "[t]he general rule is that jurisdiction over [an] individual officer[ ] of a corporation may not be based merely on jurisdiction over the corporation," *Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 906 (1st Cir.1980), the Second Amended Complaint alleges more. Aitken is said to have engaged in direct negotiations with Baptista, an Abbey employee based in Massachusetts. He made representations about Mitrano's salary, also with the knowledge that he was active in Massachusetts on Abbey's behalf. These facts might be enough to establish that Aitken "transacted business" in a fashion sufficient to come within the jurisdiction of the Massachusetts courts. See *Tatro v. Manor Care, Inc.,* 416 Mass. 763, 769 (1994). However, plaintiffs concede in their brief that the alleged fraud and misrepresentation "occurred primarily in California,"

and that none of Aitken's direct dealings with the plaintiffs took place in Massachusetts. At oral argument, the plaintiffs admitted that Aitken's personal presence as a defendant confers no particular advantage as far as they are concerned, while at the same tune possibly compromising their choice of venue. Consequently, the defendants' motion to dismiss Aitken from the case for lack of personal jurisdiction will be *ALLOWED*.

### 3. *Applicability of M.G.L. c. 149 §§ 148, 150*

*4 M.G.L. c. 149, §§ 148, 150, mandate the prompt, bi-weekly payment of wages by employers to their employees. The statute also requires that "any employee discharged from ... employment shall be paid in full on the day of his discharge...." The plaintiffs assert that the stock options granted to them as part of their executive compensation package should be considered "wages and other benefits" within the meaning of the statute. The plaintiffs admit that this is an issue of first impression under Massachusetts law to which they devote ten pages of their forty-six page brief.

This is a case of first impression because the only impression that can possibly be derived from M.G.L. c. 149, §§ 148, 150, is that its intent is to protect laborers and casual wage earners who might otherwise be vulnerable to employer intimidation. [FN3] One case has construed the statute to apply to corporate executives as well as to lower level employees, but its holding is limited to the payment of ordinary wages and wage equivalents, specifically accrued vacation pay and sick leave. See *Massachusetts v. Morash,* 490 U.S. 107, 117 (1989). As the Supreme Court noted in *Morash,* "[p]aid vacations ... are associated with regular wages or salary, rather than benefits triggered by contingencies...." Id. at 117, quoting 40 Fed.Reg. 24642-24643 (1975). The distinction between assured and contingent compensation is a sound one. In this case, there is no reason to extend the protections of a wage earner's statute to cover bonuses potentially owing to highly paid executives, who were confident enough to resign their employment if their demands for accelerated (and contingent) stock options were not met. There is even less reason to extend the opportunity to collect "treble damages for any loss of wages and other benefits ... [and] an award of the costs of the litigation and reasonable attorney fees." M.G.L. c. 149, § 150. Therefore, the motion to dismiss Count I of the Second Amended Complaint will be *ALLOWED*.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 88
(Cite as: 1996 WL 33340740, *4 (D.Mass.))

FN3. The cases reported under the statute
are all to this effect.

**4. *Statute of Frauds***

Abbey next argues that "[e]ven if Aitken had
promised to accelerate the plaintiffs' stock options
(which he did not), the alleged oral promise is
unenforceable because it does not comply with the
Statute of Frauds." [FN4] Memorandum in Support,
at 10. Under both Massachusetts and California law, a
contract for the sale of securities is not enforceable
unless "[t]here is some writing signed by the party
against whom enforcement is sought or by his or her
authorized agent or broker, sufficient to indicate that
a contract has been made for sale of a stated quantity
of described securities at a defined or stated price...."
Cal. Comm.Code § 8319(1)(a); M.G.L. c. 106, § 8-
319(1)(a). As a preliminary matter, while it may be
correct to assume, as both parties have, that a
corporation's award of options to its executives is a
"sale" of securities within the meaning of the Statute
of Frauds, [FN5] it is less clear that an alteration of
the vesting date of the same options falls within the
definition of a "sale." In any event, the plaintiffs have
submitted documents which, on their face, are a
summary, authored by Abbey, of the accelerated
vesting schedule promised by Aitken to the plaintiffs.

FN4. The parties dispute whether the
California (Cal. Comm.Code § 8319) or
Massachusetts (M.G.L. c. 106, § 8-319)
version of the Statute of Frauds applies,
however, I see no difference between the
two statutes insofar as this case is
concerned.

FN5. But see *Hiller v. Franklin Mint, Inc.*,
485 F.2d 48, 51 (3rd Cir.1973) (where an
alleged oral agreement for the transfer of
stock options is "a contract for employment
rather than a [traditional] sale, the statute of
frauds is inapplicable"); *Baldassurre v.
Singer*, 444 Pa. 100, 103 (1971) (same).

*5 While it is true, as Abbey points out, that there is
no human signature on either document, the words
"Total Pharmaceutical Care, Inc." appear on the
heading of each. The Statute of Frauds is intended to
bar suits related to the sale of securities where there is
no real evidence that a contract for sale was ever
formed. It is not, as Abbey would have it, a trap
permitting a seller to lull a buyer into believing that
he has the protection of a written agreement when for
the want of a quill and a pot of ink he does not. As

one leading commentator explains:

the statute of frauds ... does not require any
specific form of writing.... The sufficiency of the
writing is a question of fact to be determined by
the circumstances of each case.... [T]he basic
requirement is that the writing be reasonably
sufficient to prove the existence of a contract
obligating the defendant to buy or sell
securities....

Hawkland, 7 Uniform Commercial Code Series, §
8-319:03, at 388. "The word 'signed' is defined ... to
include 'any symbol executed or adopted by a party
with present intention to authenticate a writing.' Most
courts have liberally interpreted this provision." Id.

Abbey correctly points out that the cases relied upon
by the plaintiffs deal with broker/dealer confirmation
slips, but the two employee stock option summaries at
issue bear every indication of having been internally
generated by Abbey. For this reason, cases supporting
the proposition that "an interoffice memorandum
confirming a sale, signed by the sender, would satisfy
the statute even though there was n[either] intent to
satisfy ... nor delivery," Hawkland, § 8-319:03, at 388
, are on point, even if they are distinguishable on their
facts. Finally, even if I were to find that the Abbey
documents were facially insufficient to defeat the
Statute of Frauds, their existence supports the
inference that there may be other documents in the
possession of the defendants which would satisfy the
Statute, documents which the plaintiffs have a right to
seek through discovery. Thus, the motion to dismiss
Counts II and III of the Second Amended Complaint
for failure to state a claim upon which relief can be
granted will be *DENIED.*

**5.  *Fraudulent Misrepresentation and Reasonable
Reliance***

The defendants next argue that the claims against
Abbey and Aitken must fail because it was
unreasonable for plaintiffs to rely upon Aitken's oral
promise to accelerate the stock options. They point
out that the plaintiffs were aware that the terms of the
stock option incentive plan required that all option
agreements be put in writing and approved by
Abbey's Compensation Committee. The Second
Amended Complaint, however, alleges that the
plaintiffs relied not only on Aitken's promise that the
agreement would be modified, but also on his
representation that the modifications had been
approved. I cannot find at this stage in the
proceedings that plaintiffs acted unreasonably in
relying on the representations of the Chairman of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Board of the company that employed them. See *Weiner v. Fleischman,* 54 Cal.3d 476, 488 (1991) ("Even where a contract has been solemnized by a writing, an oral modification of that written contract may be proved by a preponderance of the evidence"); *Cambridgeport Savings Bank v. Boersner,* 413 Mass. 432, 439 (1992) ("[A] provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract").

*6 Abbey's next argument, that even assuming reasonable reliance, plaintiffs cannot show any resulting damages, is also unconvincing. Despite Abbey's belief that there could be no harm to the plaintiffs in their choosing to remain in Abbey's employ for the two months between the time they received Aitken's assurances and their termination, the Second Amended Complaint alleges that but for Aitken's promises, the plaintiffs would have quit their jobs and moved on. By giving up their freedom to contract for their labor elsewhere (or to simply retire), the plaintiffs acted to their detriment. [FN6] On the other hand, Cal. Civil Code § 3343, limits recoverable damages to "[o]ne defrauded in the purchase, sale or exchange of property" to actual damages. [FN7] California law is clear that "[i]n the absence of a fiduciary relationship, recovery in a tort action for fraud is limited to the actual damages suffered by the plaintiff." *Alliance Mortgage Company v. Rothwell,* 10 Cal.4th 1226, 1241 (1995), quoting *Ward v. Taggart,* 51 Cal.2d 736, 741 (1959); see also *Salahutdin v. Valley of California, Inc.,* 24 Cal.App.4th 555, 564-565 (1994). The plaintiffs' argument that § 3343 is limited to transfers of real property is unpersuasive, being contrary to both the plain meaning of the statute and the cases interpreting it. See, e.g., *Christiansen v. Roddy,* 186 Cal.App.3d 780 (1986) (no benefit of the bargain damages for defrauded purchasers of a secured note); *Hartong* v. *Partake, Inc.,* 266 Cal.App.2d 942, 969-970 (1968)

(limiting damages to out of pocket losses for claim of fraud in connection with franchise agreements); *Hill v. Wrather,* 158 Cal.App.2d 818, 825 (1958) (§ 3343 limits measure of damages to "out of pocket" in fraudulent sale of stock cases).

FN6. That the plaintiffs "would not have been entitled to the six months of severance pay which they received" had they voluntarily resigned does not alter the analysis. Defendants' Memorandum in Support, at 14.

FN7. Actual, or "out of pocket" damages are "directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received...." *Alliance,* 10 Cal.4th at 1240, quoting *Stout v. Turney,* 22 Cal.3d 718, 725 (1978).

### ORDER

For the forgoing reasons, defendants' motion to dismiss Count I of the Second Amended Complaint is *ALLOWED.* The motion to dismiss as to Counts II-V is *DENIED,* subject to the limitation on damages recoverable under Counts IV and V. The motion to dismiss the defendant Aitken for want of personal jurisdiction is *ALLOWED.* The court at this time makes no determination as to the viability of Count VI.

1996 WL 33340740 (D.Mass.)

Motions, Pleadings and Filings (Back to top)

.         1:95CR10125        (Docket) (Apr. 26, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                    Page 78
16 Mass.L.Rptr. 513, 2003 WL 21960599 (Mass.Super.)
(Cite as: 2003 WL 21960599 **(Mass.Super.)**)

**H**

Superior Court of Massachusetts.
William **OKERMAN**,
v.
VA SOFTWARE CORPORATION. [FN1]

> FN1. f/k/a VA Linux Systems, Inc. and
> Larry M. Augustin.

No. 0101825.

July 9, 2003.

*MEMORANDUM AND ORDER ON DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS*

JOHN C. CRATSLEY, Justice.

*1 The plaintiff, William **Okerman** ("Okerman"), brought this action against his former employer, VA Software Corporation ("VA Software"), [FN2] claiming breach of contract (Count I), quantum meruit (Count II), breach of good faith and fair dealing (Count III), promissory estoppel (Count IV) and violation of the Wage statute, G.L.c. 149 (Count V), as a result of his termination from VA Software. Before this Court is VA Software's motions for summary judgment as to Counts I-IV and judgment on the pleadings as to Count V.

> FN2. Okerman also brought suit against the CEO of VA Software, Larry M. Augustin, alleging a violation of the Wage statute (Count VI). The Court *(Locke, J.)* allowed Augustin's motion to dismiss.

BACKGROUND

All of the following information conies from the summary judgment record which consists of undisputed facts agreed by both parties, deposition testimony, and documentary evidence.

Mr. Okerman graduated *cum laude* from Harvard University. Prior to entering into negotiations with VA Software, Okerman had 23 years of sales experience selling hardware and/or software for at least eight different companies. In each position, Okerman earned commissions and acknowledged that while working for at least seven of the previous companies, the commission plans changed from time to time, including fluctuations in quotas and percentages earned on sales.

Offer Letter

On March 24, 1999, VA Software extended a written offer of employment ("Offer Letter") for the position of Boston Marketing Manager to William Okerman ("Okerman"), which Okerman accepted. The Offer Letter provided in pertinent part that:

> Your compensation will consist of
> A base monthly salary of $7,500.00.
> Participation in the company's stock option plan with 20,000 at the standard option price granted on your starting date subject to approval by the board of directors.
> Health insurance through Lifeguard and dental insurance through the Guardian.
> 3 weeks paid vacation each year.
> The standard VA Research Commission Plan for 1999 which has commission as follows;
> 1.5% of revenues to 3,000,000 in revenues
> 2.0% of revenues to 6,000,000 in revenues
> 3.0% of revenues above $6,000,000 in revenue
> A sign-on bonus of $2,000 subject to refund if you elect to voluntarily terminate employment with the company within 6 months of your start date.
> A $5,000 per month draw against commissions recoverable monthly for 6 months.
> As with all VA Reseach staff, your employment is "at will" meaning either you or the company may terminate your employment with two weeks written notice ...

Although the Offer Letter references the VA Research Commission Plan for 1999, the plan had not yet been drafted, finalized or presented to Okerman. Okerman commenced working at VA Research on March 29, 1999. On that date, VA Software granted Okerman 20,000 stock options. Pursuant to the Offer Letter, twenty-five percent of the stock options would vest a year later on March 29, 2000. Thereafter, the stock options vested monthly on the 29th day of each and every full month of Okerman's employment.

November 1999 Plan

*2 In preparation for VA Software's initial public offering in December of 1999, Robert Russo, Senior Vice President of World Wide Field Operations, in conjunction with Linda Yamauchi, Director of Sales Operations, developed a Compensation Overview, Policy and Plan ("November 1999 Plan"). The purpose of the November 1999 Plan was to "provide a consistent, comprehensive framework from which to understand and implement the plans." Essentially,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the November 1999 Plan provided the overarching framework for the promulgation of variable compensation plans for VA Software's salespeople, and governed the terms by which VA Software managed its sales employees.

The November 1999 Plan became effective on November 4, 1999, and states, in relevant part:

> VA [Software] management reserves the right to expand, reduce or otherwise change the territory and quota assignment as deemed appropriate to align with changes in business conditions. Business conditions include, but are not limited to, VA [Software's] business goals, product order and revenue plans, organization structure and customer business conditions. Changes are at the sole discretion of management judgment, may be made at any time and may have a retroactive effective date.

The plan also provided that "for all matters of administration, including modification, the Senior Vice President of World Wide Field Operations shall have the sole and final authority." Accordingly, Robert Russo had the final authority to interpret the document and compensation plans. Okerman disputes that the terms of the November 1999 Plan affect the terms of his employment and compensation package.

Yamauchi states in her affidavit that she had several conference calls with the members of the VA Software sales force in which she explained the purpose of the November 1999 Plan. She says she informed the sales force of the new compensation plan and addressed the fact that it would be effective beginning the second quarter of fiscal year 2000 (November 1999). Yamauchi also says she distributed the November 1999 Plan to all VA Software salespeople. Okerman disputes that he received a copy of the November 1999 Plan and that Yamauchi informed him of his participation.

### February 8, 2000 Plan

On or about February 8, 2000, VA Software notified all of its sales employees, including Okerman, that it was implementing a new variable compensation plan ("February 8, 2000 Plan"). VA Software states that the February 8, 2000 Plan was developed in order to meet the new corporate objectives of VA Software in connection with its initial public offering in December of 1999. [FN3] Okerman, however, alleges that the new plan was implemented in bad faith in order to deprive him of his commissions already earned.

> FN3. VA Software argues that in making the changes to the commission structures, it did not analyze the effect of the retroactive application on the commissions of any of its salespeople and did not make the changes with the intent to harm anyone.

VA Software retroactively applied the February 8, 2000 plan to November 1, 1999, so that it corresponded with VA Software's new fiscal year, which it converted from a calendar year to one that commenced on July 29 (making November 1 the start of Quarter 2). [FN4] Okerman, however, alleges that the February 8, 2000 Plan and its retroactive application was developed in bad faith to deprive him of commissions for services rendered. Further, Okerman maintains that the terms of the November 1999 Compensation Plan do not affect his employment terms and compensation.

> FN4. The November 1999 Plan permitted the retroactive application.

*3 On February 11, 2000, Okerman signed the February 8, 2000 Plan. However, Okerman contends that he signed the Plan solely to acknowledge its receipt. Further, Okerman avers that he continued to object to the commission structure to his supervisor, David Balch ("Balch"). Okerman admits that he continued his employment with VA Software, but alleges he did so because Balch represented to him that "the money was in the stock" and that Okerman had to remain employed in order to realize the value of his stock options. After objecting to the change in commission, Okerman continued to work for VA Software.

### September 1, 2000 Plan

On or about September 1, 2000, VA Software notified its sales employees, including Okerman, that it was implementing a new variable compensation plan ("September 1, 2000 Plan"). VA Software retroactively applied the September 1, 2000 Plan to July 31, 2000 which coincided with the beginning of VA Software's first quarter of fiscal year 2001. Okerman contends that the plan does not apply to him and that VA Software retroactively applied the plan in bad faith. That same day, Okerman signed the September 1, 2000 Plan which included a "bid bonus" program. Okerman argues that he signed the September 1, 2000 Plan only to acknowledge its receipt. Okerman continued to work for VA Software.

### November 27, 2000 Plan

On or about November 27, 2000, VA Software

notified its sales employees, including Okerman, that it was implementing a new variable compensation plan ("November 27, 2000 Plan"). VA Software alleges that it changed its plan because it realized that the market was not cooperating with company objectives and that VA Software was headed for "difficult financial times." One of the changes in the November 27, 2000 Plan was the elimination of the "bid bonus" program. Okerman disputes that VA Software eliminated the "bid bonus" program since it referenced the "bid bonus" program in the November 27, 2000 Plan and the subsequent March 5, 2001 Plan. As with the other plans, the November 27, 2000 Plan applied retroactively. The effective dates of the November 27, 2000 Plan was October 28, 2000 through January 26, 2001, which corresponded with the second quarter of fiscal year 2001. Okerman contends that the plan does not apply to him, that the plan could not be applied retroactively, and that VA Software changed the plan in bad faith to deprive him of compensation.

On December 1, 2000, Okerman signed the November 27, 2000 Plan. Okerman admits that he signed the plan, but only to acknowledge its receipt. He contends that he did not accept the terms of the new compensation structure. Okerman continued to work at VA Software.

### March 5, 2001 Variable Compensation Plan

On or about March 5, 2001, VA Software notified its sales employees, including Okerman, that it was implementing a new variable compensation plan ("March 5, 2001 Plan"). The March 5, 2001 Plan applied retroactively. Its effective dates were January 27, 2001 through April 28, 2001, which corresponded with the third quarter of fiscal year 2001.

*4 On May 20, 2001, Okerman signed the March 5, 2001 Plan. Okerman admits that he signed the plan, but only to acknowledge its receipt. Although he disputes that he agreed to the new plan terms, Okerman continued to work for VA Software.

### May 7, 2001 Variable Compensation Plan

On or about May 7, 2001, VA Software notified its sales employees, including Okerman, that it was implementing a new variable compensation plan ("May 7, 2001 Plan"). The May 7, 2001 Plan applied retroactively. Its effective dates were April 29, 2001 through July 28, 2001, which corresponded with the fourth quarter of fiscal year 2001.

On May 20, 2001, Okerman signed the May 7, 2001

Plan. Okerman alleges he signed the plan only to acknowledge its receipt. Okerman continued to work for VA Software.

### Akamai Account

In March 2000 VA Software acquired TruSolutions, which sold a product that competed with VA Software to a mutual customer, Akamai Technologies ("Akamai"). Initially, Okerman and the TruSolutions salesperson, Thomas Boyd ("Boyd"), sold their own individual products to Akamai. Okerman's supervisor, David Balch, notified Okerman that beginning in fiscal year 2001, Okerman and Boyd would manage the Akamai account jointly, splitting the compensation 50/50, regardless of who secured the sale. Okerman acknowledges that he agreed to the split and that he continued to work for VA Software. However, Okerman argues that that decision was not voluntary. Instead, Okerman contends that VA Software instituted the "split" in order to cut him out of the Akamai account.

Okerman acknowledges that he earned approximately $100,000 in salary and draw payments during the nine months he worked in 1999. Okerman argues that he earned commissions in 1999, but was not paid them, in violation of his employment agreement. On March 29, 2000, Okerman's first anniversary date, Okerman vested 15,000 of his 60,000 stock options. Okerman also admits that he vested 11,250 shares of stock options in 2000, in addition to the 15,000 shares of stock options he vested on March 29, 2000.

In June of 2001, VA Software informed its employees that it was exiting the hardware business, and that as a result, it was forced to terminate the majority of its employees effective June 29, 2001. Although most employees were terminated by June 29, 2001, Okerman stayed on at VA Software through July 27, 2001, so that he could close some sales that he had previously negotiated.

Okerman's last day at VA Software was Friday, July 27, 2001, the last day of VA Software's fiscal year. Okerman contends, however, that his last date was chosen in order to deprive him of the vesting of an additional 1,250 shares of stock options he could have received had he worked through July 29, 2001.

### DISCUSSION

This Court grants summary judgment where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Cassesso v. Commissioner of Corrections,* 390 Mass. 419, 422 (1983); *Community National Bank* v. *Dawes,* 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine dispute of material fact on every relevant issue "even if he would have no burden on an issue if the case were to go to trial." *Pederson v. Time, Inc.,* 404 Mass. 14, 17 (1989), citing *Attorney General v. Bailey,* 367, 371 (1982). Once the moving party establishes the absence of a triable issue, the non-moving party must respond and allege specific facts establishing the existence of a genuine issue of material fact in order to defeat the motion. *Pederson v. Time, Inc.,* 404 Mass. at 17.


A. Breach of Contract (Count I)


**\*5** VA Software argues that it is entitled to summary judgment as to Okerman's breach of contract claim because the parties mutually agreed to modify the original contract, the Offer Letter, on five different occasions. VA Software alleges that as an at-will employee, Okerman received valid consideration for the modifications in his continued employment with VA Software, even though the modifications resulted in him receiving a lower compensation rate. Further, it alleges that it paid Okerman the compensation due him under each commission plan in effect at each relevant time. Okerman maintains, however, that he never agreed to any modification of the original Offer Letter. Thus, he argues that VA Software breached their contract when it failed to pay him according to the terms set out in the original Offer Letter.

Okerman concedes that he signed each subsequent modification letter which detailed the changes to his commission structure. However, he maintains that he signed the letters only to acknowledge receipt of the commission changes. He states that he never consented to any of the changes. In support of his position, Okerman cites to the fact that he signed his name next to the "Received By" line on each commission change. Further, Okerman maintains that he voiced his protest regarding the commission changes to his direct supervisor via email.

Notwithstanding Okerman's objections and his argument regarding his acknowledgment of receipt, this Court concludes that VA Software is entitled to summary judgment as a matter of law. In *Gishen,* the plaintiff was a seasoned salesperson who agreed to certain compensation changes during his employment. *Gishen v. Dura Corp.,* 362 Mass. 177,

178-79 (1971). The changes in compensation resulted in plaintiff receiving a lower commission rate. *Id.* at 183. After termination, he sued his former employer to recover certain commissions provided for in the parties' original agreement. *Id.* at 180. Our Supreme Judicial Court (SJC) held that, as a matter of law, an at-will employee's decision to continue working for his employer after accepting significantly lower commission rates constituted both consideration and an assent to support a modification of his employment contract. *Id.* at 183; see also *Cochran v. Quest Software, Inc.,* 2002 WL 1964252 (D.Mass.2002) (Selya, J.). The high court, therefore concluded that the modification of the parties' original contract was valid and binding on the company. *Gishen v. Dura Corp.,* 362 Mass at 183. The SJC upheld the jury award of $82,458.84 in favor of the plaintiff. *Id.* at 186.

As in *Gishen,* Okerman knew of all five compensation changes and assented to each subsequent modification by signing it and continuing to work for VA Software. *Id.* at 183. As an at-will employee, Okerman could have been terminated for any reason. *Pollen v. Aware, Inc.,* 53 Mass.App.Ct. 823, 827 (2002). Thus, although Okerman did voice his initial objections regarding the changes in his commission structure to his immediate supervisor after the first commission structure change, Okerman nevertheless continued to work for VA Software until it exited the hardware business approximately a year and a half later. In continuing to work for VA Software after the commission changes and accepting a lower commission compensation, this Court concludes that Okerman assented and received adequate consideration for the modification of the contract. *Id.* at 183. The mere fact that Okerman argues that he only acknowledged receipt and did not consent to the changes does not alter this legal conclusion. By continuing to work for VA Software, Okerman consented to each subsequent commission structure change. Thus, as a matter of law, VA Software is entitled to summary judgment on the plaintiff's breach of contract claim.


B. Quantum Meruit (Count II)


\*6 Summary judgment in VA Software's favor must also be granted as to Okerman's quantum meruit claim. As outlined above, Okerman assented and agreed to each subsequent compensation plan modification. Therefore, Okerman's compensation is governed by the terms of each commission plan contract in effect at the time. Thus, because Okerman

©) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

is entitled to commissions earned pursuant to the commission compensation plan outlined in each contract, this Court does not have to reach the quantum meruit claim. See *Maddaloni v. Western Mass. Bus Lines, Inc.,* 386 Mass. 877, 883 (1982) (court did not reach issue of quantum meruit recovery where plaintiff was entitled to commissions pursuant to contract). VA Software is entitled to summary judgment as a matter of law on the quantum meruit claim.

C. Breach of the Covenant of Good Faith and Fair Dealing (Count III)

VA Software contends that it is entitled to summary judgment on Okerman's breach of good faith and fair dealing claim because it changed its commission structure in good faith based on business decisions and the declining economy. Further, it maintains that Okerman has not shown any evidence of bad faith in changing the commission plans.

Okerman, however, contends that the commission plans were subsequently changed in bad faith to deprive him of his earned commissions. In support of his assertion, Okerman contends that he secured Akamai, VA Software's largest client. Based on Okerman's efforts, VA Software generated substantial revenues. Okerman maintains that VA Software required him to continuously forecast his upcoming Akamai orders. Based on those upcoming projections, Okerman alleges that VA Software changed the commission compensation plans and applied them retroactively in bad faith to deprive him of his earned compensation.

Although Okerman was an at-will employee, Massachusetts law provides an implied covenant of good faith and fair dealing in at-will employment relationships. See *Fortune v. Nat'l Cash Register Co.,* 373 Mass. 96, 102 (1977). Whether VA Software changed Okerman's commission structures in bad faith to avoid paying him his earned commission is a question of fact. The Court has long recognized that claims of breach of the covenant of good faith and fair dealing are rarely appropriate for summary judgment because the employer's motivations or state of mind, is a factual inquiry. See *LaBonte v. Hutchins & Wheeler,* 424 Mass. 813, 820 (1997), citing *Flesner v. Technical Communication Corp.,* 410 Mass. 805, 809 (1991) ("where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate"). Thus, because VA Software's motive and intent in changing the

commission plans and applying them retroactively to Okerman's sales are questions of fact, summary judgment is inappropriate. VA Software's motion for summary judgment as to the breach of good faith and fair dealing claim is denied.

D. Promissory Estoppel/Detrimental Reliance (Count IV)

*7 VA Software alleges that it is entitled to summary judgment as to Okerman's promissory estoppel claim. It asserts that Okerman cannot maintain this claim based on any alleged promises made by VA Software because Okerman's reliance on any alleged promise would be unreasonable. VA Software maintains that it paid Okerman according to each commission plan in effect at the time.

Okerman, however, alleges that VA Software made two promises; (1) that he would be compensated according to the commission compensation plan structure set out in the original Offer Letter and (2) that he would obtain a windfall in his vested stock options accruing each month on the 29th day. Although VA Software promised in the original Offer Letter that it would compensate Okerman according to the commission compensation plan set out in Offer Letter, the commission structure was subsequently modified several times by the assent and agreement of Okerman. Thus no promissory estoppel claim lies for promise (1).

Okerman further alleges that VA Software promised him that he would receive a windfall from his vested stock options and that in order to receive that windfall he had to continue working for VA Software. This Court concludes that any alleged reliance by Okerman on any potential windfall from his vested stock options was unreasonable. See *Hall v. Horizon House Microwave, Inc.,* 24 Mass.App.Ct. 84, 94 (1987) (holding "[a] well founded hope" is not enough to support reasonable reliance). Thus, because Okerman knew or should have known that VA Software could not predict the final gains he might obtain from his vested stock options, VA Software's remarks amount only to a well founded hope that the vested stocks would yield great earnings in the future. Okerman cannot establish that he reasonably relied on VA Software's representations. Thus, VA Software is entitled to summary judgment as a matter of law on the plaintiffs promissory estoppel claim.

E. Violation of Wage Act Statute, G.L.c. 149, 148

Not Reported in N.E.2d
(Cite as: 2003 WL 21960599, *7 (Mass.Super.))

(Count V)

VA Software alleges that it is entitled to judgment on the pleadings as to Okerman's claim of violation of the Wage Act Statute, G.L.c. 149, 148. In support of its argument, VA Software asks this Court to take notice of a Superior Court Judge's decision which allowed the other defendant's motion to dismiss the violation of the Wage Act Statute claim in this same case. The Court *(Locke, J.)*, m a decision dated June 25, 2002, allowed the other defendant's, Larry Augustin, CEO of VA Software ("Augustin"), motion to dismiss the Wage Act Statute violation claim citing as its reason that Okerman's "right to commissions were contingent upon the attainment of certain sales goals being reached and therefore are not 'definitely determined' under the Wage Act." *Okerman v. VA Software & Larry Augustin,* Civil No. 01-01825 (Norfolk Super.Ct. June 25, 2002) *(Locke, J.).* The Court declined to expand the scope of G.L.c. 149 to cover the commissions alleged by Okerman, citing *Cumpata v. Blue Cross Blue Shield of Massachusetts, Inc.,* 113 F.Supp.2d 164, 167 (D.Mass.2000); *Doherty* v. *American Medical Response of Massachusetts,* 1 Mass. L. Rptr. 1997 Mass.Super., LEXIS 79; *Huebsch v. Katahdin Industries, Inc.,* 13 Mass. L. Rptr. 180, 2001 WL 716584 (Mass.Super.Ct. April 24, 2001); *Locke v. Sales Consultants of Boston, Inc.,* 13 Mass. L. Rptr. 164, 2001 WL 716911 (Mass.Super.Ct April 13, 2001) *(Hinkle,J.).* Id. Further, Judge Locke held that "the Wage Act was intended to protect wage earners who relied on the payment of their weekly or bi-weekly salary ... rather than on employees who had opportunities for commissions in addition to a healthy salary." *Id.*

*8 Okerman sought interlocutory review of the Court's decision dismissing the claim against Augustin, pursuant to G.L.c. 211, 118. In his petition, Okerman argued that the trial court judge erred in finding that his commissions were not "definitely determined," and that the value of his compensation is irrelevant for Wage Act Statute purposes. In support of his position, Okerman cited *Lohnes v. Darwin Partners, Inc.,* Civil No. 02-1299 (Norfolk Super.Ct. July 23, 2002) *(Gants, J.)* (15 Mass. L. Rptr. 157), which held that contingent commissions are protected by the Wage Act once the contingency occurs and that the value of the individual's compensation is irrelevant in deciding whether the Wage Act applies. *Id.* at 4-5.

After consideration, the single justice of the Appeals

Court *(Kass, J.)* denied Okerman's relief under G.L.c. 231, 118, writing that, "[w]hether the commission arrangement falls under G.L .c. 149, 148, is an arguable proposition ..." After some further analysis, he then held, "that the statute is applicable to wage earners and not to commissions in the nature of additional compensation." *Okerman v. VA Software Corp. & Larry M. Augustin,* Civil No., 02-J-415 (App.Ct. July 26, 2002) (Kass, J., single justice).

G.L.c. 149, 148, provides in pertinent part that:
[t]his section shall apply, so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employees, and commissions so determined and due such employees shall be subject to the provisions of section one hundred and fifty [providing a private cause of action with the assent of the Attorney General].

*Id.* The statute was intended primarily "to prevent unreasonable detention of wages" by requiring "regular and frequent payments." *American Mutual Liability Ins. Co. v. Commissioner of Labor & Industries,* 340 Mass. 144, 147 (1959). The Massachusetts Appeals Court has construed the scope of the Wage Statute Act narrowly. See *Commonwealth v. Savage,* 31 Mass.App.Ct. 714, 716 (1991).

In *Baptista v. Abbey Healthcare Group, Inc.,* No. 95-10125, slip-op (D.Mass. April 10, 1996), Judge Stearns concluded that "the only impression that can possibly be derived from [the Wage Act], is that its intent is to protect laborers and casual wage earners who might otherwise be vulnerable to employer intimidation." *Id.* at 8. Judge Stearns acknowledged that the Supreme Court applied the statute to corporate executives as well as low level employees, however, he noted specifically that "its holding is limited to the payment of ordinary wages and wage equivalents ..." *Id.,* citing *Massachusetts v. Morash,* 490 U.S. 107, 117 (1989). Baptista attempted to obtain payment of stock options and the Court held that "in this case, there is no reason to extend the protections of the wage earner's statute to cover bonuses potentially owing to highly paid executives ..." *Id.* at 9.

*9 Consistent with the reasoning and decisions cited by the two prior justices reviewing this same issue in this case, this Court concludes that VA Software is entitled to judgment on the pleadings as to Count V

Not Reported in N.E.2d

**(Cite as: 2003 WL 21960599, \*9 (Mass.Super.))**

of Okerman's complaint. Okerman's commissions were above and beyond his base salary. *Cumpata v. Blue Cross Blue Shield of Massachusetts, Inc.,* 113 F.Supp.2d 164, 168 (2000). Further, his commissions were contingent on the attainment of certain sales goals being reached and therefore were not "definitely determined" under the Wage Act. *Id.* Thus VA Software's motion for judgment on the pleadings is allowed.

## ORDER

For the above-mentioned reasons, the Court (1) *ORDERS* that the defendant's motions for summary judgment as to Counts I, II and IV arc *ALLOWED;* (2) *ORDERS* that the defendant's motion for summary judgment as to Count III is *DENIED;* and (3) *ORDERS* that the defendant's motion for judgment on the pleadings as to Count V is *ALLOWED.*

16 **Mass.L.Rptr.** 513, 2003 WL 21960599 (Mass.Super.)

END OF DOCUMENT

© 2005 **Thomson/West**. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                    **Page 7**
2005 WL 1156162 (Mass.Super.)
**(Cite as: 2005 WL 1156162 (Mass.Super.))**

Only the Westlaw citation is currently available.

Superior Court of Massachusetts.
Donald C. RICHARDS
v.
DATATEC SYSTEMS, INC. et al.
No. 040509BLS2.

March 31, 2005.

*MEMORANDUM OF DECISION AND ORDER ON MOTION TO DISMISS COUNT V*

NONNIE S. BURNES, Justice.

### INTRODUCTION

*1 Plaintiff Donald C. Richards ("Richards") sued his former employer Datatec Systems, Inc. ("Datatec"), Isaac J. Gaon ("Gaon"), the former CEO of Datatec and Raul Pupo ("Pupo"), the CEO who replaced Gaon. In Count Five, Richards claims that all defendants violated G.L.c. 149, § 148 et seq. (sometimes referred to as the "Wage Act"). [FN1] In response to the defendants' Motion to Dismiss, as it relates to the Wage Act claim, the court invited, and the defendants moved for, a more definite statement. That motion was allowed after hearing and the court ordered Richards to identify the "origin of the allegedly due commissions" even though Richards might not be able to quantify the amount of the commissions. Following the filing of the First Amended Complaint, the defendants press their Motion to Dismiss the Wage Act claim.

> FN1. Richards also cites G.L.c. 151, §§ 1B and 20. These sections of c. 151 address the rights of employees to be paid overtime and minimum wage and appear to have nothing to do with this case. The court will consider Richards' rights under c. 149, § 148.

### DISCUSSION

From his complaint, the court has learned that Richards entered into an Executive Employment Agreement with Datatec on June 21, 1989. Richards was employed as Datatec's National Northeast Account Manager from that time until his employment was terminated on September 26, 2003. Richards' starting salary was $50,000. His contract was to be renewed yearly unless terminated on 90 days notice by either party. At the time of his termination, he was being paid an annual salary of a bit over $63,000.

In the First Amended Complaint, Richards identified the "origin" of the commissions that he says fall under the Wage Act as coming from a contract between CVS and Datatec from March 2002, for which a purchase order was received by Datatec in April 2002. Richards says that, pursuant to that contract, CVS was to pay Datatec "approximately $32,000,000 over 30 months, or on average more than $1,000,000 a month for two and one-half years." Richards further alleges that Datatec, sometime after the CVS contract was "landed" by Richards, raised his sales quota and lowered the commission rate. Richards was terminated eleven months after the purchase order was received by Datatec from CVS.

Richards said in the Complaint and in the First Amended Complaint that he was paid an annual salary and "sales commissions based upon a written sales commission plan." Richards attached to his Complaint as Exhibit 2 a document entitled "Account Manager, Compensation Program, Fiscal Year--2003." The court understands that to be the commission agreement that he offers as support for his claim of commissions. [FN2] That document states no sales quota and no commission rate. It states four contingencies which must be satisfied before commissions will be paid and states that Datatec will pay commissions only on amounts invoiced during the Account Manager's employment with Datatec. Richards does not say in his complaint what his sales quota was at the time of the CVS contract, what his commission rate was at that time, nor what event would trigger the application of that quota or rate to this contract.

> FN2. Attached to the defendants' Motion to Dismiss as Exhibit 1 is the exact same document which, for some reason, Richards now says in his memorandum in opposition to the defendants' Motion for a More Definite Statement that he "did not receive it until the defendants attached it to their motion to dismiss the complaint after plaintiff filed this lawsuit. It was not something he agreed to." Based on Richards' own filings, the court will consider Exhibit 2 to the Complaint as it may be necessary to the deciding of this motion.

The relevant portions of the so-called Wage Act are:
*2 This section shall apply, so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

has become due and payable to such employee, and commissions so determined and due such employees shall be subject to the provisions of section one hundred and fifty.

...

The president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation within the meaning of this section.

G.L. c 148, § 149.

In order for commissions to come within the purview of the act, they must be "definitely determined" and have become "due and payable." Richards alleges that commissions are due and payable but he provides no factual support for that statement nor does he provide any factual allegations from which the court could conclude that they have been definitely determined. What triggered a commission on a sale, i.e., did it have to be booked? Invoiced? Paid? What was the amount of Richards' quota? Had he reached it in 2002 or 2003? What was Richards' commission rate?

Richards does allege that Datatec changed both his sales quota and his commission rate sometime after the CVS contract but he does not allege sufficient facts, even on the second try, so that the court could figure out that there is enough information to assess how, when, why, or how much he might be due, this keeping in mind that Richards was an employee of Datatec for nearly a year after the CVS contract was signed. As National Account Manager, he must have known some information about that account which would illuminate whether his right to a commission had been triggered and how much that commission would be. Further, he must have thought he had reached whatever milestone he was required to reach to be entitled to a commission on this sale and he must have thought that there was a rate applicable. What and how had he been paid on other sales?

The second and probably bigger problem for Richards is that the court cannot tell whether commissions were a significant portion of Richards' income each pay period. See *Lohnes v. Darwin Partners, Inc.,* 2002 WL 31187688

(Mass.Super.2002) (15 Mass. L. Rptr. 157) (Lohnes alleged that her commissions constituted a significant part of her biweekly income). G.L.c. 149, § 148 was intended primarily "to prevent unreasonable detention of wages" by requiring "regular and frequent payment." *American Mutual Liability Ins. Co. v. Commissioner of Labor & Industries,* 340 Mass. 144, 147 (1959). By the terms of the statute, commissions are included "so far as apt." The court takes "apt" here to mean that commissions are included as far as is appropriate to further the purpose of the statute, that is, to make sure that employees are paid promptly and regularly amounts on which they rely to manage their day to day lives. See *Commonwealth v. Savage,* 31 Mass.App.Ct. 714, 716 (1991) (the legislative purpose of the act is to assist employees for whom commissions constitute a significant part of weekly income). See also *Beaule v. M.S. Inserts and Fasteners Corp.,* 2004 WL 1109796 (Mass.Super.2004) (17 Mass. L. Rptr. 623) ("In construing the Wage Act, the courts have limited commissions to those which are a significant part of the weekly compensation of a person who would ordinarily be paid weekly, such as retail salespeople," citing *Savage.*); *Dennis v. Jager, Smith & Stetler, P.C.,* 2000 WL 782946 (Mass.Super.2000) (same) (11 Mass. L. Rptr. 567). That is, the commissions must be part of an employee's regular compensation, not episodic payments from special events. See *Savage* at 716 (real estate commissions). Richards makes no factual allegations that would allow this court to conclude that, if those allegations were substantiated at trial, the commission plan under which he seeks commissions from the CVS contract provided him a substantial portion of his regular compensation. Richards has not stated a claim under the Wage Act.

### ORDER

\*3 For the reasons stated in this opinion, the court *ALLOWS* the defendants' Motion to Dismiss Count Five of the First Amended Complaint.

2005 WL 1156162 (Mass.Super.)

END OF DOCUMENT

Not Reported in N.E.2d                                               Page 74
1996 WL 1186807 (Mass.Super.)
(Cite as: 1996 WL 1186807 **(Mass.Super.)**)

**C**

Only the Westlaw citation is currently available.

Superior Court of Massachusetts.
James SCOTT,
v.
GRANADA COMPUTER SERVICES, INC.
No. 9503429.

May 2, 1996.

MEMORANDUM OF DECISION AND ORDER
ON DEFENDANT'S MOTION TO DISMISS

HOUSTON.

*1 This action arises from the alleged failure to the defendant Granada Computer Services, Inc. ("Granada") to make relocation reimbursement and other payments to the plaintiff James Scott ("Scott"), a former employee, as required by various written agreements. This matter is before this Court on the defendant's motion to dismiss Count I, G.L .c. 149, §§ 148 and 150, Count III, Breach of Covenant of Good Faith, and Count IV, Wrongful Termination. For the reasons set forth below, the defendant Granada's motion to dismiss is *ALLOWED* in part and *DENIED* in part.

BACKGROUND

The plaintiff Scott alleges the following facts, which this Court accepts as true for the purposes of this motion. Scott was hired by Granada's United Kingdom operation in 1981. In or about February 1993, Scott agreed to relocate to Granada's California office in Menlo Park and accept the position of Vice-President, Assistant General Manager, U.S. Field Operations.

In connection with his relocation, Scott and Granada entered into a contract wherein Granada agreed to reimburse Scott for the commission and closing costs on the purchase of a new home in California up to $30,000.00. Granada also agreed to provide Scott with a cost differential allowance of $1000.00 per month during the first twelve months and $500.00 per month during the second twelve months of his employment. Granada expressly provided that these relocation and allowance reimbursements were to be net of federal, state and local income tax.

In or about early 1994, Granada consolidated it's U.S. Operations and offered Scott continued employment with Granada at its Burlington, Massachusetts headquarters. In connection with this further relocation, Granada agreed to reimburse Scott for his relocation expenses. It also agreed to continue to provide $500.00 per month in additional allowance; and it agreed to pay the additional relocation reimbursement and the continued cost differential allowance, net of federal, state and local income tax. The purpose of the agreement, as understood by the parties, was to ensure that Scott would not incur costs associated with his relocation. In addition, Granada agreed to pay Scott a bonus compensation.

Following his tax preparation in March 1994, Scott made repeated requests for reimbursements for expenses incurred due to both relocations and for payment of any tax liability on the relocation and cost differential payments. Despite his requests, Granada failed to pay him the monies owed. When his requests remained unhonored, Scott stated that Granada must make the payments due or he would seek court relief.

After informing Granada of his demand that it honor its contractual obligations or he would seek court relief, Granada terminated plaintiffs employment without notice. After Scott retained counsel and initiated a Wage Payment Action under G.L. c. 149, § 150, Granada attempted to pay monies due. Pursuant to G.L .c. 149, § 150, Scott filed an administrative complaint with the Attorney General's office on January 23, 1995, waited the mandatory ninety day waiting period and filed a complaint in court. The complaint alleges that the defendant violated G.L. c. 149, §§ 148 and 150 (Count I); breached its contract with Scott (Count II); breached its covenant of good faith and fair dealing (Count III); and, wrongfully terminated Scott (Count IV). Granada moves to dismiss Counts I, III and IV.

DISCUSSION

*2 "Dismissals on the basis of pleadings, before facts have been found, are discouraged; the standard applied under rule 12(b)(6) is that 'a complaint is sufficient unless it shows beyond doubt that there is no set of facts which the plaintiff could prove in support of his claim which would entitle him to relief Under that formulation the vague or ambiguous complaint tends to be immune from dismissal under rule 12 ... but where ... the complaint sets out with clarity and precision the detailed factual allegations which the plaintiff contends entitle him to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

relief, it is appropriate, although not required, to allow a motion to dismiss if the allegations of the complaint 'clearly demonstrate that plaintiff does not have a claim.' " *Fabrizio v. Quincy,* 9 Mass.App.Ct. 733, 734, 404 N.E.2d 675 (1980). Moreover, a complaint should not be dismissed because it asserts a new theory of liability because "it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions." *New England Insulation Co. v. General Dynamics Corp.,* 26 Mass.App.Ct. 28, 30, 522 N.E.2d 997 (1988).

### A. Count I, G.L. c. 149, §§ 148 & 150

The Massachusetts Payment of Wages Statute requires employers to pay their employees wages at least every other week, unless an eligible employee elects to be paid monthly. G.L. c. 149, § 148. [FN1] Employees who are involuntarily discharged must be paid in full on the day of the discharge. *Id.* Although the statute provides that "wages" shall include holiday or vacation pay, it does not provide a specific definition for the term. *Id.* Violation of the Payment of Wages Statute subjects the employer to both criminal and civil sanctions. *Id.* In particular, an employee aggrieved by the violation of the statute has a private civil right of action for injunctive relief and damages, including treble damages for loss of wages and other benefits, attorneys fees, and litigation costs. G.L. c. 149, § 150. [FN2]

> FN1. General Laws c. 149, § 148, provides, in relevant part: "Every person having employees in his service shall pay weekly or biweekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week, or to within seven days of the termination of the pay period during which the wages were earned if such employee is employed seven days in a calendar week ... but ... any employee discharged from such employment shall be paid in full on the day of his discharge ... The word 'wages' shall include any holiday or vacation payments due an employee under an oral or written agreement.
>
> "Whoever violates this section shall be punished by a fine of not less than five hundred nor more that three thousand dollars or by imprisonment in a house of correction for not more than two months, or both."

> FN2. General Laws c. 149, § 150, as added

by St. 1993, c. 110, § 182, provides, in relevant part: "Any person claiming to be aggrieved by a violation of section one hundred and forty-eight ... may, at the expiration of ninety days after the filing of a complaint with the attorney general ... institute and prosecute in his own name and on his own behalf ... a civil action for injunctive relief and any damages incurred, including treble damages for any loss of wages and other benefits. An employee so aggrieved and who prevails in such an action shall be entitled to an award of the costs of the litigation and reasonable attorney fees."

In this case, the defendant employer bases its motion to dismiss on the grounds that the payments which it allegedly failed to make to the plaintiff employee are not "wages" under the Payment of Wages Statute. "[A] basic tenet of statutory construction is to give the words their plain meaning in light of the aim of the Legislature." *Commonwealth* v. *Vickey,* 381 Mass. 762, 767, 412 N.E.2d 877 (1980); see also *Shubshelowicz v. Fall River Gas Co.,* 412 Mass. 259, 262, 588 N.E.2d 630 (1992) ("The language of a statute is the best indication of legislative intent"). "Provisions of legislation addressing similar subject matter are to be construed together to make 'an harmonious whole consistent with the legislative purpose' ... and to avoid rendering any part of the legislation meaningless." *Healey v. Commissioner of Public Welfare,* 414 Mass. 18, 25-26, 605 N.E.2d 279 (1992).

*3 The term "wages" is not defined in the statute or in interpreting regulations. However, the Supreme Judicial Court recently defined "wages" in the context of the Equal Pay Act, which prohibits wage discrimination on the basis of gender for work of like or comparable character. G.L. c. 149, § 105A. [FN3] *Jancey v. School Committee of Everett,* 421 Mass. 482, 490-93, 658 N.E.2d 162 (1995). Looking to various sources for guidance, the Supreme Judicial Court adopted a definition consistent with that provided by Black's Law Dictionary (6th ed. 1990):

> FN3. General Laws c. 149, § 105A provides, in relevant part: "No employer shall discriminate in any way in the payment of wages as between the sexes, or pay any person in his employ salary or wage rates less than the rates paid to employees of the opposite sex for work of like or comparable character."

Every form of remuneration payable for a given period to an individual for personal services, including salaries, commissions, vacation pay, dismissal wages, tips, and any other similar advantage received from the individual's employer or directly with respect to work for him ... Term should be broadly defined and includes not only periodic monetary earnings but all compensation for services rendered without regard to manner in which such compensation is computed.

*Id.* at 1579 (citations omitted). The Supreme Judicial Court therefore held that the term "wages" was not limited to periodic monetary pay, but rather extended to fringe benefits, including health insurance and other types of remuneration.

No Massachusetts appellate court has determined whether the broad definition of "wages" in *Jancey* applies with equal force to G.L. c. 149, § 148, and if so, whether payments promised to induce an employee to relocate constitutes "remuneration ... for services rendered" as required by the *Jancey* definition of **"wages."** These novel issues of law are sufficient to preclude dismissal. Moreover, even if this Court were to rule as a matter of law that payments relating to Scott's employment did not constitute "wages" under § 148, Scott has alleged other facts sufficient to preclude dismissal. In particular, Scott alleges in various parts of the Complaint that Granada has failed to pay him "bonus compensation" and "vacation pay," without specifying further the nature of these promised payments. In the absence of further information, this Court cannot conclude beyond a doubt that there is no set of facts which would entitle Scott to relief under G.L. c. 149, §§ 148, 150.

Accordingly, the motion to dismiss Count I, G.L. c. 149, §§ 148 and 150 is *DENIED.*

**B. Count III, Breach of Covenant of Good Faith**
The general rule in Massachusetts is that the employment of an **at-will** employee "is terminable by either the employee or the employer without notice, for almost any reason or for no reason at **all."** *Wright v. Shriners Hospital for Crippled Children,* 412 Mass. 469, 472, 589 N.E.2d 1241 (1992). One exception to this general rule exists where the termination breaches the covenant of good faith and fair dealing implied in the employment contract. *Fortune v. National Cash Register Co.,* 373 Mass. 96, **364** N.E.2d 1251 (1977).

*4 In *Fortune,* the Supreme Judicial Court held that there adheres in every at-will employment relationship a "covenant of good faith and fair dealing" that is violated when the employer terminates an at-will employee in order to avoid payment to the employee of compensation earned or "almost earned." *Id.* at 105, 364 N.E.2d 1251. This doctrine is limited to circumstances where the employer would be unjustly enriched as a result of the employee's termination. *Gram v. Liberty Mutual Ins. Co.,* 391 Mass. 333, 335, 461 N.E.2d 796 (1984). "That the plaintiff was fired arbitrarily and was injured in his expectations of future wages or other future emoluments does not, without more, encompass the *Fortune-type* of liability, however meretricious we may consider the dismissal to have been." *Tendios v. **Wm.** Filene's Sons Co., Inc.,* 20 Mass.App.Ct. 252, 254, 479 N.E.2d 723 (1985).

In this case, Scott claims that his termination was aimed at relieving Granada of its contractual obligations to pay him bonus compensation, vacation pay, relocation expenses and grossed up tax liability. According to the Complaint, however, these obligations arose from written agreements between the parties. Nothing in the Complaint suggests that these agreements would allow Granada to escape its liabilities in the event of his termination. Since Granada remains liable under contract for the payments regardless of Scott's employment status, there exists no basis for determining that Granada was unjustly enriched by his termination. Contrast *Fortune, supra* (plaintiffs termination allowed employer to avoid paying commissions on goods sold before the termination but not yet delivered).

Accordingly, the Granada's motion to dismiss Count III, Breach of the Covenant of Good Faith and Fair Dealing, is *ALLOWED.*

**C. Count IV, Wrongful Termination**
"As an exception to the general rule that an employer may terminate an at-will employee at any time with or without cause, [the Supreme Judicial Court has] recognized that an at-will employee has a cause of action for wrongful termination only if the termination violates a clearly established public policy." *King v. Driscoll,* 418 Mass. 576, 582, 638 N.E.2d 488 (1994). The Supreme Judicial Court "consistently has interpreted the public policy exception narrowly, reasoning that to do otherwise would 'convert the general rule ... into a rule that requires just cause to terminate an at-will **employee.'** " *Id.* (and cases cited therein). In this case, Scott claims

that he was terminated for seeking redress in court to assert his contractual right to the payments under the written agreements, or, alternatively, his statutory right to timely payment of wages under G.L. c. 149, § § 148 and 150.

\*5  "[T]he internal administration, policy, functioning, and other matters of an organization cannot be the basis for a public policy exception to the general rule that **at-will** employees are terminable at any time with or without cause." *Id.* at 583, 638 N.E.2d 488. Granada argues, and this Court agrees, that the dispute in this case over the payments allegedly owed Scott under the written agreements is strictly an internal company matter. Scott's claim that his termination was in retaliation to his exercise of his right to litigate does not, by itself, change this conclusion. "The mere fact that a dissatisfied [employee] shareholder could litigate the matter in a court of the Commonwealth does not transform this into an external matter involving, as the plaintiff argues, public policy." *Id.* Thus, accepting as true Scott's claim that his termination was in retaliation for seeking redress in court of his rights under the written agreements, such termination did not violate public policy.

Alternatively, liability under the public policy exception may be found "when the Legislature has expressed a policy position concerning the rights of employees and an employer discharges an at-will employee in violation of that established policy, unless no common law rule is needed because the legislature has also prescribed a statutory remedy."

*Mello v. Stop & Shop Cos.,* 402 Mass. 555, 557, 524 N.E.2d 105 (1988); see also *King, supra* at 584 n. 7, 638 N.E.2d 488 (where "a statute *itself* ... provide[s] that an employer may not terminate an employee for exercising rights conferred by the statute ... the common law public policy exception is not called in to play") In this case, Scott argues that he was terminated in retaliation for exercising his right under G.L. c. 149, § 150 to bring suit against Granada for failure to make timely payment of wages as required by G.L. c. 149, § 148. General Laws c. 149, § 148A, however, provides: "No employee shall be penalized by an employer in any way as a result of any action on the part of an employee to seek his or her rights under the wages and hours provisions of this chapter." Since § 148A already prohibits retaliation against an employee for asserting his rights under c. 149, Scott's exercise of his rights under §§ 149 and 150 cannot form the basis of his wrongful termination claim.

Accordingly, Granada's motion to dismiss Count IV, Wrongful Termination, is *ALLOWED.*

### ORDER

For the foregoing reasons, it is hereby *ORDERED* that the defendant Granada Computer Services, Inc.'s motion to dismiss (1) Count I, G.L. c. 149, §§ 149 and 150 is *DENIED ;* (2) Count III, Breach of Covenant of Good Faith, is *ALLOWED ;* and (3) Count IV, Wrongful Termination, is *ALLOWED.*

1996 WL 1186807 (Mass.Super.)

END OF DOCUMENT