## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**ELEANOR SCALLI, and,**
**ROBERT SCALLI**
      **Plaintiffs,**
**v.**                                             **CIVIL ACTION NO.: 03CV-12413DPW**

**CITIZENS FINANCIAL GROUP, INC.**
      **Defendant.**
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
### OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.      INTRODUCTION

Mr. Scalli and Mrs. Scalli were employed as loan officer and senior loan officers, respectively, for approximately two years by a subsidiary of Citizens Financial Group, Inc. Citizens Mortgage Corporation ("CMC"). The Plaintiffs each signed an initial offer which was changed several times by Barden Conn, Senior Vice President, and thereafter agreements were changed several times prior to Mr. Conn instructing Mr. Scalli and Ms. Scalli to execute the signature pages. The Plaintiffs herein dispute that they received all payments owed under the terms of the contracts and unilateral changes to the contract by CMC. Both contracts were changed by CMC at the beginning of the Plaintiffs employment and several times subsequent to February, 2001. Mr. Conn initiated and approved all changes to the contracts including, but not limited to specific position, duties, compensation and benefits. Mr. Conn did not inform Human Resources of any changes that occurred to the Plaintiffs' contract at the commencement of their employment or thereafter. Mr. Conn stated that he was the "man" at Citizens and that notifying Human Resources of unprecedented changes to the contract did not seem relevant. The facts and surrounding circumstances of the Plaintiffs' employment, are confirmed by the changes he made to the contracts.

1

Neither Mr. Scalli nor Mrs. Scalli made a credit decision during their employment with CMC.  All decisions regarding credit, to wit, approval of loan applications or denials of loan applications were made by the Operations Manager, Elizabeth Walsh.

In January of 2003, Elizabeth Walsh as she had done on particular occasions in the past when she could not issue a letter of denial within the deadline period outlined in the borrower's purchase and sale agreement, informed Mrs. Scalli's office that she had made a credit decision to deny the Barbosa loan.  Ms. Walsh then instructed Mrs. Scalli's office to issue a denial letter to the borrower.  Mrs. Scalli did not deny a loan or make a credit decision relative to the Barbosa loan.  Her office simply forwarded a denial letter upon the authority of the Operations Manager, Ms. Walsh.  Indeed, Ms. Walsh testified that she was not trained as a loan officer relative to the policies and procedures of issuing a denial of a loan.

Contrary to CMC's contention that Mrs. Scalli violated the Code of Ethics by selling her real estate to a customer, Mrs. Scalli never discussed the sale of any real estate with Jean Barbosa during her employment with CMC and did not sign a purchase and sale agreement or accept any offer regarding her property in February of 2003.  Because CMC failed to investigate the circumstances surrounding the Barbosa loan, failed to contact Jean Barbosa, and failed to verify whether Mrs. Scalli was selling property to Mr. Barbosa during her employment, CMC wrongfully discharged Mrs. Scalli without a verbal or written warning for the same on February 4, 2003 in violation of the Citizens Financial Group's Employee Handbook and its Performance Improvement Plan.

CMC incorrectly determined that Mr. Scalli owned a property at 208 Maverick Street, East Boston, Massachusetts and that the sale of said property to Mr. Barbosa violated CMC policy.  As a result, Mr. Scalli was suspended.

Thereafter, pursuant to an audit of all of the Scalli loan files CMC conducted an investigation into the Castillo loan but did not determine who originated the loan, and failed to establish that Mr. Scalli through a joint account with Mrs. Scalli provided gift money to Andres Castillo in violation of CMC policy. Mr. Scalli never provided gift money to Andres Castillo or to any borrower during his employment with CMC. Mr. Scalli cooperated and responded to each and every message (by telephone or otherwise) from Human Resources Director, Joyce Hicks.

The Plaintiffs' Complaint alleges wrongful discharge for violations of public policy. The Plaintiffs were discharged after CMC discovered IRS/Social Security irregularities, 401K irregularities, income reporting irregularities. The Plaintiffs were discharged under pretext and were never afforded an opportunity to respond in a meaningful manner. The Plaintiffs were not allowed to submit in a timely manner evidence that none of their actions violated CMC policy or occurred without authorization.

The Plaintiffs have repeatedly disputed that they were paid all monies due to them under the contracts. The Plaintiffs claim the contracts, to wit, compensation, positions duties and benefits were changed and during the course of their respective employments by Senior Vice President, Barden Conn. The Plaintiffs submit and Mr. Conn concurred that he was aware of the material, unprecedented changes to the contracts yet failed to inform Human Resources.

The Plaintiffs have offered ample evidence that CMC interfered with Mrs. Scalli contract with her new employee and business relationships Mr. and Mrs. Scalli had with brokers and realtors. Although both Plaintiffs obtained jobs as loan officers after leaving

CMC, they both incurred a significant reduction in business and commissions due to the continuous interference by CMC.

At all relevant times, Victoria Noel and others intentionally communicated false statements regarding Mr. Scalli's and Mrs. Scalli's termination in an attempt to procure business opportunities for themselves and for CMC. Victoria Noel, a loan officer with CMC published said false statements to third parties to gain a business advantage for CMC.

## II.    STATEMENT OF FACTS

In December 2000, Barden Conn, a CMC Senior Vice President recruited Mr. Scalli and Mrs. Scalli for the position of loan offer and senior loan officer. Loan Officers under the terms of the CMC offer letter and contract/incentive plan take loan applications and are compensated on a commission basis. At the time Mr. Scalli and Mrs. Scalli were hired, Mr. Conn instructed both that they would be paid commissions for loans they originated pursuant to the terms of incentive plan. Approximately one week after the start of his employment, Mr. Scalli testified that Mr. Conn instructed him to concentrate on marketing and that any loans he did originate would be switched by him to Mrs. Scalli's name and number. Mr. Scalli also testified that Mr. Conn promised him a forgivable draw in the first year of his employment of $50,000.00 for the material change to his contract and a $50,000.00 salary upon the renewal of his contract. Mrs. Scalli testified that Mr. Conn promised her a $30,000.00 advance verbally prior to hire and .70 basis points on all loans closed over 3 million dollars per month in July 2002. Mrs. Scalli also testified that Mr. Conn changed the offer letter and incentive plan several times to satisfy Human Resources but instructed her and Mr. Scalli to sign the same and he would "fix it" at a later time. Mrs. Scalli also testified that Mr. Conn promised her $1000.00

bonus for each $1 million in loans closed per calendar year. Ms. Tara Tribelli-Gallone, a CMC Recruiter testified that there had been a delay in receiving the Scalli documents/contracts but that she couldn't confirm whether the delay was attributed to changes made by Mr. Conn. SDMF at ¶¶ 3-12.

Mr. Scalli and Mrs. Scalli signed loan officer commission contracts/incentive plans that were materially altered by Mr. Conn, without notice to Human Resources, at the outset of their employment. As a result of the material changes made by Mr. Conn, Mr. Scalli and Mrs. Scalli were not compensated for the full amount described in the contracts and oral modifications. The $50,000.00 verbally promised by Mr. Conn to Mr. Scalli for his new unprecedented marketing position is not included in his contract/incentive plans because Mr. Conn believed that it was not relevant to disclose this information to Human Resources. In March of 2002, Mr. Scalli was again promised a $50,000.00 salary for his new marketing position and instructed to sign any and all paperwork contract renewals even though oral promises regarding the new position's duties and compensation were intentionally omitted by Mr. Conn[1]. SDMF at ¶¶ 5, 11, 12.

Although CMC claims that the "contracts in this matter supercede all prior agreements either verbal or written with respect to the subject matter," there is no mention of subsequent oral promises that incorporate material changes to said contracts by CMC management. Also, CMC through its Senior Vice President, Barden Conn,

---

[1] Although CMC claims that the benefit base salary is necessary to determine the amount of certain benefits, benefits were provided to Mr. Scalli, according to CMC even though he did not earn any commissions and he was not entitled to any salary based on his new marketing position. In fact, CMC now claims that it calculated Mr. Scalli's benefits at a rate of $50,000.00 per year though he had absolutely no expectations of receiving commissions (and did not receive commissions for a single loan during his employment) and he had no expectations of receiving a salary. In essence, Mr. Scalli received benefits based on no W-2 earnings other than his initial payment of $15,000.00 provided to him prior to the material changes to the contract instituted by Mr. Conn. Thereafter, any calculation based on W-2 income or commission to Mr. Scalli would be zero for purposes of determining and paying his benefits. Any and all monies

modified the contracts by notifying Mr. Scalli of his new marketing position and his new compensation plan. Mr. Conn, without any notice to Human Resources, switched the commissions from Mr. Scalli to Mrs. Scalli while promising Mr. Scalli that he would be compensated for all his marketing efforts through a forgivable draw in year one (1) and a salary in year two (2). SDMF at ¶¶ 16, 17.

Although Mr. Conn instructed Mr. Scalli and Mrs. Scalli to sign their contracts, he also acknowledged through his own acts and admissions that CMC was not bound by the job descriptions, incentive plans and benefit packages contained therein. SDMF at ¶¶ 19-21.

II.     MR. SCALLI'S AND MRS. SCALLI'S EMPLOYMENT AT CMC

Although Mr. Scalli and Mrs. Scalli were initially directed to report to Michael Diranian, Mr. Conn informed Mrs. Scalli at the outset of her employment that she and Mr. Scalli would report directly to him. SDMF at ¶ 30.

One week after the commencement of his employment, Mr. Conn instructed Mr. Scalli to direct his efforts on marketing and that if he did originate a loan from time to time, he (Mr. Conn) would switch the loans for commission purposes to Mrs. Scalli. Mr. Scalli never put loans he originated under Mrs. Scalli's production, and, more importantly, had no ability to do so because he did not have access to the commission reports. Mr. Scalli accepted the new position created by Mr. Conn based on a promise that he would receive a $50,000.00 forgivable draw for the first year and a $50,000.00 salary upon the renewal of his contract. SDMF at ¶ 31-34.

Mr. Conn switched commissions due to Mr. Scalli under Mrs. Scalli's production;

---

received by Mr. Scalli, beyond the initial $15,000.00, were monies deducted from Mrs. Scalli's commission without her knowledge and authorization. SDMF at ¶¶ 37-46, 28.

thus, Mrs. Scalli was paid for loans she did not originate.  Mr. Scalli was paid $15,000.00 initially upon the commencement of his employment, but thereafter received payments that were deducted from Mrs. Scalli's commissions.  SDMF at ¶¶ 37-46, 28.

III.    PLAINTIFFS' TERMINATION FROM EMPLOYMENT AT CMC

A.    Jean Barbosa's loan application

Mr. Jean Barbosa (borrower) required a mortgage for a property located at 331 Paris Street, East Boston.  The Barbosa loan was originated at the Scalli office.  Mr. Barbosa's loan had been approved for an owner occupied property.  Mr. Barbosa attempted to rework the loan with Liz Walsh, Operations Manager, but was unsuccessful. Galina, a loan processor for Liz Walsh in the Operations Department, informed Mr. Barbosa that the loan had been denied and that Eleanor Scalli would be sending out a denial letter shortly.  SDMF ¶¶52-56.

Liz Walsh instructed Luis Riascos, of Mrs. Scalli's office, to send a decline letter to Mr. Barbosa subsequent to her credit decision to deny the loan as an investment property.  Steve Roussel, a Sales Manager at CMC, testified that he received a complaint from Tony Giacalone, a realtor, regarding the Barbosa denial letter.  Mr. Roussel claimed that Mr. Giacalone heard a rumor that a borrower's (Jean Barbosa) loan was declined and that said borrower was under agreement to buy another house.  Mr. Roussel never verified any of the information provided by Mr. Giacalone and never attempted to contact Mrs. Scalli or exonerate her in anyway.  SDMF ¶¶57-60

Mr. Roussel gave the decline letter he claims to have received from Mr. Giacalone to Mr. Diranian, a Sales Manager, that Mr. and Mrs. Scalli did not report to, and Mr. Diranian never investigated any of the circumstances involving the issuance of the decline letter or whether Mr. Barbosa was under agreement to buy another house.

Mr. Conn testified that if Liz Walsh had authorized Luis Riascos to forward a decline letter signed by Mrs. Scalli, Mrs. Scalli would have had the authority to issue the Barbosa decline letter. SDMF at ¶¶64-65.

Ms. Hicks, a Senior Human Resources Generalist, Assistant Vice-President, testified that a standard policy in the mortgage industry was that loan officers could not make credit decisions because loan officers were paid commissions and a conflict exists. Mr. Conn also testified that the mere fact that CMC issued decline letters, out of the Operations Dept., with the loan officer's name on it below a signature line was a gaping hole in our organization. Ms. Walsh testified that she was not trained in what loan officers could or could not do, relative to loan approvals and denials, but Ms. Walsh admitted that she had authority to approve or recommend denials. Mrs. Scalli never made a credit decision on the Barbosa loan. Ms. Walsh instructed Mrs. Scalli's office to send out a denial letter after she decided to deny the Barbosa loan. SDMF at ¶¶66-68; 63.

Mrs. Scalli owned property at 208 Maverick Street. At the time of her termination, Mrs. Scalli was not negotiating or selling property to Mr. Barbosa. Ms. Hicks testified that it had been brought to her attention that Mrs. Scalli denied the loan because Mr. Barbosa was purchasing Mr. Scalli's property at 208 Maverick Street. Mr. Scalli did not own the property at 208 Maverick Street. Ms. Hicks never did any investigation, nor did CMC to the best of her knowledge, to confirm whether Mr. Scalli owned the 208 Maverick Street property prior to his suspension. Ms. Hicks admitted that if Mr. Scalli did not own the 208 Maverick Street property, and, thus, could not have entered into an agreement to sell the property to Mr. Barbosa, there would have been no violation of CMC policy. SDMF at ¶¶69-73.

Mrs. Scalli was terminated because her office issued a denial letter on the Barbosa loan after Liz Walsh made a credit decision on the loan and authorized Luis Riascos to send the decline letter to Mr. Barbosa.  Mr. Scalli was suspended for purportedly selling a property that he did not own to a borrower (Jean Barbosa).  Mr. Scalli testified that he told Ms. Hicks at the time of the suspension meeting that he did not know if he owned the property but that he would get back to her with an answer.  Thereafter, Mr. Scalli informed Ms. Hicks by phone that he did not own the 208 Maverick Street property.  CMC claimed that Mr. Scalli and Mrs. Scalli advanced gift money to Paula Castillo, Andres Castillo and Raphael Guerrero, borrowers in a loan Mrs. Scalli originated.  Mrs. Scalli reviewed the Castillo loan and explained that no "gift money" was needed to obtain approval.  Mrs. Scalli also explained that neither she nor Mr. Scalli ever advanced money personally to a borrower.  Andres Castillo worked on a property owned by the Scallis and received payment for his services from the Scalli joint account.  SDMF at ¶¶74-78.

Mr. Scalli did not engage in any improper activity relative to Castillo loan and he cooperated with the ongoing investigation by returning each and every phone call he received from Ms. Hicks.  Mr. Scalli and Mrs. Scalli were owed commissions, salary and other wages/benefits at the time of their terminations.  Mrs. Scalli was not provided with the information contained in her laptop and the laptop of other members of her office to determine the amount of commissions owed at the time of her termination.  SDMF at 79-81.

Plaintiffs allege that Victoria Noel, a CMC loan officer, told Danielle Felice and Javier Pico that the Scallis had been indicted for bank fraud.  Ms. Noel was motivated to do this in part for her own gain and in part to serve CMC by stopping brokers and realtors loyal to the Scallis from continuing to do business with them at their new companies.

### III.    ARGUMENT

### A.    STANDARD OF REVIEW ON MOTION FOR SUMMARY JUDGMENT

In ruling on a motion for summary judgment, "a judge…must consider the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any,' in determining whether summary judgment is appropriate.  Mass R. Civ P. 56 (c), 365 Mass. 824 (1974).  The burden on the moving party is to show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'  *Id*." *Madsen v. Erwin*, 395 Mass. 715, 719 (1985).  This burden need not be met by affirmative evidence negating an essential element of the plaintiffs' case, but may be satisfied by demonstrating that proof of that element is unlikely to be forthcoming at trial.  *See Kourouvacilis v. General Motors Corp.*, ante 706 (1991).

Where a moving party properly asserts that there is no genuine issue of material fact, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A judge's mere belief that the movant is more likely to prevail at trial is not a sufficient basis for granting summary judgment.  *See Byrd v. Roadway Express, Inc.*, 687 F.2d 85, 87 (5th Cir. 1982); *American Int'l Group v. London Am. Int'l Corp. Ltd.*, 664 F. 2d 348, 351 (2d Cir. 1981).  *10A C. Wright, A. Miller, & M. Kane*, Federal Practice and Procedure § 2725, at 104-105 (1983).

In cases where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate.  Here, the defendant's motive for the

discharges are primary contested issues of fact.  *See Pederson v. Time, Inc.*, 404 Mass. 14, 17 (1989) ("the generally accepted rule is that the 'granting of summary judgment in a case where a party's state of mind…constitutes an essential element of the cause of action is disfavored'", *quoting Quincy Mut. Fire Ins. Co. v. Abernathy*, 393 Mass. 81, 86 91984).  *See also Sweat v. Miller Brewing Co.*, 708 F. 2d 655, 657 (11th Cir. 1983*); Baldini v. Local 1095, UAW*, 581 F. 2d 145, 151 (7th Cir. 1978).  *10A C. Wright, A. Miller, & M. Kane*, supra at § 2730.  In such cases, "[m]uch depends on the credibility of the witnesses testifying as to their own states of mind.  In these circumstances, the jury should be given an opportunity to observe the demeanor, during direct and cross-examination, of the witnesses whose states of mind are at issue." *Croley v. Matson Navigation Co.*, 434 F. 2d 73, 77 (5th Cir. 1971)[2].

Finally, disputed facts and the reasonable inferences from those facts are viewed in the light most favorable to the non-moving party.  *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 464 (2003); *Hub Assocs., Inc. v. Goode*, 357 Mass. 449, 451 (1970).

**B.    MR. AND MRS. SCALLI WERE WRONGFULLY DISCHARGED IN VIOLATION OF PUBLIC POLICY**

It is well-established that "an at-will employee has a cause of action for wrongful discharge if the discharge is contrary to public policy." *DeRose v. Putnam Management Co.*, 398 Mass. 205, 210 (1986).  We have perceived clear violations of public policy when an employer terminates an employee for: (1) asserting a legal right.  *See Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 149 (1989) (*citing* example of filing a workers' compensation claim); (2) doing what the law required, *see*

---

[2] Liz Walsh, Barden Conn and Michael Diranian, all former employees of CMC, are represented by Goodwin Proctor.  See L. Walsh Dep. at 5-9.

*Hobson v. McLean Hosp. Corp.*, 402 Mass. 413, 416 (1988) (enforcing safety laws); and (3) refusing to do what the law forbids, *see DeRose*, *surpra* at 210 (giving false testimony at trial). In addition, we have established "legal redress in certain circumstances for employees terminated for performing important public deeds, even though the law does not absolutely require the performance of such a deed." *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 810-811 (1991) (cooperating with ongoing government investigation).

"[T]he Achilles heel of the [public policy exception] lies in the definition of public policy." *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 130 (1981). It is a proper role of the courts to construe the boundaries of "public policy" and thereby develop common law remedies available to at-will employees who are terminated. Cf. *Schofield v. Merrill*, 386 Mass. 244, 245, 247-248 (1982).

In this case, the motive for the discharges are primary contested issues of fact. Ms. Hicks, Human Resources Director, testified that Mrs. Scalli was terminated for violations of the CMC policy relative to credit decisions by loan officers. SDMF ¶¶ 66-68. Despite this purported reason for Mrs. Scalli's termination, Mr. Conn testified that the mere fact that CMC issued decline letters, out of the Operations Department with the loan officer's name on it below a signature line was a gaping hole in CMC's organization.

The basis for the Plaintiffs' public policy claim is that they made repeated assertions of their rights to be paid wages, commissions and benefits, individually, to the Senior Vice President, Barden Conn. SDMF ¶¶ 35-44; 63. Further, the Plaintiffs asserted rights to contribute to 401K or retirement plans to Mr. Conn. The Plaintiffs also raised their concerns about the tax consequences of the defendant's payment or non-

payment of compensation as well as social security contributions with the Senior Vice President, Barden Conn. Both state and federal law forbid the non-payment of taxes and social security contributions. In this case, the Plaintiffs repeatedly sought through Mr. Conn, be paid according to the law and that laws are not violated. SDMF at 35-44, 73.

Thus, the extremely expedited termination of Eleanor Scalli within 4 days, launched by Barden Conn's email of January 31, 2003 of Eleanor Scalli and Robert Scalli was meant to prevent a further inquiry into unauthorized and illegal practices within the bank including but not limited to:

(i)      violation of State and Internal Revenue Service and Social Security laws;

(ii)     violation of retirement benefits/ERISA laws and regulations;

(iii)    violation of Human Resources policies as it relates to changing positions/duties and compensation packages/incentive plans without written authorizations;

(iv)     violations of banking and other regulations.

There is an undisputed public interest in compliance with state and federal tax laws and social security as well as a contribution to the bank's retirement/401K plan. Contrary to the Defendant's contention, the Plaintiffs have alleged a basis for their public policy claim and there is a genuine dispute of material fact relative to the motive of the Defendant to discharge the Plaintiffs.

There being issues of material fact genuinely in dispute on Count I, the bank's motion for summary judgment on this claim should be denied.

## C.    THE DEFENDANT VIOLATED THE COVENANT OF GOOD FAITH AND FAIR DEALING

A covenant of good faith and fair dealing is implied in every contract. *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

13

The covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Associates*, 441 Mass. 451, 471-472 (1991) (quotations omitted). "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Restaurants*, 441 Mass. at 385.

A party may breach the covenant of good faith and fair dealing implicit in every contract without breaching any express term of that contract. *Marx v. Globe Newspaper Co., Inc., 13 Mass. L. Rep.*, 190, *10-11 (Mass.Super. 2001); *see Fortune v. National Cash Register Co.*, 373 Mass. 96, 101, 105 (1977). Otherwise, the implied covenant would be a mere redundancy. The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance. *Marx, 13 Mass. L. Rep.* at *10-11; *Larson v. Larson*, 37 Mass. App. Ct. 106, 110 (1994).

Here, there is evidence of fraud, deceit and misrepresentation relative to compensation benefits promised by Barden Conn. See *Dunkin' Donuts, Inc. v. Gav-Stra Donuts, Inc.*, 139 F. Supp. 2d 147, 156 (D. Mass. 2001) (breach of covenant where there was evidence of fraud deceit or misrepresentation). *Chokel v. Genzyme Corp.*, 17 Mass. L Rptr. 83, at *10 (Mass.Super. 2003).

The Plaintiffs made repeated requests to Bard Conn to pay them monies that were due to them and they were told that he would "fix it." Specifically, Eleanor Scalli would have received approximately $40,000.00 in commissions in her pipeline, less any monies

previously paid.  Neither Eleanor Scalli nor Robert Scalli were paid all compensation promised by Bard Conn.  SDMF at 78-79.

Contrary to the Defendant's Memorandum, there are genuine issues of material fact that their terminations were not for good cause and in bad faith.

There being issues of material fact genuinely in dispute on Count II, the bank's motion for summary judgment on this claim should be denied.

**D.**    **THE PLAINTIFFS REASONABLY RELIED UPON MR. CONN'S MISREPRESENTATIONS TO PAY ADDITIONAL COMPENSATION**

The Defendant next argues that it was unreasonable for the Plaintiffs to rely upon Mr. Conn's oral promises for additional compensation.  The Defendant points out that the contracts provide the terms of compensation and therefore, it would be unreasonable for them to rely on the representations of the Senior Vice President of the bank that employed them.  Yet, "[e]ven where a contract has been solemnized by a writing, an oral modification of that written contract may be proved by a preponderance of the evidence." *Baptista v. Abbey Healthcare Group, Inc.* 1996 WL 33340740, No. 95-10125-RGS (D. Mass. 1996) (Stearns, J.).  *Quoting*, *Weiner v. Fleishman*, 54 Cal. 3d 476, 488 (1991). The Defendant argues that the contract contains an integration clause.  Judge Stearns, however, went on to state that "a provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract." Id. at 5.  *Quoting*, *Cambridgeport Savings Bank v. Boersner*, 413 Mass. 432, 439 (1992).

The Defendant argues that the Plaintiffs' claims fail because they cannot satisfy the element of reasonable reliance.  More particularly, the Defendant states that Mrs. Scalli did not inquire about the failure to fulfill the oral promises with anyone at the bank except the Senior Vice President of the bank who had made the oral promises of

additional compensation.  Defendant's Memorandum in Support of Motion for Summary Judgment, P. 13.  However, it is well established under Massachusetts law that "failure to investigate the veracity of statements does not, as a matter of law, bar recovery for misrepresentation."  *Bond Leather Co.*, 764 F. 2d at 936.  To find that the Plaintiffs' failure to investigate effectively bars their claim, as the bank requests, would run counter to the established case law on that point.  "Only reliance on 'preposterous or palpably false' representations vitiates a misrepresentation claim."  *Roadmaster Indus., Inc.* 893 F. Supp. at 1179 (*quoting Zimmerman*, 575 N.E.2d at 76).  The Senior Vice President's representations cannot be so characterized[3]."

Here, there are genuine issues of material facts sufficient for a jury to conclude that the Senior Vice President's representations were false.  Specifically, there is evidence of multiple changes to the contracts including but not limited to changing of titles and duties in violation of bank policy, withholding compensation, switching compensation to other employees (namely to E. Scalli) removing commissions from one employee to compensate another; removing commissions without authorization from one employee to pay the benefits of another employee; withholding salary promises of additional compensation and the benefit of additional support staff/assistant.  Ms. Tara Tribelli-Gallone, a CMC Recruiter testified that there had been a delay in receiving the Scalli documents/contracts but that she couldn't confirm whether the delay was attributed to changes made by Mr. Conn.  SDMF at ¶¶ 3-12; 35-44; 11.

There being issues of material fact genuinely in dispute on Count III, the bank's motion for summary judgment on this claim should be denied.

---

[3]  See Cellucci v. Sun Oil Co., 2 Mass. App. Ct. 722, 320 N.E. 2d 919 (1974); Willison Contracts § 1496, at 373-74 (2d ed. 1970) (Where one of the parties possesses superior knowledge about the matter to which

**E.**     **PLAINTIFFS WERE NOT PAID WAGES EARNED AS A RESULT OF THE MATERIAL CHANGES TO THEIR CONTRACTS**

Plaintiffs allege violations of Massachusetts General Laws c. 149, §148 ("Wage Act") (Count IV).  The Wage Act states in relevant part that "[e]very person having employees in his service shall pay… each such employee the wages earned by him." Id. At the outset, Plaintiffs dispute the fact that they were paid pursuant to the material changes and oral modifications implemented and authorized by Mr. Conn from the inception of their employment.  Plaintiffs have repeatedly identified wages that were earned pursuant to the material changes implemented through the team concept.  The Defendant erroneously asserts that Plaintiffs cannot establish that the wages are presently due and owning.

In fact, the Plaintiffs have presented ample evidence that Mr. Scalli was worked for in excess of two years as a marketing specialist and, according to Mr. Conn, was owed no compensation beyond the initial $15,000.00 paid for the loans he abandoned at this former company prior to the start of his employment with CMC.  Mr. Conn's assertion defies logic and is nonsensical on its face.[4] SDMF at ¶¶ 29-33.  In July 2002, Mr. Conn promised Mrs. Scalli a higher basis point payment on loans originated and certain bonus payments for loans she originated.  Compl. at ¶¶18-21.  The Defendant's assertion that prior or contemporaneous agreements or negotiations may not be considered to vary a term of a written agreement pursuant to the parole evidence rule is entirely misplaced based on the facts presented herein.  Mr. Conn, Senior Vice-President for CMC, at all relevant times subsequent to instructing Mr. and Mrs. Scalli to

---

such representations relate, Massachusetts law recognizes an exception to the rule that erroneous promises bar a claim for deceit).

execute their respective contracts changed, modified, nullified and utterly ignored material aspects of the Scallis' incentive plan/contract.  It is well established that even if a contract has been reduced to writing, a modification may be proven based on the evidence presented by the parties.  See *Weiner v. Fleischman*, 54 cal. 3d 476, 488 (1991); see also, *Baptista v. Abbey Healthcare Group, Inc.*, 1996 WL33340740 No. 95-10125-RGS (D. Mass. 1996) (Stearns, J.).  SDMF at ¶¶ 31-44.

To the extent that the Defendant claims the terms of the contract were not uncertain or equivocal, this assertion is belied by the fact that Mr. Conn changed the contract several times.  Mr. Scalli and Mrs. Scalli signed initial versions, Mr. Conn changed the final version, and continued to modify the same throughout their employment.  SDMF at ¶¶ 5; 11; 12; 19-21.  The Defendant's reliance on the fact that a written modification to the contract is required to overcome an integrated or complete agreement is equally unconvincing.  *See Cambridgeport Savings Bank v. Boersner*, 4B Mass. 432, 439 (1992) ([A] provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract"). Further, it should be noted that evidence of a subsequent oral modification can be sufficient to overcome the presumptions of an integrated agreement.  Id. at 439 n. 10. The Plaintiffs have presented more than sufficient evidence of oral modification through their own testimony and the testimony of former CMC employees.  SDMF at 3-12; 16; 17; 19-21; 31-34[5]; 24.

---

[4] Mr. Scalli originated loans under his production number and name and Mr. Conn switched said loans under Mrs. Scalli's production based on a guarantee to Mr. Scalli that he would receive a $50,000.00 salary for his marketing position.  SDMF at 18, 37.

[5] The Defendant's claim that Mr. Conn did not have actual or apparent authority to alter the terms of the contracts.  Mr. Conn specifically that he did not inform Human Resources of the "team concept" and he did not feel it was relevant to do so, and no one at CMC needed to authorize this change.  Hence, it begs credulity to contend that Mr. Conn, Senior Vice President in charge of Massachusetts and New Hampshire, did not have authority to change Mr. Scalli's position and compensation.  CMC was well aware of the fact

The continued assertions by the Defendant that the Plaintiffs failed to document promises in any way or raise the issue of modifications to their contracts is directly contradicted by both Mr. Conn and Ms. Hicks.  Mr. Conn stated that documenting the "team concept" and all interaction with Human Resources was not relevant, and Ms. Hicks claims that these modifications to the Scalli contract can be achieved by making an oral request to a manager, in this case, Mr. Conn.  SDMF at ¶¶ 49; 24.

Finally, the Defendant incorrectly asserts that the Wage Act does not apply "to highly paid employees like the Plaintiffs."  First, the statute has been construed to apply to corporate executives as well as lower level employees if the payment sought is ordinary wages and wage equivalents.  See *Massachusetts v. Morash*, 490 U.S. 107, 117 (1989).  Second, on the one hand, in the case of Mr. Scalli, the Defendant admits that he received little or no direct compensation (as the exact amount beyond the initial $15,000.00 is disputed) and therefore cannot be characterized as a "highly paid employee."  Third, Mrs. Scalli was not a corporate executive with CMC and although she did receive commissions, the wages she seeks fall squarely within the "ordinary wages and wage equivalents" contemplated by *Massachusetts v. Morash* at 117.  Hence, the contention made by the Defendant that the Plaintiffs do not deserve the protections of M.G.L. c. 149, §148 must fail.  SDMF at ¶¶ 21-22.

There being issues of material fact genuinely in dispute on Count V, the bank's motion for summary judgment on this claim should be denied.

---

that Mr. Scalli was not originating loans under his number, was not receiving compensation in any form for his labor and was receiving paychecks from monies extracted from Mrs. Scalli's income.  Joyce Hicks, Human Resources, claimed that accounting would pay commissions; attribute taxes to Eleanor Scalli and again no one at CMC needed to authorize these changes.  SDMF at ¶15.  Ms. Hicks claims that Scallis' modified their contracts, and changed their tax reporting without any document or writing by simply

**F.    THE DEFENDANT TORTIOUSLY INTERFERED WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS AND CONTRACTUAL RELATIONS**

The elements of the tort for wrongful interference with business and/or contractual relations, upon which the plaintiffs must present evidence they are:

1.)    they had established a business relationship or were about to enter into a contractual arrangement with a prospective employer;

2.)    the defendant knew about such business relationship or arrangement;

3.)    the defendant intentionally and improperly interfered with said business relationship or arrangement; and,

4.)    they suffered a loss of advantage due to the defendant's conduct.

*Yovino v. Fish*, 27 Mass. App. Ct. 442, 445, 539 N.E. 2d 548 (1989); *United Track Leasing Corp. v. Geltman*, 406 Mass. 811, 816, 551 N.E. 2d 20 (1990) (distinguish their case (*Armstrong*).

Here, the Plaintiffs have presented evidence of beneficial contractual arrangements and business relationships.  Specifically, Eleanor Scalli had a contract with her new employer GMAC and had established numerous business relationships with local realtors and brokers along with her husband Robert Scalli.  Secondly, the Defendant admits that the Human Resources Director, Joyce Hicks, was aware that Mrs. Scalli worked at GMAC and contacted her new employer.  Further, relative to Mr. and Mrs. Scalli the defendant was aware of their business relationships with local realtors and brokers.  Additionally, the defendant intentionally and maliciously interfered with Mrs. Scalli's contract with her new employer, GMAC, and business relationships with brokers and realtors by spreading negative information regarding the Scalli's termination.

_____

"requesting it of their manager;" therefore, any suggestion that a writing was required or that a particular

Finally, because of the improper interference with business relationships with brokers and realtors, the plaintiffs suffered a loss of advantage directly resulting from the defendant's conduct.[6]  SDMF at ¶¶ 85-86.

## G.    THE DEFENDANT'S PUBLICATION OF THE STATEMENT THAT THE PLAINTIFFS WERE INDICTED FOR BANK FRAUD WAS FALSE AND DEFAMATORY

Plaintiffs claim that on or about February 6, 2003 through June 2003 Victoria Noel, a loan officer for CMC during communications with Javier Pico and Danielle Felice stated that Eleanor and Robert Scalli had been "indicted on bank fraud."  See Compl. at ¶23.  In *Burroughs v. Commonwealth*, 423 Mass. 874, 877 (1996) the court explained that "an employee's conduct is within the scope of employment if it (i) is of the kind she is employed to perform; (ii) occurs substantially within the authorized time and space limits, and (iii) is motivated, at least in part, by a purpose to serve the employer".)  It is submitted that Ms. Noel made this statement to in part serve herself and in part to serve the company.  Ms. Noel, and others employed by CMC, engaged in a concerted effort to discredit the Scallis in an effort to capture their business relationships, cultivated over several years, with local realtors.  In part, Ms. Noel did this for personal gain and, it is submitted, in part she did this to serve CMC.  See Aff. of Brokers (Philip Consolo; Stephen Amaral; Victoria Laws).  CMC was well aware of the business it would lose as a result of the Scalli terminations, thus a concerted effort occurred to prevent the Scallis from contiuning to derive business from their long established relationships with local realtors.  More importantly, Ms. Noel attempted to secure loans for CMC that would

---

person at CMC had to authorize these modifications is, at best, spurious on its face.  SDMF at ¶ 24.

[6] A plaintiff may recover damages for his or her economic losses, foreseeable consequential economic losses, and foreseeable emotional distress.  In certain cases, plaintiffs have recovered the value of defendants' unjust enrichment, and even attorney fees.  Moriearty, Adkins & Lipsitz, 45 Mass. Practice Series §6.49 (West Group 1995).

otherwise transfer to CMC's competition.  See Aff. of Brokers (Philip Consolo; Stephen Amaral; Victoria Laws).

Ms. Felice, a real estate broker, informed Erin Green that she had provided evidence of negative statements to the Scalli attorneys, but that due to personal problems, she no longer wanted to be involved in the process.  See Affidavit of Erin Green.  The information to the Defendant by Ms. Felice in the form of an affidavit recants statements allegations provided to the Plaintiffs for their verified complaint.  See Compl. at ¶47.  The new evidence presented by the Defendant, namely the Felice Affidavit, raises a dispute as to a material fact that forecloses further consideration upon a motion for summary judgment.

Finally, the claims by the Defendant that the establishing of liability is not satisfied by a communication to an agent of a defamed person is inapplicable in the instant case.  Mr. Pico was not an agent for either Mr. Scalli or Mrs. Scalli at the time Ms. Noel published the defamatory statement.  See Aff. of Javier Pico.  More importantly, because the Defendant presents absolutely no evidence to support its bald assertion that Mr. Pico was an agent at the time the defamatory publication occurred, this argument must fail.

There being issues of material fact genuinely in dispute on Count VI, the bank's motion for summary judgment on this claim should be denied.

Respectfully submitted,
By the Plaintiffs,
Eleanor Scalli and Robert Scalli
By their attorneys,

Dated: 07/29/05                          /s/ Mark E. Burke
                                         _____
                                         Mark E. Burke – BBO#556166
                                         Law Office of Mark E. Burke
                                         111 South Bedford Street, Suite 208
                                         Burlington, Massachusetts 01803
                                         (781) 273-3801

Dated: 07/29/05                          /s/ Nicholas J. Di Mauro
                                         _____
                                         Nicholas J. Di Mauro – BBO#564241
                                         Law Offices of Nicholas J. Di Mauro
                                         111 South Bedford Street, Suite 208
                                         Burlington, Massachusetts 01803
                                         (781) 273-3801