UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

*****************************************
**ELEANOR SCALLI, and,**
**ROBERT SCALLI**
    **Plaintiffs,**
**v.**                                **CIVIL ACTION NO.: 03CV-12413DPW**

**CITIZENS FINANCIAL GROUP, INC.**
    **Defendant.**
*****************************************

**PLAINTIFFS' STATEMENT OF DISPUTED FACTS IN OPPOSITION OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Plaintiffs, Eleanor Scalli and Robert Scalli, (Plaintiffs) submit this Opposition to Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment.

Pursuant to Local Rule 56.1, the following documentation is submitted in the Appendix to Opposition to Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("Appendix"):

(a)    Plaintiff, Eleanor Scalli, ("E. Scalli Dep.") (Appendix Ex. 1);

(b)    Plaintiff, Robert Scalli, (R. Scalli Dep.") (Appendix Ex. 2);

(c)    Tara Tribelli-Gallone ("Gallone Dep.") (Appendix Ex. 3);

(d)    Joyce Hicks ("Hicks Dep.") (Appendix Ex. 4);

(e)    Barden Conn ("B. Conn Dep.") (Appendix Ex 5);

(f)    Michael Diranian ("Diranian Dep.") (Appendix Ex. 6);

(g)    Elizabeth Walsh ("L. Walsh Dep.") (Appendix Ex. 7);

(h)    Steven Roussel ("Roussel Dep.") (Appendix Ex. 8);

(i)    Affidavit of Eleanor Scalli (Appendix Ex. 9);

(j)    Affidavit of Robert Scalli (Appendix Ex. 10);

1

(k)   Affidavit of Javier Pico (Appendix Ex. 11);

(l)   Affidavit of Jean Barbosa (Appendix Ex. 12);

(m)   Affidavit of Erin Green (Appendix Ex. 13);

(n)   Affidavit of Brokers (Philip Consolo, Steven Amaral, Victoria Laws) (Appendix Ex. 14);

(o)   Excerpts from Employee Handbook re: Performance Improvement Plan and Benefits (Appendix Ex. 15);

(p)   Unpublished Legal Citations (Appendix Ex. 16).

## I.   DISPUTED FACTS

1.  Mr. Scalli and Mrs. Scalli met with Barden Conn, Senior Vice President for the company in charge of Sales and Operations for Massachusetts, New Hampshire and Construction to lending, to discuss a position with the company. *See* R. Scalli Dep. at 13-15, 17, 25; E. Scalli Dep. at 4-5, 14-15.

2.  Mr. Conn informed Mr. Scalli that he was concerned about losing market share and that he had a lot of flexibility as far as what he could offer loan officers, because he was the "main man" at Citizens Mortgage (hereinafter "CMC"). *See* R. Scalli Dep. at 34-35.

3.  When, Mr. Scalli accepted employment at CMC, Mr. Conn told Mr. Scalli he would receive $50,000.00 in a forgivable draw for walking away from any loans he had in process at any other company. *See* R. Scalli Dep. 40-41.

4.  Mr. Conn told Mr. Scalli that the forgivable draw was different from commissions he would receive as a loan officer. *See* R. Scalli Dep. at 41.

5. Mrs. Scalli received several versions of the offer letter and when versions were ultimately changed to something other than what was promised verbally by Mr. Conn, Mrs. Scalli asserts that Mr. Conn told her to sign the signature page and he would fix it. *See* E. Scalli Dep. at 28-29; E. Scalli Aff. at ¶¶ 3, 4.

6. Mr. Conn verbally and in writing offered Mrs. Scalli a $30,000.00 advance. *See* E. Scalli Dep. at 27-29; E. Scalli Aff. at ¶¶ 3,4.

7. Mr. Conn promised Mrs. Scalli that he would fix the error as it related to erroneous payment of $15,000.00. See E. Scalli Dep. at 28-29.

8. Mr. Conn promised Mrs. Scalli verbally and in writing .70 basis points on loans closed over 3 million per month, instead of .65 basis points on loans closed over 1 million as is reflected in the offer letter. Mr. Conn also promised Mrs. Scalli verbally and in writing a $1,000.00 bonus for every $1 million of loans closed per calendar year. *See* E. Scalli Dep. at 33-39; E. Scalli Aff. at ¶¶ 3,4; and R. Scalli Aff. at ¶¶ 3, 4.

9. The offer letter to Mrs. Scalli changed several times ultimately reflecting information that was inconsistent with the initial versions and verbal promises made by Mr. Conn. Ms. Tara Tribelli-Gallone, a CMC Recruiter, testified that there had been a delay in receiving the Scalli documents/contracts but that she wasn't aware whether the delay was attributing to changes being made by Mr. Conn. *See* E. Scalli Dep. at 28-29; 75-76 (Vol. II); E. Scalli Aff. at ¶¶ 3, 4; T. Tribelli-Gallone Dep. at 84.

10. Mr. Scalli also received and may have signed other written documents in addition to the offer letter that in its final version reflected compensation inconsistent with

      the promises made by Mr. Conn.  *See* R. Scalli Dep. at 50-52; E. Scalli Aff. at ¶¶ 3, 4.; and R. Scalli Aff. at ¶¶ 3, 4.

### II.  TERMS OF CONTRACT, OMISSIONS, AND CHANGES

11.    Mrs. Scalli disputed that she was paid by CMC in a manner consistent with her contract.  *See* E. Scalli Dep. at 80-83 (Vol. II).

12.    Mrs. Scalli was paid commissions for loans originated by another loan officer, namely, Robert Scalli; Mrs. Scalli had unauthorized monies deducted from her commission to pay another loan officers salary, Robert Scalli; Mrs. Scalli had unauthorized monies deducted from her commissions to cover benefits for another loan officer, Robert Scalli; all of the changes instituted by CMC through Mr. Conn were entirely inconsistent with Mrs. Scalli's contract.  *See* E. Scalli Dep. at 80-86 (Vol. II).

13.    Mr. Scalli, approximately one week subsequent to the commencement of his employment, was told by Mr. Conn that his new position was marketing; Mr. Conn promised Mr. Scalli a forgivable draw for the first year of his employment of $50,000.000 and a $50,000.00 salary when his contract renewed the following year; Mr. Conn instructed Mr. Scalli to originate a very small percentage of loans but to focus on marketing; Mr. Conn informed Mr. Scalli that any loans he originated would be submitted under Mrs. Scalli's name/number; Mr. Conn informed Mr. Scalli that his benefits and 401K would be predicated on his $50,000.00 salary; all of the changes referenced above and promises made by Mr. Conn on behalf of CMC were entirely inconsistent with Mr. Scalli's contract. Human Resources Director, Joyce Hicks, claimed that the Scallis orally modified

        their contracts through request to their manager, Mr. Conn, absent any writing on document. Ms. Hicks admitted that an issue with Mr. Scalli's benefits arose and he went in the negative, so his benefits were rejected by payroll because there wasn't enough money to cover his benefits and CMC had to set-up a small draw. *See* R. Scalli Dep. at 67-75 (Vol. II); E. Scalli Dep. at 80-88 (Vol. II); B. Conn Dep. at 225-235 (Vol. II); J. Hicks Dep. at 104-105.

14. Mr. Conn claimed that Robert Scalli unilaterally chose to give his loans to Mrs. Scalli without any authority or notice to human resources; Mr. Conn claims that employees had the authority to direct their income generated from commissions to a third party without notice to human resources; Mr. Conn claimed that no one at CMC needed to authorize this activity. Luis Riascos, an assistant to Eleanor Scalli, claimed that all the loans originated by Mrs. Scalli were inputted into the computer under her name and number and all the loans originated by Mr. Scalli were inputted into the system under his name and number. *See* L. Riascos Dep. at 32-34; B. Conn Dep. at 217-218 (Vol. II); E. Scalli Aff. at ¶ 6 ; R. Scalli Aff. at ¶ 6.

15. Mr. Conn admitted that Mr. and Mrs. Scalli were hired as a team but that neither their initial offer nor their contract memorialized this unprecedented circumstance, and that human resources may have not been informed of this unprecedented situation because it was not standard. *See* B. Conn Dep. at 225-226 (Vol. II).

16. Mr. Conn claims that the reason why the contract did not accurately reflect the team concept was that it was unprecedented. *See* B. Conn Dep. at 226 (Vol. II)

17. Mr. Conn states that when Human Resources prepared the contract based on information and negotiations he had conducted with Mr. and Mrs. Scalli, he did not provide all of the information and terms negotiated, especially as it related to the team of Eleanor and Robert Scalli; Mr. Conn claimed that terms and conditions, related to the team concept did not seem relevant for purposes of the contract or informing Human Resources/Joyce Hicks. *See* B. Conn Dep. at 228-229 (Vol. II); E. Scalli Aff. at ¶ 5 and R. Scalli Aff. at ¶ 5.

18. Mr. Conn stated that he did not recall any other time where he did not memorialize a compensation package for an individual employee, other than the case of Mr. and Mrs. Scalli. *See* B. Conn Dep. at 229-230 (Vol. II).

19. Mr. Conn stated that Mr. Scalli would generate loans but receive none of the commissions due to him under the terms of his contract. *See* B. Conn Dep. at 230 (Vol. II).

20. Mr. Conn stated that although Mr. Scalli would not directly receive any compensation for generating loans at CMC, due to the omission in his contract and Mrs. Scalli's contract of the team concept, he, Mr. Conn, never promised Mr. Scalli during his negotiations or thereafter a $50,000.00 forgivable draw, a $50,000.00 salary per year, or any compensation for his new marketing position. *See* B. Conn Dep. at 232-233 (Vol. II)

21. Mr. Conn claims that Mr. Scalli was hired to do marketing and Mrs. Scalli took the loan applications and what you called them (loan officer or marketing person) was irrelevant to [us]. *See* B. Conn Dep. at 104; R. Scalli Aff. at ¶ 5.

22. Mr. Conn agreed that Mr. Scalli performed a job at CMC that did not exist under the title loan officer; Mr. Conn admitted that nobody at CMC had the authority to make a change in the position of loan officer and that he was unaware how that change, entirely inconsistent with Mr. Scalli's contract, occurred. Ms. Hicks stated she assumed that Mr. Conn had knowledge of the team concept and that he approved it. . *See* B. Conn Dep. at 105-106; J. Hicks Dep. at 118.

23. Mr. Conn claims that he was unaware of any position at CMC, loan officer or otherwise, wherein a particular employee originating loans directed said loans under someone else's social security number or tax identification number. *See* B. Conn Dep. at 105-106.

24. Mr. Conn stated to the best of his knowledge, that aside from the $15,000.00 paid to Mr. Scalli at the outset of his employment, Mr. Scalli did not receive any other compensation for his labor from 2001 through 2003. B. Conn Dep. at 111.

25. Mr. Conn claimed that he was aware of no other employee working in any capacity at CMC that did not receive compensation for his or her labor while employed at CMC. *See* B. Conn Dep. at 112.

### III.   MR. SCALLI'S AND MRS. SCALLI'S EMPLOYMENT WITH CMC.

26. Mr. Scalli and Mrs. Scalli initially reported to Michael Diranian, a Sales Manager for CMC, Mrs. Scalli understood from the outset of her employment that Mr. Conn was her direct boss, when she inquired as to why she was reporting to Mr. Diranian, Mr. Conn informed her that he would be her direct boss and Mr. Scalli's direct boss. *See* E. Scalli Dep. at 52-53.

27. Mr. Conn claimed that Mr. Scalli and Mrs. Scalli were hired as a team, that Mr. Scalli did the marketing, and that Mr. and Mrs. Scalli unilaterally, without any authority from CMC, decided to switch all loans originated by Mr. Scalli under Mrs. Scalli's volume.  *See* B. Conn Dep. at 99-104.

28. Mr. Scalli and Mrs. Scalli were hired and signed offer letters and contracts for the positions of senior loan officer and loan officer.  *See* R. Scalli Dep. at 15; E. Scalli Dep. at 26; B. Conn Dep. at 98.

29. Subsequent to the execution of the offer of employment and contract/incentive plan for the positions of senior loan officer and loan officer, Bard Conn informed Mr. Scalli that his job duties and compensation would change, i.e., all his production would go under Mrs. Scalli, and that he would now need to focus on marketing instead of originating loans.  *See* R. Scalli Dep. at 63; *see also*, R. Scalli Dep. at 69 (Vol. II).

30. Mr. Scalli claimed that Mr. Conn promised him a $50,000.00 forgivable draw for year (1) and $50,000.00 salary for year (2) for his new marketing role.  *See* R. Scalli at 41-42; B. Conn Dep. at 104.

31. Mr. Conn claimed that Mr. Scalli and Mrs. Scalli came in as a team and that Mr. Scalli did the marketing and Mrs. Scalli took loan applications.  *See* B. Conn Dep. at 104; E. Scalli Aff at ¶ 5 and R. Scalli Aff. at ¶ 5.

32. Mr. Conn claimed that Mr. Scalli and Mrs. Scalli were hired as a husband and wife unit, team originally.  *See* B. Conn Dep. at 104; E. Scalli Aff. at ¶ 5 and R. Scalli Aff. at ¶ 5.

33. Mr. Scalli claimed that Mr. Conn switched loans he originated under Mrs. Scalli's name and number and that he had no power to switch loans he originated under Mrs. Scalli's name.  *See* R. Scalli Dep. at 91; R. Scalli Aff. at ¶ 6.

34. Mrs. Scalli claimed that Mr. Conn switched all the loans in her office under her employee number and name.  *See* E. Scalli Dep. at 56; E. Scalli Aff. at ¶ 6.

35. Mrs. Scalli claimed that when she discovered that this was occurring, she asked Mr. Conn why and he stated that it had something to do with a basis point override from Mike Diranian.  *See* R. Scalli Dep. at 56.

36. Mrs. Scalli claimed that because Mr. Conn had control over the commission reports he was able to switch commissions due to other employees to her employee number.  *See* E. Scalli Dep. at 58; E. Scalli Aff. at ¶6 and R. Scalli Aff. at ¶6.

37. Mrs. Scalli claimed that Mr. Conn controlled what appeared on the commission reports and that he alone had the authority to switch around the final numbers to divert commissions on monies to Mr. Scalli to cover his draw.  *See* E. Scalli Dep. at 58; E. Scalli Aff. at ¶ 6.

38. Mr. Conn informed Mrs. Scalli that he was in trouble with human resources because they had been paying Mr. Scalli incorrectly and that he would now have to take money out of her (Mrs. Scalli) paycheck to pay Mr. Scalli.  *See* E. Scalli Dep. at 62; E. Scalli Aff. at ¶ 7.

39. Sometime thereafter, Mr. Scalli began to receive $500.00 checks that were being deducted out of Mrs. Scalli's paycheck.  E. Scalli Dep. at 62-63.

40. Mr. Scalli claimed that medical benefits were under him because he had a base salary. Mr. Scalli believed benefits were generated by his base salary because of a conversation wherein Bard Conn told him that was the case. *See* R. Scalli Dep. at 62-63.

41. Mrs. Scalli did not have deductions removed from her paycheck that were delineated as commissions originated by Mr. Scalli, and she was unaware as to why any monies were being deducted from her paycheck, prior to speaking to Mr. Conn, and she questioned Mr. Conn's authority to deduct said funds. *See* E. Scalli Dep. at 61-62; E. Scalli Aff. at ¶ 7.

42. Mr. Scalli was never paid for any loans he originated, pursuant to the terms of his contract, and he was never paid the $50,000.00 forgivable draw promised by Mr. Conn due for year (1), and the $50,000.00 salary he alleged was due for year (2). *See* B. Conn Dep. at 110; R. Scalli Dep. at 79-80, 91-92 (Vol. II).

43. In March of 2002, Mr. Scalli received a renewal letter for the position of loan officer and he simply did what Mr. Conn told him to do, he signed it and sent it back. *See* R. Scalli Dep. at 101 (Vol. II).

44. Mr. Conn claimed that information related to the team concept and/or Mr. Scalli's position as part of the team concept did not get reported to human resources. *See* B. Conn Dep. at 228-229 (Vol. II).

45. In February of 2001 and in March of 2002 the team concept which materially changed the contract/incentive package for Mr. Scalli and Mrs. Scalli was intentionally omitted because Mr. Conn claimed that it was unprecedented, and Mr. Conn further stated he had no knowledge as to why Mr. and Mrs. Scalli

contracts and incentive plans did not correctly reflect the team concept. *See* B. Conn Dep. at 226-227 (Vol. II).

46. Mr. Conn also claimed that he did inform Human Resources of the team concept around the time that Mr. Scalli and Mrs. Scalli were hired. *See* B. Conn Dep. at 99-100.

47. Mr. Conn claimed that he did not inform Joyce Hicks, Human Resources, of the team concept at the time Mr. Scalli and Mrs. Scalli were hired because it did not seem relevant to tell her. *See* B. Conn Dep. at 229 (Vol. II)[1].

### IV. TERMINATION OF ELEANOR AND ROBERT SCALLI

48. On January 16, 2003, a denial letter was issued by Mrs. Scalli's office to Jean Barbosa, this was not unusual and had occurred in the past; however, it did not happen often because not many loans were declined. *See* E. Scalli Dep. at 116-117; L. Riascos Dep. at 45-46.

49. Jean Barbosa required a mortgage for a property located at 331 Paris Street, East Boston, Massachusetts. Mr. Barbosa's loan was originated at the Scalli office. *See* E. Scalli Dep. at 113.

50. Mr. Barbosa attempted to withdraw his application subsequent to approval because he did not intend to occupy the property and the loan had been approved as an owner occupied loan, not an investment property loan. *See* E. Scalli Dep. at 123.

51. Mr. Barbosa attempted to rework the loan as an investment property loan with Liz Walsh, Operations Manager, but was unsuccessful. *See* E. Scalli Dep. at 123.

---

[1] This apparent contradiction illuminates the Plaintiffs' position that many if not all of the material facts are disputed, on occasion by the same witness.

52. Galina, a loan possession for Liz Walsh in the Operations Department, informed Mr. Barbosa that the loan had been denied and Eleanor Scalli would be sending him a denial letter shortly.  See Aff. of Jean Barbosa at ¶ 3.

53. Liz Walsh instructed Luis Riascos, a member of Mrs. Scalli's office to send a decline letter to Mr. Barbosa after she determined that the loan could not be reworked as an investment property loan.  *See* E. Scalli Dep. at 120-123; L. Riascos Dep. at 40-41.

54. Because the second loan Mr. Barbosa required to purchase the property on Paris Street could not be issued per an investment property, Liz Walsh approved a denial letter for the second mortgage.  *See* E. Scalli Dep. at 133.

55. Subsequent to the issuance of a denial letter by the Scalli office, Steve Roussel, a Sales Manager for CMC, claims he received a complaint from Tony Giacalone, a realtor, regarding Mr. Barbosa's denial.  *See* S. Roussel Dep. at 32-33.

56. Mr. Roussel claimed that Mr. Giacalone heard a rumor that a borrower loan was declined and that said borrower was under agreement to buy another house, Mr. Giacalone then provided Mr. Roussel with a denial letter for the Barbosa loan.  *See* S. Roussel Dep. at 32-36.

57. Mr. Roussel did not attempt to verify whether or not the decline letter had been authorized by contacting Mrs. Scalli; Mr. Roussel did not attempt to verify whether Mr. Barbosa was purchasing another property by contacting Mr. Barbosa; Mr. Roussel never attempted to exonerate Mrs. Scalli by taking any affirmative steps to do so.  *See* S. Roussel Dep. at 45-53.

58. Mr. Roussel never attempted to exonerate Mrs. Scalli by contacting her to verify any of the information and/or documents allegedly provided by Mr. Giacalone. *See* S. Roussel Dep. at 45-53.

59. Mr. Roussel claimed that decline letters issued by CMC have loan officer's names in the signature line because the loan officers were the primary contact. *See* S. Roussel Dep. at 138.

60. Mr. Roussel gave the decline letter he claims to have received from Mr. Giacalone to Mr. Diranian, a Sales Manager that Mr. and Mrs. Scalli did not report to, and Mr. Diranian never investigated any of the circumstances involving the issuance of the decline letter or the accusations made by Mr. Giacalone that Mr. Barbosa was under agreement to buy another house. *See* S. Roussel Dep. at 59; E. Scalli Dep. at 51-52; M. Diranian Dep. at 90-92.

61. Mr. Conn claimed that if Liz Walsh had authorized Luis Riascos to forward a decline letter signed by Mrs. Scalli, Mrs. Scalli would have had the authority for what she had done with respect to issuance of the Barbosa decline letter. Mr. Conn also stated that the mere fact that CMC issued decline letters, out of the Operations Dept., with the loan officers name on it below a signature line was a gaping hole in our organization. *See* B. Conn Dep. at 298-299, (Vol. II); B. Conn Dep. Ex. 3F, 4F (C036965); (C04074).

62. Ms. Hicks, a Senior Human Resources Generalist, Assistant Vice President, claimed that a standard policy in the mortgage industry was that loan officers could not make credit decisions because said loan officer were paid commissions and a conflict exists. *See* J. Hicks Dep. at 20, 32, 79.

63. Ms. Walsh claimed that she was not trained in what loan officers could or could not do (relative to loan approvals or denials) but that as Operations Manager she had the authority to approve or recommend a denial. *See* L. Walsh Dep. at 67.

64. Mrs. Scalli never made a credit decision. Liz Walsh instructed Mrs. Scalli's office to issue a denial letter to Mr. Barbosa subsequent to her decision to deny the loan. *See* E. Scalli Dep. at 120.

65. Mrs. Scalli owned property at 208 Maverick Street. At the time of the termination of her employment, Mrs. Scalli was not negotiating or selling that property to Mr. Barbosa. *See* E. Scalli Dep. at 111-112; *See also*, Affidavit of Jean Barbosa.

66. Ms. Hicks stated that it had been brought to her attention that the reason Mrs. Scalli denied the loan was because Mr. Barbosa was purchasing the 208 Maverick Street property from Mr. Scalli. *See* J. Hicks Dep. at 90-91

67. Ms. Hicks also claimed that aside from Mr. Scalli's statement that he owned 208 Maverick Street property she was unaware of any investigation conducted by CMC as to whether Mr. Scalli did own 208 Maverick Street property as a matter of fact. *See* J. Hicks Dep. at 92; App.

68. Ms. Hicks did not conduct any further investigation into whether Mr. Scalli owned 208 Maverick property prior to his suspension. *See* J. Hick Dep. at 92.

69. Ms. Hicks admitted that is Mr. Scalli did not own 208 Maverick Street, and thus could not have entered into an agreement to sell the property to Mr. Barbosa, there would have been no violation of CMC policy. *See* J. Hicks Dep. at 95-96.

70. Mrs. Scalli's employment was not terminated because she breached the cardinal rule for loan officers, to wit, loan officers are not permitted to make credit

      decisions, Mrs. Scalli was terminated because her office sent a denial letter at the direct instructions of a person in authority, Liz Walsh (Operations Manager). *See* E. Scalli Dep. at 120; B. Conn Dep. at 298.

71. Mrs. Scalli met with Ms. Hicks, Mr. Conn and Alexander Buor (Security) on February 4, 2003. Mr. Scalli and Mrs. Scalli were instructed to appear at said meeting by Mr. Conn under false pretenses. Mrs. Scalli explained during that meeting or the next day that Liz Walsh had authorized her office to mail Mr. Barbosa the denial letter, after Liz Walsh made the credit decision relative to the Barbosa denial letter. The Thursday or Friday before Mrs. Scalli was asked to attend the meeting with ms. Hicks and Mr. Conn, Mr. Conn phoned Mrs. Scalli screaming at the top of his lungs that he could be fired for the unauthorized advertising bills sent to Rhode Island (Corporate Office) instead of directly to him. *See* E. Scalli Dep. at 139-141, 155; E. Scalli Aff. at ¶¶ 10, 11 and R. Scalli Aff. at ¶¶ 8, 9[2].

72. Mr. Scalli claimed that he told Ms. Hicks at his suspension meeting that he would have to check into whether he owned 208 Maverick Street and he called Joyce Hicks and told her he didn't own 208 Maverick Street property and he further claimed that he did not remember if he told her Eleanor Scalli was selling the property. *See* R. Scalli Dep. at 131-132.

73. Mrs. Scalli reviewed the Paula Castillo, Andres Castillo and Raphael Guerrero loan and explained that a "gift money" was not needed to obtain approval and that this was confirmed because the approval letter did not require proof of a gift at

---

[2] CMC failed to comply with its own policy as it relates to discipline warnings or termination. See App., Ex.   .

15

closing. Mrs. Scalli also explained that neither she nor Mr. Scalli ever advanced money personally to a borrower. *See* E. Scalli Dep. at 23; 26-28.

74. Neither Mr. Scalli nor Mrs. Scalli issued money to the borrower for a gift, and no gift was required for the Castillo loan. Andres Castillo worked at a property owned by the Scallis and received payment for his services from the Scalli joint account. Mr. Scalli did not originate the Castillo loan and therefore could not have been responsible for any irregularities. *See* E. Scalli Dep. at 26-28; R. Scalli Dep. at 34-40 (Vol. II); R. Scalli Aff. at ¶ 7.

75. Mr. Scalli was terminated on March 5, 2003. Mr. Scalli did not engage in any improper activity relative to the Castillo loan and he cooperated at all relevant times with the ongoing investigation by returning each and every phone call he received from Ms. Hicks. *See* R. Scalli Dep. at 34-40 (Vol. II); 144-146.

76. Mr. and Mrs. Scalli were owed commissions, salary, a forgivable draw and other wages/benefits at the time of their termination. *See* E. Scalli Dep. at 62-63; R. Scalli Dep. at 67-69.

77. Mrs. Scalli was not provided with the information contained in her laptop and the laptop of other members of her office to determine the amount of commissions owed at the time of her termination. Ms. Hicks claimed that Mrs. Scalli had roughly $40,000.00 in her pipeline at the time of termination, assuming other loans she was paid on were factored in. *See* E. Scalli Dep. at 51-61; J. Hicks Dep. at 196 (Vol. II); Hicks Dep., Ex. 11.

78. In their complaint, Plaintiffs allege that Victoria Noel, a CMC employee, communicated with Danielle Felice and Javier Pico stating that Mr. Scalli and

      Mrs. Scalli had been "indicted for bank fraud." Ms. Noel worked as a loan officer under Mr. Diranian. Ms. Noel was motivated to do this it is allegedly in part for her own gain and in part to serve CMC by stopping brokers and realtors loyal to the Scallis from continuing to do business with them at their new companies. *See* Compl. at ¶23; *see also*, Affidavit Brokers (Philip Consolo, Stephen Amaral, Victoria Laws).

79. Danielle Felice, a real estate broker, was provided with defamatory information regarding Mr. Scalli and Mrs. Scalli. Ms. Felice decided she no longer wanted to be involved in the case due to her own problems and she recanted the information provided to Mark E. Burke and Nicholas J. Di Mauro. *See* Affidavit of Erin Green.

80. Javier Pico did not represent Mrs. Scalli in 2003. Mr. Pico did represent Mr. Scalli on one occasion in March and one occasion in August of 2003. Victoria Noel communicated defamatory information regarding Mr. and Mrs. Scalli to Mr. Pico in February 2003. *See* Affidavit of Javier Pico.

81. Mrs. Scalli was the "Top Producer" in 2003 and qualified for an all expense trip to Aruba. The all expense trip to Aruba had a specific monetary value. Mrs. Scalli alleges that she should have received the monetary value of the trip based on her performance. *See* Compl. at ¶19; E. Scalli Dep. at 70-72.

82. On December 9, 2003, Mr. Scalli and Mrs. Scalli filed complaints for non-payment of commissions and wages based on the information disclosed by Citizens Bank up to and including December 9, 2003. Mrs. Scalli was not provided with pipeline information contained in her laptop which was repossessed

by CMC on the day of her termination and Mr. Scalli had additional income promised in the form of a forgivable draw. *See* E. Scalli Aff. ¶ 10; R. Scalli Dep. at 41-42.

## V. CMC'S INTERFERENCE WITH MR. SCALLI AND MRS. SCALLI'S EMPLOYMENT WITH GMAC AND RENAISSANCE.

83. CMC interfered with Mrs. Scalli's employment by calling GMAC and making inquiries regarding Mr. Scalli who was not an employee. CMC interfered with Mr. Scalli's and Mrs. Scalli's employment with GMAC and Renaissance by spreading negative rumors regarding their termination and by directly approaching past realtors and informing them that Mr. Scalli and Mrs. Scalli had been terminated and CMC could address all their future needs. As a result, entire real estate offices and numerous brokers terminated all business with Mr. and Mrs. Scalli. *See* E. Scalli Dep. at 115-118 (Vol. II); Affidavit of Brokers.

84. CMC intentionally phoned GMAC in an attempt to invade Mr. Scalli's privacy and raised questions of suitability for Mrs. Scalli. CMC employees made numerous allegations and negative statements with respect to the manner in which Mr. Scalli and Mrs. Scalli separated from CMC. As a result of the activity delineated above, Mr. Scalli noticed that his phone stopped ringing and he sustained significant loss of business. *See* R. Scalli Dep. at 114-121; Affidavit of Brokers.

Respectfully submitted,
The Plaintiffs,
Eleanor Scalli and Robert Scalli
By their attorneys,

/s/ Mark E. Burke
_____

Mark E. Burke – BBO#556166
Law Office of Mark E. Burke
111 South Bedford Street, Suite 208
Burlington, Massachusetts 01803
(781) 273-3801

/s/ Nicholas J. Di Mauro
_____

Nicholas J. Di Mauro – BBO#564241
Law Offices of Nicholas J. Di Mauro
111 South Bedford Street, Suite 208
Burlington, Massachusetts 01803
(781) 273-3801