# EXHIBIT

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * * *
ELEANOR SCALLI and ROBERT SCALLI,     *
     Plaintiffs                        *
                                       *
VS.                                    *   CIVIL ACTION
                                       *   NO. 03CV-12413DPW
CITIZENS FINANCIAL GROUP, INC.,        *
     Defendant                         *
* * * * * * * * * * * * * * * * *      *
```

**DEPOSITION OF ELEANOR SCALLI**, called by the

Defendant, pursuant to the applicable provisions of the

Federal Rules of Civil Procedure, before Ruth E. Hulke,

Certified Shorthand Reporter No. 114893 and Notary Public

for the Commonwealth of Massachusetts, at Goodwin

Procter, Exchange Place, Boston, Massachusetts, on

Tuesday, February 15, 2005, commencing at 10:25 a.m.

# Leavitt Reporting, Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

Hearings ◆ Conferences ◆ Legal Proceedings

1  APPEARANCES:

2

3     BRADFORD J. SMITH and ANN M. GAETA, ESQ., of Goodwin
   Procter, Exchange Place, Boston, Massachusetts, 02109, on
   behalf of the Defendant.

4

5     MARK BURKE, ESQ., of Law Office of Mark Burke, 111
   South Bedford Street, Suite 208, Burlington,
   Massachusetts, 01803, on behalf of the Plaintiffs.

6

7     NICHOLAS J. DIMAURO, ESQ., of Law Office of Nicholas
   J. DiMauro, 111 South Bedford Street, Suite 208,
   Burlington, Massachusetts, 01803, on behalf of the

8  Plaintiffs.

9

10  ALSO PRESENT:    Robert Scalli
                    Jeffrey Siegel, Esq.

11

12

13

14

15

16

17

18

19

20

21

22

23

I N D E X

WITNESS            DIRECT    CROSS      REDIRECT      RECROSS

Eleanor Scalli    4

E X H I B I T S

NUMBER                                                PAGE

1    2-21-01 letter from Tribelli to Scalli    19

2    Loan Officer Commission Incentive Plan    19

3    Code of Ethics signature page             19

4    Code of Ethics, eight pages               24

5    Loan Officer Minimum Standards            24

6    Loan Officer Minimum Standards            24

7    Complaint                                 100

8    E-mail from Claudia Arrendondo            108

9    Citizens Mortgage Approval Letter         113

10   Statement of Credit Denial, Termination
     Or Change                                 116

11   E-mail                                    130

1                  P R O C E E D I N G S

2                    (Witness sworn)

3           MR. SMITH:  Can we reserve all objections,

4     except to the form of the question, until time of trial

5     as well as motions to strike?

6           MR. BURKE:  Motions to strike as well, yes.

7           MR. SMITH:  I would like the witness to review

8     and sign the deposition transcript.

9           MR. BURKE:  Waive the notorization?

10          MR. SMITH:  Okay.

11          ELEANOR SCALLI, having been duly sworn,

12     testified as follows in answer to direct interrogatories

13     by Mr. Smith:

14      Q.    Can you state your name?

15      A.    Eleanor Scalli.

16      Q.    Where do you live currently?

17      A.    I live at 233 Main Street in Winthrop,

18     Massachusetts, 02152.

19      Q.    How long have you lived there?

20      A.    Since 1998.

21      Q.    Are you married?

22      A.    Yes, I am.

23      Q.    Is your husband here today?

1    A.    Yes.

2    Q.    What is his name?

3    A.    Robert Scalli.

4    Q.    Do you have any children?

5    A.    I do.

6    Q.    How many?

7    A.    Two.

8    Q.    Their names, just for the record?

9    A.    Jake and Jacqueline.

10   Q.    How old are they?

11   A.    Nine and five.

12   Q.    Where do you presently work?

13   A.    General Motors, GMAC Mortgage Corporation.

14   Q.    What position do you hold?

15   A.    Sales manager/senior loan officer.

16   Q.    How long have you held that position?

17   A.    Since February of 2003.

18   Q.    So the same position throughout your entire

19 employment.  Is that correct?

20   A.    Yes.

21   Q.    You were hired into that position?

22   A.    Yes.

23   Q.    Who do you report to presently?

1        Q.    Okay.  Do you remember the income that your

2    husband earned during 2004?

3        A.    No.

4        Q.    Do you remember his income level for 2003?

5        A.    I don't remember that either.

6        Q.    All right.  Miss Scalli, do you remember when

7    your employment began with Citizens Bank?

8        A.    Yes.

9        Q.    When was that?

10       A.    Around March of 2001.

11       Q.    March of 2001.  How did you find out about

12   Citizens Bank or Citizens Mortgage and about employment

13   opportunities there?

14       A.    From Bard Conn.

15       Q.    Did Bard Conn contact you?

16       A.    Yes, he did.

17       Q.    When did he contact you about employment?

18       A.    I don't know the exact time.  It was months

19   before, though.

20       Q.    Months before your hire in approximately March?

21       A.    Yes.

22       Q.    How did you know Bard Conn?

23       A.    I didn't.

1        Q.    So when he contacted you, it was the first time
2   you had spoken to him?

3        A.    Yes.

4        Q.    Did he tell you how he got your name?

5        A.    I don't remember if we ever spoke about that.

6        Q.    Where were you working at the time when he
7   called you?

8        A.    North American Mortgage Company.

9        Q.    What was your position at North American?

10       A.    Loan officer.

11       Q.    How long had you worked at North American
12  Mortgage Company?

13       A.    Couple of years.

14       Q.    Had you been a loan officer for that period of
15  time?

16       A.    Yes.

17       Q.    So when you were first employed at North
18  American, was it as a loan officer?

19       A.    Yes.

20       Q.    And functioning as a mortgage originator?

21       A.    Yes.

22       Q.    When Bard Conn called you, was it on the phone
23  that he contacted you?

1          A.    I don't even remember his name.

2          Q.    But it wasn't Mark or Nick?

3          A.    No, it was not.

4          Q.    Have you ever been deposed in any other claim

5    other than the claim against Repligen and this case?

6          A.    I don't remember.

7          Q.    Have you been a party to any other litigation

8    other than this claim and the claim against Repligen?

9                MR. BURKE:    Objection.

10         Q.    Can you answer the question?

11         A.    I don't remember.

12         Q.    You don't remember?

13         A.    No.

14         Q.    Are you saying it's possible that you have been

15   a party to another claim but you don't remember?

16         A.    Well, when you say a claim, I mean, I don't

17   know what you mean, which kind of claim.    Car accident?

18   I don't know what you mean.

19         Q.    Well, have you ever sued, a lawsuit that you

20   have initiated in court?    Have you ever been a plaintiff

21   in any lawsuit that was filed in court, including car

22   accidents, other than the Repligen matter and this

23   current matter?

1      A.    Yes.

2      Q.    -- on Page 3?  Did you meet with Ms. Tribelli?

3      A.    No.

4      Q.    Have you ever met her?

5      A.    No.

6      Q.    Take a look at what has been marked as

7   Exhibit 1.  Do you remember receiving that letter from

8   Ms. Tribelli?

9      A.    I remember Bard giving me this letter.  I don't

10  know if it was the same exact letter.

11     Q.    Okay.  Well, this is a letter that's addressed

12  to you dated February 21, 2001.  Correct?

13     A.    Right.

14     Q.    When you received this document that's been

15  identified as Exhibit 2, and I'm going to identify it as

16  the Loan Officer Commission Incentive Plan -- Is that

17  what they called this document?

18     A.    That's what it says.

19     Q.    Did you refer to this document in any

20  particular way?

21     A.    No.

22     Q.    Did you review it before you signed it?

23     A.    Yes, I did.

27

1          Q.    At the time you signed this document on

2     February 22nd, 2001, did you confirm that it was

3     consistent with the verbal terms of employment that Mr.

4     Conn had offered you?

5          A.    Yes.    This document changed several times

6     because the verbal was different than the actual

7     document.

8          Q.    But at the time you signed it on February 22,

9     2001, at that time was it consistent with the verbal

10    terms that Mr. Conn had offered you?

11         A.    No.

12         Q.    It was inconsistent?

13         A.    Correct.

14         Q.    Okay.    How was it inconsistent at the time you

15    signed it?

16         A.    Compensation at time of hire is incorrect.

17         Q.    Okay.    And that appears on which page?

18         A.    That appears on the first page.

19         Q.    Under Section 2-A?

20         A.    Correct.

21         Q.    All right.    What was the verbal term that Mr.

22    Conn had offered you?

23         A.    It was thirty thousand.

1      Q.   A $30,000 advance?

2      A.   Yes.

3      Q.   Did you receive an advance after your

4 employment with Citizens started?

5      A.   Yes.

6      Q.   How much did you receive in advance?

7      A.   Fifteen thousand.

8      Q.   You only received fifteen?

9      A.   Correct.

10     Q.   Now, when Mr. Conn gave you this letter that's

11 been marked as Exhibit 2, did you realize that section

12 2-A only stated a $15,000 advance?

13     A.   I don't remember.  I just know that it was

14 inconsistent with the verbal.

15     Q.   Do you remember telling Mr. Conn that that

16 section, Section 2-A, was inconsistent with what he had

17 verbally told you?

18     A.   Yes.

19     Q.   When did you tell him that?

20     A.   I don't remember when.

21     Q.   Do you remember telling him that prior to when

22 you signed the document?

23     A.   I remember this first couple of pages changing

1    several times, and he had the signature page and told me

2    not to worry about it, that he would fix it.  The first

3    two pages changed several times.

4         Q.    When you say they changed several times, did

5    the first two pages change during the course of your

6    employment at Citizens?

7         A.    During the course of accepting the, during the

8    course of the negotiation of what we spoke about for

9    compensation.

10        Q.    Do you have those other versions of Pages 1 and

11   2 of this letter?

12        A.    I don't know.

13        Q.    I need you to look and check in your files.

14   Those are documents that we have asked for, so it's

15   important, if you do have them, we would like to get

16   copies of them.

17        Now, you said after your employment with Citizens,

18   you only received the $15,000 advance.  Is that correct?

19        A.    Yes.

20        Q.    So you did not receive a $30,000 advance.  Is

21   that correct?

22        A.    No, I did not.

23        Q.    Did you complain about that?

1       Q.    Just verbally?

2       A.    Yes.

3       Q.    What else about this offer letter that has been

4   marked as Exhibit 2 is inconsistent with the verbal terms

5   of employment that Mr. Conn discussed with you?

6       A.    The commission rates.

7       Q.    Where do those commission rates appear?

8       A.    On the lower, bottom part of the page.

9       Q.    On Page 1?

10      A.    After C, yes, on Page 1.

11      Q.    Why are those commission rates that appear at

12  the bottom of Page 1 inconsistent with what Mr. Conn told

13  you?

14      A.    Because verbally it was different than what

15  this paper says.

16      Q.    What did he tell you verbally?

17      A.    The basis points split is different.  70 basis

18  points.

19      Q.    Can you explain that?

20      A.    Yes.  Instead of 56 on the bottom, this right

21  here would be like a normal document, mine was different.

22      Q.    So instead --

23      A.    What I had worked out with him was different.

1    Q.   What had you worked out with him?

2    A.   70 basis points.

3    Q.   For monthly dollars in excess of a million

4    dollars?

5    A.   70 basis points in excess of a million dollars.

6    I can't be sure about the million.  I don't know if there

7    was a cap on it.

8    Q.   But at some point in your loan origination you

9    were eligible for 70 basis points, according to what Mr.

10   Conn told you?

11   A.   I can't remember the exact amount because we

12   had it worked out for my assistant, too.  My bottom line

13   was 70.  I think if you add 9 to it, it was really 79.

14   Nine out of 79 he was going to pay to my assistant

15   directly.  I'm not sure about the 9.  It could be one

16   digit off.  I'm not sure exactly about the exact amount,

17   but it was somewhere in that range.

18   Q.   When you saw this letter or Mr. Conn gave it to

19   you, did you raise that issue with him?

20   A.   I did.

21   Q.   What did you say?

22   A.   I said it's not what we spoke about.

23   Q.   What did he say?

1     A.    I'll fix it.

2     Q.    Did he fix it?

3     A.    I don't remember if he fixed it, but I got the

4 amount that I was supposed to on some of the commission

5 reports that came out.  I don't know if this was actually

6 fixed.

7     Q.    So you don't know if he subsequently issued a

8 new offer letter with the proper commission rate on it?

9     A.    Exactly.

10    Q.    You can't remember?

11    A.    I can't remember.

12    Q.    But you do know that you got paid on the basis

13 of 79 basis points for some certain loans?

14    A.    I never said 79.

15    Q.    I'm sorry.  70 basis points.  Is that correct?

16    A.    Around that area, yes.

17    Q.    Were you eligible for that 70 basis points from

18 the beginning of your employment with Citizens, or was

19 that a condition that began to occur during your

20 employment?

21    A.    That was all arranged before my employment.

22    Q.    What else about this offer letter was

23 inconsistent with what Mr. Conn verbally told you prior

1   to your employment?  Is there anything else that is

2   inconsistent?

3       A.    Not that I can see or that I can think of right

4   now.

5       Q.    Is there anything else that would help you

6   identify any other inconsistencies that you can think of?

7       A.    I don't understand the question.

8       Q.    Sorry.  Are there any other documents, such as

9   notes that you might have, that would help you identify

10  any other inconsistencies in the letter?

11      A.    Not that I can think of.

12      Q.    Okay.  Now, during the course of your

13  employment, and you were employed at Citizens for

14  approximately two years, did Mr. Conn issue you new loan

15  officer commission incentive plans that he asked you to

16  review?

17      A.    He may have.  I know that this particular

18  document changed a couple of times, and I don't know if I

19  ever signed it again.  He always said he would take care

20  of it.  He would say, I'll take care of it.

21      Q.    When you say it changed a couple of times, did

22  it just change during the period prior to when you

23  started employment or did it actually change during the

1  period of your employment?

2       A.    I don't remember.

3       Q.    During the course of your employment, during

4  the approximately two years of your employment, did you

5  have discussions with Mr. Conn regarding your

6  compensation?

7       A.    Yes.

8       Q.    Can you tell me about those discussions?

9       A.    I don't know which discussions you're referring

10 to, you know, the time line when.

11      Q.    If we can, if it's easier for you, let's work

12 from the beginning of your employment.

13      A.    Okay.

14      Q.    In February or March of 2001, and work towards

15 February of 2003, and tell me about the discussions you

16 would have had with Mr. Conn relative to your

17 compensation.

18      A.    He had promised me $1,000 for every million

19 closed that was going to be given to me yearly as a

20 forgivable draw.

21      Q.    When did he promise you that?

22      A.    When he was recruiting me.

23      Q.    Prior to your employment starting?

1        A.    Yes.    And after as well we spoke about it.

2        Q.    Now, so I understand what you say Mr. Conn told

3   you, that he would pay you $1,000 for every million

4   dollars in loans that were closed.    Is that correct?

5        A.    Yes.

6        Q.    What was your understanding of when that

7   payment would be made to you?

8        A.    That would be paid, I don't remember the time

9   line, but it was supposed to be yearly.

10       Q.    Was it your understanding you would get paid at

11  the end of each year?

12       A.    Well, the end of the year in loans would be the

13  end of the year, so maybe at the beginning of the next

14  year.

15       Q.    Was that your understanding?

16       A.    Yes.

17       Q.    You said it was to be paid as a forgivable

18  draw.    Can you explain what your understanding of that

19  is?

20       A.    That you don't have to pay it back.

21       Q.    Do you remember approximately how many million

22  dollars in loans you closed during your first year of

23  employment at Citizens?

1    A.    I don't remember the exact amount.

2    Q.    Can you give me an approximate number?

3    A.    Thirty-five to forty million.

4    Q.    Did you receive this $1,000 bonus as a result

5  of achieving approximately thirty-five to forty million

6  dollars in total loans?

7    A.    No, I did not.

8    Q.    Did you receive any bonus for that?

9    A.    No.

10    Q.    Did you talk to Mr. Conn about the fact that

11  you hadn't received that?

12    A.    Yes, I did.

13    Q.    When did you talk to him about it,

14  approximately?

15    A.    I don't know exactly when.

16    Q.    Was it after your first year of employment

17  ended?

18    A.    I don't know exactly when it was.

19    Q.    Did you talk to anyone else at the bank other

20  than Mr. Conn about that?

21    A.    The only contact I had of a person to talk to

22  would have been Bard.  He was my direct boss.

23    Q.    Do you remember trying to talk to anyone in

1  more than, I would say, six months, you know, in the

2  first six months was the first complaint.

3      Q.   What did he say when you complained about that?

4      A.   He told me he would take care of it.  He also

5  told me that it was better for him to put it all under my

6  name because it all went under his numbers because I

7  reported directly to him.

8      Q.   Do you know who your husband reported to?

9      A.   Bard.

10     Q.   So he reported to him as well?

11     A.   He did.

12     Q.   So, is it your understanding since your husband

13 also reported to Mr. Conn that Mr. Conn would get credit

14 for any loans that were originated under your husband's

15 name?  Is that fair to say?

16     A.   I really never knew that because I think Mike

17 Diranian was somehow involved in that.  So meaning we

18 were two people, that Bob was supposed to go under Mike

19 Diranian's production and I was supposed to go under

20 Bard's production.

21     Q.   Why do you believe that?

22     A.   Because originally I was supposed to be under

23 Mike Diranian, under his production branch.

1        Q.    What's the basis for your belief that you were

2    originally supposed to be under Mike Diranian's

3    production branch?

4        A.    Because originally he was supposed to be my

5    boss, Mike Diranian was supposed to be my reporting

6    manager.

7        Q.    When did that change?

8        A.    Very quickly.   Right when I was hired, that

9    changed.

10       Q.    But it didn't change until after your

11   employment started?

12       A.    I don't understand the question.

13       Q.    Is it -- I'm trying to understand.   Is it your

14   belief that you reported to Mike Diranian until after you

15   actively started work at Citizens?

16       A.    My belief was at the time that I was recruited

17   by Bard that he was my boss.   Shortly thereafter my

18   understanding was it was supposed to be Michael Diranian,

19   and he had called me a couple of times, and I went back

20   to Bard and I said I'm not supposed to be reporting to

21   Mike Diranian, and he said okay.   He goes, that's when he

22   said that he was my direct boss.

23       Q.    Did Bard's statement to you that you just said

1    where he said, okay, I'll be your direct boss, did Bard

2    make that statement before or after you started active

3    employment at Citizens?

4         A.    I don't remember.  I was under the impression

5    the whole time from being recruited from Bard that he was

6    my boss, that there was no one else involved.

7         Q.    Did you have an impression as to who was going

8    to be your husband's boss?

9         A.    Bard.

10         Q.    That was your understanding?

11         A.    We both met with Bard.

12         Q.    Now, you said that approximately six months

13    after you started working at Citizens that you complained

14    to Mr. Conn about the fact that all of the loans were

15    being credited under you and not your husband.  Correct?

16         A.    Correct.

17         Q.    Right.  Why did you raise that complaint?

18         A.    Because my husband started getting paychecks

19    that almost looked like they were negative numbers, and

20    it just didn't look right.  There was something wrong.

21         Q.    Miss Scalli, is it fair to say that the larger

22    the total number of loans that you originated in a given

23    period, the higher commission rate would be applied in

1   terms of figuring your commissions?

2          A.   Can you say that one more time, please?

3          Q.   Sure.  Is it fair to say that the larger the

4   total number of loans originated, that the higher the

5   commission rate would be?

6          A.   Would you make more commission if you closed

7   more or would you get higher commissioner if you closed

8   more?  I don't understand the question.

9          Q.   Take a look at Exhibit 2.  There's a box at the

10  bottom of Page 1.  It says that if your monthly dollars

11  are a million plus, at least on this it says .56 basis

12  points.  You have indicated that you may have been paid

13  approximately .7 basis points for loans in excess of a

14  million dollars.  Correct?

15         A.   Correct.

16         Q.   Is it fair to say that the larger the total

17  number of loans that originated, the higher the

18  commission basis points?

19         A.   Over a million dollars, yes.

20         Q.   So is it fair to say that the fact that all of

21  the loans were processed and originated under your name,

22  did that result in a higher commission rate for you?

23         A.   I don't understand the question .  I always

1    closed over a million.  I never closed under a million,

2    so the average was four million all the time.  So it

3    would always be over one million.  So I don't understand

4    the question.

5        Q.    During the course of your employment when you

6    originated a loan, was there a computerized system

7    whereby you submitted it for underwriting and approval?

8        A.    Yes.

9        Q.    When you submitted the loan, did you have to

10   indicate an employee number or your name as the

11   originating employee?

12       A.    Yes.  We had three.

13       Q.    Who were the three?

14       A.    Myself, my husband, and Luis.

15       Q.    Now, when your employment started and your

16   husband's employment started approximately at the same

17   time, do you know, did your husband submit loans under

18   his own name or did he use your name?

19            MR. BURKE:  Objection.

20       A.    I don't remember.

21       Q.    Miss Scalli, did your husband originate loans

22   while he was working at Citizens Bank?

23       A.    Yes.

1      Q.    Did he submit, do you know, did he submit those

2   loans as being originated by himself?

3            MR. BURKE:  Objection.  You may answer if you

4   know.

5      A.    Bard switched all the loans in my whole office

6   under my employee number and name.  Every single loan

7   that came out of my office was switched under my volume

8   and my employee name.

9      Q.    How do you know he switched them?

10     A.    Because he told me.

11     Q.    When did he tell you that?

12     A.    I don't remember.

13     Q.    What did you say when he told you that?

14     A.    I asked him why.

15     Q.    And what did he say?

16     A.    He said something to the effect that Mike

17  Diranian was involved in a basis point override.  If he

18  split it up, Mike Diranian would have to get a portion of

19  the override.

20     Q.    How did you respond?

21     A.    I didn't know what that meant.

22     Q.    What is a basis point override?

23     A.    I still don't know what it means.

1       Q.    Do you know, did your husband talk to Mr. Conn
2   about that issue?

3       A.    Several times the issue was brought up.

4       Q.    Were you present when your husband brought up
5   that issue?

6       A.    I don't remember.  You know, every single time
7   the issue was brought up several times.

8       Q.    Did your husband tell you he brought up the
9   issue?

10      A.    Yes.

11      Q.    What did he tell you?

12      A.    That he brought up the issue.

13      Q.    Did he tell you anything else about it, what
14  Mr. Conn responded?

15      A.    Bard said he would take care of it, he would
16  fix it, not to worry about it.

17      Q.    What did you understand Mr. Conn to mean when
18  he said he would fix it?

19      A.    Well, Bard was my boss, and every time he told
20  me he would fix it or he would take care of it, he always
21  did.  So every time he told me something, I would listen.

22      Q.    Did he ever fix this?

23      A.    He did not fix that.

1        Q.    But he fixed other things, you're saying?

2        A.    Well, I mean, if he said don't worry about it,

3    I'll take care of it, I wouldn't worry about it.

4        Q.    Okay.  Do you know how, what process -- Strike

5    that.  Do you know how Mr. Conn switched the loans from

6    someone else's name to your name?  Do you know how that

7    was done?

8        A.    I don't understand the question.

9        Q.    Well, you told me that every single loan that

10   came out of your office was switched by Bard Conn so that

11   it was under your name.  That's what you told me?

12       A.    The commission reports, Bard had control over

13   the commission reports.  So the commissions were all done

14   by Bard.

15       Q.    And are you saying that Mr. Conn substituted

16   your name when the commission reports were done?

17       A.    I never said my name.  What he did was, he was

18   in charge of the production, the final numbers.  He could

19   switch around the final numbers to whatever he wanted to

20   do to pay the commissions.

21       Q.    So he was in charge of production.  So do you

22   know what he did so that your name was substituted for

23   other people's names?  Do you know what he did?

1       A.    No.

2       Q.    So when you say he switched the names by

3   substituting your name for someone else's name, on what

4   report did he make that substitution?

5       A.    For example, if a loan came out of my office

6   that Luis had put into his laptop, it would show up on my

7   commission report under my name.  I don't know anything

8   else that happened in between that process.  Bard did all

9   that.

10      Q.    Do you know, did Luis ever complain about the

11  fact that loans he originated he did not receive credit

12  for?

13      A.    Luis's pay compensation was a salary plus basis

14  points paid by Bard for total loans closed.

15      Q.    So as a result he would be receiving the same

16  amount of pay anyways?

17      A.    Exactly.

18      Q.    So he had nothing to complain about?

19      A.    He had nothing to complain about to that

20  respect.

21      Q.    Did you ever talk to anyone else other than Mr.

22  Conn at Citizens about the fact that Mr. Conn was

23  switching and substituting your name for other people's

1   names on these loan originations?

2       A.   I wouldn't have known anybody else to talk to.

3       Q.   Did you ever talk to Mike Diranian about it?

4       A.   No.

5       Q.   Did you ever talk to anyone in human resources

6   about it?

7       A.   No.   Just Bard.

8       Q.   Did you ever talk to anyone in underwriting

9   about it?

10      A.   No.

11      Q.   How about anyone else in the branch that you

12  occasionally worked out of?

13          MR. BURKE:  Objection.  You can answer if you

14  understand the question.

15      A.   I don't understand the question because I

16  wasn't in any, you know, around anybody else.

17      Q.   You knew Mike Diranian, didn't you?

18      A.   Yes.  I knew Mike Diranian, yes.

19      Q.   Can you tell me about other conversations that

20  you had with Mr. Conn concerning your compensation that

21  occurred during the course of your employment with

22  Citizens?  Just so you're clear, you told me about the

23  conversations about the $30,000 advance, you told me

1   about the conversations about the commission rates and

2   the fact of the 70 basis points, you told me about the

3   conversations that you had relative to the thousand

4   dollars per million dollars originated, that forgivable

5   draw, you told me about the conversations about switching

6   and substituting your name for other employees' names on

7   loan originations.  Any other conversations or

8   communications you had with Mr. Conn?

9            MR. BURKE:  As to any benefits?

10       Q.   As to any benefits or compensation.

11       A.   There were many conversations about my

12  husband's -- My husband kept getting paychecks that just

13  didn't look right.  He called me up one time that stands

14  out in my head and said he was in trouble with human

15  resources because they had been paying Bob incorrectly.

16       Q.   When approximately, if you remember, did Mr.

17  Conn call you up and say that?

18       A.   I don't remember exactly when.  It was after

19  the first six-month period.

20       Q.   Did he say anything else to you other than that

21  he was in trouble with human resources because they had

22  been paying Bob incorrectly?

23       A.   He told me he was going to take money out of my

1   paycheck and pay it to Bob.  I said to him, "How can you

2   do that?"  I never heard of something like that being

3   done, that I was going to check with my accountant

4   because we also wanted to contribute to 401(K)s

5   separately and we couldn't do that.

6          Q.    Why couldn't you do that?

7          A.    Because my husband wasn't getting any money to

8   pay or contribute to a 401(k) and I couldn't contribute

9   out of my paycheck for him.

10         Q.    Did you tell Mr. Conn that?

11         A.    Yes, I did.

12         Q.    What did he say?

13         A.    He said, "I know.  I'm in the process of trying

14  to take care of that.  Don't worry, I'll make it up to

15  you."

16         Q.    Did he ever make it up to you?

17         A.    I don't know what that meant, I'll make it up

18  to you.

19         Q.    Did you ask him what it meant?

20         A.    No.  I just know that after more than a couple

21  of conversations my husband started getting, like, $500 a

22  week, and then I saw it was coming out of my paycheck.

23  And I complained about that.

1        Q.    Did anything happen after you complained?

2        A.    No.

3        Q.    Did that continue?

4        A.    It continued for a while, yes.

5        Q.    For how long did that continue?

6        A.    Maybe six months.  I'm not sure on the precise

7   time, but around maybe six months.

8        Q.    Then what happened at the end of that

9   six months?

10       A.    The new year came around.

11       Q.    What happened then?

12       A.    I had asked him again for the forgivable draw.

13       Q.    And?

14       A.    He told me he was in the process of making up

15   the new agreements.

16       Q.    Did he ever send you a new agreement?

17       A.    No.  I was terminated shortly thereafter.

18       Q.    So when you say the new year, you meant 2003 --

19       A.    Yes.

20       Q.    -- came around?  Okay.  So is it fair to say

21   that you said that the $500 deduction from your check

22   continued for approximately six months?  Is that right?

23       A.    Six months prior to the 2003 year, to my

1    Q.    Who was the first temp that you worked with?

2    A.    That's Luis Riascos.

3         MR. BURKE:  Can we take a break?

4         (Recess from 12:17 through 12:21 p.m.)

5         MR. SMITH:  On the record.

6    Q.    Miss Scalli, you said, I think you told me that

7    Bard Conn called you when you were at North American

8    Mortgage out of the blue to ask you about coming to work

9    for him at Citizens.  Is that correct?

10        MR. BURKE: Objection.  You may answer.

11   A.    I didn't say he called me at North American

12   Mortgage.  I said he called me and I was employed at

13   North American Mortgage at the time.

14   Q.    Did he ever tell you how he got your phone

15   number?

16   A.    My phone number was kind of everywhere.

17   Everybody had my phone number.  I don't think I asked

18   him.  If I did, I wouldn't remember.

19   Q.    Prior to him calling you, did you know who Mr.

20   Conn was?

21   A.    Never heard of him --

22   Q.    You had never met him?

23   A.    -- that I could remember.  I mean, that's not a

1  name that you would forget.

2         MR. BURKE:  Could you kindly let the witness

3  finish the question?

4         MR. SMITH:  You mean finish the answer?

5         MR. BURKE:  I mean finish the answer.  I

6  apologize.  You're interrupting her.

7         MR. SMITH:  Sure.

8     Q.   Do you remember approximately how long before

9  your employment started with Citizens in February of 2001

10  that Mr. Conn first phoned you?

11     A.   I don't want to guess, so I would have to say,

12  no, I don't remember.

13     Q.   Was it a year prior to that?

14     A.   I don't think it was quite a year.

15     Q.   So it was --

16     A.   I would say, if I had to make the best educated

17  guess, six months prior to, maybe six or seven months

18  prior to.

19     Q.   Prior to the break we were talking about some

20  of the changes to the commission rates that occurred in

21  connection with assistants in your office.  Okay?  You

22  told me that at some point Mr. Conn discussed with you

23  the option of having temporaries.  Is that correct?

1           MR. BURKE:  Objection.

2      Q.   Can you answer the question, Miss Scalli?

3      A.   Can you repeat the question?

4      Q.   Sure.  I'll rephrase the question.  At some

5  point during your employment did Bard Conn discuss with

6  you the option of having a temporary rather than a

7  full-time or part-time assistant work with you?

8           MR. BURKE:  Objection.

9           MR. SMITH:  What's the objection?

10          MR. BURKE:  I don't believe that that was her

11 testimony.

12          MR. SMITH:  I didn't ask her --

13          MR. BURKE:  You used the word "option."  I'm

14 objecting to the form of the question.

15          MR. SMITH:  Ruth, would you read the question

16 back?

17          (Question read by the Stenographer.)

18          MR. BURKE:  If you understand the question,

19 Ma'am, you may answer.

20     A.   It wasn't optional.  I had no say in it, so it

21 wasn't an option.  He told me what we were going to do,

22 and we did it.

23     Q.   What did he tell you?

1        A.    He told me it would be easier on myself and,

2   you know, he had the philosophy, the tried through time

3   philosophy the temps we could get rid of at any time and

4   we didn't have to go through the human resources stuff.

5        Q.    Who was the first temp you worked with?

6        A.    Luis Riascos.

7        Q.    Do you recall approximately what period of time

8   he worked with you?

9        A.    January of, let me see, 2002.

10       Q.    And what impact did the fact that there was a

11  temp assigned to you, what impact did that have on your

12  compensation or commission structure?

13       A.    There was no impact because, the way Bard

14  explained it was that he was going to be paying out of my

15  commission for the assistants, so he would delegate that

16  towards hiring a temp, so I wouldn't see, you know, there

17  wouldn't be any difference in my pay structure.

18       Q.    Did you determine whether it had any difference

19  in your pay structure?

20       A.    I would have noticed it, and I didn't notice

21  any decrease of any kind.

22       Q.    So is it fair to say that the existence of the

23  temp versus the assistant, there was no difference in

1  your pay structure?

2       A.   I didn't notice any difference.

3       Q.   Did you work with Luis Riascos from January of

4  2002 until your employment ended with Citizens?

5       A.   Yes.

6       Q.   Were there other temps in addition to Luis?

7       A.   Yes.

8       Q.   How many others?

9       A.   That I can think of, three.

10      Q.   Can you identify them?

11      A.   Actually four.  I can identify four.

12      Q.   Great.  Please do.

13      A.   Okay.  Luis Riascos, Flavia Oliveira.  I think

14  it's Oliveira.  I'm not sure about the last names.

15  Vanessa, I don't know the last name.

16      Q.   Pavesi?

17      A.   Yes.  Could be, but she got married.  There was

18  a different name before.  Matthew Furlong, and Edison

19  DeSousa.

20      Q.   Delarosa?

21      A.   Something like that.

22      Q.   Do you remember Ramon Carrasco?

23      A.   If I'm not mistaken, he came in for one day,

1    and he couldn't speak English, and Bard sent him home.

2    Somebody sent him home.

3        Q.    Do you remember Angela D'Avolio?

4        A.    Yes.    That was maybe a week.

5        Q.    Do you remember Reginal Gore?

6        A.    I don't believe he was a temp.

7        Q.    Do you remember him?

8        A.    Yes.

9        Q.    Was he an employee?

10       A.    He was an employee.

11       Q.    Do you remember Rodrigo Gazitua?

12       A.    No.

13       Q.    Do you remember anyone named Rodrigo?

14       A.    No.

15       Q.    Either as an employee or a temp?

16       A.    No.    Doesn't sound familiar.

17       Q.    How many temps typically did you have in the

18   office with you at one time?

19            MR. BURKE:    Objection.    From when to when are

20   you referring to?

21       A.    I don't know.    You would have to be, you know,

22   more specific.

23       Q.    Okay.    Then let's start from January of 2002,

LEAVITT REPORTING, INC.

1   when the temps started arriving.  During the period from

2   January to June of 2002, to be more specific, how many

3   temps did you have in your office?

4        A.   I don't remember from the time period and I

5   don't want to guess.  There were always two to three

6   people in my office.

7        Q.   What were they doing?

8        A.   Getting conditions, you know, anything that

9   needed to be done, you know, people helping with the

10  credit reports, helping getting the documents to get them

11  preapproved, running errands.  Anything that needed to be

12  done they would do.

13            MR. BURKE:  Did you want to start that break

14  now?

15            MR. DIMAURO:  12:30.  You still have a couple

16  of minutes.  Go ahead.

17       Q.   Do you know why Luis Riascos's employment

18  ended?

19       A.   I believe he resigned.

20       Q.   Do you know where he's working presently?

21       A.   Yes, I do.

22       Q.   Where?

23       A.   GMAC Mortgage.

1    were not present at the last deposition, but it's been

2    referred to in other ways, if it's the document that I

3    believe you're anticipating.  I'm objecting as to the

4    form of the use of the word.

5            MR. SMITH:  All right.

6        Q.    Did you issue a statement of credit denial to

7    Mr. Barbosa?

8            MR. BURKE:  Objection.  You may answer if you

9    understand the question.

10       A.    Personally, you're asking me, if I issued it?

11   No, I did not.

12       Q.    Did you ever sign any statement of credit

13   denial for Mr. Barbosa?

14       A.    I don't remember signing any statement of

15   denial.

16       Q.    You don't?  Okay.  Let's get this marked.

17           (Document marked Exhibit No. 10 for Id.)

18           MR. BURKE:  The witness now has Exhibit 10 in

19   front of her.

20       Q.    I'm asking you to look at this Exhibit 10 which

21   is entitled Statement of Credit Denial, Termination or

22   Change.  Is that your signature at the bottom?

23       A.    I can't be sure.

1      Q.    You can't be sure?  Why can't you be sure?

2      A.    Because a lot of times people in my office

3  would sign letters for me, credit letters, approval

4  letters.  They signed lots of letters coming out of my

5  office for me.

6      Q.    Do you remember anyone from your office ever

7  signing a credit denial letter?

8      A.    Specifically, no, but they have.

9      Q.    They have signed credit denial letters?

10     A.    Yes.

11     Q.    Can you explain when that occurred?

12     A.    I can't pinpoint myself to the exactness, but

13  this was nothing unusual.

14     Q.    It was not unusual for your office to issue

15  credit denials?

16     A.    Not unusual.

17     Q.    How often would you say it happened?  With what

18  type of frequency?  Every week or month?

19     A.    Since not that many loans were declined or

20  didn't qualify, it didn't happen that often.

21     Q.    I'm sorry.  To follow up on that answer, if a

22  loan didn't qualify or it was denied, was it your office

23  that issued the statement of credit denial?

1     Q.   Now, Mr. Barbosa came to you at some point

2  regarding a loan on a property on Paris Street in East

3  Boston.  Do you remember that?

4     A.   He never came to me.

5     Q.   Do you know who he came to?

6     A.   Yes.  Someone in my office.  She spoke

7  Portuguese, and that was one of the temps, Flavia.  She

8  got all the information to qualify him for the loan.

9     Q.   To qualify him for the loan on this property on

10  Paris Street?

11     A.   Yes.

12     Q.   We're going to show you a document we're going

13  to mark as Exhibit 9.

14        (Document marked Exhibit No. 9 for Id.)

15     Q.   Have you had a chance to look at this?

16     A.   Yes.

17        MR. BURKE:  I want the record to reflect it is

18  a rather lengthy document, but it's four or five pages.

19        MR. SMITH:  I think it's a four-page document

20  to be accurate.

21     Q.   Have you had a chance to read it, to look at

22  it?

23     A.   Yes.

1    as a plasterer in your husband's building?

2          A.    Not exact.

3          Q.    Was it during your employment at Citizens?

4          A.    It was definitely during, but, you know, I

5    don't know if it was before as well.  So I don't know.

6          Q.    Do you know which building he worked in?

7          A.    No, I don't.

8          Q.    Do you know whether you or your husband have

9    ever sold a property to Mr. Barbosa?

10         A.    Yes.

11         Q.    You did?  Do you know which property that was?

12         A.    Yes.  208 Maverick Street.

13         Q.    Are you the owner of that property?

14         A.    Now?

15         Q.    I'm sorry.  Prior to its sale.

16         A.    Yes.

17         Q.    Was that jointly owned by you and your husband?

18         A.    No.

19         Q.    It was just you?

20         A.    Yes.

21         Q.    Do you know the date of sale to Mr. Barbosa?

22         A.    I don't know the exact date.  Somewhere around

23    June or July maybe of 2003.

1      Q.    Do you still have a file on that sale?  Do you

2   still have the P and S tucked aside?

3      A.    I don't know.

4           MR. SMITH:  Mark, I would like to request any

5   documents relative to the sale of that property to Mr.

6   Barbosa.

7           MR. BURKE:  Yes.  If you make a request --

8   Obviously, we'll search for them now.  But if you could

9   make a request, I would appreciate it.

10          MR. SMITH:  Sure.  You mean other than the

11  request I'm making now?

12          MR. BURKE:  As part of your calling for that we

13  will conduct a search, but we would appreciate a formal

14  request.

15          MR. SMITH:  Sure.

16     Q.    Miss Scalli, do you remember when Mr. Barbosa

17  first became interested in purchasing the 208 Maverick

18  Street property from you?

19     A.    No, I don't.  It was maybe a couple of months

20  before time.

21     Q.    Couple of months before the eventual, say, the

22  closing?

23     A.    Yes.

1      A.    I don't remember.

2      Q.    You don't remember?

3      A.    Yes.

4      Q.    Do you remember approximately?  In the three

5 hundreds?

6      A.    No.  I don't remember the amount, the exact

7 amount.

8      Q.    You don't remember the amount of the loan?

9      A.    No.

10      Q.    Do you remember the date of the first loan?

11 I'm sorry.  Strike that.  The mortgage approval letter

12 that you saw that had to do with the primary loan, do you

13 remember the date of that mortgage approval letter?

14      A.    No, I do not.

15      Q.    When did you first see that mortgage approval

16 letter on that primary loan?  Do you remember?

17      A.    No, I do not.

18      Q.    Now, did you issue a mortgage denial on Mr.

19 Barbosa's loan application?

20           MR. BURKE:  Objection.

21           MR. SMITH:  Basis for the objection?

22           MR. BURKE:  You're referring to a denial, a

23 mortgage denial.  Although you haven't been -- I know you

1   were not present at the last deposition, but it's been

2   referred to in other ways, if it's the document that I

3   believe you're anticipating.  I'm objecting as to the

4   form of the use of the word.

5          MR. SMITH:  All right.

6      Q.   Did you issue a statement of credit denial to

7   Mr. Barbosa?

8          MR. BURKE:  Objection.  You may answer if you

9   understand the question.

10     A.   Personally, you're asking me, if I issued it?

11  No, I did not.

12     Q.   Did you ever sign any statement of credit

13  denial for Mr. Barbosa?

14     A.   I don't remember signing any statement of

15  denial.

16     Q.   You don't?  Okay.  Let's get this marked.

17         (Document marked Exhibit No. 10 for Id.)

18         MR. BURKE:  The witness now has Exhibit 10 in

19  front of her.

20     Q.   I'm asking you to look at this Exhibit 10 which

21  is entitled Statement of Credit Denial, Termination or

22  Change.  Is that your signature at the bottom?

23     A.   I can't be sure.

1          Q.    You can't be sure?  Why can't you be sure?

2          A.    Because a lot of times people in my office

3    would sign letters for me, credit letters, approval

4    letters.  They signed lots of letters coming out of my

5    office for me.

6          Q.    Do you remember anyone from your office ever

7    signing a credit denial letter?

8          A.    Specifically, no, but they have.

9          Q.    They have signed credit denial letters?

10         A.    Yes.

11         Q.    Can you explain when that occurred?

12         A.    I can't pinpoint myself to the exactness, but

13   this was nothing unusual.

14         Q.    It was not unusual for your office to issue

15   credit denials?

16         A.    Not unusual.

17         Q.    How often would you say it happened?  With what

18   type of frequency?  Every week or month?

19         A.    Since not that many loans were declined or

20   didn't qualify, it didn't happen that often.

21         Q.    I'm sorry.  To follow up on that answer, if a

22   loan didn't qualify or it was denied, was it your office

23   that issued the statement of credit denial?

1       A.    Yes.

2       Q.    So that statement of credit denial did not come

3   from underwriting?

4       A.    It would depend on the time constraints.  If it

5   needed to be done quickly, it would come directly from

6   the laptop in my office.  If it had, like, a couple of

7   days, it could wait, it would come from Claudia.  It all

8   depended on the time constraints.

9       Q.    What would be the time constraints in

10  connection with a credit denial?

11      A.    Well, meaning if you had a situation where a

12  borrower quit his job and couldn't get a loan, and in a

13  case like that, it's timing.

14      Q.    What was the timing more or less of?

15      A.    If they verify their complaint at the loan

16  center, something like that, and they quit their job,

17  Claudia would issue it from there because the loan would

18  be declined.  On other instances we had authority through

19  Liz Walsh because she oversaw my pipeline to send them

20  from my office.

21      Q.    Would Liz Walsh give your office, do you know,

22  authority on each instance to issue the credit denial, or

23  was it just a general authority to issue?

1    Q.    You had to get permission with respect to each

2    borrower?

3    A.    Yes.

4    Q.    Thank you.  Who gave you permission to, if you

5    remember, to issue this denial?

6    A.    This one here was Liz Walsh directly.

7    Q.    Did she give it to you?

8    A.    To Luis.

9    Q.    How do you know that?

10    A.    Because Luis told me.  I was not in the

11    meeting, like we did a pipeline meeting every Tuesday,

12    and this particular loan was discussed at the meeting,

13    and she gave it directly to Luis.  Luis wanted to

14    withdraw it, but Liz said it needed to be declined.

15    Q.    Was anyone else part of that pipeline meeting

16    on Tuesday when Liz gave that instruction?

17    A.    That particular meeting, I was not.  There

18    could have been other people in my office as far as the

19    temps that may have been there.  Flavia and maybe Vanessa

20    was there.  I don't know who else was there.  Luis was

21    definitely there.

22    Q.    Did he tell you what happened in that meeting?

23    A.    Yes, he did.  I don't know if it was the same

1  day, but he did tell me.

2       Q.   Is it fair to say if the loan had been

3  withdrawn that the potential borrower, Mr. Barbosa, would

4  have forfeited any down payment he had made in connection

5  with the P and S?  Do you know?

6       A.   No, I don't know about that because that would

7  have been up to the realtors, not up to us.

8       Q.   Is it fair to say it also would have been up to

9  the seller of the property and the term of the P and S in

10 terms of the mortgage contingency?

11      A.   I wouldn't know because I'm not the realtor or

12 the seller, or I wouldn't be the one to make that

13 decision.  All we could do is the financing stuff, so

14 whatever the --

15      Q.   It would have been up to those other persons?

16      A.   Exactly.

17      Q.   And it would have been subject to whatever

18 terms had been negotiated in the P and S?

19           MR. BURKE:  Objection.

20      Q.   Is that your understanding?

21      A.   Well, I don't know because I don't know what

22 was in the P and S.

23      Q.   Right.  But it's fair to say frequently P and

1  S's contain mortgage contingency clauses.  Is that right?

2       A.    Boilerplate ones do, but I don't read the P and

3  S's.

4       Q.    Have you ever seen a P and S?

5       A.    Yes.

6       Q.    Have you ever negotiated a P and S on your own

7  behalf?

8       A.    No.  I always let my attorneys do that.

9       Q.    Do you know what a mortgage contingency is?

10      A.    Yes.

11      Q.    What is it?

12      A.    That would be the dates that they put down, you

13  know, for the financing.

14      Q.    And also the fact that the purchase is subject

15  to the borrower qualifying for financing.  Is that right?

16      A.    In some cases, I guess.

17      Q.    How do you know that Luis told Liz Walsh that

18  the borrower here, Jean Barbosa, wanted to withdraw his

19  application for a loan?

20      A.    Can you repeat it?

21      Q.    I think you said Luis, your assistant, told Liz

22  Walsh that Jean Barbosa wanted to withdraw this loan

23  application.

1    A.    Yes.

2    Q.    How do you know that?

3    A.    Because Luis told me.

4    Q.    Did Luis tell you how he found out?

5    A.    Yes.  From Flavia.

6    Q.    How did Flavia find out?

7    A.    Because she spoke with the borrower who said he

8    wasn't going to move into the property.

9    Q.    And anything else?

10   A.    That's all I knew about that.

11   Q.    Since he wasn't going to move into the

12   property, he wanted to withdraw his application?

13   A.    Yes.  He wasn't going to move into the

14   property, and Luis tried to do it as an investment

15   property for the borrower.  He tried to rework the loan

16   along with Liz as an investment property.

17   Q.    What happened to that --

18   A.    It didn't work.

19   Q.    -- reworking?  Why didn't it work?

20   A.    Because, to my knowledge, there's a mass high

21   cost loan, and the second mortgage couldn't be granted

22   because it went over the mass cost high loan amount, of

23   the amount of points and fees you can charge.  It was

1  withdraws the loan application?  Is that your

2  understanding?

3      A.   Not really.  Because I know that if they don't

4  sign the commitment letter, we have to withdraw the loan.

5      Q.   If they don't sign the commitment letter, would

6  that be a withdrawal or would that be a denial?  In other

7  words, where the bank is denying the loan for some

8  reason.

9          MR. BURKE:  Objection.

10     A.   Since I don't have that, make that decision, I

11 don't know.  I don't know how they would handle it since

12 I don't make that decision.

13     Q.   Do you know why there would have been a

14 statement of credit denial issued on January 16th and

15 then a request to withdraw on January 17th, the day

16 after?

17     A.   Well, the second loan could not be done as

18 investment property, and Luis had gone over that with Liz

19 Walsh.  And the second loan definitely could not be done,

20 and Liz and Luis discussed this.  And at the permission

21 of Liz, Luis asked if the denial letter can be sent for

22 the second loan, and she approved it.

23     Q.   Could you say that last sentence again?

1    Q.    A real estate broker?

2    A.    He said a real estate broker.

3    Q.    Faxed him that?

4    A.    I don't know if it was this one.  All he said

5    was that he was faxed a copy of the denial letter from a

6    real estate broker.

7    Q.    Of a credit denial letter?

8    A.    Yes.

9    Q.    But you don't remember anyone saying that the

10   fact that Mr. Barbosa was not going to move into the

11   property was not a sufficient grounds to deny the loan

12   application?

13        MR. BURKE:  Objection.

14   A.    I don't remember that.

15   Q.    You don't remember that being said?

16   A.    I don't remember.

17   Q.    Did anyone ask you if you or your office had

18   issued these types of credit denials previously?

19   A.    Like who?

20   Q.    At this meeting.  At this meeting on

21   February 4th did anyone in the meeting ask you if your

22   office had previously issued these types of denials?

23   A.    I don't remember if I said to Joyce Hicks that

1    this was normal, that when Liz or Bard gave permission

2    that we could do that. I don't remember if it was right

3    at that time or the next day. Because when I went into

4    the meeting, Bard was sitting there, and I thought that

5    he was the one, I thought something was wrong with him.

6    I didn't know why I was there. So I was caught very off

7    guard. So I don't remember if I said it right at that

8    point or if I said it the next morning.

9        Q.    The next morning did you have a meeting or was

10   that a phone call?

11       A.    I phoned Joyce Hicks the next day.

12       Q.    All right. Just so I'm clear, you're not sure

13   if you told Joyce at this termination meeting or the day

14   after at a phone call that your office issued these types

15   of letters frequently?

16       A.    I know I made a comment, but I didn't elaborate

17   on it. When I was at the meeting, at the table they

18   showed me this briefly. I said this was a normal thing

19   for Liz and Bard.

20       Q.    At some point you communicated that to Joyce

21   Hicks?

22       A.    Yes.

23       Q.    I understand you don't remember whether that

1   was on February 4th or the day later, but can you tell me

2   as best you recall what you told Ms. Hicks about how

3   often these denials get issued by your office?

4        A.    I think the comment I made to her was it was a

5   normal thing that when Liz or Bard gave permission and

6   that we were under time constraints we could send them

7   out from my office.

8        Q.    Did you tell her in this instance on the

9   Barbosa issue that permission had been given?

10       A.    Yes, I did.

11       Q.    Did you tell her by whom?

12       A.    Yes.

13       Q.    What did you say?

14       A.    I said Elizabeth Walsh.

15       Q.    At the termination meeting, not -- did you

16   state that the customer had asked that this denial be

17   issued?

18       A.    I don't remember.  I never spoke to the

19   customer.

20       Q.    Do you remember making a statement of something

21   to the extent that "What was I supposed to do?  The

22   customer asked for this"?

23            MR. BURKE:  Objection.

# VOLUME II

28

1       A.   Yes.

2       Q.   And the loan approval letter is dated at the top of

3    the first page January 16th, '03, correct?

4       A.   Correct.

5            MR. SMITH:   Let me go off the record for a

6    second.

7            (Recess taken.)

8            MR. SMITH:   I'm going to show you a document

9    and have it marked as Exhibit 17.

10           (Exhibit No. 17 marked.)

11      Q.   Have you had a chance to look at this document that

12   I've marked as Exhibit 17 --

13      A.   Yes.

14      Q.   -- Ms. Scalli?  Okay, that's a copy of a check,

15   front and back, from your checking account, is that

16   correct?

17      A.   Yes.

18      Q.   And is that a joint checking account that you

19   maintain with your husband, Robert?

20      A.   Yes, it is.

21      Q.   Okay.  Now, is that checking Account No.

22   1134703179?

23      A.   Yes.

29

1    Q.  Now, the document that I've showed you is a check,

2  and I'm going to represent that the date on it, it's hard

3  on the photocopy, is January 13, 2003.  You can make out

4  the January and the '03, can't you?

5    A.  Yes.

6    Q.  Okay.  It's in the amount of $4,000, is that

7  correct?

8    A.  Correct.

9    Q.  Is that your signature on the check?

10    A.  Yes, it is.

11    Q.  Do you remember, just curiously, do you remember

12  cashing a check for $4,000 on January 13th of '03?

13    A.  No, I do not.

14    Q.  Do you remember cashing a check for $4,000 in cash

15  during this time frame?

16    A.  No, I do not.

17            MR. SMITH:  I'm going to have this marked as

18  Exhibit 18 please.

19            (Exhibit No. 18 marked.)

20    Q.  Have you had a chance to look at the document I've

21  marked as Exhibit 18?

22    A.  Yes.

23    Q.  Exhibit 18 is a copy of a Citizens Bank official

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
                                    *
ELEANOR SCALLI,                     *
ROBERT SCALLI,                      *
                Plaintiffs          *    CIVIL ACTION
                                    *    NO. 03-CV-12413DPW
                VS                  *
                                    *
CITIZENS FINANCIAL GROUP,           *
INC.,                               *
                Defendant           *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

VOLUME 2 OF THE DEPOSITION OF ELEANOR SCALLI,
taken on behalf of the defendant pursuant to the
Massachusetts Rules of Civil Procedure before Kathleen M.
Benoit, CSR # 1368F94, Shorthand Reporter and Notary Public
in and for the Commonwealth of Massachusetts at the offices
of Goodwin Procter, Exchange Place, Boston, Massachusetts, on
Tuesday, April 12, 2005, commencing at 10:53 a.m.

APPEARANCES:

NICHOLAS J. DiMAURO, ESQ., 111 South Bedford Street, Suite
208, Burlington, MA 01803, For the plaintiff, Robert Scalli

MARK E. BURKE, ESQ., 111 South Bedford Street, Suite 208,
Burlington, MA 01803, For the plaintiff, Eleanor Scalli

BRADFORD J. SMITH, ESQ., and ANNE GAETA, ESQ., Goodwin
Procter, Exchange Place, Boston, MA 02109-2881, For the
defendant

ALSO PRESENT:

JEFFREY SIEGEL, ESQ.

# *Leavitt Reporting, Inc.*

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

Hearings ◆ Conferences ◆ Legal Proceedings

1                                    INDEX
     WITNESS                    DIRECT CROSS REDIRECT RECROSS

2
     Eleanor Scalli
3        by Mr. Smith               3

4                                  EXHIBITS
     No.  Description                              Page
5
     12   Letter 1/6/03 Paula Castillo to
6          Eleanor Scalli                          11

7    13   E-mail 12/30/02 Eleanor Scalli
           to Elizabeth Walsh                      13
8
     14   Underwriting Recommendation for
9          Denial                                  19

10   15   Letter 1/16/03 Claudia Arrendondo
           to Paula Castillo and Rafael
11         Guerrero                                21

12   16   Gift Letter 1/14/03 To whom it
           May Concern                             25
13
     17   Copy of Check No. 103, 1/13/03
14         for $4,000                              28

15   18   Copy of Check No. 055755431-8
           $4,000 to Andres Castillo               29
16
     19   Teller Transactions                      30
17
     20   Documents Produced in Response
18         to Subpoena                             52

19   21   Pipeline Report                          58

20

21

22

23

1        A.   From day one.

2        Q.   And what was the basis points you were going to be

3   eligible for?

4        A.   The number 70 stands out in my mind, but it could

5   have been 71 or 72 but 70, it was definitely 70.

6        Q.   And when were you eligible for the basis point?

7        A.   From the very first day.

8        Q.   I'm sorry, when I say --

9        A.   February of 2001.

10       Q.   In terms of which volume, which loans were you

11  eligible for that?

12       A.   Every single closed loan.

13       Q.   Well, was there a dollar amount of the loans that

14  you were eligible for 70 basis points, or were you eligible

15  for 70 basis points on a $50,000 mortgage?

16       A.   Yes, I was.

17       Q.   Now, you'll see here on the chart in the bottom of

18  page 1 the commission rates are stated in terms of a

19  monthly funded goal.  Do you see that heading, monthly

20  dollars funded goal with an asterisk?

21       A.   Yes.

22       Q.   Now, that asterisk says it's retroactive to dollar

23  one for the closing month.  Now, fair to say that if you

76

1    closed more than a million dollars in that particular

2    month, I'm sorry, if more than a million dollars in loans

3    were funded for that month that you would receive,

4    according to this chart, 56 basis points, correct?

5        A.   You know what, these two pages were changed.  This

6    page was the one that was, I never agreed to this one.  So

7    I didn't have the same setup.  I always closed over 2 and

8    over 3 million.

9        Q.   All right, well, this page, it's fair to say, it

10   shows that, at least in the chart, it says 56 basis points,

11   and in addition to that, in addition to that, an additional

12   9 basis points which is the footnote at the top of the

13   second page, correct?

14       A.   No, it's not correct because the first page was

15   changed several different times, so that footnote on the

16   second page had to conform with whatever was on the first

17   page.  So if the first page might not be right, the second

18   page footnotes might not be right either.  So, for example,

19   if one of these were off the 9 basis points, it doesn't

20   jive to me.

21       Q.   So you said that from day one of your employment

22   you were eligible for 70, 71 or 72 basis points, is that

23   right?

1    Q.   Do you remember filling out all the forms relative

2  to your medical insurance?

3    A.   Nope, nope.

4    Q.   You just started receiving those benefits?

5         MR. BURKE:   Objection.

6    A.   Absolutely not.  My husband was supposed to get a

7  $50,000 salary and all the medical benefits were under him.

8  He registered for everything.

9    Q.   And it's your recollection that he -- do you

10 remember him registering for everything?

11   A.   He told me he took care of it and I believed him

12 and we had our medical cards and everything, so I had no

13 reason not to believe that he didn't do it.

14         MR. BURKE:   May I take a break.

15         MR. SMITH:   Sure.

16         (Recess taken.)

17   Q.   Ms. Scalli, are there any other parts of your

18 damages that you haven't told me about?

19   A.   Yes.

20   Q.   What else?

21   A.   During calendar year 2002 months had gone by when I

22 started to notice that, I thought there were, I thought

23 Bard had fixed the $50,000 salary for my husband which I

1  found out later that he never did, but he was starting to

2  actually get a paycheck and then I found out that that

3  money was coming out of my paycheck and I never authorized

4  that.

5      Q.  Was he getting a thousand dollars a month?

6      A.  I don't remember the exact amount.

7      Q.  Do you remember the approximate amount?

8      A.  I remember paychecks for 500 at a time but I can't

9  say I remember the exact amounts.

10      Q.  Do you remember that you were paid twice a month

11  during your employment at Citizens?

12      A.  I can't say I even remember because, you know, now

13  I'm confused.  I remember, I think it was once a month.  I

14  don't think it was twice.

15      Q.  And you remember it being as $500 a paycheck?

16      A.  Are you talking about me or my husband?

17      Q.  Well, the amount that was paid to your husband at

18  that time you said was withheld from your check, is that

19  correct?

20      A.  Yes.

21      Q.  So it would be the same?

22      A.  No, it's not the same.

23      Q.  Well, I'm sorry, the amount paid to Robert would be

1    the same amount as what was withheld from your check, is

2    that correct?

3        A.   But my paycheck would not reflect that.  I found it

4    in my commission reports.  Nobody told me about it.

5        Q.   Your commission report showed a reduction per pay

6    period?

7        A.   It said right on it to Bob.

8        Q.   And that amount was paid over to Bob and you said

9    you never authorized that?

10       A.   Correct.

11       Q.   And you learned of that during calendar year 2002?

12       A.   Yes.

13       Q.   Do you remember when in 2002 you learned of that?

14       A.   Bard called me up and said he made a whole bunch of

15   mistakes, and I think it was somewhere around the spring of

16   2002 because the reason why I remember is the weather was

17   starting to get warmer and my allergies were starting, and

18   he told me that he had made a huge, a couple of huge

19   mistakes with Human Resources, that he was violating labor

20   laws.  That because he hadn't figured out, you know, Bob's

21   salary and how he was getting paid because he didn't get

22   around to it that by law he has to get a paycheck with at

23   least minimum wage or they could be in trouble.  So he was

1  getting like negative paychecks that would say minus

2  $4,000, and everything would be negative and he said that

3  was a big problem for the bank.

4       Q.  And so that did he tell you that he was going to

5  start paying Bob a sum of money to fix that?

6       A.  What he told me was the 50,000 that was supposed to

7  be his base salary that retroactive, that a negative would

8  be deducted from the 50,000 but it never happened, and then

9  the monies that he was paid came out of my commission

10  reports without me knowing and I found out many months

11  later, it might have been 3 months later because I didn't

12  notice it.

13       Q.  When you did notice it, what did you do?

14       A.  I called Bard.

15       Q.  And what happened?

16       A.  He acted like he didn't know about it.

17       Q.  So what did you do?

18       A.  I said, oh, my God, we have to fix this, how can

19  you do this, we have to fix it.

20       Q.  So Bard told you he had no idea about --

21       A.  He said he was going to fix it, and I said please,

22  you have to fix it.

23       Q.  Did he fix it?

84

1      A.   No.

2      Q.   So did you talk to anyone else at Citizens?

3      A.   No, because it, it seemed like the months went by

4  very quickly, and by the time I did find out from the time,

5  the springtime to the end of 2002 was maybe a six-month

6  period, so it may have been like 3 or 4 months later and it

7  was already towards the end of the year and we were going

8  to be starting a new year, so Bard told me for 2003 that

9  all the new agreements and everything we were going to do

10 would wash away anything that was done in 2002.  That he

11 would fix it, meaning it would go retroactive, he would

12 deduct, you know, whatever negative and whatever he had to

13 do to fix it, and that's exactly what he said I'll fix it.

14     Q.   And to be clear, you never called anyone else at

15 Citizens when it didn't get fixed, did you?

16     A.   To be totally honest with you, I didn't have

17 anybody's names to call.  I just worked all the time.  I

18 had nothing to do with like who do I call.  He said I'll

19 take care of it.  I believed him.

20     Q.   But he never took care of anything, did he?

21     A.   No, he didn't.

22     Q.   And you kept believing him?

23     A.   Well, up until one of the last arguments we had, I

85

1  kind of was fed up with him telling me he was going to fix

2  it which led to the conversation when he was upset about

3  the bills going to the wrong place and I demanded about the

4  401K and, you know, Bob's salary and what the accountants

5  were saying to me.

6        Q.   The amount of money that -- strike that.

7             You said that Robert for a while was getting

8  negative paychecks, correct?

9        A.   Correct.

10       Q.   Was he ever or were you charged for those negative

11  amounts do you know?

12       A.   We were supposed to be because Bard told me that

13  once he, once he had the 50,000 salary it would go, it

14  would be deducted from that because all the medical

15  benefits and everything were under my husband, so whereas

16  he wasn't making anything, it would go negative, like keep

17  going negative, and that's when someone over there noticed

18  that something wasn't right, and I think that would be

19  Human Resources because he called me and told me that there

20  was a huge problem.

21       Q.   Did you, were you ever charged, you, was your

22  income ever charged for that negative income that your

23  husband received?

1    A.  I would have to dig really deep.  It might have

2  been.  It really might have been and I was wondering that

3  myself, but when you're dealing with so many numbers and so

4  much dollars, it's really hard to find every little thing.

5  Like in some of those commission reports, I saw price share

6  things that, monies taken from me that went to Bard and

7  they're right in those reports and I don't know what that

8  was for either.  It was like 3, 4, 500 at a time that says,

9  you know, between me and Bard, so I don't know what those

10  monies were for either.

11    Q.  Ms. Scalli, you said that during 2002 that you

12  closed $65 million in loans or I should say you were

13  credited with closing $65 million in loans, correct?

14    A.  Correct.

15    Q.  What portion of that $65 million were originated by

16  your husband, Robert?

17    A.  Bob was the marketing person, so in terms of

18  origination, I would say less than 20 percent.

19    Q.  When you say he was the marketing person, did he do

20  the marketing for you too?

21    A.  Yes, Bard hired him to do the marketing with a

22  salary and to originate loans.  He did all the marketing

23  for my whole group.

1    Q.  But he also originated loans?

2    A.  Yes.

3    Q.  Now, during 2002, how did you do in terms of the

4    ranking of, among loan originators in Citizens?

5    A.  I was the top one.

6    Q.  And if your husband had been credited with the

7    loans he originated, how would you have done?

8    A.  If I took maybe 10 to 20 percent off, I probably

9    would have been neck and neck with the next person in line.

10   Q.  That's your recollection?

11   A.  Yeah.  I probably would have been right there with

12   the next person underneath me.

13   Q.  Are there any other parts of your damages that you

14   haven't told me about?

15   A.  In detail, no.

16   Q.  So you've described in detail all of the damages

17   that you're claiming?

18             MR. BURKE:  Just so we are clear, other than

19   what's in the complaint, there may be some theories of

20   damages in terms of labor laws or --

21             MR. SMITH:  I'm asking her including the

22   complaint, Bard, to be clear.

23             MR. BURKE:  Whatever she has an understanding

1  of obviously.

2         MR. SMITH:  Well, she's one of the plaintiffs

3  in this case.

4         MR. BURKE:  I understand that.  I'm just

5  saying --

6     A.  I don't think I made a good estimate in terms of

7  dollar amounts.  I think it should have been higher because

8  the 6 months of lost business was a huge, huge decline in

9  my income for the next following year.

10    Q.  How much income did you earn during 2003 from GMAC?

11    A.  About 210,000, maybe a little more.

12    Q.  How much did you earn during 2002 from Citizens?

13    A.  I want to say it was maybe 400,000.

14    Q.  During that year?

15    A.  Mm-hmm, it was give or take a few.  I don't know

16  the exact amount.

17         MR. SMITH:  Let's go off the record for a

18  second.

19            (Discussion held off the record.)

20    Q.  During 2004 at GMAC, do you know how much you

21  earned?

22    A.  It was over 200,000.

23    Q.  So approximately the same that you earned during