

# EXHIBIT

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
                                   *
ELEANOR SCALLI,                    *
ROBERT SCALLI,                     *
                 Plaintiffs        *     CIVIL ACTION
                                   *     NO. 03-CV-12413DPW
                 VS                *
                                   *
CITIZENS FINANCIAL GROUP,          *
INC.,                              *
                 Defendant         *
                                   *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

          DEPOSITION OF ROBERT SCALLI, taken on behalf
of the defendant pursuant to the Massachusetts Rules of Civil
Procedure before Kathleen M. Benoit, CSR # 1368F94, Shorthand
Reporter and Notary Public in and for the Commonwealth of
Massachusetts at the offices of Goodwin Procter, Exchange
Place, Boston, Massachusetts, on Tuesday, March 1, 2005,
commencing at 10:36 a.m.


APPEARANCES:

NICHOLAS J. DiMAURO, ESQ., 111 South Bedford Street, Suite
208, Burlington, MA 01803, For the plaintiff, Robert Scalli

MARK E. BURKE, ESQ., 111 South Bedford Street, Suite 208,
Burlington, MA 01803, For the plaintiff, Eleanor Scalli

BRADFORD J. SMITH, ESQ., and ANNE GAETA, ESQ., Goodwin
Procter, Exchange Place, Boston, MA 02109-2881, For the
defendant

ALSO PRESENT:

JEFFREY SIEGEL, ESQ.

# Leavitt Reporting, Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

Hearings ◆ Conferences ◆ Legal Proceedings

1

<u>INDEX</u>

<u>WITNESS</u>                    <u>DIRECT CROSS REDIRECT RECROSS</u>

2

Robert Scalli

3     by Mr. Smith        3

4

<u>EXHIBITS</u>

<u>No.</u> <u>Description</u>                         <u>Page</u>

5

6     1  Letter 2/21/01 Citizens to Robert
         Scalli                                45

7     2  Letter 2/21/01 Tara Tribelli to
         Robert Scalli                         46

8

9     3  Letter 2/21/01 Tara Tribelli to
         Robert Scalli                         46

10    4  Citizens' Code of Ethics Signature
         Page                                  88

11

12    5  Letter 3/5/02 Barden Conn to
         Robert Scalli                         88

13    6  Joint Consolidated Complaint and
         Jury Demand                           97

14

15

16

17

18

19

20

21

22

23

1     Q.   You don't recall.  Were you a defendant in that

2  type of claim or were you a plaintiff?

3     A.   A plaintiff.

4     Q.   Did that claim settle or did it go to trial?

5     A.   I think it settled.

6     Q.   Any other cases that you've been a plaintiff or

7  defendant in?

8     A.   Not that I can remember.

9     Q.   Mr. Scalli, you were previously employed by

10  Citizens Financial Group and Citizens Mortgage Company, is

11  that right?

12     A.   Correct.

13     Q.   You were employed as a loan originator, is that

14  right?

15     A.   Yes.

16     Q.   How did you become aware of the availability of a

17  position of a loan originator at Citizens?

18     A.   At a Christmas party.

19     Q.   What Christmas party?

20     A.   Dorado Real Estate in East Boston, excuse me,

21  Tony's Real Estate in East Boston.

22     Q.   Tony's Real Estate, okay.  And how did you become

23  aware of the position?

1      A.   I was approached by a loan officer from Citizens

2   Bank.

3      Q.   Who was that loan officer?

4      A.   Steve -- let me think of his last name.  I can't

5   recall his last name.

6      Q.   Not Steve Adamo?

7      A.   No, no.  I don't remember his name.

8      Q.   What did Stephen tell you?

9      A.   Well, since we were originating loans in the same

10  offices, he said it would nice to get you over to Citizens.

11     Q.   Do you know what he meant when he said we were

12  originating loans in the same offices?

13     A.   We would all, when I say all, loan officers would

14  go into real estate offices to originate loans, and we

15  would always be crossing paths in different offices.

16     Q.   All right, so you knew him as a result casually, is

17  that right --

18     A.   Correct.

19     Q.   -- this individual Steve?

20     A.   He's a manager at Citizens; he's a manager.

21     Q.   Did Steve describe the position to you at that

22  time?

23     A.   Yes.

1     Q.  What did he say?

2     A.  That Citizens was a great place to work for, they

3  had great benefits, great work environment, great people

4  and that they were currently recruiting some of the top

5  loan originators in the area.

6     Q.  Where were you working at the time?

7     A.  Hancock Mortgage.

8     Q.  How long had you been there?

9     A.  About a year.

10    Q.  Now, was this a Christmas party prior to Christmas

11  '01 -- I'm sorry, Christmas 2000?

12    A.  It was Christmas of a few months before the hire

13  date.

14    Q.  Right, and you were hired in March of 2001, is that

15  right?

16    A.  Correct.

17    Q.  So it would have been Christmas 2000, sometime

18  around that season?

19    A.  Yes.

20    Q.  All right.  Did you follow up on that discussion

21  you had with Steve relative to that position at Citizens?

22    A.  He followed up.

23    Q.  He followed up.  How long after the party?

1    A.   He called back again and asked if he could bring

2  the managers over to my house.

3    Q.   To your house, okay.   Is that what happened?

4    A.   Yes.

5    Q.   Okay, great.   Do you remember who visited your

6  house?

7    A.   Yes.

8    Q.   Who was it?

9    A.   Steve, Mike Diranian and Bard Conn.

10    Q.   Anyone else?

11    A.   No.

12    Q.   Just the three of them?

13    A.   Just the three of them.

14    Q.   Was your wife Eleanor there for that meeting?

15    A.   Yes.

16    Q.   Was anyone else from, on your behalf there at that

17  meeting?

18    A.   No.

19    Q.   So it was just the five of you?

20    A.   Yes.

21    Q.   And you met in -- do you and Eleanor have an office

22  in your house?

23    A.   Yes.

1    else did Mr. Conn and Mike Diranian or Steve --

2         A.   Rousel.

3         Q.   Steve Rousel, you knew it would come to you, and

4    that's R O U S E L?

5         A.   I have no idea how to spell it.

6         Q.   What else did they say to you, if you can tell me,

7    at that meeting?

8         A.   They asked how I was being invited to so many real

9    estate offices that Armando couldn't get into.

10        Q.   What did you say?

11        A.   I said that I have a lot of relationships with a

12   lot of realtors because I'm not Latin and I speak a little

13   Spanish.

14        Q.   What else did they say during this meeting?

15        A.   Would you like to come to work for Citizens.

16        Q.   What did you say?

17        A.   Well, what does Citizens have to offer.

18        Q.   And what did they say?

19        A.   And Bard said that he'd like to cut right to the

20   chase, he doesn't want to lose market share, he wants to

21   hire the very best loan originators and our name came up as

22   far as last name, Scalli.

23        Q.   Did he offer you employment?

34

1    A.  He talked a lot about market share and that he

2  really was into market share.  He doesn't like to lose

3  market share.  He really wanted to get me over to Citizens

4  Bank.  He heard a lot of good things about me from Steve

5  Rousel.  He said that Steve sees you're always out there,

6  you're always out there working.  Since Armando's leaving

7  he was really worried that he has nobody to cover the area

8  that Armando was working in, and I saw Armando a few times

9  in passing prior to him leaving.

10    Q.  Did you know Armando?

11    A.  I didn't know him personally but I would know him

12  hi, how are you doing.  He was a handsome guy, nice, very

13  polite.

14    Q.  Did Bard Conn talk about the terms of employment,

15  the terms of your employment with Citizens at this meeting?

16    A.  Yes.

17    Q.  What did he say?

18    A.  He said that Citizens were pretty lucrative.  With

19  their pay structure it's a lot better than a mortgage

20  company.  That if you produce more loans you can make more

21  money.  That he has a lot of flexibility as far as what he

22  can offer loan officers because he can do it, that he was

23  the main man there.

1    Q.  Did he say anything else?

2    A.  You know, we talked about assistance, he told me

3    that he really wanted me to come to work for Citizens and

4    we talked about the health benefits.

5    Q.  What did you talk about assistance?

6    A.  That I needed to have an assistant.

7    Q.  You said you needed to have an assistant?

8    A.  Yes.

9    Q.  Did Bard Conn say anything about assistance?

10   A.  He said "Done."  And he also said "I want you to

11   come to work right away, I don't want to lose that market

12   share and I'll make it worth your while to do that."

13   Q.  Anything else you remember about this meeting?

14   A.  That we talked about how close Quincy was.  That's,

15   that's about all I can remember about that meeting.

16   Q.  Do you remember anything that your wife, Eleanor,

17   said --

18            MR. DiMAURO:  Objection.

19            MR. BURKE:  Objection.

20   A.  I don't.

21   Q.  -- during this meeting?

22   A.  I don't recall.

23   Q.  You don't recall her participating?

41

1  be given a $50,000 a year salary and that I would be

2  compensated next year with a forgivable draw.  He kind of

3  made it sound like you get your salary as a forgivable

4  draw.

5      Q.  Now, just so I'm clear, he talked to you about

6  receiving a $50,000 forgivable draw --

7      A.  For the first year.

8      Q.  -- for the first year?

9      A.  Correct.

10      Q.  In addition, he said that since the contracts are

11  year to year when the contract is renewed at the beginning

12  of the second year that he would give you another $50,000

13  draw?

14      A.  No, the draws and the commission pay were

15  different.

16      Q.  Understood.

17      A.  So it wasn't, he said that he wanted to give me

18  that first draw so I could walk away from any loans that I

19  was doing anywhere else and that he wanted to offer me the

20  salary to come to work for Citizens and --

21      Q.  When you say the salary, the $50,000 --

22      A.  Yes.

23      Q.  -- salary?

1    Q.  Okay, so is it possible you signed more than one

2  offer letter?

3    A.  I can't be sure.  There's lots of paperwork.

4    Q.  Okay, fair enough.

5        Let's look at Exhibit 2 then if you would.

6  Now, Exhibit 2 is a document that you produced to us that

7  includes a signature that you've acknowledged is yours, is

8  that correct?

9    A.  Yes.

10   Q.  Is that your social security number next to the

11  signature?

12   A.  Yes.

13   Q.  All right, if you would, on page 1 of this offer

14  letter that I've marked as Exhibit 2 and that's in front of

15  you, you see under Section 2, Plan Description, under II-A

16  that you're receiving a $15,000 advance paid biweekly at

17  $2500 for six pays which will not be charged against future

18  commissions.  Now, do you remember receiving an offer

19  letter that had just a $15,000 advance of this sort and not

20  any number greater than that?

21        (Document Perusal.)

22   A.  This is only one paper of a stack of other papers

23  that I've signed.

1      Q.  Okay.  Were there other documents that included

2   terms of compensation --

3      A.  Yes.

4      Q.  -- that you signed?

5      A.  Yes.

6      Q.  There were, okay.  Those haven't been produced to

7   me.  Do you know where they are?

8              MR. BURKE:  Objection.

9      A.  I don't know where they are.

10     Q.  You don't know where they are?

11     A.  I don't, no.

12     Q.  Tell me what you remember about the other documents

13  that included terms of compensation.

14     A.  I signed a lot of paperwork.  I don't want to

15  speculate.

16     Q.  But you told me that there were other documents in

17  addition to this offer letter that established terms of

18  compensation, and so I'm asking you to identify or describe

19  them as best you can?

20     A.  I said there was a package.

21     Q.  A package of materials related to your

22  compensation?

23     A.  A package from Citizens that included all of that.

1    Q.   Were there other documents that you remember that

2  described your terms of compensation?

3    A.   Yes.

4    Q.   Can you describe those documents for me?

5    A.   Yes, that I was getting a $50,000 salary.

6    Q.   So there was a document that you signed that

7  included a term that you would receive a $50,000 salary?

8    A.   I would have to review all these papers.  There was

9  a huge packet.

10    Q.   Do you have that packet?

11    A.   Everything I have I've produced.  Can I take

12  5 minutes and just, I have to eat something.

13              MR. BURKE:  You're sick?

14              THE WITNESS:  If I don't eat, I get really

15  lightheaded.  I have to eat.  At 12 o'clock I have to eat.

16              MR. SMITH:  That's fine.  Let's go off the

17  record.

18              (Discussion held off the record.)

19              (Lunch recess taken at 12 p.m.)

20

21

22

23

1      A.   No because I was getting a salary.

2      Q.   I'm sorry, you told me in addition to the salary?

3      A.   In addition to the salary.

4      Q.   That --

5      A.   Over 50 million.

6      Q.   Right, and I'm wondering during what period of time

7   was that $50 million in loans going to be measured?

8      A.   I don't know.

9      Q.   Well, you started employment in March, correct,

10  March of '01?

11     A.   I'm not sure of the exact date.

12     Q.   Right, but do you remember the month, do you

13  remember that it was in March 2001 when you first started?

14     A.   It could have been March.

15     Q.   Okay.  Now, did you have an understanding of --

16  strike that.

17              I want to, I have a follow-up question for

18  you on this thousand dollar forgivable draw for each

19  million you generated in excess of 50 million -- strike

20  that.

21              Take a look if you would at Exhibit 2 that's

22  in front of you, just Exhibit 2 please.  This is the

23  exhibit you told me included your signature.  Do you

1   your compensation?

2           MR. DiMAURO:  Objection.

3       A.  Mr. Conn.

4       Q.  Mr. Conn.  Let me rephrase the question.

5       A.  Thank you.

6       Q.  Either prior to your employment beginning or at the

7   beginning of your employment --

8           MR. DiMAURO:  Objection.

9           MR. SMITH:  What's wrong?

10          MR. DiMAURO:  I would ask if you would please

11  just ask him about prior first and then ask him about the

12  beginning.  They're two distinct things.  Mixing them

13  together is causing unbelievable confusion because prior he

14  is not an employee and then at the beginning he is an

15  employee.

16      Q.  Prior to your employment beginning, did you have

17  any discussions with Mr. Conn concerning other elements of

18  your compensation?

19      A.  No.

20      Q.  At the beginning of your employment, after your

21  employment started, did you have discussions with Mr. Conn

22  about other elements of your compensation?

23      A.  At the beginning?

1      Q.   Yes.

2      A.   Which time during the beginning?

3      Q.   Anytime during the first six months of your

4    employment.

5      A.   Yes.

6      Q.   Tell me about those discussions.

7      A.   A week or so after I was hired at Citizens Mr. Conn

8    called me up and asked to see me.

9      Q.   Did you meet with him?

10     A.   Yes.

11     Q.   Where?

12     A.   At my house.

13     Q.   Was anyone else there?

14     A.   No.

15     Q.   So Eleanor didn't attend this meeting?

16     A.   She was working.

17     Q.   What happened during the meeting?

18     A.   He told me that he wanted all of my production to

19   go under Eleanor's number because he was going to move

20   Eleanor under him and away from Mike Diranian.

21     Q.   What else did he say?

22     A.   That I would get my $50,000 salary if I sent all of

23   my loans under Eleanor which would then go directly to him.

1    Q.   Did Bard say anything in this conversation about

2  your $50,000 salary?

3    A.   I asked him.

4    Q.   What did he say?

5    A.   "I'll take care of it."

6    Q.   No, but did he tell you in this conversation that

7  you would get your $50,000 salary if you agreed to place

8  all of your production under Eleanor's name?

9    A.   He said that that's what he wanted and that I would

10  get my $50,000 every anniversary the first of the year.

11    Q.   Okay.  So it wasn't a salary?

12    A.   He described it as that.

13    Q.   But you understand a salary as a, don't you, as a

14  payment you receive every payroll period?

15    A.   Salaries could be paid weekly, monthly.  I don't

16  know how they're paid at Citizens but I did what Bard told

17  me to do.

18    Q.   I'm not asking you that.  I'm asking what he said

19  to you about this $50,000 salary.  Did he say it was a

20  salary that you would get, or was it a bonus at the end of

21  the year that you would receive?

22         MR. BURKE:  Objection.

23    A.   He said it was a salary.

1      Q.   He said it was a salary?

2      A.   That's how he described it.

3      Q.   Did he say anything about when you would receive

4   it?

5      A.   I kept asking him when I'd receive it.

6      Q.   When did you ask him?

7      A.   The whole year, "Bard, when am I going to get my

8   money?  When am I going to get my money?"  "I'll take care

9   of it; I'll take care of it."

10     Q.   When you asked him that, did you expect that you

11  were supposed to get a $50,000 check?

12     A.   Well, I expected because he could make a phone call

13  and produce $15,000 when he said he could do something, he

14  said he ran it, that he could make the compensations what

15  he wanted to make the compensations.  He could make the

16  basis points what he wanted to make the compensations, and

17  I kept asking him, "Hey, when am I going to get my money?"

18  And he said "I'll take care of it; I'll take care of it."

19     Q.   Did you talk to anybody else in the bank besides

20  Bard?

21     A.   Just Bard.  He ran the whole department.  All the

22  managers reported to Bard.  No one was beyond Bard.

23     Q.   What about Human Resources, did you ever talk to

1  anyone at Human Resources?

2      A.  No.

3      Q.  Ever talk to anyone in benefits?

4      A.  No.

5      Q.  Why not?

6      A.  I talked to Bard.  I've never worked for a large

7  company like Citizens ever.

8      Q.  Weren't you in the Army?

9      A.  Yes.  A whole different structure.  You don't break

10  the chain of command.

11      Q.  Other than your employment at Hancock, who else

12  have you worked for?

13      A.  Myself.

14      Q.  As a real estate developer?

15      A.  No, I worked --

16              MR. BURKE:  Objection.

17              MR. DiMAURO:  You can answer if you

18  understand the question.

19              MR. SMITH:  Just a second.  Are we getting

20  objections from both attorneys?

21              MR. BURKE:  I'm objecting on behalf of my

22  client here.

23              MR. SMITH:  You can't object on behalf of

1  A. No.

2  Q. After you were suspended from employment but before

3 you received notice that you had been terminated, did you

4 talk to anyone at Citizens?

5      MR. DiMAURO:  Objection.

6  A. Which time are you referring to?

7  Q. Well, there's only one time you were suspended from

8 employment, correct?  Do you remember when you were

9 suspended in February of 2003?

10  A. Yes.

11  Q. Okay.  During the period of time approximately two

12 weeks while you were on suspension but before you got

13 notice that your employment had been terminated, did you

14 talk to anyone from Citizens?

15  A. Joyce Hicks.

16  Q. Did you call Joyce?

17  A. Yes.

18  Q. What happened during that phone call?

19  A. She asked me a question during my suspension

20 hearing and I called her up to give her the response.

21  Q. What question did she ask you?

22  A. If I owned a certain building.

23  Q. What building?

14

1      A.   Yes.

2      Q.   Did you have a territory as a loan originator?

3      A.   At Renaissance.

4      Q.   You could sell wherever you wanted to?

5      A.   At Renaissance, yes.

6      Q.   Did you work in conjunction with any other loan

7    originators or were you on your own?

8      A.   On my own.

9      Q.   Are you aware did anyone from Citizens interfere in

10   any way with your employment at Renaissance?

11     A.   What do you mean by that?

12     Q.   Well, are you aware of whether anyone from Citizens

13   contacted anyone at Renaissance while you were there?

14     A.   The only thing that happened was somebody from

15   Citizens Bank called, I believe it was GMAC to ask them if

16   I worked at GMAC.  That's the only time somebody tried to

17   interfere into my employment.

18     Q.   Did you ever work at GMAC?

19     A.   No.

20     Q.   Why do you say that that was an attempt to

21   interfere with your employment?

22     A.   They were asking questions about me to GMAC when I

23   didn't work there.

15

1    Q.  And you think that they, or I'm sorry, you say that
2   they asked if you worked there?

3    A.  Correct.  Yeah, they identified themselves as
4   someone from Citizens.

5    Q.  And that they were asking of whether or not you
6   were employed at GMAC?

7    A.  Yes.

8    Q.  Now, did that interfere in any way with your
9   employment at Renaissance?

10    A.  Renaissance, Nation One or, at which time?

11    Q.  Well, at any time during your employment with
12   Renaissance.

13    A.  Well, when people ask questions about you and try
14   to find out where you're working, what you're doing, I feel
15   that's an invasion.

16    Q.  Is there anything else that anyone from Citizens
17   did to interfere with your employment?

18    A.  I know people were talking to brokers, to other
19   real estate brokers telling them that I was getting in
20   trouble, people from Citizens.

21    Q.  Who from Citizens?

22    A.  Someone from the East Boston branch.

23    Q.  Now, I thought you told me that no one spoke

1  negatively about you after your employment?

2           MR. DiMAURO:  Objection.

3      A.  What was the question?

4      Q.  I thought earlier in the deposition you told me

5  that no one from Citizens spoke negatively about you

6  following the termination of your employment?

7           MR. DiMAURO:  Objection.

8      A.  I said I couldn't remember.

9      Q.  You couldn't remember?

10     A.  At that time.  Well, as we're having this

11 conversation, I'm starting to remember what's happening.

12     Q.  Okay, why don't you tell me what you remember.

13     A.  That rumor mill, let's call it the rumor mill was

14 happening; that people were saying that I was getting in

15 trouble.

16     Q.  Who, what people?

17     A.  I don't remember this person's name but I know this

18 woman had a boyfriend and they worked together down at

19 Citizens.

20     Q.  So it's a woman?

21     A.  It's a woman and a guy.  It's a boyfriend and

22 girlfriend that worked at a branch together.

23     Q.  Which branch?

1    A.   The one where Armando was in East Boston.

2    Q.   Okay.  And what's your testimony about what they

3  said?

4    A.   My testimony about what they said is that I was

5  getting indicted for some type of bank fraud.

6    Q.   You remember that now?

7    A.   Now that we're talking about it I do.

8    Q.   Did you look at any documents during the recent

9  break?

10   A.   None.

11   Q.   How did you find out about this supposed statement?

12   A.   The realtors like to gossip, all the realtors do,

13  the realtors like to gossip, and I remember one of the

14  realtors, her name is Peggy, said something that somebody

15  said something that I was being indicted for bank fraud,

16  and I screamed, I said "That is not true."

17   Q.   Just so I'm clear, how many realtors were part of

18  this conversation that you're describing?

19   A.   The conversation I had was with one realtor.

20   Q.   Peggy?

21   A.   Yes.

22   Q.   And Peggy told you that she had heard that you were

23  being indicted?

1    A.    Actually, Peggy didn't say it, her boyfriend Ed
2    said it and then I went to Peggy and Peggy told me, that's
3    how it went.  And Ed installs carpets for me in some of my
4    buildings.  So one of the realtor's boyfriends initially
5    approached me with it, and then I went to her with it and
6    said "What are you talking about?"  And then she told me
7    that she heard through this woman that I was getting
8    indicted for bank fraud.
9    Q.    And when you say through this woman, this is the
10   woman in the East Boston Citizens branch?
11   A.    Correct.
12   Q.    So that Peggy told you that the woman from the East
13   Boston branch had told her that?
14   A.    Yes.
15   Q.    And you told Peggy that's not true?
16   A.    Absolutely.
17   Q.    Did you say anything else to Peggy?
18   A.    Yeah, Ed better get finished on 197's carpets.  I
19   was pretty upset that he actually took a deposit from me
20   and didn't finish installing carpets on a basement floor.
21   Q.    197?
22   A.    Bunker Hill Street.
23   Q.    Anything else between you and Peggy discussed?

019

1     A.   How upset I was.  I mean I was upset the fact that

2   she was saying I was being indicted for bank fraud when I

3   was suspended and that I was terminated and now I'm being

4   indicted.

5     Q.   No, no, I'm sorry.

6     A.   I mean that's what I said to Peggy.  I said,

7   "Peggy, it's not indictments.  What's happening is there's

8   an investigation; something's going on, I don't know, but

9   I'm not being indicted," and when one realtor talks, they

10  all talk, and now that affects me getting mortgages from

11  these people, from the realtors who I rely on to make my

12  livelihood with.

13    Q.   Were there other realtors that you're aware were

14  talking about this other than Peggy?

15    A.   There was one from Revere but I can't remember her

16  name.  I can't remember her name off the top of my head.

17    Q.   What did she say?

18    A.   The same thing, that she heard a rumor that I was

19  being indicted for bank fraud.

20    Q.   She said the same thing to you?

21    A.   Yes.

22    Q.   Did she tell you how she learned about that?

23    A.   She just said she heard it.

1    Q.  She didn't tell you where?

2    A.  No.

3    Q.  What did you say in response?

4    A.  That's bull shit.

5    Q.  Anyone else, any other realtors or just those two?

6    A.  Well, after that happened my phone stopped ringing.

7    Q.  I'm sorry, the question is any other realtors other

8  than --

9    A.  That approached me at that time, no.

10    Q.  At any other time that approached you?

11    A.  Not that I can remember right now.

12    Q.  Did anyone ever tell you that you were going to be

13  denied certain business because of that rumor?

14    A.  My phone stopped ringing.  I make my livelihood

15  with realtors sending me business, and then when someone

16  starts telling me, not just one but a second person tells

17  me that I'm being indicted on bank fraud and someone from

18  Citizens Bank in East Boston told her that, then that

19  affects my livelihood.

20    Q.  Did anyone ever tell you that they were denying you

21  business because of that rumor?

22    A.  No one ever said that.

23    Q.  Other than your phone stopping ringing as you've

1  described it, is there anything else that makes you believe

2  that you lost business because of that rumor?

3      A.  Yeah, a lot of clients, yeah, a lot of clients

4  would go into Citizens Bank looking either for myself or

5  for Eleanor or someone, and they would say no, they don't

6  work here any more but I'm filling in for them, I can do

7  the business for you.  And these were deals that I had

8  originated outside of the bank; the leads did not come from

9  the bank.  This is me going out into the communities

10 knocking on doors and getting business, and these same

11 people couldn't find me after this, and this is how, the

12 only way they could get me would be to go to a local bank

13 and ask for me.

14     Q.  And do you think Citizens should have given them

15 your current whereabouts and your home number?

16     A.  I don't, I don't know what their policy is on that.

17 I don't know what their policy is on that.

18     Q.  On the day that you were suspended, were you called

19 to a meeting?

20     A.  Yes.

21     Q.  Who called you?

22     A.  Bard Conn.

23     Q.  And where was the meeting?

1          MR. DiMAURO:  Objection.

2      A.  Because she asked if it was my building.

3      Q.  Just so the record's clear, I'm not sure, did you

4  tell Joyce Hicks whether or not Mr. Barbosa was purchasing

5  the building from Eleanor?

6      A.  I don't understand what you mean by that.

7      Q.  You said you called Joyce Hicks during your

8  suspension period?

9      A.  I called Joyce Hicks.

10     Q.  You also told me that during the suspension

11 period --

12     A.  The day after the suspension.  I was suspended and

13 I called her back the very next morning.

14     Q.  At the time you called her back, did you know that

15 Eleanor was selling Mr. Barbosa the Maverick Street

16 property?

17     A.  I knew that it wasn't my building and that Eleanor

18 was selling her, selling Mr. Barbosa that building.

19     Q.  And you knew that.  Did you tell Joyce Hicks that?

20     A.  She didn't ask that.

21     Q.  I didn't ask you that.

22     A.  No, I didn't.

23     Q.  Did you tell her that?

1     A.  No.

2     Q.  Why not?

3     A.  I don't want to say no definitely.  We had a

4 conversation which was like a minute or two, and she was

5 kind of in a hurry to get me off the phone.  Basically she

6 just told me that, I just gave her the information that I

7 gave her and I told her that Joyce this is what it is, I'm

8 going to call Bard after I hang up with you, and that's

9 what happened.

10    Q.  So you don't remember telling her --

11    A.  I don't.

12    Q.  -- that Eleanor was selling Mr. Barbosa the

13 Maverick Street property?

14    A.  At that time I don't remember.

15    Q.  Had you ever issued a loan denial in your capacity

16 as a loan originator?

17    A.  I never have.

18    Q.  You never have.  During your employment at

19 Citizens, were you authorized to issue loan approvals or

20 loan denials?

21    A.  Everything went through, went on to Eleanor's

22 pipeline, so she was really in control of the pipeline

23 because it was under her --

```
 1   I'm not aware.
 2       Q.  At the suspension meeting, did you tell Joyce Hicks
 3   about Bard's full authority over your ads?
 4       A.  Yeah, I said Bard authorized everything.
 5       Q.  What did she say?
 6       A.  I'll speak to him about that.
 7       Q.  Did Bard say anything?
 8       A.  He was very silent.
 9       Q.  Anything else happen at the suspension meeting?
10       A.  Like what?
11       Q.  Well, you've told me about the conversations
12   concerning Barbosa, the loan denial and property ownership,
13   and then you also told me about the advertisement issues.
14   I'm wondering if you told me everything that happened in
15   the suspension meeting?
16       A.  Not that I can recall.
17       Q.  So you can't recall anything else that occurred?
18       A.  No.
19       Q.  Who told you that you were being suspended?
20       A.  Joyce Hicks.
21       Q.  What did she say?
22       A.  You're being suspended.
23       Q.  Did you say anything in response?
```

1     A.   I said "Can I go into my branches and do my loans?"

2     Q.   And what did she say?

3     A.   No.

4     Q.   Did you say anything else?

5     A.   "Call me if you need any information."

6     Q.   When you said can I go into my branches and do my

7  loans, what did you mean?

8     A.   Well, I had Charlestown and Winthrop were the

9  branches I went into every day.

10    Q.   And those are Citizens --

11    A.   Branches.

12    Q.   -- branches?

13    A.   Correct.

14    Q.   And you went into those buildings and did what?

15    A.   Produced loans, sat with people, sat with Odette

16  who was the bank manager, Odette, and worked in the bank.

17    Q.   And she said no, you were suspended?

18    A.   She said no, you are suspended.

19    Q.   During the period approximately two weeks when you

20  were suspended, did Ms. Hicks try to call you?

21    A.   Every time she'd call me I'd respond back to her.

22    Q.   How many times did she call you?

23    A.   If she'd leave a message on my voice mail, I would

1    call her back.

2         Q.   Now, she sent you a termination letter at the

3    beginning of March, correct?

4         A.   It could have been.

5         Q.   And do you remember in that termination letter her

6    saying that you had failed to cooperate with the bank's

7    investigation?

8         A.   Yes.

9         Q.   Did you know what she meant?

10        A.   No.

11        Q.   Did you return all of her phone calls?

12        A.   If she called me, I called Joyce Hicks back.

13        Q.   Did she ask to meet with you?

14        A.   She did on one occasion on a Friday.

15        Q.   Did you meet with her?

16        A.   I told her I couldn't but I can meet with her on

17   Monday, and she said she wanted to see me at a certain

18   time, and I said, "Joyce, I'm leaving early today, I

19   can't."

20        Q.   Was that the only time that she asked to meet with

21   you?

22        A.   Well, during my reserve meeting, but every time she

23   wanted to meet me I was available for her.

# VOLUME II

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*
ELEANOR SCALLI,                         \*
ROBERT SCALLI,                          \*
               Plaintiffs       \*    CIVIL ACTION
                                        \*    NO. 03-CV-12413DPW
               VS               \*
                                        \*
CITIZENS FINANCIAL GROUP,       \*
INC.,                                   \*
               Defendant        \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


              DEPOSITION OF ROBERT SCALLI, taken on behalf
of the defendant pursuant to the Massachusetts Rules of Civil
Procedure before Kathleen M. Benoit, CSR # 1368F94, Shorthand
Reporter and Notary Public in and for the Commonwealth of
Massachusetts at the offices of Goodwin Procter, Exchange
Place, Boston, Massachusetts, on Wednesday, April 13, 2005,
commencing at 10:36 a.m.


APPEARANCES:

NICHOLAS J. DiMAURO, ESQ., 111 South Bedford Street, Suite
208, Burlington, MA 01803, For the plaintiff, Robert Scalli

MARK E. BURKE, ESQ., 111 South Bedford Street, Suite 208,
Burlington, MA 01803, For the plaintiff, Eleanor Scalli

BRADFORD J. SMITH, ESQ., and ANNE GAETA, ESQ., Goodwin
Procter, Exchange Place, Boston, MA 02109-2881, For the
defendant

ALSO PRESENT:

Jeffrey Siegel, Esq.
Eleanor Scalli

## Leavitt Reporting, Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

Hearings ◆ Conferences ◆ Legal Proceedings

1
                          INDEX
  WITNESS              DIRECT CROSS REDIRECT RECROSS
2
  Robert Scalli
3    by Mr. Smith          3

4
                         EXHIBITS
  No.  Description                        Page
5
  7    Plaintiff Robert Scalli's Supplemental
6       Answer to Interrogatory No. 5        5

7    8  Gift Letter                         26

8    9  Copy of Check No. 103 for $4,000     27

9    10 Copy of Check for $4,000             33

10   11 2003 Personalized Enrollment
        Worksheet                           60
11
     12 Note, Bard to Eleanor/Bob with
12      others                              99

13

14

15

16

17

18

19

20

21

22

23

34

1      MR. SMITH:  Let's go off the record.

2      (Discussion held off the record.)

3      Q.  I've showed you what's been marked as Exhibit 10.

4   It's a Citizens Bank official check in the amount of $4,000

5   that's paid to Andres Castillo.  I'm going to suggest,

6   Mr. Scalli, that the check from your and Eleanor's joint

7   checking account that's marked as Exhibit 9 was cashed for

8   $4,000 and used to obtain the official bank check payable

9   to Andres Castillo for $4,000 on January 13, 2003.  Now,

10   with those two documents in front of you, Exhibit 9 and

11   Exhibit 10, do you have any recollection regarding who

12   Andres Castillo is?

13      MR. DiMAURO:  Objection.

14      A.  Seeing the spelling, how it goes like this, I

15   recall someone named Andres.  I had, I had a person named

16   Andres work for me before.

17      Q.  All right, what type of work did Andres do for you?

18      A.  Well, there are two Andres.  There was Andres, the

19   painter, and there was Andres, the clean-out guy.

20      Q.  Do you remember paying either Andres, the painter,

21   or Andres, the clean-out guy, any money?

22      A.  I wouldn't have paid them.

23      Q.  You wouldn't have paid them?

1 A. No.

2 Q. Who would have?

3 A. My property manager.

4 Q. Who was your property manager?

5 A. At the time, which time?

6 Q. In January of 2003.

7 A. It could either be Doug Rinaldi or Mike Da' Volio.

8 Q. Do you remember the last name of Andres, the

9 painter, or Andres, the clean-out guy?

10 A. Just Andres and, Andres, the painter, I called

11 Andres Picasso, and Andres, the clean-out guy, was just

12 Andres, the clean-out guy.

13 Q. You said you recognized something about the

14 spelling.  Was it the spelling of Castillo that you

15 recognized?

16 A. Cast, it was just something I remembered.

17 Q. I'm sorry?

18 A. Just something I remember, Castillo, C A S T,

19 Andres Cast.  A lot of times when people came to work in

20 the buildings a lot of the foreigners had pretty hard names

21 to pronounce, so we kind of gave everybody a nickname,

22 Andres, this one, because everybody kind of had the same

23 name.

1    Q.   Do you remember an Andres Cast?

2    A.   That name sounds familiar.

3    Q.   Was he the painter or the clean-out guy?

4    A.   I think he could have been the clean-out guy.

5    Q.   Did you or to your knowledge did your wife ever ask

6    your property manager to pay individuals who worked for

7    you?

8    A.   The way that we did it I trust my property

9    managers, the Lord's been really good to me, so for the

10   week whoever was finishing I would just sign checks, Arnold

11   would just sign checks, so we would have checks available

12   for when they finished.

13   Q.   Would those checks be made out to the workers or

14   would they be made out to cash?

15   A.   I don't know how they did it.  I just signed my

16   name to the checks.

17   Q.   Did you put the amounts in?

18   A.   No.

19   Q.   You just have blank signed checks?

20   A.   It was always usually 20 or $30 more either way,

21   you know, $50 more, I had to do this, this and this.  And

22   then they'd have to come get me at work and say hey, this

23   guy wants $50 more, and it would create a whole nightmare,

1   so I would just sign the check, Arnold would just sign the

2   checks, and whoever was finishing up that week would get a

3   check.

4       Q.   Are you aware whether or not your property managers

5   ever used those blank checks and entered cash and had other

6   checks created as a result of them?

7       A.   I don't know.

8       Q.   Where is Andres Cast now if you know?

9       A.   I don't know.

10      Q.   When's the last time you had seen him?

11      A.   A long time ago.

12      Q.   How long?

13      A.   Cast, the Trash, that's how I remember that.   I

14   can't recall.   A while ago.

15      Q.   Cast, the Trash?

16      A.   Yeah.

17      Q.   That's how you know his name?

18      A.   Yeah, and Andres is Picasso because he painted slow

19   and he wanted a barrel of money, so that was how, I kind of

20   kept everybody in -- because normally they spoke to you

21   when you're doing properties over.   Most of the contractors

22   came in and did their work and would leave.

23      Q.   Do you remember that Andres, the Trash, or Andres

1   the Cast, as you call him, that he was related to an

2   individual who bought a property that you or your wife

3   provided financing for?

4       A.   I didn't hire these guys, so I don't know.   My

5   property manager would hire them.   I don't know what they,

6   who they were doing with or what they were doing.

7       Q.   But you obviously knew Andres Cast, you had met him

8   at one point?

9               MR. BURKE:   Objection.

10      A.   I don't recall meeting him.   I remember the name,

11  the first four letters of his name.

12      Q.   Do you recall what he looks like?

13      A.   No.   I just heard the name.   I never face-to-face

14  met this person.

15      Q.   I'm going to suggest to you, Mr. Scalli, that the

16  Andres Castillo that is the recipient of the $4,000

17  official check that's marked as Exhibit 10 in front of you

18  is the same Andres Castillo who was providing the gift in

19  accordance with the gift letter that's marked as Exhibit 7.

20      A.   I wouldn't know that.

21      Q.   Do you remember that Andres Castillo, the clean-up

22  guy, for you, that he was connected to someone who, for

23  whom you or your wife provided financing, a loan

1  origination?

2      A.  They didn't work for me; they worked in buildings

3  that I own.  They work for my property manager, and I pay

4  my property manager to pay them.  So I mean most of these

5  guys I've never met.  I would just hear their names if they

6  screwed up or did a good job.  So he must have done a good

7  job.

8              MR. SMITH:  Let's go off the record.

9              (Discussion held off the record.)

10     Q.  Back on the record.  Mr. Scalli, did you issue Form

11  1099's or Form W-2's to the employees that worked in your

12  buildings like the painters and clean-up guys?

13     A.  I'd have to talk to the property manager about

14  that.

15     Q.  Well, do you know did you have a payroll to pay

16  your employees?

17     A.  We had accounts, and they weren't employees; they

18  were independent contractors.

19     Q.  They were independent contractors?

20     A.  Yes.

21     Q.  What were Mike Da' Volio and Doug Rinaldi, were

22  they independent contractors?

23     A.  They had their own property management company,

1  correct.

2      Q.  Did you 1099 them; in other words, did you issue

3  Mr. Da' Volio or Mr. Rinaldi a Form 1099 when you paid

4  them?

5      A.  I'm almost positive but my accountant could tell

6  you that.

7      Q.  But you're almost positive that you --

8      A.  Yes.

9      Q.  Do you know, I think you said that you treated the

10  painters and clean-up guys and other individuals who

11  performed that type of labor as independent contractors as

12  well, is that correct?

13      A.  They said that's their company, they would all say

14  this is my company, this is what I do, so.

15      Q.  So you treated them as independent contractors?

16      A.  Well, they had their own business, yes.

17      Q.  I just want to be clear.  You treated them as

18  independent contractors?

19      A.  They had, yes, they had their own business.

20      Q.  Do you know did you issue Form 1099's to those

21  individuals?

22      A.  I didn't issue anything.  My accountant would have

23  done that.

41

1    Q.  But is it your understanding that a Form 1099 was

2  issued to those independent contractors who performed that

3  work?

4    A.  I would have to ask my accountant.

5    Q.  Who is your accountant?

6    A.  His name is Jeff Barenson.

7    Q.  Last name?

8    A.  Barenson, B E R S O N, Barenson.

9    Q.  B A R E N S O N?

10    A.  B A R E N S O N.

11    Q.  And was he your accountant during 2003?

12    A.  Yes.

13    Q.  And 2002?

14    A.  Oh, yeah.

15    Q.  Where is his office located?

16    A.  I can get you that information.

17    Q.  Well, I'd like to get it now.  If you can tell me

18  what town he's located in?

19    A.  I don't know.  It's a phone number so I don't know.

20    Q.  Do you know his phone number?

21    A.  No, I'd have to get that.  I don't know his phone

22  number.  It's back at my office.

23    Q.  Have you ever been to his office?

1      A.  No.

2      Q.  Is he a solo practitioner or does he have other

3  people he works with?

4      A.  I don't know.  I don't know what he does.

5      Q.  Do you know the name of his firm?

6      A.  No, just Jeff Barenson, CPA.

7      Q.  Okay.  Do you use Jeff Barenson right now for your

8  accounting services?

9      A.  Mm-hmm, yes.

10     Q.  Mr. Scalli, after your employment with Citizens

11  terminated in March of 2003, you accepted employment with

12  Hancock Mortgage, correct?

13     A.  Mm-hmm, yes.

14     Q.  And are you still working at Hancock?

15     A.  Yes.

16     Q.  Now, in the complaint that was filed, there's an

17  allegation that Citizens interfered with your relations

18  with your new employer, and by that do you mean Hancock

19  Mortgage?

20     A.  Can you repeat the question?

21     Q.  Sure.  In your complaint it's alleged that Citizens

22  improperly interfered with your contractual relations with

23  your new employer.  My question is do you mean your new

1     Q.   I'm going to suggest to you that your wife,

2  Eleanor, indicated yesterday that she thought the number

3  was $65 million during calendar year 2002.  So is it

4  possible that that is the number you're --

5     A.   It's possible.

6     Q.   All right.  What portion of that volume alone

7  during 2002 did you originate?

8     A.   I was doing all the marketing, so I would say my

9  origination at the banks would be more than 10 percent,

10  less than 20 percent.

11    Q.   Now, to originate those loans, you would be in

12  contact with the borrowers, the individuals?

13    A.   I'd be in the bank.

14    Q.   You'd be in the bank.  What bank?

15    A.   Charlestown, the Charlestown branch and the

16  Winthrop branch.  I was assigned to the Charlestown branch.

17    Q.   Did you have an office there?

18    A.   I had a desk.

19    Q.   You had a desk.  Now, did you also meet with

20  potential borrowers outside the bank?

21    A.   If they couldn't make it to the bank, I would

22  arrange to meet with them.

23    Q.   Did you ever meet them at their homes?

1    A.   If they wanted me to.

2    Q.   Did they occasionally want you to?

3    A.   Sometimes.

4    Q.   Did you meet them at coffee shops or restaurants?

5    A.   Anyplace that somebody would want to meet.

6    Q.   Did you also spend time at realtor's offices trying

7  to originate potential loans?

8    A.   Yes.

9    Q.   How many realtor offices would you say?

10    A.   A lot.

11    Q.   Can you give me a listing of the ones you spent

12  time in?

13    A.   I couldn't give you a listing, and the time would

14  be spent that if a realtor wanted to meet with you you'd go

15  and meet with them.  So it wouldn't be an office; it would

16  be a realtor in an office.

17    Q.   Occasionally were you asked to meet with realtors

18  so you could introduce yourself or perhaps introduce a new

19  loan package to see if you could originate loans in a

20  particular program?

21    A.   Occasionally.

22    Q.   You would initiate those meetings?

23    A.   Correct.

69

1    Q.  But you dealt with a large number of different

2  realtors?

3    A.  Well, I mean, you know, I didn't really do that

4  much of it because most of my time was spent on the

5  marketing side of it.  Bard made it really clear that he

6  wanted me out doing all of the marketing and what he called

7  driving business, and I would mostly make the arrangements

8  with Bard.  If we were doing a Latin festival, he would say

9  okay, make sure Eleanor goes to this Latin festival and

10  tell me what you need, and I'd say I need a sign, I need to

11  get on stage, I need some handouts, I need balloons, and he

12  would provide all that for me.

13    Q.  What other type of marketing functions did you do?

14    A.  If we wanted to advertise in a newspaper, I would

15  sit with Bard and Bard would tell me, you know, the

16  verbiage, what he would say.  And he would call it CRA

17  incentive, and he said that it would not have to go through

18  some part of the bank with CRA incentive, and I said, okay,

19  but am I doing it right, and he said yeah, as long as we

20  put the little, at the end of the advertisement, you know,

21  Citizens Bank is an equal lending opportunity.  There's a

22  whole bunch of verbiage at the very end, and I would make

23  sure that that was always there.

1    Q.   All right.  I'm trying to understand the different

2    functions you played doing your marketing.  Now, you said

3    that you would get signs or stage or handouts or balloons

4    for festivals?

5    A.   One of the functions.

6    Q.   And you also would work to get the proper verbiage

7    in in a newspaper advertisement?

8    A.   If Bard wanted to advertise in that newspaper.

9    Q.   What other things did you do in terms of this

10   marketing?

11   A.   I would go around and drop off Citizens pamphlets

12   to most of the real estate offices in Chelsea, East Boston,

13   Revere, Lynn, Charlestown, Winthrop, places like that.

14   Q.   Okay.  Now, what did these pamphlets address?

15   A.   What would happen is Bard would be over the house,

16   well, office, quite frequently, he'd bring over like any

17   marketing stuff that was needed to give to the brokers, so

18   he would always stop by and say okay, I have this pamphlet,

19   this pamphlet, this pamphlet, and he would give pamphlets

20   and say is this enough, yeah, this is good.

21   Q.   And would the pamphlets describe different loan

22   programs at Citizens?

23   A.   Mm-hmm, yes.

1    Q.   Would the pamphlets be targeted at a potential

2    borrower or would they be something for the brokers to

3    read?

4    A.   Both.

5    Q.   Now, would you set up or ask the brokers to

6    distribute them to potential borrowers that they were

7    working with?

8    A.   We would just leave them in their offices, give

9    them updates on different programs, arrange for Bard to

10   take them out, to take the realtors out.

11   Q.   Did you ever go out with the realtors?

12   A.   Yes.

13   Q.   How much of your day did you spend doing these

14   marketing materials that you just described for me?

15   A.   It would be day and night.  I mean we don't, you

16   just keep moving, you keep working.  If you ask me to break

17   it down daily, I can't give you any specific number.  More

18   than 8, less than 24.

19   Q.   Well, how much less than 24?

20   A.   When I wasn't sleeping.

21   Q.   Well, did you have children?

22   A.   I do.

23   Q.   Do you spend any time with them?

1    A.   I do, I spend some time with them, but they're in

2    after-school programs, and, you know, between six and eight

3    they would be home eating and then they would go to bed and

4    then 8 o'clock I would be right back on the phones again.

5    Q.   Who did you talk to?

6    A.   Realtors.   Realtors would mostly call.

7    Q.   Were the realtors' offices open?

8    A.   The way they work is, you know, they don't work in

9    an office; they work on call.   So if someone needs to call

10   them, they call them and say, listen, can you sell me a

11   house at 10 o'clock at night, I'm sure they were there for

12   it.

13   Q.   Which realtors would you call?

14   A.   At nighttime?

15   Q.   Yes.

16   A.   Rosemary Galindo, Peggy Pratt, Marisol Aldana, Luis

17   Gonsales.

18   Q.   You need to slow down so the court reporter can get

19   all those names.   Who else?

20   A.   They would call on the cell phone.   So we have

21   Louis Gonsales, Rodrigo Angulo, Peggy Pratt, Rosemary

22   Galindo.

23   Q.   You said her.

1    A.   Yes, Julio Galindo.   Did I say Marisol Aldana?

2    Q.   Would you repeat that last name?

3    A.   Marisol Aldana, A L D A N A.   And a few other ones

4  I can't remember.

5    Q.   Now, when you talked to the realtors, were you

6  talking to them about individual loans or purchasers that

7  they were dealing with, or were you talking with them just

8  about these marketing issues?

9    A.   They would call up and ask about marketing stuff.

10  The realtors would call up and talk about marketing.

11    Q.   Like festivals?

12    A.   Festivals, different events that were coming in,

13  developing home buyer programs, developing seminars that

14  they wanted to develop with Citizens Bank to do seminars,

15  as far as first time buyer seminars and what could Citizens

16  Bank do to assist them with that, and I would get on the

17  phone the next day and I would call Bard and say Bard, for

18  this week we have this coming up, this coming up and this

19  coming up.

20    Q.   Did you develop seminars that Citizens offered for

21  new home buyers?

22    A.   No, I would refer it to Bard and Bard would set all

23  that up.

1    Q.  So did you have any information for them concerning

2  different seminars, or would you just refer it to Bard?

3    A.  I would refer it to Bard, and if they were doing a

4  first time home buyer like through NOAH, like Louis

5  Gonsales was doing a festival and he needed $5,000, and I

6  said you'd have to speak to Bard on that, and Bard said

7  "Have him call me and I'll get him the money," and Louis

8  Gonsales did call Bard and Bard got him the $5,000.

9    Q.  Did you develop any first time home buying programs

10  for Citizens?

11    A.  No, that's not what I do.

12    Q.  Have you ever taken part in presenting a first time

13  home buyer seminar or program?

14    A.  No, I don't do that.

15    Q.  But you got calls on those, is that correct?

16    A.  Correct.

17    Q.  And would you give information about that?

18    A.  I would refer it to Bard.

19    Q.  So you wouldn't give any information about it?

20    A.  Not really.

21    Q.  You would just refer it to Bard?

22    A.  Yeah, get all the information that was needed, when

23  a festival was going to be, and I would refer it to Bard.

1    Q.  And the same thing goes, you said festivals, but

2  the same thing goes with the first time home buying program

3  too?

4    A.  Yeah, because with the first time home buyers when

5  they had a seminar, like someone like NOAH, which is in

6  East Boston, in order to attend as Citizens Bank it costs

7  the bank $5,000 to go into there and the only one who could

8  authorize that was Bard.  So there would be a room full of

9  20 people and Bard would say, okay, you're going to be here

10  at this.  I'd say Bard, they're having this, and he'd call

11  me back saying, okay, you're going to be here, you're going

12  to be here doing this, passing this out, doing this.

13    Q.  Now, other than these programs that you've

14  described, the first time home buying program, the

15  seminars, the festivals, and you referred all those to

16  Bard, correct?

17    A.  Correct.

18    Q.  What other things did you talk about with the

19  realtors at night when they'd call you on the phone?

20    A.  Loan programs.

21    Q.  Would you answer questions about particular loan

22  programs?

23    A.  I don't recall.

1    people needed me.

2        Q.   I'm trying to get an estimate.  So that 4 to

3    6 hours a day would include meetings outside the branch; it

4    just included branch work, is that correct?

5        A.   No, I worked more than 6 to 8 hours a day.

6        Q.   I understand but what I'm trying to understand is

7    that you said you did 4 to 6 hours of branch work and that

8    included --

9        A.   Between two branches.

10       Q.   That's right, between two branches, and that

11   included not only the time you spent in the branches but

12   also the time you spent perhaps meeting a client at their

13   work, is that correct?

14       A.   Correct.

15       Q.   Or meeting them someplace else outside the branch?

16       A.   Correct, and that could be more than 5 on each end.

17   It could be 10 hours for the whole day.  It would just be

18   depending on how much, you know, I could get the meeting

19   with them or them get the meeting with me.

20       Q.   Did you ever keep track of what you did on a

21   day-to-day basis in terms of the number of hours you worked

22   or where you worked?

23       A.   On a yellow, a yellow legal pad.

1      Q.   Do you still have that information?

2      A.   I don't.

3      Q.   What did you usually mark down on that yellow legal

4   pad?

5      A.   Appointments, phone calls.

6      Q.   Who was the branch manager in Charlestown?

7      A.   I forget.

8      Q.   Odette was the branch manager in Winthrop?

9      A.   Correct.

10     Q.   The loans that you originated, you yourself, did

11  you track them on anything?

12     A.   On the computer.

13     Q.   Whose computer?

14     A.   My computer.

15     Q.   Your laptop?

16     A.   I think so.

17     Q.   The laptop you were issued by Citizens?

18     A.   Correct.

19     Q.   Did you track them anywhere else?

20     A.   No.

21     Q.   How did you track them?

22     A.   I did what Bard told me to do.  Whenever I get a

23  loan, put it into Eleanor's pipeline, so they were in her

1     A.   Everybody did.

2     Q.   But among others, you too?

3     A.   I had a lot of jobs, correct.

4     Q.   How much time a day did you spend running around

5  collecting commissions?

6     A.   With that much volume and Eleanor being No. 1 at

7  the bank, our office was the premier office.  We produced

8  more than most branches did.

9     Q.   If Eleanor was No. 1 at the bank, what number were

10 you?

11     A.   I wasn't even recognized at the bank.  I looked for

12 my listings and they didn't even have me on the pipeline

13 reports.

14     Q.   But that's because all of the loans you originated

15 were given credit to Eleanor, correct?

16     A.   Bard did that.  I didn't do that.

17     Q.   The fact is that all of the loans you originated

18 ended up in Eleanor's listing, correct?

19     A.   I didn't have the power to do that; Bard did that.

20     Q.   But the fact is they ended up being listed under

21 Eleanor's name, correct?

22     A.   If that's what Bard did, I'm sure that's correct.

23     Q.   Do you know, is that what Bard did?

1    A.   I don't know what Bard did.

2    Q.   So you don't know if the loans that you originated

3  were credited to Eleanor; you don't know that?

4    A.   The loans that I did went into Eleanor's pipeline.

5    Q.   Do you know that?

6    A.   I do know that.

7    Q.   How do you know that?

8    A.   I would see the names.

9    Q.   Where would you see the names?

10    A.   Just in the files in the office.

11    Q.   The files in the office would record that they were

12  on Eleanor's list?

13    A.   All the files in the office, as Bard said, were to

14  go into Eleanor's pipeline.  The loans that I originated

15  and the applications that I took, I would pass them off to

16  the assistants and the assistants would take it from there.

17    Q.   And it's your understanding that the assistants

18  would log them onto Eleanor's pipeline?

19    A.   I don't know what the assistants would do.

20    Q.   You don't know what they did?

21    A.   I didn't control the assistants.

22    Q.   But you gave them direction, you said you trained

23  them on a number of things including getting conditions,

1    A.  Yes.

2    Q.  Do you remember receiving this note?

3    A.  I don't remember receiving the note, no.

4    Q.  I'm going to represent that this note and the

5 letter was produced by your counsel to us so that we got it

6 from you recently.

7    A.  Mm-hmm.

8    Q.  But you don't remember reading that note?

9    A.  Well, the note is put to my wife and myself.

10    Q.  I understand.  Do you remember --

11    A.  Yes.

12    Q.  But you don't remember getting this note from Bard?

13    A.  I don't remember when I got it, no.

14    Q.  You don't remember when you got it?

15    A.  Correct.

16    Q.  But you do remember getting a note of that sort

17 from Bard?

18    A.  Yes.

19    Q.  You do, all right.  What did you do when you got

20 this note, do you remember?

21    A.  I did what he told me to do.

22    Q.  What did you do?

23    A.  Signed it and sent it back.