

EXHIBIT

```
                                  PAGES:    1 - 122
                                  VOLUME:       I
                                  EXHIBITS: 1 - 23
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                  CIVIL ACTION
                                  NO.:  03-CV-12413DPW
```

- - - - - - - - - - - - - - - - - - - - x

ELEANOR SCALLI and
ROBERT SCALLI,

       Plaintiffs

vs.

CITIZENS FINANCIAL GROUP, INC.,

       Defendant

- - - - - - - - - - - - - - - - - - - - x

       Deposition of JOYCE ANN HICKS, a witness called on behalf of the Plaintiffs, taken pursuant to notice before Jeanne M. Bramanti, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Office of Mark E. Burke, 111 South Bedford Street, Burlington, Massachusetts, on Tuesday, December 7, 2004, commencing at 11:20 a.m.

\*\*\*\*\*

BRAMANTI & LYONS COURT REPORTING, INC.
REGISTERED PROFESSIONAL REPORTERS
92 STATE STREET, 8TH FLOOR, BOSTON, MA 02109
TEL: 617.723.7321 / FAX: 617.723.7322
www.bramanti-lyons.com

```
 1        APPEARANCES:

 2        Mark E. Burke, Esq. and
          Nicholas DiMauro, Esq.
 3        Law Office of Mark E. Burke
          111 South Bedford Street
 4        Burlington, Massachusetts 01803
          Attorney for the Plaintiffs
 5
          Bradford J. Smith, Esq.
 6        Goodwin Procter LLP
          Exchange Place
 7        Boston, Massachusetts 02109
          Attorney for the Defendant
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

I N D E X

Deposition of:                                           Page

Joyce Ann Hicks

   Examination by Mr. Burke                               5
   Examination by Mr. DiMauro                            80


- - - - - -

E X H I B I T S

No.                                                      Page


1   Notice of Taking Deposition, 4 pages                 5

2   Defendant's Answers to Interrogatories,
    10 pages                                             5

3   Hire Information
    Bates Nos. C00001 - C00026                           5

4   Hire Information
    Bates Nos. C00027 - C00054                           5

5   E. Scalli Performance Evaluation
    Bates Nos. C00055 - C00207                           5

6   Employee Handbook & Procedure Manual
    Bates Nos. C00208 - C01770                           5

7   Organizational Charts
    Bates Nos. C01771 - C01778                           5

8   Loan Originator Job Description
    Bates Nos. C01779 - C01780                           5

9   E. Scalli's Discharge Documents
    Bates Nos. C02328 - C02333                           5

10  R. Scalli's Discharge Documents
    Bates Nos. C02362, C02312, 13, 10,
    11 and C02314 - C02327                               5

| | Exhibits Continued: | Page |
|---|---|---|
| 11 | E. Scalli's Compensation Documents<br>Bates Nos. C01781 - C02203 | 5 |
| 12 | R. Scalli's Compensation Documents<br>Bates Nos. C02204 - C02256 | 5 |
| 13 | E. & R. Scalli's Incentive Programs<br>Bates Nos. C02257 - C02275 | 5 |
| 14 | E. & R. Scalli's Electronic Data<br>Bates Nos. C02276 - C02309 | 5 |
| 15 | Castillo Transaction<br>Bates Nos. C02334 - C02361 | 5 |
| 16 | Commission Reports | 5 |
| 17 | Documents Re. Barbosa Transaction<br>Bates Nos. C02368 - C02372 | 5 |
| 18 | Documents Re. Advertising<br>Bates Nos. C02373 - C02380 | 5 |
| 19 | R. Scalli's Compensation<br>Bates Nos. C02381 - C02386 | 5 |
| 20 | Memo from E. Walsh dated<br>2/4/03 | 43 |
| 21 | Memo from E. Walsh dated<br>2/3/03 | 43 |
| 22 | Memo from Louise Riascos dated<br>1/17/03 | 43 |
| 23 | Policy 5.0 Bates No. C00359 | 58 |

1  A.   Approximately. I'm not positive about that date.
2  Q.   But the e-mail from Mr. Conn would --
3  A.   It would be from that point forward. I just don't know
4       the date on that e-mail off the top of my head.
5  Q.   And as it relates to the telephone conversation with
6       Sharon Costa, did that occur before the in-person
7       meeting or after, if you know?
8  A.   I honestly don't remember at this point.
9  Q.   What was the substance of that call, that telephone
10      call with Sharon Costa?
11 A.   I asked her to, you know, review the procedure for
12      denying loans, what the process would be in all of our
13      mortgage centers and where that information was written
14      as well as how loan offices are aware of that.
15 Q.   And what did she say?
16 A.   Well, she went over the process which is that the
17      underwriters are the only ones authorized as well as
18      the center operations manager to deny a loan. Under no
19      circumstances are loan officers to approve or deny a
20      loan, and that the form that goes to the customer would
21      be generated from the operations center in Quincy. And
22      then she did give me a copy of the actual policy that
23      states that as well.
24 Q.   And are you familiar with any of the documents that

1  Q.  Is he in the same physical space as you were?
2  A.  He was then; he is not any longer.
3  Q.  And then you spoke to him after you had reviewed
4      information with Sharon Costa, correct?
5  A.  Yes.
6  Q.  And what did he do or say in response to that?
7  A.  My recollection is that he obviously felt that if she
8      had, you know, had done -- based on the documents that
9      we were looking at and after we spoke with her what she
10     had done, the denial, that that obviously was very
11     serious and it was a conflict with her position here,
12     and that she should be terminated.
13 Q.  When you say that it was a conflict with her position,
14     what do you mean?
15 A.  The reason that loan officers are not allowed to
16     approve or deny loans is because they are paid
17     commission on those loans, and we keep that totally
18     separate from their function so that there isn't a
19     conflict in that someone might be approving a loan
20     because they're financially going to benefit from it.
21 Q.  What evidence did you have when you performed this
22     investigation that Eleanor Scalli had approved or
23     denied a loan?
24 A.  There was a denial document in the customer's file that

1  A.  Well, it depends on the type of loan, but for the loans
2      that have to go through full underwriting the
3      underwriter would review the loan documents and
4      underwrite it and make a decision either that it's been
5      approved, denied, or would put some conditions on the
6      approval of the loan with conditions.  They may be
7      requesting additional documentation to support maybe
8      income.  There could be a lot of reasons for the
9      conditions depending upon the type of loan.  Once they
10     complete that they would make a decision and a letter
11     would go out to the customer saying they were approved
12     or denied from the operation center.
13 Q.  And there were conditions as it relates to this loan,
14     correct?
15 A.  Correct.
16 Q.  Did you determine whether any of these conditions had
17     been met prior to termination of Eleanor Scalli?
18 A.  No.
19 Q.  Now, he further indicates here that he has a copy of
20     the approval and the decline signed by Eleanor, and so
21     he was offering that to you, correct?
22 A.  Yes.
23 Q.  And did he forward that to you --
24 A.  Yes.

      everything else. So it's there for a lot of reasons, and that's the policy in place that they have to adhere to, and it's not unique to Citizens. It's standard in the mortgage industry. So this is something that she would have been exposed to any other player in the mortgage industry.

Q. Were you aware that she worked with other lenders, is that what you're implying?

A. No. I'm not implying anything. I'm just -- obviously she worked for other lenders. You know, we knew that when we hired her. That's why she was good at what she did in terms of her sales. But what I'm saying is that loan officers not making credit decisions is standard in the industry. It's not a unique Citizens' policy, that's all I'm saying.

Q. But you're not testifying about what her knowledge was, right? You don't know what her knowledge was of this particular provision, correct?

A. I don't know what her knowledge is. All I know is that she should have been aware of this. It was on her laptop. She was responsible for knowing the policy.

Q. It was on her laptop. How do you know that? Did you review her laptop?

A. All originators have the policy manual. It's sent to

| | | |
|---|---|---|
| 1 | | that the loan was denied, but your referencing Eleanor? |
| 2 | A. | Eleanor. |
| 3 | Q. | Not Robert? |
| 4 | A. | Right.  We asked him if he was aware of it, and he said |
| 5 | | that he wasn't. |
| 6 | Q. | So there's no issue regarding Robert with respect to |
| 7 | | denial? |
| 8 | A. | Other than? |
| 9 | Q. | Sending out any inappropriate denial letters is my |
| 10 | | question? |
| 11 | A. | Not sending it out, no. |
| 12 | Q. | And if I can ask you because I know that you said that |
| 13 | | you don't rely on hearsay.  How is it that you came to |
| 14 | | gather information regarding Robert's ownership in any |
| 15 | | property? |
| 16 | A. | The -- as far as the Maverick address? |
| 17 | Q. | Any property.  Maverick or any other property. |
| 18 | A. | Well, the other property, that he brought up himself. |
| 19 | | He said that he owned a lot of property when we met |
| 20 | | with him, but the Maverick property was a situation |
| 21 | | where that had been brought to our attention, and that |
| 22 | | was the reason that Eleanor had denied the loan, and we |
| 23 | | were asking him point blank if that were the situation. |
| 24 | | We weren't taking it from another party as assuming it |

1      was true. We wanted to hear what he had to say about
2      it and some explanation on his part.
3   Q. Now, I know that you took these notes and you were very
4      careful in taking them, but it seems that in the first
5      sentence regarding 208 Maverick Street we have Robert,
6      according to your notes, stating that there is a P & S
7      or that -- I'm sorry. That Barbosa was buying a
8      property from him at a specific address, 208 Maverick
9      Street, but more interesting is the next sentence which
10     contradicts the first one wherein he states that he
11     doesn't, does not know what property -- he doesn't know
12     if a P & S, I'm using his words, but that he would have
13     to go back and check because he owned many property.
14     So if I understand what he said, and did you understand
15     it as this --
16  A. I know. I remember what he said, yeah. We asked him
17     about the address, and then I asked him specifically is
18     there a P & S that's been signed, and that's when he
19     said he didn't know because he owned a lot of property
20     and he would have to check.
21  Q. So he didn't know?
22  A. He knew that he was buying from him. He didn't know if
23     it had gone to the point where there was a P & S.
24  Q. Well, he also didn't know, would you agree, your notes

|    |    |                                                                   |
|----|----|-------------------------------------------------------------------|
| 1  |    | on -- you took the note that he didn't know what                  |
| 2  |    | property because he owned many properties?                        |
| 3  | A. | No.  That's not how it reads.                                     |
| 4  | Q. | You don't agree with that?                                        |
| 5  | A. | No.                                                               |
| 6  | Q. | Okay.  Did anyone ever speak to Mr. Barbosa relative to           |
| 7  |    | whether or not there was a P & S?                                 |
| 8  | A. | I didn't.  I don't know if anybody else did or not.               |
| 9  | Q. | And I think that you said in earlier testimony that the           |
| 10 |    | bank never checked as to whether Robert Scalli owned              |
| 11 |    | this property?                                                    |
| 12 | A. | We didn't check because he admitted that he owned it              |
| 13 |    | when we met with him.  We didn't need to check.                   |
| 14 | Q. | Your notes say that he admitted it?                               |
| 15 | A. | Yes.                                                              |
| 16 | Q. | And if I understood how you testified earlier with                |
| 17 |    | respect to losing a deposit, I guess, I suggest is that           |
| 18 |    | Mr. Barbosa, and you can tell me if you agree with this           |
| 19 |    | or not, Mr. Barbosa would have to be either in                    |
| 20 |    | collusion or conspiracy with Miss Eleanor Scalli in               |
| 21 |    | order to prompt her to extract, I guess, a denial                 |
| 22 |    | letter?                                                           |
| 23 | A. | I don't know if I say collusion is the word.  I mean, I           |
| 24 |    | think that it's -- you know, that could be the case,              |

| | | |
|---|---|---|
| 1 | | twelve months of his employment? Were you ever made |
| 2 | | aware of that? |
| 3 | A. | I was later on in the process. It was at the Scallis' |
| 4 | | request to funnel the loans under the one name because |
| 5 | | the way the commission structure works is the basis |
| 6 | | points go up with volume, so if all loans fell under |
| 7 | | one person they would receive higher commissions by |
| 8 | | doing that. Plus there were also certain tax reasons, |
| 9 | | some reasons why they wanted it set up that way. |
| 10 | Q. | So there is some document wherein the Scallis had |
| 11 | | requested that? |
| 12 | A. | There is not a document, no. They requested it of |
| 13 | | their manager, but had they not wanted that it was |
| 14 | | never, no one ever called me and said why am I not |
| 15 | | getting any money after all this time which I think |
| 16 | | they would have done. |
| 17 | Q. | That's exactly my point. You weren't involved in that |
| 18 | | situation wherein they communicated with you -- |
| 19 | A. | No. |
| 20 | Q. | -- regarding their willingness to put it under one |
| 21 | | person's name or -- |
| 22 | A. | No. |
| 23 | Q. | When did you -- when did you first come to learn that? |
| 24 | A. | I think it was at the end of the year because it became |

DEPOSITION OF JOYCE ANN HICKS

|   |   |   |
|---|---|---|
| 1 |    | an issue with his benefits, and he went in the |
| 2 |    | negative, so they rejected from payroll because there |
| 3 |    | wasn't enough money to cover his benefit deductions at |
| 4 |    | that point which is when we had to set up a small draw |
| 5 |    | for him. |
| 6 | Q. | And do you remember approximately when that was |
| 7 |    | datewise? |
| 8 | A. | I would say it was probably in January because it would |
| 9 |    | have been with the new year when the benefits increased |
| 10 |   | this dollar amount, so probably towards the end of |
| 11 |   | January I would think. |
| 12 | Q. | And would it be common under those circumstances |
| 13 |    | wherein there was such a dramatic change, I feel as |
| 14 |    | it's dramatic because certainly I may be |
| 15 |    | characterizing, but based on the original agreement of |
| 16 |    | his employment wouldn't human resources be made aware |
| 17 |    | of this change with respect to what does the change |
| 18 |    | involve?  Citizens Bank certainly has a criteria for |
| 19 |    | loan officers, it's stated very plainly, and now there |
| 20 |    | is some side agreement that's under Eleanor's name or |
| 21 |    | whatever it may be, is that something that would be |
| 22 |    | brought to the attention of human resources so that it |
| 23 |    | could be documented properly? |
| 24 | A. | It should have been, yes.  But what, in terms of the |

118

```
 1        whether -- I don't know what Bard's involvement was
 2        directly on that.
 3   Q.   But I thought your earlier testimony was that he
 4        approved this new relationship, that he alone approved
 5        it without your knowledge.
 6   A.   I did not know about it.  I would assume as a manager
 7        that he might have, but I'm assuming that.  I don't --
 8        I did not find out about it until the end when we were
 9        looking at all the commission statements and saw that
10        there was no income for Bob.  So it was late on in the
11        process.  It wasn't a situation where Bard said to me
12        I've approved this agreement with the Scallis or this
13        is what they're doing.
14   Q.   Okay.  But certainly he would have been aware of it as
15        their manager?
16   A.   Yeah, I would assume because he reviews the commission
17        statement each month, yes.
18   Q.   So I guess that if he, upon having knowledge of the
19        structure if he disapproved he would have obviously
20        stopped it?
21   A.   Yes.
22   Q.   Or brought it to your attention as he did with the
23        e-mail regarding this matter?
24   A.   Right.
```

196

to have over a million dollars to do that, which it looks like she probably did.

Q. What figures are you referring to?

A. The actual loan amount.

Q. So do we know the total on the loan amount?

A. Actually, it looks like it is totaled here, five million.

Q. So approximately six million, what would 65 basis points be of approximately $6 million?

A. Let's see, 6,500 on a million.

      MS. GAETA: You need a calculator.

A. Somewhere around $15,000 I think. I don't have a calculator.

Q. You said 6,500 on a million?

A. Right.

Q. So that would be if it was 6 million, six times 6,500?

A. Correct.

Q. So 6 times 6 would be 36?

A. Yes.

Q. So it would be about $40 thousand?

A. Roughly. That depends -- that's assuming there's other loans where she was paid on this month they would be factored in.

Eleanor Scalli – Pipeline

| Ln # | Borrower | Reg Date | Product | Status | Street | City | State | Loan Amt | Lock Dt | Exp Dt | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2142081 | SILVA,RICARDO | 10/29/01 | 3300 | 1 | 220A FOUNTAIN S | FRAMINGHAM | MA | 189,050 | 1/27/03 | 2/25/03 | 6.375 |
| 2246104 | BEZERRA,ISAIAS | 12/6/02 | 3300 | 2 | 21 ELM STREET 6 | MALDEN | MA | 180,800 | 1/31/03 | 2/13/03 | 5.25 |
| 2246108 | MEJIA,FREDDY | 12/5/02 | 7518 | 2 | 81 SAGAMORE ST | LYNN | MA | 422,750 | 1/31/03 | 2/13/03 | 5.25 |
| 2142361 | FITZPATRICK,JOH | 12/24/02 | 3320 | 2 | 29 TAFTS AVENUE | WINTHROP | MA | 263,000 | 12/31/02 | 2/24/03 | 8.125 |
| 2142366 | BEATON,DINA | 12/31/02 | 8399 | 2 | 103- 105 SECOND | ANDOVER | MA | 96,000 | 1/7/03 | 2/21/03 | 8.7 |
| 2142367 | NETO,DJALMA | 1/9/03 | 2930 | 2 | 280 LEXINGTON S | EAST BOSTON | MA | 250,000 | | | 6 |
| 2246133 | BUSTAMIANTE,ALEX | 1/13/03 | 7518 | 2 | 231 SARATOGA ST | EAST BOSTON | MA | 427,500 | 1/31/03 | 2/28/03 | 6.875 |
| 2142395 | MARTINEZ,ELIAS | 1/28/03 | 7518 | 2 | 121 TRENTON STR | EAST BOSTON | MA | 399,000 | | | 5.25 |
| 2142391 | FAJARDO,HUGO | 1/30/03 | 7518 | 2 | 118 THORNTON | REVERE | MA | 448,400 | | | 6 |
| 2246086 | ALVARADO,ABRAHA | 12/12/02 | 7518 | 3 | 9-11 FITZ TERRA | CHELSEA | MA | 436,500 | 1/31/03 | 2/13/03 | 6.25 |
| 2246120 | GUZMAN,EDWIN | 12/20/02 | 3300 | 3 | 64 HOOD STREET | LYNN | MA | 242,650 | 1/16/03 | 1/29/03 | 5.25 |
| 2246125 | VILLATORO,ROBER | 12/27/02 | 2800 | 3 | 140- 142 PETTEY | PROVIDENCE | RI | 159,200 | 1/6/03 | 2/3/03 | 6.125 |
| 2246126 | VILLATORO,ROBER | 12/27/02 | 2899 | 3 | 140- 142 PETTEY | PROVIDENCE | RI | 19,900 | 1/31/03 | 2/28/03 | 7.875 |
| 2246123 | CARIA,VICTOR | 1/10/03 | 2800 | 3 | 71-73 PRESCOTT | CHELSEA | MA | 397,600 | 1/24/03 | 2/7/03 | 12.5 |
| 2246124 | CARIA,VICTOR | 1/10/03 | 2899 | 3 | 71-73 PRESCOTT | CHELSEA | MA | 74,550 | 1/24/03 | 2/7/03 | 8.875 |
| 2142377 | SKELLEY,DANIELL | 1/22/03 | 1391 | 3 | 8 WOODWARD RD | MERRIMACK | NH | 288,800 | 1/27/03 | 2/19/03 | 13 |
| 2142383 | SBAI,TARIK | 1/22/03 | 1300 | 3 | 48 WASHINGTON A | CHELSEA | MA | 87,000 | 1/27/03 | 2/19/03 | 6.5 |
| 2142389 | NASCIMIENTO,SIL | 1/24/03 | 2800 | 3 | 72 GROVER STREE | EVERETT | MA | 224,000 | 1/24/03 | 2/18/03 | 6 |
| 2142390 | NASCIMIENTO,SIL | 1/24/03 | 2899 | 3 | 72 GROVER STREE | EVERETT | MA | 42,000 | | | 8.5 |
| 2142385 | CLIFFORD,MARK | 1/28/03 | 2531 | 3 | 14 DEACON DRIVE | MIDDLETON | MA | 247,800 | 1/29/03 | 3/17/03 | 12.5 |
| 2142398 | TEJADA,OSCAR | 1/30/03 | 2800 | 3 | 56 HENRY AVENUE | LYNN | MA | 342,400 | | | 4.375 |
| 2142399 | TEJADA,OSCAR | 1/30/03 | 2899 | 3 | 56 HENRY AVE | LYNN | MA | 64,200 | | | 9.25 |
| 2142400 | DIGIOVANNI,MARK | 2/3/03 | 1300 | 3 | 150 ORLEANS ST | EAST BOSTON | MA | 138,200 | 2/3/03 | 3/17/03 | 13 |
| 2142349 | DASILVA,ANA | 12/11/02 | 1300 | 4 | 411 B RESERVOIR | REVERE | MA | 150,000 | 1/27/03 | 2/25/03 | 5.875 |
| | | | | | | | | 5,591,300 | | | 5.875 |

Closed 2/10
2142356 DIVENUTI    2899    5        MA    24800    2/7/03    2/14/03    8

C 01781


EXHIBIT