

# EXHIBIT

```
                                  PAGES:     1 - 114
                                  VOLUME:    I
                                  EXHIBITS:  1 - 2
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                          CIVIL ACTION
                          NO.:  03-CV-12413DPW
```

- - - - - - - - - - - - - - - - - - - x

ELEANOR SCALLI and
ROBERT SCALLI,

      Plaintiffs

vs.

CITIZENS FINANCIAL GROUP, INC.,

      Defendant

- - - - - - - - - - - - - - - - - - - x

      Deposition of BARDEN KENNET CONN, a witness
called on behalf of the Plaintiffs, taken pursuant to
notice before Jeanne M. Bramanti, Registered
Professional Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Law Office of
Mark E. Burke, 111 South Bedford Street, Burlington,
Massachusetts, on Tuesday, December 7, 2004,
commencing at 11:20 a.m.

***** 

BRAMANTI & LYONS COURT REPORTING, INC.
REGISTERED PROFESSIONAL REPORTERS
92 STATE STREET, 8TH FLOOR, BOSTON, MA 02109
TEL:  617.723.7321 / FAX:  617.723.7322
www.bramanti-lyons.com

1      APPEARANCES:

2      Mark E. Burke, Esq. and
       Nicholas DiMauro, Esq.
3      Law Office of Mark E. Burke
       111 South Bedford Street
4      Burlington, Massachusetts 01803
       Attorney for the Plaintiffs

5

       Anne M. Gaeta, Esq.
6      Goodwin Procter LLP
       Exchange Place
7      Boston, Massachusetts 02109
       Attorney for the Defendant

8

       Present:  Eleanor Scalli
9               Robert Scalli

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DEPOSITION OF BARDEN KENNET CONN

1                                I N D E X

2

3       Deposition of:                                      Page

4       Barden Kennet Conn

5          Examination by Mr. Burke                          4
           Examination by Mr. DiMauro                       97
6

7                             - - - - - -

8

9
                             E X H I B I T S
10

11      No.                                                 Page

12      1    Memo to Mike  Diranian from Elizabeth           42
             Walsh dated 2/4/03 (1 page)
13
        2    Position Description (9 pages)                 102
14

15

16

17

18

19

20

21

22

23

24

1　A.　I met with the Scallis at their house my recollection

2　　　is twice with both of them at their kitchen table,

3　　　dining room table.

4　Q.　And on each of those occasions were both present?

5　A.　Yes, I believe so.

6　Q.　Aside from meeting them at their home on those two

7　　　occasions were there communications back and forth

8　　　between yourself and Robert Scalli prior to his

9　　　acceptance of the employment?

10　A.　I'm sure there were.

11　Q.　What would the nature of those conversations be, sir?

12　A.　My best guess would be that it was negotiating money.

13　Q.　And tell me a little bit to the best of your

14　　　recollection what those negotiations involved.

15　A.　Type line buyout, transition money, assistants as far

16　　　as their current assistants that they had.

17　Q.　Now, do I understand that the documentation for their

18　　　acceptance, and when I say their, Eleanor and Robert

19　　　Scalli, was predicated upon an offer for the position

20　　　of loan officer?

21　A.　Correct.

22　Q.　And were the compensation package for Eleanor and

23　　　Robert different in any way that you were aware of?

24　A.　My recollection is that they were identical.

1   Q.   And when you say they were identical, can you explain

2        to me how Eleanor was paid?

3   A.   I believe she received a $15,000 guarantee for the

4        first three months and that her contract contained

5        wording incorporating the use of an assistant.

6   Q.   And how was Robert compensated?

7   A.   It's my understanding or recollection that he also

8        received and his contract contained the use of an

9        assistant.

10   Q.   And did Robert, if you know, did Robert generate

11       commissions in the same manner based on the origination

12       of loans as Eleanor?

13   A.   My recollection is that Bob never wrote any loans.

14   Q.   And why was that?

15   A.   My recollection is that they wanted all the volume to

16       go into Eleanor's name so that Eleanor would be the top

17       loan officer in the company as opposed to splitting the

18       volume up.

19   Q.   And when you say they wanted, who is they, sir?

20   A.   Bob and Eleanor.

21   Q.   Was this ever communicated to human resources?

22   A.   Was what ever communicated to human resources?

23   Q.   Precisely what you just testified to that volume was

24       being placed, as you put it, solely under Eleanor

1           Scalli?

2      A.   Yes, I believe it was.

3      Q.   By whom?

4      A.   By me.

5      Q.   When was that, sir?

6      A.   Oh, I don't remember.

7      Q.   Well --

8      A.   It would have been sometime around the time of their

9           hire.

10     Q.   And at that time would you have presented a position

11          description, position description to Joyce Hicks?

12     A.   No.

13     Q.   You mentioned earlier that you, you were involved in

14          many trainings, am I correct?

15     A.   Yes.

16     Q.   What training did you have with respect to human

17          resources?

18     A.   My training with human resources was pretty limited.

19     Q.   Did you ever receive a packet wherein there was

20          specific and very delineated structures for changing

21          someone's job description within Citizens Bank?

22     A.   There was a set procedure for changing someone's job

23          description, pay, comp.  I forget the name of the form.

24     Q.   And so you were familiar with that form or forms --

1    A.    Yes.

2    Q.    -- might be more accurate?

3    A.    Yes.

4    Q.    Were those forms created anew for Robert Scalli and

5          produced to Joyce Hicks --

6                MS. GAETA:  Objection.

7    Q.    (By Mr. DiMauro)  -- at the outset of the change to his

8          compensation package?

9    A.    I don't know.

10   Q.    Well, a minute ago you said that there were certain

11         procedures that you were aware of.

12   A.    Right.

13   Q.    One of those procedures where the documents would be

14         executed by you?

15   A.    Correct.

16   Q.    Forwarded to human resources?

17   A.    I didn't say I executed the documents.

18   Q.    Listen to the question, sir.  That's not what I said.

19                A minute ago you said there was a procedure

20         wherein you as a manager would execute certain

21         documents for an employee if there was a change in job

22         descriptions under the guidelines presented by

23         Citizens' bank that would then be presented to human

24         resources.  Would that be accurate?

1   A.   No.  What I said was there was a form for doing that.

2        I would traditionally call that into human resources

3        the same that I would call in contractual information

4        to them, this is what I want to do.  They would prepare

5        the offer letter or the change form letter, whatever

6        they were doing, but someone in human resources would

7        do that for me.

8   Q.   Would it surprise you, sir, that that description that

9        you're explaining at this time is not within the rules

10       presented in the package?

11              MS. GAETA:  Objection.  Which rules?

12              MR. DiMAURO:  He can answer it.

13  A.   It wouldn't surprise me.

14  Q.   So I'm going to -- let's have this marked.  I'll let

15       you look at it first.

16              (Exhibit No. 2 marked.)

17  Q.   (By Mr. DiMauro)  I'm going to give you what's marked

18       as Exhibit 2, Mr. Bard, and just take a moment and

19       review that.

20              Have you had an opportunity, sir, to review

21       that?

22  A.   Yes.

23  Q.   Do you know whether or not Joyce Hicks was presented

24       with something required by the standards set forth in

1          what you just reviewed with respect to Robert Scalli

2          when his job was changed for compensation purposes?

3      A.    No.

4      Q.    Would it surprise you to learn that human resources,

5          i.e., Joyce Hicks, took the position that a job at

6          Citizens Bank could not be changed without the

7          presentment of such a document?

8      A.    That wouldn't surprise me.

9      Q.    So under what authority would this change take place as

10          it relates to Robert Scalli?

11              MS. GAETA:  Objection, just to clarify which

12          change.

13              MR. DiMAURO:  The change that we're discussing

14          right now is the change wherein loans originated by

15          Robert Scalli would be then placed under Eleanor

16          Scalli's number.

17      A.    Can you ask that question again?

18      Q.    Sure.  If human resources stated that a job change that

19          would in effect completely, completely change the

20          compensation package for an individual employee would

21          require this type of filing, the filing that you just

22          reviewed, if that were the case under what authority

23          did you have to change Mr. Scalli's compensation

24          package without filing that document?

1    A.    None.

2    Q.    So how was his, how was his compensation package, i.e.,

3          job description changed?

4    A.    It wasn't.

5    Q.    Okay.  A moment ago you testified that he was

6          compensated by way of sending loans that he originated

7          to Eleanor Scalli, correct?

8    A.    (No response.)

9    Q.    Was that the essence of your testimony?

10   A.    No.

11   Q.    Okay.  Tell me how he was compensated.

12   A.    They came in as a team, a husband and wife team.  Bob

13         Scalli did the marketing; Eleanor Scalli took the loan

14         applications.  We hired them as a husband and wife unit

15         team origination.  What you called either one within

16         the relationship I guess was irrelevant to us.

17              They came in as a team.  They asked that it be

18         structured that way.  They had the control about how

19         loans would go, so they were Eleanor's loans.  If she

20         chose to put them all in her pipeline or put them all

21         in Bob's pipeline, that was up to them.

22   Q.    Let me see if I understand your testimony, sir.  You're

23         saying that Eleanor Scalli and Bob Scalli had the

24         ability and authority to make jobs up at will?

1              MS. GAETA:  Objection.

2    A.    No.

3    Q.    I just indicated a moment ago that Joyce Hicks

4          testified that the job that Robert Scalli was hired for

5          was loan officer.  You indicated in your earlier

6          testimony that you agreed with that, correct?

7    A.    Correct.

8    Q.    Are you aware of any job presently offered at Citizens

9          Bank wherein a loan officer originates loans but places

10         them for compensation purposes under the number of a

11         different employee?

12   A.    No, I'm not aware of that.

13   Q.    So I'll ask that question again, sir.  How is it that

14         within the structure of Citizens Bank did Robert Scalli

15         get placed into a position that for the most part never

16         existed?

17             MS. GAETA:  Objection.

18   Q.    (By Mr. DiMauro)  You can answer the question if you

19         understand it.

20   A.    I don't understand the question.

21   Q.    Mr. Scalli had a job that did not exist at Citizens

22         Bank for the purpose of the title loan officer; is that

23         correct, sir?

24   A.    That's correct.

1    Q.    Who had the authority to make that change in the

2          position of loan officer?

3    A.    Nobody.

4    Q.    And so, therefore, how did that, how did that change

5          occur?

6    A.    I don't know.

7    Q.    Well, sir, were you the manager for Mr. Scalli?

8    A.    Yes, I was.

9    Q.    Are you aware of the positions that people hold below

10         you?

11   A.    Yes, I am.

12   Q.    And are you aware of the descriptions that are entailed

13         therein?

14   A.    Yes, I am.

15   Q.    So I'm asking you, sir, what job description did you

16         submit to Joyce Hicks indicating how Mr. Robert Scalli

17         would be compensated, sir?

18   A.    Loan officer.

19   Q.    And is there a position at Citizens Bank wherein

20         someone is originating loans but placing them under

21         someone else's social security number and/or tax ID?

22   A.    Not that I'm aware of.

23   Q.    You said, sir, that you attended undergraduate school

24         at Boston University, correct?

1   A.   I don't remember.

2   Q.   However, would you agree that if there were papers

3        filed they would more likely than not go to Joyce

4        Hicks?

5   A.   That's correct.

6   Q.   So if Joyce Hicks testified that she never received any

7        such paperwork from you would you have any reason to

8        doubt her work?

9   A.   No.

10          MR. DiMAURO:  Five more minutes and I'm going

11      to let you go.  I know you have to go.

12          MS. GAETA:  Thank you.

13          MR. DiMAURO:  You're welcome.

14   Q.   (By Mr. DiMauro)  So aside from the situation wherein

15        he was placing loans he originated under his wife

16        Eleanor Scalli's number is there any other way in your

17        mind that you believe that Robert Scalli would be

18        compensated for his efforts?

19   A.   Not that I can think of.

20          MS. GAETA:  Can we just take a minute?

21          (Off the record.)

22   A.   Yeah, we did pay him $15,000 when we hired him.

23   Q.   Yes, you testified to that.  I'm saying besides the

24        15,000 were there any other compensation packages that

1          were discussed with Mr. Scalli or promised to

2          Mr. Scalli based on your understanding of what his

3          so-called new job position became?

4     A.   I don't have any recollection.

5     Q.   And so would it be fair to say that aside from the

6          $15,000 with respect to Citizens Bank and what they

7          produced to the internal revenue and what they produced

8          to my client Mr. Scalli didn't receive any other

9          compensation, would that be fair?

10    A.   To the best of my knowledge.

11               MS. GAETA:  Can we take a minute?

12               THE WITNESS:  Why don't we just call it a day.

13         I mean, I guess there is other stuff that I'm not aware

14         of.

15    Q.   (By Mr. DiMauro)  Would it be fair to say that the

16         change that was made to Mr. Scalli's position if not

17         authorized through human resources, i.e., Joyce Hicks,

18         that that would be a violation of policy, would that be

19         fair to say?

20               MS. GAETA:  Objection to the extent that he

21         never testified that there was a change in a position.

22               MR. DiMAURO:  I believe he did.  He can answer

23         it if he understands it.

24    A.   Bob Scalli's position never changed.  He was always a

1      loan officer.

2   Q.  But there was no loan officer that you testified that

3       you're aware of that originates loans under someone

4       else's number, correct, sir?

5   A.  That is correct.

6   Q.  So that is a change from what the loan officer is

7       stated to be at Citizens Bank, correct?  Is that a fair

8       statement?

9   A.  Correct.

10  Q.  Okay.  One last question.

11          Are you aware of any circumstance with respect

12      to an employee that worked directly below you wherein

13      that employee worked in whatever capacity but was not

14      paid a single dime by the company?

15  A.  I'm not aware of that situation.

16          MR. DiMAURO:  Thank you very much.

17          MR. BURKE:  Just so that the record is clear

18      we're suspending until a mutually agreeable time

19      between counsel as well as the witness, and the witness

20      has agreed to produce himself for another examination.

21          (Deposition suspended at 2:45 P.M.)

22

23

24

# VOLUME II

VOLUME: II
PAGES: 115-332
EXHIBITS: See index

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 03CV-12413DPW

- - - - - - - - - - - - - - - - - - - - -x
ELEANOR SCALLI and ROBERT SCALLI,

      Plaintiffs,

vs.

CITIZENS FINANCIAL GROUP, INC.,

      Defendant.
- - - - - - - - - - - - - - - - - - - - -x

      Continued deposition of BARDEN K. CONN, a
witness called on behalf of the Plaintiffs, taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure before Susan L.
Prokopik (CSR #124893), a Registered Merit
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Law Offices
of Mark E. Burke, 111 South Bedford Street, suite
208, Burlington, Massachusetts on Thursday, March
31, 2005, commencing at 9:23 a.m.

BRAMANTI & LYONS COURT REPORTING, INC.
REGISTERED PROFESSIONAL REPORTERS
92 STATE STREET, BOSTON, MA  02109
TEL: 617.723.7321 / FAX: 617.723.7322
www.bramanti-lyons.com

APPEARANCES:


        Mark E. Burke, Esq.
        Law Offices of Mark E. Burke
        111 South Bedford Street, suite 208
        Burlington, Massachusetts 01803
                - and -
        Nicholas J. DiMauro, Esq.
        Law Offices of Nicholas J. DiMauro
        111 South Bedford Street, suite 208
        Burlington, Massachusetts 01803
        Attorneys for the Plaintiffs



        Anne M. Gaeta, Esq.
        Goodwin Procter LLP
        53 State Street
        Exchange Place
        Boston, Massachusetts 02109
        Attorney for the Defendant


ALSO PRESENT:

        Eleanor Scalli
        Robert Scalli

INDEX

Deposition of:                                    Page

BARDEN K. CONN

  Examination by Mr. Burke            119, 304

  Examination by Mr. DiMauro                186

EXHIBITS

| No. | | Page |
|---|---|---|
| 3 | Documents | 119 |
| 3A | 1/17/03 E-mail | 130 |
| 3B | Decline/Withdrawn Checklist | 137 |
| 3C | Uniform Residential Loan Application | 141 |
| 3D | Fax cover sheet | 144 |
| 3E | Purchase and Sale Agreement | 144 |
| 3F | 2/5/03 letter | 167 |
| 4 | Documents | 119 |
| 4A | Decline/Withdrawn Checklist | 161 |
| 4B | 1/17/03 E-mail | 165 |
| 4C | 2/5/03 letter | 170 |
| 5 | New Hire Information | 181 |

### E X H I B I T S

| No. | | Page |
|-----|---|------|
| 6 | 10/1/02 E-mail | 183 |
| 7 | 2/21/01 letter | 186 |
| 8 | Employee Profile Change | 205 |
| 9 | Handwritten memo and attachments | 212 |
| 10 | Statement of Credit Denial, Termination or Change | 250 |
| 11 | Loan Officer Ranking | 262 |
| 12 | Handwritten notes | 321 |

1    A.    No.

2    Q.    Okay.  And you would agree that by Robert Scalli,

3          without any authority by you or anyone else at

4          Citizens, handing his loans over to his wife, he

5          was not being compensated at that point, correct?

6          Directly.

7                    MS. GAETA:    Objection.

8    Q.    You can answer the question.

9    A.    If he chose to give his loans to his wife, he

10         wouldn't have been paid on them.

11   Q.    Okay.  That's all.  And if he wasn't being paid,

12         therefore, he was now changing the way the

13         compensation structure was listed on attachment

14         A?

15   A.    I would disagree with that statement.

16   Q.    Why?

17   A.    Because if -- the compensation is the

18         compensation.  It's clearly laid out.  If you

19         take loans and you close those loans, you receive

20         pay.  If you don't and you give them to someone

21         else, you have no loans to get paid on.  So if he

22         chooses to give something away and he doesn't

23         turn the loans in under his own name, he's not

24         going to get paid on the loans.

1  Q.  So he's changing his compensation, correct?

2  A.  No.

3  Q.  Well --

4  A.  He's choosing to give his loans to his wife.

5  Q.  And there's no document that reflects that to the

6      best of your knowledge, correct?

7  A.  Correct.

8  Q.  And there's no person at Citizens Bank, either

9      above or below you, that you know authorized such

10     a situation, correct?

11 A.  Wouldn't need to authorize it.

12 Q.  Why is that?

13 A.  If he chose to give his loans to his wife, that

14     would be his own decision.

15 Q.  And if human resources said that that's a

16     violation of Citizens Bank policy, would you

17     agree with that, sir?

18 A.  I would have to ask human resources.

19 Q.  Okay.  But if they claimed -- if Joyce Hicks, for

20     instance, testified that exactly what you're

21     describing is a violation of Citizens Bank

22     policy, mainly because it violates all aspects of

23     the reporting laws in this country, and I asked

24     you earlier if you recall if you had any person

1           that was unprecedented based on what we've

2           discussed, and if the position according to human

3           resources was a violation of Citizens Bank

4           policy, would you agree that someone, either at

5           your level or above you, would have informed

6           Joyce Hicks of the situation right from the

7           outset?

8    A.     In a standard situation.

9    Q.     Okay.  Why not this situation?

10   A.     It was not standard.

11   Q.     What do you mean by that?

12   A.     Bob and Eleanor were hired as a husband and wife

13          team.  To work together.

14   Q.     Okay.  Let me ask you about that.  Were you privy

15          to their contracts when they were initially

16          hired?

17   A.     Yes.

18   Q.     Were they characterized in any document that you

19          can recall as you sit here today as a, quote,

20          unquote -- I'm sorry.  Quote, closed quote, team?

21   A.     Sorry.  What was the question again?

22   Q.     Okay.  You were involved initially negotiating

23          their hire.  You went to their home on two

24          occasions, correct?

1   A.  Correct.

2   Q.  Okay.  And thereafter, there were documents that

3       were sent to Robert and Eleanor Scalli with

4       respect to the offer of employment set up as a

5       contract similar to what we reviewed earlier.

6       And what I'm asking you is, was there any

7       contract that you're aware of as you sit here

8       today that characterized their employment as a

9       quote, closed quote, team?

10  A.  No.

11  Q.  Okay.  Why not?

12  A.  It was unprecedented.

13  Q.  Unprecedented, sir, doesn't answer my question.

14      Why?  Why wouldn't you have -- when I say "you,"

15      I apologize.  Why wouldn't Citizens Bank have

16      wanted to chronicle that in their contract?

17  A.  I don't know.

18  Q.  Would they be attempting to hide something?  For

19      purposes of --

20  A.  Not that I know of.

21  Q.  Do you find something funny about that?

22  A.  No.

23  Q.  Okay.  So as you sit here today, you really don't

24      have any notion as to why they wouldn't correctly

1    characterize their hire, correct?

2                MS. GAETA:  Objection.  To the

3    characterization that their hire was not

4    correctly characterized.

5                MR. DiMAURO:  Okay.  If he understands

6    it.  I'll rephrase it if he doesn't.

7  A.  Please rephrase it.

8  Q.  Sure.  As you sit here today, you have no

9    knowledge direct or indirect as to why they would

10   not want to properly delineate the quote,

11   unquote, team of Eleanor and Robert Scalli?

12 A.  I have no knowledge.

13 Q.  Okay.  Did you ever have any discussions with

14   Joyce Hicks as to why human resources chose not

15   to do that?

16 A.  Not that I recall.

17 Q.  Okay.  Would there be anything that would refresh

18   your recollection?

19 A.  Not that I can think of.

20 Q.  Were there any discussions with Steve Adamo

21   regarding a nonpublication, if you will, on any

22   written document of the team?

23 A.  Not that I recall.

24 Q.  Were there any discussions with Mr. Diranian?

1  A.  Not that I recall.

2  Q.  Okay.  The compensation package that you did

3      review initially for Robert, is that something

4      that you put together on your own or did you do

5      it in concert with human resources?

6  A.  In concert with human resources.

7  Q.  Okay.  And tell me what were the mechanics of

8      that.

9  A.  Negotiated the money with Bob and Eleanor.  What

10     they thought was a fair amount of money to

11     transition them from their current employer to

12     Citizens.  That that information was relayed to

13     human resources and that generated the initial

14     job offers.

15 Q.  And during that time, even if unprecedented, did

16     you discuss with Joyce Hicks the team?

17 A.  No, I did not.

18 Q.  Why not?

19 A.  I don't know.

20 Q.  But there has to be some reason why you wouldn't

21     have brought it to her attention that this new

22     unprecedented role you had in store for Mr. and

23     Mrs. Scalli would be the so-called quote, unquote

24     team.

1          MS. GAETA:  Objection.

2   Q.   There would have been some reason -- well, let me

3        ask you.  What reason would you have not to tell

4        her about it?

5   A.   None.

6   Q.   None.  So you would agree that you would have

7        told her?

8   A.   I would agree that -- it didn't seem relevant to

9        tell her.

10  Q.   So was your office, you directly, not Citizens

11       Bank, were you in the habit of creating positions

12       that were -- and compensation packages that were

13       not memorialized on paper?

14  A.   No.

15  Q.   Was that your habit?

16  A.   No.

17  Q.   Well, it seems to be a habit because in this

18       particular case you would agree you did not

19       memorialize the quote, unquote team, correct?

20  A.   I agree that I did not memorialize the team.

21  Q.   Okay.  And therefore, were there other instances

22       other than Robert Scalli, Eleanor Scalli, where

23       you did not memorialize a compensation package

24       for an individual employee?

1   A.   Not to my recollection.

2   Q.   Okay.  So in this particular case, you were

3       treating, as you say, Robert and Eleanor Scalli

4       as a very unusual case.

5   A.   It was the first time we had a team concept.

6   Q.   Okay.  And in that team concept, would it be safe

7       to say that Robert Scalli aside from the fact

8       that loans were being placed under his wife's

9       number, Robert Scalli was left with little or no

10      compensation?

11             MS. GAETA:  Objection.

12  A.   What was the question?

13  Q.   Okay.  With respect to the manner in which loans

14      were being generated and placed under Eleanor

15      Scalli's name, Robert Scalli was on paper left

16      with no compensation being directed to him for

17      any of the loans being given to Eleanor, correct?

18  A.   That's correct.

19  Q.   Okay.  And so when he was hired, did you ever

20      have a conversation with him as to how he would

21      be paid?

22  A.   Yeah.  I believe so.

23  Q.   Okay.  What was that conversation?

24  A.   Under the terms of the contract that he signed.

1    Q.    Okay.  The terms of the contract that he signed

2          as you testified earlier have certain critical

3          elements omitted.  One of the critical elements

4          that's been omitted is the team concept.

5          Correct?

6                    MS. GAETA:  Objection to the term of

7          critical elements being omitted from the

8          contracts.

9                    MR. DiMAURO:  Okay.  If he understands

10         it.  If not, I'll rephrase it.

11   A.    Please rephrase.

12   Q.    Sure.  You testified earlier that the team

13         concept -- that was your characterization.  So

14         you understand what I mean by the team concept?

15   A.    Yes, I do.

16   Q.    Okay.  The team concept was for reasons you have

17         not been able to explain omitted from their

18         original paperwork when they were hired, correct?

19   A.    Correct.

20   Q.    Okay.  And in addition to that omission, which I

21         believe is a critical omission, were there other

22         compensation packages that were also omitted?

23                    MS. GAETA:  Objection.  Compensation

24         packages for whom?

1    MR. DiMAURO: Robert Scalli. I

2    apologize. Robert Scalli.

3  A.  No.

4  Q.  So if the team concept worked, as you say it did,

5    and everyone was aware of it, isn't it true that

6    you could have also omitted things like salaries

7    that were promised from the same offer that was

8    given to Robert Scalli?

9  A.  No.

10 Q.  Why not?

11 A.  Salaries are really concrete.

12 Q.  This was an unusual case according to your

13    testimony.

14 A.  $50,000 salary would be in an offer letter.

15 Q.  So you think that $50,000 in salary is something

16    that's more important than delineating the team?

17 A.  $50,000 is pretty significant, yes.

18 Q.  Well, I think that it certainly is significant,

19    would you agree, if someone were promised

20    $50,000, worked for in excess of two years and

21    was never compensated a penny of that money.

22    Would you agree? That would be significant?

23 A.  If they thought they had that coming, I would say

24    that was significant.

1    Q.    Okay.  And if promises were made with respect to

2          compensation, and if structures of compensation

3          were changed at will without any memorialization,

4          can you sit here today and tell me that you did

5          not negotiate a $50,000 forgivable draw with

6          Robert Scalli?

7    A.    Yes, I can.

8    Q.    Okay.  You never had any conversation with him

9          either in his first or second year employment

10         regarding the promise of a $50,000 forgivable

11         draw?

12   A.    No, I did not.

13   Q.    And/or salary?

14   A.    Did not talk about salary with Bob.

15   Q.    However, you have admitted that with respect to

16         the team concept, you didn't tell anybody about

17         that either, correct?

18                    MS. GAETA:  Objection.

19   A.    It was not memorialized in their job offer

20         letters.

21   Q.    Okay.  Did you tell anybody about it in human

22         resources?

23   A.    To the best of my knowledge, no.

24   Q.    Okay.  With respect to the office, the Woburn

1       office, give me a little background on how

2       Eleanor and Robert Scalli were assigned there.

3       First of all, were they assigned to that office?

4   A.  Yes.

5   Q.  By whom?

6   A.  Me.

7   Q.  Okay.  And --

8               MS. GAETA:  Excuse me.  Can you put the

9       air conditioning?

10              MR. DiMAURO:  Sure.  Want it up again?

11              (Off the record.)

12  Q.  And can you tell me a little bit about what the

13      structure was at the Woburn office as it relates

14      to Robert and Eleanor Scalli?

15  A.  Can you be more specific?

16  Q.  How did they interact at that office?  What did

17      they do on a weekly basis?

18  A.  I wasn't located in that office so I don't know

19      how much time they did or didn't spend there.  I

20      know that they had an office in their house that

21      they worked out of that we licensed.

22  Q.  Okay.  And when you say that you licensed,

23      explain what you mean by that.

24  A.  In other words, because they're meeting customers

1          there, our compliance people thought it was

2          important that we get a license for their house.

3    Q.    Okay.  And do you know --

4                   MR. DiMAURO:  Have you provided that?

5          Let's go off the record one second.

6                   (Off the record.)

7    Q.    And when was this done?  Do you know?

8    A.    No idea.

9    Q.    How do you know it was done?

10   A.    I believe it was done because I was contacted by

11         Pete Masuck and Dan Dewey, who were our

12         compliance people, to discuss licensing the

13         house.

14   Q.    Okay.  And was this done in 2001 when they were

15         hired?

16   A.    I don't know.

17   Q.    Now, do you have any time frame on when it was

18         done?

19   A.    No, I don't.

20   Q.    How do you recall it being done at all?

21   A.    Again, just based on my conversation with Dan

22         Dewey and Pete Masuck.

23   Q.    Okay.  And how many employees did they have at

24         the home, do you know?

1   and then took my direction from human resources.

2  Q.   All right.  If you had learned that prior to

3       going to human resources -- I'm just asking your

4       opinion.  I'm not asking what human resources

5       claims or doesn't claim.  If you had learned

6       prior to contacting human resources from Eleanor

7       that this had been authorized by Liz and that

8       Luis Riascos had sent this declination letter,

9       would you have come to some different conclusions

10      as to what's going on?

11 A.   You're asking me -- if I understand you correctly

12      --

13 Q.   Yeah.  Your opinion.

14 A.   If Liz had authorized --

15 Q.   If she had authorized Luis.

16 A.   To issue a decline letter.

17 Q.   Right.

18 A.   Would I have handled it differently.

19 Q.   Yes.

20 A.   Yes.

21 Q.   How would you have handled it differently?

22 A.   I would have talked to Liz.

23 Q.   And what would you have said to Liz?

24 A.   Liz, why in the world would you tell Luis he

1      could issue a decline letter and sign Eleanor's

2      name to it?

3   Q.  Okay.  Because she shouldn't have done that?

4   A.  Correct.

5   Q.  If she had responded to you and said -- I

6      appreciate the candor of your answer.  If she had

7      responded to you and said, The reason why I did

8      is because compliance authorized me to do it, you

9      would have -- that would have been a valid

10      response.

11  A.  I would have said, We got a gaping hole in

12      compliance.

13  Q.  Okay.  But it would have been a valid response.

14      In other words, she would have had backup for

15      what she had done, correct?  She would have had

16      authority for what she had done?

17  A.  In that letter, yeah.  Sure.

18  Q.  Okay.

19              MS. GAETA:  Objection.

20  Q.  And -- okay.  And you agreed with me earlier that

21      this doesn't look to be a doctored letter so we

22      can assume if this is a real letter created by

23      compliance, created by compliance, and it existed

24      in the operations department that certainly Liz

1   A.   So I would have had a problem with that.

2   Q.   Okay.  And if her response to your problem was,

3        It is operational.  Here is the operational

4        document.  Completely authorized.  Would you have

5        any problem at that point?  She is showing you a

6        document that operation --

7   A.   Yes.  I would have a problem with it.

8   Q.   What would be the problem?  With the mechanism of

9        it or what would be the problem?

10  A.   The problem would be loan officers declining

11       loans.

12  Q.   Okay.

13  A.   So I guess I would have a problem with Liz saying

14       --

15  Q.   Philosophically you would have a problem?

16  A.   I would say, We have a gaping problem.  We have a

17       hole in our organization that allows a loan

18       officer to use this form to decline loans because

19       it puts the franchise at risk.  We have a major

20       problem.  We need to get Pete Masuck, Dan Dewey,

21       legal on the phone right now.

22  Q.   So Citizens Bank would have a major problem if

23       that --

24  A.   I would say that was a problem, yes.

EXHIBIT NO. 7
4/25
M. EISEN

2246121



# CITIZENS
## MORTGAGE CORPORATION

JEAN BARBOSA
129 BROOKS STREET
EAST BOSTON, MA  02128

Date:           02/05/03
RE:             331 PARIS STREET
                EAST BOSTON, MA  02128
Loan Amount:  $  244,000.00
Interest Rate:    8.875
Payment Term: 360
Loan Type:      CONVENTIONAL FIXED

Dear Applicant:

Thank you for your application for the mortgage loan referenced above.  We are unable to offer you credit on the terms that you requested for the following reason(s):

**Borrower's Request**

**EXHIBIT**

Conn 3F
_sw 3/31/05_

Should you have any additional information which might assist us in evaluating your creditworthiness, please let us know. If you have any questions regarding this notice, you should contact us at:

CITIZENS MORTGAGE CORPORATION
1200 HANCOCK STREET
QUINCY, MA 02169
800-852-5577

[  ] If ["X"] Our credit decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below.  You have a right under the Fair Credit Reporting Act to know the information contained in your credit file at the consumer reporting agency.  The reporting agency played no part in our decision and is unable to supply specific reasons why we have denied credit to you.

**EXHIBIT**

Roussel 3
_sw 3/17/05_

You have the right to obtain a free copy of your credit report within sixty days from the consumer reporting agency that has been identified on this notice.  The consumer credit reporting agency must provide someone to help you interpret the information on your credit report.  Each calendar year you are entitled to receive, upon request, one free consumer report.

You have the right to dispute inaccurate information by contacting the consumer credit reporting agency directly.  If you have notified a consumer credit reporting agency that you dispute the accuracy of information in your file, the agency must then, within thirty days, reinvestigate and modify or remove inaccurate information.  The consumer credit reporting agency may not charge a fee for this service. If reinvestigation does not resolve the dispute to your satisfaction, you may send a statement to the consumer credit reporting agency to be kept in your file, explaining why you think the record is inaccurate. The consumer reporting agency must include your statement about the disputed information in a report it issues about you.

[X] If ["X"] Our credit decision was based in whole or in part on information obtained from an outside source other than a consumer reporting agency.  Under the Fair Credit Reporting Act, you have the right to make a written request, no later than 60 days after you receive this notice, for disclosure of the nature of this information.

The Federal equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is the  FDIC Consumer Response Center, 2345 Grand Boulevard, Suite 100, Kansas City, MO 64108.

Citizens is committed to providing quality products and services and appreciates your business. Thank you for choosing Citizens Mortgage Corporation for your mortgage financing.  **Citizens Mortgage Corporation**

By: _____
**ELEANOR SCALLI**

[  ] Mailed    [  ] Delivered

ADVACTMA (FITECH 7/02)

C03965
CONFIDENTIAL

# CITIZENS
## MORTGAGE CORPORATION

JEAN BARBOSA
129 BROOKS STREET
EAST BOSTON, MA  02128

Date:        02/05/03
RE:          331 PARIS STREET
             EAST BOSTON, MA  02128
Loan Amount:  $  45,750.00
Interest Rate:  13.000
Payment Term:  360
Loan Type:    CONVENTIONAL FIXED

Dear Applicant:

Thank you for your application for the mortgage loan referenced above.  We are unable to offer you credit
on the terms that you requested for the following reason(s):

**Borrower's Request**

EXHIBIT

Conn   4 C

SCp  3/31/05

Should you have any additional information which might assist us in evaluating your creditworthiness,
please let us know. If you have any questions regarding this notice, you should contact us at:

        CITIZENS MORTGAGE CORPORATION
        1200 HANCOCK STREET
        QUINCY, MA 02169
        800-852-5577

EXHIBIT

Roussel   2

SCp  5/17/05

[  ] If ["X"] Our credit decision was based in whole or in part on information obtained in a report from
the consumer reporting agency listed below.  You have a right under the Fair Credit Reporting Act to know
the information contained in your credit file at the consumer reporting agency.  The reporting agency played
no part in our decision and is unable to supply specific reasons why we have denied credit to you.

You have the right to obtain a free copy of your credit report within sixty days from the consumer reporting
agency that has been identified on this notice.  The consumer credit reporting agency must provide
someone to help you interpret the information on your credit report.  Each calendar year you are entitled
to receive, upon request, one free consumer report.

You have the right to dispute inaccurate information by contacting the consumer credit reporting agency
directly.  If you have notified a consumer credit reporting agency that you dispute the accuracy of
information in your file, the agency must then, within thirty days, reinvestigate and modify or remove
inaccurate information.  The consumer credit reporting agency may not charge a fee for this service.
If reinvestigation does not resolve the dispute to your satisfaction, you may send a statement to the
consumer credit reporting agency to be kept in your file, explaining why you think the record is inaccurate.
The consumer reporting agency must include your statement about the disputed information in a report it
issues about you.

[X] If ["X"] Our credit decision was based in whole or in part on information obtained from an outside
source other than a consumer reporting agency.  Under the Fair Credit Reporting Act, you have the right to
make a written request, no later than 60 days after you receive this notice, for disclosure of the nature
of this information.

The Federal equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants
on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has
the capacity to enter into a binding contract); because all or part of the applicant's income derives from any
public assistance program; or because the applicant has in good faith exercised any right under the Consumer
Credit Protection Act.  The federal agency that administers compliance with this law concerning this creditor is
the  FDIC Consumer Response Center, 2345 Grand Boulevard, Suite 100, Kansas City, MO  64108.

Citizens is committed to providing quality products and services and appreciates your business.  Thank you for
choosing Citizens Mortgage Corporation for your mortgage financing.   Citizens Mortgage Corporation

        C04074                By: _____
        CONFIDENTIAL                ELEANOR SCALLI

[  ] Mailed    [  ] Delivered