

# EXHIBIT

VOLUME: I
PAGES: 1-278
EXHIBITS: 1-3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 03CV-12413DPW

- - - - - - - - - - - - - - - - - - - -x
ELEANOR SCALLI and ROBERT SCALLI,

       Plaintiffs,

vs.

CITIZENS FINANCIAL GROUP, INC.,

       Defendant.
- - - - - - - - - - - - - - - - - - - -x

       Deposition of STEVEN ROUSSEL, a witness
called on behalf of the Plaintiffs, taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure before Susan L.
Prokopik (CSR #124893), a Registered Merit
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Law Offices
of Mark E. Burke, 111 South Bedford Street, suite
208, Burlington, Massachusetts on Tuesday, May
17, 2005, commencing at 10:23 a.m.

---

BRAMANTI & LYONS COURT REPORTING, INC.
REGISTERED PROFESSIONAL REPORTERS
92 STATE STREET, BOSTON, MA  02109
TEL: 617.723.7321 / FAX: 617.723.7322
www.bramanti-lyons.com

1       APPEARANCES:

2

3           Mark E. Burke, Esq.
            Law Offices of Mark E. Burke
            111 South Bedford Street, suite 208
4           Burlington, Massachusetts 01803
                        - and -
5           Nicholas J. DiMauro, Esq.
            Law Offices of Nicholas J. DiMauro
6           111 South Bedford Street, suite 208
            Burlington, Massachusetts 01803
7           Attorneys for the Plaintiffs

8

9           Anne M. Gaeta, Esq.
            Goodwin Procter LLP
10          53 State Street
            Exchange Place
11          Boston, Massachusetts 02109
            Attorney for the Defendant

12

13      ALSO PRESENT:

14          Eleanor Scalli

15

16

17

18

19

20

21

22

23

24

3

1                          I N D E X

2
       Deposition of:                          Page
3
       STEVEN ROUSSEL
4
          Examination by Mr. Burke          5, 222
5

6          Examination by Mr. DiMauro            29

7

8

9

10                       E X H I B I T S

11     No.                                    Page

12     1    1/17/03 E-mail                     162

13     2    2/5/03 document                    270

14     3    2/5/03 document                    270

15

16

17

18

19

20

21

22

23

24

                  DEPOSITION OF STEVEN ROUSSEL

1   expertise to determine whether something from

2   your mortgage company would be authentic or not?

3          MS. GAETA:   Objection.

4  A.  No.  No.

5  Q.  Why would he be questioning the authenticity of

6   such a letter if he had no background in the

7   operations department, sir?

8  A.  I don't know.

9  Q.  Okay.  He didn't mention the reason why he was

10   questioning it?

11  A.  Not at that first time, no.

12  Q.  How about the second time?

13  A.  The second time, the answer is yes.

14  Q.  What did he say?

15  A.  He had told me that there was a rumor that a

16   particular borrower was getting declined and that

17   that person was under agreement to buy another

18   house.

19  Q.  Okay.

20  A.  And that's when he gave me the letter.

21  Q.  So your testimony, sir, if I understand you

22   correctly is that Mr. Giacalone's making

23   accusations against the borrower, correct?

24          MS. GAETA:   Objection.

1  A.  I don't understand.

2  Q.  Well, you just testified that Mr. Giacalone made

3      accusations that -- by the way, do you know the

4      borrower's name in this case, sir?

5  A.  Well, I saw the decline letter that was presented

6      to me.  I remember the decline letter that I saw

7      with my counsel.  I remember that name.

8  Q.  What is that name, sir?

9  A.  Barbosa?

10             MS. GAETA:  Just answer his question.

11 Q.  That's fine.  Jean Barbosa.  Does that sound

12     familiar?

13 A.  I just know Barbosa.  I just remember Barbosa.

14 Q.  All right.  And your testimony was that Mr.

15     Giacalone of Tony's Realty made an assertion to

16     you that a borrower, in this case the borrower is

17     Jean Barbosa, was engaging in activities wherein

18     he was looking to purchase a home or under

19     agreement, I believe you said, to purchase a home

20     from another party.  Is that what Mr. Giacalone

21     told you?

22 A.  Well, no.  He first said, I have an issue.

23             And then he asked me to take a look at

24     the decline letter.  And I didn't know if it was

1    authentic.  So I think what he was doing was he

2    was questioning me on the authenticity of that

3    decline letter.  I don't think he was like

4    saying, you know -- I don't think he was saying

5    the customer's guilty of anything.  I think he

6    was raising the question, Is this authentic?

7  Q.  Well, a moment ago you testified that he told you

8    that it wasn't authentic, that he made that

9    determination.

10 A.  Well, then I would want to retract that.  He was

11    questioning me saying, Is this authentic?

12 Q.  Okay.

13 A.  And I didn't know.  To be candid with you, I

14    didn't know.

15 Q.  Let me ask the question again, sir.  Is your

16    testimony that Tony Giacalone stated to you that

17    the reason why he thought this letter was not

18    authentic was because he had knowledge that the

19    borrower, Jean Barbosa, was in fact under

20    agreement to purchase another property from

21    another party?

22         MS. GAETA:  Objection.

23 A.  I don't know that.

24 Q.  Okay.  So you're changing your testimony now,

DEPOSITION OF STEVEN ROUSSEL

35

1        sir?

2                MS. GAETA:  Objection.

3    Q.   What did Tony Giacalone tell you about this

4         borrower?

5    A.   Tony didn't say anything about the borrower.  He

6         was questioning the authenticity of the decline

7         letter.

8    Q.   Sir, you realize that you're under oath today?

9    A.   Yes, I do.

10   Q.   You testified a moment ago that Mr. Giacalone

11        informed you that the reason why -- we'll read it

12        back in a moment.

13   A.   Okay.

14   Q.   The reason why he thought that this letter was

15        not authentic was because he had knowledge that

16        the borrower was in an agreement to purchase

17        another property.  Is that correct, sir?

18   A.   I would have to read the transcript but I can

19        tell you this:  That the first time that I was in

20        that office, I went in there for a sales call.

21        From there, Tony was -- he wasn't there and he

22        basically was saying, you know, I have a problem

23        with Citizens.  I said, Gee, what's that problem?

24        I'm fielding the complaint.

1      What happened is then he said, Well, I

2   have a decline letter.  Okay?  I got the decline

3   letter.  Okay?  I had asked him if he wanted to

4   give me the decline letter and he said no.

5      What then happened the next day, I

6   guess, he had found out that he had this decline

7   letter, okay, and that he had heard that the

8   borrower was possibly buying another house.

9   Whether it's true or not, sir, I don't know.  You

10  would have to ask Tony Giacalone that.

11     He then said from there that he would

12  like to give me the decline letter.  I just went

13  there, picked up the decline letter, gave it to

14  Mike.

15  Q.  So the person that told you that this particular

16  borrower may be buying another house or may be in

17  agreement for another house was Tony Giacalone,

18  correct?

19  A.  Yes.

20  Q.  Correct?

21  A.  Yes.

22  Q.  Okay.  And did he tell you how he came to find

23  that out?

24  A.  No, sir.

1  A.  The answer is no.

2  Q.  And did you in your discussions with Mike

3      Diranian, did you pass on the information

4      regarding, as you say, this agreement to purchase

5      another property to Mike during your conversation

6      with him?

7  A.  Yes, I did, sir.

8  Q.  Okay.  And you did that without any verification

9      at all as to what you were passing on to Mike

10     Diranian?

11              MS. GAETA:  Objection.

12 A.  Well, let me --

13 Q.  You can answer it.

14 A.  Let me tell you what I said to Mike.  I said,

15     Mike, I said, We have this letter.  I don't know

16     if it's authentic.  And Tony is questioning that

17     Citizens Bank gave a decline letter for this

18     buyer to buy another property.  I said, That's

19     the full story.  And I said, I think it's a

20     serious matter that needs to be looked into.

21              He agreed.  And he ran with it.  I

22     think that you can all agree in this room that

23     that was a relative piece of information to give

24     Mike Diranian.  He needed to know whether or not

1       that letter was being given -- well, first of

2       all, is it authentic?  Second, if it's not, then,

3       hey, we're okay.  Okay?

4              And if it's not, then he needed to know

5       about that other piece.  And I thought that was

6       important.  And if I was wrong in telling Mike

7       that, then I apologize.

8   Q.  So you said a moment ago you're not in the

9       business of gossip, sir; is that correct?

10  A.  That's correct.

11  Q.  So why would you be gossiping, passing on hearsay

12      to Mike Diranian regarding something that not

13      only did you not verify, you didn't even --

14      unless you want to change your testimony again.

15      You didn't even ask Mr. Giacalone.  How do you

16      know that?

17              MS. GAETA:  Objection.

18  Q.  Did you, sir?  Did you ask Mr. Giacalone when he

19      made an assertion, an accusation against Jean

20      Barbosa, the borrower, did you say to him, You're

21      making a very serious accusation, Tony.  Where

22      did you get this information?

23              MS. GAETA:  Objection.

24  Q.  Did you say that to him, sir?

1           MS. GAETA:  Objection.

2  A.  No.  I didn't say that.  I just -- I was there in

3      an awkward position.  I was fielding a complaint.

4      And I said to Tony there, I said, Listen.

5      There's got to be a logical explanation.  Okay?

6      We'll get to the bottom of it.  It's your option

7      on whether or not you wanted to continue.

8           He gave me the letter.  Okay.  I

9      thought it was real important information that

10     once I took -- once I made that decision, okay,

11     to give that letter to Mike, then Mike knows

12     that, number one, I don't know the authenticity

13     of this letter and that it's not only the letter

14     but possible -- and if you can call it gossip but

15     I don't consider that gossip.

16          I consider that relative information to

17     say the allegation or however you want to call it

18     is to say, Did Citizens give this borrower a

19     decline letter and give an approval on the same

20     borrower with another loan.

21          At that point, I didn't know if that

22     borrower was coming through Citizens or through

23     another company but I thought that that was

24     relative information.  I think it would not have

1  been good for me just to give Mike a half -- you

2  know, a half a story saying, Hey, Mike, it's your

3  problem.

4     I would hope to think -- and I had that

5  relationship with Mike, that we were mature

6  enough to get the whole story, the best possible

7  story that we had.

8 Q. Okay.  So why didn't you get the whole story,

9  sir?

10     MS. GAETA:  Objection.

11 Q. Is there a reason why?

12     MS. GAETA:  Objection.

13 A. I thought I had enough of the story, sir.  But

14  before we were going to --

15 Q. Why don't you do this for me, sir?  Why don't you

16  define your version of -- give me your version

17  and an explanation of how you define gossip.

18     MS. GAETA:  Objection.

19 A. I mean, gossip is talking about people in a

20  negative way.

21 Q. Okay.  So --

22 A. That might be true.  It may not be true.

23 Q. So when Tony Giacalone spoke in not only a

24  negative way but accused Jean Barbosa of engaging

1        in the purchase of another property and said that

2        it was -- he believed was under agreement, that's

3        not gossip, sir?

4              MS. GAETA:  Objection.

5   A.   Well, let's reel the tape back.  I had told Tony

6        at that time that I didn't think Eleanor Scalli

7        would do something like that.

8   Q.   Okay.

9   A.   So are you ready?  First of all, I stuck up for

10       an employee that at that point we had no

11       knowledge of was it true or not true so let's

12       kind of remember that fact.

13  Q.   So did you stick up for her, sir, by passing on

14       this negative gossip to Mike Diranian?

15              MS. GAETA:  Objection to that

16       characterization.

17  Q.   Is that how you stuck up for her, sir?

18  A.   No, sir.

19  Q.   How did you stick up for her, sir?

20  A.   Let's go back and let's say and let's look at the

21       transcripts.  Because I know Eleanor is here.

22       Let her read the whole transcript.  I went in

23       there and I told Tony that I didn't think Eleanor

24       Scalli would do something like this.  He had two

1    choices.  Either to proceed with the letter or

2    not to proceed with the letter.

3            I did say in my testimony already and

4    you can see it in there probably two or three

5    times already, I had said that I didn't think

6    Eleanor Scalli would do something like that.

7    Let's look into it further because there's got to

8    be some reasonable, logical explanation.

9  Q.  Okay.  Let me stop you there for a moment, sir.

10   Try to listen to my question.  All right?  And

11   try to answer my question as best you can.

12 A.  I'll try.

13 Q.  I am making no reference in this question I'm

14   about to ask you to the authenticity of a letter.

15   My question is very straightforward.  Tony

16   Giacalone, according to you, made negative

17   accusations against Jean Barbosa, the borrower,

18   as it related to him purchasing a property,

19   property from another party which was under

20   agreement.  Correct?

21           MS. GAETA:  Objection.  You're

22   mischaracterizing his testimony.

23 Q.  Is that correct, sir?

24           MS. GAETA:  You can answer the question

1       if you understand it.

2   Q.  You can answer it.  You got that information from

3       Tony, correct?

4   A.  Yes.

5   Q.  Okay.  You also testified to the fact that you

6       never asked Tony, Mr. Giacalone, Where do you get

7       that information?  It's not only negative.  It's

8       not only hearsay.  Where did you get it?  You

9       never asked him that, did you, sir?

10                  MS. GAETA:  Objection.

11  A.  No, I did not ask him that.

12  Q.  Okay.  But you then took that negative

13      information without verifying it, pure hearsay,

14      pure gossip, and you did Eleanor Scalli a favor

15      by passing that information on to Mike Diranian.

16  A.  That is correct.  And let me tell you why.

17  Q.  Yeah.

18  A.  At that point, we didn't know if that letter was

19      authentic.  And I gave Eleanor and her team,

20      every reasonable adult, to say there has to be a

21      logical explanation.  I did not know if that

22      letter was authentic.

23  Q.  Let me stop you again, sir.  You keep referring

24      to the letter.  I'm not talking about a letter.

1       Do you remember what I stated at the beginning of

2       this -- of my question, leave the letter out?

3   A.  Okay.

4   Q.  Forget about the decline letter.  Take it out of

5       your mind completely.

6   A.  Okay.

7   Q.  Aside from the decline letter, Mike Diranian,

8       according to your testimony, was given

9       information, very negative information, through

10      you, which he has also testified to, through you,

11      that Jean Barbosa was under agreement to purchase

12      another property, correct?

13  A.  That was hearsay from Tony Giacalone.

14  Q.  Okay.  And that --

15  A.  Mike did not tell me that.

16  Q.  Right.  You told him that?

17  A.  I told him that.

18  Q.  Correct.  And that, as you say, that gossip,

19      negative hearsay, whatever -- however you want to

20      characterize it --

21  A.  Relevant facts.

22  Q.  You never, ever asked Tony Giacalone about the

23      nature of that information, correct?

24              MS. GAETA:  Objection.

1  A.  That is true.  I did not ask Tony where he got

2      that information.

3  Q.  Okay.  And if you will -- first of all, how long

4      did you know Eleanor Scalli prior to speaking to

5      Tony about this issue?

6  A.  I've known Eleanor since childhood.

7  Q.  Okay.  As you say, you were going to speak -- you

8      were trying to speak on her behalf saying she --

9      I think your testimony was, she wouldn't do

10     something like that.  Is that --

11 A.  I was trying to exonerate her on the premise that

12     nobody would ever do something like that.

13 Q.  And when you were trying to exonerate her, sir,

14     you -- did you ever call her up?

15 A.  No, sir.  I did not.

16 Q.  Did you ever ask her, a person you've known since

17     childhood, before calling Mike Diranian, I've

18     heard a lot of gossip.  I didn't verify any of it

19     but I heard a lot of gossip.  Can you tell me

20     about it?

21          Did you ever call her up and ask her

22     that question?

23          MS. GAETA:  Objection.

24 A.  No, sir.  I did not.

```
 1  A.  No, sir.  I did not.

 2  Q.  You had no further conversation?

 3  A.  No, sir.

 4  Q.  Did you have any further conversation after that

 5      point with Tony Giacalone?

 6  A.  No, sir.  I did not.

 7  Q.  Was there a reason why -- strike that.  After you

 8      received this purported declination letter from

 9      Tony Giacalone, you passed it on, as you

10      indicated in your testimony, to Mike Diranian?

11  A.  Yes, sir.  I did.

12  Q.  Immediately after that, let's say either the same

13      day or the day after or the week after, what

14      conversations did you have with Tony Giacalone

15      regarding this matter he was very upset about?

16  A.  That Mike were to get back to him --

17  Q.  What --

18  A.  -- with his finding.

19  Q.  And what did he say about that?

20  A.  He was okay with that.

21  Q.  Okay.

22  A.  He felt like he was getting serviced.  He had a

23      complaint.  And I was servicing it like any other

24      complaint.  It would have to be researched and
```

1       to answer your question directly, if Eleanor had

2       a deal with Bard or Mike, I don't know about that

3       deal because it wasn't my territory.  With Kathy,

4       I don't recollect her ever making a big deal out

5       of not getting TV or radio.

6                   I think that she wouldn't present well

7       to be candid with you.  I don't think we would

8       ever make that decision for her at that time in

9       her career.

10  Q.  Do you know a person named Victoria Noel?

11  A.  Yes, I do.

12  Q.  And how do you know her, sir?

13  A.  She was a colleague of mine that I have a lot of

14      respect for.

15  Q.  And did she work under your direction?

16  A.  No, sir.  She did not.

17  Q.  Who did she work for?

18  A.  She worked for Mike.  Out of Woburn.  She was one

19      of the five people that could have got that

20      letter from Tony.  There's four people, including

21      Mike, that work out of Woburn.  She was one of

22      those four.

23  Q.  Okay.  And did you ever discuss with Miss Noel

24      Eleanor Scalli's situation or Robert Scalli's

1       situation with respect to them leaving the bank?

2   A.  No, sir.  I didn't have that sort of relationship

3       with them.

4   Q.  Did you ever hear Miss Noel indicate that the

5       reason why Eleanor and Robert left the bank is

6       because they were going to be indicted for bank

7       fraud?

8   A.  No, sir.  I have not ever heard that.

9   Q.  Okay.  Do you know whether or not Miss Noel made

10      any representations like that to anyone on your

11      team, any of the loan officers under your

12      direction?

13  A.  Not to the best of my knowledge.  Vicki just

14      didn't come around our office.  And as a matter

15      of fact, my loan officers just didn't cross into

16      East Boston.  Um, there wasn't that sort of

17      contact with my office and Woburn's office.  We

18      were competing offices.

19              You know, it's like the Yankees and the

20      Red Sox, you know.  You know, you're friends but

21      you don't talk about stuff like that.

22  Q.  But you're in competition?

23  A.  That's true.  But it's good, healthy competition.

24      All right?  You know, it's -- if something is

DEPOSITION OF STEVEN ROUSSEL

1        and -- but only people underneath my

2        jurisdiction.  You know, so even still today, we

3        have, you know, updated the system.  I still

4        don't have capabilities of ever reviewing someone

5        that's not reporting in to me.

6   Q.   Okay.

7   A.   And I think that's fair.

8   Q.   Have you ever seen a decline letter issued with

9        your name on it?

10  A.   Yes.  It will have my name on it but not my

11       signature.

12  Q.   Okay.  So you have seen them with your name on

13       it?

14  A.   On the bottom to say that I was a loan officer on

15       the deal.  I believe that's how our decline

16       letters at that time were being sent out.

17  Q.   Okay.  How are they sent out now, sir?

18  A.   You know?  I don't handle that aspect of the loan

19       anymore.  My assistant does.  She handles that.

20            (Recess.)

21  Q.   Mr. Roussel, you indicated earlier you have a

22       recollection of possibly sending Liz Walsh a

23       birthday card to her home.

24  A.   (Witness nods.)

1    nonprofits and those areas.

2  Q.  Okay.  And --

3  A.  Dorchester, Mattapan, Roxbury.

4  Q.  Okay.  And do you know whether or not any of the

5    loan officers under Mike Diranian's supervision

6    worked with that office, that Realtor?

7  A.  Yes.

8  Q.  Who?

9  A.  Um, going back years ago, Armando Tativa.  He was

10    in there.  Gonzalo Puibgo.  Vicki Noel.  When I

11    mean Vicki Noel, I mean John Allard.  Her

12    partner.

13  Q.  You mean Vicki Noel and John Allard both?

14  A.  They were partners.

15  Q.  Okay.

16  A.  A lot like Eleanor and her assistants.  They had

17    a thing.

18  Q.  Okay.

19  A.  And -- there was me.

20  Q.  All right.

21  A.  And I would say those are the four.

22  Q.  Now, when you say Vicki Noel and John Allard were

23    partners, what do you mean by that?

24  A.  They were a team.  A lot like the way Eleanor and