Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.
Richard J. BAPTISTA and Francis P. Mitrano
v.
ABBEY HEALTHCARE GROUP, INC., Total Pharmaceutical Care Inc., Timothy Aitken, and the Plan Administrator of the Abbey Medical, Inc. Employee Retirement Plan
No. 95-10125-RGS.

April 10, 1996.

MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS THE SECOND
AMENDED COMPLAINT

STEARNS, J.

*1 Plaintiffs Richard Baptista and Francis Mitrano are two former executives of the defendant Abbey Healthcare Group, Inc. (Abbey). The plaintiffs claim that defendant Timothy Aitken, the Chairman of the Board of Abbey (and the President of defendant Total Pharmaceutical Care, Inc. [TPC], a subsidiary of Abbey), promised that they would be entitled to exercise certain stock options if they were terminated by Abbey, and that when they were, Abbey refused to honor Aitken's promise. Plaintiffs also allege that the administrator of the Abbey Medical Employee Retirement Plan violated ERISA by failing to provide them with timely pension plan information. Before the court is defendants' motion to dismiss the Second Amended Complaint. Defendants claim improper venue, lack of personal jurisdiction over Aitken, and a complete defense to Counts I-V of the Second Amended Complaint under the Statute of Frauds.

PROCEDURAL BACKGROUND

On August 14, 1995, the court allowed in part Abbey's motion to compel arbitration of the plaintiffs' original claims, and ordered that seven of the ten counts of the First Amended Complaint be dismissed and referred to arbitration. Two of the three remaining counts involved stock options allegedly owed to the plaintiffs, and the third an alleged ERISA violation. On October 16, 1995, the plaintiffs filed a six count Second Amended Complaint alleging a violation of M.G.L. c. 149, §§ 148, 150, on the part of Abbey, TPC, and Aitken for failure to pay "wages and benefits" (stock options) upon termination; breach of contract and conversion by Abbey and TPC; fraud and misrepresentation by Aitken (and, through Aitken, Abbey) regarding the stock options; and a violation of ERISA by Abbey's plan administrator. [FN1]

> FN1. The ERISA claim will be addressed separately. In a November 26, 1995 Memorandum of Decision, the court ruled that the issue of whether the plaintiffs may recover statutory penalties based on the ERISA allegation (29 U.S.C. § 1132(c)(1)(B)) is not subject to arbitration.

FACTS

When considering a motion to dismiss, "[w]e must accept the allegations of the complaint as true, and if, under any theory, the allegations are sufficient to state a cause of action in accordance with the law, we must deny the motion to dismiss." *Vartanian v. Monsanto Company,* 14 F.3d 697, 700 (1st Cir.1994); *Knight v. Mills,* 836 F.2d 659, 664 (1st Cir.1987). The facts alleged in the Amended Complaint, which for present purposes are deemed true, are these. The plaintiffs are registered Massachusetts pharmacists who have extensive managerial experience in the home health care industry. In 1984, Baptista was named General Manager of the Deaconess Home Health Care Corporation (HHCC). At that time, HHCC was a newly established not-for-profit subsidiary of the Deaconess Hospital. HHCC specialized in the delivery of in-home intravenous drug therapies. Mitrano joined HHCC as Director of Operations in 1986. In 1989, Baptista was named President of HHCC and Mitrano was elevated to Vice President.

In the early 1990's, certain assets of the Deaconess were purchased by TPC. Baptista became the President of the home health care division of TPC and a Senior Vice President, while Mitrano became the Vice President of Operations. Under the terms of their employment, Baptista and Mitrano received the right to purchase 40,000 and 30,000 shares of TPC stock respectively. The right to purchase these shares (options) vested in equal installments over a four year period from February, 1993, to February, 1996. The options were to vest so long as plaintiffs remained employed by TPC. If their employment was terminated, plaintiffs had the right to exercise any vested options. In October of 1992, after a steep decline in the price of TPC stock, the option package

Not Reported in F.Supp. Page 86
(Cite as: 1996 WL 33340740, *1 (D.Mass.))

Case 1:03-cv-12413-DPW   Document 42-17   Filed 07/29/2005   Page 2 of 5

was re-configured. The exercise price was lowered and the vesting schedule was extended from four to five years. In May of 1993, TPC gave Baptista and Mitrano options to buy an additional 12,500 and 10,000 shares of TPC stock, respectively, options which were to vest in equal annual installments over a four year period beginning in May of 1994.

*2 In November of 1993, TPC become an Abbey subsidiary. Abbey offered to exchange cash and Abbey stock for plaintiffs' vested (or soon to vest) TPC options. As for unvested TPC options, Abbey offered plaintiffs the opportunity to purchase Abbey stock under the same vesting schedule at an equivalent price.

Baptista and Mitrano accepted the offer, but because of SEC restrictions were not permitted to exchange the TPC options that were scheduled to vest in September of 1994. With respect to these options, Abbey offered the plaintiffs a "Substitute Option" to purchase an equivalent amount of Abbey stock, 25% of which vested on the date of the TPC--Abbey merger (but which could only be exercised six months after the merger date), and the remainder according to the schedule of the superseded TPC options. The plaintiffs accepted this offer.

To sum up, as of December 1, 1993, Baptista and Mitrano had been awarded options as follows.

> Baptista: Options to purchase 23,115 shares of Abbey at $13.367/per share in substitution for the 1992 TPC options, scheduled to vest in 7,705 share increments in February of 1995, 1996, and 1997; and options to purchase 9,030 of Abbey at $13.497/share in substitution for the 1993 TPC options, scheduled to vest in 3,010 share increments in May of 1995, 1996, and 1997.
> Mitrano: Options to purchase 17,337 shares of Abbey at $13.367/per share in substitution for the 1992 TPC options, scheduled to vest in 5,779 share increments in February of 1995, 1996, and 1997; and options to purchase 7,224 of Abbey at $13.497/share in substitution for the 1993 TPC options, scheduled to vest in 2,408 share increments in May of 1995, 1996, and 1997.

In February of 1994, Abbey fired Victor Chaltiel, the Chairman of TPC. The remaining officers of TPC, fearing further terminations, informally appointed three representatives, Baptista among them, to discuss a modification of the vesting schedules with Aitken. The plaintiffs allege that they (and the other officers) considered leaving Abbey in response to Chaltiel's firing, but entered into discussions with Aitken because "moving the dates of vesting forward toward the present--would work a real incentive to the TPC officers to stay put...." Second Amended Complaint, at 6.

Following discussions (primarily in California where Abbey's headquarters are located), Aitken promised to immediately vest the TPC options that were to come due in September of 1994 and 1995, and to accelerate the vesting of the 1996 and 1997 options to February, 1995. He also agreed to pro-rate the vesting schedule so that any officer terminated between vesting dates would receive a proportional share of any unvested options that would otherwise have been earned. The Second Amended Complaint alleges that during February, March and April of 1994, Aitken represented to several TPC officers that he had sought and obtained approval for the modifications to the options plans from Abbey's board of directors, that the modifications were "done," and that the TPC officers should rely on him as a "man of his word."

*3 The Second Amended Complaint alleges that Aitken not only made oral representations about the promised options, but that he "directed that certain paperwork be prepared to reflect the modified vesting schedules." In fact, an "Employee Stock Options Summary" was mailed by Abbey to the plaintiffs on April 7, 1994. Second Amended Complaint, at 6. These documents summarized the accelerated vesting schedule promised by Aitken (with the exception of the pro-rated schedule). The Second Amended Complaint also alleges "[o]n information and belief, other paperwork reflecting Aitken's promise-- including actual modified substitute stock option agreements reflecting the disputed modifications--was prepared and executed by Abbey personnel." Second Amended Complaint, at 6.

Baptista and Mitrano were terminated by Abbey on April 28, 1994. They immediately demanded that Abbey permit them to exercise their vested options, but Abbey, without specifically denying the existence of their right to do so, refused.

*DISCUSSION*

1. *Venue*

Abbey argues that the entire Second Amended Complaint should be dismissed because venue does not lie in the District of Massachusetts. Under 28 U.S.C. § 1391(b), when, as here, jurisdiction over an action is not founded solely on the parties' diversity of

Not Reported in F.Supp.
(Cite as: 1996 WL 33340740, *3 (D.Mass.))

Case 1:03-cv-12413-DPW    Document 42-17    Filed 07/29/2005    Page 3 of 5

Page 8

citizenship (plaintiffs claim federal question jurisdiction as well as diversity), venue is appropriate "where any defendant resides, if all defendants reside in the same State," or "[in a] district in which a substantial part of the events or omissions giving rise to the claim occurred." Abbey correctly argues that although the corporate defendants "reside" in Massachusetts, because Aitken is a California resident, venue does not lie under the first clause of the statute. Although plaintiffs concede that the alleged fraud and misrepresentation "occurred primarily in California," this does not preclude a finding that "a substantial part of the events or omissions giving rise to the claim occurred [in Massachusetts]." The plaintiffs lived and worked in Massachusetts, acquired the original vesting rights in Massachusetts, were terminated in Massachusetts, and became aware of Aitken's alleged fraud in Massachusetts. [FN2] Under these facts, the "substantial occurrence" requirement of the venue statute is met, and venue is proper in this district. The motion to dismiss the Second Amended Complaint for improper venue will be *DENIED.*

> FN2. At oral argument, Abbey acknowledged that "Boston is the main branch of Abbey outside of California."

*2. Lack of Personal Jurisdiction over Aitken*

Abbey also argues that the plaintiffs' claim of fraudulent misrepresentation against Aitken (Count IV) should be dismissed because the court lacks personal jurisdiction over Aitken, "a California resident ... not alleged to have engaged in tortious conduct in Massachusetts." Defendants' Memorandum in Support, at 14. While it is true that "[t]he general rule is that jurisdiction over [an] individual officer[ ] of a corporation may not be based merely on jurisdiction over the corporation," *Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 906 (1st Cir.1980), the Second Amended Complaint alleges more. Aitken is said to have engaged in direct negotiations with Baptista, an Abbey employee based in Massachusetts. He made representations about Mitrano's salary, also with the knowledge that he was active in Massachusetts on Abbey's behalf. These facts might be enough to establish that Aitken "transacted business" in a fashion sufficient to come within the jurisdiction of the Massachusetts courts. See *Tatro v. Manor Care, Inc.,* 416 Mass. 763, 769 (1994). However, plaintiffs concede in their brief that the alleged fraud and misrepresentation "occurred primarily in California,"

and that none of Aitken's direct dealings with the plaintiffs took place in Massachusetts. At oral argument, the plaintiffs admitted that Aitken's personal presence as a defendant confers no particular advantage as far as they are concerned, while at the same time possibly compromising their choice of venue. Consequently, the defendants' motion to dismiss Aitken from the case for lack of personal jurisdiction will be *ALLOWED.*

*3. Applicability of M.G.L. c. 149 §§ 148, 150*

**\*4** M.G.L. c. 149, §§ 148, 150, mandate the prompt, bi-weekly payment of wages by employers to their employees. The statute also requires that "any employee discharged from ... employment shall be paid in full on the day of his discharge...." The plaintiffs assert that the stock options granted to them as part of their executive compensation package should be considered "wages and other benefits" within the meaning of the statute. The plaintiffs admit that this is an issue of first impression under Massachusetts law to which they devote ten pages of their forty-six page brief.

This is a case of first impression because the only impression that can possibly be derived from M.G.L. c. 149, §§ 148, 150, is that its intent is to protect laborers and casual wage earners who might otherwise be vulnerable to employer intimidation. [FN3] One case has construed the statute to apply to corporate executives as well as to lower level employees, but its holding is limited to the payment of ordinary wages and wage equivalents, specifically accrued vacation pay and sick leave. See *Massachusetts v. Morash,* 490 U.S. 107, 117 (1989). As the Supreme Court noted in *Morash,* "[p]aid vacations ... are associated with regular wages or salary, rather than benefits triggered by contingencies...." Id. at 117, quoting 40 Fed.Reg. 24642-24643 (1975). The distinction between assured and contingent compensation is a sound one. In this case, there is no reason to extend the protections of a wage earner's statute to cover bonuses potentially owing to highly paid executives, who were confident enough to resign their employment if their demands for accelerated (and contingent) stock options were not met. There is even less reason to extend the opportunity to collect "treble damages for any loss of wages and other benefits ... [and] an award of the costs of the litigation and reasonable attorney fees." M.G.L. c. 149, § 150. Therefore, the motion to dismiss Count I of the Second Amended Complaint will be *ALLOWED.*

Not Reported in F.Supp.
(Cite as: 1996 WL 33340740, *4 (D.Mass.))

Case 1:03-cv-12413-DPW   Document 42-17   Filed 07/29/2005   Page 4 of 5

Page 88

> FN3. The cases reported under the statute are all to this effect.

### 4. Statute of Frauds

Abbey next argues that "[e]ven if Aitken had promised to accelerate the plaintiffs' stock options (which he did not), the alleged oral promise is unenforceable because it does not comply with the Statute of Frauds." [FN4] Memorandum in Support, at 10. Under both Massachusetts and California law, a contract for the sale of securities is not enforceable unless "[t]here is some writing signed by the party against whom enforcement is sought or by his or her authorized agent or broker, sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price...." Cal. Comm.Code § 8319(1)(a); M.G.L. c. 106, § 8-319(1)(a). As a preliminary matter, while it may be correct to assume, as both parties have, that a corporation's award of options to its executives is a "sale" of securities within the meaning of the Statute of Frauds, [FN5] it is less clear that an alteration of the vesting date of the same options falls within the definition of a "sale." In any event, the plaintiffs have submitted documents which, on their face, are a summary, authored by Abbey, of the accelerated vesting schedule promised by Aitken to the plaintiffs.

> FN4. The parties dispute whether the California (Cal. Comm.Code § 8319) or Massachusetts (M.G.L. c. 106, § 8-319) version of the Statute of Frauds applies, however, I see no difference between the two statutes insofar as this case is concerned.

> FN5. But see *Hiller v. Franklin Mint, Inc.*, 485 F.2d 48, 51 (3rd Cir.1973) (where an alleged oral agreement for the transfer of stock options is "a contract for employment rather than a [traditional] sale, the statute of frauds is inapplicable"); *Baldassurre v. Singer*, 444 Pa. 100, 103 (1971) (same).

*5 While it is true, as Abbey points out, that there is no human signature on either document, the words "Total Pharmaceutical Care, Inc." appear on the heading of each. The Statute of Frauds is intended to bar suits related to the sale of securities where there is no real evidence that a contract for sale was ever formed. It is not, as Abbey would have it, a trap permitting a seller to lull a buyer into believing that he has the protection of a written agreement when for the want of a quill and a pot of ink he does not. As one leading commentator explains:

> the statute of frauds ... does not require any specific form of writing.... The sufficiency of the writing is a question of fact to be determined by the circumstances of each case.... [T]he basic requirement is that the writing be reasonably sufficient to prove the existence of a contract obligating the defendant to buy or sell securities....

Hawkland, 7 Uniform Commercial Code Series, § 8-319:03, at 388. "The word 'signed' is defined ... to include 'any symbol executed or adopted by a party with present intention to authenticate a writing.' Most courts have liberally interpreted this provision." Id.

Abbey correctly points out that the cases relied upon by the plaintiffs deal with broker/dealer confirmation slips, but the two employee stock option summaries at issue bear every indication of having been internally generated by Abbey. For this reason, cases supporting the proposition that "an interoffice memorandum confirming a sale, signed by the sender, would satisfy the statute even though there was n[either] intent to satisfy ... nor delivery," Hawkland, § 8-319:03, at 388, are on point, even if they are distinguishable on their facts. Finally, even if I were to find that the Abbey documents were facially insufficient to defeat the Statute of Frauds, their existence supports the inference that there may be other documents in the possession of the defendants which would satisfy the Statute, documents which the plaintiffs have a right to seek through discovery. Thus, the motion to dismiss Counts II and III of the Second Amended Complaint for failure to state a claim upon which relief can be granted will be *DENIED*.

### 5. Fraudulent Misrepresentation and Reasonable Reliance

The defendants next argue that the claims against Abbey and Aitken must fail because it was unreasonable for plaintiffs to rely upon Aitken's oral promise to accelerate the stock options. They point out that the plaintiffs were aware that the terms of the stock option incentive plan required that all option agreements be put in writing and approved by Abbey's Compensation Committee. The Second Amended Complaint, however, alleges that the plaintiffs relied not only on Aitken's promise that the agreement would be modified, but also on his representation that the modifications had been approved. I cannot find at this stage in the proceedings that plaintiffs acted unreasonably in relying on the representations of the Chairman of the

Board of the company that employed them. See *Weiner v. Fleischman,* 54 Cal.3d 476, 488 (1991) ("Even where a contract has been solemnized by a writing, an oral modification of that written contract may be proved by a preponderance of the evidence"); *Cambridgeport Savings Bank v. Boersner,* 413 Mass. 432, 439 (1992) ("[A] provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract").

*6 Abbey's next argument, that even assuming reasonable reliance, plaintiffs cannot show any resulting damages, is also unconvincing. Despite Abbey's belief that there could be no harm to the plaintiffs in their choosing to remain in Abbey's employ for the two months between the time they received Aitken's assurances and their termination, the Second Amended Complaint alleges that but for Aitken's promises, the plaintiffs would have quit their jobs and moved on. By giving up their freedom to contract for their labor elsewhere (or to simply retire), the plaintiffs acted to their detriment. [FN6] On the other hand, Cal. Civil Code § 3343, limits recoverable damages to "[o]ne defrauded in the purchase, sale or exchange of property" to actual damages. [FN7] California law is clear that "[i]n the absence of a fiduciary relationship, recovery in a tort action for fraud is limited to the actual damages suffered by the plaintiff." *Alliance Mortgage Company v. Rothwell,* 10 Cal.4th 1226, 1241 (1995), quoting *Ward v. Taggart,* 51 Cal.2d 736, 741 (1959); see also *Salahutdin v. Valley of California, Inc.,* 24 Cal.App.4th 555, 564-565 (1994). The plaintiffs' argument that § 3343 is limited to transfers of real property is unpersuasive, being contrary to both the plain meaning of the statute and the cases interpreting it. See, e.g., *Christiansen v. Roddy,* 186 Cal.App.3d 780 (1986) (no benefit of the bargain damages for defrauded purchasers of a secured note); *Hartong v. Partake, Inc.,* 266 Cal.App.2d 942, 969-970 (1968) (limiting damages to out of pocket losses for claim of fraud in connection with franchise agreements); *Hill v. Wrather,* 158 Cal.App.2d 818, 825 (1958) (§ 3343 limits measure of damages to "out of pocket" in fraudulent sale of stock cases).

> FN6. That the plaintiffs "would not have been entitled to the six months of severance pay which they received" had they voluntarily resigned does not alter the analysis. Defendants' Memorandum in Support, at 14.

> FN7. Actual, or "out of pocket" damages are "directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received...." *Alliance,* 10 Cal.4th at 1240, quoting *Stout v. Turney,* 22 Cal.3d 718, 725 (1978).

### ORDER

For the forgoing reasons, defendants' motion to dismiss Count I of the Second Amended Complaint is *ALLOWED*. The motion to dismiss as to Counts II-V is *DENIED*, subject to the limitation on damages recoverable under Counts IV and V. The motion to dismiss the defendant Aitken for want of personal jurisdiction is *ALLOWED*. The court at this time makes no determination as to the viability of Count VI.

1996 WL 33340740 (D.Mass.)

Motions, Pleadings and Filings (Back to top)

. 1:95CR10125 (Docket) (Apr. 26, 1995)

END OF DOCUMENT