1    A.  Yes.

2    Q.  Who told you that?

3    A.  Bard, and there's another agreement with that in
4  it.  This is a different agreement.

5    Q.  Do you have a copy of that agreement?

6    A.  I don't know.  I provided everything I have.  But
7  these first two pages were changed several times.  I did
8  sign the back copy though.

9    Q.  Do you have any other versions of the first two
10  pages of this document?

11    A.  I don't know.  I know that Bard changed them like
12  three or four times.

13    Q.  Well, this one here is dated February 21st.  Did
14  the changes that Bard make, were they made prior to the
15  issuance of this document?

16    A.  Like I said, there were more than a couple of
17  these.

18    Q.  And my question is is it possible that the other
19  versions of this document preceded this document that you
20  signed on February 22nd?

21    A.  I don't remember.

22    Q.  But you say you remember Bard telling you that if
23  you were terminated you would receive commissions on every



A. Can you ask me the question one more time again please?

Q. Sure. Can you tell from looking at Exhibit 20, which is in front of you right now, which mortgage loans were funded prior to your date of termination and that you weren't paid for?

A. Yes. Which I wasn't paid for or which I was paid for?

Q. Well, let's start with what you were paid for, sorry.

A. On this page, these two pages right here, I was paid for these loans.

Q. Those were the two first two pages of Exhibit 20?

A. I think it was. I would have to go look at my pay stub to see if it matches, and then I would have to look at the pipeline to make sure every loan was in here because they made mistakes.

Q. Now, you say that you'd compare it to your pipeline report to see if they missed any particular loans?

A. Yes.

Q. From looking at Exhibit 20, that stack in front of you right now, can you tell if there are any loans that funded as of the date you were terminated but that you

```
 1  weren't paid for?
 2      A.  But I was terminated in February and this list only
 3  goes up to December of 2002, so I wouldn't be able to tell.
 4      Q.  All right, great.
 5              (Discussion held off the record.)
 6      Q.  Okay, Ms. Scalli --
 7      A.  Yes.
 8      Q.  -- your estimate of $300,000 damages includes the
 9  $65,000 in bonus measured by the $65 million in loans you
10  originated during 2002.  You say it also includes
11  commissions on certain loans that are closed at or around
12  the time of your termination that you weren't paid on, is
13  that correct?
14      A.  I'm going to ask you to repeat it, sorry.
15      Q.  Sure.  The $300,000 in damages includes commissions
16  on loans that closed at or around the time of your
17  termination?
18      A.  Not necessarily.  Some loans closed after my
19  termination.
20      Q.  Okay, and I'm sorry, I would include those in at or
21  around the time of your termination --
22      A.  Yes.
23      Q.  -- including after your termination?
```

1  the same amount as what was withheld from your check, is
2  that correct?
3      A.  But my paycheck would not reflect that.  I found it
4  in my commission reports.  Nobody told me about it.
5      Q.  Your commission report showed a reduction per pay
6  period?
7      A.  It said right on it to Bob.
8      Q.  And that amount was paid over to Bob and you said
9  you never authorized that?
10     A.  Correct.
11     Q.  And you learned of that during calendar year 2002?
12     A.  Yes.
13     Q.  Do you remember when in 2002 you learned of that?
14     A.  Bard called me up and said he made a whole bunch of
15 mistakes, and I think it was somewhere around the spring of
16 2002 because the reason why I remember is the weather was
17 starting to get warmer and my allergies were starting, and
18 he told me that he had made a huge, a couple of huge
19 mistakes with Human Resources, that he was violating labor
20 laws.  That because he hadn't figured out, you know, Bob's
21 salary and how he was getting paid because he didn't get
22 around to it that by law he has to get a paycheck with at
23 least minimum wage or they could be in trouble.  So he was

1 getting like negative paychecks that would say minus
2 $4,000, and everything would be negative and he said that
3 was a big problem for the bank.
4     Q.   And so that did he tell you that he was going to
5 start paying Bob a sum of money to fix that?
6     A.   What he told me was the 50,000 that was supposed to
7 be his base salary that retroactive, that a negative would
8 be deducted from the 50,000 but it never happened, and then
9 the monies that he was paid came out of my commission
10 reports without me knowing and I found out many months
11 later, it might have been 3 months later because I didn't
12 notice it.
13     Q.   When you did notice it, what did you do?
14     A.   I called Bard.
15     Q.   And what happened?
16     A.   He acted like he didn't know about it.
17     Q.   So what did you do?
18     A.   I said, oh, my God, we have to fix this, how can
19 you do this, we have to fix it.
20     Q.   So Bard told you he had no idea about --
21     A.   He said he was going to fix it, and I said please,
22 you have to fix it.
23     Q.   Did he fix it?

```
 1      A.  No.
 2      Q.  So did you talk to anyone else at Citizens?
 3      A.  No, because it, it seemed like the months went by
 4  very quickly, and by the time I did find out from the time,
 5  the springtime to the end of 2002 was maybe a six-month
 6  period, so it may have been like 3 or 4 months later and it
 7  was already towards the end of the year and we were going
 8  to be starting a new year, so Bard told me for 2003 that
 9  all the new agreements and everything we were going to do
10  would wash away anything that was done in 2002.  That he
11  would fix it, meaning it would go retroactive, he would
12  deduct, you know, whatever negative and whatever he had to
13  do to fix it, and that's exactly what he said I'll fix it.
14      Q.  And to be clear, you never called anyone else at
15  Citizens when it didn't get fixed, did you?
16      A.  To be totally honest with you, I didn't have
17  anybody's names to call.  I just worked all the time.  I
18  had nothing to do with like who do I call.  He said I'll
19  take care of it.  I believed him.
20      Q.  But he never took care of anything, did he?
21      A.  No, he didn't.
22      Q.  And you kept believing him?
23      A.  Well, up until one of the last arguments we had, I
```

kind of was fed up with him telling me he was going to fix it which led to the conversation when he was upset about the bills going to the wrong place and I demanded about the 401K and, you know, Bob's salary and what the accountants were saying to me.

Q. The amount of money that -- strike that.

You said that Robert for a while was getting negative paychecks, correct?

A. Correct.

Q. Was he ever or were you charged for those negative amounts do you know?

A. We were supposed to be because Bard told me that once he, once he had the 50,000 salary it would go, it would be deducted from that because all the medical benefits and everything were under my husband, so whereas he wasn't making anything, it would go negative, like keep going negative, and that's when someone over there noticed that something wasn't right, and I think that would be Human Resources because he called me and told me that there was a huge problem.

Q. Did you, were you ever charged, you, was your income ever charged for that negative income that your husband received?

1  A. I would have to dig really deep. It might have
2 been. It really might have been and I was wondering that
3 myself, but when you're dealing with so many numbers and so
4 much dollars, it's really hard to find every little thing.
5 Like in some of those commission reports, I saw price share
6 things that, monies taken from me that went to Bard and
7 they're right in those reports and I don't know what that
8 was for either. It was like 3, 4, 500 at a time that says,
9 you know, between me and Bard, so I don't know what those
10 monies were for either.
11  Q. Ms. Scalli, you said that during 2002 that you
12 closed $65 million in loans or I should say you were
13 credited with closing $65 million in loans, correct?
14  A. Correct.
15  Q. What portion of that $65 million were originated by
16 your husband, Robert?
17  A. Bob was the marketing person, so in terms of
18 origination, I would say less than 20 percent.
19  Q. When you say he was the marketing person, did he do
20 the marketing for you too?
21  A. Yes, Bard hired him to do the marketing with a
22 salary and to originate loans. He did all the marketing
23 for my whole group.