UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ELEANOR SCALLI and        )
ROBERT SCALLI,            )
          Plaintiffs,     )
                          )          CIVIL ACTION NO.
        v.                )          03-12413-DPW
                          )
CITIZENS FINANCIAL        )
GROUP, INC.,              )
          Defendant.      )


MEMORANDUM AND ORDER
February 28, 2006


The Plaintiffs, Eleanor and Robert Scalli, have brought six separate claims against the Defendant, Citizens Financial Group, Inc., relating generally to their termination from employment by the Defendant's subsidiary, Citizens Mortgage Corporation ("Citizens" or "the Company").  More specifically, the Plaintiffs' Consolidated Complaint seeks redress for wrongful discharge (Count I), breach of the covenant of good faith and fair dealing (Count II), misrepresentation (Count III), compliance with the Wage Act (Count IV), interference with their subsequent employment (Count V), and defamation (Count VI).  The Defendant has moved for summary judgment on all counts.

## I. BACKGROUND

Citizens makes its motion for summary judgment, even though it disputes many of the facts in the record.  It submits that even on the Plaintiffs' version, no reasonable jury could find in favor of the Plaintiffs as a matter of law.  I recite the relevant factual background, bearing in mind that I must "construe the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in that party's favor." Braga v. Genlyte Group, Inc., 420 F.3d 35, 38 (1st Cir. 2005)(citing Whitlock v. Mac-Gray, Inc., 345 F.3d 44, 45 (1st Cir. 2003)).

### a.  The Hiring

In December 2000, Mr. Scalli was working as a loan officer for Hancock Mortgage and his wife, Mrs. Scalli, was working as a loan officer for North American Mortgage Company when Steven Roussel, a loan officer from Citizens, approached Mr. Scalli at a social event about working for Citizens.

Early in 2001, Barden Conn, a Citizens Senior Vice President in charge of sales and operation for Massachusetts and New Hampshire and construction lending, followed up with the Scallis to discuss employment possibilities with Citizens.  After negotiations about compensation, set out in greater detail in subsection II.c. infra, the Scallis signed offer letters from Citizens in late February 2001.  The final version of the written

offer letters did not reflect some of the employment compensation
promises allegedly made earlier by Mr. Conn.  Mrs. Scalli
testified that Mr. Conn told her he would fix the discrepancies,
but the parties did not execute new documents.  Nevertheless, the
Scallis commenced employment with Citizens soon thereafter,
working out of their home in Winthrop, Massachusetts.

The offer letters indicate that Citizens hired Mrs. Scali
as a Senior Loan Officer and Mr. Scalli as a Loan Officer.
According to Citizens, its loan officers solicit applicants, pre-
qualify applicants, take applications and monitor the loan
origination process through closing residential mortgages.  Loan
origination involves external relationships among borrowers, the
real estate community and loan officers and internal
relationships between loan officers and processors and the
underwriting and loan closing departments.  Initially both
Scallis reported to Michael Diranian, a Citizens Sale Manager,
but at some point after starting their employment they began
reporting directly to Mr. Conn.

Mr. Conn contends that Citizens hired the Scallis as a team,
with Mr. Scalli being primarily responsible for the marketing
aspect of loan origination, although his official position
remained Loan Officer.  Either on Mr. Conn's request or by the
Scallis' choice all of the loans Mr. Scalli originated would be
entered under Mrs. Scalli's name/production number.  Neither the
initial offers, nor Mr. Scalli's employment renewal offer in

-3-

March 2002 reflected this "team" arrangement.  According to Mr. Scalli, Mr. Conn explained that such an arrangement would result in an overage (bonus/commission) going to him instead of Mr. Diranian, since Mr. Conn was paid direct compensation from all the loans that were produced through Mrs. Scalli's pipeline.  Mr. Conn, however, has testified that his compensation was capped and that the income he earned from the combined volume of loans produced by his other loan officers had already reached the cap.[1]

During the Scallis' employment at Citizens, Mr. Scalli originated between 10% and 20% of the loans that were reported under Mrs. Scalli's name.  In 2002, Mrs. Scalli was ranked as Citizens' top loan officer.  If the loans originated by Mr. Scalli had not been included under Mrs. Scalli's production number, she would have been "neck and neck" with the second-highest ranked loan officer.

Citizens paid Mrs. Scalli approximately $242,000 for 2001, $428,000 for 2002, and $83,300 in 2003 for her employment through February 4, 2003.  Citizens paid Mr. Scalli $15,746.91 in 2001, $8,154.90 in 2002, and $2,966.10 in 2003 for his employment through March 5, 2003.  Sometime around June 2002, the Company started to pay Mr. Scalli a monthly draw to cover the employee portion of the family medical benefit he had elected.  This draw was deducted from Mrs. Scalli's commissions in order to cover Mr.

---

[1] I do not resolve this factual dispute at this stage.

-4-

Scalli's benefit deductions.  The Scallis claim that this
compensation was not paid in a manner consistent with their
contracts or the promises made by Mr. Conn before they began
working for Citizens.  Mrs. Scalli also claims that she was
promised an all expense trip to Aruba for being "top producer" in
2002.  She elected not to go on the sales trip in 2002, and could
not go on the sales trip in 2003 because she was no longer a
Citizens employee in good standing.

### b.  The Termination

In December 2002, Jean Barbosa, a plasterer who did work in
buildings owned by Mr. Scalli during the Scallis' employment with
Citizens, was interested in obtaining a mortgage through Citizens
for a residential property at 331 Paris Street in East Boston.
Mr. Barbosa entered into a purchase and sale agreement for the
Paris Street property on December 13, 2002 and then applied for a
loan to purchase the property through Mrs. Scalli's office.
Citizens' underwriting department approved the loan and a
commitment letter dated January 9, 2003 and addressed to Mr.
Barbosa was prepared.

Mr. Barbosa told Mrs. Scalli's then assistant, Luis Riascos,
that he wanted to withdraw his application because he did not
intend to occupy the property and the loan had been approved as
an owner occupied loan, not an investment property.  Mr. Barbosa
and Elizabeth (Liz) Walsh, a Citizens Operations Manager,

-5-

attempted to rework the loan as an investment property loan, but they were unsuccessful.    As a result, Ms. Walsh instructed Mr. Riascos to issue a Statement of Credit Denial, Termination, or Change ("Denial Letter") to Mr. Barbosa dated January 16, 2003. The Denial Letter appears to be signed by "Eleanor Scalli", but Mrs. Scalli testified that she does not remember if she actually signed the document or whether someone else in her office signed her name.    Mrs. Scalli's office issued these kinds of denials on occasion with permission from Ms. Walsh or Mr. Conn by printing out templates from their office laptops.

At some point after Mrs. Scalli's office issued the Denial Letter, Steven Roussel, who had become a Sales Manager at Citizens, received a complaint from Tony Giacalone, a realtor, about the Barbosa Denial Letter.    Mr. Giacalone suggested that the Denial Letter was not authentic and that he believed Mr. Barbosa was using it to get the deposit returned so that he could buy a different house.[2]    Mr. Roussel did not know if the Denial Letter was authentic because it had a different address and template than he was accustomed to and he was not familiar with loan officers actually signing a denial letter, so he gave the letter to Mr. Diranian.

---

[2] Mr. Barbosa's purchase and sale agreement for the Paris Street property provided that the $14,750 deposit would be retained by the seller as liquidated damages if the buyer failed to perform his duties under the agreement; however, if, despite the buyer's attempts, he was unable to obtain a mortgage for the property, the deposit would be refunded to the buyer.

Mr. Diranian thought the Denial Letter "just wasn't right," "it looked like a mock up document," and it looked "unprofessional." He forwarded the decline letter to Mr. Conn, who asked Ms. Walsh to review Mr. Barbosa's file. Ms. Walsh reported that Citizens had approved the loan.

Mr. Conn contacted Joyce Hicks, a Senior Human Resources Generalist Assistant Vice President, who consulted with her supervisor Debra Cornish and Sharon Costa, Vice President of Citizens Mortgage Corporation Operations. Ms. Hicks and Ms. Cornish agreed that if Mrs. Scalli had made a credit decision on a loan her employment would be terminated because it was standard policy that, in order to avoid a conflict of interest, loan officers not decline loans. Ms. Hicks had also been told that Mrs. Scalli denied the loan because Mr. Barbosa was purchasing a property (208 Maverick Street) from Mr. Scalli. Ms. Hicks and Ms. Cornish agreed that Mr. Scalli's employment would also be suspended pending further investigation concerning his involvement in the matter.

Ms. Hicks, Ms. Cornish, and Mr. Conn met with the Scallis separately on February 4, 2003. Although Mrs. Scalli explained during that meeting or the next day that Ms. Walsh had authorized her office to mail Mr. Barbosa the Denial Letter,[3] Citizens

_____

[3] There is some dispute about whether Ms. Walsh could authorize denial letters. Mrs. Scalli testified that her office could issue denial letters, and did so regularly, with the approval of Ms. Walsh or Mr. Conn when there was a time

terminated her employment on February 4, 2003 because she "breached the cardinal rule for loan officers."  Citizens suspended Mr. Scalli's employment that same day, pending further investigation.

The following day, Mr. Scalli called Ms. Hicks to tell her that the Maverick Street property was not his building and he was not selling it to Mr. Barbosa.  Mr. Scalli did not inform Ms. Hicks that Mrs. Scalli owned the property.  At the time of the termination, Mrs. Scalli was not negotiating a sale of the Maverick Street property to Mr. Barbosa, although Mr. Barbosa became interested in the property a few months before the eventual sale to him in June or July 2003.[4]

---

constraint.  This understanding contradicts Mr. Diranian's testimony that only underwriters can decline loans and Mr. Conn's testimony that neither he nor Ms. Walsh had the authority to deny loans.  According to Mr. Diranian and Ms. Hicks, all denials must be approved by Operations.  However, Mr. Conn's testimony suggests that with certain approvals Ms. Walsh may have had the authority to order a denial.  In any event, I must read the facts in the light most favorable to the non-moving party and thus I assume that Ms. Walsh did in fact properly authorize Mr. Riascos to issue the denial.

[4] Citizens moves to strike Paragraph 4 of the Barbosa's Affidavit, wherein he states that he "never had a discussion with Eleanor Scalli regarding purchasing any property that she owned while she was employed at Citizens Mortgage," because it "directly conflicts with Mr. Scalli's testimony" that "[he] knew that it wasn't [his] building and that Eleanor was ... selling Mr. Barbosa [the Maverick Street] building".

The basis for this motion is Prosser v. Ross, 70 F.3d 1005 (8th Cir. 1995), where the Eighth Circuit extended the well-established principle that "when an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is

While Mr. Scalli's employment was suspended, Citizens discovered what it perceived to be irregularities concerning a loan originating from Mrs. Scalli for Paula Castillo, Andres Castillo and Raphael Guerrero.  Citizens determined that the Scallis issued money to the customers from their bank account as a gift contrary to conflict of interest rules.  According to the

---

clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 20 (1st Cir. 2000)(internal quotations and citations omitted).  In Prosser, the Eighth Circuit extended this principle to cases "in which a plaintiff attempts to avoid summary judgment by proffering testimony from another person that contradicts the plaintiff's own testimony." Prosser, 70 F.3d at 1008.  However, this Court rejected the extension of "the sham affidavit rule to post-deposition affidavits of non-deposed, non-party affiants" in Mahan v. Boston Water and Sewer Com'n, 179 F.R.D. 49, 56 (D.Mass. 1998).  "The role of a judge at summary judgment is to determine if there are triable issue(s) of material fact(s) by considering whether a reasonable jury could find for the nonmoving party based on the admissible evidence.  The judge is not to invade the province of the trier of fact by making credibility determinations or weighing the evidence.  Though the integrity of summary judgment would be impaired if a nonmoving party could defeat summary judgment by offering a party or nonparty affidavit that contradicts, without satisfactory explanation, prior deposition testimony, this Court also believes that the integrity of summary judgment process would be defeated if the Court encroached upon the role of the trier of fact and turned summary judgment into trial on the merits.  A disinterested witness's affidavit signed under the pains and penalties of perjury should be taken as truthful at summary judgment." Id. at 56-57.

I find the explanation in Mahan persuasive and deny Citizens' motion to strike Paragraph 4 of Barbosa's Affidavit accordingly.  I also point out that Paragraph 4 is consistent with Mrs. Scalli's deposition testimony and it was she, not Mr. Scalli, who owned and eventually sold the property to Barbosa. Consequently, consistent with my duty to consider the record in the light most favorable to the Plaintiffs, I find that Mrs. Scalli was not negotiating a sale of the Maverick Street property to Mr. Barbosa while she was at Citizens.

Scallis, the payment from their joint account was intended as payment for work done by Andres Castillo on property owned by them.  The Scallis contend that neither of them issued money to the borrowers as a gift.

During Mr. Scalli's suspension from employment, Ms. Hicks also became aware that Mrs. Scalli may have accepted employment with GMAC (General Motors Acceptance Corporation).  Since she suspected that Mr. Scalli might also be applying for employment with GMAC, "a Citizens representative called GMAC to confirm whether or not Mr. Scalli had accepted employment at GMAC during his suspension from employment with Citizens."  Mr. Scalli had not accepted employment at GMAC.  Nonetheless, Citizens terminated Mr. Scalli's employment on March 5, 2003.

### c.  Post-Termination

In the Plaintiffs' Complaint they allege that Victoria Noel, a Citizens employee who worked as loan officer under Mr. Diranian until April 1, 2003, told Danielle Felice and Javier Pico that the Scallis had been "indicted for bank fraud."  Mr. Pico, a Massachusetts attorney who represented Mr. Scalli in two real estate closings in 2003 - one in March and one in August - and in legal matters after August 2003, stated that Ms. Felice told him in February 2003 that the Scallis were being indicted for bank fraud.[5]  However, Ms. Felice, a real estate broker, swore in an

_____

[5] The Defendant has moved to strike Paragraph 9 of Mr. Pico's Affidavit, where he stated that "Victoria Noel, while

-10-

Affidavit dated May 31, 2005 that she has never met Ms. Noel and that Ms. Noel never told her that the Scallis had been indicted for bank fraud.[6]

Mrs. Scalli did in fact go to work at GMAC after Citizens terminated her employment.  She earned approximately $210,000 from GMAC in 2003 and over $200,000 in 2004.  Mr. Scalli was hired by Hancock Realty after his termination from Citizens.


## II.  DISCUSSION

### a.  Summary Judgment Standard

The moving party is entitled to summary judgment when "the pleadings, depositions, answers to interrogatories, and

---

employed at Citizens Mortgage Company, underlined in February of 2003, that Robert Scalli and Eleanor Scalli were being indicted for bank fraud", because Mr. Pico "fail[ed] to disclose who was informed of" the allegedly defamatory statement.  Consistent with my duty to construe the record in the light most favorable to the Plaintiffs, I assume, despite the missing object in the disputed paragraph, that it was Mr. Pico who was "informed" given that it his Affidavit and deny this motion.

[6] The Plaintiffs have submitted an Affidavit by Erin Green, a friend of Ms. Felice's boyfriend, suggesting that Ms. Felice may have been motivated to lie when she prepared her Affidavit. The Defendant has moved to strike Mr. Green's Affidavit because it is inadmissible hearsay according to Fed. R. Evid. 801(c) and "too amorphous to satisfy the requirement of Rule 56(e)." Perez v. Volvo Car Corp., 247 F.3d 303, 316 (1st Cir. 2001).  Even if I considered Mr. Green's Affidavit of Ms. Felice's then-existing intention not to be involved in the Scalli litigation pursuant to the hearsay exception in Fed. R. Evid. 803(3), his Affidavit cannot serve as evidence of the conversation alleged by the Plaintiffs as part of the foundation of their defamation claim.

admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c).  A fact is "material" if it has the
"potential to affect the outcome of the suit under the applicable
law."  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d
46, 52 (1st Cir. 2000), and a "genuine" issue is one supported by
such evidence that "a reasonable jury, drawing favorable
inferences, could resolve it in favor of the nonmoving party."
Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2
(1st Cir. 1999)(internal quotations and citation omitted).

Once the movant makes the necessary showing, the non-movants
"may not rest upon the mere allegations or denials" of their
pleading, but "must set forth specific facts showing that there
is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see Nat'l
Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.
1995), cert. denied, 515 U.S. 1103 (1995).  "[C]onclusory
allegations, improbable inferences, and unsupported speculation,"
are insufficient to establish a genuine dispute of fact.
Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st
Cir. 1990).  "When the nonmovant bears the ultimate burden of
proof on a given issue, he must make a factual showing, by means
of competent and specific evidence, sufficient to establish the
essential elements of his claim."  Johnson v. Gordon, 409 F.3d
12, 17 (1st Cir. 2005).

### b.  Count I - Wrongful Discharge

In their Complaint, the Plaintiffs allege that Citizens' "termination of Eleanor and Robert Scalli and discharge is contrary to public policy."

In Massachusetts, the general rule is "that employment at will[7] is terminable by either the employee or the employer without notice, for almost any reason or for no reason at all." Wright v. Shriners' Hosp. for Crippled Children, 412 Mass. 469, 472 (1992).  In fact, "an employer does not violate a public policy justifying the recovery of damages solely by giving a false reason for the discharge of an at-will employee."  Mello v. Stop & Shop Companies, 402 Mass. 555, 557 (1988).

The Supreme Judicial Court has "recognized exceptions to th[e] general rule, however, when employment is terminated contrary to a well-defined public policy."  Id. at 472.  "Redress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation

---

[7] The Plaintiffs acknowledge that Citizens hired them as 'at will' employees.  The Scallis' offer letters included the following: "You agree that this Plan does not constitute an employment contract or a guarantee of employment for any specific length of time and in no way limits CMC's authority to terminate employment at its sole discretion, with or without cause. Nothing contained herein should be construed to alter your status as an 'at will' employee. Upon termination of employment, you will receive credit for commissions for all mortgage loans funded on the system up to, and including, your last day of employment."

claim), for doing what the law requires (e.g., serving on a
jury), ... for refusing to do that which the law forbids (e.g.,
committing perjury)," or for an employee "who was discharged in
retaliation for his cooperation with a law enforcement
investigation concerning his employer." Id. at 472-73 (citations
omitted).

Here, the Plaintiffs allege that "[t]he basis of their claim
is that they made repeated assertions of their rights to be paid
wages, commissions and benefits, individually, to the Senior Vice
President, Barden Conn"; "asserted rights to contribute to 401K
or retirement plans to Mr. Conn"; "raised their concerns about
the tax consequences of the defendant's payment or non-payment of
compensation as well as social security contributions with" Mr.
Conn.  I find that there are three fundamental problems with the
Plaintiffs' theory.

First, as the Plaintiffs' essentially conceded in oral
argument, there is no evidence that the Scallis raised concerns
about the tax and social security consequences of the
compensation scheme to Mr. Conn or anyone else prior to their
termination.  Thus, as in Mello, it appears that it was only
after their discharge that the Plaintiffs raised the charge that
Citizens was seeking to get rid of them to 'cover up' a
potentially illegal tax and social security scheme.  "We are not
dealing here, therefore, with a case in which the employer

-14-

discharged an employee because the employee threatened to report the employer's criminal conduct to the authorities[.]"  Mello, 402 Mass. at 559.

Second, the only evidence that the Plaintiffs threatened to pursue their compensation and deduction complaints is Mrs. Scalli's testimony that she demanded that Mr. Conn fix the problem and Mr. Scalli's testimony that he told Mr. Conn he was tired of his responses and that he was going to speak with someone at Citizens named Steve Adamo.  However, there is no evidence that either of the Plaintiffs ever voiced their complaints with anyone other than Mr. Conn prior to their termination.  It appears that the Scallis first complaint for non-payment of wages to someone other than Mr. Conn was in a letter dated December 9, 2003 after they were terminated.  Since there is no evidence suggesting that Ms. Hicks and Ms. Cornish, the decision makers concerning Plaintiffs' termination from employment, were aware of the purported complaints to Mr. Conn,[8]

---

[8] Although Ms. Hicks testified that sometime in early 2002 she became aware that the Scallis were funneling all of Mr. Scalli's loans under Mrs. Scalli's name and that Mr. Scalli's benefits were rejected from payroll because there was not enough money to cover his benefit deductions at that time, the Scallis have not proffered any evidence suggesting that Ms. Hicks was aware that they were complaining about the compensation scheme, which apparently seems to have benefitted at least Mrs. Scalli financially.  Similarly, while Mrs. Scalli testified that Mr. Conn said he was worried because he was violating "labor laws", the Plaintiffs have not connected his alleged concerns to their termination in a way that suggests wrongful discharge in violation of public policy.

it is difficult to see how Citizens terminated the Scallis for asserting their legal and contractual rights.

Third, even assuming that a reasonable jury could infer that the Scallis wage and benefits complaints to Mr. Conn somehow motivated Citizens' termination of the Scallis, "[i]t is a question of law for the judge to decide whether a retaliatory firing in these circumstances would violate public policy." Wright, 412 Mass at 472. "A basis for a common law rule of liability can easily be found when the Legislature has expressed a policy position concerning the rights of employees and an employer discharges an at-will employee in violation of that established policy, unless no common law rule is needed because the Legislature has also prescribed a statutory remedy." Mello v. Stop & Shop Companies, 402 Mass. 555, 557 (1988). This means that where the Legislature has prescribed a statutory remedy, the Courts should not fashion an additional common law remedy for terminations covered by the statutory scheme. As an example of this rule, the Supreme Judicial Court cited to M.G.L. c. 149, §148A, which provides "that no employee shall be penalized for seeking rights under the wage and hour provisions of G.L. c. 149." Id. at 558 n. 2. Thus, even if a reasonable jury could infer that Citizens terminated the Plaintiffs because they raised concerns about their wages and commissions, I will not recognize the terminations as violations of public policy because the

Scallis could have sought relief under the Wage Act, as discussed more fully below.  Furthermore, I will not hold Citizens responsible for the Scallis' failure to set up their 401K in the two year period based on this record.

In sum, while Citizens' hasty termination of the Scallis employment without a thorough investigation into the allegedly suspicious loan denials might have been "bad, unjust and unkind" or even unfair, there is no common law remedy in these circumstances.  <u>Glaz v. Ralston Purina Co.</u>, 24 Mass.App.Ct. 386, 389 (1987).  Thus, I grant summary judgment for Citizens on this count.

### c. Failure to Pay Compensation Owed (Counts II, III & IV)

The Plaintiffs allege three different causes of action that relate to Citizens' failure to pay them the compensation allegedly owed.  In Count II, the Plaintiffs allege that Citizens breached the implied covenant of good faith and fair dealing by failing to pay them benefits and commissions owed.  In Count III, the Plaintiffs allege that Citizens "made false statements of material fact to Eleanor and Robert Scalli regarding career advancement with the intent that Eleanor and Robert Scalli thereon relied ... to their detriment."  In Count IV, the Plaintiffs allege that Citizens violated the Wage Act, M.G.L. c. 149, §148.

I begin with Count II after outlining the different

-17-

compensation amounts claimed.

**Oral Promises**: Mr. Scalli claims that Mr. Conn promised him a $50,000.00 forgivable draw for 2001 and a $50,000.00 salary for 2002. Neither his initial signed offer letter encompassing his Loan Officer Incentive Plan, nor the second offer letter signed a year later reflect these promises. Mrs. Scalli claims that Mr. Conn offered her a $30,000.00 advance in 2001 upon joining Citizens. Her initial signed offer letter encompassing her Loan Officer Incentive Plan only reflected a $15,000 advance, which she did receive. She also claims that Mr. Conn promised her .70 basis points on loans closed over 3 million per month, instead of the .65 basis points on loans closed over 1 million as is reflected in the offer letter, and that he promised her a $1,000 bonus for every $1 million of loans closed per calendar year. According to the Scallis, Mr. Conn promised he would "fix" these "errors".

**Team Concept Compensation**: There appears to be some dispute as to when Mr. Conn promised Mr. Scalli the annual $50,000 forgivable draw or salary. Initially in his deposition, Mr. Scalli indicated that this promise was made during the negotiation phase before he executed the first offer letter. See R. Scalli (vol I), pp. 38-41, 52-55, 61; Defendant's Facts, ¶ 3. Mr. Scalli also indicated that when he received the offer letter that did not contain any reference to his salary he asked Mr.

Conn about it.  Mr. Conn told him that confirmation of his
$50,000 salary would be in the employment package, which it was
according to Mr. Scalli.  <u>See</u> R. Scalli (vol I), p. 59.  Later in
his deposition, Mr. Scalli indicated that about a week after he
started working, Mr. Conn told him that he would receive an
annual $50,000 forgivable draw or salary for focusing on
marketing and putting the loans he originated under his wife's
name/production number.  <u>See</u> R. Scalli (vol I), pp. 63, 66-67,
79, 82; Plaintiff's Facts, ¶ 13.  In any event, the parties agree
that Mr. Scalli was not compensated for the loans he originated,
which amounted to about 10 to 20% of his wife's productivity,
other than the initial $15,000.  Instead, Mrs. Scalli received
the compensation that would have gone to Mr. Scalli if the loans
had been originated under his name.  In addition, at some point
during their employment at Citizens, Mr. Scalli began to receive
a draw that was being deducted from Mrs. Scalli's paycheck to
cover the deductions for the couple's family medical benefits.

**Pipeline Compensation**: Mrs. Scalli claims that Citizens owes
her approximately $40,000 in compensation for the loans in her
pipeline that had not closed as of the date she was terminated
(February 4, 2003).  Citizens concedes that there was
approximately $40,000 in potential commissions for loans in Mrs.
Scalli's pipeline at the time of her termination.  However,
Citizens maintains that Mrs. Scalli "was paid commissions on all

loans that closed up to her date of termination."

**Miscellaneous**: In January 2003, Mrs. Scalli qualified for an all expense trip to Aruba for being the top producer in 2002. Mrs. Scalli claims that she is owed the monetary value of the trip. In the Amended Complaint, Mrs. Scalli also claims that she was "repeatedly promised during her employment additional support staff to increase her production and sales thereby increasing her commissions, which she never received." The Plaintiffs do not contest Citizens' arguments for summary judgment as to these claims in their Opposition or their Response to the Defendant's Reply Brief and for good reason.

### i) Count II - Covenant of Good Faith and Fair Dealing

The Plaintiffs allege in Count II that Citizens "breached the covenant of good faith and fair dealing by failing to pay benefits and commissions" owed to the Scallis.

The Supreme Judicial Court recently summarized the law with respect to implied covenants of good faith and fair dealing.

> Every contract in Massachusetts is subject, to some extent, to an implied covenant of good faith and fair dealing. This implied covenant may not be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, but rather concerns the manner of performance. It has been explained that the implied covenant exists so that the objectives of the contract may be realized. The concept of good faith and fair dealing in any one context is shaped by the nature of the contractual relationship from which the implied covenant derives. The scope of the covenant is only as broad as the contract that governs the particular relationship.

> In the context of employment, employers (in varying
> contexts and subject to strict limitations) have been
> held liable for breach of the implied covenant of good
> faith and fair dealing only in circumstances when an
> at-will employee has been terminated in bad faith.
> There is no general duty on the part of an employer to
> act "nicely."  Accordingly, to the extent that the
> plaintiff's claim rests on allegations that [her
> employer] dealt with her in a manner that was unfair
> ..., the plaintiff did not present a claim on which she
> could recover.

Ayash v. Dana-Farber Cancer Institute, 443 Mass. 367, 385-86

(2005)(internal citations and quotations omitted.)

    In Ayash, the Supreme Judicial Court held that "[i]n the

specific context of a physician-hospital employment relationship,

we have assumed (but not yet decided) that a physician whose

staff privileges have been terminated by a hospital may assert a

claim of breach of the implied covenant of good faith and fair

dealing against the hospital based on its alleged bad faith

failure to follow its own bylaws."  Id. at 386.  Here, there is

no analogous claim being made.  Consequently, I consider the

claim in terms of a typical Fortune claim.  See Fortune v.

National Cash Register Co., 373 Mass. 96, 101 (1977).

    In Fortune, the Supreme Judicial Court "held that the

defendant employer's written contract with its employee

'contain[ed] an implied covenant of good faith and fair dealing,

and a termination not made in good faith constitutes a breach of

the contract.' [The Court] stated that '[w]here the principal

seeks to deprive the agent of all compensation by terminating the

contractual relationship when the agent is on the brink of

-21-

successfully completing the sale, the principal has acted in bad faith and the ensuing transaction between the principal and the buyer is to be regarded as having been accomplished by the agent.... The same result obtains where the principal attempts to deprive the agent of any portion of a commission due the agent.'" King v. Driscoll, 424 Mass. 1, 6 (1996) quoting Fortune, 373 Mass. at 104-105.  "Subsequently, in Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 672(1981) (Gram I ), [the Court] held that breach of the implied covenant of good faith and fair dealing occurs when, despite the employer's good faith, the discharge of the terminable at-will employee nevertheless results in the employee's loss of compensation already earned."  Thus, the purpose of this cause of action is to deny the employer "any readily definable, financial windfall resulting from the denial to [the employee] of compensation for past services." Id. at 7 quoting Gram v. Liberty Mut. Ins. Co., 391 Mass. 333, 334-335 (1984) (Gram II).

In this case, the Plaintiffs claim that "there are genuine issues of material fact that their terminations were not for good cause and in bad faith", but make no specific Fortune argument in their Opposition.[9]  However, given the discussion during oral

---

[9] In a footnote in their Response to the Defendant's Reply Brief, the Plaintiffs assert that "[c]ontrary to the Defendant's assertion, the Plaintiffs' raised a Fortune claim as well as genuine issues of material fact. See Opp. at 14." [Response, p. 5 n. 5.] Simply citing Fortune on page 14 of their Opposition is not what I would consider specifically making a Fortune argument.

argument, I find that the issue of whether Mrs. Scalli was on the brink of receiving commissions for her work up to the date of her termination deserves comment.  Presumably this would include any loans that Mr. Scalli worked on that were inputted under Mrs. Scalli's name.

Mrs. Scalli's signed offer letter encompassing her Loan Officer Incentive Plan provided that upon termination she would receive commission for all loans "funded on the system up to, and including, [her] last day of employment[.]"  Citizens maintains that this phrase means that Mrs. Scalli is only entitled to commission on loans that were closed prior to her termination. See Hicks Depo. (vol II), pp. 182-83.  The Plaintiffs no longer contest that Mrs. Scalli received compensation for all loans closed up to her termination.[10]  However, they argue that she is entitled to the commissions she was on the brink of receiving, suggesting that the cut off date should be earlier in the loan origination process, perhaps when the underwriting department issues a commitment letter or the "Lock Date". See Hicks Depo., Exhibit 11.  This may amount to as much as $40,000.

---

[10] In the Plaintiffs' written submission, they seem to be concerned that Mrs. Scalli might not have received commissions for the loans she originated that were closed up to February 4, 2003 since Citizens had failed to provide her with a printout up to that date.  However, in oral argument, the Plaintiffs appear to have accepted that Mrs. Scalli received commissions for all of her loans "closed" by her termination.  The issue seems to have transformed into whether Mrs. Scalli was paid for all loans "funded on the system".

While this argument is somewhat compelling, I grant summary judgment for Citizens on this count because the purpose of this cause of action is "to prevent an employer from being unjustly enriched by depriving the employee of money that he had fairly earned and legitimately expected." <u>King</u>, 424 Mass. at 7 <u>quoting</u> <u>Kravetz v. Merchants Distribs., Inc.</u>, 387 Mass. 457, 463 (1982). In other words, the purpose is to deny the employer "any readily definable, financial windfall resulting from the denial to [the employee] of compensation for past services." <u>Id.</u> <u>quoting</u> <u>Gram</u> <u>II</u>, 391 Mass. at 334-335. Here, the uncontested testimony of Ms. Hicks is that the loans that had yet to be closed in Mrs. Scalli's pipeline were reassigned to other loan officers to see those loans through closing. Consequently, the commission payments for the loans in Mrs. Scalli's pipeline were paid to other loan officers and Citizens did not realize a windfall by not paying commissions to Mrs. Scalli on the loans in her pipeline but not closed at the time of her termination. [Hicks Depo., pp. 186-88]

To the degree the Scallis' breach of good faith and fair dealing claim is premised on Citizen's failure to pay the various compensation amounts allegedly promised over and above the compensation included in their Loan Officer Incentive Plans, I must disagree. While the Scallis may have been frustrated by Mr. Conn's repeated dismissals of their claims for more compensation, I cannot on these facts find that Citizens' decision to terminate

the Scallis without paying them contested amounts over and above the compensation agreed upon in their Loan Officer Incentive Plan resulted in a "readily definable, financial windfall" for Citizens. Id. quoting Gram II, 391 Mass. at 334-335. Thus, I grant summary judgment on this count.

### ii) Count III - Tortious Misrepresentation[11]

In their Complaint, the Plaintiffs allege that Citizens "made false statements of material fact to Eleanor and Robert Scalli regarding career advancement with the intent that Eleanor and Robert Scalli thereon relied ... to their detriment." The alleged false statements of material fact developed during discovery and in the parties submissions[12] encompass Mr. Conn's

---

[11] The First Circuit has observed that a claim for "tortious misrepresentation" is "something of a misnomer (our canvass of Massachusetts case law does not reveal a single articulation of the elements of a particularized cause of action for tortious misrepresentation), but in all events, Massachusetts jurisprudence recognizes causes of action for both fraudulent misrepresentation and negligent misrepresentation." Massachusetts School of Law at Andover, Inc. v. American Bar Association, 142 F.3d 26, 41 (1st Cir. 1998). I construe Count III of the Amended Complaint as articulating a claim for fraudulent or intentional misrepresentation, also known as deceit in Massachusetts.

[12] In disposing of this Count, I do not limit the Plaintiffs' misrepresentation claim to the allegations contained in the Amended Complaint as urged by Citizens in footnote 6 of the Reply Brief. It is true that "Massachusetts considers deceit to be a variety of fraud", Cummings v. HPG Intern., Inc., 244 F.3d 16, 23 (1st Cir. 2001), and that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). It is not clear whether, once a Plaintiff satisfies the heightened pleading standard, he or she is limited to the four corners of the pleadings in opposing a motion for summary judgment.

promises regarding additional compensation prior to the execution of the contracts between the Scallis and Citizens and his promise to "fix" the discrepancies.  These promises include Mr. Scalli's $50,000.00 forgivable draw for 2001 and a $50,000.00 salary for 2002, Mrs. Scalli's $30,000.00 advance in 2001 for which she only received half, Mrs. Scalli's .70 basis points on loans closed over 3 million per month instead of the .65 basis points on loans closed over 1 million, and Mrs. Scalli's $1,000 bonus for every $1 million of loans closed per calendar year.[13]

"The elements of misrepresentation are well established:  in order to recover, plaintiff 'must allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his [or her] damage.'"  Damon v. Sun Co., Inc., 87 F.3d 1467, 1471-72 (1st Cir. 1996) quoting Barrett Assocs., Inc. v. Aronson, 346 Mass. 150, 152(1963) (quoting Kilroy v. Barron, 326 Mass. 464, 465

Arguably, the Court may consider the depositions, answers to interrogatories, admissions on file, and affidavits in addition to the pleadings.  Fed. R. Civ. P. 56(c).  In any event, consistent with my obligation to read the record in the light most favorable to the Plaintiffs, I consider the Claims of fraud found in the record regardless of whether each instance has been pled with particularity.

[13] As mentioned above, the Plaintiffs appear to concede that summary judgment is appropriate with respect to Mrs. Scalli's claim for the monetary value of the Aruba trip and additional support staff.

(1950)).  Citizens argues that summary judgment is appropriate
because the Plaintiffs have not provided any documentation
supporting the alleged promises by Mr. Conn and because they
cannot establish reasonable reliance.

Assuming, for purposes of this motion, that Mr. Conn did in
fact make earlier promises of additional compensation not
reflected in the contracts later executed by each of Mr. and Mrs.
Scalli, the contracts would supersede any earlier promises in the
ordinary course because the contracts were fully integrated
agreements.  See Hogan v. Riemer, 35 Mass.App.Ct. 360, 364
(1993); Fairfield 274-278 Clarendon Trust v. Dwek, 970 F.2d 990,
993 (1st Cir. 1992) citing New England Financial Resources, Inc.
v. Coulouras, 30 Mass.App.Ct. 140, 145 (1991)(parol evidence rule
precludes use of oral evidence to modify integrated agreement).
"'A fully integrated agreement is a statement which the parties
have adopted as a complete and exclusive expression of their
agreement.' Starr v. Fordham, 420 Mass. 178, 188 n. 8 (1995)
citing Restatement (Second) of Contracts § 210(1) (1981). Such an
agreement will typically contain an 'integration clause' stating
that it constitutes the parties' sole agreement and that there
are no oral or written representations outside of the agreement."
Cabot v. Cabot, 55 Mass.App.Ct. 756, 763 (2002) "[T]he question
of integration is one of fact reserved for the trial judge[.]"
Cambridgeport Sav. Bank v. Boersner, 413 Mass. 432, 436-437 n. 7
(1992).  Here, all of the executed contracts contain the

-27-

following integration clause: "This Plan supersedes all prior agreement, either verbal or written, with respect to the subject matter of the Plan."

The executed contracts also contain the following: "No adjustment to commission will occur without the written consensus of the Center Manager and President of CMC." Moreover, "[a]ny adjustment to commission will require the written approval of your Center Manager and the President of CMC." In signing the contract, the Scallis expressly "acknowledge[d] and agree[d] to be bound by the terms of this Loan Officer Incentive Plan during the term of [their] employment with [Citizens.]"

Of course, "[a]n integration clause in a contract does not insulate automatically a party from liability where he induced another person to enter into a contract by misrepresentation." The Plaintiffs seek to invoke this exception by contending that their contracts were not integrated despite the "integration clause" because their Loan Officer Incentive Plans failed to express the unprecedented "team" concept.[14]

The argument that their contracts were not integrated is rather equivocal because the Plaintiffs cannot decide whether the

---

[14] In _Starr_, for example, the Supreme Judicial Court found that the trial court judge did not commit clear error in finding that the partnership agreement between two attorneys was not fully integrated because it did not express their private agreement, negotiated before the signing of the partnership agreement, that they would divide equally between themselves their combined share of the firm's profits. _Starr v. Fordham_, 420 Mass. 178, 188 n. 8 (1995).

contracts failed to express the team concept agreed upon prior to the execution of the agreements "and/or" whether the contracts were immediately modified by Mr. Conn approximately one week after the commencement of their employment.  In any event, to the degree that the promises central to the "team concept", that is the $50,000 salary in exchange for Mr. Scalli focusing on marketing and putting his loans under his wife's names, were not made until one week after the contracts were executed, that would not "disintegrate" the commission agreements.  But even if the team concept had been agreed upon before the execution of the contracts, I find that the failure to express the so-called "team concept" in Mrs. Scalli's Loan Officer Incentive Plans certainly does not "disintegrate" her commission agreement.  As to Mr. Scalli, however, one could at least argue based on this version of the facts that while his Loan Officer Incentive Plan was an integrated agreement as to his commission-based employment as a loan officer, the promise of a non-commission-based salary pertained to an agreement outside the scope of the incentive plan.

Even though I find that the Loan Officer Incentive Plans were integrated agreements, "[t]he integrated documents barrier may be penetrated by evidence tending to show that the documents are not, in fact, complete, Ryder v. Williams, 29 Mass.App.Ct. 146, 149-150 (1990), or that the execution and delivery of the documents were induced by fraud.  Bates v. Southgate, 308 Mass.

170, 182 (1941)." <u>Hogan</u>, 35 Mass.App.Ct. at 364-65.  <u>See</u> <u>also</u>

<u>McEvoy Travel Bureau, Inc., v. Norton Co.</u>, 408 Mass. 704, 711 n.

5 (1990).  Here, the Scallis contend in their Affidavits that

they received several prior versions of the initial offer letter

and incentive plan from Citizens, which reflected the additional

promises made by Mr. Conn.  According to the Scallis, Mr. Conn

changed the final version, yet instructed each of them to sign

it, promising that he would fix any inconsistencies.[15]  I find

---

[15] Citizens moves to strike both the Affidavits containing these assertions because (1) they failed to provide the "first versions" of the offer letters referred to in paragraph 4 and thereby failed to comply with Rule 56(e), which requires that "sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith"; and because (2) they contradict the Scallis' deposition testimony.

According to Citizens, "[f]ailure to attach papers referred to in an affidavit renders the affidavit incompetent as evidence. The Plaintiffs argue that "[t]he fact that the Defendant claims it did not possess the 'first version' or the fact that the Plaintiffs do not possess copies, does not preclude this Court from considering that portion of their affidavits that states the final version was inconsistent with the previous versions."  I will consider the references to initial offer letters in the Scalli Affidavits as evidence of the existence of different versions of the offer letter, but not as to their terms because they have not been attached.  <u>See</u> <u>Albright v. F.D.I.C.</u>, 21 F.3d 419 (Table), 1994 WL 109047, *4 (1st Cir. 1994) <u>citing</u> 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice & Procedure § 2722 ("averments made in Rule 56 affidavit to unattached contracts and documents may be sufficient to establish a triable issue as to their existence, but not as to their <u>terms</u>.")

With respect to the second ground, it is well-established that "when an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." <u>Torres v. E.I. Dupont De Nemours & Co.</u>, 219 F.3d 13,

that these allegations alone are insufficient to penetrate the
integration barrier and I turn, therefore, to the question of
whether the Scallis reasonably relied on the earlier promises.

Citizens argues that any reliance by the Scallis is
unreasonable as a matter of law because they "failed to inquire
about the conflict between the[] oral promises and [their]
Contracts with anyone at the Company, aside from Mr. Conn, during
the entire two year period that [they] worked for [Citizens]."
The Scallis dispute this conclusion because "[t]he Massachusetts
courts have consistently held that failure to investigate the
veracity of statements does not, as a matter of law, bar recovery
for misrepresentation." Bond Leather Co. Inc. v. Q.T. Shoe Mfg.
Col., Inc., 764 F.2d 928, 937 (1st Cir. 1985). See also Damon,
87 F.3d at 1480. However, the Supreme Judicial Court recently
clarified its position on this issue in Kuwaiti Danish Computer
Co. v. Digital Equipment Corp., 438 Mass. 459, 467-69 (2003).

> [I]n Yorke v. Taylor, 332 Mass. 368, 374 (1955), this
> court adopted the rule of the Restatement of Torts §
> 540 (1938), which states: "The recipient in a business
> transaction of a fraudulent misrepresentation of fact
> is justified in relying on its truth, although he might
> have ascertained the falsity of the representation had
> he made an investigation." The court also noted,
> however, that "[t]he plaintiff here was not relying on
> a statement of opinion nor on a representation that was

20 (1st Cir. 2000)(internal quotations and citations omitted).
However, the Plaintiffs argue that their affidavits are entirely
consistent with their deposition testimony and that Citizens
quotes portions of the deposition in a manner that is clearly out
of context.  I consider the Affidavits because they are not
clearly inconsistent with their deposition testimony.

either preposterous or palpably false. <u>See</u> Restatement of Torts § 541." <u>Id.</u>  Restatement (Second) of Torts §§ 540 and 541 (1977) are similar to their 1938 Restatement counterparts.  Restatement (Second) of Torts § 540 states: "The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation."  Restatement (Second) of Torts § 541 states: "**The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him."  There is thus a distinction between a falsity that could only be uncovered by way of "investigation" and a falsity that was readily apparent or "obvious."**  Comment a to Restatement (Second) of Torts § 540, supra, states that, "**if a mere cursory glance would have disclosed the falsity of the representation, its falsity is regarded as obvious under the rule stated in § 541.**"

<u>Id.</u> at 467-68 (emphasis added).  Consequently, while "[r]eliance normally is a question for a jury[,] ... in some circumstances a plaintiff's reliance on oral statements in light of contrary written statements is unreasonable as a matter of law."  <u>Marram v. Kobrick Offshore Fund, Ltd.</u>, 442 Mass. 43, 59 (2004)(internal citations omitted).  The Supreme Judicial Court added that courts generally only make such a finding as a matter of law "after some record has been established on a motion for summary judgment or after a trial."  <u>Id.</u> at 59-60.  As examples, the Court cited to the following:

> <u>Kuwaiti Danish Computer</u>, 438 Mass. at 468 (summary judgment appropriate because it was unreasonable to rely on oral statements that conflicted with written quotation, where "[a]ll that was required of [the plaintiffs' representatives] was that they read the document to ascertain the obvious"); <u>Mahaney v. John Hancock Mut. Life Ins. Co.</u>, 6 Mass.App.Ct. 919, 920

(1978), quoting Yorke v. Taylor, 332 Mass. 368, 374
(1955) (after trial, court held as matter of law that
it was unreasonable to rely on oral statements that
were "preposterous or palpably false" in face of
contradictory written statements). See also Sands v.
Ridefilm Corp., 212 F.3d 657, 665 (1st Cir. 2000)
(summary judgment affirmed where "[i]t was unreasonable
for the plaintiff to rely on the alleged oral
representations because of the express written word");
Trifiro v. New York Life Ins. Co., 845 F.2d 30, 33 (1st
Cir. 1988) (summary judgment appropriate "[w]hen a
person acts in a way contrary to his own acknowledged
understanding of the facts, his acts must be deemed
unreasonable as a matter of law.... Confronted by such
conflict a reasonable person investigates matters
further; he receives assurances or clarification before
relying").

Id. at 60. Massachusetts case law also stands for the more
specific proposition that where "the contract was fully
negotiated and voluntarily signed, ... plaintiffs may not raise
as fraudulent any prior oral assertion inconsistent with a
contract provision that specifically addressed the particular
point at issue." Starr v. Fordham, 420 Mass. 178, 188 (1995)
citing Turner v. Johnson & Johnson, 809 F.2d 90, 97 (1st Cir.
1986).

In this case, I find it unreasonable as a matter of law for
the Scallis to purport to rely on additional promises made by Mr.
Conn during the negotiation phase, that is if they were made
before the execution of their contracts, given that the Scallis
were aware that the contracts they executed did not contain those
additional terms. I also find that it was unreasonable as a
matter of law for the Scallis to purport to rely for two years on
Mr. Conn's alleged post-execution promises to fix the

discrepancies and his promise of a salary for Mr. Scalli.  The additional promises were given by Mr. Conn without any acknowledgment by Human Resources, which is significant because the offer letters were signed by either Tara Tribelli, a Human Resources officer at Citizens, or Ms. Hicks and not Mr. Conn. The Scallis have also failed to provide any documentation supporting their bald assertions of additional promises. Furthermore, it was unreasonable for Mrs. Scalli to rely on Mr. Conn's alleged promise of compensation at .70 basis points, a $30,000 advance, and multiple support staff when the contract specifically stated that she would receive .65 basis points and a $15,000 advance and be assigned one full-time sales assistant.[16] As to Mr. Scalli, it was certainly unreasonable for him to rely on Mr. Conn's alleged promise of a $50,000 salary for 2002 when that alleged promise was never fulfilled in 2001 and was not included in the second contract he executed.  Consequently, I grant Citizens' motion for summary judgment on this count.

### iii) Count IV - Wage Act

The Massachusetts Wage Act allows employees to institute a civil action against a former employer for loss wages and benefits with the written authorization of the Attorney

---

[16] In any event, Mrs. Scalli testified that she always had two to three sales assistants working in her office, even though her contract only required one.

General.[17]   Before considering the compensation allegedly owed pursuant to this cause of action, I must address the applicability of the Wage Act because curiously Citizens argues that the Wage Act does not apply to the Plaintiffs.  I say curiously because Citizens argued that summary judgment should be granted with respect to the wrongful termination claim because relief under the Wage Act is already available.

In its written submissions, Citizens argues that the Wage Act does not apply because the Scallis were "highly paid executives" or "corporate executives".  I question whether this designation is accurate given that Mrs. Scallis was a Senior Loan Officer and Mr. Scalli was some a Loan Officer/marketing specialist.  In ordinary parlance, the term "executive" refers to those individuals within an organization that have significant administrative or managerial authority, such as Mr. Conn, a Citizens Vice President to whom the Scallis reported.   In any event, Citizens is incorrect that "high paid executives" are not covered by M.G.L. c. 149, §148.  The cases cited by Citizens do not convince me otherwise. "The plain and unambiguous statutory language demonstrates that executive and professional employees, no matter how highly compensated they may be, are protected by

---

[17] "Any employee claiming to be aggrieved by a violation of section 148 ... may ... institute and prosecute in his own name and on his own behalf ... a civil action for injunctive relief and any damages incurred, including treble damages for any loss of wages and other benefits."  M.G.L. c. 149, § 150.

the Wage Act from the unreasonable detention of their salary."

Kohli v. Res Engineering, Inc., 13 Mass.L.Rptr. 108, 2000 WL

1876605, *2 (Mass.Super. December 19, 2000).[18]

In oral argument, Citizens appeared to suggest that the

Scallis should be considered as some kind of outside salespeople

not covered by the Wage Act.  Presumably, Citizens was trying to

classify the Scallis as independent contractors under M.G.L. c.

149, §148B.[19]  See e.g. Commonwealth v. Savage, 31 Mass.App.Ct.

---

[18] "The Wage Act contains no [] exclusion [for "highly
compensated professional employees"].  Indeed, section 148B
creates a rebuttable presumption that any individual "performing
any service" for another is an employee for purposes of section
148.  Furthermore, section 148 explicitly refers to "employees
engaged in a bona fide executive, administrative or professional
capacity" in the context of permitting said employees to be paid
biweekly, semi-monthly or, at the employee's option, monthly
instead of requiring them to be paid within six days of the
termination of the pay period as is the case with most other
employees. G.L. c. 149, § 148. Section 148 goes on to provide
that "the words salaried employee shall mean any employee whose
remuneration is on a weekly, bi-weekly, semi-monthly, monthly or
annual basis, even though deductions or increases may be made in
a particular pay period." G.L. c. 149, § 148 (emphasis added).
Section 148[B] explicitly lists categories of employees to whom
"[t]his section shall not apply."  One of those categories is not
highly paid employees. Had the Legislature intended the Wage Act
to apply only to low-wage employees, it surely would have
explicitly so said.  Kohli v. Res Engineering, Inc., 13
Mass.L.Rptr. 108, 2000 WL 1876605, *2 (Mass.Super. December 19,
2000).

[19] For the purpose of this chapter and chapter 151, an
individual performing any service, except as authorized under
this chapter, shall be considered to be an employee under those
chapters unless:--
    (1) the individual is free from control and direction in
    connection with the performance of the service, both under
    his contract for the performance of service and in fact; and

    (2) the service is performed outside the usual course of the

-36-

714 (1991) where the Appeals Court of Massachusetts found that a
real estate broker was not an "employee" of the firm with which
she was associated within the meaning of the Wage Act.  The
Supreme Judicial Court recently cited Savage and summarized its
holding as "weekly wage law did not apply to real estate broker
whose commissions were episodic, and where broker functioned, and
filed taxes, as independent contractor[.]"  Wiedmann v. The
Bradford Group, Inc. 444 Mass. 698, 703 (2005).  The Wiedmann
Court did not question the determination in Savage other than
correcting the inference drawn from the title of the weekly wage
law that the law only applied to commissions that were paid on a
weekly basis.  Id. at 703-704.  With respect to evaluating an
individual's status under the Wage Act,

> M.G.L. c. 149 §148B provides a standard for determining
> whether an individual performing services shall be
> deemed an employee [covered by M.G.L. c. 149, §148] or
> an independent contractor. The employer bears the
> burden of proof and, because the conditions are
> conjunctive, its failure to demonstrate any one of the
> criteria set forth in subsections (1 ), (2 ), or (3 ),
> suffices to establish that the services in question
> constitute "employment" within the meaning of the
> statute. Silva v. Director of the Div. of Employment
> Sec., 398 Mass. 609, 611 (1986) (referring to the
> identical language found in M.G.L. c. 151A § 2).  A

> business of the employer; and,

> (3) the individual is customarily engaged in an
> independently established trade, occupation, profession or
> business of the same nature as that involved in the service
> performed.

M.G.L. c. 149, §148B(a).

-37-

rebuttable presumption is established that any person
performing services for another is an employee unless
the employer meets the three prong test. <u>Athol Daily
News v. Bd. Of Review of Employment</u>, 439 Mass. 171, 175
(2003).

<u>Rainbow Development, LLC v. Com., Dept. of Industrial Accidents</u>,

2005 WL 3543770, *2 (Mass. Super. November 17, 2005).  Given that

Citizens did not brief this argument, nor even argue what facts

would support the conclusion that the Scallis were independent

contractors, assuming that is what counsel meant at oral

argument, I am left with sifting through the record myself.  I

find that while Mr. and Mrs. Scalli worked for Citizens from

their home, the record before me read in the light most favorable

to them suggests they ought to be considered employees for the

purposes of M.G.L. 149, §148; their employment contracts refer to

them as "employees" and Mr. Conn clearly exerted at least some

"control and direction in connection with the performance of the

service" provided by the Scallis.

    Having said that, I note that the Wage Act only ensures "the

payment of ordinary wages and wage equivalents, like specifically

accrued vacation pay and sick leave" that "constitute a

significant part of weekly income" as opposed to "compensation

'triggered by contingencies'," such as a trip to Aruba.  <u>Cumpata

v. Blue Cross Blue Shield of Massachusetts</u>, 113 F.Supp.2d 164,

167 (D. Mass. 2000).  To that list, "commissions" must be added

because M.G.L. c. 149, §148 specifically applies "to the payment

of commissions[.]"  However, the Act only applies to commissions
"that are definitely determined and have become due and payable."
Weidmann, 444 Mass. at 704; M.G.L. c. 149, §148.  Thus, I reject
any suggestion that Mrs. Scalli is owed, pursuant to the Wage
Act, an amount equivalent to the commissions she would have
received for the loans in her pipeline when she was terminated
had she in fact seen them through their closing.  Such potential
commissions cannot be considered "definitely determined" and "due
and payable" because the uncontested testimony is that Citizens'
loan officers only receive commission on loans when they are
closed.  While the Plaintiff's contracts use the language "funded
on the system", the Plaintiffs have not provided any reason to
find that commissions are "definitely determined" and "due and
payable" to loan officers before the loans close.  This is a
different question than whether the Scallis were "on the brink
of" receiving commissions for the loans in Mrs. Scalli's pipeline
that had yet to close.

Turning to the other substantive claims, the Plaintiffs
charge that they have not been paid pursuant to the material
changes and oral modifications implemented through the team
concept authorized by Mr. Conn since the inception of their
employment.

The Plaintiffs argue "that prior or contemporaneous
agreements or negotiations" should be considered as varying the

-39-

written agreement despite the parole evidence rule.  I disagree.
All of the promises allegedly made by Mr. Conn to Mrs. Scalli
during the compensation negotiations were superceded by the
written integrated agreements encompassing her Loan Officer
Incentive Plan.  To find otherwise would confirm the Plaintiffs'
"continuing erroneous belief that the same evidence of a
contemporaneous agreement that [ought to be] excluded under the
parol evidence rule could prove [their] theory of subsequent oral
modification."  Cambridgeport Savings Bank v. Boersner, 413 Mass.
432, 438 (1992).  Thus, I find that Mrs. Scalli has no claim
against Citizens under the Wage Act.  If anything, she appears to
have received more than her wages due under her contract since
about 10 to 20% of the commissions she received were for loans
actually originated by her husband.

   The more complex question is whether the Plaintiffs have
provided enough evidence such that a reasonable jury could find
that Mr. Conn altered Mr. Scalli's compensation on behalf of
Citizens by agreeing to an oral modification of his incentive
plan or a separate non-commission-based compensation agreement
for his marketing efforts.  "It is a settled principle of law
that '[t]he mode of performance required by a written contract
may be varied by a subsequent oral agreement based upon a valid
consideration.'"  Cambridgeport Sav. Bank v. Boersner, 413 Mass.
432, 439 (1992) quoting Siegel v. Knott, 316 Mass. 526, 528

(1944).  The Plaintiffs contend that "[e]ven where a contract has been solemnized by a writing, an oral modification of that written contract may be proved by a preponderance of the evidence." Baptista v. Abbey Healthcare Group, Inc., No. 95-cv-10125, 1996 WL 33340740, * 5 (D. Mass. April 10, 1996) quoting Weiner v. Fleishman, 54 Cal. 3d 476, 488 (1991).  See also Cambridgeport Sav. Bank, 413 Mass. at 439 n. 10 ("The evidence of a subsequent oral modification must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties.") Thus, I consider whether the Plaintiffs have made a "factual showing, by means of competent and specific evidence, sufficient to establish" a subsequent oral modification or separate agreement.  Johnson, 409 F.3d at 17.

On the one hand, Mr. Scalli claims that Mr. Conn promised the annual $50,000 forgivable draw or salary a week after he started working in return for Mr. Scalli agreeing to focus on marketing and agreeing to put the loans he originated under his wife's name/production number.  See R. Scalli (vol I), pp. 63, 66-67, 79, 82; Plaintiff's Facts, ¶ 13.  Yet, this appears to contradict with Mr. Scalli's earlier testimony that Mr. Conn first made the salary promise during the initial negotiations.  See R. Scalli (vol I), pp. 38-41, 52-55, 61; Defendant's Facts, ¶

3.  The latter scenario is corroborated by Mr. Scalli's testimony that when he received the offer letter, which did not contain any reference to his salary, Mr. Conn told him that confirmation of his $50,000 salary would be in the employment package.  See R. Scalli (vol I), p. 59.  Mr. Scalli testified that he did in fact receive a document in his employment package that addressed the $50,000 salary, but that document has not been produced. Citizens, through Ms. Hicks' Affidavit, attempts to explain Mr. Scalli's confusion about seeing $50,000 listed as his "benefit based salary" on the benefit enrollment worksheet, which he would have received in his initial employment package and each year thereafter.

Recognizing the limit on credibility determinations at the summary judgment stage, I nonetheless find that the Plaintiffs have not provided sufficient evidence such that a reasonable jury could find that Mr. Conn and Mr. Scalli made an enforceable prior or subsequent oral modification or separate agreement that Mr. Scalli would receive a salary in exchange for Mr. Scalli agreeing to focus on marketing and agreeing to put the loans he originated under his wife's name/production number.   "Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the onus is on the nonmoving party to present facts that show a genuine issue for trial.  A party opposing a properly supported motion for summary judgment may not

rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. [The] Plaintiff[s] must offer significant probative evidence tending to support the complaint." <u>Feliciano v. State of Rhode Island</u>, 160 F.3d 780, 784 (1st Cir. 1998)(internal citations, quotations, and original alterations omitted). Here, the Plaintiffs have failed to do so with respect to the alleged $50,000 salary promise. In fact, a review of the record reveals nothing to support the Plaintiffs' bald assertion of a $50,000 salary, other than the benefits worksheet, which is ambiguous at best.

As to Mr. Scalli's claim that he is owed, pursuant to the Wage Act, an amount equal to the commission he should have received for the loans he originated that were attributed to his wife, I find that he has not provided any evidence of damage. It appears from the evidence before me that the Scallis treated and continue to treat their incomes as a joint income or family income. No adverse consequences have been demonstrated to flow from this intradomestic transfer. Consequently, I grant summary judgment to Citizens on this count.

### d. Count V - Interference with Subsequent Employment

The Plaintiffs allege in Count V that Citizens "improperly interfered with Eleanor and Robert Scalli's advantageous and/or contractual relations with their new employer."

To prevail on their intentional interference claim, the Plaintiffs must make a "factual showing, by means of competent and specific evidence, sufficient to establish the essential elements of [their] claim." <u>Johnson</u>, 409 F.3d at 17.  This means the Plaintiffs must provide enough evidence to "demonstrate (1) that [they] had a business relationship, (2) that the defendant knew of this relationship, (3) that the defendant intentionally and maliciously interfered with the relationship, and (4) that the defendant's actions harmed [them]." <u>Zimmerman v. Direct Federal Credit Union</u>, 262 F.3d 70, 76 (1st Cir. 2001) citing <u>Comey v. Hill</u>, 387 Mass. 11, 19 (1982).  More recently the Supreme Judicial Court phrased the third element as requiring the Plaintiff to show that "the defendant's interference, in addition to being intentional, was improper in motive or means." <u>Harrison v. NetCentric Corp.</u>, 433 Mass. 465, 476 (2001).  "There is no practical difference, however, between 'actual malice' and improper motives and means for purposes of this tort." <u>Id.</u> at 479, n. 16.

Both Mrs. Scalli and Mr. Scalli found employment as loan originators shortly after the termination of their employment from Citizens; Mrs. Scalli took a job with GMAC and Mr. Scalli with Hancock Realty.  While Citizens admits that one of its representatives contacted GMAC about Mr. Scalli during his suspension knowing that Mrs. Scalli now worked there, the

-44-

Plaintiffs do not appear to rely on this communication as a basis
of liability -- nor could they -- because there is no evidence
that Citizens intentionally and maliciously interfered with Mrs.
Scalli's relationship with GMAC or that Citizens' telephone
inquiries harmed Mrs. Scalli.  Rather, the Plaintiffs appear to
rest their intentional interference claim on the allegation that
Citizens interfered with the relationships with their new
employers by interfering with their "business relationships with
brokers and realtors by spreading negative information regarding
the Scalli's [sic] termination."

     Even if I were to draw a link between the alleged
interference with their business relationships with brokers and
realtors and interference with their relationship with their new
employers, the Plaintiffs evidence is inadequate.  There is the
fact that Mrs. Scalli's earnings decreased after leaving
Citizens, the testimony of Mr. and Mrs. Scalli that their phones
stopped ringing and that they heard rumors they claim Citizens
was spreading,[20] and the Affidavits of Philip Consolo, Stephen

---

     [20] Mr. Scalli testified that Ed Martinez told him that his
girlfriend, Peggy Pratt, told him that her best friend, Diana
Franco, a Citizens employee, told her that the Scallis were being
indicted for bank fraud.  He also testified that Steve Roussel
told him that he heard from other realtors that the Scallis had
been indicted for bank fraud.  Mr. Scalli also testified that Mr.
Pico told him that it was Victoria Noel who told the realtors
about the alleged indictment, although in Mr. Pico's Affidavit
Mr. Pico only states that Ms. Noel told *him* the rumor.  Mr.
Scalli also testified that he was asked about the rumors during
his interview at Hancock Mortgage where he was hired.

Amaral and Victoria Laws ("the Brokers"), three brokers/owners of
Remax Offices in Massachusetts who claim to have heard rumors
that Mrs. Scalli was being indicted on bank fraud.  Two of these
individuals refused to do business with Mrs. Scalli as a result.
There is also the evidence discussed in the next subsection with
respect to the Plaintiffs' defamation claim, namely the Affidavit
of Javier Pico suggesting that a Citizens employee told Mr. Pico,
a real estate agent, that the Scallis were being indicted on bank
fraud.  The Plaintiffs argue that all of this evidence "raise[s]
inferences that [Citizens] loan officers, including but not
limited to Victoria Noel, as part of the scope of their
employment, were contacting brokers and attorneys in an effort to
capture business for themselves and [Citizens] by publishing
knowingly false statements about Mr. Scalli and Mrs. Scalli."
They also argue that "[i]t defied credulity to suggest that the
Court may not draw proper inferences that CMC employees were
engaged in a concerted effort to capture the loan origination
business from brokers and attorneys loyal to the Plaintiffs for
many years through improper means while acting within the scope
of their employment as loan officers at CMC."  The difficulty is
that most of the evidence is inadmissible and none of it
establishes the necessary connection to Citizens.

I grant Citizens' motion to strike the Affidavits of the
Brokers pursuant to Fed. R. Civ. P. 37(c)(1) because the

Plaintiffs failed to disclose these witnesses, either initially or in supplemental responses, as "individuals likely to have discoverable information that the disclosing party may use to support its claims or defenses" as required by Fed. R. Civ. P. 26(a)(1)(A) and in response to the Defendant's Interrogatory Request No. 4.  I find that the Plaintiffs' failure to disclose the names is not harmless and was designed to, and would, in fact, secure them a tactical advantage.  To be sure, as the Plaintiffs point out, Citizens chose not to depose any of the other brokers actually identified by Mr. Scalli and Mrs. Scalli in their depositions.  But the Plaintiffs' duty to supplement specific discovery requests are not satisfied by parallel disclosures involving other witnesses.  Moreover, paragraphs 3 and 4 of the Affidavits of Victoria Laws and Philip Consolo, respectively, are "simply too amorphous to satisfy the requirement of Rule 56(e)".  Perez v. Volvo Car Corp., 247 F.3d 303, 316 (1st Cir. 2001)("Statements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous to satisfy the requirements of Rule 56(e), even when proffered in affidavit form by one who claims to have been a participant.") Even if I were to consider the otherwise admissible portions of the Affidavits of the Brokers, the three Brokers do not state that they heard the rumors from Citizens employees.

As a result, the only affirmative evidence substantiating this claim is the fact that Mrs. Scalli's earnings decreased after leaving Citizens, the Scallis' own testimony that realtors and brokers with whom they had cultivated a business relationship stopped going to them for loans, and Javier Pico's Affidavit stating that a Citizens employee told him in February 2003 that the Scallis were being indicted for bank fraud.  The rest of Mr. Scalli's testimony about what realtors told him is hearsay resting at various levels of the totem pole.

The Plaintiffs cannot rely on the conclusory allegation and unsupported speculation that Ms. Noel acted either with malice or on behalf of Citizens when she relayed the rumors to Mr. Pico. Ms. Noel did not testify as to her motives and Mr. Pico did not relate the circumstances of the conversation in a manner that would permit a jury to infer malice or authority on Ms. Noel's part.  The fact that the Scallis phone stopped ringing and that Mrs. Scalli earned less at GMAC is unfortunate, but cannot be blamed on Citizens on this evidence. Thus, I find that the admissible evidence is insufficient for a reasonable jury to infer that Citizens employee(s) were the source of the rumor, that Citizens employee(s) intentionally and maliciously spread that rumor in order to interfere with the Plaintiffs' subsequent employment relationships, and that they did so in the scope of their employment.  I grant summary judgment for Citizens on this

count.

### e.  Count VI - Defamation

The Plaintiffs allege in Count VI that "through its agents and employees, Citizens Financial Group, Inc. published false statements that exposed the Plaintiffs to ridicule in their community."

To prevail on their defamation claim, the Plaintiffs must make a "factual showing, by means of competent and specific evidence, sufficient to establish the essential elements of [their] claim." Johnson, 409 F.3d at 17.  This means the Plaintiffs must provide enough evidence "to establish that [Citizens] published a false statement about [them] to a third party that either caused [them] economic loss or was of the type that is actionable without proof of economic loss.  A false statement that would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community, would be considered defamatory, and the imputation of a crime is defamatory per se, requiring no proof of special damages.  The element of publication is satisfied where the defamatory communication is transmitted to even one person other than the plaintiff." Phelan v. May Department Stores Co., 443 Mass. 52, 55-56 (2004)(internal quotations and citations omitted).  In addition, to hold Citizens liable for the alleged defamation by one of its former employees,

the Plaintiffs must make a factual showing sufficient to establish that Citizens is liable for the allegedly tortious conduct of Ms. Noel.

The only allegedly defamatory statements that are potentially attributable to Citizens stem from the conversation that took place between Ms. Noel and Mr. Pico.[21]  With respect to this conversation, Citizens challenges the Plaintiffs' proof on the publication and vicarious liability elements.

The only admissible evidence presented on the publication issue is Mr. Pico's Affidavit stating that Ms. Noel, while employed at Citizens, told him in February 2003 that the Scallis had been "indicted on bank fraud".  Citizens argues that this is insufficient publication as a matter of law because Mr. Pico was an agent of the Scallis at the time and thus not a proper "third party".  However, in his Affidavit, Mr. Pico stated that he did not represent Mrs. Scalli in 2003 and that he represented Mr. Scalli in real estate transactions and legal matters in 2003 after the alleged defamation took place.  The Scallis' testimony does not suggest the representation began before February 2003.

---

[21] There is no evidence to support the claim that Ms. Noel defamed the Scallis in a conversation with Ms. Felice.  Mr. Green's Affidavit cannot make up for this deficiency.  In this connection, I will grant Citizens' motion to strike the Affidavits of the Brokers pursuant to Fed. R. Civ. P. 37(c)(1) for the reasons discussed above.  But, even if I were to consider these unanticipated Affidavits, none of the three Brokers state that they heard the rumors from Citizens employees, let alone Citizens employees acting within the scope of their employment.

Thus, the evidence in the record does not establish that Mr. Pico was an agent of the Scallis in February 2003 when he had the questionable conversation with Ms. Noel.

In Massachusetts, "[a]n employer may be held vicariously liable for the intentional tort of an agent if the tortious act or acts were committed within the scope of employment." Worcester Ins. Co. v. Fells Acres Day School, Inc., 408 Mass. 393, 404 (1990). "Conduct of an agent is within the scope of employment if it is of the kind he is employed to perform; if it occurs substantially within the authorized time and space limits; and if it is motivated, at least in part, by a purpose to serve the employer." Burroughs v. Commonwealth, 423 Mass. 874, 877 (1996)(internal quotations and citations omitted). In Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996), the First Circuit considered the third requirement of New Hampshire's "scope of employment" test, which like Massachusetts asks whether the conduct was "actuated at least in part by a purpose to serve an objective of the employer." The Court determined that "[t]his inquiry focuses on the subjective intent of the employee and his notion of how to serve his employer's interests need not be reasonable or reflective of good judgment." Id. at 1212.

The burden is on the Plaintiffs to make a factual showing sufficient to permit a reasonable jury to find that Ms. Noel was acting on behalf of or upon the direction of her employer. Kelly

v. Middlesex Corp., 35 Mass.App.Ct. 30, 32 (1993); Johnson, 409
F.3d at 17. In this case, all that the record establishes is
that Ms. Noel, the alleged defamer, was a loan officer at
Citizens at the time of her conversation with Mr. Pico.
Citizens' own internal documents report that "loan origination
involves external relationships between borrowers, the real
estate community and loan officers and internal relationships
between loan officers and processors and the underwriting and
loan closing departments." From this statement, a reasonable
jury might infer that conversing with real estate lawyers is
within the kind of conduct Ms. Noel was employed to perform.
However, as to the second requirement, the Plaintiffs simply
state that Ms. Noel's "phone calls to attorneys and brokers to
develop business occurs within the authorized time and space
limits of her employment." Similarly, with respect to the third
requirement, the Plaintiffs simply argue that it may be "inferred
that obtaining new business from attorneys and/or brokers by
spreading falsehoods about her competition would benefit Ms.
Noel", but "an inference can [also] be drawn that her actions
also served [Citizens] by salvaging sources of business that
would have essentially transferred to [Citizens] competition."

Citizens contests the suggested inference that Ms. Noel
acted, at least in part, to serve Citizens because "it would
clearly not be in the Company's interests to have its former

number one loan originator (who originated millions of dollars worth of loans for the Company) indicted for bank fraud." I find that there is a more fundamental problem with the Plaintiffs ability to meet their burden generally on this count. That is, the record does not indicate when the conversation took place (after work, on the weekend, during a business conversation, or during a social encounter?), who brought up the subject of the Scallis (did the topic come up as an aside? did Mr. Pico call Ms. Noel to ask about the Scallis' situation? or did Ms. Noel specifically call Mr. Pico to pass on the false information?), what the relationship between Ms. Noel and Mr. Pico was (was Ms. Noel even aware that Mr. Pico had a relationship with the Scallis?), what Ms. Noel's relationship with the Scallis was, what her familiarity with the situation was, and finally what else was said during the conversation. The only reference in the record providing any more detail to which I have been directed, albeit for a different reason, comes from a hearsay-ridden section of Mrs. Scalli's testimony where she indicated that "[Mr. Pico] told me specifically that [Ms. Noel] told, that [Mr. Pico] asked [Ms. Noel] what was the word at Citizens, like what's being said, and [Ms. Noel] said that I was fired for bank fraud." [E. Scalli vol. II, p. 126.] Thus, I find that there is no "competent and specific evidence, sufficient to establish" that Ms. Noel was acting on behalf of or upon the direction of her employer when she communicated with Mr. Pico. Johnson, 409 F.3d

at 17; <u>Kelly</u>, 35 Mass.App.Ct. at 32.  Given the lack of evidence,
a jury could not reasonably find that Citizens is responsible for
Ms. Noel's conversation with Mr. Pico.

This case is unlike <u>Aversa</u>, where the District Court could
"justifiably" conclude that the defamer "intended, at least in
part and although misguidedly, to serve an objective of his
employer" because the District Court had before it the defamer's
own deposition.  <u>Aversa</u>, 99 F.3d at 1212-13.  Here we have
absolutely no evidence as to what Ms. Noel's intention was when
she spoke to Mr. Pico.  Consequently, even though "summary
judgment is often inappropriate" "where motive, intent, or other
state of mind questions are at issue", <u>Evans v. Certified</u>
<u>Engineering & Testing Co., Inc.</u>, 834 F.Supp. 488, 499 (D. Mass.
1993) <u>citing</u> <u>Flesner v. Technical Communications</u>, 410 Mass. 805,
809 (1991), I grant summary judgment to Citizens on this count.

### III.   CONCLUSION

For the reasons set forth more fully above, I:

GRANT the Defendant's motion for summary judgment as to all
counts;

DENY the Defendant's motion to strike the affidavits of
Robert Scalli and Eleanor Scalli;

DENY the Defendant's motion to strike paragraph four of the
affidavit of Jean Barbosa;

GRANT the Defendant's motion to strike the affidavits of

-54-

Philip Consolo, Stephen Amaral and Victoria Laws;

    DENY the motion to strike paragraph nine of the affidavit of Javier Pico; and

    GRANT the motion to strike the affidavit of Erin Green.

                    /s/ Douglas P. Woodlock

                    _____

                    DOUGLAS P. WOODLOCK
                    UNITED STATES DISTRICT JUDGE